**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL WILLIAMS, LUCY PARSONS LABS, and DANIEL ORTIZ, on behalf of himself and a class of similarly situated people. <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, SUPERINTENDENT DAVID O'NEAL BROWN, CHICAGO POLICE OFFICERS NICHOLAS EVANGELIDES (#20526), DALE POTTER JR. (#21649), MICHAEL KOCIOLEK (#20675), SCOTT REIFF (#20847), BRIAN RONEY (#2241), JUAN PEREZ (#902), MARC LAPADULA (#21158), SCOTT BROWNLEY (#20568), JOSEPH MERKEL (#21015), CAROL MARESSO (#20183), NESTOR DE JESUS (#20461), SALVATORE ALOISIO (#20082), ROBERT COSTELLO (#231), MICHAEL DOUGHERTY (#363), DAVID MAGANA (#7098), EDUARDO ALMANZA (#15464), HARSIMRAN POWAR (#17135), MICHAEL MATIAS (#18985), ARTHUR HARB (#311), and MARK FLECHSIG (#1733). <br><br> Defendants, | Case No. 22-cv-3773 <br> Class Action <br> JURY TRIAL DEMANDED |

## CIVIL RIGHTS CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES

Individual Plaintiffs MICHAEL WILLIAMS and DANIEL ORTIZ, and organizational

Plaintiff LUCY PARSONS LABS, file this complaint for damages, declaratory, and injunctive

relief on behalf of themselves and their members, and a class of similarly situated individuals in

the City of Chicago who have been or will be stopped by Chicago police officers responding to a ShotSpotter alert, against the CITY OF CHICAGO and CHICAGO POLICE SUPERINTENDENT DAVID BROWN in his official capacity, as well as CHICAGO POLICE DEPARTMENT OFFICERS NICHOLAS EVANGELIDES (#20526), DALE POTTER JR. (#21649), MICHAEL KOCIOLEK (#20675), SCOTT REIFF (#20847), BRIAN RONEY (#2241), JUAN PEREZ (#902), MARC LAPADULA (#21158), SCOTT BROWNLEY (#20568), JOSEPH MERKEL (#21015), CAROL MARESSO (#20183), NESTOR DE JESUS (#20461), SALVATORE ALOISIO (#20082), ROBERT COSTELLO (#231), MICHAEL DOUGHERTY (#363), DAVID MAGANA (#7098), EDUARDO ALMANZA (#15464), HARSIMRAN POWAR (#17135), MICHAEL MATIAS (#18985), ARTHUR HARB (#311), and MARK FLECHSIG (#1733), in their individual capacities, and allege as follows:

### INTRODUCTION

1. The City of Chicago spends more than $9 million dollars every year on a contract with ShotSpotter, a for-profit company, to use its unreliable and ineffective gunshot detection system. The City of Chicago and Superintendent David Brown (hereinafter, "Municipal Defendants") have purposefully blanketed the South and West sides of the City of Chicago with ShotSpotter sensors, to the detriment of the primarily Black and Latinx people who live under ShotSpotter's shadow.

2. The Municipal Defendant's use of ShotSpotter is fueling unconstitutional policing practices in a City that has a long history of discriminatory police conduct.

3. Every day in Chicago, Chicago Police Department (CPD) officers are deployed around 100 times to chase down alerts of supposed gunfire generated by ShotSpotter. More than 90% of the time they find no indication of any gun-related incident, according to the City's own

2

data. The result is more than 31,600 unfounded CPD deployments every year because of ShotSpotter—more than 87 on an average day.

4.     CPD relies so heavily on ShotSpotter because the City has repeatedly contracted for its use. Remarkably, however, ShotSpotter has never been tested to determine how well it can distinguish gunshots from other loud noises like fireworks. The City's decision to use this unreliable technology to direct massive numbers of unwarranted and highly volatile police deployments produces grave and systematic violations of Chicagoans' constitutional and statutory rights.

5.     CPD has intentionally misused ShotSpotter alerts to make scores of illegal stops and arrests. CPD officers, chasing down unfounded ShotSpotter alerts, have stopped and detained thousands of innocent Chicagoans who happened to be near the location of an alert. CPD officers have used ShotSpotter's presence on the South and West sides of the City as justification for aggressive police tactics—treating residents as suspects, detaining them, and frisking them just because there has supposedly been a history of ShotSpotter alerts in the area. CPD officers have even used ShotSpotter alerts as a basis to falsely accuse people of crimes.

6.     Individual Plaintiff Michael Williams spent 11 months in the Cook County Jail because CPD officers intentionally and improperly relied on a ShotSpotter alert to falsely accuse him of murder.

7.     Mr. Williams is a 65-year-old, community-minded man who would frequently provide assistance to people in his South Side neighborhood. On the evening of May 31, 2020, a young man flagged him down for a ride home. He agreed. A few blocks away, Mr. Williams' passenger was shot through the open window of his car. Mr. Williams raced his injured passenger to the hospital for medical attention, spoke with hospital staff, and gave his name and

3

information to hospital security. When CPD officers came to his home weeks later to ask him about the shooting, he went to the police station voluntarily, intent on helping them investigate who shot his passenger. He would not return home for 11 months.

8.      Instead of investigating the shooting, CPD officers put Mr. Williams under arrest. Defendants determined, based on a faulty ShotSpotter report, that the fatal shot was fired from inside his car. The arrest was baseless. The officers ignored the fact that ShotSpotter itself warns that its alerts cannot provide the exact location of a shot; they ignored the fact that ShotSpotter had provided a wildly inaccurate street address for the shooting; they ignored the fact that ShotSpotter does not guarantee its system to work when shots are fired inside vehicles; they ignored the fact that ShotSpotter had initially classified the noise as fireworks, not a gunshot. They disregarded forensic evidence showing that the fatal gunshot did not come from a close range. They failed to investigate whether the shot came from a dark sedan, in the next lane, that crept forward slowly alongside Mr. Williams' RAV4 and then peeled away through a red light. In short, Defendant Officers put blind faith in ShotSpotter evidence they knew or should have known was unreliable in order to falsely arrest and prosecute Mr. Williams for murder.

9.      As a result of his false arrest, Mr. Williams, a medically vulnerable elderly person, spent 11 months in terrible conditions at the Cook County Jail. During that time, he suffered terribly, including twice contracting COVID-19. His defense attorneys challenged the reliability of ShotSpotter evidence in court, but when it came time for the prosecution to vouch for ShotSpotter, the State's Attorney's Office balked. Prosecutors abandoned the ShotSpotter evidence and dismissed the case against Mr. Williams, admitting to the judge that the office lacked any basis to continue prosecuting him. Mr. Williams is now, finally, a free man.

10. Defendants do not just use ShotSpotter to lay false charges. CPD officers engage in thousands of unwarranted confrontations with residents on the streets of Chicago because they are chasing down bogus ShotSpotter alerts, knowing the technology to be ineffective.

11. On April 19, 2021, Plaintiff Daniel Ortiz, a 36-year-old Chicagoan of Puerto Rican descent, was stopped, frisked, handcuffed, interrogated, and ultimately arrested on false drug charges by CPD Defendant Officers Powar and Matias, who were responding to a ShotSpotter alert in the Schorsch Village neighborhood on the Northwest side. The primary caretaker for his young family, Mr. Ortiz was outside a laundromat that afternoon finishing his family's laundry. Defendant Officers Powar and Matias pulled into the parking lot in their unmarked police SUV, moved aggressively toward Mr. Ortiz, and immediately detained him for questioning about supposed gunfire. In fact, there had been no gunshot, and police found nothing to corroborate the ShotSpotter alert.

12. Defendants Powar and Matias, however, escalated their illegal stop of Mr. Ortiz. They illegally searched his car and discovered a legal amount of marijuana and a legal bottle of prescription drugs prescribed to Mr. Ortiz's mother. Defendants Powar and Ortiz, with the approval of Defendants Lieutenant Harb and Sergeant Flechsig, nevertheless arrested Mr. Ortiz on false drug charges, inflating the amount of marijuana and omitting the fact that the pills were properly prescribed. Defendant Officers Powar and Matias also impounded Mr. Ortiz's vehicle. Mr. Ortiz was jailed overnight. The charges were dismissed in court the next day and his vehicle was eventually returned after Mr. Ortiz prevailed in a hearing challenging its seizure.

13. CPD's illegal stop of Mr. Ortiz is not unique; it is emblematic of a systematic pattern of illegal ShotSpotter stops in the City of Chicago.

14.     When CPD officers receive a ShotSpotter alert, they race to the location of the alert—often with multiple squad cars—because the system is telling them that a person just fired a gun there. CPD officers treat anyone in the area as a likely shooter, despite knowing that the overwhelming majority of ShotSpotter alerts turn up no evidence of gunfire.

15.     According to the Chicago Office of the Inspector General ("OIG"), over a period of 18 months, CPD officers detained more than 2,400 Chicago residents after chasing down ShotSpotter alerts—or even just because of a supposed *history* of past ShotSpotter alerts in an area. These ShotSpotter-prompted encounters are hostile, terrifying, and unwarranted. Over a six month period in 2019, police reported using physical force against scores of unarmed Chicagoans during ShotSpotter-prompted incidents.

16.     The City's reliance on ShotSpotter results in a misallocation of municipal resources to the detriment of the people who live under ShotSpotter's footprint. The City pays $9 million every year to ShotSpotter and spends untold more on the thousands of hours CPD officers spend chasing down unfounded ShotSpotter alerts. ShotSpotter inflates gunfire statistics, thereby providing false justification for oppressive police tactics in neighborhoods under its surveillance—all of which are already overpoliced.

17.     Meanwhile, the enormous volume of ShotSpotter-prompted deployments detracts from the capacity to address actual 9-1-1 calls, slowing response times while providing no public safety benefit. In police districts with active ShotSpotter sensors, more than one in twelve of CPD's "Priority 1" calls for service are for unfounded ShotSpotter alerts, displacing actual calls from residents seeking police assistance.

18.     The harms that flow from CPD's use of ShotSpotter are meted out along stark racial lines. The City has blanketed 12 out of 22 Chicago police districts with active ShotSpotter

sensors, and in the process, has covered nearly the entire South and West sides. These 12 police districts are exactly the ones with the highest proportion of Black and Latinx residents and the lowest proportion of White residents: 80% of Black Chicagoans live within ShotSpotter's active footprint; 65% of Latinx Chicagoans do too. Only 30% of White Chicagoans live in a ShotSpotter area.

19.     This stark pattern of racial deployment—and the harms that it generates—discriminates against Black and Brown Chicagoans in violation of the Illinois Civil Rights Act and the U.S. Constitution's guarantee of equal protection. Moreover, this blanket surveillance of Black and Brown communities cannot be explained or justified by historical rates of gun crime.

20.     Organizational Plaintiff Lucy Parsons Labs is a Chicago-based non-profit membership organization that is focused on investigating, exposing, and educating the public about police surveillance and the harms it causes, particularly for people of color and other marginalized communities. It has spent years investigating surveillance technologies and worked to end the City of Chicago's use of ShotSpotter and to protect its members and constituencies from ShotSpotter's harmful consequences.

21.     All Plaintiffs bring this suit to obtain declaratory and injunctive relief to end the unconstitutional and discriminatory use of ShotSpotter by the City of Chicago and to enjoin the City from relying on ShotSpotter alerts to justify investigatory stops. Mr. Williams individually seeks damages for the 11 months that were robbed from him and the physical, medical, and emotional harms that he suffered while jailed on false charges. Mr. Ortiz likewise seeks damages for his illegal stop, arrest, detention, and vehicle forfeiture.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over Plaintiffs' federal claims for damages and injunctive relief pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The Court has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same facts and form part of the same case as the federal claims.

23.    Venue is proper in the United States District Court for the Northern District of Illinois under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the Plaintiffs' claims occurred in this district. Venue is also proper under 28 U.S.C. § 1391(a) because one or more Defendants reside in this District and, on information and belief, all Defendants are residents of the State in which the District is located.

## PARTIES

### *Plaintiffs*

24.    Individual Plaintiff MICHAEL WILLIAMS is a 65-year-old grandfather and resident of the South Shore neighborhood in Chicago. Mr. Williams was falsely accused of first-degree murder and arrested by Defendants Evangelides, Potter, Kociolek, Reiff, Roney, Perez, LaPadula, Brownley, Merkel, Maresso, De Jesus, Aloisio, Costello, Dougherty, Magana, and Almanza on August 28, 2020. He remained incarcerated in the Cook County Jail for 11 months until July 23, 2021, when the Cook County State's Attorney's Office dismissed the charges against him after conceding that it could not use ShotSpotter evidence against him and that it "ha[d] insufficient evidence to proceed with the prosecution."

25.    Individual Plaintiff Michael Williams seeks compensatory and punitive damages as a result of the Defendants' misconduct.

26.     Individual Plaintiff DANIEL ORTIZ is a 36-year-old father who grew up in the Portage Park neighborhood in Chicago. Mr. Ortiz was illegally stopped, questioned, and frisked by Defendants Powar and Matias following a bogus ShotSpotter alert outside a laundromat. Defendants Powar and Matias then illegally searched his vehicle, arrested him on false drug charges, and illegally impounded and forfeited his vehicle. Defendant Harb approved probable cause against him, and Defendant Flechsig approved charges. Mr. Ortiz was jailed overnight by police, who filed charges against him. Those charges were dismissed upon his first appearance at bond court. He subsequently recovered his vehicle, which had sustained multiple damages as a result of Defendant Officers' illegal seizure.

27.     Individual Plaintiff Daniel Ortiz seeks declaratory and injunctive relief on behalf of a class of similarly-situated individuals who have been or will be stopped and seized by CPD officers without reasonable suspicion or probable cause because of faulty ShotSpotter technology. He also seeks compensatory and punitive damages as a result of the Defendants' misconduct.

28.     Organizational Plaintiff LUCY PARSONS LABS ("LPL") is a registered 501(c)(3) non-profit membership organization. It is a collaboration between data scientists, transparency activists, artists, and technologists and is based in Chicago. It works at the intersection of digital rights and on-the-streets issues of policing. Its main work includes providing digital security trainings, pursuing police accountability, researching the use of police technologies and police tactics, and engaging in public education and advocacy on related topics. It frequently files and litigates public record requests in order to obtain transparency and accountability. It publishes research, educational materials, and advocacy materials. Its work has

9

focused on issues including various forms of police surveillance, civil asset forfeiture, the budget and funding of police activities, and police technologies.

29.     Individual members of LPL live in or regularly travel through the districts of Chicago where ShotSpotter is deployed. Individual members are particularly likely to be subject to an unlawful stop based on a ShotSpotter alert.

30.     LPL has had to spend significant time and money to counteract the City of Chicago's unlawful and discriminatory reliance upon ShotSpotter. It has devoted significant time to offering trainings on ShotSpotter, submitting FOIA requests related to ShotSpotter, helping to lead a local coalition focused on stopping ShotSpotter, and holding related meetings, thus diverting resources from the organization's focus on other police accountability issues, such as civil asset forfeiture and facial recognition. LPL's work on ShotSpotter has diverted resources away from ongoing organizational development projects, setting back its strategic planning and fundraising. LPL brings this action on its own behalf and as an organizational representative for its members. LPL participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

**_Municipal Defendants_**

31.     Defendant CITY OF CHICAGO is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois. It is authorized under the statutes of the State of Illinois to maintain the CHICAGO POLICE DEPARTMENT, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible. Defendant City was, at all times material to this Complaint, the employer and principal of the individual Defendant Officers.

32.     Defendant DAVID O'NEAL BROWN is the Superintendent of the Chicago Police Department. At all times relevant to the events at issue in this case, Defendant Brown was employed by the Chicago Police Department. As such, he was acting under color of law. At all times relevant to the events at issue in this case, Defendant Brown promulgated rules, regulations, policies, and procedures at the Chicago Police Department. Defendant Brown has addressed CPD's use of ShotSpotter in public forums and before the City Council, including responding to the findings of the OIG and other criticisms of ShotSpotter on behalf of CPD and the City of Chicago. Defendant Brown is responsible for supervising all CPD officers and managing all operations at the CPD. He is sued here in his official capacity.

*Williams Defendant Officers*

33.     Defendants Detective NICHOLAS EVANGELIDES (#20526), Detective DALE POTTER JR. (#21649), Detective MICHAEL KOCIOLEK (#20675), Detective SCOTT REIFF (#20847), Sergeant BRIAN RONEY (#2241), Sergeant JUAN PEREZ (#902), Detective MARC LAPADULA (#21158), Detective SCOTT BROWNLEY (#20568), Detective JOSEPH MERKEL (#21015), Detective CAROL MARESSO (#20183), Detective NESTOR DE JESUS (#20461), Detective SALVATORE ALOISIO (#20082), Lieutenant ROBERT COSTELLO (#231), Lieutenant MICHAEL DOUGHERTY (#363), Officer DAVID MAGANA (#7098), and Officer EDUARDO ALMANZA (#15464) are City of Chicago employees with the CPD. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the CPD. Each one of them participated in the investigation of Mr. Williams' case and contributed to his arrest and detention on false charges of murder. Each one is sued in his or her individual capacity for violating the rights of Mr. Williams under the Constitution and Illinois law.

11

*Ortiz Defendant Officers*

34.     Defendants Officer HARSIMRAN POWAR (#17135), Officer MICHAEL MATIAS (#18985), Lieutenant ARTHUR HARB (#311), and Sergeant MARK FLECHSIG (#1733) are City of Chicago employees with the CPD. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the CPD. Defendants Powar and Matias participated in the stop, questioning, arrest, detention, and charge of Mr. Ortiz and the forfeiture of his vehicle. Defendants Harb and Flechsig approved probable cause and criminal charges, respectively. Each one is sued in his or her individual capacity for violating the constitutional rights of Mr. Ortiz.

## FACTUAL ALLEGATIONS

## I.     CPD RELIES ON SHOTSPOTTER'S NOISE DETECTION SYSTEM, KNOWING IT IS AN UNRELIABLE AND INEFFECTIVE LAW ENFORCEMENT TOOL

35.     In 2018, the City of Chicago entered into a $33 million, three-year, non-competitive contract with ShotSpotter. In December 2020, the City and Superintendent Brown, without any notice or comment from the public or City Council, exercised an option to extend the contract with ShotSpotter through August 19, 2023, at a cost of more than $9 million per year.

