**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL WILLIAMS, LUCY PARSONS LABS, and DANIEL ORTIZ, on behalf of himself and a class of similarly situated people, | Case No. 22-cv-03773 |
| Plaintiffs, | Judge Ronald A. Guzman |
| v. | Magistrate Judge Young B. Kim |
| CITY OF CHICAGO, et al., | Jury Trial Demanded |
| Defendants. | |

**DEFENDANTS CITY OF CHICAGO AND SUPERINTENDENT BROWN'S**
**MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO**
**FEDERAL RULES OF CIVIL PROCEDURE RULE 12(B)(1) AND (B)(6)**

Defendants City of Chicago ("City") and Superintendent David Brown ("Superintendent Brown"), through their undersigned counsel, move to dismiss the *Amended Civil Rights Class Action Complaint For Declaratory And Injunctive Relief And For Damages* [ECF Doc. # 38,] ("Complaint" or "Am. Compl.") pursuant to Rule 12(b)(1) and (b)(6).

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

RULE 12(B)(1) ARGUMENT ........................................................................... 3

I.    PLAINTIFFS LACK STANDING TO PURSUE CLASS
CERTIFICATION AND EQUITABLE RELIEF ................................ 3

    A.    Plaintiff Lucy Parsons Labs Cannot Establish Standing To Sue On
Behalf Of Itself Or Its Members. .......................................... 4

        1.    LPL Lacks Standing To Sue On Its Own Behalf. .......... 4

        2.    LPL Lacks Standing To Sue On Behalf Of Its Members. ............ 5

    B.    Plaintiffs Lack Standing To Pursue Equitable Relief On Behalf Of
Themselves Or A Class of Similarly-Situated Individuals. ...................... 7

RULE 12(B)(6) ARGUMENT ........................................................................... 8

I.    PLAINTIFFS FAIL TO STATE A *MONELL* CLAIM FOR VIOLATION
OF THEIR FOURTH AMENDMENT RIGHTS. ................................ 9

    A.    Plaintiffs Fail To Plead That The City's Express Policies Were The
Moving Force Behind The Claimed Constitutional Violations. .............. 10

        1.    The First Policy: CPD's Investigatory Stop Policy. .................. 10

        2.    The Second Policy: The ShotSpotter Flex Program. .................. 11

        3.    Plaintiffs Fail To Allege That Either S04-13-09 Or S03-19
Was The Moving Force Behind The City's Alleged Illegal
Stops And Seizures. ................................................. 12

    B.    Plaintiffs Have Not Pled Facts Establishing That CPD Had A
Widespread Practice Or Custom That Caused Their Injuries. ................. 13

        1.    Plaintiffs Fail To Show A Widespread Practice Of
Unconstitutional Investigatory Stops And Seizures Arising
From ShotSpotter Responses. ....................................... 13

        2.    Plaintiffs Do Not Allege Facts Suggesting That City
Policymakers Had Actual Or Constructive Knowledge Of
A Widespread Practice Of Unconstitutional Stops. .................... 14

            a.    The OIG Report Does Not Demonstrate Awareness. ...... 14

            b.    Individual Plaintiffs' Alleged Stops Did Not Create
Awareness. ................................................. 15

i

        c.     The Articles, Testimony, Public Statements And Other Studies Do Not Demonstrate Awareness. ............. 15

   C.    Plaintiffs Allege Insufficient Facts To Establish That The City Was Deliberately Indifferent To Any Unconstitutional Practice Of CPD Officers Responding To ShotSpotter Alerts. ........................... 15

        1.    Without Facts To Support Knowledge Of A Widespread Practice, Plaintiffs Cannot Establish Deliberate Indifference. ................................................................. 15

        2.    Plaintiffs Have Not Pled Facts Suggesting That The City Was Deliberately Indifferent In Its Training Or Supervision Of CPD Officers. .......................................... 16

II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE ........................................................ 17

   A.    Plaintiffs Fail To Allege Discriminatory Effect. ...................................... 17

   B.    Plaintiffs Fail To Allege Discriminatory Purpose. ................................. 20

III.   PLAINTIFFS FAIL TO ALLEGE A VIOLATION OF THE ILLINOIS CIVIL RIGHTS ACT. ........................................................................... 23

   A.    Plaintiffs Failed To Allege A Specific CPD Policy Or Practice Concerning The Deployment Of ShotSpotter Technology. ..................... 23

   B.    Plaintiffs Have Not Alleged A Robust Causal Connection. ................... 24

        1.    Plaintiffs' Reliance On Pre-Existing Disparities Fails To Support Their ICRA Claim. ........................................................ 25

        2.    Robust Causality Cannot Be Established By Plaintiff's Conclusory Allegations Of Disparate Harm. .............................. 26

IV.   PLAINTIFFS' REMAINING STATE LAW CLAIMS (COUNTS XIII, XXIII AND XXIV) AGAINST THE CITY MUST BE DISMISSED. .............. 28

V.    ALL CLAIMS AGAINST SUPERINTENDENT BROWN MUST BE DISMISSED. .................................................................................... 29

   A.    The Federal Official Capacity Claims Against Superintendent Brown Are Redundant And Must Be Dismissed. ................................... 29

   B.    ICRA Does Not Provide For A Claim Against Superintendent Brown. ................................................................................................. 29

CONCLUSION ................................................................................................. 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. City of Indianapolis,*
    742 F.3d 720 (7th Cir. 2014) .......................................................................................23, 28

*Alcorn v. City of Chicago,*
    No. 17 C 5859, 2018 WL 3614010 (N.D. Ill. July 27, 2018) .................................13

*Alston v. City of Madison,*
    853 F.3d 901 (7th Cir. 2017) .......................................................................................22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................................9, 21

*Askew v. Sheriff of Cook County,*
    568 F.3d 632 (7th Cir. 2009) .......................................................................................28

*Barnes v. Shalala,*
    865 F. Supp. 550 (W.D. Wisc. 1994)..........................................................................5

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,*
    520 U.S. 397 (1997)......................................................................................................16

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007)...........................................................................................9, 21

*Bond v. Atkinson,*
    728 F.3d 690 (7th Cir. 2013) .......................................................................................20

*Brooks v. Ross,*
    578 F.3d 574 (7th Cir. 2009) .........................................................................................9

*Brownmark Films, LLC v. Comedy Partners,*
    682 F.3d 687 (7th Cir. 2012) .......................................................................................11

*Calvin v. Conlisk,*
    534 F.2d 1251 (7th Cir. 1976) .......................................................................................5

*Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.,*
    19-cv-3014, 2020 WL 1330654 (N.D. Ill. Mar. 22, 2020) .................................23, 24

*Cesario v. Jewel Food Stores, Inc.*,
No. 17 CV 319, 2017 WL 5152348 (N.D. Ill. 2017)............................................................28

*Chavez v. Ill. State Police*,
251 F.3d 612 (7th Cir. 2001) .............................................................17, 18, 20, 22

*Chriswell v. Vill. of Oak Lawn*,
No. 11 C 00547, 2013 WL 5903417 (N.D. Ill. Nov. 4, 2013)................................................18

*City of Canton v. Harris*,
489 U.S. 378 (1989).............................................................................16

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)...........................................................................6, 7, 8

*Connick v. Thompson*,
131 S. Ct. 1350 (2011)..........................................................................16

*Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*,
522 F.3d 796 (7th Cir. 2008) ....................................................................4

*Edwards v. Two Unknown Male Chicago Police Officers*,
623 F. Supp. 2d 940 (N.D. Ill. 2009) ............................................................16

*Friends of the Earth v. Laidlaw Envtl. Serv.*,
528 U.S. 167 (2000).............................................................................4

*Gable v. City of Chicago*,
296 F.3d 531 (7th Cir. 2002) ...................................................................14

*Grassroots Collaborative v. City of Chicago*,
2020 IL App (1st) 192099........................................................................5

*Hall v. City of Chicago*,
2012 WL 6727511 (N.D. Ill. Dec. 28, 2012) .....................................................12

*Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*,
570 F.3d 811 (7th Cir. 2009) ....................................................................8

*Hanno v. Sheahan*,
No. 01 C 4677, 2004 WL 2967442 (N.D. Ill. Nov. 29, 2004)................................................17

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982).............................................................................4

iv

*Inclusive Communities Project, Inc. v. Heartland Comm. Ass'n, Inc.*,
　399 F. Supp. 3d 657 (N.D. Tex. 2019) ...................................................26

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
　No. 3:17-CV-206-K, 2017 WL 3498335 (N.D. Tex. Aug. 16, 2017) ....................................28

*Jackson v. Cerpa*,
　696 F. Supp. 2d 962 (N.D. Ill. 2010).....................................................23

