**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL WILLIAMS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHICAGO, *et al.*,<br><br>Defendants. | Case No. 22-cv-3773<br><br>Judge Ronald A. Guzman<br>Magistrate Judge Young B. Kim |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT CITY OF CHICAGO'S MOTION TO DISMISS FOR LACK OF STANDING PURSUANT TO RULE 12(B)(1)**

The City of Chicago has moved pursuant to Rules 12(b)(6) and 12(b)(1) to dismiss Plaintiffs' well-pled class action complaint for injunctive and monetary relief. ("City Mot."). ECF. No 51. Briefing on the motion is limited to the 12(b)(1) standing question. ECF No. 53. Plaintiffs' allegations show they have standing to challenge the City's ongoing violations of the Fourth Amendment, Equal Protection Clause, and Illinois state law, by its reliance on ShotSpotter.

**SUMMARY OF RELEVANT FACTUAL ALLEGATIONS**

Chicago Police Department ("CPD") officers are deployed nearly 100 times per day in response to ShotSpotter alerts, targeting individuals in the vicinity as suspects and frequently subjecting them to *Terry* stops based on those alerts. Yet the technology has never been tested for false alerts and is demonstrably ineffective. Amended Complaint (ECF No. 38) at ¶¶ 3, 41, 44–62, 71, 105–06. More than 90% of the time, officers find no evidence of any gun-related incident when they chase down an alert, according to Chicago's Office of the Inspector General (OIG). *Id.* ¶¶ 3, 47–48. There were 31,640 unfounded ShotSpotter alerts over twelve recent months. *Id.* ¶ 51. The Municipal Defendants have direct knowledge of ShotSpotter's appalling track record. *Id.* ¶¶ 40-

42, 107-8. They know that ShotSpotter has a contractual incentive to trigger alerts to noises that are not gunfire, *id.* ¶¶ 63–68, 530, and that the company deceives its customers and the public with misleading claims of "accuracy," *id.* ¶¶ 112–19, 531. Yet the City continues to instruct its officers to rely on ShotSpotter alerts to effectuate *Terry* stops, to cast people under suspicion for being in "high-ShotSpotter" locations, to charge people with crimes, and to shape how police allocate resources, including by slowing response to 9-1-1 calls. *Id.* ¶¶ 143–164, 518–22, 548–51.

The City intentionally deploys ShotSpotter along racial lines, placing 80% of Black residents and 65% of Latinx residents under ShotSpotter surveillance. *Id.* ¶¶ 171, 177–85. The City has placed ShotSpotter across the South and West sides, targeting only the areas that have the highest proportion of Black and Latinx residents, *id.*, a pattern that cannot be explained by gun crime rates, *id.* ¶¶ 186–93. ShotSpotter alerts are a remarkably frequent occurrence in these neighborhoods. There are approximately 100 ShotSpotter deployments on an average day in Chicago, over 30,000 per year. *Id.* ¶¶ 3, 51. The OIG identified more than 2,400 stops based in whole or part on ShotSpotter alerts, or a supposed history of alerts in the area. *Id.* ¶ 125.[1]

Plaintiff Scruggs, who is Black, Plaintiff Williams, who is also Black, and Plaintiff Ortiz, who is Latinx, live, work and/or frequently travel in ShotSpotter's shadow on the South and West sides of the City. *Id*. ¶¶ 26, 227, 350, 409–11, 501–02. Scruggs and Ortiz have been subjected to unfounded stops stemming solely from faulty ShotSpotter alerts, not for any unlawful conduct. *Id.* ¶¶ 349–70, 421–42, Plaintiff Lucy Parsons Labs is a "registered 501(c)(3) non-profit membership organization," *id*. ¶ 31, which has individual members who "live in or regularly travel through the districts of Chicago where ShotSpotter is deployed" and are thus "particularly likely to be subject

[1] Per the OIG, this number is a significant undercount because the City's haphazard recordkeeping only allows a fraction of ShotSpotter-prompted investigatory stops to be matched with a ShotSpotter alert. *Id.* ¶ 126.

to an unlawful stop based on a ShotSpotter alert." *Id*. ¶ 32.[2] LPL's mission includes "digital security trainings, pursuing police accountability, researching the use of police technologies and police tactics, and engaging in public education and advocacy on related topics." *Id*. ¶ 31. These services are geared toward promoting "transparency and accountability" and "public education," including by "publish[ing] research, educational materials, and advocacy materials." *Id*.

