IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL WILLIAMS, et al., | Case No. 22-cv-03773 |
| Plaintiffs, | Judge Ronald A. Guzman |
| v. | Magistrate Judge Young B. Kim |
| CITY OF CHICAGO, et al., | Jury Trial Demanded |
| Defendants. | |

**<u>CITY OF CHICAGO'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>**

Plaintiffs' Response in Opposition to Defendant City of Chicago's Motion to Dismiss (the "Response" or "Resp.") [Dkt. 63] fails to overcome the defects identified by the City of Chicago ("City") in its motion (the "Motion" or "Mot.") [Dkt. 51] related to standing.[1] Despite nearly 700 paragraphs of allegations in the Amended Complaint (the "Compl.") [Dkt. 38], Plaintiffs have only alleged two instances—one each for plaintiffs Ortiz and Scruggs—in which a plaintiff was unlawfully detained by CPD officers responding to a ShotSpotter alert. In fact, Plaintiffs Lucy Parsons Labs ("LPL") and Williams present no allegations of being detained by officers responding to a ShotSpotter alert. This is simply not a case of Plaintiffs suffering repeated injuries traceable to ShotSpotter necessitating prospective equitable relief. Moreover, Plaintiffs do nothing more than speculate that they face a "real and immediate" danger of becoming a victim of a future ShotSpotter stop. With each day that passes the immediacy of a threat of future harm requiring equitable protection becomes less real and more attenuated. As shown below, none of the Plaintiffs can establish standing to pursue class certification or equitable relief.

---

[1] Plaintiffs indicated in their Response that they will voluntarily dismiss Superintendent Brown from this case (Dkt. 63 at 4). In addition, the Court limited briefing on the motion to the 12(b)(1) standing issues. (Dkt. 53).

1

# ARGUMENT

Plaintiffs contend that the allegations of their Amended Complaint are sufficient to establish LPL's Article III standing to pursue class and equitable relief on their Fourth Amendment, Fourteenth Amendment and Illinois Civil Rights Act ("ICRA") claims. Notwithstanding Plaintiffs' assertions to the contrary, this Court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Evers v. Astrue*, 536 F.3d 651, 656–57 (7th Cir. 2008). It is clear that "[w]hen subject-matter jurisdiction—which is to say, the power to hear and decide the case at all—is at stake, a district judge … [may] make any findings necessary to determine the court's adjudicatory competence." *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019).

At the same time, Plaintiffs seek to reserve an "opportunity to supplement the factual record before the Court renders a decision." (Resp. at 4, fn. 3). But at the pleadings stage, Plaintiffs' complaint must contain sufficient allegations to support the Court's exercise of jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."). On the allegations before this Court, Plaintiffs' prayer for class certification and claims for equitable relief must be stricken.

I. **Plaintiffs Have Not Met Their Required Burden To Show Lucy Parsons Labs Has Organizational Standing To Sue On Behalf Of Itself Or Associational Standing To Sue On Behalf Of Its Alleged Members.**

   A. **Lucy Parsons Labs Has Not Suffered An Injury Warranting Equitable Relief.**

Plaintiffs have not sufficiently alleged that LPL suffered the required concrete and particularized injury. *See, e.g.*, *Disability Rights Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 801 (7th Cir. 2008) (Organizational standing requires alleging that an

organization has suffered a concrete and particular injury in its own right.). Generally, an organization may show that it has suffered a concrete and particular injury in its own right by alleging it typically provides one service but has had to divert its efforts instead to litigation. *See Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) (fair housing organization had to divert efforts from counseling clients to litigating on their behalf, thereby unfairly bearing what the Court called the "opportunity costs of discrimination"). Though the diversion of resources can constitute an injury, *see id.*, courts are loath to find organizational standing simply because an organization elected to file a lawsuit. The key inquiry, as set forth in *Grassroots Collaborative v. City of Chicago*, is whether the organization's resource diversion occurred because of action by the defendant, or whether it was due to the budgetary decisions or organizational priorities of the plaintiff. *See Grassroots Collaborative*, 2020 IL App (1st) 192099, ¶ 28—29 (collecting cases).

