IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL WILLIAMS, LUCY PARSONS LABS, DANIEL ORTIZ, and DERICK SCRUGGS, on behalf of himself and a class of similarly situated people. ) ) ) ) | |
| Plaintiffs, ) | Case No. 22-cv-3773 |
| ) | |
| v. ) | Judge Lindsay C. Jenkins |
| ) | Magistrate Judge Young B. Kim |
| CITY OF CHICAGO, et al. ) | |
| ) | |
| Defendants, ) | |

**PLAINTIFFS' RESPONSE TO SOUNDTHINKING'S
MOTION TO QUASH SUBPOENA**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 1

A.     Plaintiffs Scruggs and Ortiz's Challenges to ShotSpotter-based *Terry* stops. .................... 1

    1.     Information obtained thus far raises grave doubts about the reliability of the ShotSpotter reports that led Defendant Officers to stop Plaintiffs. ....................... 2

    2.     SoundThinking has refused to disclose information about how it generated its reports and their reliability. ................................................................................... 4

B.     Plaintiff Michael Williams's Challenge to his Arrest and Prosecution. ........................... 5

ARGUMENT ................................................................................................................................ 6

I.     The Subpoenaed Information Is Relevant to Plaintiffs' Fourth Amendment Claims......... 7

II.     The Subpoenaed Information Is Not Barred by This Court's May 9th Ruling. ............... 10

III.     The Information SoundThinking Is Withholding Is Centrally Important, and its Disclosure Does not Impose an Undue Burden. ................................................................ 12

CONCLUSION ........................................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Alabama v. White*,
  496 U.S. 325 (1990) .................................................................................................. 7, 9

*Chavez v. Hat World, Inc.*,
  No. 12-CV-5563, 2013 WL 1810137 (N.D. Ill. Apr. 29, 2013) .......................................... 7, 12

*Florida v. Harris*,
  568 U.S. 237 (2013) ......................................................................................................... 9

*Hall v. State*,
  297 S.W.3d 294 (Tex. Crim. App. 2009) ........................................................................... 9

*Jones v. Clark*,
  630 F.3d 677 (7th Cir. 2011) ........................................................................................... 7

*Nw. Mem. Hosp. v. Ashcroft*,
  362 F.3d 923 (7th Cir. 2004) ..................................................................................... 7, 13

*People v. Jones*,
  2023 IL App (1st) 221311 (Ill. App. Ct. June 7, 2023) .......................................................... 10

*United States v. Cortez*,
  449 U.S. 411 (1981) .......................................................................................................... 7

*United States v. Hensley*,
  469 U.S. 221 (1985) ....................................................................................................... 10

*United States v. Rickmon*,
  952 F.3d 876 (7th Cir. 2020) .................................................................................. 7, 8, 11

**Other Authorities**

Brendan Max, *SoundThinking's Black-Box Gunshot Detection Method: Untested and Unvetted Tech Flourishes in the Criminal Justice System*, 26 Stanford Tech. L.J. 193, 213-38 (2023) ... 8

Edgeworth Analytics, *Independent Audit of the ShotSpotter Accuracy, 2019-2022*
  (May 2, 2023) ................................................................................................................. 8

Fed. R. Civ. P. 26(b)(1) ............................................................................................................ 6, 12

Fed. R. Civ. P. 45 ......................................................................................................................... 6

ii

Plaintiffs Scruggs, Ortiz, and Williams respond to ShotSpotter's motion to quash as follows:

## INTRODUCTION

SoundThinking[1] has withheld documents responsive to Plaintiff's subpoena because it does not believe they are relevant to the claims in this case. SoundThinking is wrong. Plaintiffs seek information about how ShotSpotter operators made the decision to send "gunfire" reports to police—reports that led directly to the Defendant Officers' *Terry* stops of Plaintiffs Scruggs and Ortiz. Such information is pertinent to the Fourth Amendment inquiry, which considers the ShotSpotter reports provided to the Defendant Officers—and, importantly, the reliability of those reports—to determine whether the totality of the circumstances supported reasonable suspicion.

With respect to Plaintiff Williams, SoundThinking has withheld communications regarding the manner in which its senior employee, Walter Collier III, prepared a "forensic" report for use in Mr. Williams's prosecution. The initial ShotSpotter report and this subsequent "forensic" report were central to Mr. Williams' arrest, continued detention, and the ultimate decision to drop all charges. Records about how the forensic report was prepared are relevant because they may show that that the ShotSpotter evidence never supported probable cause or that charges were dropped in a manner indicative of innocence.

