UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Michael Williams, *et al.*, | |
| *Plaintiffs,* | No. 22 CV 3773 |
| v. | |
| City of Chicago, *et al.*, | Judge Lindsay C. Jenkins |
| *Defendants.* | |

MEMORANDUM OPINION AND ORDER

Plaintiffs Michael Williams, Lucy Parsons Lab ("LPL"), Daniel Ortiz, and Derick Scruggs (collectively, "Plaintiffs") initiated this lawsuit against the City of Chicago (the "City"), former Chicago Police Department Superintendent David Brown ("Brown"), and twenty-one individual Chicago police officers, (collectively, "Individual Defendants").[1] [Dkt. 38.] The Amended Complaint, which spans 122 pages, 692 numbered paragraphs, and 24 counts, centers around the Chicago Police Department's use of ShotSpotter, an acoustic gunshot detection system that Plaintiffs allege regularly leads officers to make "scores of illegal stops and arrests," in violation of the Fourth and Fourteenth Amendments. [*Id.* at ¶¶ 1, 5.]

The City seeks to dismiss portions of the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [Dkt. 51.] The Individual Defendants also seek to dismiss most of Plaintiffs Williams, Ortiz and Scruggs'

---

[1] The Individual Defendants are: Nicholas Evangelides, Dale Potter Jr., Michael Kociolek, Scott Reiff, Brian Roney, Juan Perez, Marc LaPadula, Scott Brownley, Joseph Merkel, Carol Maresso, Nestor De Jesus, Salvatore Aloisio, Robert Costello, Michael Dougherty, David Magana, Eduardo Almanza, Harsimran Powar, Michael Matias, Fidel Legorreta, Theodore Andrews Jr., Sarah Keckley, and "Jane Doe."

1

individual claims pursuant to Rule 12(b)(6). [Dkt. 54.] For the reasons stated below, the City's motion to dismiss is granted as to the claims against Superintendent Brown,[2] but is otherwise denied. The Individual Defendants' motion to dismiss is granted in part and denied in part.

## I.    Background

The Court takes Plaintiffs' well-pleaded factual allegations as true for purposes of ruling on the motions to dismiss. *See Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). This case concerns ShotSpotter, an acoustical surveillance system that purports to detect, record, locate, and alert law enforcement to potential gunfire in real-time. [*See* Dkt. 38 ¶¶ 69–103.] According to the Amended Complaint, ShotSpotter technology has not undergone significant testing and is both unreliable and ineffective because it can mistakenly identify non-gunshots as gunshots and often fails to detect actual gunfire. [*See id.* at ¶¶ 1, 4, 45.] Moreover, ShotSpotter's technology can provide an imprecise location for the detected sound, giving police officers and investigators a false sense of accuracy regarding the supposed location of the gunshot. [*See id.*]. According to Plaintiffs, CPD officers respond to approximately 100 daily alerts, 90% of which are false alarms. [*Id.* at ¶ 3.] Plaintiffs contend that the City deliberately deployed ShotSpotter devices in communities of color, and that CPD officers knowingly misuse the flawed technology to engage in discriminatory and unconstitutional policing practices against individuals who happen to be in the vicinity of an alert. [*See id.* at ¶¶ 1–5, 10–21.]

---

[2]    Plaintiffs have agreed to voluntarily dismiss their claims against Defendant Superintendent David Brown. [Dkt. 63 at 4, n.5.]

LPL and the individual Plaintiffs initiated this action on behalf of themselves and a class of similarly situated individuals seeking declaratory and injunctive relief that would end the City's use of ShotSpotter technology. Plaintiffs also seek compensatory and punitive damages for the alleged misconduct. LPL is a non-profit organization based in Chicago that is focused on investigating, exposing, and educating the public about police surveillance and the alleged harms it causes people of color and other marginalized communities. [*Id.* at ¶¶ 22, 31–33.] LPL alleges that it has spent years investigating surveillance technologies, that it has spent significant resources to counteract the City's use of this technology, and that it endeavors to end the City's use of ShotSpotter to protect its members and constituencies from ShotSpotter's harmful consequences. [*Id.*]

The Amended Complaint also describes harm allegedly suffered by the three individual Plaintiffs. Those allegations are summarized as follows:

- Michael Williams ("Williams") is a 65-year-old Black man from the South Side of Chicago. On May 31, 2020, Williams was driving in his car with the front windows rolled down when a bullet struck the passenger who was riding in the front seat of the vehicle, killing him. [Dkt. 38 at ¶¶ 225–241.] CPD investigated the shooting and "pulled surveillance video footage near the time and place of the ShotSpotter alert," though none of the video footage depicted the shooting itself. [*Id.* at ¶ 266.] On August 28, 2020, Williams was arrested and charged with first-degree murder based on officers' claims that ShotSpotter allegedly indicated the fatal gunshot came from inside Williams' car. Williams spent 11

months in Cook County Jail until the Cook County State's Attorney's Office ("CCSAO") dismissed the case. [*Id.* at ¶¶ 6–10, 23, 26–27, 225–348.]