36.     The Municipal Defendants renewed and continued the contract with ShotSpotter despite actual knowledge that the system is unreliable and harmful.

37.     The Municipal Defendants know that the system has never been tested in Chicago or elsewhere to assess its reliability. They know that the so-called "accuracy" figures provided by ShotSpotter are meaningless and deceptive. They know that the system is ineffective as a law enforcement tool, based on the public reporting of its own watchdog agency. The OIG has

studied and repeatedly reported on the technology. Analyzing the City's own police data, the OIG found that ShotSpotter generates tens of thousands of unjustified CPD deployments each year. The OIG also found that the overwhelming majority of ShotSpotter deployments led CPD to find nothing to corroborate supposed gunfire and that the technology led to thousands of unfounded CPD investigatory stops. Other studies, also relying on the City's own police data, back up the OIG findings.

38.     The Municipal Defendants know, based on public testimony in City Council and the experience of their own employees, that Cook County prosecutors drop cases involving ShotSpotter evidence and avoid defending the system's reliability in court when it is challenged in criminal cases. The Municipal Defendants and other city managers have been repeatedly confronted in public, in City Council, and in other forums with the many harms that the system imposes on the predominantly Black and Latinx people who live in neighborhoods under ShotSpotter's surveillance.

39.     In spite of this knowledge, the Municipal Defendants continue to fund and use ShotSpotter to dispatch CPD officers on tens of thousands of unwarranted deployments every year. They continue to direct CPD officers to rely on ShotSpotter alerts in stopping and detaining civilians, without cause.

***Numerous Studies in Chicago and Other Cities Show That ShotSpotter Is Unreliable and Ineffective in Practice***

40.     Experience in Chicago and elsewhere shows that ShotSpotter is unreliable and ineffective for police to use in practice.

41.     ShotSpotter both over-detects and under-detects gunfire, interpreting miscellaneous noises as gunshots and failing to pick up actual gunshots. It can also provide

13

inaccurate locations for the noises that it detects, giving police and investigators a false sense of precision as to where a supposed gunshot occurred.

42.     City of Chicago data show how rarely officers who respond to ShotSpotter alerts find any evidence of a gun or gunshots.

43.     In August 2021, the OIG conducted a thorough study of CPD deployments prompted by ShotSpotter. The OIG examined what police officers reported finding in response to 50,176 ShotSpotter alerts between January 1, 2020 and May 31, 2021. The OIG found that police reported a gun-related incident only 9.1% of the time. This figure includes not just shootings but any situation involving a gun, including when police find shell casings, identify a person armed with a weapon, or otherwise.

44.     Put differently, nearly 91% of ShotSpotter alerts turned up no reported evidence of any gun-related incident.

45.     The OIG report concluded that ShotSpotter alerts "rarely produce evidence of a gun-related crime."

46.     A December 2017 analysis of Chicago data by journalists at South Side Weekly showed similarly poor results. It found that just slightly over 10% of ShotSpotter-linked events resulted in the CPD finding enough evidence to open an investigation.

47.     The extraordinary volume of unwarranted ShotSpotter deployments persists to this day. From April 15, 2021 through April 13, 2022, only 9.6% of ShotSpotter alerts led CPD officers to turn up any evidence of a gun-related crime, according to data from the City's Office of Emergency Management and Communications. This amounts to 31,640 unfounded ShotSpotter-prompted dispatches during the period in question.

48.     During this most recent one-year period, CPD deployed police an average of just over 87 times *every day* to chase down ShotSpotter alerts that turned up no evidence of any gun-related incident.

49.     Even as the rate of false alarms has remained extremely high, the total number of ShotSpotter alerts in Chicago has risen precipitously, thereby increasing the volume of unfounded CPD deployments dramatically. Between July 1, 2021, and July 1, 2022, there were approximately 44,300 ShotSpotter alerts in the City of Chicago, up from approximately 37,500 alerts during the prior one-year period (July 2020 to July 2021), 23,700 in the year before that (July 2019 to July 2020), and 17,800 the year earlier (July 2018 to July 2019). Upon information and belief, the City has not expanded the size of the area actively monitored by ShotSpotter during these periods.

50.     The City of Chicago knows about the massive number of unfounded ShotSpotter deployments, but it does not report them to ShotSpotter as errors. An official ShotSpotter Performance Overview, which was obtained by Plaintiff Lucy Parsons Labs through FOIA, summarizes errors reported to ShotSpotter by the Chicago Police Department. It shows that over a period of just under six months in 2021, CPD reported *zero* false positive alerts.

51.     Similar analyses in other cities record even more dismal "hit rates," similarly high proportions of unwarranted police deployments, and extremely low rates of arrest or gun recovery as a result of ShotSpotter alerts.

52.     In Dayton, Ohio, police are deployed in response to ShotSpotter alerts an average of four times a day. Fewer than 2% of Dayton ShotSpotter deployments between December 11, 2020, and June 30, 2021, resulted in an arrest. Just 5% of ShotSpotter deployments led officers to report incidents of any crime.

53. In Atlanta, Georgia, an official city analysis determined that police found shell casings following only 3% of ShotSpotter alerts between January 1 and July 31, 2019. As of October 23, 2019, ShotSpotter had only led to five arrests and five guns recovered out of 1,349 incidents in 2019. The city's analysis calculated the cost ratio of its ShotSpotter implementation at $56,000 per gun recovered or $56,000 per arrest.

54. In Houston, Texas, fewer than 2% of ShotSpotter alerts between December 2020 and September 2021 led police to make an arrest, according to a Houston Police Department report. Out of 2,330 ShotSpotter alerts, only 54 resulted in or were linked to an arrest.

55. In Minneapolis, Minnesota, only 32 ShotSpotter alerts out of roughly 8,500 led to an arrest, a rate of less than 0.5%.

56. In addition to prompting unfounded police responses, ShotSpotter also fails to send an alert when there has been an actual shooting. The same ShotSpotter Performance Overview obtained by Plaintiff Lucy Parsons Labs shows that there were 466 gunfire incidents over a nearly six-month period that ShotSpotter did not identify but that Chicago police learned about through other means. This included 41 incidents where ShotSpotter provided an incorrect location for the gunfire.

57. Of those 466 cases, ShotSpotter either failed to detect the noise, failed to send an alert, or sent an alert to CPD with the wrong location. These 466 incidents reflect only instances where Chicago police learned of a shooting and chose to file a complaint with ShotSpotter. On information and belief, there are many more shooting incidents that ShotSpotter missed where CPD officers filed no complaint with the company.

16

58.     ShotSpotter thus triggers an enormous number of unfounded police alerts. Despite the enormous volume of alerts, ShotSpotter also fails to trigger alerts (or provides incorrect locations) for a large number of actual shooting incidents.

***Chicago's Contract with ShotSpotter Incentivizes ShotSpotter to Trigger False Alerts***

59.     ShotSpotter's contract with the City of Chicago gives it a financial incentive to over-report noises as gunfire or possible gunfire. These financial incentives further drive the technology's unreliability.

60.     The City of Chicago's contract with ShotSpotter does not contain *any* limit on the proportion of ShotSpotter alerts that are not actually caused by gunfire. The City of Chicago has imposed no contractual requirement at all to avoid false alerts.

61.     The City's contract with ShotSpotter only requires that for every 10 alerts that ShotSpotter sends out, ShotSpotter can receive no more than one complaint from CPD about a gunshot that CPD discovered but which ShotSpotter missed or mislocated by more than 25 meters. Only these missed or mislocated gunshots count against ShotSpotter. False positive alerts and situations where CPD pursues a ShotSpotter alert and finds nothing to corroborate gunfire never count against ShotSpotter under the contract.

62.     ShotSpotter can thus guarantee that it will always hit its performance target of one complaint per ten alerts simply by putting a thumb on the scale in favor of triggering alerts to loud noises that are not gunfire. Excess but unfounded alerts *help* ShotSpotter meet its performance target because they overwhelm any complaints ShotSpotter receives from CPD about missed or mislocated gunshots, and they never count against the company.

63.     The City of Chicago has thus given ShotSpotter a powerful contractual incentive to over-report loud noises as gunfire and, therefore, to dispatch police to chase down sounds that are not gunshots.

64.     In addition, the City's contract with ShotSpotter excludes from its performance targets gunshots fired in "enclosed spaces" or "if the weapon discharged is of .25 or smaller caliber," which includes small handguns that fire .22 caliber rounds. When ShotSpotter misses or mislocates these gunshots, it does not count against its contractual performance targets.

***ShotSpotter is a Black Box, Concealing its Technological Flaws***

65.     The dismal results of ShotSpotter on the ground likely reflect flaws in the underlying technology. The system is a black box, shrouded in secrecy, and it has never been independently validated or properly tested for reliability.

66.     ShotSpotter purports to do two things: (1) identify the sound of gunfire as distinct from the cacophony of sounds in an urban environment and (2) triangulate the location of those supposed gunshots on a map to within 82 feet (25 meters).

67.     Studies show, however, that ShotSpotter sensors can easily be triggered by sounds other than gunshots, such as fireworks, trash trucks, blown tires, helicopters, construction, vehicles traveling over expansion plates and potholes, and even church bells. A 2014 ShotSpotter white paper acknowledges that some loud bangs—like fireworks, which are common year round in a large city—may trigger false positives.

68.     ShotSpotter likewise can report significantly mistaken locations of supposed gunfire. A ShotSpotter employee has admitted in court that incidents can be "significantly mislocated" and prior reported incidents have been off by distances of 450 meters or more.

18

69.     ShotSpotter's potential for issuing false and mislocated alerts is evident from the system's mechanics. The ShotSpotter system contains three main components—sensors, computer algorithms, and human operators—each of which creates significant opportunity for error. The City of Chicago knows of or should know of these flaws and has been confronted about many of them directly in City Council testimony.

70.     *First*, ShotSpotter's sensors themselves introduce opportunities for error. Pursuant to the City's contract, ShotSpotter has installed approximately 15-20 sensors for every square mile within its surveillance shadow. Each sensor contains microphones, audio processing circuitry, a cellular network connection, and other hardware. Sensors are typically installed high up on City lampposts, public buildings, or other structures. The sensors are continuously listening and recording, storing 30 hours of audio on the device itself.

71.     The sensors are designed to identify any and all loud, impulsive noises—what ShotSpotter calls any "bang, boom, or pop." When a sensor detects a loud noise, it automatically sends audio clips and other data to ShotSpotter's computer system via a cellular network.

72.     The placement of these sensors can affect their ability to distinguish and triangulate noises. The technology is liable to fail when a noise is very close to a sensor, in which case the microphone may pick up a distorted signal that cannot be properly timed. It is also negatively impacted by physical elements, including wind and temperature, which affect the speed that sound propagates, and surrounding buildings, which create reflections and other disturbances in the sound propagation.

73.     *Second*, the secret, black-box algorithms that ShotSpotter uses to analyze the noises that are detected by its sensors create enormous opportunities for error.

74.     When enough nearby ShotSpotter sensors report a noise in a certain span of time, ShotSpotter's computer system processes the noises through two proprietary computer algorithms.

75.     One algorithm attempts to identify the location of the sound by comparing the relative amount of time it took for the noise to reach each sensor, a process known as multilateration.

76.     Another algorithm attempts to classify the noise as originating from a gunshot or another source.

77.     These algorithms generate an output that purports to identify the location of the noise and to classify it as a "gunshot," "possible gunshot," or some other noise.

78.     ShotSpotter treats both algorithms as trade secrets.

79.     On information and belief, there has neither been any independent testing or validation of these algorithms, nor has the City of Chicago ever required such independent review or conducted one itself.

80.     ShotSpotter employees have published documents that reveal fundamental scientific flaws in the design and reliability of its system.

81.     The noise-classification algorithm, which is supposed to screen out noises that are not gunshots, suffers from clear flaws in design. According to a technical paper authored by eight ShotSpotter employees, the algorithm converts audio recordings of the loud noises its sensors detect into visual images that depict the waveform and other features of the sound. These visual images are then assembled into a single "image mosaic" that is split up into distinct "tiles," each of which contains certain information in visual form. The algorithm analyzes these image mosaics to decide whether to classify the noise as a gunshot.

82.     According to the technical paper, some of the tiles in the image mosaic encode information that appears to have nothing to do with the actual sound that ShotSpotter's microphones pick up. For example, one tile visually depicts the "location of recent nearby incidents." Another tile visually depicts the number of "recent incidents." That is, the mosaic includes information about *prior* noises rather than the specific noise that is being analyzed. By including such extraneous information in the image mosaic, ShotSpotter's algorithms may be more likely to classify noises as gunshots if there have been more "nearby" or "recent" ShotSpotter alerts in the area. In this way, the system may be more likely to trigger false alerts in places where it has previously triggered alerts, creating harmful and inaccurate feedback loops that falsely inflate the number of ShotSpotter alerts in particular areas.

83.     ShotSpotter's noise-classification algorithm may suffer from other defects. ShotSpotter uses a "machine learning" algorithm to classify the image mosaics as gunshots or other noises. But ShotSpotter's methods and implementation have never been independently tested or audited, nor has ShotSpotter released any information about any internal testing it has done.

84.     In general terms, the type of machine learning algorithm that ShotSpotter uses works by being "trained" to recognize the features of the image mosaics that reflect gunshots as opposed to other noises. To train the algorithm, it must be fed sample image mosaics that have been pre-labeled as examples of gunshots and other noises. Using those labeled examples, the algorithm attempts to "learn" the features of the image mosaics that correspond to gunshot noises as opposed to those that correspond to other noises.

85.     Little is known about how ShotSpotter trains its algorithm or tests it for reliability. The ShotSpotter technical paper concedes that when ShotSpotter labels the samples that it uses to

train the algorithm, the "ground truth" about whether a noise is a gunshot is rarely known and that "it is to be expected that some training data are misidentified."

86.     There is significant opportunity for error in any such machine learning process, and the method devised by ShotSpotter has never been independently validated and verified. Absent rigorous testing and validation, such algorithms may reflect unacceptably high false positive rates or could systematically misclassify certain noises as gunfire. Despite the high-tech veneer, there is no basis to believe that ShotSpotter's algorithm produces reliable results.

87.     *Third*, after ShotSpotter's algorithms process the loud noises its sensors detect, a low-level ShotSpotter employee reviews the noise and makes the ultimate decision as to whether to trigger an alert that will dispatch police. These human operators work in call-center style facilities in Newark, California, or Washington, D.C. They are another major source of error.

88.     ShotSpotter's operators have full discretion to override the computer. They can change a noise classified by the algorithm as "fireworks" to a gunshot and trigger an alert that dispatches police. They can modify the location or number of gunshots supposedly detected.

89.     ShotSpotter operators spend mere seconds reviewing the noise before deciding whether to dispatch police. The entire process, from when the noise is registered by a sensor to when a ShotSpotter operator triggers an alert, takes less than 60 seconds.

90.     According to ShotSpotter, its human operators override the computer classification about 10% of the time.

91.     ShotSpotter's operators have no obvious qualifications to conduct forensic audio analysis of gunshots or to direct a highly charged law enforcement response.

92.     Minimum job requirements for ShotSpotter operators are a high school degree and one year of experience working in a call center or customer service position. They are not

22

forensic experts or audio specialists. ShotSpotter has not disclosed any detailed information about how it trains or evaluates the proficiency of these operators. There is no public evidence or testing that ShotSpotter's internal training adequately leads these operators to differentiate a gunshot from other impulsive noises.

93.     ShotSpotter operators can trigger an alert by categorizing a noise as either a "gunshot" or "probable gunshot."

94.     ShotSpotter trains its operators using a protocol it calls the "Classification Continuum," which, according to ShotSpotter, "summarizes the key considerations that a reviewer should weigh in evaluating whether a given noise even was a gunshot—as opposed to, for instance, a firework, backfiring truck, or helicopter." ShotSpotter has refused to publicly disclose this crucial document, but ShotSpotter's characterization of the operator's decision as a "continuum" suggests that it permits operators to trigger alerts even when it is not clear whether the noise is a gunshot.

95.     On information and belief, ShotSpotter's operators are trained to err on the side of *triggering* an alert whenever they are in doubt about whether a noise is a gunshot or not.

96.     The determination of a ShotSpotter operator, made in mere seconds, is immediately pushed out to CPD's computer systems and then transmitted to officers in the field on their City-issued mobile devices or mobile computers. The alert is presented to officers as a pin on a map. Officers may also listen to audio snippets of the noise if they so choose.

97.     When CPD receives a ShotSpotter alert, it dispatches officers, irrespective of whether ShotSpotter decided to classify the noise a "gunshot" or just a "probable gunshot." CPD policies make no distinction between how officers should treat each type of alert.

23

98.     It is these ShotSpotter alerts, issued after mere seconds of review by a low-level ShotSpotter employee, that led the individual Defendants Officers to falsely arrest and prosecute Plaintiff Williams and to illegally stop and seize Plaintiff Ortiz.

99.     Upon request by prosecutors or investigators, ShotSpotter can also conduct a re-analysis of the audio snippets and produce what it calls a "Detailed Forensic Report." The methods used to produce such reports are equally shrouded in secrecy and have not been independently tested or validated. Likewise, the individuals who conduct these re-analyses are not forensic audio specialists or otherwise qualified. One ShotSpotter employee who produces these reports, Walter Collier III, is a former CPD officer. ShotSpotter has stated that "no official or formal training materials exist" for these employees specifically, and that they are simply trained "on the job."

***The Municipal Defendants Have Direct Knowledge that ShotSpotter Is Unreliable***

100.     The Municipal Defendants have repeatedly contracted with ShotSpotter, knowing full well it is untested and unreliable.

101.     There are *no* studies testing whether ShotSpotter can reliably distinguish between the sound of gunshots and similar noises like firecrackers, backfiring cars, construction noises, helicopters, or other loud bangs.

102.     Neither ShotSpotter nor any other entity has ever published results from a controlled test of the ShotSpotter system against actual fireworks, engine backfires, blown tires, or other confounding noises to determine how often the system is likely to generate a false positive alert—*i.e.*, an alert that is triggered by a noise other than gunfire. ShotSpotter has recently declined an offer by an independent industry research publication to test its technology.

103.     The Municipal Defendants know about the lack of studies and testing because they have been confronted about it directly in City Council, the Public Safety Committee, and other forums, because it has been widely publicized in national news reports, and because they have themselves declined to permit or conduct deployment qualification testing—or any other testing—of the system in Chicago.