*James v. City of Evanston*,
　No. 20-CV-00551, 2021 WL 4459508 (N.D. Ill. Sept. 29, 2021) .........................................19

*Jones v. City of Chicago*,
　856 F.2d 985 (7th Cir. 1988) ..........................................................16

*Kentucky v. Graham*,
　473 U.S. 159 (1985)...................................................................29

*Latuszkin v. City of Chicago*,
　250 F.3d 502 (7th Cir. 2001) ..........................................................13

*Lujan v. Def. of Wildlife*,
　504 U.S. 555 (1992).................................................................3, 4

*Marion v. City of Corydon, Indiana*,
　No. 4:07-cv-0003, 2007 WL 9734296 (S.D. Ind. Dec. 3, 2007) ...........................................28

*Martinez v. City of Chicago*,
　534 F. Supp. 3d 936 (N.D. Ill. 2021) ...................................................20

*Mayes v. City of Hammond*,
　442 F. Supp. 2d 587 (N.D. Ind. 2006) ..................................................16

*McCauley v. City of Chicago*,
　671 F.3d 611 (7th Cir. 2011) ..........................................................21

*McCormick v. City of Chicago*,
　230 F.3d 319 (7th Cir. 2000) ...........................................................9

*McKleskey v. Kemp*,
　481 U.S. 279 (1987)...................................................................20

*Milw. Police Ass'n v. Bd. of Fire and Police Comm'rs of Milw.*,
　708 F.3d 921 (7th Cir. 2013) ............................................................5

v

*Monell v. Depart. of Social Serv. of City of New York*,
 436 U.S. 658 (1978).............................................................................................. *passim*

*Montano v. City of Chicago*,
 535 F.3d 558 (7th Cir. 2008) ...........................................................................9, 12

*Munguia v. Illinois*,
 No. 10 C 0055, 2010 WL 3172740 (N.D. Ill. 2010).................................................27

*Nabozny v. Podlesny*,
 92 F.3d 446 (7th Cir. 1996) ...................................................................................20

*Peterson v. City of Chicago*,
 No. 14-CV-9881, 2015 WL 13882814 (N.D. Ill. June 23, 2015)..........................12

*Phelan v. Cook Cnty.*,
 463 F.3d 773 (7th Cir. 2006) ...................................................................................13

*Polk v. Dent*,
 No. 13 CV 9321, 2015 WL 2384601 (N.D. Ill. May 19, 2015)................................8

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
 2 F.4th 1002 (7th Cir. 2021) .............................................................................6, 7

*Quinn v. Bd. of Educ. of the City of Chicago*,
 234 F. Supp. 3d 922 (N.D. Ill. 2017) ......................................................21, 22, 23

*Ramos v. City of Chicago*,
 707 F. Supp. 345 (N.D. Ill. 1989) ..........................................................................13

*Riverside Medic. Ctr. v. Depart. of Rev. of State of Ill.*,
 342 Ill. App. 3d 603 (1st Dist. 2003) ......................................................................6

*Robinson v. City of Chicago*,
 868 F.2d 959 (7th Cir. 1989) ...................................................................................7

*Sanner v. Board of Trade of City of Chicago*,
 62 F.3d 918 (7th Cir. 1995) .....................................................................................6

*Smith v. Bd. of Educ. for Waukegan Public Sch. Dist. # 60*,
 2021 WL 4459529 (N.D. Ill. 2021) ........................................................................29

*Smith v. City of Jackson*,
 544 U.S. 228 (2005)................................................................................................24

*Srail v. Vill. of Lisle, Ill.*,
    588 F.3d 940 (7th Cir. 2009) ..................................................................19

*Suber v. City of Chicago*,
    No. 10 C 2876, 2011 WL 1706156 (N.D. Ill. May 5, 2011) ...................29

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) .................................................................................6

*Swan v. Bd. of Educ, of City of Chicago*,
    2013 WL 4401439 (N.D. Ill. Aug. 15, 2013) .........................................24

*TBS Group, LLC v. City of Zion, Illinois*,
    No. 16-cv-5855, 2017 WL 5129008 (N.D. Ill. Nov. 6, 2017) ................25

*TBS Grp., LLC v. City of Zion*,
    No. 16-cv-5855, 2017 WL 319201 (N.D. Ill. Jan. 23, 2017)..................26

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015)..................................................................24, 25, 27, 28

*United Food & Commer. Workers Union, Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996).................................................................................5

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989).................................................................................25

*Williams v. Cook Cnty.*,
    No. 18 C 1456, 2018 WL 4361946 (N.D. Ill. Sept. 13, 2018)................19

*Willis v. Bell*,
    726 F.Supp. 1118 (N.D. Ill. 1989) .........................................................29

**Statutes**

740 ILCS 23/5(a) ...............................................................................................29

740 ILCS 23/5(a)(2)...........................................................................................23

745 ILCS § 10/2–109 .........................................................................................29

42 U.S.C. § 1983.................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)........................................................................................................3

Fed. R. Civ. P. 12(b)(6)........................................................................................................8

Fed. R. Civ. P. 23(a) ............................................................................................................4

Fed. R. Civ. P. 23(b)(2).........................................................................................................4

## **INTRODUCTION**

Plaintiffs allege that the Chicago Police Department's ("CPD") use of an acoustic gunshot detection system known as ShotSpotter leads officers to regularly violate the Fourth and Fourteenth Amendment rights of individuals in Chicago by conducting improper investigatory stops and arrests, and that this purported practice disproportionally affects Black and Latinx individuals. The Complaint, more accurately, however, attacks the efficacy of ShotSpotter rather than states a claim for unconstitutional policies or practices on the part of the City.

Plaintiffs' objective, especially Plaintiff Lucy Parsons Labs ("LPL"), is undoubtedly to end the City's contract with ShotSpotter, Inc., the company that provides the ShotSpotter technology. The Complaint, however, lacks factual allegations supporting a causal connection between the deployment and use of ShotSpotter and the alleged injuries to Plaintiffs Michael Williams, Daniel Ortiz, and Derick Scruggs, or a class of similarly situated individuals, and therefore, cannot provide a basis for any legally cognizable claims against the City.

By way of background, ShotSpotter is a gunshot detection system used in more than 135 cities. *See ShotSpotter Respond FAQ*, ShotSpotter, https://www.shotspotter.com/faqs/shotspotter-respond-faqs/ (last visited Jan. 4, 2023). The system works through an array of acoustic sensors connected wirelessly to ShotSpotter's centralized, cloud-based application to detect and locate gunshots using a method known as triangulation. *Id*. Each acoustic sensor captures the time and audio associated with impulsive sounds that may represent gunfire. *Id*. This data is used to locate the incident and is then filtered by algorithms to classify the event as a potential gunshot. Then, a human "acoustic expert" at ShotSpotter's Incident Review Center reviews these findings to make a final determination to classify the detected noise as gunshots and alert local police. *Id*.

In Chicago, a ShotSpotter issued alert is sent to the particular police district's Strategic Decision Support Center, which further reviews the alert, and, if appropriate, the City's Office of

Emergency Management and Communications dispatches field officers to respond to the alert. CPD policy provides directives to responding officers concerning their investigations, including explicit directions respecting investigatory stops and the constitutional bases for such encounters. *See infra*, Section II.A.

ShotSpotter technology is an effective law enforcement tool. "ShotSpotter evidence and expert witness testimony have been successfully admitted in over 190 court cases in 20 states." *Public Defenders say modified ShotSpotter coordinates were used to implicate client; is it a widespread problem?*, ABA Journal, https://www.abajournal.com/news/article/pds-say-modified-shotspotter-coordinates-were-used-to-implicate-client-is-it-a-widespread-problem (last visited Jan. 4, 2023). "ShotSpotter evidence has prevailed in ten successful *Frye* challenges and one successful *Daubert* challenge throughout the United States." *Id.*

Nonetheless, LPL, along with its supporters (including the MacArthur Justice Center, counsel for Plaintiffs in this case), are opposed to the City's use of ShotSpotter and have voiced their opposition for years. LPL is currently leading a movement at #StopShotSpotter to force the City to cancel its contract with ShotSpotter. LPL maintains that "[e]ven if this technology was completely accurate . . . we still believe this contract should be canceled." *Chicago: Cancel the ShotSpotter Contract Now*, Lucy Parsons Labs, https://lucyparsonslabs.com/posts/end-ShotSpotter/ (last visited Jan. 4, 2023). As part of the effort to end the City's contract with ShotSpotter, Plaintiffs filed this putative class action lawsuit, on behalf of themselves and all other similarly situated individuals, against the City, Superintendent Brown in his official capacity (collectively the "Defendants"), and twenty-one individual police officers. Plaintiffs attempt to state claims against Defendants pursuant to *Monell v. Depart. of Social Serv. of City of New York*, 436 U.S. 658 (1978), under the Fourth Amendment and the Fourteenth Amendment's Equal

Protection Clause, and the Illinois Civil Rights Act of 2003 ("ICRA"). Plaintiffs also assert state law claims against the City based on theories of *respondeat superior* and indemnification.