## LEGAL STANDARD

In assessing standing at the pleading stage, "the court must consider the allegations of the complaint as true" and decide whether jurisdiction exists on that basis. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009) (internal quotation omitted). Where, as here, a party mounts a purely "facial" challenge to standing, "the court does not look beyond the allegations in the complaint, which are taken as true for purposes of the motion." *Id.* at 444. On a facial attack, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 496 (7th Cir. 2005) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 504 U.S. 555, 561(1992)) (cleaned up). This four-corners analysis is distinct from a court's consideration of a "factual" standing challenge, in which a party argues that "the complaint is formally sufficient but . . . that there is *in fact* no subject matter jurisdiction." *Apex Digital*, 572 F.3d at 444. Such challenges require a defendant to produce "external facts [that] call[] the court's jurisdiction into question." *Id*.

[2] The City's baseless suggestion that LPL does not have members, City Mot. at 6, is false and contradicted by the pleadings. Am. Compl. ¶¶ 31–33.

The City's Rule 12(b)(1) motion constitutes a purely facial challenge, for it does not cite to or rely upon facts outside the pleadings.[3] Rather, the City aims its fire at the sufficiency of the allegations, arguing that (1) the individual plaintiffs' "*allegations* failed to demonstrate an imminent risk of harm sufficient to seek injunctive relief." City Mot. at 8 (emphasis added); (2) "LPL's *alleged* 'injuries' are insufficient to establish organizational standing," *id.* at 4–5 (emphasis added); and (3) LPL "does not *allege* sufficient facts" to sue on behalf of its members, *id*. at 5–7 (emphasis added).[4] The allegations in the Amended Complaint establish injunctive standing. [5]

## ARGUMENT

### I. The Individual Plaintiffs Have Standing to Seek Equitable Relief Against the City.

Plaintiffs Ortiz and Scruggs have standing to seek, on their own behalf and behalf of similarly-situated class members, equitable relief to enjoin the City's unlawful policy, pattern, and practice of using ShotSpotter to effectuate investigatory stops, in violation of the Fourth Amendment. Am. Compl. ¶¶ 511–58. Plaintiffs Ortiz, Scruggs, and Williams likewise have standing to pursue their Equal Protection claim challenging the City's intentionally discriminatory deployment of ShotSpotter, as well as their ICRA claim to remedy the racially disparate impact of the technology's use. The City only challenges Plaintiffs' standing to pursue equitable relief; it does not contest their standing to seek *damages* against the City under *Monell*.[6]

---

[3] If the Court regards any factual matter beyond the pleadings to be relevant to standing at this stage—despite the City's failure to put Plaintiffs on notice in its Rule 12(b)(1) argument of any potentially relevant material—Plaintiffs request the opportunity to supplement the factual record before the Court renders a decision on such basis.

[4] While the Introduction to Defendants' motion references allegations outside the pleadings—including promotional material from ShotSpotter's website and a (misleading) statement from an unnamed ShotSpotter representative quoted in an ABA Journal article, City Mot. at 2—these materials have no plausible bearing on whether Plaintiffs have standing to seek injunctive relief against the City. These materials, included by the City for rhetorical effect, are not referenced anywhere in the City's Argument, let alone its Rule 12(b)(1) arguments.

[5] Plaintiffs will voluntarily dismiss their official-capacity claims against Superintendent Brown. *See* City Mot. 29–30.