For instance, in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), the Supreme Court found that a fair housing organization had suffered injury sufficient to confer standing when its counseling and referral services were "perceptively impaired" by defendants' alleged racial steering practices.[2] The organization was forced to litigate on behalf of its clients because defendants' discriminatory practices meant that the organization could not adequately provide services. In contrast, here, where an organization such as LPL, in furtherance of its mission, investigates and challenges allegedly wrongful practices, the fact that the organization elected to challenge *this particular* practice does not constitute an injury. *See Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001) (anti-corruption investigative organization was not injured when it investigated

---

[2] Plaintiffs misapply the *Havens* decision in their effort to establish its "organizational standing." Plaintiffs fail to address that the plaintiff in *Havens*, unlike here, sought only damages. 445 U.S. at 378-79. Thus a distinguishing feature in *Havens* from the instant matter is that the court held that (past) diversion of resources was an injury in fact sufficient to confer standing to pursue damages, but did not address the issue of standing for equitable relief. *Id.*

Case: 1:22-cv-03773 Document #: 66 Filed: 02/24/23 Page 4 of 16 PageID #:530

and filed suit to challenge corruption because "ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing").

LPL alleges that "an important part of its mission is to oppose and organize against discriminatory and oppressive policing and surveillance practices." (Compl. ¶ 31). To achieve this mission, LPL works at the "intersection of digital rights and on-the-streets issues of policing," and is an organization dedicated to investigating, opposing, and educating the public on the use of police technology that LPL deems discriminatory or oppressive. *Id.* For example, LPL alleged that its work includes providing digital security trainings, pursuing police accountability through litigation, researching the use of police technologies and police tactics, and engaging in public education and advocacy on related topics. *Id.* Thus, LPL's "primary purpose" is to combat the complained-of conduct, and its "participation in the instant case does not impair [its] ability to do its work; rather, it is the very work of [LPL] to litigate [the complained of conduct]." *Ass'n for Disabled Americans v. Claypool Holds., LLC*, No. IP00-0344-C-T/G, 2001 WL 1112109, at *15 (S.D. Ind. Aug. 6, 2001). This alleged "injury" is not enough to confer organizational standing because LPL's "participation in this action and expenditure of resources is insufficient to constitute a concrete and demonstrable injury to its activities." *Id.*; *see also Plotkin*, 239 F.3d 882, 886 (7th Cir. 2001) (same); *Grassroots Collaborative*, 2020 IL App (1st) 192099, ¶¶ 32–33 (diversion of resources does not constitute "concrete and demonstrable injuries . . . and are, instead, only abstract injuries . . . insufficient to confer standing).³ Here, LPL merely alleged expenditure of resources in furtherance of its stated mission rather than pleading an actual injury. *See* Chicago: Cancel the

---

³ *See also*, *Calvin v. Conlisk*, 534 F2.d 1251, 1253 (7th Cir. 1976) (finding that an organizations incursion of expenses is not within the "zone of interests protected by the Fourteenth Amendment or 42 U.S.C. § 1983"). While Plaintiffs argue that *Calvin* pre-dates *Havens*, this is irrelevant because *Havens* did not address issues of standing for equitable relief. Moreover, *Ass'n for Disabled Americans*, *Plotkin*, and *Grassroots Collaborative* each post-date *Havens*.

4

ShotSpotter contract now, Lucy Parsons Labs, https://lucyparsonslabs.com/posts/end-ShotSpotter/ (last visited Feb. 24, 2023).

Moreover, LPL's focus on stopping ShotSpotter, (Compl. ¶ 33), and it participation in this lawsuit, is foundational to its continuing fundraising efforts to further its mission:

> Lucy Parsons Labs continues to challenge and dismantle the carceral state through deep research, massive amounts of political education, and lawsuits. . . . Join us and build more power in 2023 against the systems of surveillance that criminalize Black, brown, and poor communities across the country.