ShotSpotter reports contributed directly to each police action challenged in this case. Plaintiff is entitled to examine how those reports were created and whether they were reliable.

## BACKGROUND

A.   **Plaintiffs Scruggs and Ortiz's Challenges to ShotSpotter-based *Terry* stops.**

Plaintiffs Scruggs and Ortiz bring this lawsuit to challenge their unconstitutional *Terry*

---

[1] After Plaintiffs' subpoena was issued, ShotSpotter, Inc. changed its corporate name to SoundThinking, Inc., but it continues to market its gunshot detection system under the name ShotSpotter. Plaintiffs here use the term "ShotSpotter" to refer to the gunshot detection system and "SoundThinking" to refer to the company that provides it.

1

stops. The Amended Complaint alleges that Defendants Officers executed those stops solely on the basis of ShotSpotter reports of gunfire, Am. Compl. ¶¶ 369, 377, 442, 467, ECF No. 38, and even the Defendants concede that those gunfire reports were central to their decision to detain Plaintiffs, *see* ECF No. 77-9, at 7–8 (Def. Andrews Resp. to Pl. Scruggs's Interrog. 11–13); ECF No. 77–11, at 5–6 (Def. Powar Resp. to Pl. Ortiz's Interrog. 11).

This case, therefore, concerns whether (or to what extent) Defendant Police Officers were justified in relying on ShotSpotter reports to stop, detain, and search the Plaintiffs on suspicion of firing a weapon.[2] Plaintiffs Ortiz and Scruggs seek to establish that the Defendant Officers were not entitled to rely on the ShotSpotter reports at all, or at least that the ShotSpotter reports merit so little weight—and must be viewed by officers with such skepticism—that they could not justify a *Terry* stop, either on their own or in conjunction with whatever other circumstances Defendants will claim justified their actions. Plaintiffs' ability to prove this theory of Fourth Amendment liability is important not just to their individual damages claims but also because they seek also to be able to represent a class of thousands of Chicago residents who are likewise subject to *Terry* stops by police officers relying solely or in part on ShotSpotter reports.[3]

1. **Information obtained thus far raises grave doubts about the reliability of the ShotSpotter reports that led Defendant Officers to stop Plaintiffs.**

The limited information that SoundThinking has provided thus far has revealed grave

---

[2] The Motion to Quash is incorrect to assert that Plaintiffs Scruggs and Ortiz are challenging their subsequent arrests on (pretextual) charges. Mot. to Quash 2-3, 7. Plaintiffs' claims concern the initial *Terry* stops and associated detention. The Motion is also incorrect to assert that ShotSpotter was not part of the decision to detain Plaintiffs. *Id.* 2-3, 7. The Defendant Officers relied exclusively (or at least centrally) on ShotSpotter's gunfire report as the initial basis to detain Plaintiffs on suspicion of firing a gun. *See infra*. The Motion is likewise incorrect that ShotSpotter merely told officers to go to a particular location. *See* Mot to Quash 2 ("ShotSpotter alerts police to a location, not to a person and not to crime."). In fact, ShotSpotter told the Defendant Officers that a gunshot had been fired there. ShotSpotter is not a mere dispatcher; it is a species of informant or tipster that reports a specific crime (i.e. gunfire within the city) to the police. ShotSpotter's reports are why police treated Plaintiffs as suspects.

[3] While discovery on the class claims has been stayed, Plaintiffs' suitability to serve as class representatives may be affected by their ability to prove that their Fourth Amendment rights were violated by the Defendant Officers. In this way, any limitations on the discovery sought here regarding ShotSpotter may inappropriately prejudice the class action claims that are, for the time being, subject to a bifurcation-and-stay order.

2

doubts about the veracity of the gunfire reports that led Defendant Officers to stop Plaintiffs and underscores that discovery of additional information into the ShotSpotter process that generated these reports is relevant and necessary.

The Defendant Officers who stopped Mr. Ortiz and Mr. Scruggs received alerts from ShotSpotter that, in both cases, reported to them that a "single gunshot" had been detected. The Defendant officers in each case chased down the ShotSpotter report of gunfire to the location ShotSpotter provided and proceeded to detain each Plaintiff solely (or, at least, in part) on the basis of its report of gunfire. The records produced by SoundThinking thus far, however, have revealed for the first time that there was grave uncertainty within the ShotSpotter system about whether the noises that ShotSpotter reported as "single gunshots" were actually gunshots.