- Daniel Ortiz ("Ortiz") is a Chicago resident of Puerto Rican descent. On April 19, 2021, Ortiz was stopped, frisked, handcuffed, and interrogated outside a laundromat by CPD officers who were responding to a ShotSpotter alert. After he was handcuffed, officers searched Ortiz's car without probable cause and found marijuana along with a bottle of prescription drugs. [*Id.* at ¶¶ 383–385.] Ortiz was transported to a police station and spent a night in jail. The charges against Ortiz were dismissed the following day. [*Id.* at ¶¶ 12–13, 23, 28, 349–409.]

- Derick Scruggs ("Scruggs") is a Black man who resides in the South Shore neighborhood in Chicago. On July 18, 2022, a ShotSpotter alert sent CPD officers to Scruggs's job in Englewood, where he worked as a licensed armed security guard. Officers immediately stopped, detained, and interrogated Scruggs as a shooting suspect. After a lengthy interrogation, the officers released Scruggs because there was no actual evidence to corroborate any alleged gun-related activity. The next day, officers returned to Scruggs's workplace to continue their investigation, unlawfully detained him, and eventually arrested him for failing to carry his Permanent Employee Registration Card. The charges were ultimately dismissed by CCSAO two months later. [*Id.* at ¶¶ 14–15, 29-30, 410–502.]

4

In response to the Amended Complaint, all Defendants have filed motions to dismiss.

## II.    Legal Standards

A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject-matter jurisdiction. A Rule 12(b)(1) motion is construed as a "facial attack[ ] on the complaint, contesting whether the allegations, taken as true, support standing." *Choice v. Kohn Law Firm, S.C.*, 77 4th 636, 638 (7th Cir. 2023) (citing *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021)). Well-pleaded facts are accepted as true, and the Court draws all reasonable inferences in Plaintiffs' favor. *Id*. Under the familiar standing test, a plaintiff must show that (1) "he suffered an injury in fact that is concrete, particularized, and actual or imminent"; (2) "the injury was likely caused by [the defendant]"; and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citation omitted). When a plaintiff seeks injunctive relief, he must "demonstrate that he faces a real and immediate threat of future injury; a past injury alone is insufficient to establish standing for purposes of prospective injunctive relief." *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833 (7th Cir. 2019) (cleaned up).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting

*EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Court "accept[s] all well-pleaded facts as true and draw all reasonable inferences in plaintiff's favor." *Id.* at 600 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)).

## III.   Analysis

### A.   The City's Motion to Dismiss

Plaintiffs bring three claims against the City. Count One brings a *Monell* claim under the Fourth and Fourteen Amendments and Count Two brings a *Monell* claim under the Equal Protection Clause. Count Three claims a violation of the Illinois Civil Rights Act of 2003. [Dkt. 38.] A *Monell* claim challenges the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 694 (2018).

The City challenges standing on three grounds: (1) whether LPL has alleged an injury sufficient to establish organizational standing; (2) whether LPL has associational standing; and (3) whether the individual Plaintiffs' allegations are sufficient to seek injunctive relief. [Dkt. 51 at 12–17.][3]

### 1.   LPL's Standing

An organization can satisfy the standing requirements of Article III in two ways: either "the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'"

---

[3]     Citations to docket filings refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

*Students for Fair Admission, Inc. v. President and Fellows of Harvard College*, 600 U.S. ----, 143 S. Ct. 2141, 2157-59 (2023) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). To show that it has organizational standing, LPL must "show that [it is] under an actual or imminent threat of suffering a concrete and particularized 'injury in fact'; that this injury is fairly traceable to the defendant's conduct; and that it is likely that a favorable judicial decision will prevent or redress the injury." *Common Cause Indiana v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

LPL has organizational standing to challenge the City's use of ShotSpotter. In the Amended Complaint, LPL describes itself as "a Chicago-based non-profit membership organization that is focused on investigating, exposing, and educating the public about police surveillance and the harms it causes, particularly for people of color and other marginalized communities." [Dkt. 38, at ¶ 22.] LPL alleges it has spent years "investigating surveillance technologies and worked to end the City of Chicago's use of ShotSpotter and to protect its members and constituencies from ShotSpotter's harmful consequences." [*Id.*] As evidence of its injury-in-fact, LPL alleges that it had to spend significant time and money to counteract the City's reliance on ShotSpotter, including devoting significant time to trainings, submitting FOIA requests, leadership of a local coalition, and more, which in turn "divert[ed] resources from the organization's focus on other police accountability issues." [*Id.*, at ¶ 33.] LPL also alleges that this work "diverted resources away from ongoing organizational development projects, setting back its strategic planning and fundraising. [*Id.*]

7

The City urges the Court to conclude there is no standing because LPL has merely alleged "expenditure of resources in furtherance of its stated mission rather than pleading an actual injury," so its decision to "challenge *this particular* practice does not constitute an injury." [Dkt. 66 at 3–4 (emphasis in original)]. But the concrete diversion of resources from other aspects of its mission is sufficient to show LPL's standing. See *Common Cause*, 937 F.3d at 951–955. ("Any work to undo a frustrated mission is, by definition, something in furtherance of that mission.") *Common Cause* explained that a voting rights organization had organizational standing when it expended resources in combatting an amendment to a voter registration law, even though the organization's efforts to do so fulfilled its existing mission. Indeed, the organization would be expected to take on work consistent with that mission such that standing flowed from the diversion of resources. *Id*. at 951–55.