104.     The Municipal Defendants, Chicago Mayor Lori Lightfoot, other senior officials in the City of Chicago and CPD brass have all defended ShotSpotter technology in response to questions from the City's own OIG and others, despite being presented with significant information about ShotSpotter's poor performance as a law enforcement tool, its misleading marketing claims, and the absence of any proper testing of the system's reliability.

105.     The City of Chicago first used ShotSpotter more than a decade ago and most recently extended its contract in December 2020. Its current contract does not require any controlled testing of the system or its human operators to determine the rate of false positive alerts, nor does it require ShotSpotter to provide results of such testing.

106.     The Municipal Defendants did not ask or permit ShotSpotter to test the system for false negatives after the system was installed, for example by using test-fired gunshots. On information and belief, neither ShotSpotter nor the City of Chicago has ever tested the system in any covered neighborhood to determine how frequently it fails to detect gunfire.

107.     On information and belief, the City has not reviewed any ShotSpotter training materials for its human operators or imposed any training, qualification, or testing requirements with respect to the ShotSpotter employees who trigger alerts.

108.    In its marketing and public relations materials, ShotSpotter makes a claim of "97 percent accuracy" and "0.5 percent false positivity." These claims are false, deceptive, and misleading.

109.    An audit commissioned by ShotSpotter acknowledges that these figures are not derived from any testing and do not reflect any actual knowledge about whether the sounds that triggered ShotSpotter alerts were gunshots.

110.    Instead, ShotSpotter derives these "accuracy" rates by simply *assuming* that all of its alerts are gunfire. ShotSpotter only counts an alert as an error if a police department happens to voluntarily send ShotSpotter a complaint about an erroneous alert, and ShotSpotter then determines, unilaterally, that the complaint is valid.

111.    ShotSpotter's claim of 97% accuracy is, in actuality, a tally of customer complaints, a meaningless one, as customers are under no obligation to complain about every error to ShotSpotter.

112.    CPD officers *never* file complaints with ShotSpotter when they arrive at the location of a ShotSpotter alert and find no corroboration of gunfire, according to a CPD officer's testimony to City Council and an official ShotSpotter document. Yet the OIG reports that CPD officers find no evidence of a gun crime in response to more than 90% of ShotSpotter alerts.

113.    Because officers file no complaints about these unfounded alerts, ShotSpotter counts every one of them as actual gunfire and includes those fruitless police deployments in publishing a 97% accuracy rate.

114.    The Municipal Defendants have been confronted directly about these scientifically meaningless marketing claims in City Council meetings and other forums, and they have been reported in national news outlets.

115.     The City continues to rely on the technology, knowing and directing that CPD officers treat ShotSpotter alerts as if they are far more precise and reliable than they actually are, with dire consequences for civilians.

## II.     CPD SYSTEMATICALLY USES SHOTSPOTTER TO INSTIGATE UNLAWFUL STOPS AND SEARCHES OF CIVILIANS ON CHICAGO'S SOUTH AND WEST SIDES

*CPD Uses Faulty ShotSpotter Technology to Systemically Initiate Investigatory Stops without Reasonable Suspicion*

116.     ShotSpotter alerts result in a large number of illegal stops and frisks, known in Chicago as "investigatory stops."

117.     CPD officers conduct hundreds of illegal investigatory stops every year because they are chasing down ShotSpotter reports of supposed gunfire and stop or frisk people on the basis of the ShotSpotter alert, without independent grounds to suspect that the person has committed a crime or is carrying a weapon.

118.     When CPD officers receive a ShotSpotter alert they race into neighborhoods equipped with little information except that one or more gunshots were supposedly just fired at the location where ShotSpotter is sending them.

119.     Both ShotSpotter and CPD's own policies command officers responding to a ShotSpotter alert to regard any person they encounter as a potential suspect and lethal threat.

120.     As a result, CPD systematically sends numerous police officers in multiple squad cars to chase down ShotSpotter alerts. On an average day multiple people on the South and West sides are stopped and frisked by police who are investigating unfounded ShotSpotter alerts.

121.     The OIG identified more than 2,400 investigatory stops linked to ShotSpotter alerts over the course of 18 months, from January 1, 2020 to May 31, 2021, of which 1,056

matched a ShotSpotter event number recorded by CPD. An additional 1,366 investigatory stop reports mentioned ShotSpotter in the narrative description provided by the officer but could not be linked to ShotSpotter using a matching event number.

122.    The actual number of people stopped by police following a ShotSpotter alert is likely much higher than the OIG was able to document. As the OIG found, CPD fails to keep consistent records matching ShotSpotter incidents with investigatory stops. Police officers also may not record the involvement of ShotSpotter in their narrative of investigatory stops or arrests that are in fact prompted by ShotSpotter. Moreover, CPD officers sometimes fail to prepare an investigatory stop report at all, in which case a ShotSpotter-prompted investigatory stop will not appear in CPD data.

123.    CPD investigatory stops prompted by ShotSpotter alerts rarely turn up any evidence of gun crime. Of the 1,056 investigatory stops that OIG was able to match directly to a ShotSpotter event number, only 244 resulted in an arrest and only 152 resulted in a gun being recovered. The vast majority of these stops turned up no gun crime.

124.    ShotSpotter alerts cannot supply officers with reasonable suspicion for a police stop.

125.    ShotSpotter has never been tested to establish its reliability and so cannot properly be considered by an officer at all when determining whether there is reasonable suspicion to stop a person.

126.    The U.S. Court of Appeals for the Seventh Circuit has previously concluded that ShotSpotter "is analogous to an anonymous tipster" and cannot establish reasonable suspicion on its own. *United States v. Rickmon*, 952 F.3d 876, 882 (7th Cir. 2020).

127. ShotSpotter alerts also cannot establish a lawful basis for a stop by CPD officers because a ShotSpotter alert does not supply enough information to establish individualized suspicion. At best, the technology tells an officer that a gun may have been fired several minutes earlier, and that shot may have been fired somewhere within 82 feet of the location of the alert. It tells the officer nothing about the physical description of a person, what may have transpired before or after the loud noise, or anything else that might tie a particular individual to the loud noise or gunshot.

128. The fact that a person happens to be found by a police officer near the location of a recent ShotSpotter alert is never reasonable suspicion for a stop.

129. ShotSpotter also improperly biases the perceptions of officers responding to an alert, priming officers to expect to find gunfire and to regard residents with unwarranted suspicion. CPD officers responding to a ShotSpotter alert are liable to interpret otherwise innocuous behavior as corroboration of supposed gunfire, thus furthering the likelihood of a false arrest or stop.

130. CPD's characteristically aggressive response when dispatched to ShotSpotter alerts may itself prompt residents to behave in ways that officers then use as justification for a stop—for example, if a resident walks away from an officer or wears a concerned expression on their face.

131. CPD officers also systematically stop and frisk people because of a perceived history of ShotSpotter alerts in the area in the past.

132. CPD officers who stop residents on the street regularly cite the supposed history of ShotSpotter alerts in an area as a false justification for detaining residents or searching them once detained.

29

133. OIG's detailed review of 72 randomly-selected investigatory stop reports from January 2020 through May 2021 that mention ShotSpotter by name turned up 10 reports in which reporting officers "referred to the aggregate results of the ShotSpotter system as informing their decision to initiate a stop or their course of action during the stop, even when they were not responding to a specific ShotSpotter alert."

134. The OIG's report states that "the introduction of ShotSpotter technology in Chicago has changed the way some CPD members perceive and interact with individuals present in areas where ShotSpotter alerts are frequent" and that "[a]t least some officers, at least some of the time, are relying on ShotSpotter results in the aggregate to provide an additional rationale to initiate stop or to conduct a pat down once a stop has been initiated."

135. Nearly every part of the City that falls under ShotSpotter's shadow experiences a significant volume of ShotSpotter alerts over time. There are now approximately 44,300 ShotSpotter alerts sent to CPD per year, spread over approximately 117 miles, which amounts to an average of 379 ShotSpotter alerts per square mile per year.

136. Using the "past alert" rationale, CPD officers can determine that nearly any part of the City blanketed with ShotSpotter has had a significant volume of ShotSpotter alerts.

137. In this way, CPD officers use ShotSpotter's mere presence, which regularly triggers unfounded alerts, as false justification to stop or frisk residents who live within its surveillance footprint.

138. On information and belief, CPD officers do not make any distinction between founded and unfounded ShotSpotter alerts when citing historical ShotSpotter alerts to justify a stop or search.

***The City of Chicago's Policies and Practices Fuel the Technology's Negative Consequences***

139.    The Municipal Defendants have adopted and maintained express policies and widespread practices concerning ShotSpotter that fuel its negative consequences and that lead systematically to illegal searches and seizures. They have also failed to train officers to avoid illegal searches and seizures despite their knowledge that ShotSpotter is unreliable and untested.

140.    The Municipal Defendants' formal ShotSpotter Flex Program policy, Special Order S03-19, explicitly warns officers responding to a ShotSpotter alert to "be[] aware that an offender or multiple offenders may be on scene." It instructs officers to expect danger, cautioning them to "take a safe and strategic approach while responding to the incident."

141.    The Municipal Defendants' ShotSpotter Flex Program policy conveys to officers a false sense of ShotSpotter's precision, directing them to investigate "the precise location" provided by ShotSpotter, as well as the area surrounding the "precise location given by ShotSpotter information."

142.    The Municipal Defendants, by practice and express policy, assign ShotSpotter alerts the same priority as 9-1-1 calls reporting in-progress shootings. That is, the Municipal Defendants treat ShotSpotter as "Priority 1" calls for service, which are reserved for police deployments involving an imminent threat to life, bodily injury, or major property damage/loss. The only calls that Defendants assign a higher priority ("Priority 0") are those in which police officers, EMS personnel, or firefighters face a life-threatening circumstance.

143.    The Municipal Defendants' practice and express policy make no distinction between alerts that ShotSpotter itself codes as "multiple gunshot," "single gunshot" or merely "probable gunshot." All are given the same highest priority and police officers are not directed to make any distinction in how they respond.

31

144.    The Municipal Defendants' policies and training fail to inform officers about the overwhelming likelihood that any given ShotSpotter alert will lead them to find no shooting or other gun-related incident.

145.    The Municipal Defendants, by practice and policy, direct officers always to treat ShotSpotter alerts as if they correspond to actual gunfire.

146.    The Municipal Defendants' policies and training fail to inform officers that ShotSpotter has never been tested for its ability to distinguish gunfire from other loud noises. The Municipal Defendants' policies and training affirmatively mislead officers about the accuracy and precision of ShotSpotter alerts.

147.    The Municipal Defendants' policy and training fails to provide specific guidance about whether or when ShotSpotter alerts may justify an investigatory stop or other search or seizure.

148.    The Municipal Defendants' policy and training fails to inform officers that a person's mere presence within the vicinity of a ShotSpotter alert does not supply lawful justification for an investigatory stop or other search or seizure.

149.    The Municipal Defendants' policies fail to inform officers that the U.S. Court of Appeals for the Seventh Circuit has stated that ShotSpotter alerts should, at best, be regarded as akin to a tip from an anonymous source of unknown reliability. They also do not provide operational guidance consistent with that assessment.

150.    The Municipal Defendants' practice and express policies do not require CPD officers to keep track of or report unfounded ShotSpotter alerts that result in no corroboration of any gun-related incident.

151. The Municipal Defendants' express policy requires officers to rely on ShotSpotter alerts when investigating any type of shooting incident and to rely on ShotSpotter reports for investigation and prosecution purposes.

152. The Municipal Defendants, by practice and express policy, instruct CPD to rely on ShotSpotter alerts to guide police behavior, inform police strategy and tactics, and assess police performance.

153. Upon information and belief, the Municipal Defendants make no distinction between founded and unfounded ShotSpotter alerts when using ShotSpotter to guide police behavior, inform police strategy and tactics, and assess police performance.

154. The Municipal Defendants' practice and express policy directs CPD's Strategic Decision Support Centers ("SDSCs"), which are police surveillance hubs located in CPD police districts, to rely on ShotSpotter alerts to assess gun violence trends, crime patterns, and specific locations that have a high amount of purported gunfire incidents. The Municipal Defendants further instruct SDSCs to disseminate ShotSpotter information in order to inform police strategies and responses, including in investigations, patrol missions, parole/probation, and gang strategies.

155. The Municipal Defendants, by explicit policy, mandate that ShotSpotter alerts be included in the Compstat statistical summaries prepared by police districts that are within ShotSpotter's shadow. Compstat reports are used to benchmark crime in police districts, to assess the performance of police officers and leadership, and to guide the allocation of police resources and the decision about what police tactics to employ.

156. In all of these ways, the Municipal Defendants' policies and practices treat ShotSpotter as if it is accurate and effective, and instruct police officers to rely on ShotSpotter

uncritically. The Municipal Defendants' policies require and encourage CPD to rely on ShotSpotter as a basis for all manner of police decisions, from high-level decisions about resource allocation to investigations of particular crimes to street-level decisions about whether to conduct an investigatory stop.

157.    The Municipal Defendants purposefully perpetuate these policies and practices, knowing the technology is ineffective and unreliable.

158.    The Municipal Defendants' practices and policies—as well as its omission of policymaking regarding ShotSpotter's unreliability—lead officers to engage in large numbers of illegal, unnecessary, and frightening interactions with residents who live in areas wired with ShotSpotter sensors.

159.    Plaintiff Ortiz's stop by police, discussed in Section V below, is a prime example. Officers targeted him on the Northwest side of the city as a suspect in a non-existent shooting and detained him for questioning just because he was near a ShotSpotter alert. Even as it became clear that there was no gunfire to be found, the Ortiz Defendant Officers escalated the encounter, searching Mr. Ortiz's vehicle without consent, laying meritless drug charges against him, and seizing his car.

160.    The Municipal Defendants and individual CPD officers who rely on ShotSpotter to stop and arrest civilians have historically been immune from oversight for their unlawful conduct.

161.    Most people stopped or searched by CPD officers because of ShotSpotter would never know that ShotSpotter is what caused CPD to target them. At the time of a stop or arrest, CPD officers are not required to inform people that they are investigating a ShotSpotter alert.

34

Even after the fact, CPD's record-keeping makes it difficult and sometimes impossible to determine whether a police action was prompted by ShotSpotter.

162.    As a result, it is extremely difficult for residents to challenge individual illegal ShotSpotter stops or searches.

### III.    THE CITY OF CHICAGO HAS INTENTIONALLY DEPLOYED SHOTSPOTTER ALONG STARK RACIAL LINES AND USES SHOTSPOTTER TO TARGET BLACK AND LATINX PEOPLE, IN KEEPING WITH CHICAGO'S HISTORICAL PATTERN OF DISCRIMINATORY POLICING.

163.    The City of Chicago decides which parts of the City should be under surveillance by the ShotSpotter system. The Municipal Defendants have intentionally chosen to blanket nearly all of the South and West sides with active sensors. Throughout its long contractual relationship with ShotSpotter, the Municipal Defendants have consistently and deliberately chosen to deploy ShotSpotter only in overwhelmingly Black and Latinx neighborhoods for the purpose of targeting the people in those neighborhoods.

164.    Relying on that technology, CPD regularly conducts high-stakes deployments in those neighborhoods, thus discriminatorily subjecting Black and Latinx people to unlawful seizures, false arrests, and police violence stemming from such police responses.

165.    Chicago first began using ShotSpotter in 2003. The City halted the program because it was producing false leads.

166.    In 2007, Chicago initiated a pilot program with ShotSpotter that was promptly discontinued. According to a 2010 NBC Chicago report, the CPD found the program to be "not entirely effective" in an urban environment.

167.    In 2012, CPD launched another pilot program for ShotSpotter, installing sensors in a total of three-square miles in the predominantly Black and Latinx Englewood and Harrison

districts. ShotSpotter sensors were installed in sections of CPD's 3rd, 7th, 8th, and 11th Police Districts.

168.    In 2017, CPD moved to rapidly expand its ShotSpotter program as part of its establishment of SDSCs. SDSCs access the City's ShotSpotter network, its Police Observation Devices (surveillance cameras), its Automated License Plate Readers, and various other surveillance systems.

169.    In January 2017, the first SDSC was launched in Englewood, the 7th District. Between January and July 2017, CPD began to use ShotSpotter in the 11th, 6th, 9th, 10th, and 15th Districts. In September 2017, CPD expanded the program to the 2nd, 3rd, 4th, 5th, 8th, and 25th Districts.



*Figure 1   Left: ShotSpotter alerts per police district and beat since the start of the City's current contract with ShotSpotter.*
        *Right: Proportion of Black and Latinx residents by census tract with boundaries of police districts and beats shown.*

170.    The City and ShotSpotter both refuse to disclose where sensors are located. But data published by the City of Chicago showing the latitude and longitude of ShotSpotter alerts shows that sensors are currently active and reporting supposed gunshots across 12 CPD police districts—the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 15th, and 25th districts. This coverage area also comports with public statements that City and CPD officials have provided regarding ShotSpotter's expansion over the years.

171.    The City continues to use ShotSpotter across these 12 Police Districts, pursuant to the City's $9 million annual contract with ShotSpotter, which the City signed on August 22, 2018 and has since extended through August 2023.

172.    There is a stark racial disparity between districts with ShotSpotter and districts without. The 12 police districts where the City has chosen to deploy and activate ShotSpotter map precisely onto the 12 districts with the highest proportion of Black and Latinx residents and the lowest proportion of White residents.

173.    The City of Chicago targeted ShotSpotter in every police district that has a population of more than 65% Black or Latinx residents, according to census data.

174.    The City of Chicago has not activated ShotSpotter in any district with more than 25% White residents.

175.    The City of Chicago has chosen to blanket entire police districts with ShotSpotter sensors, subjecting entire neighborhoods and blocks within each district to surveillance. The result is that approximately 117 square miles of the City are indiscriminately blanketed with gunshot sensors. This is in stark contrast with other cities using ShotSpotter, which have chosen to deploy ShotSpotter only in geographically limited "hotspots."

176. The City of Chicago deliberately chose to implement ShotSpotter along racial lines and to put the vast majority of the city's Black and Latinx residents under ShotSpotter's surveillance.