The Complaint is fatally deficient and should be dismissed for the following reasons. *First*, LPL, an organizational plaintiff that has not suffered any injury, lacks standing to sue on behalf of itself or its members, and all Plaintiffs lack standing to seek equitable relief because none of them face any concrete and imminent threat of suffering a future injury. *Second*, Plaintiffs' Fourth Amendment seizure claim fails because they have not identified any express policy or a widespread practice of unlawful stops and seizures that caused their alleged injuries. *Third*, Plaintiffs' equal protection claim fails because they have not pled facts that the City's actions had a discriminatory effect or that the City acted with discriminatory purpose. *Fourth*, Plaintiffs' ICRA claims fails because Plaintiffs fail to plead facts reflecting a disparate effect and the robust causality required of claims based solely on disparate impact. *Fifth*, Plaintiffs fail to state claims for indemnification and *respondeat superior* against the City. Lastly, Plaintiffs fail to plead any viable claims against Superintendent Brown that are not redundant of the claims alleged against the City. For the reasons further stated below, Plaintiffs' dissatisfaction with ShotSpotter is simply a legally insufficient basis to support the claims brought here and all claims against the Defendants should be dismissed.

## **RULE 12(B)(1) ARGUMENT**

## I. **PLAINTIFFS LACK STANDING TO PURSUE CLASS CERTIFICATION AND EQUITABLE RELIEF.**

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). Standing turns on the injury-in-fact test. A plaintiff must show (1) "a concrete and particularized injury that is either actual or imminent," (2) "that the injury is fairly traceable to the defendant;" and (3) "that it is likely that a favorable decision will redress that injury." *Id.* at 560–61. The plaintiff bears the burden of

3

establishing all three elements, and failure to allege any single element requires dismissal for lack of Article III jurisdiction. *Id.* at 561. Here, Plaintiffs do not—and cannot—meet this "irreducible constitutional minimum" with respect to their equitable relief claims. *See Lujan*, 504 U.S. at 560. Accordingly, Plaintiffs' requests for class certification[1] and equitable relief should be stricken with prejudice. *See Friends of the Earth v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 185 (2000) (plaintiffs must have standing for each form of relief sought).

### A. Plaintiff Lucy Parsons Labs Cannot Establish Standing To Sue On Behalf Of Itself Or Its Members.

LPL seeks relief on its own behalf and on behalf of its members "only for purposes of securing declaratory and injunctive relief." Am. Compl. ¶¶ 31–33. Its claims are based upon general, conclusory allegations that it has suffered an injury in fact and that its members are thus "likely to be subject to an unlawful stop based on a ShotSpotter alerts." *Id.* LPL cannot establish that it has organizational standing because LPL cannot show "a concrete and particularized injury," and fails to meet the requirements necessary to confer associational standing on behalf of its members. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *see also Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008).

### 1. LPL Lacks Standing To Sue On Its Own Behalf.

LPL is a non-profit membership organization that alleges it has suffered an injury because it "has been forced to divert many of its resources," including time and money "to responding to CPD's unconstitutional use . . . of ShotSpotter." Am. Compl. ¶¶ 22, 31–32. However, allegations that an organization "will incur expenses in processing claims of police misconduct unless the

---

[1] Plaintiffs Ortiz and Scruggs seek class certification pursuant to Rules 23(a) and 23(b)(2) for the purposes of obtaining "declaratory and injunctive relief." Am. Compl. ¶ 503. Because Plaintiffs lack standing to seek such relief, the request for class certification should be stricken. In the event this motion is denied, the City reserves its right to oppose Plaintiffs' request for class certification at the appropriate time.

federal equity court intervenes, assuming this amounts to injury in fact, [are] not within the zone of interests protected by the Fourteenth Amendment or 42 U.S.C. § 1983." *Calvin v. Conlisk*, 534 F.2d 1251, 1253 (7th Cir. 1976). *Calvin* held that standing based on such allegations improperly "give[s] any organization with a particularized interest the right to bring suit in order to spare itself the expense of continued efforts to further that interest." *Id.*; *see also Barnes v. Shalala*, 865 F. Supp. 550, 561 (W.D. Wisc. 1994) (standing based on allegations that organization's "resources are being sapped . . . would eviscerate the constitutional requirement of the standing doctrine").[2] Illinois courts have similarly found a lack of standing in ICRA actions where diversion of resources is the sole injury. *See Grassroots Collaborative v. City of Chicago*, 2020 IL App (1st) 192099, ¶¶ 32–33 (diversion of resources does not constitute "concrete and demonstrable injuries . . . and are, instead, only abstract injuries . . . insufficient to confer standing."). Thus, LPL's alleged "injuries" are insufficient to establish organizational standing.

### 2. LPL Lacks Standing To Sue On Behalf Of Its Members.

LPL also fails to establish associational standing—that is, standing on behalf of its members. *United Food & Commer. Workers Union, Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996). An organization has standing to sue on behalf of its members if "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit." *Milw. Police Ass'n v. Bd. of Fire and Police Comm'rs of Milw.*, 708 F.3d 921, 928 (7th Cir. 2013). Dismissal is warranted where an

---

[2] The *Calvin* court also reasoned that the "organizations' voluntary decision to assume the burden of processing these claims arguably breaks the causal chain between the defendants' conduct and the expenses incurred by the organizations in processing the claims." 534 F.2d at 1253, n.3. Similarly, LPL's voluntary choice to bear the costs of challenging the City's use of ShotSpotter is insufficient to show that any injury to LPL is fairly traceable to the City.

association cannot satisfy all three requirements. *Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 922 (7th Cir. 1995).

As an initial matter, LPL does not allege sufficient facts establishing whether it in fact has "members"—a feature not required within the structure of a 501(c)(3) not-for-profit organization. *Riverside Medic. Ctr. v. Depart. of Rev. of State of Ill.*, 342 Ill. App. 3d 603, 607 (1st Dist. 2003).

Moreover, even if LPL had alleged a membership structure, LPL fails to allege that any of its members has standing. Plaintiffs alleging associational standing must plead facts sufficient to show that that at least one member (1) has actually suffered, or faces the real and immediate threat of suffering, an injury-in-fact (here, an unlawful seizure by a CPD officer responding to a ShotSpotter alert); (2) that the injury was caused by the defendant (here, by CPD policies and practices), and (3) that such injuries are redressable by a favorable decision. *See Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021).

There are no allegations that any member of LPL has ever been stopped by CPD officers responding to a ShotSpotter alert. At most, LPL alleges that its members "live in or regularly travel through the districts of Chicago where ShotSpotter is deployed," and are likely to be unlawfully stop based on a ShotSpotter alerts. Am. Compl. ¶ 32. Plaintiffs, however, present no allegations that either they or at least one of their members is "immediately in danger of sustaining some direct injury" due to the CPD's alleged unlawful seizures. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations omitted). And merely alleging that an organization's members are statistically likely to suffer harm is not sufficient to confer standing. *See Summers v. Earth Island Institute*, 555 U.S. 488, 497 (2009) (rejecting an organization's allegations of "statistical probability" of harm as insufficient to confer associational standing); *Prairie*, 2 F.4th at 1010 (finding allegations of "generalized harm to a group of individual members" without identifying

any one member with standing to sue on his own behalf were insufficient to establish associational standing.) Accordingly, LPL fails to establish it has associational standing.