[6] The Amended Complaint makes clear that the Individual Plaintiffs seek damages against all Defendants, including the City, for all of the constitutional violations alleged. Am. Compl. at 121-22. While the City's motion purports to

### A. Plaintiffs Scruggs and Ortiz Have Standing to Pursue Equitable Relief Against the City for its Fourth Amendment Violations, on Behalf of Themselves and the Class

The City's policies and practices, which direct officers to rely on ShotSpotter as a basis for *Terry* stops, infringe upon their constitutional rights under the Fourth Amendment in several ways. First, the City violates the rule set forth in *Florida v. Harris*, which prohibits officers from justifying searches or seizures using detection tools, like ShotSpotter, that have not been subjected to basic reliability testing to determine the rate of false alerts. 568 U.S. 237, 245 (2013) (police must be able to "prove [a tool's] reliability" to justify giving its results weight). Second, the City's policies and practices are unconstitutional because, under them, officers fail to seek independent corroboration of ShotSpotter alerts when detaining civilians. The municipal practices flout the Seventh Circuit's holding that ShotSpotter is, at best, "analogous to an anonymous tipster," and therefore can never justify a seizure without "independent confirm[ation]" of gunfire and individualized suspicion. *United States v. Rickmon*, 952 F.3d 876, 882 (7th Cir. 2020). Third, the City's policies and practices violate the Fourth Amendment by directing officers to rely on ShotSpotter—and failing to properly train them as to its limitations—even though a ShotSpotter alert alone cannot establish individualized suspicion because of the limited information it purports to provide, *i.e.,* at best the approximate location of a loud noise that may or may not have come from a gunshot several minutes before police arrive. Am. Compl. ¶ 131–32. This contravenes the Seventh Circuit's holding in *United States v. Bohman* that "[a] mere suspicion of illegal activity at

seek dismissal of all claims against it, City Mot. at 3, it does not seek dismissal of Plaintiffs' claim for damages that arise out of the same *Monell* causes of action that are the basis for the injunctive relief they seek. As the City correctly notes, a party's standing to pursue injunctive relief is a separate question from its standing to pursue retrospective relief for damages, City Mot. at 7, and its arguments against standing for prospective relief do not touch Plaintiffs' standing to seek retrospective *Monell* damages. To the extent the City failed to appreciate that Plaintiffs seek both injunctive relief and damages on the *Monell* causes of action (Counts I and II), Plaintiffs have made their position clear in a recent meet-and-confer and motion to clarify the status of discovery. ECF No. 62.

a particular place is not enough to transfer that suspicion to anyone who leaves that [location]," 683 F.3d 861, 864 (7th Cir. 2012).

Because of these ongoing violations of the Fourth Amendment, Plaintiffs Scruggs and Ortiz have standing to seek prospective relief against the City, for they satisfy all three elements of standing: they are suffering an "injury in fact" that is "concrete and particularized" and "actual and imminent;" there is a "causal connection between the injury and the [City's] conduct"; and the injury could be redressed by a favorable decision from this Court. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013). The City only challenges the injury prong. City Mot. at 7–8.

"[T]o establish injury in fact when seeking prospective injunctive relief, a plaintiff must allege a 'real and immediate' threat of future violations of their rights." *Scherr*, 703 F.3d at 1074 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983)). Plaintiffs are not required to establish "that the possibility of future injury [is] certain," but only to show a genuine threat—what the Seventh Circuit has called "a substantial risk that such harm will occur." *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1019 (7th Cir. 2016). Courts engage in a fact-specific and flexible analysis of relevant factors to determine whether there is such a risk. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1337 n.6 (11th Cir. 2013); *accord Scherr*, 703 F.3d at 1075-75. Those factors focus on the particular circumstances of the plaintiffs, including whether they can choose to avoid the challenged conduct or instead are liable to be affected even when "engaging in innocent, lawful conduct," *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015). The factors also include the nature of the challenged conduct, including whether it constitutes "a specific pattern of conduct, akin to an explicit policy," *Ill. Migrant Council v. Pilliod*, 540 F.2d 1062, 1067 (7th Cir. 1976); *see also Smith*, 143 F. Supp. 3d at 752. The *Lyons* Court noted that Mr. Lyons would have had standing if he had been able to allege either "(1) that all

police officers [engaged in the challenged conduct against] any citizen with whom they happen to have an encounter . . . or (2) that the City ordered or authorized police officers to act in such a manner." *Lyons*, 461 U.S. at 105-06.