Lucy Parsons Labs' EOY Fundraiser, Donorbox, https://donorbox.org/lpl-2022 (last visited Feb. 24, 2023). LPL identifies this lawsuit and its anti-ShotSpotter efforts as its accomplishments for 2022, even highlighting them its fundraising campaigns: "finalized and filed *Williams v. City of Chicago* with the MacArthur Justice Center. . . . Find out more about the *#StopShotSpotter* movement here." *Id*. Thus, LPL's efforts to stop ShotSpotter and pursue litigation are in furtherance of and support LPL's core mission to fight police technologies and surveillance in Chicago.

Here, and unlike *Havens*, LPL's core mission has not been perceptively impaired by the City's use of ShotSpotter. As in *Plotkin*, LPL has employed the methods it typically uses – education, organizing, investigation and FOIA litigation – to investigate and oppose the City's use of ShotSpotter. That LPL's choice to file this lawsuit may preclude it from also pursuing additional organizational priorities is no injury – this is a run-of-the-mill budgetary decision as to how to allocate its organizational resources. As the Appellate Court of Illinois has explained,

> If the diversion or spending of resources to counter the effects of a defendant's act or omission constitutes an injury sufficient to confer standing, then organizations could artificially create standing simply by expending some of their resources to "combat" the defendant's action, even if the organization was not otherwise injured by the defendant's action. This would, in our opinion, completely undermine the purpose of the standing requirement by allowing those not actually injured to bring suit.

*Grassroots Collaborative*, 2020 IL App (1st) 192099, ¶ 39.

> **B.  LPL Lacks Associational Standing Because None of Its Purported Members Have Suffered Any Injury Or Alleged A Reasonable Probability Of Suffering An Injury.**

Plaintiffs concede that not one member of LPL has ever been stopped by CPD officers responding to a ShotSpotter alert. Because LPL members have not suffered actual injuries, then the law requires LPL to allege sufficient facts that their members face a "real and immediate" threat of future injury as opposed to a threat that is "conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). In response, Plaintiffs merely offer that "its members are nevertheless subject to ongoing injuries . . . because they live, work, or travel within the City's ShotSpotter footprint." (Resp. at 15). This argument is purely conjectural, relying on a string of hypothetical facts to unfold: a ShotSpotter alarm to sound, CPD to respond to the alert, an LPL member to be in the vicinity of the alert, a CPD officer to conduct an investigatory stop, and the stop to be performed without reasonable suspicion or probable cause.

Moreover, the central case upon which Plaintiffs rely, *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r Ind. Dep't of Corr.*, 642 F. Supp. 2d 872 (S.D. Ind. 2009), fails to support Plaintiffs' argument in any respect. There, the Court held:

> IPAS has alleged that its constituents, mentally ill prisoners, are being housed in specific separation units within IDOC's system and have suffered injury as a result of their isolation and limited access to mental health treatment. Congress granted IPAS standing by statute, *and IPAS has sufficiently pled actual injury to its constituents so as to meet the constitutional requirements of Article III standing* under *Hunt* and *Disability Rights Wisconsin*.

*Id*. at 880 (emphasis added). In *IPAS*, unlike here, the plaintiff alleged actual injury to the individuals the agency was intended to protect, not conjectural or hypothetical injury. For these reasons and those stated in Section II, LPL fails to allege a basis to find associational standing.