In particular, ShotSpotter's computer algorithm initially classified the noise that led police to Mr. Scruggs as a "firecracker," doing so with a confidence level of "99.79620%". Ex. B, at 4 (screenshot disclosed by SoundThinking showing ShotSpotter's machine classification of the noise, SST_Williams_386). That determination, together with audio files, waveforms, and other information, was sent to a SoundThinking employee for review. *Id.* at 1 (screenshot showing history of the alert, SHTSP_CP002_7). 74 seconds later, that ShotSpotter employee reclassified the noise from "firecracker" to "single gunshot" and published it to Chicago Police. *Id.* Nine seconds later, CPD acknowledged receipt of the report and proceeded to dispatch officers. *Id.* ShotSpotter's report to CPD identified the noise simply as a single gunshot or single round, without qualification. *Id.* at 6, 10–11, SST_Williams_388, 392-93). It appears that ShotSpotter's report—and the information provided to responding officers—contained no inkling that its computer had classified the noise as a firecracker with extremely high confidence.

The ShotSpotter report that led police to detain Mr. Ortiz has a strikingly similar backstory.

3

SoundThinking's recent disclosures show that that the noise in that case was classified by the ShotSpotter computer only as "Probable Gunfire" with a confidence of 4.24644%. Ex. C, at 8 (SST_Williams_423). That assessment, together with other information, was sent to a ShotSpotter employee who reclassified the noise as a "single gunshot" 10 seconds later and published it to police. *Id.* at 1, 7 (SST_Williams_417, SHTSP_CP002_46). Chicago police acknowledged receipt 16 seconds later and proceeded to dispatch officers. *Id.* Again, it appears ShotSpotter's report to the Defendant Officers described the noise as a single gunshot or single round without any indication that its employee had overridden the computer's low-confidence determination that the noise was merely "probable" gunfire. *Id.* at 5 (SST_Williams_420).

      **2.**    **SoundThinking has refused to disclose information about how it generated its reports and their reliability.**

Plaintiffs' subpoena to SoundThinking seeks information about the process that generated these reports. SoundThinking has refused to respond to any parts of the subpoena that would shed light on how or why its employees overrode the computer's classification and told the Defendant Officers that a "single gunshot" had occurred. Such information is central to Plaintiffs' ability to show that the gunfire reports ShotSpotter provided to the Defendant Officers should be regarded as unreliable and, therefore, must be discarded or discounted in the Fourth Amendment totality-of-the-circumstances inquiry.

The information that Plaintiffs seek—and that SoundThinking has refused to disclose—includes the basic protocols and guidance that SoundThinking employees use to decide whether a noise warrants a gunfire report to police (Requests 7 and 8), as well as the training, qualifications, and proficiency of the employees who issued the specific gunfire reports that the Defendant Officers relied upon (Requests 1(b), 3(b), and 4(b)). *See* Ex. A (Subpoena). This information bears directly on how ShotSpotter generated the specific gunfire reports that the Defendant Officers

4

relied on to detain Plaintiffs. SoundThinking has, in other cases, provided some of the information responsive to these requests, including a (likely outdated) version of guidance it provides employees about when they should report a noise to police as gunfire, but it refuses to do so here. *See* Ex. D ("Classification Continuum"); *infra* 13 n.9.

In addition, SoundThinking has refused to disclose information about close-in-time noise events (Requests 1(j), 3(k), and 4(k)) and the position of nearby ShotSpotter microphones that detected or failed to detect the noises that were reported as gunfire (Requests 1(f), 3(f), and 4(f)). Ex. A. This information would shed light on the true source of the specific noises at issue here.

SoundThinking has also withheld information about the computer system that ShotSpotter uses to classify noises as gunfire or non-gunfire (Requests 1(h), 3(h), 4(h), 12-15), which is especially pertinent given the decision to override the computer in both Mr. Scruggs and Mr. Ortiz's cases.

Finally, SoundThinking has withheld information about the overall reliability of the system in Chicago (Requests 9(a)-(d), 10), including documentation of any testing or validation of the system, as well as the frequency with which ShotSpotter sends gunfire reports even when its computer algorithm has classified a noise as non-gunfire. Such information about how the overall system has (or has not) been tested and vetted—as well as its track record—is relevant to assessing the reliability of the specific reports that the Officers used here.

SoundThinking's refusal to disclose all of this information stymies Plaintiffs' ability to examine and prove unreliable the ShotSpotter reports that led to their detention by Defendant Officers. Such proof is an important part of their Fourth Amendment claims. *Infra* 7–12.