Here, LPL has alleged concrete steps sufficient to confer organizational standing. The Amended Complaint alleges that the City's extension of the ShotSpotter contract has required LPL to "research[ ] the use of police technologies and police tactics," "engage[ ] in public education and advocacy," "file[ ] and litigate[ ] public record requests," and "publish[ ] research, educational materials, and advocacy materials," among other things. [*Id*. ¶ 31.] These expenditures "diverted resources away from ongoing organizational development projects," including

strategic planning and fundraising. [*Id*. ¶ 33.] This is sufficient for organizational-standing purposes.[4]

### 2.     Individual Plaintiffs' Standing to Seek Injunctive Relief

The City also challenges Plaintiffs Ortiz and Scruggs's standing to pursue equitable relief as to Counts One, Two and Three. To establish standing for prospective injunctive relief, "a plaintiff must face a real and immediate threat of future injury as opposed to a threat that is merely conjectural or hypothetical." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). Allegations that convey but a "possible future injury are not sufficient," *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (internal quotations omitted), because that makes any injury merely "conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

Ortiz and Scruggs maintain they have alleged facts sufficient to pursue their Fourth Amendment claims for injunctive relief because there is a sufficient risk of future harm given the high rates of ShotSpotter activations in neighborhoods where they live and work. Plaintiffs point to allegations in the Amended Complaint that Scruggs lives in South Shore and works in Englewood as an armed security guard; that he carries a licensed firearm between those neighborhoods in connection with that work; and that these neighborhoods and others have some of the highest rates

---

[4]     Because the Court concludes that LPL has suffered an injury in its own right, it need not address whether LPL also has associational standing. *Students for Fair Admission,* 143 S. Ct. at 2157-59 (an organization can establish standing through organizational or associational standing).

of ShotSpotter activations. [Dkt. 38 at ¶¶ 410–411, 501–502]. Likewise, Ortiz alleges he "regularly travels and goes about daily business within parts of the City of Chicago that are within ShotSpotter's footprint. He is thus likely to be falsely targeted again by CPD officers, solely based on the fact that he is in a high-alert ShotSpotter area of the City." [*Id.* ¶ 409.] Plaintiffs also emphasize that Scruggs and Ortiz were not engaged in unlawful conduct when they were stopped by CPD in 2021 and 2022, and "could be stopped again anytime in the future." [Dkt. 63 at 7.]

For its part, the City maintains that "allegations of two discrete, past incidents do not establish 'ongoing violations,'" sufficient to establish standing because Ortiz and Scruggs's "personal circumstances do not place them in substantial risk of a real and immediate threat of future harm." [Dkt. 66 at 7.] The City relies on *Lyons*, where the Supreme Court held that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," if it is "unaccompanied by any continuing, present adverse effects." 461 U.S. at 102. In *Lyons*, the Supreme Court concluded that a plaintiff's allegations regarding police officers subjecting him to an illegal chokehold during a traffic stop prompted by the plaintiff's unlawful conduct did not establish an imminent threat based on the assumption that the plaintiff would not commit any such misconduct in the future. *Id.* at 97–98.

The allegations here are distinguishable from *Lyons* for the reasons explained in *Smith v. City of Chicago*, 143 F. Supp. 3d 741 (N.D. Ill. 2015). In *Smith*, the court concluded that plaintiffs had standing to seek equitable relief for alleged repeated unconstitutional stops and frisks, rejecting the City's argument that there was no standing because the claims were only "based on the CPD's past misconduct." *Id.* The

10

court in *Smith* distinguished *Lyons*, noting that plaintiffs had "alleged that they were engaging in innocent, lawful conduct—not unlawful conduct—prior to the alleged suspicionless stops and/or frisks." *Id*. at 752. This included everyday activities such as "walking home from the grocery store, standing in front of their own homes or the homes of friends," or taking photos. *Id*.

Plaintiffs Scruggs and Ortiz do the same here. Each allege they have been stopped by CPD in the past based on ShotSpotter alerts. [Dkt. 38 at 69–92.] And both sufficiently allege that they have and will continue to engage in ordinary everyday activities where they live and work—neighborhoods with high rates of ShotSpotter activations—resulting in an ongoing and substantial risk of a future police encounter. [*Id*. at 165–167.]