*Figure 2 Racial demographics of police districts with active ShotSpotter installations (2010 census data).*

177. As a result, a total of 80% of Black Chicagoans live under ShotSpotter's footprint, as do 65% of Latinx Chicagoans, according to census data. Only 30% of White Chicagoans live in a ShotSpotter area.

178.     This disparity and deployment pattern is not explained by reference to historical gun crimes.

179.     The City has chosen to activate ShotSpotter in Black and Brown neighborhoods that have far lower historical gun crime rates than other parts of the City that do not have ShotSpotter.

180.     For example, according to city data, the areas covered by ShotSpotter include 28 police beats that experienced fewer than 100 shootings involving a victim (both homicides and non-fatal shootings) over 12 years between January 2010 and March 2022. Yet there are 18 police beats not under ShotSpotter's footprint that have experienced *more* than 100 such shootings over the same period.

181.     The City has also chosen to activate ShotSpotter in Black and Latinx neighborhoods that have notably low historical rates of shootings.

182.     There are 13 police beats within the ShotSpotter area that have experienced fewer than 60 shootings involving a victim over 12 years between January 2010 and March 2022—less than 5 per year. The rate of shootings in those ShotSpotter-covered areas is less than half of the median number of shootings in police beats city-wide, which stands at 121.5 over that same period.

183.     For example, in police beat 834, which includes much of the Ashburn neighborhood, a middle-class, predominantly Black and Latinx area on the Southwest Side, there were only 31 shootings involving a victim between January 2018 and March 2022, well below the City-wide median. Yet there were 1,016 ShotSpotter alerts in that area over the same period, far above the median number of ShotSpotter alerts in ShotSpotter-covered police beats on the South and West sides.

184.    By contrast, police beat 1821, which encompasses much of Old Town on the Near North Side, an affluent and predominantly White neighborhood, had 39 shootings over the same period—more than beat 834—yet it had no ShotSpotter alerts because the City has not activated sensors there.

185.    The only police district where Defendants have *not* chosen to deploy ShotSpotter on the South and West sides is the 22nd district—which encompasses significant White-majority neighborhoods. The western part of that district includes the predominantly White neighborhoods of Mount Greenwood and Beverly, traditionally home to many Chicago firefighters and police officers. The City decided not to extend ShotSpotter to cover this district, despite the fact that much of the district has reported gun crime rates as high or higher than many others that are within ShotSpotter's footprint.

186.    Civilians and residents on the South and West sides of Chicago are subjected to large numbers of ShotSpotter deployments—with all of the risks and consequences they bring—not because historical gun crime rates somehow explain ShotSpotter's presence, but because the City has chosen to indiscriminately blanket active ShotSpotter sensors over massive swathes of the city where most Black and Latinx residents live.

***The City's Deliberate Decision to Target ShotSpotter at Black and Latinx Communities Harms Those Communities***

187.    CPD's use of ShotSpotter harms the communities under its surveillance in numerous ways.

188.    Black and Latinx people are being stopped, arrested, and abused by the CPD during hostile police deployments at much higher rates than White people, solely because of the City's discriminatory ShotSpotter program.

40

189.    These ShotSpotter-prompted stops and arrests also expose Black and Latinx people to increased and discriminatory use of force by law enforcement. The OIG has recently found that "comparing the population of the city to the population that was subject to the use of force after a stop . . . Black people were 11.7 times more likely to face a use of force following an investigatory stop than non-Black people."

190.    Police have frequently used physical force against people of color when responding to ShotSpotter alerts. According to data disclosed by the City of Chicago, over the six-month period between July 1, 2019 and December 31, 2020, there were 82 reports of CPD using physical force against residents that could be linked to ShotSpotter-prompted police deployments by matching case numbers. All 82 of the people that CPD used force against during these ShotSpotter deployments were Black and Latinx, with the exception of 4 whose race CPD lists as "unknown." In 70 of these 82 cases, the person accosted by police was not armed with a gun, according to the City's records.

191.    ShotSpotter also generates inflated statistics about gunfire in the areas under its surveillance shadow. ShotSpotter-based statistics are included in Compstat reports and in various analyses by SDSCs that are used to guide CPD's tactics. On information and belief, CPD justifies aggressive and unwarranted police tactics on the basis of these statistics.

192.    ShotSpotter also diverts City resources away from more useful and equitable municipal services.

193.    ShotSpotter contributes to slow response to 9-1-1 calls. More than one in twelve "Priority 1" calls for police service in ShotSpotter districts was an unfounded ShotSpotter deployment. Specifically, between April 15, 2021 and April 13, 2022, there were 31,640 unfounded ShotSpotter alerts out of total of a 365,317 Priority 1 calls for police service in the 12

41

ShotSpotter districts, according to data from the Office of Emergency Management and Communications that is published by the Office of Inspector General.

194.    These unfounded ShotSpotter deployments contribute to the slow or non-existent police response that residents on the South and West sides often experience when they affirmatively call 9-1-1 for assistance because ShotSpotter alerts. Priority 1 calls for service, including ShotSpotter alerts, are given precedence over nearly all other calls for police service.

195.    According to a recent Wirepoints report, in 2021, more than 400,000 high-priority (Priority 1 or 2) calls for police service city-wide came in during periods when there were no police available to respond. Unfounded ShotSpotter alerts contribute to that problem.

196.    There is no evidence that ShotSpotter has reduced gun crime in ShotSpotter districts in Chicago. The Municipal Defendants have not published any studies even attempting to quantify ShotSpotter's effect, if it exists, on gun crime in Chicago. Studies in other cities have found no benefit. One study found that ShotSpotter did not reduce rates of violent crime, even as it more than tripled the number of police deployments chasing down supposed gunshots. Another study of 68 counties that use ShotSpotter found that ShotSpotter was associated with no difference in county-level homicides, murder arrests, or weapons arrests.

197.    There is likewise no evidence that ShotSpotter helps to save lives by getting police to shooting victims faster, which has been a frequent claim made by senior City of Chicago officials, including Defendant Superintendent Brown, and ShotSpotter itself. Defendants have not published any studies supporting this claim. Peer-reviewed studies in two other cities—Hartford, Connecticut and Camden, New Jersey—have found no benefit for patient outcomes of shooting victims when comparing situations where ShotSpotter detected the gunshot or did not.

42

198.     On information and belief, residents are better than ShotSpotter at notifying emergency services about actual shootings that involve a gunshot wound victim. On information and belief, even within ShotSpotter-covered areas, residents in Chicago report a higher proportion of shooting victims to emergency services than ShotSpotter does. ShotSpotter misses (or mislocates) a sizeable number of actual shootings that are within its coverage area. Moreover, ShotSpotter does not even claim to be useful for shootings that occur indoors or with small-caliber or silenced weapons.

199.     Thus, the City knowingly employs a racialized, discriminatory, and ineffective law enforcement program that results in significant and lasting harm to those it targets.

***The City of Chicago's Decision to Deploy ShotSpotter Along Racial Lines is Consistent with the City's History of Racially Discriminatory Policing Targeting the Same Black and Latinx Populations in the City***

200.     CPD's decision to target Black and Latinx communities with ShotSpotter and CPD's deployment pattern for ShotSpotter track CPD's long history of racial discrimination in policing tactics.

201.     Most recently, the Chicago Office of Inspector General has documented and quantified CPD's continuing practice of racially disparate and disproportionate stops and use of force.

202.     In a March 2022 report, the OIG found, based on CPD data, that "Black people were overwhelmingly disproportionately stopped by CPD, regardless of demographic composition and crime level in the district of the stop."

203.     The OIG also found that "[a]mong those whom CPD members stopped, Black people were disproportionately subjected to force," again controlling for demographics and

crime level of the area. It also found that "CPD was more likely to use higher-level force options against Black people than non-Black people."

204.    The OIG reports that Black people were 1.5 times more likely to be searched or frisked during an investigatory stop than other people and that CPD officers searched the cars of Black people 3.3 times more frequently during traffic stops than those of White people.

205.    Earlier, in 2017, the United States Department of Justice (DOJ) released a report on the CPD, finding evidence of systemic discrimination in policing against Black and Latinx communities in Chicago, including a pattern of unconstitutional use of force, conduct, and supervision by police officers in these minority communities.

206.    As the DOJ found, many Black and Latinx Chicago residents regard CPD as an "occupying force" in their neighborhoods. While the population of Chicago is roughly equal-thirds Black, Latinx, and White, CPD used force against Black people at rates nearly ten times that of White people. With respect to both uses of force and investigatory stops, CPD continued to exhibit patterns of racial bias. Further, of persons killed by the police from 2007 through 2017, 76 percent were Black, 13 percent were Latinx, and 8 percent were white.

207.    The DOJ's findings built on an analysis of the Chicago Police Accountability Task Force ("Task Force"), which released a report describing the history of CPD's abusive relationship with Black and Latinx communities; the policies, practices, and behaviors that contributed to such strained relations; and the training, accountability and oversight reforms necessary to protect civilians' rights. Following the DOJ's findings, the City of Chicago entered into a federal consent decree, which governs CPD use of force and police accountability, among other things, and which is being overseen by a federal judge.

208.    The CPD history of engage in racially discriminatory stops goes back many decades and has had many incarnations.

209.    A 2015 report by the ACLU of Illinois found that Black Chicagoans were subjected to 72% of all stops yet constituted only 32% of the population. It also found extremely high rates of stop and frisk: more than 250,000 stops that did not lead to an arrest over a period of 4 months.

210.    Following that report in 2015, the ACLU of Illinois entered into a settlement agreement with the City of Chicago requiring CPD to document all stops, to properly train and supervise its officers, and to regularly disclose certain data. The agreement appointed a retired magistrate judge to serve as a consultant to review and oversee CPD's policies, practices, and orders regarding stop-and-frisk, and to issue periodic compliance reports.

211.    Further back, between 1992 and 1995, CPD arrested over 42,000 persons—primarily persons of color—in connection to a "gang loitering ordinance" that prohibited "loitering" in a public place after receiving dispersal orders. The U.S. Supreme Court held that the ordinance was unconstitutionally vague and violated Fourth Amendment due process rights. The ordinance "fail[ed] to distinguish between innocent conduct and conduct threatening harm" and left a "potential for arbitrary enforcement" by giving police "too much discretion" that touched a "substantial amount of innocent conduct."

212.    Despite amendment of the gang loitering ordinance, in 2014, CPD officers issued 4,842 orders to disperse, including 4,100 against Black persons, 673 against Latinx persons, and just 66 against white persons.

213.    Still earlier, in the 1980s, the CPD made approximately 150,000 arrests annually, mostly in minority neighborhoods, for so-called "disorderly conduct." This amounted to nearly

45

half of CPD's annual arrests. Such arrests were one of the primary methods for CPD interactions with minority neighborhoods. Officers often failed to appear in court following such arrests.

214.    In 1983, the ACLU of Illinois sued the City alleging that CPD officers primarily carried out these arrests against Black and Latinx people observed "congregat[ing]" in minority neighborhoods. When the City failed to participate in the resulting ACLU suit in the Northern District of Illinois challenging the constitutionality of such stops, District Judge Prentice Marshall declared CPD's conduct unconstitutional, directed the city to expunge over 800,000 disorderly conduct arrests from the previous five years, and ordered that CPD notify all those whose records would be expunged that they could sue the City for damages.

215.    CPD's discriminatory deployment of ShotSpotter reinforces and fuels CPD's longstanding discriminatory policing practices. As the Task Force wrote, CPD's history of "enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct." ShotSpotter exacerbates these problems because it generates tens of thousands of high-intensity—but ultimately fruitless—police deployments and thousands of hostile encounters between police and residents, and it does so only in predominantly Black and Latinx parts of the city.

**IV.** **DEFENDANTS FALSELY ACCUSED PLAINTIFF MICHAEL WILLIAMS OF FIRST-DEGREE MURDER AND INCARCERATED HIM FOR ELEVEN MONTHS BASED ON A FAULTY SHOTSPOTTER ALERT THAT THEY KNEW WAS NOT RELIABLE**

*The Events of May 31, 2020*

216.    Plaintiff Michael Williams was falsely arrested for murder and spent nearly a year in the Cook County Jail because CPD officers used unreliable ShotSpotter evidence to arrest and prosecute him.

217.    The evening of May 31, 2020, was a turbulent one in Chicago. Six days earlier, police officers in Minneapolis had murdered George Floyd. Video of his murder had spurred uprisings nationwide, including in Chicago.

218.    That night, Mr. Williams and his wife had gone to a relative's house for dinner. After returning home to his apartment in the South Shore neighborhood, Mr. Williams went out for a drive. He intended to buy cigarettes at a gas station near East 76th Street and S. South Chicago Ave. He found that the gas station had been broken into. Mr. Williams turned his car around, heading east back in the direction of his home.

219.    Mr. Williams was not armed, nor does he own a gun.

220.     On his way east, around 11:40 p.m. or thereabouts, Mr. Williams passed the parking lot of an AutoZone located near E. 76th Street and S. Stony Island Avenue. Mr. Williams was driving with his front window down because he did not feel particularly well and needed the fresh air. A young man in the AutoZone parking lot waved down Mr. Williams and asked him for a lift to where he was staying, about 15 blocks north in the Woodlawn neighborhood. Mr. Williams obliged.

221.    It was not unusual when Mr. Williams agreed to give the young man a lift home that night.

222.    Mr. Williams is a 65-year-old married man with three children and multiple grandchildren. While he and his wife are of modest means, they are generous and community-minded. They frequently donate bags of groceries to needy people in the neighborhood and take people into their home to provide meals. They also regularly pick people up off the streets to give them rides when they need it.

223.    Mr. Williams did not know who the young man was. He believed he recognized him from seeing him around the neighborhood but had never spoken to him and did not know anything about him.

224.    Mr. Williams left the AutoZone parking lot, heading northbound to take the young man home. Mr. Williams' front window remained down.

225.    A few minutes later, they were continuing north along S. Stony Island Ave, somewhere past E. 71st Street. Without warning, a bullet came through the open car window.

226.    Mr. Williams slumped down in his seat, terrified that he might be struck by gunfire.

227.    Mr. Williams hollered at his passenger, asking if he was alright. Mr. Williams soon realized that his passenger had been shot. Mr. Williams hit the gas to race away from danger.

228.    Mr. Williams did not see where the fatal gunshot came from, but he did perceive that there was a vehicle in the next lane, immediately to his left, when the shot was fired.

229.    Terrified that there could be more gunshots, Mr. Williams sped through the intersection at E. 63rd Street, still heading northbound. Soon thereafter, he pulled a U-turn, intent on getting his passenger to the nearest hospital he could think of.

230.    Mr. Williams pulled up to the St. Bernard Hospital emergency room to get help for his passenger. Hospital staff received the wounded young man. Mr. Williams left his parked car and walked into the lobby of the hospital.

231.    Mr. Williams attempted to speak with hospital staff. A female hospital staff member told him that he could not stay because he was not next-of-kin and COVID protocols prohibited visitors. He provided his name and information to a hospital security guard before leaving.

232.    The wounded young man died from the gunshot wound approximately two days after he was shot.

233.    The events of that evening were extremely traumatic for Mr. Williams. The shooting had put him in mortal fear for his own life. He was distraught about his passenger. Because of the trauma of that evening, he avoided driving his car thereafter, for fear that he might be targeted again by the people who had shot into his car. He left the car parked on the street outside his apartment, where police soon found it and towed it for processing and investigation.

### The Unreliable ShotSpotter Alert and Shoddy Police Investigation

234.    On June 1, 2020, hours after the young man was received in the hospital, CPD detectives, including Defendant Detective Michael Kociolek (#20675), began an initial investigation, interviewing potential witnesses, requesting video footage, and taking other investigative steps.

235.    Defendant Sergeant Brian Roney (#2241) assigned follow-up on the shooting investigation to Defendant Detective Nicholas Evangelides (#20526).

236.    Over course of the subsequent days, Defendants Evangelides, Kociolek, and other CPD officers interviewed various members of the victim's family. They also conducted interviews of the victim's girlfriend and other friends or acquaintances who had been with the victim earlier in the evening.

237.    Police learned that the victim had apparently borrowed another person's cellphone to try to call for a ride home. His mother told police that she had received a call from that number at 11:25p.m. but that she did not answer the call.

238.    Defendant Detective Dale Potter Jr. (#21649) obtained several search warrants to search the victim's Facebook account as well as the cell phone records of the phone that he had apparently used to call for a ride.

239.    Nothing in any of these interviews, cell phone records, Facebook records, or other investigative steps suggested any link at all to Mr. Williams. The evidence regarding the victim's phone call suggest that he did indeed need a ride home, which Mr. Williams tried to provide.

240.    The Williams Defendant Officers failed to conduct obvious investigative inquiries into the victim's shooting death, including that he might have been intentionally targeted. They learned, for example, that the victim's mother had information that the victim may have been intentionally "set up" to be killed. On information and belief, Williams Defendant Officers did not seriously pursue this lead. Moreover, upon information and belief, had the Williams Defendant Officers conducted a thorough investigation, they would have learned that the victim had survived a shooting at a bus stop two weeks earlier and was staying with a relative for his personal safety. The Williams Defendant Officers reported no follow-up of this.

50

241. Instead, the Williams Defendant Officers worked together to charge and prosecute Mr. Williams, without cause, based on shoddy ShotSpotter evidence.

242. On June 4, 2020, Defendant Officer Scott Brownley of the Area One Technology Center gave Defendant Evangelides a copy of ShotSpotter Investigative Lead Summary, Incident Report No. 778-13539 (the "ShotSpotter Report" or "Initial ShotSpotter Report"). The ShotSpotter Report purported to identify a single gunshot at 11:46 p.m. near the intersection of E. 63rd Street and S. Stony Island Avenue.

243. The ShotSpotter Report included a map with a pin located in the northbound lane of S. Stony Island Avenue. It also included a large round circle that encompassed much of the intersection and surrounding area, reflecting the 82-foot margin of error that ShotSpotter provides for its alerts.

244. Ignoring the fact that the report suggested the shot may have occurred anywhere within an 82-foot radius, the Williams Defendant Officers instead fixated on the precise location of the pin on the ShotSpotter Report as the place where the fatal shot was fired. In a detailed Case Supplementary Report recounting the entire investigation, Defendant Evangelides falsely wrote that "Shot Spotter technology pinpointed the gunshot's exact location and determined the fired shot's origin was in the northbound lane of Stony Island just south of 63rd Street." The Defendant Officers repeated this false claim throughout their investigation of Mr. Williams in reports and interviews.