**B.      Plaintiffs Lack Standing To Pursue Equitable Relief On Behalf Of Themselves Or A Class of Similarly-Situated Individuals.**

All Plaintiffs seek equitable relief on behalf of themselves. *See* Am. Compl. (Request for Relief). Plaintiffs Ortiz and Scruggs additionally seek relief on behalf of a class of similarly-situated individuals who have been or will be subjected to unlawful seizures by CPD officers "because of faulty ShotSpotter technology," *id.* ¶ 30, because they are likely to be "falsely targeted" again due to working, traveling, and living in areas covered by ShotSpotter. *Id.* ¶¶ 408, 502. While Plaintiffs' allegations "presumably afford[]" them standing to claim damages against the individual officers and the City, these allegations "do[] nothing to establish a real and immediate threat" of future constitutional harm necessary to establish "standing to seek the injunction requested [because such relief] depend[s] on whether [they are] likely to suffer future injury." *Lyons*, 461 U.S. at 105.[3]

In *Lyons,* plaintiff sought an injunction prohibiting Los Angeles Police Department ("LAPD") officers from using chokeholds. *See id.* at 98. The Supreme Court found Lyons lacked standing because the one episode experienced by Lyons did "nothing to establish a real and immediate threat" to establish standing based on the threat of future unlawful conduct by law enforcement officers. *Id.* at 105–06. The Court reasoned that standing would require proof either "(1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter . . . or, (2) that the City ordered or authorized police officers to act in such

---

[3] "[T]he same standard and reasoning applies to plaintiff[s]' claim for declaratory relief" because "[t]he declaratory relief statute is not an independent basis for jurisdiction and requires an 'actual controversy.'" *Robinson v. City of Chicago*, 868 F.2d 959, 966 n.5 (7th Cir. 1989).

manner." *Id.* at 106. Otherwise, the plaintiff's allegations failed to demonstrate an imminent risk of harm sufficient to seek injunctive relief. *Id.*

Here, Ortiz's and Scruggs' allegations fail to establish "a real and immediate threat" under *Lyons* because they do not allege one other instance in which they have been stopped by CPD officers since their initial encounters in April 2021 and July 2022, respectively, or a likelihood they will be the subject of a future unconstitutional encounter. *See Polk v. Dent,* No. 13 CV 9321, 2015 WL 2384601, at *1 (N.D. Ill. May 19, 2015) (incidents of past misconduct did not "establish a real and immediate threat warranting injunctive or declaratory relief for future conduct"). Their allegations reflect discrete, isolated instances. Likewise, the circumstances of Williams' arrest reflect an even more unique and isolated event. Am. Compl. ¶¶ 225-241, 274. The causal chain needed to establish a likely future encounter is purely speculative—not only requiring Plaintiffs to be in the vicinity of a response to a ShotSpotter alert, but also that officers would stop and/or arrest them without cause.

Moreover, applying *Lyons*' reasoning, Plaintiffs do not—and cannot—allege that (a) *all* CPD officers *always* stop and/or arrest individuals without cause in response to ShotSpotter alerts or (b) the City orders or authorizes officers to act in such a manner. Accordingly, Plaintiffs[4] lack standing to pursue equitable relief on behalf of themselves or a class.

## RULE 12(B)(6) ARGUMENT

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). A "complaint must contain sufficient factual matter, accepted

---

[4] LPL failed to plead any instance in which a member was unlawfully stopped or arrested much less that its members face an imminent threat of being stopped or arrested as a result of CPD officers responding to a ShotSpotter deployment. Thus, LPL also fails to meet the *Lyons* elements to pursue equitable relief.

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). "[L]egal conclusions[, or t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" should be disregarded. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Instead, the Court must determine whether the Complaint's "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## I.    PLAINTIFFS FAIL TO STATE A *MONELL* CLAIM FOR VIOLATION OF THEIR FOURTH AMENDMENT RIGHTS.

Each Plaintiff, except for Michael Williams, pursues *Monell* liability in Count I against the City for violations of their Fourth Amendment rights alleging that the City has "adopted and maintained express policies and widespread practices concerning ShotSpotter that fuel its negative consequences and that lead systematically to illegal searches and seizures." Am. Compl. ¶¶ 143, 544. To state a *Monell* claim, Plaintiffs must sufficiently allege the City caused their constitutional injuries through (1) the enforcement of an express policy, (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice, or (3) a person with final policymaking authority. *See McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). Plaintiffs predicate their claim on the first two theories of *Monell* liability. Each requires Plaintiffs to not only establish the existence of an express policy or widespread practice, but Plaintiffs must plead facts sufficient to demonstrate the "requisite causation" affirmatively linking the identified policy or practice to the complained of constitutional violations. In other words, Plaintiffs must demonstrate that the express policy or widespread practice was the "moving force" behind the constitutional deprivation. *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008).

Plaintiffs fail to allege any facts plausibly showing that (i) any "express policies" caused the alleged unlawful stops and seizures of which complain, and (ii) any "widespread practice" of

unlawful stops and seizures exists. Rather, Plaintiffs' *Monell* claim is largely informed by the City's Office of Inspector General's August 2021 Report, titled *The Chicago Police Department's Use of ShotSpotter Technology* ("OIG Report"). (A copy of the OIG Report is attached as Exhibit A.) Despite Plaintiffs' emphasis on cherry-picked passages and statistics from the OIG Report, the Complaint fails to link the report's findings concerning ShotSpotter to the alleged discrete seizures of Plaintiffs Ortiz and Scruggs or to a larger widespread unconstitutional practice, or to any unconstitutional express policies, and therefore, does not correlate to a plausible *Monell* claim.

> **A.    Plaintiffs Fail To Plead That The City's Express Policies Were The Moving Force Behind The Claimed Constitutional Violations.**

Plaintiffs' central contention is that officers responding to ShotSpotter alerts have made "scores of illegal stops and arrest," Am. Compl. ¶ 5, in violation of the Fourth Amendment, but Plaintiffs fail to identify a single official, express policy of the City that could plausibly have caused these purportedly illegal stops and arrests. Although they recite the general elements for a *Monell* claim by stating the City's "express policies" caused their injuries, *see*, *e.g.*, *id.* ¶¶ 143, 544, Plaintiffs fail to show any express policy of the City that, when enforced, caused the alleged constitutional violations. Plaintiffs identify two official City policies in the Complaint, but on their face there is nothing unconstitutional about these policies. Indeed, these policies are meant to prevent the alleged false arrests and stops about which Plaintiffs complain.

> **1.    The First Policy: CPD's Investigatory Stop Policy.**

Plaintiffs identify the City's *Investigatory Stop System* policy stated in Special Order S04-13-09 ("S04-13-09") that mandates the procedures officers must follow to conduct a constitutional

investigatory stop. *See* Am. Compl. ¶ 539. (A copy of S04-13-09 is attached as Exhibit B.)[5] Plaintiffs do not contest that S04-13-09 is the express, written policy of the City that requires officers to possess the constitutionally required "reasonable articulable suspicion" prior to conducting an investigatory stop. *Id.* This directive likewise instructs officers that "reasonable articulable suspicion depends on the totality of the circumstances," including the "reasonable inferences that are drawn" from an officer's "training and experience." *See* S04-13-09 (Ex. B) § II.C. Moreover, S04-13-09 expressly prohibits race-based stops. *See id.* § III.E. (prohibiting "racial profiling or other bias-based policing when conducting investigatory stops").

### 2.    The Second Policy: The ShotSpotter Flex Program.

Plaintiffs also rely on CPD's ShotSpotter Flex Program policy, which is memorialized in Special Order S03-19 ("S03-19"). Am. Compl. ¶¶ 144–45. (A copy of S03-19 is attached as Exhibit C.) This directive "informs" officers of the City's "use of the ShotSpotter Flex program as part of" the department's "Gang Violence Reduction Strategy." *See* S03-19 (Ex. C) § I.A. S03-19 explains that ShotSpotter is "intended to enhance the department's ability to respond effectively to investigate violent crime involving gunfire." *Id.* § IV.A. It admonishes officers responding to a ShotSpotter alert to "follow the procedures" in the written directives entitled "*Preliminary Investigations*," which include the procedures mandated in the City's investigatory stop policy detailed in S0413-09. *Id.* § VII. C.3; S04-13-09 (Ex. B) (at "Index Category: 04 – Preliminary Investigations."). S03-19 does not direct an officer responding to a ShotSpotter alert to conduct an investigatory stop of any person that may be present at the scene. Instead, it directs a responding

---

[5] Attachment of Special Order S04-13-09 and the other orders are proper and does not convert this motion into one for summary judgment. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("It is well settled that in deciding a Rule 12(b)(6) motion, a court may consider documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim.") (internal quotations and citation omitted).

officer to "take a safe and strategic approach while responding to the incident," which is an alert of possible gunfire, and to "canvass" a recommended "25-meter radius" surrounding the location for "victims, evidence, and witnesses." *See* S03-19 (Ex. C) § VII. C.2, 5.

### 3. Plaintiffs Fail To Allege That Either S04-13-09 Or S03-19 Was The Moving Force Behind The City's Alleged Illegal Stops And Seizures.