Plaintiffs Scruggs and Ortiz face a "substantial risk" of being subject to the complained conduct solely because of their personal circumstances. Plaintiff Scruggs lives in the South Shore neighborhood and works in the nearby Englewood neighborhood, which have among the highest rates of ShotSpotter activations in the City. Am. Compl. ¶¶ 410-11, 501–02; City Mot. Ex. A at 13 (OIG Report). He works as an armed security guard and carries a licensed firearm to and from work, Am. Compl. ¶ 502, which means that officers are especially likely to target him if he happens to be in the vicinity of another alert. Plaintiff Ortiz likewise frequently travels and works in the ShotSpotter areas in the City of Chicago. *Id.* ¶ 409. Moreover, Plaintiffs are Black and Latino men, which makes it more likely that officers will target them for an investigatory stop. Am. Compl. ¶¶ 209–24. Plaintiffs Scruggs and Ortiz were also not engaged in unlawful conduct that caused them to be stopped. Scruggs was doing nothing more than standing outside his workplace doing his job as an armed security guard when police targeted and seized him, *id*. ¶¶ 411-457, while Ortiz was heading back into the laundromat from his car to finish the last load of his kids' clothes, *id.* ¶¶ 349-54; 362. They were detained by police—and could be stopped again anytime in the future—while "engaging in innocent, lawful conduct—not unlawful conduct—prior to the alleged suspicionless stops and/or frisks." *Smith*, 143 F. Supp. 3d at 752.

These facts render Plaintiffs' case "distinguishable from *Lyons*," where the Court reasoned that Mr. Lyons could avoid a future police chokehold by not engaging in conduct to provoke police. *Smith*, 143 F. Supp. 3d at 752; *Lyons*, 461 U.S. at 106. Instead, this suit is on all fours with *Smith*, 143 F. Supp. 3d 741, a pending class action challenging the City's general stop and frisk policies

and practices. There, the Court found the City's policies and practices relating to stop and frisk were a sufficient risk of future harm to the lead plaintiffs who, much like Plaintiffs Ortiz and Scruggs, had been "walking home from the grocery store, standing in front of their own homes or the homes of friends, or taking digital photographs for a college course" when stopped without suspicion. *Id.* at 751. Indeed, Courts in this district have routinely found standing for equitable relief where plaintiffs were subjected to unconstitutional policies while abiding by the law and could again be subjected to such practices, regardless of the lawfulness of their conduct. *See Smith*, 143 F. Supp. 3d at 752; *Barrios v. City of Chicago*, No. 15-cv-2648, 2016 WL 164414, at *8 (N.D. Ill. Jan. 14, 2016); *Anderson v. Cornejo*, No. 97-cv-7556, 1999 WL 258501, at *2 (N.D. Ill. Apr. 21, 1999); *Hvorcik v. Sheahan*, 870 F. Supp. 864, 867 (N.D. Ill. 1994); *Franklin v. Chicago*, 102 F.R.D. 944, 948 (N.D. Ill. 1984). Federal courts nationwide are in accord.[7]

Plaintiffs are also subject to real and immediate threat of future violations—and satisfy the causation and redressability prongs of the standing inquiry too—because the City's express policies and widespread practices direct, encourage, and facilitate individual officers relying solely upon unreliable ShotSpotter alerts to effectuate *Terry* stops. Am. Compl. ¶¶ 120-64; *see Ill. Migrant Council*, 540 F.2d at 1067. The OIG identified a widespread pattern and practice of CPD officers treating residents differently—including subjecting them to *Terry* stops—only because ShotSpotter, a demonstrably unreliable and untested technology, had been installed and had previously triggered alerts in a neighborhood.