**II.     Plaintiffs Failed To Justify Their Standing To Seek Equitable Relief On Behalf Of Themselves Or A Class of Similarly Situated Individuals.**

Plaintiffs' claim for class certification and equitable relief should be dismissed because (i) their allegations of two discrete, past incidents do not establish "ongoing violations" of their civil rights (Resp. at 6), (ii) their personal circumstances do not place them in "substantial risk" of future violations (*id.* at 7), and (iii) their allegations do not establish "a real and immediate threat" that the Individual Plaintiffs will be subject in the near future to an unlawful police encounter at the location of an officer's response to a ShotSpotter alert (*id.* at 8). Plaintiffs simply fail to plead allegations sufficient to establish standing under *Lyons*, namely that (1) *all* CPD officers *always* stop and/or arrest individuals without cause in response to ShotSpotter alerts or (2) the City orders or authorizes officers to act in such a manner as they must to establish standing. *See* 461 U.S. at 106 (emphasis in original). These requirements exist because "speculation about a possible chain of future events do not establish standing." *Otero v. Dart*, No. 12 C 3148, 2012 WL 5077727, at *5 (N.D. Ill. Oct. 18, 2012). Here, all Plaintiffs offer is speculation.

Finally, the City's *Lyons* analysis equally applies to the Fourteenth Amendment Equal Protection and ICRA claims, thus warranting the dismissal of both the ICRA claim and the equitable relief sought for the alleged Equal Protection violations.

**A.     Plaintiffs' Allegations Of Ongoing Constitutional Violations Do Not Confer Standing To Seek Class And Equitable Relief.**

Plaintiffs failed to allege "ongoing violations of the Fourth Amendment." (Resp. at 6). After stripping the hyperbole of Plaintiffs' allegations, what remains are just two incidents in which CPD officers allegedly stopped Plaintiffs without cause and solely on the basis of a ShotSpotter alert. Calling these two incidents "ongoing violations" requires quite the leap. On this record, this Court cannot find that Plaintiffs have shown a genuine threat that harm will occur to them in the near, or even distant, future.

7

The mere existence of a policy or practice cannot establish "ongoing violations." Plaintiffs ignore the underlying precepts of *Lyons*, which held that allegations of a policy or practice are insufficient to confer standing to seek injunctive relief absent allegations tending to show that there exists a "real and immediate threat" that the plaintiff himself or herself is likely to be subjected to harm as a result of the policy or practice.[4] *Lyons*, 461 U.S. at 106 (allegation that "the City authorized the use" of chokeholds "did not indicate why *Lyons* might be realistically threatened by police officers who acted within the strictures of the City's policy"). Indeed, "the fact that [Plaintiffs have] alleged the existence of an official municipal policy [or practice]—which would imply that the violation is systemic, not isolated, in nature—is of no consequence: the existence of a municipal policy [or practice], in and of itself, is no indication that the named plaintiff[s] will be harmed by it." *Boston v. City of Chicago*, No. 86-C-5534, 1988 WL 31532, at *8 (N.D. Ill. Mar. 28, 1988). Thus, the existence of the alleged City policy or practice, in and of itself, is insufficient to confer standing or establish ongoing violations of future harm to Plaintiffs.

---

[4] Plaintiffs argue that the City violates their constitutional rights under the Fourth Amendment under *Florida v. Harris*, 568 U.S. 237 (2003), *United States v. Rickmon*, 952 F. 3d 876 (7th Cir. 2020), and *United States v. Bohman*, 683 F. 3d 861 (7th Cir. 2012). None of these cases declare any alleged policies or practices related to ShotSpotter unconstitutional and each is distinguishable from the circumstances found here. *See Harris*, 568 U.S. at 244–45 (discussing the reliability of a dog alert and reinforcing the uncontested proposition of law that all facts surrounding a dog's alert should be considered for an inquiry of probable cause); *Rickmon*, 952 F. 3d at 882 (denying the defendant motion to suppress the firearm recovered from a vehicle and holding that a ShotSpotter alert is "analogous to an anonymous tipster" that can be considered in the context of other circumstances to supply reasonable suspicion for a stop); *Bohman*, 683 F.3d at 864 (addressing the validity of a traffic stop and holding that a "a mere suspicion of illegal activity about a place, without more, is not enough to justify stopping everyone emerging from that property"). Moreover, Plaintiffs impermissibly argue the merits of to the City's 12(b)(6) motion to dismiss and not to the City's 12(b)(1) motion although this Court specifically limited briefing "only on Rule 12(b)(1) Argument. . ." Since Plaintiffs' arguments (and the cases) improperly extend to issues specifically restricted by this Court, this Court should disregard them. If the Court is inclined to consider them, the City incorporates by reference the arguments it made in its Motion related to the constitutionality of the aforementioned alleged policies and practices. (Mot.at 11–17).