**B.**     **Plaintiff Michael Williams's Challenge to his Arrest and Prosecution.**

Plaintiff Michael Williams' claims are different from those of Plaintiffs Scruggs and Ortiz.

In Mr. Williams' case, ShotSpotter was not the reason for a *Terry* stop but instead was used as evidence leading to his false arrest and malicious prosecution on charges of First Degree Murder. With respect to his claims, the key information that SoundThinking has refused to provide in response to the subpoena is information about how its employees assisted in the prosecution and how it prepared the Detailed Forensic Report, which was key evidence used to continue detaining Mr. Williams. The State's Attorney's Office eventually withdrew reliance on the Detailed Forensic Report and, quickly thereafter, dropped all charges, conceding that it lacked evidence to maintain the prosecution. Plaintiff Williams seeks to obtain all communications (including internal communications) concerning the Report and prosecution that were made by Walter Collier III, the SoundThinking employee who prepared the Report, because they may shed light on whether the ShotSpotter evidence actually contradicted the police's theory of the case and whether charges were dismissed in a manner indicative of innocence, which is an aspect of Mr. Williams' state-law malicious prosecution claim.[4]

## ARGUMENT

Rule 26(b)(1) provides that parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "The scope of material obtainable pursuant to a Rule 45 subpoena is as broad as what is otherwise permitted under Rule 26(b)(1)." *Chavez v. Hat World, Inc.*, No. 12-CV-

---

[4] In addition to the issues raised by SoundThinking's Motion to Quash, Plaintiffs remain in discussions with SoundThinking regarding completeness of its existing, voluntary disclosures. SoundThinking made its last production on the evening of June 13, 2023, a week after filing its motion to quash. Plaintiffs responded by email on June 15 to flag three apparent problems with SoundThinking's disclosures. *See* Ex. E (correspondence between Plaintiffs and SoundThinking). Those issues are: (1) a particular email disclosed by SoundThinking appears to be missing its attachment; (2) SoundThinking's email disclosures concerning Mr. Williams's case appear to omit correspondence that took place during the crucial period toward the end of the prosecution; and (3) SoundThinking's disclosure of information concerning the specific noise events at issue here was limited to screenshots of isolated pieces of information visible on ShotSpotter's internal review system, and appeared to omit other information displayable on-screen regarding each alert. *See* Exs. B, C. Plaintiffs asked SoundThinking for disclosure of any other information accessible on-screen, or at least an explanation of what information had been omitted by the decision to disclose only the isolated snippets. SoundThinking has not yet responded to these concerns.

5563, 2013 WL 1810137, at *2 (N.D. Ill. Apr. 29, 2013). While third parties receive greater protection from the burdens of subpoenas than parties, a burden is considered undue only when "the burden of compliance…would exceed the benefit of production of the material sought." *Nw. Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004).

I.  **The Subpoenaed Information Is Relevant to Plaintiffs' Fourth Amendment Claims.**

Plaintiffs require information from SoundThinking concerning the manner in which it identified supposed gunfire and the reliability of its reports to police because such information is directly relevant to the Fourth Amendment test governing the *Terry* stops of Plaintiffs Scruggs and Ortiz. Whether Defendant Officers had reasonable suspicion is assessed using an objective test that requires "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *accord Jones v. Clark*, 630 F.3d 677 (7th Cir. 2011). Crucially, "[r]easonable suspicion . . . is dependent upon both the content of information possessed by police *and its degree of reliability*." *Alabama v. White*, 496 U.S. 325, 330 (1990) (emphasis added). Where officers are relying on information supplied to them by a third-party source—as opposed to their own observations—then the reliability of that source is part of the "totality of the circumstances" that must be assessed. *Id.* As the Seventh Circuit explained in a case concerning ShotSpotter, "we [consider] a number of circumstances relevant to our reasonable suspicion analysis" starting with "(1) the reliability of any reports to police." *United States v. Rickmon*, 952 F.3d 876, 881 (7th Cir. 2020). In this case, ShotSpotter's reports were the only reason (or at least an essential reason) Plaintiffs Scruggs and Ortiz were detained by police, so an important part of Plaintiffs' proof focus on those reports' reliability.[5]

---

[5] SoundThinking's Motion expends considerable space vouching for ShotSpotter's reliability. That is a merits issue not properly considered on a motion to quash. Nevertheless, it is important to note that the sources presented by SoundThinking fail to provide any evidence at all that it is reliable with respect to ShotSpotter's crucial determination about whether to classify noises as gunshots and report them to police as such.