The City emphasizes that the conclusion in *Smith* was also based on those plaintiffs having alleged "ongoing constitutional violations pursuant to an unconstitutional policy or practice," together with past instances of alleged unconstitutional stops and frisks. 143 F. Supp. 3d at 752. True, but so does the Amended Complaint in this case. Plaintiffs allege that the City has an unconstitutional policy and practice of permitting police officers to rely on ShotSpotter as a basis for making *Terry* stops and arrests. [Dkt. 38 at 143–164.] For example, Plaintiffs allege the City maintains a practice and express policy that "encourages officers to treat individuals found in the vicinity of ShotSpotter alerts as suspects, and to subject them to investigatory stops on that basis;" that the City's "practices and express policies with respect to ShotSpotter alerts violate the [City's] own [reasonable articulable suspicion] policy;" that the City's policies require and

encourage CPD to rely on ShotSpotter for decisionmaking, including whether to conduct an investigatory stop; and that the City's "practices and policies—as well as its omission of policymaking regarding ShotSpotter's unreliability—lead officers to engage in large numbers of illegal, unnecessary, and frightening interactions with residents who live in areas wired with ShotSpotter sensors." [*Id.*] These are sufficient allegations of an ongoing policy that, coupled with alleged past violations, support a claim for injunctive relief. *Scruggs v. McAleenan*, No. 18 C 2109, 2019 WL 4034622, at *3 (N.D. Ill. Aug. 27, 2019); *Barrios v. City of Chicago*, 15 C 2648, 2016 WL 164414 at *9 (N.D. Ill. Jan. 14, 2016) (plaintiff who alleged a single instance of past misconduct had standing to seek injunctive relief in challenging to the City's vehicle impoundment policy); *Hvorcik v. Sheahan*, 870 F. Supp. 864, 869 (N.D. Ill. 1994). As pled, the individual Plaintiffs have standing to seek injunctive relief as to Count One because there is "a sufficient likelihood that they will again be wronged in a similar way." *Lyons*, 461 U.S. at 111.

For these same reasons, the City's standing challenge as to Counts Two and Three fare no better. The City acknowledges that the *Lyons* analysis "equally applies" to all the claims for equitable relief, including its Equal Protection and ICRA claims. [Dkt. 66 at 7.] Given the Court's conclusion that Ortiz and Scruggs have demonstrated standing to seek injunctive relief, the motion to dismiss is denied.

## B. Individual Defendants' Motion to Dismiss

The Individual Defendants also seek dismissal of Counts Four through Twelve brought by Williams; Counts Fourteen, Fifteen and Sixteen brought by Ortiz; and Counts Eighteen through Twenty-Two brought by Scruggs.

12

### 1. Williams

#### a. Group Pleading

First, the Individual Defendants argue that all individual counts brought by Williams (Counts Four, Five, Six, Seven, Nine, Ten, Eleven and Twelve) are deficient because they use "group pleading," referring to the Individual Defendants only "generally as 'defendants' or 'officers,'" and then referring to them collectively throughout the body of the complaint. [Dkt. 54 at 2–8.] Williams responds that this argument focuses too narrowly on the language contained in the Counts toward the end of the Amended Complaint, while ignoring "detailed allegations in the body of the document" pertaining to Williams that are incorporated by reference. [Dkt. 65 at 31–33.]

It is well established that 42 U.S.C. § 1983 lawsuits against individuals "require personal involvement in the constitutional deprivation to support a viable claim." *Gonzales v. McHenry County, Illinois*, 40 F.4th 824, 828 (7th Cir. 2022); *see also Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019). "To establish personal liability, the plaintiff must show that the relevant official 'caused the constitutional deprivation at issue' or 'acquiesced in some demonstrable way in the alleged constitutional violation.'" *Gonzalez*, 40 F.4th at 828 (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003)). Despite the personal involvement requirement, "[g]roup pleading, while not ideal, is not categorically impermissible" for a § 1983 claim. *Fulton v. Bartik*, 547 F. Supp. 3d 799, 810 (N.D. Ill. 2021); *see also Dukes v. Washburn*, 600 F. Supp. 3d 885, 898 (N.D. Ill. 2022). A complaint survives if any group pleadings, taken along with any individual pleadings, create the

plausible inference that each defendant is liable. *Martinez v. Wexford Health Servs., Inc.*, 18-C-50164, 2021 WL 1546429, at *3 (N.D. Ill. Apr. 20, 2021). Stated differently, group pleading is permissible where, "reading the allegations sensibly and as a whole, there is no genuine uncertainty regarding who is responsible for what." *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013)).

The Amended Complaint is sufficient to satisfy this minimal standard. First, Williams's allegations are directed at a specific subset of the Individual Defendants, dubbed the "Williams Defendant Officers." [Dkt. 38, at ¶ 36.] The Amended Complaint dedicates nearly 20 pages and more than 100 paragraphs to describing the events pertaining to him beginning on May 31, 2020 and the investigation that followed, starting with Detectives Kociolek, Evangelides, Roney and Potter. It alleges that Officer Brownley and Detective Evangelides used a ShotSpotter report to focus in on the area of E. 63rd and S. Stony Island, where the May 31, 2020 shooting occurred. It alleges that Sergeant Perez, along with Detectives Evangelides, Potter, and Reiff interrogated Williams and were responsible for placing him under arrest, along with Officers Magana and Almanza. It alleges that Officer Nunez and Lieutenant Dougherty authored the arrest report; that Officers Merkel, Maresso, De Jesus, LaPadula and Aloisio worked to obtain approval for murder charges; and that Lieutenant Costello formally approved a first-degree murder charge. [Dkt 38 at ¶¶ 229–297.] Reading the complaint's allegations "sensibly and as a whole," the Court is not left with "genuine uncertainty regarding who is responsible for what." *Engel*, 710 F.3d at 710.