245. The Williams Defendant Officers relied on this false evidence to charge Mr. Williams with the crime. They did so knowing that the ShotSpotter report did not support their charge, for multiple reasons.

51

246.    An initial ShotSpotter report cannot identify the "exact location" of gunshots. The Initial ShotSpotter Report that the Williams Defendant Officers relied on itself warns repeatedly that it should not be relied upon in this way. It states that "locations were automatically calculated by the ShotSpotter system at the time of detection. They are approximate and should be deemed as such." The same document provides an explicit "Disclaimer" that "this summary should only be used for initial investigative purposes because the shot timing, location, and count could differ once reviewed by a ShotSpotter Forensic Engineer." The Disclaimer further warns that a "weapon discharge in an enclosed space" may affect the ability of sensors to properly detect gunshots. The Disclaimer concludes by warning that "the data and conclusions herein should be corroborated with other evidentiary sources such as recovered shell casings and witness statements."

247.    The Williams Defendant Officers intentionally disregarded each of these warnings in their investigation of the shooting, relying solely on the Initial ShotSpotter Report to determine the supposedly "exact location" of the supposed gunshots.

248.    The Williams Defendant Officers also ignored the fact that ShotSpotter's materials explicitly state that its initial reports only provide the location of supposed gunshots within an 82-foot radius. The Initial ShotSpotter Report that the Williams Defendant Officers relied on itself showed a large circle on the map clearly showing the margin of error around the pin on the map.

249.    The Williams Defendant Officers also disregarded an obvious error in the Initial ShotSpotter Report. That report listed the street address of the supposed gunshot at 5700 S. Lake Shore Drive, more than one mile away from the dot on the map and GPS coordinates in the

report. The Williams Defendant Officers should have known from this error that ShotSpotter locations are not "exact."

250.    On information and belief, the Williams Defendant Officers also knew the ShotSpotter location was inaccurate from their past experience investigating ShotSpotter alerts, in which they learned that the dot on the map is not an exact location for gunfire.

251.    Yet, the Williams Defendant Officers ignored multiple red flags in the Report, ShotSpotter's own warnings, and their past investigative experience in order to pursue a false murder case against Mr. Williams.

252.    The Williams Defendant Officers also improperly determined that the noise identified in the ShotSpotter Report *was* a gunshot, even though the ShotSpotter Report had initially been categorized by ShotSpotter's algorithm as fireworks, with an almost 99% confidence level. It was only after a low-level ShotSpotter operator, listening to the single "pop" detected by ShotSpotter's sensors, overrode the computer algorithm, that the sound was reclassified the noise as gunfire. On information and belief, the Williams Defendant Officers knew about that unreliable human override yet decided to classify the noise as a gunshot anyway.

253.    In pursuing a case against Mr. Williams, the Williams Defendant Officers also disregarded ShotSpotter's own warnings that its system is not meant to detect gunshots in an enclosed space such as a vehicle. The ShotSpotter alert thus could not and should never have been used as evidence that the fatal shot was fired from inside Mr. Williams' car.

254.    Despite the explicit disclaimer, and despite the centrality of the ShotSpotter evidence to their subsequent investigation, the Williams Defendant Officers failed to request a post-processing analysis from ShotSpotter engineers, which ShotSpotter calls a "Detailed Forensic Report." Their failure to do so was in derogation of CPD's formal ShotSpotter policy,

which directs investigators to "acquire detailed forensic reports" for "investigation and prosecution purposes." Nobody asked ShotSpotter to prepare a Detailed Forensic Report until months after Mr. Williams was arrested and indicted on murder charges.

255. Upon information and belief, the Williams Defendant Officers also made no effort to ascertain the reliability of the ShotSpotter algorithms or the proficiency of the operator who triggered the ShotSpotter alert described in the Initial ShotSpotter Report.

256. In short, ignoring all evidence about ShotSpotter's reliability and its inaccuracy, particularly under the circumstances presented by the shooting, the Williams Defendant Officers used the Initial ShotSpotter Report, generated within seconds of the loud noise, to guide their faulty investigation of the crime and ultimately to falsely arrest Mr. Williams for first-degree murder.

257. The Williams Defendant Officers, now focused on the dot on the map in the ShotSpotter Report as the location of the shot, pulled surveillance video footage near the time and place of the ShotSpotter alert. No video shows the shooting. One video shows the intersection adjacent to the ShotSpotter alert but does not encompass the specific location ShotSpotter gave. That video shows there was a dark sedan or coupe in the left-turn lane immediately adjacent to where Mr. Williams' vehicle was (off camera) around the time when the ShotSpotter alert registered a supposed gunshot. The video shows the dark car creeping forward past Mr. Williams' car into the crosswalk before suddenly speeding away to make a left-turn through a red light. Moments later, Mr. Williams' car comes into view, accelerating straight through the intersection.

258. On information and belief, the Williams Defendant Officers never ascertained the license plate number of the dark vehicle that crept alongside Mr. Williams' car, never ascertained

its ownership, never sought a search warrant, and did not trace its movements around the time of the shooting.

259.     The Williams Defendant Officers dismissed the strong possibility that the shots came from this other vehicle and maliciously focused on Mr. Williams. Nothing in the video or any other evidence ruled out the dark sedan as the source of the fatal gunshot.

260.     Neither the ShotSpotter Report nor the video footage demonstrated that the shot was fired from inside Mr. Williams' car. Neither were sufficient to supply probable cause of that theory of the crime.

261.     Defendant Evangelides and the other Williams Defendant Officers also intentionally ignored forensic evidence that contradicted their theory of the case and that excluded the possibility that the shot came from inside Mr. Williams' car.

262.     The Cook County Medical Examiner conducted an autopsy of the victim's body on June 6, 2020. The Medical Examiner concluded that "[t]here was no evidence of close range firing on the body." This effectively excluded the possibility that Mr. Williams shot the victim in his car.

263.     The Illinois State Police Division of Forensic Sciences examined the passenger-seat headrest of Mr. Williams' car for any traces of gunshot residue. The laboratory report found no traces of gunshot residue. This result likewise tended to exclude Mr. Williams as a suspect.

264.     The Defendant Officers disregarded this clear evidence of Mr. Williams' innocence, and maliciously pursued charges against him.

***Defendants' Interrogation and Arrest of Mr. Williams***

265.     On August 28, 2020, Defendant Sergeant Perez (#902) and other officers came to Mr. Williams home and asked him to come to the police station for questioning regarding their

investigation of the fatal shooting. They told him he was not under arrest and that police just wanted to ask him questions.

266.    Mr. Williams agreed to go with the officers because he thought he might be able to help the police with their investigation. Mr. Williams was feeling ill that day and required help from his wife to get down the stairs of his apartment.

267.    Mr. Williams did not request an attorney at that time because he did not believe he was under arrest based on the Defendant Officers' representations.

268.    Defendant Perez and other CPD officers took Mr. Williams to the Second District police station at 51st and S. Wentworth Avenue.

269.    Mr. Williams spent the next three days locked up at that police station, except for three trips to the hospital for emergency treatment.

270.    On arrival, Mr. Williams was taken upstairs to the Area One Detective Division in the police station. There, Defendant Detectives Evangelides, Potter, and Scott Reiff (#20847) questioned Mr. Williams without reading him Miranda warnings. Mr. Williams truthfully recounted the events of May 31, 2020, as set forth in paragraphs 216 to 233.

271.    Defendants Evangelides, Potter, and Reiff then transferred Mr. Williams to a small, windowless holding cell. It was equipped with a video tape recording device, which was switched on.

272.    Defendant Evangelides then finally read Mr. Williams his Miranda rights and, in the presence of Defendants Potter and Reiff, repeated many of the same questions that had just been asked of Mr. Williams in the other room. Mr. Williams provided consistent answers, truthfully and to the best of his recollection.

273.    On information and belief, at the time they interrogated Mr. Williams, the
Defendant Officers had already decided that the fatal shot came from inside Mr. Williams' car
based on the Initial ShotSpotter Report and video. Having made that unfounded determination,
they proceeded to try to force Mr. Williams to confess to that crime, despite no evidence linking
him to the murder.

274.    Throughout the interrogation, Defendant Evangelides repeatedly accused Mr.
Williams of lying, citing supposed "inconsistencies" between the police's investigation and Mr.
Williams' account. In fact, Mr. Williams' account was consistent with the evidence amassed by
police.

275.    Defendant Evangelides also tried to pressure Mr. Williams to confess by detailing
the police's purported "evidence" involving the ShotSpotter alert. In reality, the ShotSpotter
evidence did not implicate Mr. Williams. Knowing the statement to be untrue, Defendant
Evangelides told Mr. Williams that "ShotSpotter detects gunshots in the area and it's
sophisticated and it can pinpoint *exactly* where that occurs."

276.    Defendant Officers had already come to the false conclusion that the fatal shot
was fired inside Mr. Williams' car. Defendant Evangelides made this plain at the end of his
interrogation when he directly accused Mr. Williams of murder for the first time. "There is
nobody else in that car, Michael," Defendant Evangelides said, referring to Mr. Williams' car,
"because *you* shot him."

277.    Mr. Williams, stunned to be directly accused of a crime he did not commit,
immediately ended his cooperation with the police investigation. "You know what," he said, "get
me a lawyer right now. Get me a lawyer."

278. Despite no physical evidence implicating him in the crime, and though Mr. Williams had steadfastly asserted his innocence, Mr. Williams was formally arrested by Defendant Sergeant Perez, Defendant Detectives Evangelides, Nicholas Nunez (#20743), Potter, and Reiff, and Defendant Officers David Magana (#7098) and Eduardo Almanza (#15464). He was then taken to a holding cell at the police station.

279. Defendant Officer Nunez prepared the arrest report at 9:33 p.m. on August 28, 2020. Defendant Lieutenant Michael Dougherty (#363) approved probable cause at 10:00 p.m. the same evening.

280. Because there was no evidence implicating Mr. Williams in the crime, the arrest report did not describe evidence that provided probable cause to arrest Mr. Williams. The arrest report stated only, falsely, that "WILLIAMS provided statements to [Defendant] EVANGELIDES that contradicted evidence obtained throughout the course of the investigation."

281. Mr. Williams was held in police lockup for two nights before he saw a judge.

282. Defendant Detectives Evangelides, Reiff, Potter, Joseph Merkel (#21015), Carol Maresso (#20183), Nestor De Jesus (#20461), Marc LaPadula (#21158), and Salvatore Aloisio (#20082), among others, continued to investigate the case after Mr. Williams' arrest, seeking to obtain approval to file murder charges against Mr. Williams. During this post-arrest period, they did not find evidence to implicate him in the crime. Defendant LaPadula reinterviewed the Medical Examiner who confirmed again that the fatal gunshot did not come from close range.

283. On August 30, 2020, Defendant Potter obtained a warrant to search Mr. Williams' Samsung smart phone. The phone contained no evidence corroborating the Officers' allegations against Mr. Williams or tying Mr. Williams to the victim in any way.

284.    Despite the absence of evidence, on August 30, 2020, the Defendant Officers obtained approval to formally file charges of first-degree murder against Mr. Williams. Defendant Lieutenant Robert Costello (#231) gave final approval of the charges that day.

285.    The formal Probable Cause Statement for Judicial Determination, signed by Defendant Potter at 11:40 a.m. on August 30, 2020, also provided no actual evidence that Mr. Williams had committed the crime.

286.    The Probable Cause Statement asserted, without any evidence, explanation, or elaboration, that "[t]he investigation revealed that the gunshot had come from within the vehicle." It stated that Mr. Williams was the only person in the car with the victim and noted unspecified statements by Mr. Williams during his interrogation that supposedly "contradicted video evidence." In fact, Mr. Williams provided no such statements.

287.    The Defendant Officers never identified any motive for the crime. They never identified any prior connection between Mr. Williams and the victim. They never recovered any weapon or physical evidence whatsoever to support the charges. They never identified any eyewitnesses or circumstantial witnesses to support their charges. They had no video evidence establishing that the fatal gunshot was fired from inside Mr. Williams' vehicle. They ignored evidence tending to show that the gunshot could not have come from inside the car.

288.    The Defendant Officers engaged in tunnel vision to target Mr. Williams, arresting him for first-degree murder, without probable cause. As a result, they never identified the true perpetrator of the murder.

*Court Proceedings and the Ultimate Dismissal of Charges*

289.    On August 30, 2020, Mr. Williams had his first court appearance for a probable cause hearing. Defendant Officer Potter testified at the hearing. Mr. Williams appeared by video.

59

290.     The documents and testimony presented to the Court at the preliminary hearing, including the Arrest Report, Case Incident Report, and Felony Minutes, included no facts beyond those in the Probable Cause Statement. There was no evidence supporting the Defendant Officers' false claim that the shots came from inside Mr. Williams' car.

291.     During the probable cause hearing, Defendant Officer Potter misled the Court. Defendant Officer Potter provided no testimony about the unreliability of the ShotSpotter evidence. Defendant Officer Potter affirmatively mischaracterized the evidence against Mr. Williams, informing the judge there was video surveillance of the incident without stating that that evidence did not show any shots fired and that Mr. Williams' vehicle was off camera during the time police believed the shooting occurred.

292.     On the basis of Defendant Officer Potter's misleading testimony, the judge determined that there was probable cause against Mr. Williams.

293.     On September 22, 2020, the Grand Jury issued an indictment against Mr. Williams for first-degree murder. The only witness listed on the Indictment was Defendant Officer Evangelides, who, on information and belief, failed to present evidence of the unreliability of the ShotSpotter evidence or to be truthful as to the lack of evidence implicating Mr. Williams in the crime. The unreliable Initial ShotSpotter Alert was presented to the Grand Jury and was, on information and belief, essential to its finding of a true bill.

294.     Mr. Williams' was eventually assigned counsel from the Cook County Public Defender Office. His attorneys mounted a vigorous defense and issued numerous subpoenas seeking to interrogate the reliability and admissibility of the ShotSpotter evidence that was central to the State's case.

295.    On April 22, 2021, Mr. Williams' defense attorneys filed a Motion to Exclude

ShotSpotter Evidence Pursuant to *Frye* and Rule 403. The 41-page motion presented a

meticulous and thorough challenge to the reliability of ShotSpotter's initial alerts and its so-

called forensic reports. The motion sought an evidentiary hearing to ascertain, for the first time,

the reliability of ShotSpotter evidence in Cook County and whether it should be excluded under

*Frye* standards.

296.    On May 3, 2021, Plaintiff Lucy Parsons Labs and two other community-based

organization, Brighton Park Neighborhood Council and Organized Communities Against

Deportations, filed an *amicus* brief in support of Mr. Williams' motion for a *Frye* hearing. The

brief spotlighted the daily impact of unreliable ShotSpotter alerts on Black and Brown residents

of Chicago and reported the City's data showing that the vast majority of alerts turn up no

evidence of gun crime.

297.    On June 11, 2021, rather than defending the reliability of ShotSpotter, the State's

Attorney Office chose to withdraw the ShotSpotter evidence, rendering moot the challenge to

ShotSpotter's reliability. Mr. Williams' counsel informed the Court that he would be seeking

dismissal because ShotSpotter was central to the finding of probable cause and had been

presented to the Grand Jury.

298.    At the next court date, on July 23, 2021, the Assistant State's Attorney moved to

dismiss the charges. He reiterated the prior decision "not [to] use ShotSpotter evidence in this

particular case." He then explained, "We have since conducted a thorough reevaluation of the

evidence in this case. All the video that was collected by the Chicago Police Department,

statements taken, circumstantial evidence, we requested some additional forensic testing during

our analysis, and after that review, Judge, it was our determination that we have insufficient evidence to proceed with the prosecution of Mr. Williams."

299.    The Assistant State's Attorney moved for dismissal of the charges, *nolle prosequi*. The Court granted the motion.

300.    The Assistant State's Attorney also confirmed, in response to questions from the Court, "that ShotSpotter evidence was used before the Grand Jury in getting the indictment."

301.    Mr. Williams was released from the Cook County Jail on the evening of July 23, 2021, nearly 11 months after his unlawful arrest.

### Eleven Months of Illegal Detention Under Terrible Conditions

302.    Mr. Williams suffered terribly while he was jailed for almost a year on the Defendant Officers' false charges of murder.

303.    Mr. Williams suffers from multiple chronic ailments. He has diabetes, chronic obstructive pulmonary disease (COPD), hyperlipidemia, high blood pressure, and a history of deep vein thrombosis and pulmonary embolism. He requires several medications to manage these illnesses. He relies on dentures to eat because he is missing his teeth. He walks with a cane because of pain in his knees.

304.    Mr. Williams was held in police lockup beginning in the afternoon on August 28, 2020, when he was brought in for questioning, until three days later, August 31, 2020, when he was taken to the Cook County Jail. For nearly all of his time in lockup, he was confined to a holding cell in the downstairs area of the station.

305.    The only food he received in police lockup during those three days were two baloney sandwiches. Mr. Williams could only eat the bread because of his diabetes.

306.     Mr. Williams attempted to sleep on the bench in the holding cell, but it was freezing cold.

307.     Mr. Williams explained to a guard that being in the holding cell with no access to medications, breathing pumps, and adequate food would aggravate his medical conditions. The guard did nothing to alleviate those concerns.

308.     During the three days Mr. Williams spent in the holding cell, guards did not let him take his medications or allow him to use his breathing pump.

309.     Mr. Williams experienced multiple health crises while jailed in the holding cell.

310.     Soon after officers falsely accused Mr. Williams of murder, on his first night in police lockup, he experienced serious chest pain and difficulty breathing. He was rushed to Mercy Hospital for treatment.

311.     Despite doctors explaining that Mr. Williams had serious medical issues, police took him back to the holding cell at 51st and Wentworth less than 24 hours later.

312.     On the second night that Mr. Williams spent in the holding cell, Mr. Williams again needed to be rushed to Mercy Hospital just before midnight. He experienced extreme shock and a sharp increase in his blood sugar, feeling lightheaded as if he was going to pass out.

313.     On the third night in lockup, just after midnight, Mr. Williams was again taken to Mercy Hospital for treatment.

314.     Mr. Williams was not permitted to call a lawyer during those three days in police lockup. He was allowed only one short phone call with his wife.