Plaintiffs completely fail in their burden to plead that the two policies they have identified, S04-13-09 and S03-19, lead to illegal searches and seizures. Plaintiffs fail to allege any facts whatsoever about how these policies that provide procedural protections caused or were the moving force behind the alleged violations of their constitutional rights. *See Montano*, 535 F.3d at 570. Plaintiffs in a conclusory fashion allege that ShotSpotter's technology is "unreliable" and demand the end of its use as a law enforcement tool, but fail to explain how the two policies cause the unlawful seizures of which they complain. *See Peterson v. City of Chicago*, No. 14-CV-9881, 2015 WL 13882814, at *3 (N.D. Ill. June 23, 2015) ("'boilerplate' statements that repeat the elements of a *Monell* claim without any further factual content have been dismissed for failure to state a claim"). While Plaintiffs allege that the City's express policies resulted in the officers engaging in illegal seizures when responding to ShotSpotter alerts, without any supporting facts, these conclusory allegations cannot plausibly flow from policies that provide procedural protections and direct officers to engage in constitutional procedures for policing.

Indeed, Judge Leinenweber has already found that S04-13-09 complies with the Fourth Amendment. *Hall v. City of Chicago*, 2012 WL 6727511, *8 (N.D. Ill. Dec. 28, 2012) (J. Leinenweber). Thus, S04-13-09 reflects the City's constitutional express policy governing investigatory stops, the enforcement of which did not cause Plaintiffs' alleged injuries. Likewise, S03-19 also cannot be an "express policy" the enforcement of which caused Plaintiffs' alleged constitutional injuries. S03-19 does not direct officers to conduct an investigatory stop (or

effectuate arrests), and instead orders officers to follow the City's investigatory stop policy should the "totality of the circumstances" warrant an investigatory stop. *See Alcorn v. City of Chicago*, No. 17 C 5859, 2018 WL 3614010, at *16 (N.D. Ill. July 27, 2018) (noting that the policy itself was "[not] unconstitutional at all"). Consequently, Plaintiffs fail to show that any express policy was the "moving force" behind their alleged injuries.

### B. Plaintiffs Have Not Pled Facts Establishing That CPD Had A Widespread Practice Or Custom That Caused Their Injuries.

A widespread practice or custom under *Monell* is established through "facts tending to show that the City was aware of the [allegedly unconstitutional] behavior of the officers, or that the activity was so persistent and widespread that the City should have known about the behavior." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). Practices are widespread when they are "so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006).

Plaintiffs, in a conclusory fashion, allege that CPD officers have a widespread practice of engaging in illegal stops and seizures when responding to ShotSpotter alerts but do not plead facts sufficient to show that a widespread practice exists, much less that City policymakers knew or should have known of an unconstitutional widespread practice.

### 1. Plaintiffs Fail To Show A Widespread Practice Of Unconstitutional Investigatory Stops And Seizures Arising From ShotSpotter Responses.

In Plaintiffs' 692-paragraph complaint, they only allege two instances of unconstitutional seizures initiated in response to a ShotSpotter alert of gunshots—the claims of plaintiffs Daniel Ortiz and Derick Scruggs—since its inception in 2003. *See* Am. Compl. ¶¶ 173, 349–502. Without more, Plaintiffs do not allege sufficient facts showing the existence of a widespread practice by officers conducting *unlawful* investigatory stops or seizures. *See Ramos v. City of Chicago*, 707 F.

13

Supp. 345, 347 (N.D. Ill. 1989) ("six incidents of police brutality over a ten-year period . . . in no way indicates a policy or custom"); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (three incidents insufficient to establish a widespread practice).

From January 1, 2020, to May 31, 2021, Plaintiffs state CPD officers responded to 50,176 ShotSpotter alerts. *See* Am. Compl. ¶ 47. According to Plaintiffs, although officers responded to 50,176 ShotSpotter alerts, officers only conducted 1,056 investigatory stops upon arriving at the dispatched, ShotSpotter-identified location, *id.* ¶ 125, meaning an investigatory stop occurred during 2.1% of all officer responses to the 50,176 alerts. Putting Plaintiffs Ortiz and Scruggs' allegations aside, neither Plaintiffs nor the OIG Report, upon which Plaintiffs mostly rely, assert that any of the 1,056 investigatory stops were unconstitutional. Consequently, pleading only two claims of unconstitutional stops fails to establish a widespread practice that was the "moving force" behind any alleged unconstitutional injury caused by the deployment of ShotSpotter.

### 2. Plaintiffs Do Not Allege Facts Suggesting That City Policymakers Had Actual Or Constructive Knowledge Of A Widespread Practice Of Unconstitutional Stops.

#### a. The OIG Report Does Not Demonstrate Awareness.

The OIG Report issued no findings or conclusions that any investigatory stop initiated in responding to a ShotSpotter alert was the product of an unconstitutional seizure. *See generally*, OIG Report (Ex. A). Instead, the extent of the OIG's conclusions from its analysis were (1) "ShotSpotter alerts rarely produce document evidence of a gun-related crime, rarely give rise to investigatory stops, and even less frequently lead to the recovery of gun-crime related evidence" and (2) "OIG found evidence that CPD members' generalized perceptions of the frequency of ShotSpotter alerts in a given area *may* be substantively changing policing behavior." *Id.* at p. 22 (emphasis added). The OIG Report concludes that "[t]he operational value of ShotSpotter is ultimately a question of relative costs and benefits" that requires more data and analysis. *Id.*

Accordingly, the OIG Report cannot establish that the City policymakers knew or should have known of a widespread practice of improper investigatory stops by CPD officers.

> **b.    Individual Plaintiffs' Alleged Stops Did Not Create Awareness.**

Plaintiffs also rely on the two allegedly unconstitutional stops involving Plaintiffs Ortiz and Scruggs. Critically, Plaintiffs allege no facts suggesting that City policymakers knew or should have known about the two alleged incidents. Therefore, the two incidents involving Plaintiffs cannot establish that City policymakers knew or should have known that the use of ShotSpotter was prompting a widespread practice among officers of conducting improper stops or arrests targeting anybody, much less "racially" targeting Black and Latinx residents.

> **c.    The Articles, Testimony, Public Statements And Other Studies Do Not Demonstrate Awareness.**

The article concerning a study conducted by the South Shore Weekly, public statements, testimony in the City Council, and other unidentified studies did not place City policymakers on notice about any alleged unconstitutional investigatory stops. Am. Compl. ¶¶ 526–27. While Plaintiffs allege that these studies and other forms of notice informed the City that ShotSpotter technology was "inaccurate and unreliable," they fail to allege any facts that they informed the City policymakers of a widespread practice of improper investigatory stops or arrests by officers. Similarly, Plaintiffs fail to identify any lawsuits alleging claims of unconstitutional seizures brought against the City stemming from CPD responses to ShotSpotter alerts.

> **C.    Plaintiffs Allege Insufficient Facts To Establish That The City Was Deliberately Indifferent To Any Unconstitutional Practice Of CPD Officers Responding To ShotSpotter Alerts.**

> **1.    Without Facts To Support Knowledge Of A Widespread Practice, Plaintiffs Cannot Establish Deliberate Indifference.**

As discussed above, Plaintiffs have not pled sufficient facts to show the City's policymakers knew or should have known of a widespread practice of officers conducting illegal

investigatory stops or seizures while responding to ShotSpotter alerts. Consequently, Plaintiffs cannot and do not plead facts demonstrating that City policymakers were deliberately indifferent to an unconstitutional practice. Deliberate indifference in the context of a *Monell* claim means that "'a reasonable policymaker [would] conclude that the plainly obvious consequences' of the City's actions would result in the deprivation of a federally protected right." *Gable*, 296 F.3d at 537 (*citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 411 (1997)). Plaintiffs offer no facts suggesting as much here, and their claims must be dismissed.

> **2.      Plaintiffs Have Not Pled Facts Suggesting That The City Was Deliberately Indifferent In Its Training Or Supervision Of CPD Officers.**

Plaintiffs also allege in a conclusory manner that the City failed to train or supervise its officers, Am. Compl. ¶ 538, but they do not allege facts to satisfy the high standard for such a claim. The City's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). Plaintiffs must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390–391 (1989). "Moreover, to establish liability, the identified deficiency in the training program must closely relate to the ultimate injury." *Edwards v. Two Unknown Male Chicago Police Officers*, 623 F. Supp. 2d 940, 951 (N.D. Ill. 2009).

Similarly, "[p]roof that a supervisor was negligent or even grossly negligent in failing to detect or prevent constitutional violations is insufficient" to state a failure to supervise claim. *Mayes v. City of Hammond*, 442 F. Supp. 2d 587, 634 (N.D. Ind. 2006). Rather, "[t]he supervisor must . . . act either knowingly or with deliberate, reckless indifference." *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988). Additionally, Plaintiffs must establish that the failure to

supervise caused the alleged constitutional violations. *Hanno v. Sheahan*, No. 01 C 4677, 2004 WL 2967442, at *13 (N.D. Ill. Nov. 29, 2004).