Plaintiffs' allegations buttress the OIG's findings concerning the City's widespread policies and practices. It explains how the City's explicit policy directs officers to use ShotSpotter

---

[7] *See, e.g.*, *Thomas v. County of Los Angeles*, 978 F.2d 504, 508 (9th Cir. 1992); *Hernandez v. Cremer*, 913 F.2d 230, 234-35 (5th Cir. 1990); *Floyd v. City of New York*, 283 F.R.D. 153, 169-70 (S.D.N.Y. 2012); *Natl. Cong. for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999).

as justification for effectuating stops, in violation of *Florida v. Harris*, *id.* ¶¶ 155–62, and directs officers to unlawfully treat ShotSpotter alerts as tantamount to eyewitness reports of actual shootings, *id*.; and how the City has failed to train or direct officers about the system's limitations, or about the Constitutional limits on ShotSpotter-prompted stops under *Rickmon* and *Bohman, id.* ¶¶ 149–54. Plaintiffs allege that the City entered and continued a contract with ShotSpotter that incentivizes false alerts, *id.* ¶¶ 63–68, even while the City has never field-tested the system for reliability nor insisted that ShotSpotter conduct rudimentary testing to ascertain false-alert rates, *id.* ¶¶ 104–111. In short, Plaintiffs are subject to the City's express and widespread policies and practices, under which they can fall victim to ShotSpotter alerts at any time.

These facts satisfy *Lyons*. Unlike in *Lyons*, "*all* police officers in [Chicago] *always* [rely on ShotSpotter as a potential basis to effectuate a *Terry* stop of] any citizen with whom they happen to have an encounter" following a ShotSpotter alert. *Lyons*, 461 U.S. at 106. Contrary to the City's argument, City Mot. at 8, Plaintiffs here *have* alleged the existence of an explicit, unlawful policy, so "that the City ordered or authorized police officers to act in [a] manner" that amounts to systematically unconstitutional conduct. *Lyons*, 461 U.S. at 106.

Despite allegations of a well-established policy and practice, and the Plaintiffs' specific circumstances rendering them vulnerable to categorically unlawful municipal conduct, Defendants argue that Plaintiffs lack standing because they have been subjected to an illegal ShotSpotter stop only once. City Mot. at 8 (citing *Polk v. Dent,* 2015 WL 2384601 at *1 (N.D. Ill. May 19, 2015)). Defendants are incorrect. Unlike in *Polk*, where the "[p]laintiffs fail[ed] to allege the likelihood of these future events," Plaintiffs have offered a wealth of individualized and empirical allegations—including the geographically targeted application of ShotSpotter and the sheer number of unfounded alerts each year—that undermine Defendants' characterization of these encounters as

"discrete, isolated instances." City Mot. at 8. Further undermining the City's argument, Plaintiffs allege that *every* ShotSpotter-prompted stop is unconstitutional insofar as police, as a matter of policy and practice, rely on untested technology in violation of *Harris*, *Rickmon*, and *Bohman*. Plaintiffs need not wait to be stopped a second or third time to seek an injunction when they face an ongoing, substantial risk in their neighborhoods every day.