### B. Plaintiffs' Personal Circumstances Fail To Establish Substantial Risk Or Confer Standing.

Plaintiffs suggest that they established Article III standing merely based upon their personal circumstances, namely, that Scruggs and Ortiz frequently travel and work in ShotSpotter areas in the City, are Black and Latino men, and therefore "it is more likely that officers will target them for an investigatory stop." (Resp. at 7).

Such allegations about "risk" of future violations are too speculative and attenuated to confer standing. Although the Complaint alleges that Black and Latinx persons are more likely to be subjected to investigatory stops than their white counterparts, it fails to include plausible allegations establishing that Scruggs and Ortiz are likely to have another encounter with CPD officers, prompted by ShotSpotter, much less to be subjected to an unlawful stop. Plaintiffs do not allege that (1) every person that travels and works in ShotSpotter areas are stopped, or (2) every Black and Latinx person found in a ShotSpotter area following an alert is stopped. Plaintiffs also have not alleged what specifically about their personal circumstances suggests that CPD officers will target them for an investigatory stop if they happen to be in the area of a ShotSpotter alert.

Indeed, courts within the Seventh Circuit have relied on *Lyons* to dismiss claims for equitable relief based on similar allegations. For example, in *Simack v. City of Chicago*, No. 02 C 3139, 2003 WL 924335 (N.D. Ill. Mar. 6, 2003), the plaintiffs went so far as to claim that they "will continue to panhandle and that *they will be arrested* for some misdemeanor crime while doing so." *Id.* at *4 (emphasis added). Even so, they lacked standing to pursue injunctive relief regarding CPD bonding procedures because "[t]hese possibilities . . . are speculative rather than real or immediate." *Id.*; *see also Portis v. City of Chicago*, 347 F. Supp. 2d 573, 576 (N.D. Ill. 2004) (plaintiffs lacked standing to seek equitable relief challenging alleged City practice of prolonged detentions following non-custodial ordinance violations because "[t]he argument that

they would again fall victim to wrongful incarceration . . . for some misdemeanor in the future amounted to speculation").

Furthermore, Plaintiffs' personal circumstances do not distinguish this case from *Lyons*. (Resp. at 7). To have standing, they must show that they are "in immediate danger of again being" improperly stopped. *Robinson v. City of Chicago*, 868 F.2d 959, 966 (7th Cir. 1989); *Lyons*, 461 U.S. at 101–02. To do so, again, Plaintiffs need to allege "either (1) that *all* police officers in [Chicago] *always* [improperly stop] any citizen with whom they happen to have an encounter. . . or (2) that the City ordered or authorized police officers to act in such manner." *Lyons* 461 U.S. at 106 (emphasis original). Contrary to Plaintiffs' formulaic recitation of this standard in their brief, Plaintiffs' allegations are far from establishing this "incredible assertion." *See id.*