The Seventh Circuit in *Rickmon* expressly flagged that "[i]n some future decision, we may have to determine ShotSpotter's reliability." *Rickmon*, 952 F.3d at 879 n.2. This is that case. In *Rickmon*, the record regarding ShotSpotter's reliability had not been developed because Rickmon had "declined to further challenge ShotSpotter's adequacy." *Id.* As a result, the Court determined that it "need not reach the reliability of ShotSpotter." *Id.* But in this case, Plaintiffs seek to build precisely that record concerning ShotSpotter's reliability, and they must be permitted to do so because, as they allege in the Amended Complaint, the ShotSpotter alert was the only circumstance—and, at the very least, an essential circumstance—that justified Defendant Officers' decision to detain them. *Id.*

The idea that the totality of the circumstances analysis extends to information about the reliability of third-party information—and extends beyond information within the personal knowledge of the detaining officer—is clearly established in Fourth Amendment law. For example, where an officer bases a search or seizure on an alert from a drug-sniffing dog, the "totality of the circumstances" includes an assessment of the dog's reliability through, for example, "evidence of a dog's satisfactory performance in a certification or training program" or

---

None of the "[f]ield tests, live-fire testing, and studies" referenced in the Motion actually test the ShotSpotter system with respect to this critical noise-classification task. *See* Mot to Quash 5–6 & n.4. In fact, there has never been any published test of the ShotSpotter system against noises like firecrackers or blown tires to see how well the system actually distinguishes gunfire from similar noises. *See* Brendan Max, *SoundThinking's Black-Box Gunshot Detection Method: Untested and Unvetted Tech Flourishes in the Criminal Justice System*, 26 Stanford Tech. L.J. 193, 213–38 (2023), https://law.stanford.edu/wp-content/uploads/2023/06/Publish_26-STLR-193-2023_SoundThinkings-Black-Box-Gunshot-Detection-Method.pdf.

The Edgeworth Analytics report cited in the Motion, titled "Independent Audit of ShotSpotter Accuracy," is especially vexing and deceptive as to ShotSpotter's marketing claim of a 97% "accuracy rate." See Mot. to Quash 5 n.4. That report, which was commissioned by SoundThinking, did not involve any actual testing of the system. Rather, it calculates a so-called "accuracy" rate by starting from the baseline *assumption*, without evidence, that 100% of ShotSpotter's gunfire reports correspond to an actual gunshot. The report explains that SoundThinking counts an alert as an error only when a customer (police department) submits a voluntary error report to ShotSpotter complaining that ShotSpotter missed (or mislocated) an actual gunshot or issued a false alert to non-gunfire. If ShotSpotter agrees with the customer complaint, that single alert is deducted from the (assumed) 100% "accuracy" rate. Thus, what the "97% accuracy" claim actually means is that ShotSpotter receives (and agrees with) three formal complaints from its customers for every 100 alerts that it sends out. This is, of course, not a measure of accuracy at all but just a (partial) tally of customer complaints. SoundThinking's "accuracy" claim is thus a seriously misleading representation to the public and to this Court. *See generally* Am. Compl. ¶¶ 112–18.

"successful[] complet[ion of] a training program that evaluated his proficiency in locating drugs." *Florida v. Harris*, 568 U.S. 237, 247 (2013). Such evidence may not be in the officer's immediate knowledge, but it is nonetheless relevant to the Fourth Amendment analysis because it bears upon the reliability of the information the officer used. When contesting a search or seizure based on a dog-sniff, a person is therefore entitled "to challenge . . . evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Id.* The ShotSpotter reports here are much the same: whether the Defendant Officers could rely on them depends on whether the ShotSpotter system and employees who issued the reports had been properly tested and used reliable methods. Plaintiffs are entitled to examine and challenge their reliability, including through the use of information not within the personal knowledge of the Defendant Officers. *See also, e.g.*, *Hall v. State*, 297 S.W.3d 294, 298 (Tex. Crim. App. 2009) (finding that LIDAR speed gun did not establish probable cause for speeding because there was no evidence it provided "reasonably trustworthy information").[6]

To take another example, where an officer relies on tips from the public as the basis for a *Terry* stop, the extent to which that tip can establish reasonable suspicion depends on "the informant's basis of knowledge or veracity." *White*, 496 U.S. at 329. Whether a tip can contribute to the "totality of the circumstances" thus depends on an assessment of the reliability of its source. The SoundThinking employees who issued the gunfire reports at issue here can be thought of as analogous to a tipster. It is, therefore, appropriate for Plaintiff to inquire into their reliability in order to show that the totality of the circumstances did not justify a *Terry* stop.