### b.     Count Four: Unlawful Seizure

In Count Four, Williams brings a claim against the Williams Defendant Officers for false arrest in violation of the Fourth Amendment.[5]

"The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause," which "can happen when the police hold someone without any reason before the formal onset of a criminal proceeding" and "also can occur when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Manuel v. City of Joliet*, 580 U.S. at 367; see also *Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019) (a violation of the Fourth Amendment may be premised on "intentionally or recklessly [ ] false statements in a warrant application and those false statements were material to a finding of probable cause.") Although the Seventh Circuit "has not provided elements for a Fourth Amendment unlawful pretrial detention claim," "[t]he consensus among district courts" is that a plaintiff must show that the defendants (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor. *Bahena v. Kennedy*, 2021 WL 8153974, at *6 (N.D. Ill. Oct. 25, 2021) (collecting cases).

---

[5]     The caption in Counts Four and Eighteen also cite the Fourteenth Amendment as a basis for the false arrest claims. [Dkt. 38 at 103, 115.] Such a claim only sounds in the Fourth Amendment. "*Manuel I* makes clear that the Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention." *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019) (citing *Manuel v. City of Joliet*, 580 U.S. 357, 365-69 (2017)); *see also Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020).

The existence of probable cause is an "absolute defense" to a Fourth Amendment claim. *See Norris v. Serrato*, 761 Fed. Appx. 612, 615 (7th Cir. 2019) (citation omitted) (holding that "probable cause is an absolute defense to claims under § 1983 against police officers for an allegedly unreasonable seizure, whether a false arrest or a wrongful pretrial detention."). "Probable cause to arrest exists if the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). "The officers' subjective intentions are irrelevant so long as there was probable cause to detain him for any crime." *United States v. Brown*, 973 F.3d 667, 706 (7th Cir. 2020). In other words, "[w]hat matters, and all that matters, is whether the facts known to the arresting officers at the time they acted supported probable cause to arrest." *White v. Hefel*, 875 F.3d 350, 357 (7th Cir. 2017).

Williams argues that he was detained without probable cause based on "knowingly false allegations" from the Williams Defendant Officers. [Dkt. 65 at 16.] He points to allegations in the Amended Complaint where he asserts that the relevant officers seized on a knowingly inaccurate and imprecise ShotSpotter alert, and ignored or failed to follow-up on other evidence (including the surveillance video footage), which suggested the "strong possibility that the shots came from [a different] vehicle." [Dkt. 38 at ¶¶ 255–256, 259–260, 264, 268.] All of this, Williams alleges, resulted in insufficient probable cause to support his detention. [Dkt. 38 at 266–269.]

At this stage, the Individual Defendants have not established as a matter of law that there was probable cause to support Williams's arrest. The Court simply

cannot determine from the Amended Complaint alone whether the facts and circumstances known at the time would have led reasonably prudent officers to believe that there was probable cause. The parties vigorously dispute who knew what and when, the importance (or lack thereof) of the surveillance video, and whether other types of evidence available to the Officers were consistent with probable cause. But this is beside the point. For now, it is enough that Williams plausibly alleges that he had not committed a crime, was nevertheless detained, and that Defendants lacked probable cause to support his detention. Defendants may be able to demonstrate otherwise on a more complete record, but at the dismissal stage, Williams's unlawful seizure claim may proceed.

### c.   Count Five: Unlawful Seizure Based on Legal Process

Count Five alleges unlawful seizure pursuant to legal process. The Individual Defendants seek dismissal of this claim as duplicative, arguing that it is based on the same set of facts as Counts Four and Six. [Dkt. 54 at 10.] Williams maintains that each of these counts are distinct: Count Four is based on his false arrest on August 28, 2020; Count Five is based on his detention pursuant to legal process starting on August 30, 2020 until the state dismissed the charges on July 23, 2021; and Count Six is based on malicious prosecution from that same time period. [Dkt. 65 at 17–18.]

Counts Four and Five raise distinct claims. As discussed above, the Supreme Court has recognized a difference between "pre-legal-process[ ] arrest" and "post-legal process[ ] pretrial detention." *Manuel*, 580 U.S. at 367. The Fourth Amendment governs both, and both are cognizable. *Jones v. York*, 34 F.4th 550, 563–64 (7th Cir. 2022) (quoting *Lewis v. City of Chicago*, 914 F.3d 472, 474 (7th Cir. 2019) (detention

17

without probable cause violates the Fourth Amendment "when it precedes, but also when it follows, the state of legal process in a criminal case."").