315.     Mr. Williams was taken into custody at the Cook County Jail ("CCJ") on August 31, 2020. He was held there without bond until the State's Attorney dismissed charges on July 23, 2021.

316.    Medical staff at CCJ identified Mr. Williams' chronic conditions during an initial medical screening.

317.    Mr. Williams continued to experience acute chest pains on arrival at CCJ. He was taken to Stroger Hospital for testing and treatment on September 1, 2020, the day after he was transferred to CCJ.

318.    On September 9, 2020, Mr. Williams complained that his cane was taken away during a visit to an outside hospital and it was not returned to him.

319.    Mr. Williams also had his diabetic shoes permanently taken away from him, even though he made several requests to staff.

320.    Despite having no teeth and being diabetic, staff repeatedly served hard food that Mr. Williams could not eat and ignored the dental soft tray his doctor ordered. Staff also continued to serve food high in sugar and dangerous for a diabetic such as cookies, baloney, peanut butter, chips, and cake.

321.    Mr. Williams filed multiple grievances requesting adequate food, given his diabetes and lack of teeth. Staff did not regularly test his blood sugar after providing this food, nor did they give him insulin.

322.    Within two weeks of his transfer to CCJ, Mr. Williams developed painful knots/growths on his backside. He repeatedly requested medical attention for this because it caused extreme pain and made him unable to lie down. Staff did not identify the cause of the growths or provide anything to address it adequately. Eventually the growths began to bleed. It was extremely painful to sleep on the thin mattress in his cell. He was forced to endure this extreme discomfort for the entire time he was jailed.

64

323.    Mr. Williams suffered multiple other medical ailments due to the conditions at CCJ. These included burning in his eyes, severe itchiness and dry skin, dizziness, spotty vision, and balance problems while walking.

324.    About two months after he was jailed, Mr. Williams' lower plate denture began to break in half. He pleaded with jail staff to allow him to use Krazy Glue to fix it. They refused.

325.    Without his dentures, Mr. Williams was unable to eat hard food. He complained repeatedly over the course of weeks that he did not have teeth and was being served food that he could not chew. His requests were ignored.

326.    On or around December 16, 2020, Mr. Williams tested positive for COVID-19. He was put in a cohort housing environment surrounded by others who had tested positive for COVID-19.

327.    Staff considered Mr. Williams to be high risk for serious COVID illness due to his age and other risk factors, including venous thromboembolism, COPD, and Type 2 Diabetes.

328.    Just before testing positive for COVID-19, Mr. Williams experienced shortness of breath and various pains.

329.    On December 23, 2020, while in COVID isolation with other inmates, Mr. Williams requested to be put into a different tier, citing his older age and breathing problems. Jail staff refused.

330.    Despite having multiple chronic conditions that put him at serious risk for severe symptoms of COVID-19, staff never tested or monitored his blood oxygen levels.

331.    Mr. Williams suffered from several blood clots on his leg and severe skin irritation as well.

332.    During his incarceration, Mr. Williams developed tremors that caused his right hand to violently shake. Mr. Williams never had any issues with tremors before entering the CCJ.

333.    Mr. Williams' imprisonment on false accusations of murder also caused him severe mental anguish. Mr. Williams fell into despair at the prospect of being sentenced to spend the rest of his life in prison—and to die in prison—for a crime that he did not commit.

334.    Mr. Williams thought of his wife, who he could not help or take care of. After he was jailed, he lost his income, most notably his Supplementary Security Income. His wife was left unable to pay the rent on their apartment, unable to keep up on bills, and barely able to take care of herself or their dogs. Mr. Williams was anguished that he could not do anything to help.

335.    At times, Mr. Williams felt as though he was losing his mind. He experienced intrusive and disturbing thoughts. Every day, he kept replaying in his mind the ominous words the judge had said to him at his first bond hearing after being transferred to CCJ: that he could be sentenced to life in prison.

336.    Mr. Williams was in utter despair, facing the enormous pressure of being accused of a crime he did not commit and a lifetime term in prison on false charges—all because he agreed to help a stranger with a ride home.

337.    Mr. Williams' despair grew so deep that he began to think of taking his own life. He made preparations to do so and nearly made a suicide attempt.

338.    To this day, Mr. Williams continues to suffer the consequences of his false detention.

339. Mr. Williams and his wife have been unable to catch up on the bills and expenses that piled up while he was jailed and lost his income. They continue to struggle to make rent and other bills.

340. Mr. Williams continues to experience ailments that began or worsened while at CCJ. Mr. Williams continues to suffer debilitating tremors in his hand. Many of Mr. Williams' preexisting conditions were aggravated during his arrest and detention.

341. Mr. Williams is also deeply troubled that his home is in a neighborhood blanketed by ShotSpotter sensors, the very system that landed him in jail on false charges. He lives in constant fear of CPD officers. He is deeply concerned that police might stop him or arrest him again as a result of an alert from the faulty system.

## V. DEFENDANT OFFICERS ILLEGALLY STOPPED, SEARCHED, AND ARRESTED PLAINTIFF DANIEL ORTIZ BECAUSE OF A BOGUS SHOTSPOTTER ALERT

342. On the afternoon of April 19, 2021, Mr. Ortiz was doing his family's laundry at a coin wash on the 6700 block of W. Belmont Ave, next door to a Family Dollar store in the Schorsch Village neighborhood of Northwest Chicago.

343. Mr. Ortiz has two young children with his girlfriend and is also raising her two other children, whose father has passed away. He is the primary caregiver in his family.

344. On April 19th, he was doing laundry for the four kids and his girlfriend.

345. Mr. Ortiz was accompanied by his close childhood friend, Mario Serrano.

346. As they waited for the final load of laundry, Mr. Ortiz was sitting in his car with Mr. Serrano outside the laundromat.

347. The car was legally parked in the parking lot immediately outside the entrance to the laundromat.

67

348. As they talked, neither Mr. Ortiz nor Mr. Serrano heard any noise that resembled a gunshot. Unbeknownst to them, ShotSpotter had sent an alert of supposed gunfire to the immediate area where they were parked, sitting and chatting.

***Defendant Officers Illegally Stopped and Arrested Mr. Ortiz as a Result of False ShotSpotter Evidence***

349. Around 4:10pm, ShotSpotter sent an alert to CPD about a supposed gunshot near the 6700 block of W. Belmont Avenue, in the Schorsch Village neighborhood on Northwest Side of Chicago. The ShotSpotter alert reported a "single gunshot." On information and belief, the alert was transmitted to numerous CPD officers in the area.

350. Defendant Officers Harsimran Powar (#17135) and Michael Matias (#18985) responded to the alert first, arriving at the 6700 block of W Belmont Ave soon after the alert was sent out to police officers.

351. The officers were dressed in black and were driving in an unmarked vehicle.

352. Mr. Ortiz noticed the Defendant Officers walking quickly and aggressively down the street. Their behavior struck Mr. Ortiz as threatening.

353. Mr. Ortiz saw the Defendant Officers approach cars in the parking area, look inside, and pull on door handles, attempting to open the car doors without the owners' permission.

354. The Defendant Officers advanced to a van parked adjacent to Mr. Ortiz's car. Mr. Ortiz stood at the hood of his car, while Mr. Serrano began to walk into the laundromat.

355. Defendant Officer Powar yelled at Mr. Ortiz that a shooting occurred on the block. He began shouting questions at Mr. Ortiz, asking him about the supposed shooting. Powar approached Mr. Ortiz aggressively and ordered Mr. Ortiz to respond to questions.

356.     Mr. Ortiz turned away from Defendant Officer Powar to walk into the laundromat.

357.     Defendant Officer Powar pursued Mr. Ortiz, continuing to order him to answer questions and attempting to detain him, without a reasonable basis. Powar sought to prevent Mr. Ortiz from going back inside the laundromat and grabbed his arm to restrain him.

358.     Defendant Officer Powar subsequently handcuffed Mr. Ortiz, pushing him against the hood of his car.

359.     Defendant Officers Matias and Powar patted down Mr. Ortiz without his consent.

360.     Defendant Officer Matias also handcuffed and searched Mr. Serrano, who was ordered out of the laundromat by the Defendant Officers.

361.     Mr. Ortiz and Mr. Serrano were both restrained and ordered to remain seated on the street curb.

362.     The only reason the Defendant Officers targeted and detained Mr. Ortiz was the false and unreliable ShotSpotter alert.

363.     The Defendant Officers lacked probable cause to search or arrest Mr. Ortiz. They also lacked reasonable suspicion to detain him for questioning or to conduct a pat down.

364.     Over the course of the encounter Mr. Ortiz repeatedly told Defendant Officers Powar and Matias that he had heard no gunshots, that he had no knowledge of any supposed shooting, and that they were harassing him for no reason.

365.     At one point, Mr. Ortiz observed that if the officers were actually interested in investigating a supposed shooting, they should consider talking to a man who had been working at a food stand in the parking lot all day, selling elotes with a young girl who appeared to be his granddaughter. On information and belief, the Defendant Officers did not do so.

69

366. At some point after first stopping Mr. Ortiz and ordering him to answer questions about a supposed shooting, Defendant Powar said that he smelled the odor of marijuana.

367. In response to Defendant Officers' questions, Mr. Ortiz also told them, truthfully, that he had legally smoked marijuana and that he possessed a legal quantity of the drug. He had recently purchased it at a nearby legal marijuana dispensary.

368. In fact, Mr. Ortiz possessed approximately half an ounce of marijuana, well below the legal limit of 30g that is permitted for adults under the Illinois Cannabis Regulation and Taxation Act, 410 ILCS 705/10-10. The marijuana was in the original small bags provided by the dispensary.

369. At some point, people from inside the laundromat came out and told the officers that Mr. Ortiz and Mr. Serrano had done nothing wrong and that there were no gunshots.

370. Approximately 3-4 additional police cars arrived at the scene sometime after Defendant Officers Powar and Matias handcuffed and patted down Mr. Ortiz.

371. The new officers on the scene—Officers Soly E. Roman (#10493), Mychael Ramos (#12622), Jorge Ulloa (#13936), Ilir Llika (#17061), Matthew Deneen (#2899), Miguel Nieves (#4931), and Kevin O'Brien (#8884)—continued to detain Mr. Ortiz and his friend. They continued questioning them about supposed gunshots. All of the officers at the scene acted in concert to detain and arrest Mr. Ortiz.

372. At some point, some of the officers showed Mr. Ortiz a screen with the ShotSpotter alert that had directed them to the location. They explained that the ShotSpotter alert seemed to show the address of the Family Dollar as the location of supposed gunfire. The officers explained that they were there to investigate the supposed gunshots.

373. The false ShotSpotter alert was the only reason that Defendant Officers Powar and Matias had arrived in the parking lot and targeted Mr. Ortiz to stop, question, and frisk him.

374. Police officers found no evidence to corroborate gunfire. To the best of Plaintiff's knowledge, nobody in the area had heard or seen any gunfire. On information and belief, there were no gunshots.

### Defendant Officers Illegally Searched Mr. Ortiz's Vehicle and Arrested Him on False Drug Charges

375. After handcuffing him, Defendant Officers Powar and Matias searched Mr. Ortiz's car without his consent. Defendant Officer Powar took the car keys out of Mr. Ortiz's pocket to open the vehicle, without Mr. Ortiz's consent.

376. Defendant Officers Powar and Matias lacked probable cause to search Mr. Ortiz's vehicle. They did not have probable cause to believe that the vehicle contained illegal quantities of marijuana or any other drugs. They likewise had no probable cause to believe that the vehicle contained a weapon.

377. Defendant Officers Powar and Matias searched Mr. Ortiz's car for about 25 minutes.

378. Defendant Officers Powar and Matias recovered the approximately half-ounce of marijuana that Mr. Ortiz had told them he had purchased from a legal dispensary.

379. Defendant Officers Powar and Matias also recovered a prescription drug bottle containing 20 hydrocodone pills with a prescription label affixed indicating that the contents had been lawfully prescribed by a doctor. The pills were in their original container.

380. Mr. Ortiz informed the Defendant Officers that the pills belonged to his elderly mother and had been legally prescribed to her, as indicated on the label. He explained that he

often drove his mother around for errands and she had left the pills in his car. He explained that the painkillers had been prescribed to her due to her back pain.

381.    Mr. Ortiz lived in the same household as his mother at the time, one floor below her.

382.    Mr. Ortiz did not violate any law by having his mother's lawfully-prescribed prescription in his vehicle. Illinois law specifies that a person may legally possess a controlled substance, including hydrocodone, if the person is either the "ultimate user" or "a person in possession of a controlled substance for the ultimate user under a lawful prescription of a practitioner." 720 ILCS 570/302(c)(3). In addition, the law defines the "ultimate user" to include both the person to whom the drugs were prescribed as well as a person who possesses the prescription "for the use of a member of his or her household." 720 ILCS 570/102(ss).

383.    Defendant Officers Powar and Matias nevertheless arrested Mr. Ortiz on false drug charges. They did so without probable cause. All of the Ortiz Defendant Officers and other officers who had arrived assisted in unlawfully arresting and transporting Mr. Ortiz from the scene.

384.    The arrest report claimed, falsely, that Mr. Ortiz possessed 36g of marijuana, just above the legal limit of 30g, in violation of 720 ILCS 550.0/4(c). Mr. Ortiz did not possess that much marijuana, which amounts to nearly 1.5 ounces. At one point, while handcuffed at the scene, Mr. Ortiz asked the officer to weigh the marijuana on a scale. Mr. Ortiz did not see any of the officers ever do so and, on information and belief, neither Defendant Officers Powar, Matias, nor any of the other officers who arrived ever weighed the marijuana.

385.    The arrest report also falsely accused Mr. Ortiz of illegally possessing a controlled substance, the hydrocodone pills, in violation of 720 ILCS 570.0/402(c). The arrest

72

report, however, omitted the facts showing that Mr. Ortiz was in compliance with the law, including that the drugs were in an ordinary prescription bottle with a label affixed, prescribed to Mr. Ortiz's mother. The arrest report stated only that the tablets were found in an "amber vial."

386. The arrest report was prepared by Defendant Officer Powar with assistance from Defendant Officer Matias and other responding officers. It was approved by Defendant Lieutenant Arthur Harb (#311).

387. Knowing there was insufficient evidence against Mr. Ortiz, Defendant Sergeant Mark Flechsig (#1733) unlawfully approved the charges and storage of Mr. Ortiz's property.

388. In addition to falsely arresting Mr. Ortiz, the Ortiz Defendant Officers illegally impounded his vehicle, a 2017 Ford Edge SUV, under Illinois civil forfeiture laws, which permit forfeitures in certain circumstances where a vehicle is used to facilitate certain drug offenses.

389. The Ortiz Defendant Officers impounded the car on the basis of the same false allegations of drug crimes that formed the basis for their criminal complaint. The Ortiz Defendant Officers lacked probable cause to impound and forfeit the vehicle, as it was not used to facilitate a drug offense.

***Mr. Ortiz's Illegal Detention and Subsequent Release***

390. Mr. Ortiz was taken by the Ortiz Defendant Officers to lockup at the 25th Precinct station at 5555 W. Grand Avenue.

391. Mr. Ortiz was held at the station overnight. While he was there, Defendant Officer Powar verbally harassed him.

392. Mr. Ortiz was wrongfully charged with one felony count of possession of controlled substances and one misdemeanor count of possession of cannabis over 30 grams.

393.    On the same day, April 19, 2021, Defendant Officers Powar and Matias prepared a misdemeanor complaint against Mr. Ortiz for the false marijuana possession charge and a felony complaint for the false hydrocodone possession charge. Powar signed as the complainant on both charges; Matias notarized both the felony and misdemeanor complaints. The complaints were filed in the Cook County Circuit Court. The court clerk's office file-stamped the complaints on April 20, 2021.

394.    Mr. Ortiz was transferred to Cook County Jail at 4 a.m. on April 20, 2021.

395.    That day, Mr. Ortiz was set to make his initial appearance in bond court before Judge Mary Marubio.

396.    The Assistant State's Attorney dropped all charges against Mr. Ortiz, moving to dismiss the charges *nolle prosequi*. Mr. Ortiz was not even called individually to appear before the judge. He was informed summarily that the charges were dismissed.

397.    Mr. Ortiz was then released from custody.

398.    After being released, Mr. Ortiz sought to recover his illegally impounded car. He was initially told that he would have to pay a $3,000 fine to recover the vehicle. He refused and insisted on a hearing.

399.    On April 21, 2021, Mr. Ortiz attended a hearing at 400 W. Superior Street to challenge the seizure of his car. No police officers appeared as witnesses. The Administrative Law Judge ordered the vehicle released to Mr. Ortiz.

400.    Mr. Ortiz searched for the vehicle and ultimately found it at a police impound lot at 2255 E. 103rd Street. When the car was returned to him, he found that there was approximately $1,200 in new damage to the car door and body. This damage was not present when he was arrested and the car was impounded.

401.    CPD denied Mr. Ortiz's claims for recovery for the damage to his vehicle. The vehicle repairs remain outstanding.

402.    The erroneous ShotSpotter alert prompted the Defendant Officers to falsely suspect and target him, search his person and vehicle, and ultimately arrest and illegally detain him on false charges. Upon information and belief, Defendant Officers Powar and Matias arrested Mr. Ortiz and filed the charges to retaliate against Mr. Ortiz and to attempt to justify retroactively their unlawful conduct.

403.    Mr. Ortiz cares for four children in his home. He suffered from the stigma of his false arrest around his family and friends.

404.    Mr. Ortiz continues to feel unsafe around CPD officers after Defendant Officers violently accosted him during a routine chore he undertook to serve his family. He still sees the same officers around the neighborhood and is disturbed by their unwarranted actions.

405.    Mr. Ortiz regularly travels and goes about daily business within parts of the City of Chicago that are within ShotSpotter's footprint. He is thus likely to be falsely targeted again by CPD officers, solely based on the fact that he is in a high-alert ShotSpotter area of the City.

## CLASS ACTION ALLEGATIONS

406.    Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiff Ortiz brings this action on behalf of himself and a class consisting of all persons who have been or will be subject to an investigatory stop by Chicago Police Department officers where a recent ShotSpotter alert—or a history of ShotSpotter alerts in the area—is part of the basis for the investigatory stop, as indicated in an Investigatory Stop Report and/or in records of ShotSpotter-initiated police incidents. The Plaintiff seeks declaratory and injunctive relief against the Municipal Defendants on behalf of the class.