Rather than alleging any such facts, Plaintiffs merely assert that the City "failed to inform officers that a person's mere presence with the vicinity of a ShotSpotter alert does not supply lawful justification for an investigatory stop or other search or seizure," among other shortcomings. *See* Am. Compl. ¶¶ 149–153. To make such allegations, Plaintiffs ignore the instructions officers receive through the Special Orders, such as S04-13-09 and S03-19. Thus, Plaintiff alleged no facts suggesting that the City failed to train or supervise officers, much less any facts suggesting that the City was deliberately indifferent to deficiencies related to ShotSpotter training or supervision.

## II. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE.

To plead a violation of the Equal Protection Clause, Plaintiffs must allege that "the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). Plaintiffs generally allege that "CPD's policy of deploying ShotSpotter in Chicago's majority Black and Latinx districts violates the Equal Protection Clause." Am. Compl. ¶ 547. Plaintiffs further claim that the City deliberately chose to "blanket" 12 police districts with overwhelmingly Black and Latinx neighborhoods "for the purpose of targeting people in those neighborhoods." *Id.* ¶¶ 171, 179. Yet, Plaintiffs fail to plead that CPD's deployment decisions had a racially discriminatory effect on Black and Latinx individuals in ShotSpotter areas that was motivated by a racially discriminatory purpose, and thus, Count II must be dismissed.

### A. Plaintiffs Fail To Allege Discriminatory Effect.

To plead discriminatory effect, Plaintiffs must allege "[(i)] that they are members of a protected class, [(ii)] that they are otherwise similarly situated to members of the unprotected class,

and [(iii)] that [they] were treated differently from members of the unprotected class." *Chavez*, 251 F. 3d at 636. Plaintiffs fail to meet these essential elements by not alleging any facts to demonstrate that Black and Latinx individuals, including Plaintiffs, were treated differently from other similarly-situated individuals such that the deployment of ShotSpotter resulted in higher rates of unjustified stops and arrests or reduced access to police services for Black and Latinx individuals.

Because ShotSpotter is race-neutral—it is a sound detection system designed to identify the time and location of gunshots, which does not identify, or account for, race or ethnicity in any respect—Plaintiffs must allege facts demonstrating a racially discriminatory effect based on the implementation of ShotSpotter. Plaintiffs' allegations, however, fall short. Plaintiffs principally charge that CPD's decision to deploy ShotSpotter technology in 12 majority-Black and Latinx police districts adversely harms minorities within those districts by (1) putting Black and Latinx persons within those districts at greater risk for unlawful "investigatory stops, arrests and uses of force" than residents living in majority-White districts; (2) changing police behavior within those 12 police districts; and (3) diverting police resources contributing to delays in 9-1-1 response times. Am. Compl. ¶¶ 549–51. As shown below, Plaintiffs' allegations are conclusory and fail to show that Black and Latinx individuals are treated differently because of the deployment of ShotSpotter. *See Chriswell v. Vill. of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at *11 (N.D. Ill. Nov. 4, 2013) (dismissing equal protection claim where the plaintiff failed to allege that she was subject to different treatment than similarly-situated individuals).

While Plaintiffs allege that "Black and Latinx people are being stopped, arrested, and abused by the CPD during hostile police deployments at much higher rates than White people, ***solely because*** of the City's discriminatory ShotSpotter program," Plaintiffs present no allegations to substantiate such an assertion. *See* Am. Compl. ¶ 197 (emphasis added). There are no facts

18

alleging differences in (i) investigatory stops, arrests, or uses of force between Black and Latinx individuals and Whites (let alone unlawful police actions), (ii) officer behavior, or (iii) allocation of police resources to support the claim that ShotSpotter deployments adversely impacted Black or Latinx persons. Plaintiffs also fail to offer any statistical or non-statistical allegations of unlawful investigatory stops, arrests, uses of force, and/or 9-1-1 response times: (a) before and after the deployment of ShotSpotter within the 12 selected districts; or (b) comparing such alleged police activities in the majority-White districts compared to the ShotSpotter-selected districts.

The absence of these crucial allegations of comparison further reflects Plaintiffs' failure to plead a similarly situated comparator[6] that is necessary for a meaningful comparison to substantiate their claim that CPD's deployment decisions had a racially disparate effect on Black and Latinx individuals.

Plaintiffs also fail to allege that White individuals within the ShotSpotter districts are treated differently compared to Black and Latinx individuals. Without such allegations, there is no basis to make the inferential leap to the conclusion that Black and Latinx individuals are subject to more negative CPD interactions because of the deployment of ShotSpotter in certain districts. *See Williams v. Cook Cnty.*, No. 18 C 1456, 2018 WL 4361946, at *8 (N.D. Ill. Sept. 13, 2018) ("It is insufficient that Plaintiffs allege the new policy negatively affects members of a protected

---

[6] A person is similarly-situated if he or she is "comparable to the plaintiff in all material respects." *James v. City of Evanston*, No. 20-CV-00551, 2021 WL 4459508, at *11 (N.D. Ill. Sept. 29, 2021). A similarly-situated individual and the plaintiff must have "enough common features between the individuals to allow a meaningful comparison." *Id.* (internal quotations omitted). Plaintiffs' contention that ShotSpotter is deployed in police districts with higher percentages of Black and Latinx residents lacks any specific facts or analysis comparing whether such residents are similarly situated to other residents of Chicago. Am. Compl. ¶ 181. Simply being a resident of Chicago does not make all Chicago residents similarly situated, and Plaintiffs fail to allege that they are otherwise similarly situated to a comparator of the unprotected class. *See e.g.*, *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 946 (7th Cir. 2009) ("Merely stating that all residents of Lisle live within Lisle's borders . . . is insufficient to establish that such residents are similarly situated").

class; they must allege that similarly-situated parties are treated differently.").

Furthermore, Plaintiffs' reliance on City-wide and historical statistics misses the mark. While Plaintiffs allege that "Black people were 11.7 times more likely to face a use of force following an investigatory stop than non-Black people[,]" Plaintiffs do not link such City-wide data to ShotSpotter deployment, nor do they allege that this "use of force" was caused by or related to ShotSpotter. Am. Compl. ¶ 198. Similarly, Plaintiffs rely on city-wide data that "400,000 high-priority (Priority 1 or 2) calls for police service city-wide came in when there were no police available to respond," contending without any factual support that ShotSpotter contributes to that problem. *Id.* Plaintiffs fail to address equally plausible explanations such as staffing shortages or call volume. Ultimately, Plaintiffs' allegations fail to address the key issue—whether the selection of districts to deploy ShotSpotter proximately caused Plaintiffs' harm and resulted in a racially discriminatory outcome for Black and Latinx individuals.

### B. Plaintiffs Fail To Allege Discriminatory Purpose.

Plaintiffs' Equal Protection claim also fails because they have not sufficiently alleged that the City "'acted with discriminatory purpose.'" *Chavez*, 251 F.3d at 645 (quoting *McKleskey v. Kemp*, 481 U.S. 279, 292 (1987)). Plaintiffs' repeated reliance on conclusory assertions that CPD "purposely blanketed" and "purposely placed" ShotSpotter throughout the City along racial lines, without more, cannot state an Equal Protection claim. Am. Compl. ¶¶ 1, 163, 171, 180, 553.

"Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Martinez v. City of Chicago*, 534 F. Supp. 3d 936, 950 (N.D. Ill. 2021) (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996)). Plaintiff must show that the City "adopted [a] policy *because of, not in spite of or with indifference to*, its effect on" Plaintiffs. *Bond*

*v. Atkinson*, 728 F.3d 690, 693 (7th Cir. 2013) (emphasis added). Moreover, the required level of factual specificity rises with the complexity of the claim. *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011).

Plaintiffs' conclusory assertions that the City has "consistently and deliberately chosen to deploy ShotSpotter only in overwhelmingly Black and Latinx neighborhoods for the purpose of targeting the people in those neighborhoods" amount to nothing more than a formulaic recitation of the elements of an Equal Protection claim and should be disregarded. Am. Compl. ¶ 171. In *Ashcroft v. Iqbal*, the Supreme Court explained that markedly similar allegations were "bare assertions . . . [that] amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim," *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555); *McCauley*, 671 F.3d 616–17 ("facts" that are actually legal conclusions or elements of the cause of action, should be disregarded on a motion to dismiss).