Nor can the City immunize its unconstitutional policy from judicial review on the theory that ShotSpotter stops must become *even more* frequent or numerous before *any* individual in the City of Chicago can satisfy Article III and obtain review on the merits. City Mot. at 8. To the contrary, a single past violation, combined with an ongoing risk of injury in the face of an ongoing policy or practice, suffices to establish standing for injunctive relief. *Scherr*, 703 F.3d at 1071, 1074. This Court and others have frequently considered equitable claims against law enforcement policies that are similarly widespread, particularly in putative class actions like this one. *See, e.g., Smith,* 143 F. Supp. 3d at 752; *Hvorcik,* 870 F. Supp. at 866–68 (challenge to Sheriff's practice of maintaining invalid warrants in its records system); *Franklin*, 102 F.R.D. at 947–48 (challenge to CPD policy for transporting arrestees); *Barrios,* 2016 WL 164414 at *7–9 (challenge to City policies regarding vehicle impoundment and forfeiture practices); *Anderson,* 1999 WL 258501 at *1–2 (challenge to ICE body searches at O'Hare airport). Plaintiffs have suffered and continue to suffer a "real and immediate threat" of future harm that establishes Article III standing.

### B. Plaintiffs Scruggs, Ortiz, and Williams Have Standing to Seek Equitable Relief Against the City for its Equal Protection Clause and ICRA Violations.

Plaintiffs Williams, Ortiz, and Scruggs allege that the City's geographic placement of ShotSpotter, and the consequences thereof to themselves and the putative sub-class, is intentionally and facially discriminatory on the basis of race, in violation of the Equal Protection Clause. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-268 (1977); *Shaw v.*

*Reno*, 509 U.S. 630, 643 (1993). Plaintiffs also allege that the City's coverage decisions and their consequences are "criteria or methods of administration that have the effect of subjecting [them and the putative class] to discrimination because of their race," violating ICRA. 740 ILCS 23/5(a)(2); Am. Compl. ¶¶ 545–65. Plaintiffs have standing to pursue these claims.

First, unequal treatment under the law is itself "a type of personal injury we have long recognized as judicially cognizable." *Heckler v. Mathews*, 465 U.S. 728, 738 (1984). "The 'injury in fact' . . . is the denial of equal treatment." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Plaintiffs have amply alleged the City engages in racial discrimination by deploying ShotSpotter along racial lines. Am. Compl. ¶¶ 171–208. This is unequal treatment under the law, caused by the City's conduct and redressable by the Court via the equitable relief that Plaintiffs seek here. This alone suffices to establish standing.

Second, in addition to the injury of the discrimination itself, Plaintiffs have alleged numerous specific harms that they (and the putative sub-class) incur due to the City's discriminatory policy. As detailed already, Plaintiffs suffer a real and immediate threat of future Fourth Amendment violations as a result of the City's policies and practices and so have standing to challenge the racially discriminatory nature of that threat *a fortiriori*. *Smith*, 143 F.Supp.3d at 752 (finding standing in Equal Protection challenge where plaintiffs "alleged ongoing constitutional violations pursuant to an unconstitutional policy or practice"). Even aside from the threat of illegal *Terry* stops, Plaintiffs continue to suffer many other harms because of the alleged racial discrimination the City perpetuates through its use of ShotSpotter. Plaintiffs, who live, work, and travel in ShotSpotter's shadow are likely to be targeted as suspects by police based merely on their presence in ShotSpotter areas. *Id*. ¶¶ 197–99, 408–09, 500–02. The City's ShotSpotter coverage decisions mean Plaintiffs are more likely to be stopped by the police solely on account

of their race, *id*. ¶¶ 197–200, and are more likely to face a use of force following an investigatory stop, *id*. As further evidence of harm, ShotSpotter diverts significant public safety resources in Plaintiffs' communities, resulting, for instance, in reduced response times to 9-1-1 calls. *Id.* ¶¶ 202–04. *See Cent. Austin Neighborhood Ass'n v. City of Chicago*, 1 N.E.3d 976, 980 (Ill. App. 1st Dist. 2013) (allowing ICRA claim to proceed on allegations that the City's "administrative methods for responding to 911 calls" had racially disparate impact).

Plaintiffs offer detailed allegations as to how the City's ShotSpotter policies and practices are discriminatory and impose harm on Plaintiffs and the putative class. *Lyons*, 461 U.S. at 102-03 ("continuing, present adverse effects" suffice to establish standing) (quotation omitted). These harms can be redressed by a favorable court order. Plaintiffs have standing to pursue their claims.