Plaintiffs' own allegations disprove their assertion that all CPD officers always rely on a ShotSpotter alert as a basis for a *Terry* stop. (Resp. at 9). Plaintiffs alleged that every day, CPD officers are deployed 100 times to respond to ShotSpotter alerts, (Compl. ¶ 3), meaning that CPD officers respond to roughly 54,000 ShotSpotter alerts in an 18-month period. (*See also id.* at ¶ 53 (alleging between July 1, 2021, and July 1, 2022 there were approximately 44,300 ShotSpotter alerts . . . up from approximately 37,500 alerts during the prior one-year period")). Plaintiffs, however, also alleged that around "2,400 investigatory stops [were] linked to ShotSpotter alerts over the course of 18 months, from January 1, 2020 to May 31, 2021." (*Id.* at ¶ 125). A comparison of ShotSpotter alerts to ShotSpotter-related stops reveals that stops occurred in less than 5% of these alerts, which is reflective of the individualized discretion placed in CPD officers to make decisions whether it is appropriate to initiate a stop. Where, as here, substantial individualized discretion is involved—as in the discretion to apply chokeholds in *Lyons* and the discretion to arrest in *Robinson*, *Otero*, and *Portis*—the risk of being subjected to future illegal conduct

dissipates. Thus, it stands to reason that *all* CPD officers *do not always rely on ShotSpotter* as a basis for a *Terry* stop following a ShotSpotter alert.

Likewise, Plaintiffs fail to support with sufficient allegations their assertion that "the City ordered or authorized police officers to act in such a manner." (Resp. at 7). Critically, Plaintiffs do not identify an explicit CPD policy that directs, orders, or even authorizes CPD officers to unconstitutionally stop Black or Latinx people, or anyone else, based only on a ShotSpotter alert. (Mot. at 8). Plaintiffs fail to identify an express policy that "directs officers to rely on ShotSpotter as a basis for *Terry* stops," (*see* Resp. 5), or allege that command personnel directed CPD officers to rely on ShotSpotter alert as the sole basis for stops. To the contrary, the City's investigatory stop policy, Special Order S04-13-09, requires officers to possess the constitutionally required "reasonable articulable suspicion" to conduct an investigatory stop. (*See* Compl. ¶ 539).

C. **Plaintiffs Fail To Identify Allegations Supporting That They Are Subject To A Real And Immediate Threat Of Future Injury That Is Fairly Traceable to the City's Use of ShotSpotter.**

Plaintiffs argue that they face a real and immediate threat of future constitutional harm "because the City's express policies and widespread practices direct, encourage, and facilitate individual officers relying solely upon unreliable ShotSpotter alerts to effectuate *Terry* stops." (Resp. at 8). However, as explained above, *see supra* Section II.B., Plaintiffs cannot identify an explicit policy directing CPD officers to violate Plaintiffs' rights when responding to ShotSpotter alerts. In addition, the OIG Report, despite Plaintiffs' assertions to the contrary, does not specifically identify any unconstitutional conduct or issue any such findings to support a custom or practice. (*See* Mot. at 14–15).

Importantly, *Lyons* held that, to establish standing, the plaintiff needed to allege that he would have another encounter with the CPD. *Lyons*, 461 U.S. at 105–06; *Chavez v. Illinois State Police*, No. 94 C 5307, 1999 WL 592187, at *16 (N.D. Ill. Aug. 2, 1999). But as shown above, *see*

11

*supra* Section II.B., Plaintiffs provide no basis to conclude that they meet this threshold requirement. Here, Plaintiffs Ortiz and Scruggs each only identify one alleged unconstitutional encounter with officers responding to a ShotSpotter alert without substantial facts to suggest a risk of future violations. While Plaintiffs argue and cite cases where courts reasoned that plaintiffs' innocent conduct factored into the standing analysis, each of those case is distinguishable and involved factors not present here (i.e., a history of *repeated* unconstitutional encounters).

Initially, *Lyons* does not depend on the lawfulness or unlawfulness of the plaintiff's conduct; to the contrary, the Supreme Court was careful to explain that "it is no more than conjecture to suggest that in every instance of a traffic stop, arrest, *or other encounter* between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse." *Lyons*, 461 U.S. at 108 (emphasis added).