---

[6] The fact that this subpoena arises in the context of a Section 1983 lawsuit for damages as opposed to a motion to suppress should not affect the analysis. *Cf.* Tr. Of May 9 Hearing 35:5-8 (ECF No. 108-5). The Fourth Amendment's requirements are of course the same in both contexts. To be sure, there may be different questions about the availability of the distinct remedies—*e.g.* qualified immunity may be asserted as a defense against personal liability for damages—but such issues are distinct from the threshold question, which is that the reliability of third-party reports provided to officers is germane to the Fourth Amendment totality-of-the-circumstances test.

9

The same principle—*i.e.* that information outside the officer's personal knowledge is relevant to the *Terry* analysis—applies when an officer relies on information or bulletins generated by a separate police agency to effectuate a search or seizure. The officer may rely on third-party bulletins only when the source of the information is reliable. *See United States v. Hensley*, 469 U.S. 221, 232–33 (1985). In such cases, the Fourth Amendment inquiry goes beyond the information in the detaining officer's immediate knowledge and extends to whether the information developed by the source agency was reliable. *Id.* (a *Terry* stop based on a flyer issued by another agency was only justified "if the police who issued the flyer possessed reasonable suspicion justifying a stop").

The Illinois Appellate Court's decision this month in *People v. Jones*, 2023 IL App (1st) 221311 (Ill. App. Ct. June 7, 2023) is directly on point and supports Plaintiffs position. There, the court ordered SoundThinking to respond to a subpoena from a defendant who was seeking much the same information that Plaintiffs seek here in order to mount a Fourth Amendment challenge to a police stop premised on a ShotSpotter report. *Id.* ¶¶ 35–36. The court held that disclosure from SoundThinking was necessary to challenge "the reliability of the information upon which the officers based their reasonable suspicion" and also "to prepare for any testimony or argument that ShotSpotter alerts are reliable and often lead police to illegal firearms." *Id.* ¶ 37. The same is true here: Defendants are likely to argue that ShotSpotter is sufficiently reliable to support reasonable suspicion as part of the totality of the circumstances; Plaintiff is entitled to develop evidence to rebut that argument and to show that ShotSpotter's gunfire reports should not be part of the Fourth Amendment calculus at all or should be given exceedingly little weight.

## II. The Subpoenaed Information Is Not Barred by This Court's May 9th Ruling.

The Court's Order limiting Plaintiffs' discovery against the City of Chicago does not bar the discovery sought here for several reasons. Most fundamentally, the City did not generate the

10

gunfire reports that police officers used as a basis to stop Plaintiffs, and so information in its possession bears only indirectly upon the actual reliability of those reports. This subpoena, by contrast, seeks information from the source of the reports and will directly illuminate how they were generated and their reliability. The Court's discovery order thus addressed a distinct issue.

In this case, Plaintiffs will need to prove, among other things, that the Fourth Amendment has been violated because Plaintiffs were stopped without reasonable suspicion. ShotSpotter's reliability is a critical touchpoint of that analysis. *See supra*. The fact that the information sought here about ShotSpotter might not have been within the personal knowledge of the Defendant Officers is not dispositive because—as with a drug-sniffing dog, a third-party police report, or an informant—the Fourth Amendment totality-of-the-circumstances inquiry goes beyond the personal knowledge of the responding officers to objective reliability of the information upon which they acted. *See supra*. Plaintiffs should be permitted to build their case-in-chief, part of which will be to show that the reports upon which they were detained were unreliable.[7]

Moreover, the Officers have not been deposed about their knowledge of ShotSpotter's reliability, operations, output, and processes. Plaintiffs should be able to ask the officers questions that are based on information about how the gunfire reports they followed were actually generated, which is what the subpoena seeks here. Their responses to such questions may have significant bearing upon their individual liability and may also shed light on the potential liability of the City. Even if the Court harbors some doubts about the viability of this approach to establishing Fourth Amendment liability against the Defendant Officers, it would be inappropriate to cut off Plaintiffs'

---

[7] Defendants may attempt to avoid personal liability by asserting, in some manner, a defense that they cannot be faulted for relying on unreliable ShotSpotter alerts. *But see Rickmon*, 952 F.3d at 881 (putting officers on notice that ShotSpotter reports cannot alone justify a stop). The mere possibility of that kind of defense, however, is not a basis to cut off Plaintiffs' ability to build their affirmative case that the totality of the circumstances did not justify their stops.