The Individual Defendants also seek dismissal of Count Five based on the probable cause determinations by a judge and later a Grand Jury. [Dkt. 54 at 10.] A plaintiff may plead a violation of his Fourth Amendment rights where he alleges that he was wrongfully detained pretrial based on falsified evidence, even if the prosecution does not result in his conviction. *Rainsberger*, 913 F.3d at 647. To state such a Fourth Amendment claim, a plaintiff must plead that "the defendants (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Walker v. City of Chicago*, No. 20 C 7209, 2022 WL 375515, at *4 (N.D. Ill. Feb. 8, 2022); *Moore v. City of Chicago*, No. 19 C 3902, 2020 WL 3077565, at *3 (N.D. Ill. June 10, 2020) ("There is no probable cause—and detention is unlawful—when 'a judge's probable-cause determination is predicated solely on a police officer's false statements' or 'fabrications.'"). Here, Williams alleges, among other things, that Potter presented false and misleading information at the probable cause hearing by testifying that the gunshot came from inside the vehicle, and that Evangelides falsely testified to the grand jury about the meaning of the ShotSpotter evidence. [Dkt. 38 at ¶¶ 271–273, 291, 294, 300, 307.] The unlawful seizure claim is sufficiently pled and may proceed.

### d.     Counts Six and Ten: Malicious Prosecution

Counts Six and Ten bring malicious prosecution claims under federal and state law, respectively. There is "no such thing as a constitutional right not to be prosecuted without probable cause." *Anderson v. City of Rockford*, 932 F.3d 494, 512 (7th Cir.

2019) (quoting *Manuel*, 903 F.3d at 670); *Howlett v. Hack*, 794 F.3d 721, 727 (7th Cir. 2019). Count Six is dismissed.[6]

A claim for malicious prosecution under Illinois law requires proof that: "(1) [the plaintiff] was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018); *Beaman v. Freesmeyer*, 451 Ill. Dec. 310, 183 N.E.3d 767, 782 (2021).

As to the first element, the Individual Defendants argue that Williams has failed to adequately plead that the relevant officers "commenced and continued the criminal proceeding," since the State's Attorney's Office obtained an indictment that initiated court proceedings. [Dkt. 54 at 11.] Although prosecutors decide whether to bring a case, liability extends to "all persons who played a significant role in causing the prosecution of the plaintiff." *Beaman*, 2019 IL 122654, ¶ 43 (quoting *Frye v. O'Neill*, 166 Ill. App. 3d 963, 975 (4th Dist. 1988)). Where the claim is against the arresting officer, an indictment typically breaks the chain of causation, so the plaintiff must show some "postarrest action which influenced the prosecutor's decision to indict." *Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017) (quoting *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 902 (7th Cir. 2001)). For example, a law-enforcement officer might be liable if he knowingly provides misinformation to the prosecutor, conceals exculpatory information, engages

---

[6]     This disposition resolves the Individual Defendants' argument that Count Six must be dismissed because it is duplicative of Count Five.

in wrongful or bad-faith conduct instrumental in the initiation of the prosecution, or participates in the case so actively as to amount to advice and cooperation. *Beaman*, 2019 IL 122654, ¶¶ 44–45.

Williams's response brief tacitly acknowledges that the allegations in the Amended Complaint are insufficient in this regard. Instead, through his response brief, he seeks to amend his pleadings with the following allegation: "On August 29, 2020, the Defendant Officers asked Cook County prosecutors to approve first degree murder charges against Mr. Williams. On information and belief, the Defendant Officers made false and misleading statements to prosecutors about evidence in the case, and prosecutors approved charges based on those false and misleading statements." [Dkt. 65 at 21.] But a complaint may not be amended by briefing in response to a motion to dismiss. *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989). Because this allegation is necessary to sufficiently plead a malicious prosecution claim and it is plainly missing, the motion to dismiss Count Ten is granted, but the Court grants Williams leave to replead.

The remaining elements of Count Ten are easily disposed of at the pleadings stage. As for the second and third elements, for the reasons already discussed, the Individual Defendants have not established as a matter of law that there was probable cause to support Williams's arrest. Nor can the Court conclude from the pleadings alone whether the Williams Defendant Officers acted with malice. And Williams has sufficiently alleged that the murder charges against him were dismissed in a manner indicative of innocence. [Dkt. 38 at 302, 304, 305.] It may be that "the State's *nolle* was *not* based on the belief Plaintiff was innocent," as the

Individual Defendants maintain. [Dkt. 54 at 21.] But considering that the complaint alleges facts suggesting that probable cause to bring the charges was lacking in the first place, Williams's allegation that the charges were "terminated in his favor," are enough at the dismissal stage. [Dkt. 38 at ¶ 575.] *Woodard v. American Family Mut. Ins. Co.*, 950 F. Supp. 1382, 1387 (N.D. Ill. 1997) (at motion to dismiss stage, plaintiffs were not required to "plead facts which, if proven, would show that the dismissal was entered for reasons consistent with his or her innocence.").

### e.    Counts Seven and Eleven: Conspiracy

Counts Seven and Eleven allege federal and state law conspiracy claims. To state a claim for civil conspiracy under Illinois law, "a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133 (1999). For a § 1983 conspiracy claim, the plaintiff must allege that "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). For a claimed conspiracy to survive a motion to dismiss, it must be plausibly pled through allegations of fact that generally take one of two forms: "(1) direct allegations of an agreement, like an admission by a defendant that the parties conspired; or (2) more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed." *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 826–27 (7th Cir. 2019).