407.    Plaintiff and the class members are similarly situated for the purpose of asserting the claims alleged in this Complaint on a common basis.

408.    A class action is the only practicable means by which the individual named Plaintiff and the class members can challenge the Municipal Defendants' unconstitutional policies and practices related to the manner in which police respond to ShotSpotter alerts. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit. Many members of the class also do not know that they are being targeted for a stop and search by CPD as a result of a ShotSpotter alert because CPD fails to tell them.

409.    The class is so numerous that joinder of all members is impractical. Over an 18-month period, from January 1, 2020 to May 31, 2021, there were over 2,400 people who were subject to an investigatory stop by CPD in response to a specific ShotSpotter alert or because of a real or perceived history of frequent ShotSpotter alerts in an area. The class also includes a significant number of future class members, given that individuals are stopped by CPD on a daily basis as a result of ShotSpotter alerts.

410.    There are questions of law and fact common to all class members, including but not limited to whether the Municipal Defendants' policies and practices regarding the use of unreliable ShotSpotter evidence to justify investigatory stops violates the Fourth and Fourteenth Amendment rights of all class members.

411.    Because the practices and procedures challenged in this Complaint apply with equal force to the individual named Plaintiff and the other members of the class, the claims of the individual named Plaintiff is typical of the class and subclass.

412.    The individual named Plaintiff will fairly and adequately represent the interests of the class and subclass. He possesses a strong personal interest in subject matter of the lawsuit

and is represented by experienced counsel with expertise in complex civil rights litigation. Counsel have previously litigated injunctive class actions, and have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

413.    The Defendants have acted on grounds generally applicable to the class: their policies, procedures, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

## CLASS AND ORGANIZATIONAL LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### *Monell* Liability – Violation of the Fourth and Fourteenth Amendments
### (On Behalf of Lucy Parsons Labs, Plaintiff Ortiz and the class of similarly-situated individuals against Municipal Defendants)

414.    Each paragraph of this Complaint is incorporated as if restated fully herein.

415.    Count I is alleged against Municipal Defendants City of Chicago and Superintendent Brown in his official capacity.

416.    The City of Chicago's use of ShotSpotter results in illegal investigatory stops or arrests of the Plaintiff and members of the Plaintiff Class and Plaintiff Organization in violation of the Fourth Amendment. Such violations are a continuing, persistent, and widespread practice.

417.    CPD officers falsely manufacture reasonable suspicion for these searches and seizures by relying on ShotSpotter alerts that have never been tested for reliability and are not sufficiently reliable to be used as any part of the basis for a Fourth Amendment search or seizure.

418.    CPD officers falsely manufacture reasonable suspicion for these searches and seizures by stopping individuals merely because they are in the vicinity of ShotSpotter alerts.

419.    CPD officers falsely manufacture reasonable suspicion for these searches and seizures by stopping individuals without corroboration of the ShotSpotter alert or individualized suspicion.

420.    CPD officers falsely manufacture reasonable suspicion for these searches and seizures by relying on a claim, real or perceived, that a particular area has had frequent ShotSpotter alerts in the past.

421.    The Municipal Defendants have implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of relying on ShotSpotter to initiate investigatory stops for unreasonable searches and seizures in violation of the Fourth Amendment.

422.    The Municipal Defendants have implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops and seizures by relying on ShotSpotter alerts, even though the system has never been tested for reliability and is not sufficiently reliable to be used as any part of the basis for a Fourth Amendment search or seizure.

423.    The Municipal Defendants have implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops by stopping individuals merely because they are in the vicinity of ShotSpotter alerts.

424.    The Municipal Defendants have implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops by stopping individuals without corroboration of the ShotSpotter alert or individualized suspicion.

425. The Municipal Defendants have implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops by relying on the claim, real or perceived, that an area has had frequent ShotSpotter alerts in the past.

426. The Municipal Defendants maintain a policy, custom, and practice of unconstitutional misconduct by CPD officers by using the ShotSpotter system with deliberate indifference to the constitutional rights of the Plaintiff class.

427. The Municipal Defendants continue to use the ShotSpotter system with deliberate indifference to the constitutional rights of the Plaintiff class.

428. The Municipal Defendants have or should have knowledge that their present use of ShotSpotter would result in constitutional violations. This knowledge includes:

429. The Municipal Defendants are aware of multiple studies showing that ShotSpotter technology is inaccurate and unreliable, including one study by the Chicago OIG.

430. The Municipal Defendants have received criticisms of their use of ShotSpotter and the ShotSpotter contract at multiple press conferences, town hall meetings, city council hearings, and more, including the OIG's report on ShotSpotter.

431. The Municipal Defendants know that ShotSpotter alerts overwhelmingly lead police to find no corroboration of gunfire.

432. The Municipal Defendants know that ShotSpotter has never been tested to determine its reliability with respect to its ability to distinguish gunfire from other loud noises.

433. The Municipal Defendants know that the City's contract with ShotSpotter does not create any obligation for ShotSpotter to avoid false alerts and it in fact strongly incentivizes

ShotSpotter to over-report loud noises as gunfire and to trigger police dispatches in response to noises that are not gunshots.

434. The Municipal Defendants know that ShotSpotter's purported "accuracy" rates do not reflect any actual measure of the system's reliability and that these supposed "accuracy" rates take no account of the overwhelming proportion of ShotSpotter alerts in Chicago that do not turn up any evidence of gunfire.

435. The Municipal Defendants know that ShotSpotter alerts do not and cannot supply enough information to identify a particular individual as a suspect.

436. The Municipal Defendants know that the U.S. Court of Appeals for the Seventh Circuit has analogized ShotSpotter alerts to unverified anonymous tips that cannot be relied upon without corroboration and that officers nevertheless routinely rely on ShotSpotter alerts and treat them as perfectly accurate without any corroboration.

437. The Municipal Defendants know that its officers routinely rely on specific ShotSpotter alerts—or a real or perceived history of ShotSpotter alerts in an area—as a basis to initiate an investigatory stop or other search or seizure.

438. The Municipal Defendants know that ShotSpotter leads to thousands of fruitless investigatory stops in Chicago.

439. The Municipal Defendants have failed to act to prevent CPD officers from stopping civilians based on ShotSpotter alerts, despite their knowledge and notice of ongoing constitutional violations.

440. The Municipal Defendants have failed to adjust their policies to minimize or eliminate the number of false alerts or to minimize or eliminate illegal stops and arrests on account of ShotSpotter.

441.    The Municipal Defendants have failed to adequately train and supervise CPD officers on how to use ShotSpotter in a manner that does not violate individuals' constitutional rights under the Fourth Amendment, including prohibiting stops based on ShotSpotter alerts alone, prohibiting officers from relying on ShotSpotter alerts as part of the determination of reasonable suspicion or probable cause, prohibiting officers from using historical aggregate ShotSpotter alerts in an area as part of a determination of reasonable suspicion or probable cause, and training officers that ShotSpotter alerts are not to be regarded as reliable evidence and that the vast majority of ShotSpotter alerts should be expected to lead them to find no evidence of gun crime.

442.    The Municipal Defendants have failed to test or insist on testing the accuracy and reliability of any aspect of the ShotSpotter system as deployed in Chicago.

443.    The Municipal Defendants have failed to adequately supervise ShotSpotter, including the ShotSpotter employees who are empowered to trigger alerts to loud noises. The Municipal Defendants have effectively delegated authority to ShotSpotter and its employees to direct CPD officers to particular locations to investigate supposed gunfire. The Municipal Defendants rely on ShotSpotter and its employees as an integral part of the City's police dispatch and deployment decisions.

444.    The Municipal Defendants have failed to take other remedial action.

445.    The Municipal Defendants have acted with deliberate indifference to the Fourth Amendment rights of the individual named plaintiff and putative class members. As a direct and proximate result of these acts and omissions, the constitutional rights of the Plaintiffs under the Fourth and Fourteenth Amendments have been violated.

446.    Unless restrained by order of this Court, a real and immediate threat exists that the Fourth Amendment rights of the Plaintiff and putative class members will be violated by CPD officers in the future through the use of ShotSpotter. Plaintiffs seek injunctive and declaratory relief against the City and Superintendent Brown in his official capacity to prevent the continued violation of their constitutional rights.

**COUNT II – 42 U.S.C. § 1983**
***Monell* Liability – Equal Protection Clause Violation**
**(On Behalf of Lucy Parsons Labs and its members, as well as Plaintiff Williams and Plaintiff Ortiz against Municipal Defendants)**

447.    Each paragraph of this Complaint is incorporated as if restated fully herein.

448.    Count II is alleged against Municipal Defendants City of Chicago and Superintendent Brown in his official capacity.

449.    The Municipal Defendants have implemented, enforced, encouraged, sanctioned, and directly ordered a policy of employing ShotSpotter in neighborhoods on the basis of race and subjecting residents to increased police surveillance, arrests, and unfounded investigatory stops in violation of the Fourteenth Amendment. The Municipal Defendants employ ShotSpotter in a facially discriminatory way, deploying ShotSpotter only in the twelve police districts that have the highest proportion of Black and Latinx residents and the lowest proportion of White residents. As a result, CPD's policy of deploying ShotSpotter in Chicago's majority Black and Latinx districts violates the Equal Protections Clause.

450.    Data shows that the CPD's facially discriminatory decision about where to deploy ShotSpotter imposes racially discriminatory harms on Black and Latinx communities. City-wide, a massively disproportionate share of Black and Latinx residents live under ShotSpotter surveillance.

451. Black and Latinx residents, including Plaintiffs Williams and Ortiz and members of Plaintiff LPL, are and have been subjected to additional ShotSpotter-initiated police deployments, investigatory stops, arrests, and uses of force that residents living in majority-White districts are not subjected to. Because ShotSpotter surveillance is absent in majority-white districts, these residents are not subject to additional police deployments on the basis of ShotSpotter and are thus at a lower risk of unlawful stops.

452. The mere presence of ShotSpotter alerts changes police behavior in the predominantly Black and Latinx districts where the City has chosen to deploy the system. Police officers cite the supposed history of ShotSpotter alerts to justify future investigatory stops and other police tactics.

453. Unreliable gunfire statistics generated by ShotSpotter skew how police resources are allocated in those districts and harm Black and Latinx residents. Large volumes of ShotSpotter alerts divert police resources from actual 9-1-1 calls by residents and contribute to lengthy delays that people in these districts often experience when calling for police service.

454. By its acts and omissions, the Municipal Defendants have acted under color of state law to deprive the plaintiffs of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

455. The Municipal Defendants intentionally discriminate by purposefully placing ShotSpotter sensors in Chicago police districts where Black and Latinx people live. Municipal Defendants purposefully do not put ShotSpotter in primarily White districts.

456. This discriminatory purpose is further evidenced by the City of Chicago's long and well-documented history of discriminatory policing, particularly as to stop and frisks.

457.     The Municipal Defendants were and remain deliberately indifferent to the harms created by CPD officers through implementation of ShotSpotter. Despite notice of racial disparities in ShotSpotter deployment, including in public City Council meetings, the City's policies, practices, and decisions concerning ShotSpotter remain unchanged.

458.     The Municipal Defendants have implemented, enforced, encouraged, and sanctioned CPD's policy of using and employing ShotSpotter in a manner that constitutes racial and/or ethic discrimination against the individual named plaintiffs, and the organizational plaintiff Lucy Parsons Labs and its members in violation of the Fourteenth Amendment.

459.     As a direct and proximate result of the Municipal Defendants acts and omissions, the Fourteenth Amendment rights of the Plaintiffs and members of the Plaintiff Organization have been violated.

460.     Unless restrained by order of this Court, a real and immediate threat exists that CPD officers will violate the Fourteenth Amendment rights of the Plaintiffs and members of the Plaintiff Organization in the future. Plaintiffs seek injunctive and declaratory relief against the Municipal Defendants to prevent the continued violation of their constitutional rights and to prevent the continued use of ShotSpotter in the 12 predominantly Black and Latinx districts where it is currently active.

### COUNT III – 740 ILCS 23/5(a)(2)
### Violation of the Illinois Civil Rights Act of 2003 (ICRA)
### (On Behalf of Lucy Parsons Labs and its Members, as well as Plaintiffs Williams and Ortiz against Municipal Defendants)

461.     Each paragraph of this Complaint is incorporated as if restated fully herein.

462.     Count III is alleged against Defendants City of Chicago and Superintendent Brown in his official capacity.

463.    The Illinois Civil Rights Act ("ICRA") prohibits any state, county, or local government in Illinois from utilizing criteria or methods of administration that "have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2)

464.    Municipal Defendants have deliberately chosen to deploy ShotSpotter only in the 12 police districts that have the highest proportion of Black and Latinx residents in the city.

465.    The criteria and methods the Municipal Defendants have used in determining where to deploy ShotSpotter has resulted in a disparate impact on Black and Latinx residents.

466.    The Municipal Defendants' disparate deployment of ShotSpotter directly produces disparate harm. Black and Latinx residents are subject to increased ShotSpotter-prompted police encounters, investigatory stops, pretextual arrests, uses of force, and other harmful policing tactics. The presence of ShotSpotter and a history of ShotSpotter alerts changes the way police respond to residents in ways that directly harm Black and Latinx residents. Municipal Defendants' use of ShotSpotter skews the allocation of municipal resources and slows response to 9-1-1 calls in districts with primarily Black and Latinx residents.

467.    The Municipal Defendants' discriminatory law enforcement practices with respect to ShotSpotter's deployment and use constitute criteria and methods of administration that create a disparate impact on Black and Latinx people, in violation of the ICRA.

## PLAINTIFF WILLIAMS' INDIVIDUAL CLAIMS

### COUNT IV – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Arrest Without Probable Cause
### (Plaintiff Williams against Williams Defendant Officers)

468.    Each paragraph of this Complaint is incorporated as if restated fully herein.

469.     Count IV is alleged against the Williams Defendant Officers.

470.     The actions by Williams Defendants Officers in falsely detaining, arresting, and imprisoning Plaintiff Williams without reasonable suspicion or probable cause violated Plaintiff Williams' clearly-established Fourth Amendment rights to be free from unreasonable search and seizure.

471.     The misconduct described in this Count, based on the use of ShotSpotter, was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

472.     The actions of the Williams Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to loss of liberty, pain, suffering, mental distress, anguish, humiliation, degradation, loss of income, medical injury, and legal expenses.

## COUNT V – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Unreasonable Seizure Pursuant to Legal Process
### (Plaintiff Williams against Williams Defendant Officers)

473.     Each paragraph of this Complaint is incorporated as if restated fully herein.

474.     Count V is alleged against the Williams Defendant Officers.

475.     The actions by the Williams Defendant Officers in falsely arresting and imprisoning Plaintiff Williams for nearly 11 months pursuant to legal process—including a probable cause hearing and grand jury indictment—were without probable cause. This violated Plaintiff Williams' Fourth Amendment rights to be free from unreasonable search and seizure.

476.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

477.    Plaintiff waited until the criminal charges on which Mr. Williams were held were terminated in his favor before bringing this civil action. The prosecution moved to dismiss charges before trial because it determined that it lacked evidence sufficient to prosecute the case.

478.    The actions of the Williams Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure pursuant to legal process. Their actions were the direct and proximate cause of Plaintiff's loss of liberty for nearly 11 months, as well as pain, suffering, mental distress, anguish, degradation, humiliation, loss of liberty, loss of income, medical injury, and legal expenses.

## COUNT VI – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Malicious Prosecution
### (Plaintiff Williams against Williams Defendant Officers)

479.    Each paragraph of this Complaint is incorporated as if restated fully herein.

480.    Count VI is alleged against the Williams Defendant Officers.

481.    The Williams Defendant Officers arrested and charged Plaintiff Williams with first-degree murder despite lacking probable cause, in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments.

482.    The Williams Defendant Officers made statements to prosecutors and the Court to exert influence and to institute and continue the unjust legal proceedings.

483.     Among other acts and omissions, the Williams Defendant Officers ignored exculpatory evidence that exonerated Mr. Williams. They relied on ShotSpotter evidence that they knew was unreliable and that did not inculpate him. They misled the Court and prosecution with respect to the evidence, including video evidence and Mr. Williams' statements under interrogation. They failed to take basic steps to investigate the crime and failed to pursue other obvious lines of inquiry. Defendants thus caused the proceedings against Michael Williams to be initiated wrongfully and maliciously. Furthermore, Defendant Officers Potter and Evangelides intentionally provided misleading and incomplete testimony regarding the evidence at Plaintiff's probable cause hearing and grand jury indictment.

484.     The criminal proceeding initiated by the Williams Defendants Officers terminated in Mr. Williams' favor upon the prosecution's motion to dismiss the charges before trial, without any conviction, based on its determination that the evidence did not support the charges against Mr. Williams.

485.     The actions of the Williams Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment right against malicious prosecution, leading to Plaintiff's loss of liberty for nearly 11 months, as well as pain, suffering, mental distress, anguish, degradation, humiliation, loss of liberty, loss of income, medical injury, and legal expenses.

### COUNT VII – 42 U.S.C. § 1983
### Conspiracy to Deprive Plaintiff of His Constitutional Rights
### (Plaintiff Williams against Williams Defendant Officers)

486.     Each paragraph of this Complaint is incorporated as if restated fully herein.

487.     Count VII is alleged against the Williams Defendant Officers.

488. Each of the Williams Defendants Officers, acting in concert with one another as well as other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

489. Each of the Williams Defendant Officers took concrete steps to enter into an agreement to unlawfully arrest and charge Plaintiff Williams, knowing they lacked probable cause to do so, and for the purpose of violating Plaintiff's Fourth and Fourteenth Amendment rights. Among other things, they relied on ShotSpotter evidence they knew was not reliable and arrested Mr. Williams based on conclusions unsupported by evidence.

490. In furtherance of this conspiracy, each of the Defendants committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by effecting the Plaintiff's arrest without probable cause and filing wrongful charges based on the false arrest, which resulted in Plaintiff's indictment and unlawful imprisonment.

491. Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

492. As a direct and proximate result of the William Defendant Officers' conspiracy, Plaintiff suffered loss of liberty for nearly 11 months, as well as pain, suffering, mental distress, anguish, degradation, humiliation, loss of liberty, loss of income, medical injury, and legal expenses.