The Complaint is devoid of any facts that address the decision-making process concerning the deployment of ShotSpotter, let alone facts that show the City acted with discriminatory purpose. Plaintiffs fail to offer any facts pointing to specific internal policies or practices reflecting an intent to target minorities and their communities by the deployment of ShotSpotter. Similarly absent are factual allegations of any statements or directives by CPD decision-makers reflecting that Black and Latinx populations were intentionally singled out. *See Quinn v. Bd. of Educ. of the City of Chicago*, 234 F. Supp. 3d 922, 935 (N.D. Ill. 2017) (dismissing equal protection claim where plaintiffs failed to allege any statements that suggested the decision-makers were motivated by race discrimination). Plaintiffs are required to plead a policy of intentional discrimination because of its effect on a particular group, and as stated above, the level of specificity rises with the complexity of the claim. Here, the challenges and nuances of policing in a large, urban city

21

that faces substantial issues with gun violence demand more than the bare assertions of discriminatory purpose that Plaintiffs present.

Plaintiffs' statistical allegations also do not establish discriminatory purpose. *See Chavez*, 251 F.3d at 647–48 ("statistics may not be the sole proof of a constitutional violation"). *Chavez* noted that a statistical pattern of discriminatory impact may demonstrate a constitutional violation only in "rare cases" and limited contexts relating to (1) jury venire, (2) Civil Rights Act of 1964 violations, and possibly even (3) legislative redistricting, none of which apply to our case. *Id.* at 647. Unless the case is within a rare, recognized exception, the plaintiff is required to allege other non-statistical facts in support of the alleged discriminatory intent. *Id.* at 647–48.

Plaintiffs' case does not fall within any recognized exception, and therefore, Plaintiffs' statistical allegations regarding the disparity of the racial compositions of different police districts in which ShotSpotter is or is not employed, alone, cannot establish the City's discriminatory purpose or intent in employing ShotSpotter. Am. Compl. ¶¶ 181–82, 185; *see Chavez*, 251 F.3d at 647–48; *see also Alston v. City of Madison*, 853 F.3d 901, 908 (7th Cir. 2017) ("[W]e cannot say that mere disparate impact is sufficient to prove discriminatory purpose.").

Plaintiffs' reliance on historical trends is equally unavailing to show any discriminatory intent. Although Plaintiffs allege that Chicago has a "history of racial discrimination in policing tactics[,]" Plaintiffs fail to establish the relevance of such allegations to the specific claims in this case. Am. Compl. ¶¶ 209, 554. "[G]eneric trends" are not enough to show a "specific sequence of events" that "might reflect a discriminatory motive." *Quinn*, 234 F. Supp. 3d at 935. In *Quinn*, while the plaintiffs alleged a "generic trend" of "Chicago's history of school segregation," the court ruled that generic trends were too speculative to show a "specific sequence of events" or an analysis that reflected the defendant's discriminatory motive for the complained-of policy. *Id.*

Likewise, Plaintiffs fail to allege a specific sequence of events or "draw any link" between their allegations of historical policing trends in Chicago, Am. Compl. ¶¶ 209–224, and the City's decisions behind the use of ShotSpotter. *See Quinn*, 234 F. Supp. 3d at 935. None of the purported patterns of unconstitutional police conduct in minority communities are alleged to be caused by, because of, or even related to ShotSpotter. Am. Compl. ¶¶ 211–23. Nor do Plaintiffs allege any facts to support their conclusory statement that "ShotSpotter reinforces and fuels CPD's longstanding discriminatory policing practices." *Id.* at ¶ 224.

## III. PLAINTIFFS FAIL TO ALLEGE A VIOLATION OF THE ILLINOIS CIVIL RIGHTS ACT.

To state an ICRA claim, plaintiffs must allege that the defendant (1) utilizes "criteria or methods of administration" that (2) "have the effect of subjecting individuals to discrimination because of their race, color, rational origin, or gender." 740 ILCS 23/5(a)(2). ICRA is the state equivalent of federal laws protecting against disparate impact discrimination in the housing and employment contexts, and accordingly federal precedent under Title VI and Title VII cases is applicable. *Jackson v. Cerpa,* 696 F. Supp. 2d 962, 964 (N.D. III. 2010). To adequately state a disparate impact claim, a plaintiff must identify a specific policy and practice and must allege sufficient facts that plausibly demonstrate that the policy or practice has caused a "relevant and statistically significant disparity" between members of affected classes. *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014).

### A. Plaintiffs Failed To Allege A Specific CPD Policy Or Practice Concerning The Deployment Of ShotSpotter Technology.

To state an ICRA claim, Plaintiffs must explain which criteria and methods of administration are at issue. *See Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.*, 19-cv-3014, 2020 WL 1330654, at *4 (N.D. Ill. Mar. 22, 2020) (dismissing ICRA claim because plaintiff failed to identify a specific practice that caused the alleged disparate impact). Plaintiffs do not identify any

specific "criteria or methods of administration. Instead, Plaintiffs simply recite the legal standard, alleging that "criteria and methods the Municipal Defendants have used in determining where to deploy ShotSpotter has resulted in disparate impact on Black and Latinx residents." Am. Compl. ¶ 563. Because Plaintiffs have failed to identify a specific policy or practice, Plaintiffs cannot demonstrate that any such policy caused a relevant and statistically significant disparity between Black and Latinx residents and White residents within the affected police districts. *See Swan v. Bd. of Educ, of City of Chicago,* 2013 WL 4401439, at *19 (N.D. Ill. Aug. 15, 2013) (holding that plaintiffs must "isolate[e] and identify" the specific practices responsible for the discrimination).

Instead, Plaintiffs allege that CPD "deliberately chose" to deploy ShotSpotter in the districts that have the highest proportion of Black and Latinx residents. Am. Compl. ¶ 562. But "it is not enough to simply allege that there is a disparate impact... or point to a generalized policy that leads to such an impact." *Cary*, 2020 WL 1330654, at *4 (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)). Moreover, Plaintiffs' own allegations identify four majority-Black and Latinx police districts (Districts 12, 14, 17, and 22) in which ShotSpotter has not been deployed. Am. Compl. ¶ 184. The exclusion of these districts from ShotSpotter deployment belies a policy or practice based on racial demographics. Plaintiffs cannot state an ICRA claim based solely on the generalized policy of deploying ShotSpotter in some, but not all, majority-Black and Latinx districts across the City.

### B. Plaintiffs Have Not Alleged A Robust Causal Connection.

Plaintiffs' ICRA claim fails because it does not plausibly allege that deployment of ShotSpotter caused a disparate impact on Black and Latinx Chicagoans. *See supra* Section II.A. The Supreme Court cautioned that "[a] robust causality requirement" is necessary to ensure that disparate-impact liability does not "displace valid governmental and private priorities, rather than solely" removing unnecessary barriers. *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive*

*Communities Project, Inc.*, 576 U.S. 519, 544 (2015) (internal citation omitted).

In *Inclusive Communities Project, Inc.*, plaintiffs challenged a state agency's selection criteria for allocating the low-income housing tax credits it distributed to developers because those credits went disproportionately toward low-income housing in majority African-American urban areas as opposed to majority white suburban neighborhoods. *See id.* at 524–26. The Supreme Court declined to hold that plaintiffs had established a prima facie case based solely on a statistical disparity in the allocation of the housing credits. *See id.* at 539–40. Rather, to make out a prima facie case for disparate impact liability, the Court held that, at the pleading stage, the plaintiffs must draw an explicit, causal connection between the disparities and the challenged policy. *Id.* at 543. This "robust causality requirement ensures that 'racial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* at 542 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989). To plead the "robust causality requirement," a plaintiff needs to explain how the policy at issue "will *cause* a racially disparate impact, as distinct from just resulting in a disparate impact." *TBS Group, LLC v. City of Zion, Illinois*, No. 16-cv-5855, 2017 WL 5129008, at *9 (N.D. Ill. Nov. 6, 2017) (emphasis in original).

### 1. Plaintiffs' Reliance On Pre-Existing Disparities Fails To Support Their ICRA Claim.

Plaintiffs do not allege facts sufficient to demonstrate a causal connection between ShotSpotter deployment and disparate harms. Plaintiffs merely point to pre-existing disparities that are disconnected and independent from ShotSpotter deployment. In support of their claim, Plaintiffs list general statistics regarding the City's demographics disparities in the 12 police districts where ShotSpotter was deployed alleging that each district has a population of more than 65% Black or Latinx residents and none have more than 25% White residents (Am. Compl.