## II. PLAINTIFF LUCY PARSONS LABS HAS STANDING TO SUE ON BEHALF OF ITSELF AND ITS MEMBERS.

An organization may bring a lawsuit on behalf of itself, on behalf of its members, or on behalf of both. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 924 (7th Cir. 2008). On the allegations as pled, LPL has standing to pursue its Fourth Amendment, Equal Protection, and ICRA claims for equitable relief under both organizational and associational theories of standing.

### A. LPL Has Organizational Standing To Sue on Account of Its Own Injuries.

Lucy Parsons Labs has suffered and continues to suffer injury to its own interests because of the CPD's policies and practices, and thus has standing to seek equitable relief. An organization seeking to sue on its own behalf must show that it has (1) suffered an injury in fact, (2) which is causally connected to the challenged conduct, and (3) which is likely to be redressed by a favorable court decision. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2339-41 (2014). An organization suffers a cognizable injury when the unlawful conduct leads it to divert resources

from a core purpose, causing "demonstrable injury to the organization's activities—with the consequent drain on the organization's resources." *Havens*, 455 U.S. at 379; accord *Common Cause Indiana v. Lawson*, 937 F. 3d 944, 952 (7th Cir. 2019); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951–52 (7th Cir. 2007), aff'd, 553 U.S. 181 (2008); *Equal Rights Ctr. v. Kohl's Corp.*, No. 14-cv-8259, 2015 WL 3505179, at *2 (N.D. Ill. June 3, 2015) (Guzmán, J.). At the pleading stage, allegations regarding diversion of resources suffice to establish standing. *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 800–01 (7th Cir. 2008)

LPL has an Article III injury under the *Havens* standard because the City's unconstitutional and discriminatory use of ShotSpotter has forced the organization to divert time and resources away from its usual services and programs to address the effects of the City's ShotSpotter policies. Am. Compl. ¶¶ 22, 33. In particular, the City's decision to extend its contract with ShotSpotter, *id.* ¶ 39, has made it more difficult for LPL to provide its core services of community education and advocacy for transparency and accountability, including its work focused on "civil asset forfeiture and facial recognition." *Id.* ¶¶ 31, 33. Instead, LPL has been forced to change course to researching the City's ShotSpotter policies and practices, educating and training members of the community on this issue, and helping lead community meetings and advocacy against the technology. *Id.* ¶ 31. These were not part of LPL's preexisting activities, *id.* ¶¶ 31, 33, and the shift to such work has impacted LPL's core operations, "divert[ing] resources away from organizational development projects" and "setting back its strategic planning and fundraising." *Id.* ¶ 33.

The City Defendants oppose standing principally on the basis of *Calvin v. Conlisk*, 534 F.2d 1251 (7th Cir. 1976), but that case predates *Havens Realty*, in which the Supreme Court affirmed that where a defendant's "practices have perceptibly impaired [an organization's] ability to provide [its usual] services . . . there can be no question that the organization has suffered injury

in fact." 455 U.S. at 365. LPL has been forced to do just that by the City's decision to extend its use of ShotSpotter. This is not a case where LPL has "manufacture[d] an injury" simply because of "disagreement with the government," *Barnes v. Shalala*, 865 F. Supp. 550, 561 (W.D. Wis. 1994) (cited at City Mot. at 5). It is instead one where LPL has "devoted resources to identifying and investigating Defendants' discriminatory policies and practices," *Equal Rights Center*, 2015 WL 3505179, at *2 (internal quotation omitted), and "devoted additional time and resources to ameliorating the . . . effects of [the City's ShotSpotter policies], including conducting activities such as training sessions aimed at educating voters and community activists about the increased risk" of constitutional violations and other harms that flow from the City's ShotSpotter policies, *Common Cause Indiana*, 937 F.3d at 952 (internal quotation omitted). *See also Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) (there is cognizable injury in "deflection of . . . time and money" that was "opportunity costs of discrimination"). Moreover, contrary to the City's suggestion, City Mot. at 5, LPL has not just pleaded diversion of resources but also "impairment to the provision of their services or the performance of their daily operations," *Grassroots Collaborative v. City of Chicago*, 2020 IL App (1st) 192099, ¶ 32, including its "digital security trainings," "public education and advocacy," and "ongoing organizational development projects," Am. Compl. ¶ 33.[8]