Next, the allegations here are not "on all fours with *Smith* [*v. City of Chicago*, 143 F. Supp. 3d 741 (N.D. Ill. 2015)]" as Plaintiffs argue. (*See* Resp. 7). In *Smith*, the plaintiffs "alleged ongoing constitutional violations pursuant to an unconstitutional policy or practice *in tandem* with allegations that CPD officers *repeatedly* subjected them to unconstitutional stops and frisks." 143 F. Supp. 3d at 752 (emphasis added). Unlike here, the plaintiffs in *Smith* alleged that "CPD officers have repeatedly stopped and frisked many of them" and that "the same group of CPD officers unlawfully stopped one of the named Plaintiffs three times on the same day in the same neighborhood." *Id.* at 749. In contrast, none the Individual Plaintiffs allege more than one encounter with CPD officers. (*See* Mot. at 7–8).

Similarly, in *Anderson v. Cornejo*, a case involving improper customs searches at O'Hare airport, the plaintiffs submitted declarations that they had been subjected to illegal searches at least once a year, that they regularly took international flights into O'Hare, and that they had plans to

take such a flight soon. No. 97 C 7556, 1999 WL 258501, at *1 (N.D. Ill. Apr. 21, 1999). Moreover, "[e]very person returning on an international flight is potentially subject to being searched by the Customs Service." *Id.* at *2. In contrast, there are no allegations here that Plaintiffs *both* suffered repeated instances of alleged unlawful stops prompted by ShotSpotter *and* reasonably expect to find themselves in substantially similar circumstances in the future. *See also Barrios v. City of Chicago*, No. 15 C 2648, 2016 WL 164414, at *8 (N.D. Ill. Jan. 14, 2016) (finding standing where a plaintiff was twice "the victim of the City's alleged policy" *and* alleged that the policy at issue was mandatory).

Unlike *Smith*, *Anderson*, and *Barrios*,[5] critically absent from Plaintiffs' complaint are allegations of repeated violations and mandatory policies. For these reasons, the facts alleged here more closely resemble *Lyons*. Because Plaintiffs allege no plausible facts suggesting that they will again encounter CPD officers (let alone an encounter traceable to ShotSpotter), this Court should not find that Article III standing has been established.[6]

---

[5] *See also Floyd v. City of New York*, 83 F.R.D. 153, 169 (S.D. N.Y. 2012) (one of the plaintiffs was stopped three times before the lawsuit was filed and once after the filing of the lawsuit); *National Congress for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D. N.Y. 1999) ("at least three of the named plaintiffs claim they have been victimized by these unconstitutional practices repeatedly").

[6] The cases other cited by Plaintiffs are similarly distinguishable. In *Franklin v. City of Chicago*, the Court distinguished the mandatory and non-discretionary policy at issue there from the "challenged police procedure if applying a choke hold . . . in *Lyons* [which] clearly involves the use of discretion on part of police." 102 F.R.D. 944, 948 (N.D. Ill. 1984). Here, by contrast, Plaintiffs do not identify any mandatory CPD policies rather the initiation of a stop involves the use of an officer's discretion. (*See* Mot. at 10–13). *Hvorcik v. Sheahan* involved a scenario where a plaintiff's arrest warrant was quashed, yet remained on the Cook County Sheriff's system and subsequently caused his arrest. 870 F. Supp. 864, 867 (N.D. Ill. 1994). The court distinguished *Lyons* by reasoning that "'members of plaintiff class do not have to induce a police encounter before the possibility of injury can occur;'" the fact that their names showed up on the sheriff's system with outstanding warrants was enough alone to cause such an encounter. *Id.* at 869 (citation omitted). Here, however, it is axiomatic that the individual Plaintiffs must have another encounter with a CPD officer before CPD officers can again stop them.