11

ability to pursue this theory of liability in the context of a discovery dispute, particularly one against a third-party vendor.

Finally, to the extent there is a conflict between Plaintiffs' subpoena (issued prior to May 9th) and the Court's May 9th ruling, which came without briefing, Plaintiffs respectfully ask the Court to reconsider or narrow its prior ruling.[8]

### III. The Information SoundThinking Is Withholding Is Centrally Important, and its Disclosure Does not Impose an Undue Burden.

The materials sought by subpoena all bear directly on the reliability of the ShotSpotter reports that were the basis for the Defendant Officers' actions. Such materials are, therefore, integral to Plaintiffs' ability to prove that Fourth Amendment violations occurred.

The propriety of a contested subpoena is principally guided by Rule 26(b)(1)'s relevance and proportionality determinations. *Chavez*, 2013 WL 1810137 at *2. As discussed below, each item of the subpoena seeks information relevant to Plaintiffs' claims and all requests are proportional to the needs of the case. With respect to proportionality, it is important to note that the issues at stake are of great importance given that Plaintiffs seek not just individual damages but to be able to represent a class of thousands of residents who are affected by the broad use of SoundThinking's unvalidated surveillance technology. Moreover, SoundThinking chooses to provide its technology in Chicago so that it can be used in precisely the ways that are being challenged in this lawsuit, so the burdens of a subpoena are eminently foreseeable. In addition, SoundThinking is the only place that Plaintiffs can get information about how the ShotSpotter reports at issue were generated. The parties' relative resources also counsel against quashing the

---

[8] To the extent that the Court quashes the subpoena on the grounds that the material sought is not relevant to the damages claims against the Defendant Officers, Plaintiffs reserve their right issue a renewed subpoena when the Court lifts the stay of discovery with respect to Plaintiffs' *Monell*, class action, and ICRA claims against the City.

12

subpoena—SoundThinking is a well-resourced and ably-represented corporation with more than 80 million dollars in annual revenue. The burden of compliance is small and it would not exceed the benefit of production. *Nw. Mem. Hosp.*, 362 F.3d at 927. Specifically:

**Request 7** of the subpoena seeks operating procedures and training materials that concern how ShotSpotter employees determine whether a noise is gunfire and decide to send a gunfire report to police. Such information is directly relevant to the reliability of the ShotSpotter gunfire reports at issue here and their use by Defendant Officers. It is proportional because it bears directly on the ultimate issues in the case, is unavailable to Plaintiff, and is easy for SoundThinking to produce.[9] Movant complains that the request is not sufficiently limited in scope, Mot. to Quash 15, but Plaintiffs have made clear during meet-and-confer discussion that they are only interested in materials relevant to the specific alerts here

**Requests 1(b), 3(b), and 4(b)** concern the "qualifications/experience, training materials, proficiency/competency testing record (including actual proficiency tests with answers), and contact information of any ShotSpotter employee who reviewed the noise event[s]." Ex. A. Because these employees are the people who made the decision to report gunfire, such information is directly relevant to the reliability of their reports. ShotSpotter presumably keeps regular training and proficiency records, cutting against any burden or expense. Privacy concerns can be addressed via the Confidentiality Order. Mot. to Quash 12–13.

**Requests 1(f), 3(f), and 4(f)** seek the locations of ShotSpotter sensors in the areas immediately surrounding the incidents at issue in this case. This information is relevant and

---

[9] A review of version 1.3 of ShotSpotter's Classification Continuum, which is now public but likely outdated, shows just how important such disclosure is to be able to understand the meaning and reliability of ShotSpotter gunfire reports. Ex. D. The document reveals numerous highly subjective factors that go into the decision to issue a gunfire report. *See id.* at 9–13, 17–19. It also reveals troubling sources of potential error, including a strong directive to employees to label noises as gunfire rather than communicate doubt to police by labelling noises as "probable gunfire." *Id.* at 4–5. Such documents could also allow Plaintiffs to show that the noises here were incorrectly classified even according to ShotSpotter's own rather amorphous criteria. *Id.* at 9–13.

13

important to the issues here because, per a now-public version of ShotSpotter's Classification Continuum, the number of sensors that activate in response to a noise—and the spatial layout of activated sensors—are important factors in determining whether a noise is actually gunfire. *See* Ex. D, at 9–14. A map of nearby sensors would permit Plaintiffs (through an expert) to assess the SoundThinking employee's determination that the noises here were gunshots. This request is proportional: it seeks information readily available to ShotSpotter but inaccessible to Plaintiffs.