The Amended Complaint takes the second approach and sufficiently pleads facts that plausibly suggest a circumstantial agreement. While Williams does not plead the exact dates of the conspiracy, he pleads the approximate timing—defendants took steps in furtherance of the alleged conspiracy beginning shortly before his arrest and continuing until the charges were dismissed. From these allegations, it is plausible to infer that the Williams Defendant Officers intended to work in concert to ensure Williams' conviction.[7]

### f.  Count Eight: Supervisory Liability Claim

Count Eight raises a supervisory liability claim against Defendants Dougherty and Costello. Under § 1983, "a government official is only liable for his or her own misconduct." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). A supervisor is liable for a subordinate's misconduct resulting in constitutional violation only if the supervisor was personally involved. *Id.* "Personal involvement in a subordinate's constitutional violation requires supervisors to know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* at 494.

Williams's response points primarily to the allegations that Dougherty and Costello expressly approved of the actions of others, namely that, after Officer Nunez

---

[7]     As to the City's other argument, courts in this district have expressed doubt about the applicability of the intracorporate conspiracy doctrine as an impediment to a civil conspiracy claim. *Walker v. City of Chicago*, 559 F. Supp. 3d 747, 752–53 (N.D. Ill. 2021); *Haliw v. City of S. Elgin*, 19 C 01515, 2020 WL 1304697, at *4 (N.D. Ill. Mar. 18, 2020) (holding that the Seventh Circuit has not expressly spoken on the doctrine). Based on the Court's research, the Seventh Circuit has not held that the intracorporate conspiracy doctrine bars § 1983 claims against police officers who conspire to violate an individual's constitutional rights.

prepared an arrest report on August 28, 2020, Dougherty "approved probable cause at 10:00 p.m. the same evening." [Dkt. 38 at ¶ 288.] The Amended Complaint also alleges that on August 30, 2020, Officers "obtained approval to formally file charges of first-degree murder against Mr. Williams," and that Costello "gave final approval of the charges that day." [*Id.* at ¶ 293.] It alleges that Dougherty and Costello "were personally involved in the arrest, charging, and prolonged detention of Mr. Williams, as well as the CPD's review of his case. They knew or should have known of their subordinates' unconstitutional actions and related misconduct in the case." [*Id.* at ¶¶ 593–594.] These allegations, which the Court must accept as true, sufficiently allege personal involvement.

### g.    Count Nine: Failure to Intervene

The Individual Defendants argue for dismissal of Count Nine, a § 1983 failure to intervene claim. To prove failure to intervene under § 1983, Williams must prove that the defendants knew that a constitutional violation was committed and had a realistic opportunity to prevent it. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017). Because the underlying constitutional claims have survived, this dependent claim is not subject to dismissal. Nor are the allegations too vague and unspecific given the detail provided about the relevant officers' alleged actions. [Dkt. 38 at ¶¶ 225–348.]

### h.    Count Twelve: Intentional Infliction of Emotion Distress

Williams concedes that this claim is time barred. [Dkt. 65 at 33, n.5.] Count Twelve is dismissed.

### 2. Ortiz

#### a. Count Fourteen: Unconstitutional *Terry* Stop

In Count Fourteen, Ortiz brings a Fourth Amendment unlawful seizure claim. A brief detention to investigate a crime constitutes a seizure under the Fourth Amendment and therefore, the detention must be reasonable. *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir. 2015). Officers may carry out a *Terry* stop only when they "have a reasonable suspicion, grounded in specific and articulable facts" that an individual has committed a felony or is about to commit a crime. *United States v. Hensley*, 469 U.S. 221, 229 (1985).

The Individual Defendants make a half-hearted argument for dismissal of this claim, suggesting that Ortiz's "evasive behavior or [ ] other observations the officers may have made," might have supplied reasonable suspicion to justify the stop. [Dkt. 54 at 32.] But Ortiz alleges that the "only reason" for the stop was a "false and unreliable ShotSpotter alert," which plausibly asserts there was no reasonable suspicion. [Dkt. 38 at ¶ 340.] Defendants may be able to demonstrate that there was reasonable suspicion for the stop on a more complete record, but at this stage, Ortiz's allegations allow this claim to proceed.

#### b. Remaining Claims

The remaining claims brought by Ortiz are his failure to intervene claim in Count Fifteen and his conspiracy claim in Count Sixteen. As discussed above, because Ortiz's underlying constitutional claim has survived, his failure to intervene claim is

not subject to dismissal. Nor are the allegations too vague and unspecific to warrant dismissal. [Dkt. 38 at ¶¶ 357–390.]

The Individual Defendants make even less of an effort to explain why Ortiz's conspiracy claim raised in Count Sixteen must be dismissed. Their argument consists of exactly one sentence, repeated verbatim in the reply brief. [Dkt. 54 at 33; 70 at 12–13.] ("Similarly, the Conspiracy claim asserted in Count Sixteen should also be dismissed as it is vague, conclusory and lacks an underlying constitutional violation."). As such, the Individual Defendants' argument is undeveloped and fails to provide a basis for dismissal. *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (citation omitted) (explaining that parties forfeit arguments that are perfunctory, undeveloped, and unsupported by pertinent authority). In any event, the Amended Complaint sufficiently alleges circumstantial evidence of an agreement giving rise to an inference that an agreement existed. *Alarm Detection Sys.*, 930 F.3d at 826–27.