### Count VIII – 42 U.S.C. § 1983
### Supervisory Liability
### (Plaintiff Williams against Defendants Dougherty and Costello)

493. Each paragraph of this Complaint is incorporated as if restated fully herein.

494. Count VIII is brought against Defendants Dougherty and Costello.

89

495.     The violation of Plaintiff Williams' constitutional rights as described above was proximately caused by the deliberate indifference or recklessness of the Supervisory Defendants, including but not limited to Lieutenant Dougherty and Lieutenant Costello.

496.     Specifically, these Defendants were personally involved in the arrest, charging, and prolonged detention of Mr. Williams, as well as the CPD's review of his case. They knew or should have known of their subordinates' unconstitutional actions and related misconduct in the case.

497.     The misconduct described in this Count was objectively unreasonable and undertaken intentionally with malice, willfulness, and deliberate indifference to Plaintiff Williams' clearly established constitutional rights.

498.     The personal involvement of these Defendant Officers, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff Williams, including the above-mentioned injuries and damages.

### Count IX – 42 U.S.C. § 1983
### Failure to Intervene
### (Plaintiff Williams against Williams Defendant Officers)

499.     Each paragraph of this Complaint is incorporated as if restated fully herein.

500.     Count IX is alleged against the Williams Defendant Officers.

501.     In the manner described above, during the constitutional violations described herein, one or more of the Williams Defendant Officers stood by without intervening to prevent the violation of Plaintiff Williams' constitutional rights, even though they had the duty and reasonable opportunity to do so.

502.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the truth and Mr. Williams' constitutional rights.

503.    As a result of Defendants' misconduct described in this count, Mr. Williams suffered severe injuries, including the extended loss of his liberty, physical harm, emotional distress, and mental humiliation and anguish.

**COUNT X – State Law Claim**
**Malicious Prosecution**
**(Plaintiff Williams against Williams Defendant Officers)**

504.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

505.    Count X is alleged against the Williams Defendant Officers.

506.    In the manner described more fully above, the Williams Defendants Officers arrested and charged Plaintiff Williams with first-degree murder and exerted their influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff, knowing they lacked genuine probable cause for doing so.

507.    Williams Defendant Officers filed false evidence and made statements to prosecutors and the Court with the intent of exerting influence and to institute and continue the unjust legal proceedings against Plaintiff.

508.    Among other acts and omissions, Williams Defendant Officers ignored exculpatory evidence that exonerated Mr. Williams. They relied centrally on ShotSpotter evidence that they knew was unreliable and that did not inculpate him. They misled the Court and prosecution with respect to the evidence, including video evidence and Mr. Williams' statements under interrogation. They failed to take basic steps to investigate the crime and failed to pursue other obvious lines of inquiry. Defendants thus caused the proceedings against Michael Williams to be initiated wrongfully and maliciously. Furthermore, Defendant Officers Potter and

Evangelides intentionally provided misleading and incomplete testimony regarding the reliability of ShotSpotter evidence at Plaintiff's probable cause hearing and grand jury indictment.

509.     In doing so, the Williams Defendant Officers caused Plaintiff to wrongfully be subjected to judicial proceedings without probable cause.

510.     These judicial proceedings were instituted and continued maliciously, resulting in injury to Plaintiff.

511.     In July 2021, Plaintiff's criminal prosecution was terminated in his favor upon the prosecution's motion to dismiss charges before any trial, without any conviction, based on its determination that the evidence did not support charges against Plaintiff.

512.     The Williams Defendant Officers' actions were taken under color of law and within the scope of their employment.

513.     As a direct and proximate result of the Williams Defendant officers' misconduct described in this Count, Plaintiff suffered loss of liberty for nearly 11 months, as well as pain, suffering, mental distress, anguish, degradation, humiliation, loss of liberty, loss of income, medical injury, and legal expenses.

### COUNT XI – State Law Claim
### Civil Conspiracy
### (Plaintiffs Williams against Williams Defendant Officers)

514.     Each paragraph of this Complaint is incorporated as if restated fully herein.

515.     Count XI is alleged against the Williams Defendant Officers.

516.     The individual Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

517.    Each of the Williams Defendant Officers took concrete steps to enter into an agreement to unlawfully use force on, detain, and arrest the Plaintiff Williams, knowing they lacked probable cause to do so and for the purpose of violating Plaintiff Williams' rights.

518.    The Williams Defendant Officers committed unlawful overt acts and were otherwise willful participants in joint activity in furtherance of this conspiracy.

519.    The Williams Defendant Officers acted with malice, willfulness, and reckless indifference to the rights of others.

520.    Each Williams Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

521.    As a direct and proximate result of the Defendants' conspiracy, Plaintiffs suffered damages, including severe emotional distress and anguish, as a proximate result of the individual Defendants' misconduct and conspiracy to engage in misconduct.

### COUNT XII – State Law Claim
### Intentional Infliction of Emotional Distress
### (Plaintiff Williams against Williams Defendant Officers)

522.    Each paragraph of this Complaint is incorporated as if restated fully herein.

523.    Count XII is alleged against the Williams Defendant Officers.

524.    The acts and conducts of the Williams Defendant Officers described above were extreme and outrageous. The Williams Defendant Officers' actions were rooted in an abuse of power and authority. The Williams Defendant Officers intended to cause, or recklessly disregarded the probability that the conduct would cause, severe emotional distress to Plaintiff Williams.

525.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

**COUNT XIII – State Law Claim**
**Respondeat Superior**
**(Plaintiff Williams against City of Chicago)**

526.     Each paragraph of this Complaint is incorporated as if restated fully herein.

527.     Count XIII is alleged against the City of Chicago.

528.     In committing the acts alleged in this Complaint, each of the individual Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment.

529.     Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

**PLAINTIFF ORTIZ'S INDIVIDUAL CLAIMS**

**COUNT XIV – 42 U.S.C. § 1983**
**Violation of the Fourth and Fourteenth Amendment**
**Unconstitutional *Terry* Stop and Frisk**
**(Plaintiffs Ortiz against Defendant Officers Powar and Matias)**

530.     Each paragraph of this Complaint is incorporated as if restated fully herein.

531.     Count XIV is alleged against the Defendants Powar and Matias.

532.     The actions by Defendants Powar and Matias in stopping, detaining, questioning, and patting down Plaintiff Ortiz without reasonable suspicion violated Plaintiff Ortiz's clearly-established rights under the Fourth and Fourteenth Amendment to be free from unreasonable search and seizure.

533.     The misconduct described in this Count, based on the use of ShotSpotter, was objectively unreasonable.

534. The misconduct described in this Count, based on the use of ShotSpotter, was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

535. The actions of Defendant Officers Powar and Matias were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to pain, suffering, mental distress, anguish, humiliation, loss of liberty, damage to property, and other harms.

**COUNT XV – 42 U.S.C. § 1983**
**Violation of the Fourth and Fourteenth Amendment**
**Unconstitutional Vehicle Search**
**(Plaintiffs Ortiz against Defendant Officers Powar and Matias)**

536. Each paragraph of this Complaint is incorporated as if restated fully herein.

537. Count XV is alleged against the Defendants Powar and Matias.

538. The actions by Defendants Powar and Matias in searching Plaintiff Ortiz's vehicle without probable cause and without consent violated Plaintiff Ortiz's clearly-established rights under the Fourth and Fourteenth Amendment to be free from unreasonable search and seizure.

539. The misconduct described in this Count was objectively unreasonable.

540. The misconduct described in this Count was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

541. The actions of Defendants Powar and Matias were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to pain, suffering, mental distress, anguish, humiliation, loss of liberty, damage to property, and other harms.

## COUNT XVI – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Arrest Without Probable Cause
### (Plaintiffs Ortiz against Ortiz Defendant Officers)

542.     Each paragraph of this Complaint is incorporated as if restated fully herein.

543.     Count XVI is alleged against the Ortiz Defendant Officers.

544.     The actions by the Ortiz Defendant Officers in arresting Plaintiff Ortiz without probable cause violated Plaintiff Ortiz's rights under the Fourth and Fourteenth Amendment to be free from unreasonable search and seizure.

545.     The misconduct described in this Count, based on the use of ShotSpotter and other information observed or gathered by the Ortiz Defendant Officers, was objectively unreasonable.

546.     The misconduct described in this Count, based on the use of ShotSpotter and other information observed or fathered by the Ortiz Defendant Officers, was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

547.     The actions of the Ortiz Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to pain, suffering, mental distress, anguish, humiliation, loss of liberty, damage to property, and other harms.

## COUNT XVII – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Unreasonable Seizure Pursuant to Legal Process
### (Plaintiffs Ortiz against Ortiz Defendant Officers)

548.     Each paragraph of this Complaint is incorporated as if restated fully herein.

549.     Count XVII is alleged against the Ortiz Defendant Officers.

550.    The actions by The Ortiz Defendant Officers in falsely arresting and imprisoning Plaintiff Ortiz pursuant to a criminal complaint sworn by Defendant Powar and notarized by Defendant Matias was without probable cause. This violated Plaintiff Ortiz's Fourth Amendment rights to be free from unreasonable search and seizure.

551.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

552.    Plaintiff waited until the criminal charges on which Mr. Ortiz was held were terminated in his favor before bringing this civil action. The prosecution moved to dismiss the charges, *nolle prosequi*, at the first Court hearing following Mr. Ortiz's arrest.

553.    The actions of the Ortiz Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure pursuant to legal process. Their actions were the direct and proximate cause of Plaintiff's loss of liberty, as well as pain, suffering, mental distress, anguish, degradation, humiliation, and other harms.

### COUNT XVIII – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Malicious Prosecution
### (Plaintiffs Ortiz against Ortiz Defendant Officers)

554.    Each paragraph of this Complaint is incorporated as if restated fully herein.

555.    Count XVIII is alleged against the Ortiz Defendant Officers.

556.    The Ortiz Defendant Officers arrested and charged Plaintiff Ortiz with felony possession of controlled substances and misdemeanor possession of cannabis despite lacking probable cause, in violation of the Fourth and Fourteenth Amendments.

557.     The Ortiz Defendant Officers deliberately ignored and obfuscated evidence establishing that Plaintiff Ortiz did not commit the charged crimes. They failed to undertake basic investigatory steps essential to ascertain whether a crime had been committed. They thus caused the proceedings against Plaintiff Ortiz to be initiated wrongfully and maliciously.

558.     The criminal proceeding initiated by the Ortiz Defendant Officers terminated in Plaintiff Ortiz's favor upon the prosecution's motion to dismiss the charges at the first court hearing following his arrest, without any conviction.

559.     Plaintiff Ortiz was imprisoned overnight on these false charges and his vehicle was subjected to forfeiture and impoundment in parallel with and because of the false charges.

560.     The actions of the Ortiz Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to pain, suffering, mental distress, anguish, humiliation, loss of liberty, damage to property, loss of income, and legal expenses.

561.     The actions of the Ortiz Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to pain, suffering, mental distress, anguish, humiliation, loss of liberty, damage to property, and other harms.

**COUNT XIX – 42 U.S.C. § 1983**
**Violation of the Fourth and Fourteenth Amendment**
**Unconstitutional Seizure of Property**
**(Plaintiffs Ortiz against Defendant Officers Powar and Matias)**

562.     Each paragraph of this Complaint is incorporated as if restated fully herein.

563.     Count XIX is alleged against the Ortiz Defendant Officers.

564. The actions by the Ortiz Defendant Officers in seizing, impounding, and forfeiting Plaintiff Ortiz's vehicle without probable cause violated Plaintiff Ortiz's rights under the Fourth and Fourteenth Amendment to be free from unreasonable search and seizure.

565. The misconduct described in this Count, based on information and evidence observed and gathered by the Ortiz Defendant Officers, was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

566. The actions of the Ortiz Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to mental distress, humiliation, damage to property, and other harms.

### Count XX – 42 U.S.C. § 1983
### Supervisory Liability
### (Plaintiff Ortiz against Supervisory Defendants Harb and Flechsig)

567. Each paragraph of this Complaint is incorporated as if restated fully herein

568. Count XX is alleged against Defendants Lieutenant Harb and Sergeant Flechsig.

569. The deliberate indifference and/or recklessness of Supervisory Defendant Lieutenant Harb and Sergeant Flechsig proximately caused the violation of Plaintiff Ortiz's constitutional rights as described above.

570. These Defendants approved subordinate officers' arrest, charge, and detention of Mr. Ortiz without probable cause, as well as the unfounded seizure of his property. They expressly signed off on these actions. They knew or should have known of their subordinates' unconstitutional actions and related misconduct in this case.

571.     Defendant Officers' misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

572.     Defendant Officers, through their actions and omissions, proximately and directly caused the constitutional deprivations and personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

**Count XXI – 42 U.S.C. § 1983**
**Failure to Intervene**
**(Plaintiff Ortiz against Ortiz Defendant Officers)**

573.     Each paragraph of this Complaint is incorporated as if restated fully herein.

574.     Count XXI is alleged against the Ortiz Defendant Officers.

575.     In the manner described above, during the constitutional violations described herein, the Ortiz Defendant Officers, stood by without intervening against the violation of Plaintiff Ortiz's constitutional rights, even though they had a duty and reasonable opportunity to do so.

576.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Ortiz's constitutional rights.

577.     As a result of the misconduct described in this count, Mr. Ortiz suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress, and anguish.

**COUNT XXII – 42 U.S.C. § 1983**
**Conspiracy to Deprive Plaintiff of His Constitutional Rights**
**(Plaintiffs Ortiz against Ortiz Defendant Officers)**

578.     Each paragraph of this Complaint is incorporated as if restated fully herein.

579.     Count XXII is alleged against the Ortiz Defendant Officers.

100

580. Ortiz Defendant Officers and acting in concert with one another as well as other officers, known and unknown, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

581. The Ortiz Defendant Officers took concrete steps to enter into an agreement to unlawfully arrest Plaintiff Ortiz, knowing they lacked probable cause to do so, and for the purpose of violating Plaintiff's Fourth and Fourteenth Amendment rights.

582. In furtherance of this conspiracy, each of the Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by effecting the Plaintiff's search and seizure without probable cause, filing wrongful charges based on the false arrest, which resulted in his unlawful imprisonment and unlawfully seizing his vehicle.

583. Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

584. As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered loss of liberty, pain, suffering, mental distress, anguish, humiliation, damage to property and other harms.

## PLAINTIFF WILLIAMS' AND ORTIZ'S INDIVIDUAL CLAIMS

### COUNT XXIII – Indemnification
### (Plaintiffs Williams and Ortiz against City of Chicago)

585. Each paragraph of this Complaint is incorporated as if restated fully herein.

586. Count XXIII is alleged against the City of Chicago.

587.     In Illinois, pursuant to 745 ILCS 10/9-102, public entities are directed to pay any

tort judgment for compensatory damages for which employees are liable within the scope of their

employment activities.

588.     Each of the individual Williams and Ortiz Defendant Officers acted within the

scope of their employment in committing the misconduct described herein. Therefore, Defendant

City of Chicago is liable as their employer for any resulting damages or award of attorney's fees.

### REQUEST FOR RELIEF

Wherefore, Plaintiff Ortiz, on behalf of himself and the putative class he seeks to represent,

request that this Court grant the following relief:

a. Issue an Order certifying this case as a class action pursuant to Federal Rules of Civil
   Procedure 23(a) and 23(b)(2); and

b. Issue a class-wide judgment declaring that the policies, practices, and conduct of the City
   of Chicago, through the Municipal Defendants and CPD, and as described in this
   Complaint, constitute violations of the rights of Plaintiffs and the class they represent
   under the Fourth and Fourteenth Amendments to the U.S. Constitution.

c. Declare that ShotSpotter alerts do not establish reasonable suspicion or probable cause
   for investigatory stops, that ShotSpotter alerts cannot be considered by officers as part of
   the totality of the circumstances to justify an investigatory stop or arrest, and that there
   must be an independent and adequate factual basis for a stop or arrest, independent of the
   ShotSpotter alert;

d. Enjoin the Municipal Defendants from conducting stops or searches prompted by
   ShotSpotter absent an independent factual basis sufficient to establish reasonable
   suspicion or probable cause;

Wherefore, the Individual Plaintiffs and Organizational Plaintiff request that this Court grant the

following relief:

a. Declare that the policies, practices, and conduct of the City of Chicago, through the
   Municipal Defendants and CPD, and as described in this Complaint, constitute violations
   of the rights of Plaintiffs under the U.S. Constitution and Illinois state law;

b. Declare that ShotSpotter alerts do not establish reasonable suspicion or probable cause
   for investigatory stops, that ShotSpotter alerts cannot be considered by officers as part of
   the totality of the circumstances to justify an investigatory stop or arrest, and that there

must be an independent and adequate factual basis for a stop or arrest, independent of the ShotSpotter alert;

c. Declare that City of Chicago has violated the Illinois Civil Rights Act and the Equal Protection Clause by deploying ShotSpotter in a racially discriminatory manner;

d. Enjoin Municipal Defendants from continuing to operate or rely on the ShotSpotter noise detection system in the City of Chicago.

e. Enjoin the Municipal Defendants from conducting stops or searches prompted by ShotSpotter absent an independent factual basis sufficient to establish reasonable suspicion or probable cause;

f. Declare that the Williams Defendant Officers violated Plaintiff Williams' rights under federal and state law.

g. Award Plaintiff Williams compensatory damages arising from the violations alleged in this Complaint.

h. Award Plaintiff Williams punitive damages for the violations alleged in this complaint.

i. Declare that the Ortiz Defendant Officers violated Plaintiff Ortiz's rights under federal law.

j. Award Plaintiff Ortiz compensatory damages arising from the violations alleged in this Complaint.

k. Award Plaintiff Ortiz punitive damages against the individual officer Defendants for the violations alleged in this complaint.

l. Issue and order and judgment granting reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

m. Grant such other relief as the Court deems just and proper.

Dated: July 21, 2022                         Respectfully submitted,

/s/Jonathan Manes
Jonathan Manes
Alexa Van Brunt
Roderick & Solange MacArthur Justice Center
160 E. Grand Ave., 6th Floor
Chicago, IL 60611
(312) 503-0012 (tel)
(312) 503-0891 (fax)
jonathan.manes@macarthurjustice.org
alexa.vanbrunt@macarthurjustice.org