25

¶¶ 181–82) and a total of 80% of Black and 65% of Latinx Chicagoans live "under ShotSpotter footprint" compared to "only 30% of White Chicagoans." (*id.* ¶¶ 20, 185). To the extent the Complaint suggests that officers' responses to ShotSpotter alerts disproportionately impacts Black and Latinx residents within those districts, Plaintiffs' allegations have not shown that these disparities are because of ShotSpotter, rather than due to pre-existing demographic trends on the West and South Sides of Chicago. This case is similar in this regard to *Inclusive Communities Project, Inc. v. Heartland Comm. Ass'n, Inc.*, 399 F. Supp. 3d 657 (N.D. Tex. 2019), where the court found that plaintiffs had not set forth a prima facie case of disparate impact under the FHA because "[t]he statistical racial disparities relied upon by [plaintiff] preexisted the enactment of the policy at issue and, therefore, cannot be shown to have been caused by it." *Id.* at 668; *see also TBS Grp., LLC v. City of Zion*, 2017 WL 319201, at *3 (N.D. Ill. Jan. 23, 2017).

## 2. Robust Causality Cannot Be Established By Plaintiff's Conclusory Allegations Of Disparate Harm.

Plaintiffs contend that CPD's "disparate deployment of ShotSpotter directly produces disparate harm." Am. Compl. ¶ 564. Like their Equal Protection claim, Plaintiffs ICRA claim relies upon the same conclusory allegations that Black and Latinx residents are: (1) "subject to increased ShotSpotter-prompted police encounters, investigatory stops, pretextual arrests, [and] uses of force;" (2) "ShotSpotter alerts changes the way police respond to residents in ways that directly harm Black and Latinx residents;" and (3) "ShotSpotter skews the allocation of municipal resources and slows response to 9-1-1 calls in districts with primarily Black and Latinx residents." *Id.* For the reasons set forth above, *supra* Section III.A.2, Plaintiffs have failed to plead facts establishing a disparate effect and the "robust causality" required for a disparate impact claim.

Indeed, Plaintiffs' ICRA claim must fail because Plaintiffs merely leap from their general observation—that Black and Latinx residents are more likely to be stopped, arrested and abused

by police—to a second and independent one—that the likelihood of increased investigatory stops, arrest and use of force for Black and Latinx population results "because of the City's discriminatory ShotSpotter program." *See* Am. Compl. ¶ 197. This conclusory allegation is not enough to plead causation based on controlling Supreme Court precedent that requires them to produce "statistical evidence demonstrating a causal connection" between ShotSpotter and these disparities, and Plaintiffs have not done so here. *Inclusive Communities*, 576 U.S. at 543.

When Plaintiffs do use statistical evidence related to ShotSpotter alerts and stops and arrests, they fail to connect it to the racial component of the persons being stopped or arrested. Plaintiffs allege that ShotSpotter alerts result in a large number of investigatory stops and point to the OIG report which identified "more than 2,400 investigatory stops linked to ShotSpotter . . . of which 1,056 matched a ShotSpotter event," (Am. Compl. ¶ 125), and "of the 1,056 investigatory stops, only 244 resulted in an arrest and only 152 resulted in a gun being recovered" (*id.* ¶ 127). But, neither the OIG report nor these numbers contain any allegations regarding the relationship between ShotSpotter notifications and the racial demographics of those stopped or arrested. Indeed, there are zero allegations related to the effect of ShotSpotter alerts on the Black and Latinx population as compared to the White population related to investigatory stops and arrests. Simply put, Plaintiffs have not alleged facts linking any alleged disparate impact on a protected class to ShotSpotter. These statistics are insufficient to demonstrate Plaintiffs' racial discrimination claims and fail to show that ShotSpotter caused any disparities. *See Munguia v. Illinois*, No. 10 C 0055, 2010 WL 3172740, at *8 (N.D. Ill. 2010) (holding that an ICRA claim requires "proof that Plaintiffs were treated differently, due to their race than other similarly situated persons").

Moreover, missing is any statistical allegations that Black or Latinx Chicagoans are more likely than other racial groups to be subjected to *excessive, illegal or unconstitutional* use of

physical force by Police "that could be linked to ShotSpotter." *See* Am. Compl. ¶ 199. Indeed, while Plaintiffs allege that "in 70 of the 82 cases, the person accosted by police was not armed with a gun," (*id.*), these allegations do not state that the use of force was unjustified, excessive, or unconstitutional. *See Marion v. City of Corydon, Indiana*, No. 4:07-cv-0003, 2007 WL 9734296, at *4 (S.D. Ind. Dec. 3, 2007) (to state a claim for constitutional violation, a plaintiffs needs to allege a violation of a constitutional right, e.g., to be "free from excessive, unreasonable, and unjustified use of force against his person"). Without such facts, Plaintiffs' allegations that "[a]ll 82 of the people that CPD used force against during these ShotSpotter deployments were Black and Latinx, with the exception of 4 whose race CPD lists as 'unknown[,]'" fails to state that ShotSpotter caused a violation of constitutional rights. Am Compl. ¶ 199.

In sum, while Plaintiffs allege general pre-existing demographic disparities, historical discrimination statistics, and ShotSpotter data, they fail to connect these, let alone demonstrate that these disparities were caused by ShotSpotter. This failure puts this case squarely among those in which courts, following the roadmap created by the Supreme Court in *Inclusive Communities*, have dismissed disparate impact claims for a failure to satisfy the causality requirement. *See, e.g., Adams*, 742 F.3d at 733; *Cesario v. Jewel Food Stores, Inc.*, No. 17 CV 319, 2017 WL 5152348, at *4 (N.D. Ill. 2017); *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, No. 3:17-CV-206-K, 2017 WL 3498335, at *9 (N.D. Tex. Aug. 16, 2017).

## IV. PLAINTIFFS' REMAINING STATE LAW CLAIMS (COUNTS XIII, XXIII AND XXIV) AGAINST THE CITY MUST BE DISMISSED.

The City is not a necessary party to be joined for purposes of Plaintiffs' indemnification claim against the individual defendant officers, thus Plaintiffs' indemnification claim in Count XXIV must be dismissed as premature. *See Askew v. Sheriff of Cook County*, 568 F.3d 632, 636–37 (7th Cir. 2009) (setting forth when a municipality is a necessary party).

Likewise, Plaintiffs fail to allege a claim against the City under the doctrine of *respondeat superior* when Plaintiffs fail to state a claim against the Individual Defendant Officers, thus Counts XIII and XXIV must be dismissed. See 745 ILCS § 10/2–109 ("[a] local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable".) Should this Court dismiss all claims stated against the individual defendant officers, Plaintiffs' claim under the doctrine of *respondeat superior* must fail against the City.

## V.   ALL CLAIMS AGAINST SUPERINTENDENT BROWN MUST BE DISMISSED.

### A.   The Federal Official Capacity Claims Against Superintendent Brown Are Redundant And Must Be Dismissed.

Plaintiffs sue Superintendent Brown only in his official capacity. Am. Compl. ¶ 35 ("he is sued here in his official capacity"). A suit against a governmental official in his official capacity is a suit against the governmental entity. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). Plaintiffs have sued the City in this lawsuit. Therefore, Plaintiffs' federal claims in Counts I and II against Superintendent Brown are redundant of their claims against the City and should be dismissed. *See Willis v. Bell*, 726 F. Supp. 1118, 1124 (N.D. Ill. 1989) ("Any official capacity claim against . . . [then Chicago Police Superintendent Martin] is redundant, calling for its dismissal."); *Suber v. City of Chicago*, No. 10 C 2876, 2011 WL 1706156, at *2 (N.D. Ill. May 5, 2011) (same).

### B.   ICRA Does Not Provide For A Claim Against Superintendent Brown.

ICRA provides for a cause of action only against "unit[s] of State, county, or local government in Illinois," and does not allow claims against individual defendants such as Superintendent Brown. 740 ILCS 23/5(a); *Smith v. Bd. of Educ. for Waukegan Public Sch. Dist. # 60*, 2021 WL 4459529, at *7 (N.D. Ill. 2021) (dismissing ICRA claims against individual defendants and noting that ICRA "provides a cause of action against only three potential parties:

29

the State of Illinois, its counties, and its local governments"). Therefore, Plaintiffs' ICRA claim in Count III directed against Superintendent Brown fails as a matter of law.

## <u>CONCLUSION</u>

For all the above reasons, Defendants request that this Court grant their motion to dismiss the Complaint and provide any further relief it deems necessary and just.

Dated: January 4, 2023           Respectfully submitted,

**CITY OF CHICAGO**

*s/ Michael P. Sheehan*
One of their Attorneys

Michael P. Sheehan
Allan T. Slagel
Barton O'Brien
Ioana M. Guset
Yeoeun C. Yoon
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone:    (312) 527-4000
Facsimile:    (312) 527-4011
Email:      msheehan@ taftlaw.com
            aslagel@taftlaw.com
            bobrien@taftlaw.com
            iguset@taftlaw.com
            yyoon@taftlaw.com

75761977v11