**B. LPL Has Associational Standing to Sue on Behalf of its Members.**

LPL has associational standing and may sue on behalf of members who face risks of harm like those of the named plaintiffs, because "(1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to [LPL's] purpose; and (3) neither

[8] The City's reliance on an Illinois appellate decision, *Grassroots Collaborative*, has no bearing on the Article III standing inquiry, particularly to the extent that it rejects certain binding federal interpretations of federal standing requirements. *Grassroots Collaborative,* 2020 IL App (1st) 192099 ¶ 40. (rejecting, *inter alia*, the Seventh Circuit's decision in *Village of Bellwood*, 895 F.2d 152).

the claim asserted nor the relief requested requires an individual member's participation in the lawsuit." *Sierra Club*, 546 F.3d at 924. The City disputes just the first requirement. City Mot. 5-7.

Because LPL has members who live and travel in ShotSpotter-covered neighborhoods, these members would have individual standing to challenge the City's ShotSpotter policies and practices as they are substantially likely to be illegally targeted by police on account of ShotSpotter alerts, *supra* § I.A, and because they suffer the discriminatory consequences of the City's ShotSpotter policies, *supra* § I.B.[9] While LPL does not allege that any of its members have *already* been stopped on account of a ShotSpotter alert, its members are nevertheless subject to ongoing injuries including unequal treatment, a substantial risk of being targeted or stopped by police on account of ShotSpotter, and poorer public safety response because they live, work, or travel within the City's ShotSpotter footprint where the City's ShotSpotter policies and practices apply. *See supra* § I.A-.B; *cf. Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 642 F. Supp. 2d 872, 878-79 (S.D. Ind. 2009). LPL has standing to sue on behalf of its members.

## CONCLUSION

The City has failed to establish a lack of standing based on the allegations of Plaintiff's complaint. Its motion should be denied. In the unlikely event the Court determines that it lacks jurisdiction, Plaintiff seeks the opportunity to cure any deficiency. *See El v. AmeriCredit Fin. Services, Inc.*, 710 F.3d 748, 751 (7th Cir. 2013) (dismissals for lack of jurisdiction are generally without prejudice, giving the litigant the opportunity to establish jurisdiction).

---

[9] Upon the Court's request, LPL will supplement its pleadings with an affidavit providing details about its affected members. However, contrary to the City's suggestion, City Mot. at 6–7, LPL "does not need to specifically identify the member on whose behalf the suit is filed." *Chi. Reg'l Council of Carpenters v. Pepper Constr. Co.*, 32 F. Supp. 3d 918, 925 (N.D. Ill. 2014); *accord Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1011 (7th Cir. 2021) ("[T]he requirement for an individual member to have standing still allows for the member on whose behalf the suit is filed to remain unnamed by the organization.") (quotation omitted).

Respectfully submitted,

/s Jonathan Manes
Jonathan Manes
Alexa Van Brunt
MacArthur Justice Center
160 E. Grand Ave., 6th Fl.
Chicago, Illinois 60615
(312) 503-0012
jonathan.manes@macarthurjustice.org

Elizabeth Mazur
Hughes Socol Piers Resnick & Dym
70 W. Madison Street, Suite 4000
Chicago, IL 60602
(312) 580-0100
emazur@hsplegal.com

Daniel Massoglia
First Defense Legal Aid
601 S. California Ave.
Chicago, Illinois 60612
(708) 797-3066
daniel@first-defense.org

*Attorneys for Plaintiffs*

Dated: February 6, 2023