13

> **D. The *Lyons* Analysis Also Precludes The Individual Plaintiffs From Establishing Standing To Seek Class And Equitable Relief Against The City For Plaintiffs' Equal Protection Clause And ICRA Violations.**

*Lyons* applies to Plaintiffs' equal protection and ICRA claims. *See e.g.*, *Scruggs v. McAleenan*, No. 18 CV 2109, 2019 WL 4034622, at *3 (N.D. Ill. Aug. 27, 2019) (applying *Lyons* to the plaintiff's constitutional claims, including equal protection); *Beley v. City of Chicago*, No. 12-CV-9714, 2013 WL 3270668, at *3 (N.D. Ill. June 27, 2013); *Derfus v. City of Chicago*, 42 F. Supp. 3d 888, 896 (N.D. Ill. 2014).[7] Accordingly, for all the reasons stated above, in Sections A-C, Plaintiffs cannot show "a real and immediate threat" that they will again be subject to a future constitutional injury. As such, their request to seek class certification and equitable relief for their equal protection and ICRA claims should equally be dismissed.

While Plaintiffs acknowledge that *Lyons* applies, they seem to suggest that mere unequal treatment suffices to show standing to seek equitable relief. (Resp. at 11). But none of the legal authority that Plaintiffs cite support their inaccurate assertion. In *Heckler v. Mathews*, the plaintiff did not request, and the court did not address, the issue of injunctive or prospective relief. 465 U.S. 728 (1984). *Heckler* only found that the plaintiff sufficiently established that he suffered a past injury for standing where he alleged that he received fewer benefits under the Social Security Act than a similarly situated woman. *Id.* at 738. Therefore, the *Heckler dicta* that unequal treatment is a "type" of injury that courts have recognized does not relieve Plaintiffs' burden to show a real and immediate threat of another unconstitutional injury when seeking equitable relief. *Id.*; *see also Chavez v. Illinois State Police*, No. 94CV5307, 1996 WL 66136, at *5–*6 (N.D. Ill. Feb. 13, 1996)

---

[7] Plaintiffs do not cite any authority to suggest that *Lyons* does not apply to such claims. *See Chavez v. Illinois State Police*, No. 94 C 5307, 1999 WL 592187, at *12 (N.D. Ill. Aug. 2, 1999) ("The plaintiffs attempt to blur [the] distinction [between prospective relief and retrospective relief] by citing to general standing cases[.]"). In fact, Plaintiffs cite to *Lyons* themselves. (Resp. at 12.)

("[T]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury.'") (quoting *Lyons*, 461 U.S. at 101).

*Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville,* 508 U.S. 656, 656, 668 (1993) is inapplicable because its holding was limited to cases challenging "set-aside" programs. More specifically, the court held that "[i]n *the context of a challenge to a set-aside program*, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract" and that, in order to establish standing in those particular situations, "a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* (emphasis added). This is not a case where Plaintiffs challenged a set-aside-program and, therefore, *Jacksonville* is inapplicable. Likewise, *Central Austin Neighborhood Association v. City of Chicago* is equally inapplicable because it does not address or even mention standing, let alone standing for equitable relief. 2013 IL App (1st) 123041.

Lastly, Plaintiffs falsely claim that they can establish standing because they have alleged numerous specific harms. Each plaintiff alleged one instance in which they were unlawfully stopped or charged with a crime. This amounts to three—not numerous—instances of specific harms. Accordingly, *Lyons* controls and Plaintiffs have failed to show a real and immediate threat of future injury which is necessary in order to seek class and equitable relief for Plaintiffs' Fourteenth Amendment Equal Protection and ICRA claims.

## CONCLUSION

For the reasons stated herein and in the City's Motion to Dismiss, the City requests that this Court grant its motion to strike Plaintiffs' requests for class certification and equitable relief for lack of Article III standing.

15

| | |
|---|---|
| Dated: February 24, 2023 | Respectfully submitted, |
| | **CITY OF CHICAGO** |
| | *s/ Michael P. Sheehan* |
| | One of their Attorneys |

Michael P. Sheehan
Allan T. Slagel
Barton O'Brien
Ioana M. Guset
Yeoeun C. Yoon
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
Email: msheehan@taftlaw.com
aslagel@taftlaw.com
bobrien@taftlaw.com
iguset@taftlaw.com
yyoon@taftlaw.com

76360361v11