**Requests 1(j), 3(k), and 4(k)** seek documentation of any noise events (including non-gunfire events) that ShotSpotter identified within 30 minutes and a 1-mile radius of the alerts in this case. Such information may reveal a non-gunfire source of noise nearby. Indeed, SoundThinking's disclosures have already revealed at least one loud noise classified as "non-gunfire" that was detected within about a block of where Mr. Ortiz was detained, just a few minutes after police were dispatched. *See* Ex. D, at 9 (SST_Williams_424). Plaintiffs' request for details about such alerts is highly pertinent, time- and geographically-limited information that is easily accessible to ShotSpotter and unavailable to Plaintiffs.

**Request 8** seeks material ShotSpotter uses to train police about how to use its alerts. The request is relevant because it will shed light on how Defendant Officers were to receive and respond to the ShotSpotter reports at issue here. The subpoena is proportional, limited only to training materials provided to City of Chicago public safety officials.

**Requests 9(a)-(d)** seek information about whether and how ShotSpotter has been tested and evaluated for reliability in Chicago. Request 9(a) seeks qualification testing, live-fire testing,[10] or other validation, which goes directly to the reliability of the specific alerts upon which Defendant Officers relied. Requests 9(b)-(d) seeks records that document the performance metrics

---

[10] During a meet-and-confer, SoundThinking represented that there has been no live-fire testing in Chicago. If so, SoundThinking could respond to that part of the subpoena simply saying so in writing or on the record.

that ShotSpotter itself establishes for its system: compliance with contractual service level agreements, records of missed/mislocated/misidentified gunshots, and complaints received by ShotSpotter from CPD. Such records go to the threshold Fourth Amendment issues about the reliability the alerts at issue here. The request is also limited, seeking records only related to Chicago for the three-year period that encompasses the alerts at issue in this case.

**Request 10** seeks records of other instances where, as here, SoundThinking employees disagreed with ShotSpotter's algorithmic determination regarding the source of the noise and issued gunfire reports. The request is limited: the 30-day periods around each of incident at issue here. Such information will shed light on the frequency with which ShotSpotter reports gunfire to police when there is internal doubt, and accordingly whether the particular ShotSpotter alerts that led police to stop Plaintiffs Ortiz and Scruggs can be regarded as especially unreliable.

**Requests 1(h), 3(h), 4(h), 12, 13, 14, and 15** seek certain information about how ShotSpotter's computer algorithms work. These algorithms play a major role in producing ShotSpotter's gunfire reports. The information will allow Plaintiffs (through an expert) to assess the reliability of the algorithmic noise classifications that employees overrode here. If the records are commercially sensitive they can be placed under the Confidentiality Order.

Finally, **Request 2(b)** seeks communications by SoundThinking employee Walter Collier III (including internal communications) that specifically concern the prosecution of Mr. Williams and the Detailed Forensic Report he prepared. This request is uniquely relevant to Plaintiff Williams' malicious prosecution claim and is important to understand why the ShotSpotter evidence was withdrawn and how that led charges to be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to quash and order prompt disclosure of the materials that have not yet been produced.

Respectfully submitted,

/s/Jonathan Manes
Jonathan Manes
Alexa Van Brunt
Roderick & Solange MacArthur
    Justice Center
160 E. Grand Ave, 6th Fl.
Chicago, IL 60611
(312) 503-0012
jonathan.manes@macarthurjustice.org
alexa.vanbrunt@macarthurjustice.org

Daniel Massoglia
Joseph DiCola
Dan Lastres
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
daniel@first-defense.org
joseph@first-defense.org
lastres@first-defense.org

Elizabeth Mazur
Hughes Socol Piers Resnick & Dym, Ltd
70 W. Madison, Suite 4000
Chicago, Illinois 60603
312.580.0100
emazur@hsplegal.com

Dated: June 19, 2023

16

## CERTIFICATE OF SERVICE

      I, Jonathan Manes, an attorney, certify that I served this Response to SoundThinking's Motion to Quash on all counsel of record as well as counsel for SoundThinking by filing it on the Court's CM/ECF system.

                                                          /s/ *Jonathan Manes*

Case: 1:22-cv-03773 Document #: 115 Filed: 06/19/23 Page 20 of 20 PageID #:1691