### 3. Scruggs

#### a. Counts Seventeen and Eighteen: Unconstitutional *Terry* Stop and False Arrest

Counts Seventeen and Eighteen arise out of Scruggs' encounters with certain of the Individual Defendants on July 18 and 19, 2022. As the Court understands it, Count Seventeen alleges a Fourth Amendment unlawful seizure claim based on Scruggs's detention on July 18, and again on July 19, 2022. Count Eighteen alleges a Fourth Amendment false arrest claim based only on Scruggs's arrest on July 18,

2022.[8] The Individual Defendants seek dismissal of the false arrest claim to the extent that it is duplicative of the unlawful detention claim, arguing that both claims involve the same operative facts and allege the same injury. [Dkt. 70 at 14.]

It is true that these counts have substantial overlap. Both are based on the same set of events on July 18—Scruggs was subject to a *Terry* stop and during the encounter he was placed in handcuffs and was not free to leave. Ordinarily, this transforms a *Terry* stop into a full custodial arrest. *Mwangangi v. Nielsen*, 48 F.4th 816, 826 (7th Cir. 2022) (observing that the "use of handcuffs substantially aggravates the intrusiveness of a *Terry* stop and, as a meaningful restraint on freedom of movement, is normally associated with arrest"); *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (use of certain police restraint techniques such as "using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests," may become "so intrusive" as to "become[ ] tantamount to an arrest requiring probable cause" (cleaned up)). But the Individual Defendants fail to identify any Seventh Circuit case law suggesting that a false arrest claim must be dismissed as duplicative of an unlawful detention claim when both claims are based on the same set of facts. Seventh Circuit and courts within its jurisdiction have recognized the viability of both claims even when an alleged false arrest arises out of events that also form the basis of the unlawful seizure. *See, e.g., Mwangangi*, 48 F.4th at 826 (evaluating plaintiff's

---

[8]     Plaintiffs' response brief states that "[w]ith respect to the encounter [on] July 19, Plaintiff does *not* contend that his pretextual misdemeanor arrest (for not carrying his Permanent Employee Registration Card) was illegal; he only contends that the *Terry* stop that preceded that arrest was unconstitutional." [Dkt. 65 at 38 (emphasis in original).]

unlawful seizure claim as distinct from his false arrest claim, all of which arose from a single encounter with police). At this stage, Scruggs's unlawful seizure claim and false arrest claim may proceed.

### b.  Count Twenty-One: State Law False Arrest

Count Twenty-One alleges a claim for false arrest under Illinois law. To establish a false arrest claim under Illinois law, a plaintiff must prove he "was restrained or arrested by the defendant, and that the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff." *Meebrey v. Marshall Field & Co., Inc.*, 139 Ill.2d 455, 474 (1990). A false arrest case fails if the arrest was supported by probable cause. *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 626 (7th Cir. 2010).

In his response brief, Scruggs states that Count Twenty-One is predicated on "(1) the investigatory stop on July 18, 2022, that subsequently rose to the level of an arrest, and (2) the investigatory stop the following day, July 19, 2022, up until the point where the officers found probable cause to determine" Scruggs had committed the misdemeanor offense for working without his PERC card. [Dkt. 65 at 41.] With this clarification, the false arrest claim can proceed. Scruggs has alleged that the "Officers lacked probable cause to search, detain, or arrest Mr. Scruggs," and "lacked reasonable suspicion to detain him for questioning or to conduct a pat down," on July 18 [*see* Dkt. 38 at ¶ 443], and on July 19 [*see* Dkt. 38 at ¶ 468].

### c.  Remaining Claims

The remaining claims brought by Scruggs are his failure to intervene claim in Count Nineteen and his federal and state law conspiracy claims in Counts Twenty

27

and Twenty-Two. These claims survive because the underlying constitutional claims have survived, and because Scruggs has sufficiently alleged circumstantial evidence of an agreement beginning with the events on July 18 and continuing into the following day. [Dkt. 38 at ¶¶ 413–488.]

### 4. Qualified Immunity

Finally, the Court declines to dismiss Plaintiffs' claims based on qualified immunity. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) ("[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds."). "Because an immunity defense usually depends on the facts of the case," and because plaintiffs are "not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity," dismissal at the pleading stage is typically inappropriate. *Id*. (quoting *Jacobs v. City of Chi.*, 215 F.3d 758, n.3 (7th Cir. 2000)).

## IV. Conclusion

The City's Motion to Dismiss [Dkt. 51] is granted as to former Superintendent Brown. The motion is otherwise denied. The Individual Defendants' Motion to Dismiss [Dkt. 54] is granted in part and denied in part. Counts Six and Twelve are dismissed with prejudice; Count Ten is dismissed with leave to replead. The Motion is otherwise denied.

Enter: 22-cv-3773
Date: September 29, 2023

_____
Lindsay C. Jenkins
United States District Judge