**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL WILLIAMS, LUCY PARSONS LABS, and DANIEL ORTIZ, on behalf of himself and a class of similarly situated people, | Case No. 22-cv-03773 |
| Plaintiffs, | Judge Lindsay C. Jenkins |
| v. | Magistrate Judge Young B. Kim |
| CITY OF CHICAGO, et al., | Jury Trial Demanded |
| Defendants. | |

**CITY OF CHICAGO'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE RULE 12(B)(6)**

Defendant City of Chicago ("City"), through its undersigned counsel, moves to dismiss the

*Amended Civil Rights Class Action Complaint for Declaratory and Injunctive Relief and for Damages* ("SAC" or

"2d Am. Compl.") [Dkt. 214] pursuant to Federal Rule of Civil Procedure 12(b)(6).

# **TABLE OF CONTENTS**

Page

LEGAL STANDARD ..................................................................................................2

I. PLAINTIFFS FAIL TO STATE ANY ACTIONABLE CLAIMS UNDER MONELL ..................................................................................................................3

    A. Plaintiffs Do Not Identify an Express Policy That Was the Moving Force That Caused Their Injuries ..................................................................4

        1. The ShotSpotter Flex Program (Special Order S03-19). ....................4

        2. Investigatory Stop Policy (Special Order S04-13-09). ........................5

        3. Plaintiffs Fail to Allege That Either Express Policy Was the Moving Force Behind Their Constitutional Injuries. ...........................6

    B. Plaintiffs Failed to Show a Widespread Practice that Caused Their Constitutional Injuries. ..............................................................................7

        1. Plaintiffs Fail to Identify a Widespread Practice of Unconstitutional Investigatory Stops that was the Moving Force Behind their Constitutional Injuries. ................................................7

        2. Plaintiffs Do Not Allege Any Facts to Support That City Policymakers Had Actual or Constructive Knowledge of a Widespread Practice of Unconstitutional Stops. ...................................9

            a. The OIG Report Does Not Demonstrate Awareness. ...........9

            b. Individual Plaintiffs' Alleged Stops Did Not Create Awareness. ................................................................................9

            c. Articles, Testimony, Public Statements and Other Studies Do Not Demonstrate Awareness. ...........................10

    C. Plaintiffs Allege Insufficient Facts to Establish That the City Was Deliberately Indifferent to Any Alleged Unconstitutional Practice. ...........10

        1. Without Facts to Support Knowledge of a Widespread Practice, Plaintiffs Cannot Establish Deliberate Indifference. .........10

        2. Plaintiffs Fail to Show the City Was Deliberately Indifferent in Its Training or Supervision of CPD Officers. ................................11

II. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE. ......................................................................11

    A. Plaintiffs Fail to Allege Discriminatory Effect. ................................12

    B. Plaintiffs Fail to Allege Discriminatory Purpose. ..............................14

III. PLAINTIFFS FAIL TO ALLEGE VIOLATION OF THE ILLINOIS CIVIL RIGHTS ACT. ......................................................................................16

A.   Plaintiffs Failed to Allege a Specific CPD Policy Or Practice Concerning the Deployment of ShotSpotter Technology. ............................. 17

B.   Plaintiffs Have Not Alleged a Robust Causal Connection. ........................... 17

1.   Plaintiffs' Reliance on Pre-Existing Disparities Fails to Support Their ICRA Claim. ................................................................. 18

2.   Robust Causality Cannot Be Established by Plaintiffs' Conclusory Allegations of Disparate Harm. ....................................... 19

IV.   PLAINTIFFS' STATE LAW CLAIMS FOR RESPONDEAT SUPERIOR IN COUNTS X AND XXII SHOULD BE DISMISSED. ....................................... 20

CONCLUSION............................................................................................................................... 20

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Adams v. City of Indianapolis,*
    742 F.3d 720 (7th Cir. 2014)........................................................................................ 16, 20

*Alcorn v. City of Chicago,*
    No. 17 C 5859, 2018 WL 3614010 (N.D. Ill. July 27, 2018).............................................. 6

*Alston v. City of Madison,*
    853 F.3d 901 (7th Cir. 2017)........................................................................................ 15, 16

*Anderson v. Allen,*
    No. 1:19-CV-02311, 2020 WL 5891406 (N.D. Ill. Oct. 5, 2020)...................................... 6, 9

*Arquero v. Dart,*
    587 F. Supp. 3d 721 (N.D. Ill. 2022) .................................................................................. 7

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................................ 2, 3, 9, 15

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007)......................................................................................................... 2, 15

*Board of County Com'srs of Bryant County, Okl. v. Brown,*
    520 U.S. 397 (1997)............................................................................................................ 10

*Bond v. Atkinson,*
    728 F.3d 690 (7th Cir. 2013).............................................................................................. 14

*Brooks v. Ross,*
    578 F.3d 574 (7th Cir. 2009)................................................................................................ 3

*Brownmark Films, LLC v. Comedy Partners,*
    682 F.3d 687 (7th Cir. 2012).............................................................................................. 20

*Carmona v. City of Chicago,*
    No. 15-CV-462, 2018 WL 306664 (N.D. Ill. Jan. 5, 2018) ................................................. 8

*Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.,*
    19-cv-3014, 2020 WL 1330654 (N.D. Ill. Mar. 22, 2020) ................................................ 17

*Cesario v. Jewel Food Stores, Inc.,*
    No. 17 CV 319, 2017 WL 5152348 (N.D. Ill. 2017)........................................................ 20

*Chavez v. Ill. State Police*,
    251 F.3d 612 (7th Cir. 2001)............................................................................................ 12, 14, 15

*Chriswell v. Vill. of Oak Lawn*,
    No. 11 C 00547, 2013 WL 5903417 (N.D. Ill. Nov. 4, 2013) .......................................... 13

*City of Canton v. Harris*,
    489 U.S. 378 (1989)......................................................................................................... 11

*Connick v. Thompson*,
    131 S. Ct. 1350 (2011) ..................................................................................................... 11

*Darko v. City of Chicago*,
    Case. No. 21-cv-6467, 2023 WL 5334600 (N.D. Ill. Aug. 19, 2023)............................... 11

*Edmond v. City of Chicago*,
    2023 WL 3847098 (N.D. Ill. 2023) .................................................................................. 17

*Gable v. City of Chicago*,
    296 F.3d 531 (7th Cir. 2002)........................................................................................8, 10

*Hall v. City of Chicago*,
    No. 12 C 6834, 2012 WL 6727511 (N.D. Ill. Dec. 28, 2012) (J. Leinenweber)................ 6

*Inclusive Comm. Project, Inc. v. Heartland Comm. Ass'n, Inc.*,
    399 F. Supp. 3d 657 (N.D. Tex. 2019) ........................................................................ 18, 20

*Jackson v. Cerpa*,
    696 F. Supp. 2d 962 (N.D. Ill. 2010)................................................................................ 16

*James v. City of Evanston*,
    No. 20-CV-00551, 2021 WL 4459508 (N.D. Ill. Sept. 29, 2021)..................................... 16

*Johnson v. Cook County Sheriff's Office*,
    2018 WL 2193235 (N.D. Ill. May 14, 2018)....................................................................... 9

*Latuszkin v. City of Chicago*,
    250 F.3d 502 (7th Cir. 2001)............................................................................................... 7

*Marion v. City of Corydon, Indiana*,
    No. 4:07-cv-0003, 2007 WL 9734296 (S.D. Ind. Dec. 3, 2007) ..................................... 19

*Martinez v. City of Chicago*,
    534 F. Supp. 3d 936 (N.D. Ill. 2021)................................................................................ 14

*McCauley v. City of Chicago*,
    671 F.3d 611 (7th Cir. 2011)....................................................................................... 14, 15

*McKleskey v. Kemp,*
    481 U.S. 279 (1987) ........................................................................................................................14

*Montano v. City of Chicago,*
    535 F.3d 558 (7th Cir. 2008) ...........................................................................................................6

*Munguia v. Illinois,*
    No. 10 C 0055, 2010 WL 3172740 (N.D. Ill. 2010) ......................................................................19

*Nabozny v. Podlesny,*
    92 F.3d 446 (7th Cir. 1996) ............................................................................................................14

*Peterson v. City of Chicago,*
    No. 14-CV-9881, 2015 WL 13882814 (N.D. Ill. June 23, 2015) .....................................................6

*Phelan v. Cook Cnty.,*
    463 F.3d 773 (7th Cir. 2006) ............................................................................................................7

*Quinn v. Bd. of Educ. of the City of Chicago,*
    234 F. Supp. 3d 922 (N.D. Ill. 2017) ........................................................................................15, 16

*Ramos v. City of Chicago,*
    707 F. Supp. 345 (N.D. Ill. 1989) ....................................................................................................8

*Smith v. City of Jackson,*
    544 U.S. 228 (2005) ........................................................................................................................17

*Spiegel v. McClintic,*
    916 F.3d 611 (7th Cir. 2019) ............................................................................................................3

*Swan v. Bd. of Educ, of City of Chicago,*
    2013 WL 4401439 (N.D. Ill. Aug. 15, 2013) ..................................................................................17

*TBS Group, LLC v. City of Zion, Illinois,*
    No. 16-cv-5855, 2017 WL 5129008 (N.D. Ill. Nov. 6, 2017) ........................................................18

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.,*
    576 U.S. 519, 544 (2015) ...........................................................................................................18, 19

*Thomas v. Nennah Joint Sch. Dist.,*
    74 F.4th 521 (7th Cir. 2023) .............................................................................................................3

*White v. City of Chicago,*
    829 F.3d 837 (7th Cir. 2016) ............................................................................................................8

*Williams v. Cook Cnty.,*
    No. 18 C 1456, 2018 WL 4361946 (N.D. Ill. Sept. 13, 2018) .......................................................14

*Wilson v. Edward Hosp.*,
  981 N.E.2d 971 (Ill. 2012) ................................................................................................................20

*Winn v. City of Chicago*,
  No. 20 C 5246, 2022 WL 80272 (N.D. Ill. Jan. 6, 2022) ...................................................................20

**Statutes**

740 ILCS 23/5(a)(2) ..............................................................................................................................16

**Other Authorities**

Fed. R. Civ P. 12(b)(6).............................................................................................................................2

Plaintiffs' objective in filing this lawsuit is to end the City's contract with SoundThinking, Inc., formerly known as ShotSpotter, Inc., which provides ShotSpotter technology in Chicago. ShotSpotter technology is an acoustic gunshot detection technology used by police departments in more than 150 cities. The technology functions through an array of acoustic sensors designed to first detect and then identify the location of gunshots utilizing a triangulation process. *See ShotSpotter Respond FAQ*, ShotSpotter, https://www.shotspotter.com/faqs/shotspotter-respond-faqs/ (last visited Dec. 6, 2023). A ShotSpotter alert results in an officer being dispatched to a location. And, like officers being dispatched to a location provided during a 911 call, there is nothing inherently unconstitutional about officers responding to a ShotSpotter alert. However, with no factual support, Plaintiffs conclude or assume that officers *systematically* violate the Constitution *after* they arrive at a ShotSpotter-identified location.

For years, Plaintiffs—and particularly Organizational Plaintiff Lucy Parsons Labs ("LPL")—have opposed the Chicago Police Department's ("CPD") use of the ShotSpotter technology in Chicago. LPL continues to lead a long-established movement at #StopShotSpotter and openly advocates for the termination of the contract. This is LPL stated "mission." LPL insists that "[e]ven if this technology was completely accurate . . . we still believe this contract should be canceled." *Chicago: Cancel the ShotSpotter Contract Now*, Lucy Parsons Labs, https://lucyparsonslabs.com/posts/end-ShotSpotter/ (last visited Dec. 6, 2023). LPL's "activism"—now adopted by the individual Plaintiffs—presently takes form in this lawsuit claiming violations of both the Fourth and Fourteenth Amendments and other state law claims.

Plaintiffs' SAC asserts municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and Plaintiffs further appeal to this Court to effectively terminate the City's contract by requesting an order enjoining the City "from continuing to use, operate, or rely upon" the ShotSpotter technology as a law enforcement tool in Chicago. SAC, *Request for Relief* at p.

146. To sufficiently allege a *Monell* claim, Plaintiffs must allege facts to support a reasonable inference that CPD's use of the ShotSpotter technology was the "moving force" that caused the alleged constitutional injuries. Plaintiffs do not allege such facts. The facts alleged, even if proven, do not support, let alone establish that CPD's use of the ShotSpotter technology was the "moving force" behind the constitutional deprivation as alleged. And, for this reason alone, their *Monell* claims must be dismissed.

Moreover, the SAC is legally deficient for additional reasons each of which warrants dismissal under Rule 12(b)(6). *First*, as articulated above, Plaintiffs have not properly alleged that the CPD's use of the ShotSpotter technology was the "moving force," which caused the alleged deprivation of federal rights. *Second*, Plaintiffs have not (1) identified an express policy that, when enforced, caused Plaintiffs constitutional harm, or (2) identified a widespread practice of officers conducting unlawful investigatory stops after arriving at a ShotSpotter-identified location. And, without identifying such a practice, Plaintiffs have no factual basis to suggest that City policymakers were aware of the practice or acted in a deliberately indifferent manner. *Third*, Plaintiffs' claim under the Equal Protection Clause is devoid of facts showing the use of the ShotSpotter technology had a discriminatory effect or that the City acted with a discriminatory purpose in its implementation in Chicago. *Fourth*, Plaintiffs do not plead facts reflecting a disparate effect or the "robust" causality required to state an ICRA claim that is based solely on a disparate impact theory. *Finally*, Plaintiffs fail to state cognizable claims for *respondeat superior* against the City.

## LEGAL STANDARD

In the context of a Rule 12(b)(6) challenge, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "Legal conclusions" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,"

should be disregarded. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Instead, the Court must determine whether the SAC's "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## I.  PLAINTIFFS FAIL TO STATE ANY ACTIONABLE CLAIMS UNDER *MONELL*

In Count 1, Plaintiffs Scruggs and Ortiz, and Organization Plaintiff LPL seek to hold the City liable under *Monell* for purported violations of the Fourth Amendment alleging that the City has "adopted and maintained express policies and widespread practices" regarding the ShotSpotter technology "as well as explicit decisions of officials with final policymaking authority," which resulted "in illegal investigatory stops." SAC ¶¶ 146, 460. Likewise, in Count 12, Plaintiff Williams seeks to hold the City's liable for "maintaining policies and practices directing CPD officers to regard ShotSpotter alerts as providing the 'precise location' of a gunshot," and for the City's alleged failure to train and supervise its officers about the use of the ShotSpotter technology in criminal investigations and proceedings, which purportedly lead to officers "misusing the technology to the detriment of those suspected of crimes" and, in particular, to "initiate criminal proceedings against Plaintiff Williams." SAC ¶¶ 564-69. Lastly, Plaintiffs contend that the alleged conduct was "ratified by decision makers with final policymaking authority." *Id.*

To properly allege a *Monell* claim, Plaintiffs must show constitutional injuries caused by (1) the enforcement of an express policy of the City, (2) has a widespread practice that is so permanent and well-settled that it constitutes a custom or practice of the City, or (3) the actions of a person with final policymaking authority. *See Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Plaintiffs' claims are based on all three theories. For each theory to survive a motion to dismiss, Plaintiffs must not only show a policy, practice, or official action, but must also plead sufficient factual content demonstrating the "direct causal link." In other words, Plaintiffs must show that the policy, practice, or official action was the "moving force" behind the constitutional deprivations. *Thomas v. Nennah Joint Sch. Dist.*, 74

3

F.4th 521, 524 (7th Cir. 2023). For the reasons below, Plaintiffs do not allege facts showing an unconstitutional express policy, an unconstitutional widespread practice, or an actionable decision of a final policymaker, much less facts showing the required causal link or "moving force" behind the alleged constitutional harm.

### A. Plaintiffs Do Not Identify an Express Policy That Was the Moving Force That Caused Their Injuries.

Plaintiffs allege officers responding to ShotSpotter alerts have made "scores of illegal stops and arrests" in violation of the Fourth Amendment (SAC ¶ 5), recite the general *Monell* elements, and conclude the City's "express policies" caused their injuries (*id.* ¶¶ 146, 492). Plaintiffs do reference two CPD policies, but they fail to allege facts suggesting that the policies are unconstitutional or that the policies caused a deprivation of their rights under the Fourth or Fourteenth Amendments.

### 1. The ShotSpotter Flex Program (Special Order S03-19).

Plaintiffs reference CPD's ShotSpotter Flex Program, which is set forth in Special Order S03-19 (the "ShotSpotter Flex Program"). *Id.* ¶¶ 147-48, 150. A copy of the ShotSpotter Flex Program is attached as Exhibit A. This policy "informs" officers of the CPD's "use of the ShotSpotter Flex Program as part of the department's "Gang Violence Reduction Strategy."[1] *See* ShotSpotter Flex Program (Ex. A) § I.A. The ShotSpotter Flex Program explains that the ShotSpotter technology is "intended to enhance the department's ability to respond effectively to investigate violent crime involving gunfire." *Id.* § IV.A. The technology further guides officers by "assisting responding officers to quickly identify victims and in providing aid." *See id.* § IV. C.2. Officers responding to a ShotSpotter Alert are directed to "take a safe and strategic approach while responding to the incident, being aware that . . . offenders may be on scene," and to "canvass" a recommended "25-meter radius" surrounding

---

[1] CPD's "Gang Violence Reduction Strategy" is designed to combat "murders, shootings, and general violence related to gang activity." *See* General Order G10-01.

4

the location for "victims, evidence, and witnesses." *See id.* § VII. C.2, 5.

The ShotSpotter Flex Program does not instruct officers to detain residents based on a ShotSpotter alert alone. *See* SAC ¶ 150. Likewise, it does not direct officers to rely upon the "precise location" for reasonable articulable suspicion or probable cause. Instead, it admonishes responding officers to "follow the procedures" in CPD's written directives titled "Preliminary Investigations," which includes the Investigatory Stop System Policy ("Investigatory Stop Policy") detailed in Special Order S04-13-09. *See* ShotSpotter Flex Program (Ex. A) § VII. C.3; SAC ¶¶ 147-48, 150. The ShotSpotter Flex Program is therefore a facially neutral policy that directs officers responding to a ShotSpotter alert to follow the Investigatory Stop Policy should the "totality of the circumstances" warrant an investigatory stop. Accordingly, the ShotSpotter Flex Program cannot be the "express policy" that caused any violation of Plaintiffs' constitutional rights.

### 2. Investigatory Stop Policy (Special Order S04-13-09).

Special Order S04-13-09 (the "Investigatory Stop Policy") is the second policy referenced by Plaintiffs. This policy details the procedures officers must follow to conduct a constitutionally compliant investigatory stop. *See* SAC ¶¶ 159, 486. A copy of the Investigatory Stop Policy is attached as Exhibit B. Plaintiffs correctly allege that the Investigatory Stop Policy is CPD's official policy and requires officers to possess the constitutionally required "reasonable articulable suspicion" prior to conducting an investigatory stop. *Id.* This directive instructs officers that "reasonable articulable suspicion depends on the totality of the circumstances," including the "reasonable inferences that are drawn" from an officer's "training and experience." *Id.* at § II.C. The policy provides that to conduct an investigatory stop, an officer "must possess specific and articulable facts which, combined with rational inferences from these facts, reasonably warrant a belief that the suspect is committing, is about to commit, or has committed a criminal offense." *Id.* at § II.C.1. The policy further prohibits "racial profiling or other bias-based policing when conducting Investigatory Stops." *Id.* at § III.E.  Plaintiffs

also concede the constitutionality of the Investigatory Stop Policy, which is consistent with Judge Leinenweber's determination that CPD's Investigatory Stop Policy complies with the Fourth Amendment. *Hall v. City of Chicago*, No. 12 C 6834, 2012 WL 6727511, *8 (N.D. Ill. Dec. 28, 2012) (J. Leinenweber). SAC ¶¶ 159, 486. Based on the directives of the Investigatory Stop Policy and prohibitions on racial profiling, and Plaintiffs' concession, the policy cannot be the "express policy" that caused Plaintiffs' alleged constitutional injuries.

### 3. Plaintiffs Fail to Allege That Either Express Policy Was the Moving Force Behind Their Constitutional Injuries.

Plaintiffs fail in their burden to plead that either of the two policies identified, the ShotSpotter Flex Program or the Investigatory Stop Policy, were the "moving force" behind the alleged constitutional harms. *See Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008); *Anderson*, 2020 WL 5891406, at *3. Instead, Plaintiffs repeatedly allege that the ShotSpotter technology is "unreliable" but do not show the causal link between the alleged unreliability of the technology and the alleged constitutional harms. Plaintiffs' boilerplate allegations and unsupported assumptions do not fill the gap. Plaintiffs fail to show a plausible inference that the ShotSpotter Flex Program (1) directs officers to conduct unlawful "investigatory stops" that "lead to illegal searches and seizures," (2) directs detectives to rely on the "precise location" of an alert to establish probable cause, or (3) was the moving force behind their alleged constitutional injuries. SAC ¶¶ 146, 149, 460; *see Peterson v. City of Chicago*, No. 14-CV-9881, 2015 WL 13882814, at *3 (N.D. Ill. June 23, 2015) ("'boilerplate' statements that repeat the elements of a *Monell* claim without any further factual content have been dismissed for failure to state a claim").

Contrary to Plaintiffs' conclusory assertions, the ShotSpotter Flex Program does not direct officers to conduct an investigatory stop or effectuate arrests in response to an alert. Instead, the policy incorporates and directly orders officers responding to ShotSpotter alerts to follow CPD policies and investigate the circumstances of the alert. *See Alcorn v. City of Chicago*, No. 17 C 5859, 2018 WL 3614010,

at *16 (N.D. Ill. July 27, 2018) (noting that the policy itself was "[not] unconstitutional at all"). Without more Plaintiffs failed to meet their burden by failing to show that either of the official policies was the "moving force" that caused their alleged constitutional harm.

**B.    Plaintiffs Failed to Show a Widespread Practice that Caused Their Constitutional Injuries.**

A widespread practice or custom under *Monell* is established through "facts tending to show that the City was aware of the [allegedly unconstitutional] behavior of its officers, or that the activity was so persistent and widespread that the City should have known about the behavior." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). Plaintiffs "must show that the practices were 'so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision.'" *Arquero v. Dart*, 587 F. Supp. 3d 721, 728 (N.D. Ill. 2022) (quoting *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006)).

**1.    Plaintiffs Fail to Identify a Widespread Practice of Unconstitutional Investigatory Stops that was the Moving Force Behind their Constitutional Injuries.**

There is no widespread practice of *unconstitutional* investigatory stops or seizures identified in the 633-paragraph SAC. Plaintiffs rely on only two instances of allegedly unconstitutional stops initiated in response to a ShotSpotter alert—the claims of Plaintiffs Ortiz and Scruggs (*see* SAC ¶¶ 178, 297-449)—and the arrest of Williams (*see id.* ¶¶ 248-85). Plaintiffs offer no allegations to suggest a widespread practice concerning arrests arising from ShotSpotter alerts. To create the appearance of a widespread practice concerning investigatory stops, Plaintiffs rely heavily upon the City's Office of Inspector General's August 2021 Report, titled *The Chicago Police Department's Use of ShotSpotter Technology* ("OIG Report"). A copy of the OIG Report is attached as Exhibit C. Plaintiffs allege that from January 1, 2020, to May 31, 2021, CPD officers responded to 50,176 ShotSpotter alerts. *See* SAC ¶ 48. According to Plaintiffs, the responding officers only conducted 1,056 investigatory stops upon arriving at the ShotSpotter-identified location (*id.* ¶ 128), meaning an investigatory stop only occurred 2.1% of

the time following an officer's arrival at dispatched location. Neither Plaintiffs nor the OIG Report found any of the 1,056 investigatory stops *unconstitutional*. Put differently, Plaintiffs allege that CPD's use of the ShotSpotter technology has created a widespread practice of "illegal investigatory stops and arrests," and in support of their proposition, Plaintiffs cite 1,056 *lawful* investigatory stops. Thus, Plaintiffs can only rely on two instances of allegedly unconstitutional stops or seizures initiated in response to a ShotSpotter alert: the allegations of Plaintiffs Ortiz and Scruggs. Two incidents of unconstitutional investigatory stops, however, are insufficient to show the existence of a widespread practice. *See Ramos v. City of Chicago*, 707 F. Supp. 345, 347 (N.D. Ill. 1989) ("six incidents of police brutality over a ten-year period . . . in no way indicates a policy or custom"); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (three incidents insufficient to establish a widespread practice). Thus, Plaintiffs fail to show the existence of a widespread practice so permanent and well-settled that it constitutes a custom or practice of the City.

Moreover, without establishing the existence of a widespread practice, Plaintiffs cannot logically show any such practice was the "moving force" behind any alleged constitutional harm. *See Carmona v. City of Chicago*, No. 15-CV-462, 2018 WL 306664, at *2 (N.D. Ill. Jan. 5, 2018) ("Courts in this District regularly dismiss *Monell* claims where the plaintiff has failed to allege instances other than that from which he suffered.").

The Seventh Circuit's decision in *White v. City of Chicago*, 829 F.3d 837 (7th Cir. 2016),[2] does not dictate a different result. The *White* court found that the plaintiff was not required to identify other individuals harmed by the same unconstitutional practice to state a plausible *Monell* claim because other factual content presented, i.e., a defective boilerplate arrest warrant, also supported a plausible inference that the alleged unconstitutional practice existed. The *White* decision found that taken

---

[2] The Court specifically cited to *White* in the Court's October 16, 2023 Minute Entry Order (Dkt. 206).

together the standardized form and plaintiff's individual experience was sufficient to factually support a *Monell* claim under Rule 8. *See also Johnson v. Cook County Sheriff's Office*, 2018 WL 2193235, at *4 (N.D. Ill. May 14, 2018). Here, no such "other factual content" exists. And, Plaintiffs failed to plead "enough factual content" to support a plausible inference that the City's practices the "moving force" behind the Plaintiffs' purported constitutional harm. *Iqbal*, 556 U.S. at 678; *see also Anderson v. Allen*, No. 1:19-CV-02311, 2020 WL 5891406, at *4 (N.D. Ill. Oct. 5, 2020).

      **2.**      **Plaintiffs Do Not Allege Any Facts to Support That City Policymakers Had Actual or Constructive Knowledge of a Widespread Practice of Unconstitutional Stops.**

      **a.**      **The OIG Report Does Not Demonstrate Awareness.**

Plaintiffs cannot show that City policymakers had actual or constructive knowledge of constitutional violations. Plaintiffs' claim that the OIG Report put City policymakers on notice falls short. Plaintiffs' allegations do not provide how City policymakers had actual or constructive knowledge of anything more than 1,056 lawfully conducted investigatory stops and the OIG's findings and conclusions. The OIG found that "ShotSpotter alerts rarely produce document evidence of a gun-related crime, *rarely give rise to investigatory stops*, and even less frequently lead to the recovery of gun-crime related evidence," and based on its review of *three* Investigatory Stop Reports, the OIG makes passing reference to some anecdotal "evidence that CPD members' generalized perceptions of the frequency of ShotSpotter alerts in a given area *may* be substantively changing policing behavior." OIG Report, p. 22 (emphasis added). The OIG Report concluded that "[t]he operational value of ShotSpotter is ultimately a question of relative costs and benefits" that requires more data and analysis. *Id.* Accordingly, the OIG Report does not support Plaintiffs' assertions that the alleged widespread practice exists and cannot demonstrate that City policymakers knew or should have known of a (non-existent) widespread practice of improper investigatory stops or arrests by CPD officers.

      **b.**      **Individual Plaintiffs' Alleged Stops Did Not Create Awareness.**

Critically, Plaintiffs allege no facts suggesting that City policymakers knew or should have known about the alleged incidents involving Scruggs, Ortiz, and Williams. Therefore, these three incidents cannot establish that City policymakers knew or should have known that the use of the ShotSpotter technology was prompting a widespread practice among officers to conduct improper stops or arrests targeting anybody, much less practice of "racially" targeting Black and Latinx residents.

### c. Articles, Testimony, Public Statements and Other Studies Do Not Demonstrate Awareness.

The article concerning a study conducted by the South Shore Weekly, public statements, testimony in the City Council, and other unidentified studies did not place City policymakers on notice about any alleged unconstitutional investigatory stops. SAC ¶¶ 473-74. While Plaintiffs allege that these studies and other forms of notice informed the City that ShotSpotter technology was "inaccurate and unreliable," they fail to allege any facts that they informed the City policymakers of a widespread practice of unconstitutional investigatory stops or arrests by officers.

### C. Plaintiffs Allege Insufficient Facts to Establish That the City Was Deliberately Indifferent to Any Alleged Unconstitutional Practice.

### 1. Without Facts to Support Knowledge of a Widespread Practice, Plaintiffs Cannot Establish Deliberate Indifference.

Since Plaintiffs have not pled sufficient facts to show the existence of an unconstitutional widespread practice, much less that City's policymakers knew or should have known of any such practice, it follows that Plaintiffs cannot and do not plead facts demonstrating that City policymakers acted in deliberately indifferent manner. Deliberate indifference in the context of a *Monell* claim means that "'a reasonable policymaker [would] conclude that the plainly obvious consequences' of the City's actions would result in the deprivation of a federally protected right." *Gable*, 296 F.3d at 537 (*citing Board of County Com'srs of Bryant County, Okl. v. Brown*, 520 U.S. 397, 404 (1997) (a plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.")). Plaintiffs offer no facts suggesting as much here, and their claims must be dismissed.

### 2. Plaintiffs Fail to Show the City Was Deliberately Indifferent in Its Training or Supervision of CPD Officers.

Plaintiffs also allege in a conclusory fashion that the City failed to train or supervise its officers (SAC ¶ 485), but they do not allege facts to satisfy the standard for such a claim. The City's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). Rather than alleging any such facts, Plaintiffs repeatedly assert that the City "failed to inform officers that a person's mere presence with the vicinity of a ShotSpotter alert does not supply lawful justification for an investigatory stop or other search or seizure," and that the City allegedly "fail[ed] to supervise, train, CPD officers with respect to the proper use of ShotSpotter in criminal investigations" among other shortcomings. *See* SAC ¶¶ 153-58, 564. To make such allegations, Plaintiffs ignore the instructions officers receive through CPD directives, such as the ShotSpotter Flex Program and the Investigatory Stop Policy as discussed *supra* in Section I.A.

Additionally, Plaintiff Williams conclusory allegation that CPD's "failure to train and supervise its officers about the use of the ShotSpotter technology in criminal investigations and proceedings" was deliberately indifferent is insufficient to plead a *Monell* claim. SAC ¶¶ 564-56. A plaintiff must allege facts showing that "the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Darko v. City of Chicago*, Case. No. 21-cv-6467, 2023 WL 5334600, at *9 (N.D. Ill. Aug. 19, 2023) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390–391 (1989)). Plaintiff Williams has not pled the requisite facts. Accordingly, Plaintiffs allege no facts suggesting that the City failed to train or supervise officers, much less any facts suggesting that the City was deliberately indifferent to any alleged deficiency related to training on the ShotSpotter technology or supervision regarding its use by officers.

## II. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE.

To plead a violation of the Equal Protection Clause ("EPC"), Plaintiffs must allege both that "the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). Plaintiffs claim that the City deliberately chose to "blanket" 12 police districts with overwhelmingly Black and Latinx neighborhoods "for the purpose of targeting the people in those neighborhoods . . . to unlawful seizures, false arrests, and police violence[.]" SAC ¶¶ 176-77. Yet, Plaintiffs fail to plead facts that CPD's deployment decisions had a racially discriminatory effect on Black and Latinx individuals in ShotSpotter areas or that the City's deployment decisions were motivated by a racially discriminatory purpose.

### A.     Plaintiffs Fail to Allege Discriminatory Effect.

To plead discriminatory effect, Plaintiffs must allege "[(i)] that they are members of a protected class, [(ii)] that they are otherwise similarly situated to members of the unprotected class, and [(iii)] that [they] were treated differently from members of the unprotected class." *Chavez*, 251 F. 3d at 636. Plaintiffs fail to meet these essential elements by not alleging any facts to demonstrate that Black and Latinx individuals, including Plaintiffs, were treated differently from other similarly situated individuals such that the deployment of ShotSpotter resulted in higher rates of unjustified stops and arrests or reduced access to police services for Black and Latinx individuals.

Because ShotSpotter is race-neutral—it is a sound detection system designed to identify the time and location of gunshots, which does not identify, or account for, race or ethnicity in any respect—Plaintiffs must allege facts demonstrating a racially discriminatory effect based on the implementation of ShotSpotter. Plaintiffs' allegations, however, fall short. Plaintiffs allege that CPD's decision to deploy ShotSpotter technology in 12 majority-Black and Latinx police districts adversely harms minorities within those districts by (1) putting Black and Latinx persons within those districts at greater risk for unlawful "investigatory stops, arrests and uses of force" than residents living in majority-White districts; (2) changing police behavior within those 12 police districts; and (3) diverting

police resources contributing to delays in 9-1-1 response times. SAC ¶¶ 497-99. However, Plaintiffs' allegations are conclusory and fail to show that Black and Latinx individuals are treated differently because of the deployment of ShotSpotter. *See Chriswell v. Vill. of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at *11 (N.D. Ill. Nov. 4, 2013) (dismissing EPC claim where the plaintiff failed to allege that she was subject to different treatment than similarly situated individuals).

While Plaintiffs allege that "Black and Latinx people are being stopped, arrested, and abused by the CPD during hostile police deployments at much higher rates than White people, *solely because* of the City's discriminatory ShotSpotter program," Plaintiffs present no allegations to substantiate such an assertion. *See* SAC ¶ 202 (emphasis added). There are no facts alleging differences in (i) investigatory stops, arrests, or uses of force between Black and Latinx individuals and White people (let alone unlawful police actions), (ii) officer behavior, or (iii) allocation of police resources to support the claim that *ShotSpotter deployments* adversely impacted Black or Latinx persons.

While Plaintiffs allege that "Black people were 11.7 times more likely to face a use of force following an investigatory stop than non-Black people[,]" Plaintiffs do not link such City-wide data to ShotSpotter deployment, nor do they allege that this "use of force" was caused by or related to ShotSpotter. *Id.* at ¶ 203. Plaintiffs also fail to offer any statistical or non-statistical allegations of unlawful investigatory stops, arrests, uses of force, and/or 9-1-1 response times: (a) before and after the deployment of ShotSpotter within the 12 selected districts; or (b) comparing such alleged police activities in the majority-White districts compared to the ShotSpotter-selected districts. While Plaintiffs rely on city-wide data that "400,000 high priority (Priority 1 or 2) calls for police service city-wide came in when there were no police available to respond," they offer no factual support that ShotSpotter contributes to that problem. *Id.* at ¶ 209. Plaintiffs fail to address equally plausible explanations such as staffing shortages or call volume. *Id.* at ¶¶ 206-09. Finally, Plaintiffs also fail to allege that White individuals within the ShotSpotter districts are treated differently compared to Black

13

and Latinx individuals.

Without such allegations, there is no basis to make the inferential leap to the conclusion that Black and Latinx individuals are subject to racially discriminatory CPD interactions *because of* the deployment of ShotSpotter in certain districts. *See Williams v. Cook Cnty.*, No. 18 C 1456, 2018 WL 4361946, at *8 (N.D. Ill. Sept. 13, 2018) ("It is insufficient that Plaintiffs allege the new policy negatively affects members of a protected class; they must allege that similarly situated parties are treated differently.").

### B. Plaintiffs Fail to Allege Discriminatory Purpose.

Plaintiffs' EPC claim also fails because they have not sufficiently alleged that the City "'acted with discriminatory purpose.'" *Chavez*, 251 F.3d at 645 (quoting *McKleskey v. Kemp*, 481 U.S. 279, 292 (1987)). Plaintiffs' repeated reliance on conclusory assertions that CPD "purposely blanketed" and "purposely placed" ShotSpotter throughout the City along racial lines, without more, cannot state an EPC claim. SAC ¶¶ 1, 176, 188, 200, 501.

"Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Martinez v. City of Chicago*, 534 F. Supp. 3d 936, 950 (N.D. Ill. 2021) (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 454 (7th Cir. 1996)). Plaintiff must show that the City "adopted [a] policy *because of, not in spite of or with indifference to*, its effect on" Plaintiffs. *Bond v. Atkinson*, 728 F.3d 690, 693 (7th Cir. 2013) (emphasis added). Moreover, the required level of factual specificity rises with the complexity of the claim. *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011).

Plaintiffs' conclusory assertions that the City has "consistently and deliberately chosen to deploy ShotSpotter only in overwhelmingly Black and Latinx neighborhoods for the purpose of targeting the people in those neighborhoods" amount to nothing more than a formulaic recitation of

the elements of an Equal Protection claim and should be disregarded. SAC ¶ 176. In *Ashcroft v. Iqbal*, the Supreme Court explained that markedly similar allegations were "bare assertions . . . [that] amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim," 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555); *McCauley*, 671 F.3d 616–17 ("facts" that are actually legal conclusions or elements of the cause of action, should be disregarded on a motion to dismiss).

The SAC is devoid of any facts that address the decision-making process concerning the deployment of ShotSpotter, let alone facts that show the City acted with discriminatory purpose. Plaintiffs do not offer any facts pointing to specific internal policies or practices reflecting an intent to target minorities and their communities. *See supra* Section I. Similarly, there are no factual allegations of any statements or directives by CPD decision-makers reflecting that Black and Latinx populations were intentionally singled out. *See Quinn v. Bd. of Educ. of the City of Chicago*, 234 F. Supp. 3d 922, 935 (N.D. Ill. 2017) (dismissing equal protection claim where plaintiffs failed to allege any statements that suggested the decision-makers were motivated by race discrimination). Plaintiffs are required to plead a policy of intentional discrimination because of its effect on a particular group. Here, the challenges and nuances of policing in a large, urban city that faces substantial issues with gun violence demand more than the bare assertions of discriminatory purpose that Plaintiffs present.

Plaintiffs' statistical allegations also do not establish discriminatory purpose. *See Chavez*, 251 F.3d at 647–48 ("statistics may not be the sole proof of a constitutional violation"). A statistical pattern of discriminatory impact may demonstrate a constitutional violation only in "rare cases" and limited contexts. *Id.* at 647. Unless the case is within such an exception (e.g., relating to jury venire), the plaintiff is required to allege other non-statistical facts in support of the alleged discriminatory intent. *Id.* at 647–48. Plaintiffs' case does not fall within any recognized *Chavez* exception, and therefore, Plaintiffs' statistical allegations, alone, cannot establish the City's discriminatory purpose or intent in employing ShotSpotter. SAC ¶¶ 190-98; *see Chavez*, 251 F.3d at 647–48; *see also Alston v. City of Madison*,

853 F.3d 901, 908 (7th Cir. 2017) ("[W]e cannot say that mere disparate impact is sufficient to prove discriminatory purpose."); *James v. City of Evanston*, No. 20-CV-00551, 2021 WL 4459508, at \*10 (N.D. Ill. Sept. 29, 2021) (applying *Alston* principles in determining motion to dismiss).

Plaintiffs' reliance on historical trends is equally unavailing to show any discriminatory intent. Although Plaintiffs allege that Chicago has a "history of racial discrimination in policing tactics[,]" Plaintiffs fail to establish the relevance of such allegations to the specific claims in this case. SAC ¶¶ 2, 214, 502. "[G]eneric trends" are not enough to show a "specific sequence of events" that "might reflect a discriminatory motive." *Quinn*, 234 F. Supp. 3d at 935.

Plaintiffs fail to allege a specific sequence of events or "draw any link" between their allegations of historical policing trends in Chicago, and the City's decisions behind the use of ShotSpotter. *See Quinn*, 234 F. Supp. 3d at 935. None of the patterns of unconstitutional police conduct in minority communities are alleged to be caused by, because of, or even related to ShotSpotter. SAC ¶¶ 219-29. Nor do Plaintiffs allege any facts to support their conclusory statement that "ShotSpotter reinforces and fuels CPD's longstanding discriminatory policing practices." *Id.* at ¶¶ 11, 229.

## III.    PLAINTIFFS FAIL TO ALLEGE VIOLATION OF THE ILLINOIS CIVIL RIGHTS ACT.

To state an ICRA claim, plaintiffs must allege that the defendant (1) utilizes "criteria or methods of administration" that (2) "have the effect of subjecting individuals to discrimination because of their race, color, rational origin, or gender." 740 ILCS 23/5(a)(2).[3] To adequately plead an ICRA claim, a plaintiff must identify a specific policy and practice and must allege sufficient facts that demonstrate that the policy or practice has caused a "relevant and statistically significant disparity" between members of affected classes. *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014).

---

[3] ICRA is the state equivalent of federal laws protecting against disparate impact discrimination in the housing and employment contexts, and accordingly federal precedent under Title VI and Title VII cases is applicable. *Jackson v. Cerpa,* 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010).

A. **Plaintiffs Failed to Allege a Specific CPD Policy Or Practice Concerning the Deployment of ShotSpotter Technology.**

Plaintiffs must first identify which criteria and methods of administration are at issue. *See Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.*, 19-cv-3014, 2020 WL 1330654, at *4 (N.D. Ill. Mar. 22, 2020) (dismissing ICRA disparate impact claim because plaintiff failed to identify a specific practice that caused the alleged disparate impact). Plaintiffs fail to do so and simply recite the legal standard, alleging that "criteria and methods the Municipal Defendants have used in determining where to deploy ShotSpotter has resulted in disparate impact on Black and Latinx residents." SAC ¶ 511. Because Plaintiffs have failed to identify a specific policy or practice, Plaintiffs cannot demonstrate that any such policy caused a relevant and statistically significant disparity between Black and Latinx residents and White residents within the affected police districts. *See Swan v. Bd. of Educ, of City of Chicago*, 2013 WL 4401439, at *19 (N.D. Ill. Aug. 15, 2013) (holding that plaintiffs must "isolate[e] and identify" the specific practices responsible for the discrimination); *see also Edmond v. City of Chicago*, 2023 WL 3847098, at *7 (N.D. Ill. 2023).

Instead, Plaintiffs merely allege that CPD "deliberately chose" to deploy ShotSpotter in the districts that have the highest proportion of Black and Latinx residents. SAC ¶ 510. But "it is not enough to simply allege that there is a disparate impact… or point to a generalized policy that leads to such an impact." *Cary*, 2020 WL 1330654, at *4 (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)). Moreover, Plaintiffs' own allegations identify four majority-Black and Latinx police districts (Districts 12, 14, 17, and 22) in which ShotSpotter has not been deployed. SAC ¶ 189. The exclusion of these districts from ShotSpotter deployment belies a policy or practice based on racial demographics. Plaintiffs cannot state an ICRA claim based solely on the generalized policy of deploying ShotSpotter in some, but not all, majority-Black and Latinx districts across the City.

B. **Plaintiffs Have Not Alleged a Robust Causal Connection.**

Plaintiffs' ICRA claim fails because it does not allege that deployment of ShotSpotter caused

a disparate impact on Black and Latinx Chicagoans. *See supra* Section II.A. The Supreme Court cautioned that "[a] robust causality requirement" is necessary to ensure that disparate-impact liability does not "displace valid governmental and private priorities, rather than solely" removing unnecessary barriers. *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Comm. Project, Inc.*, 576 U.S. 519, 544 (2015) (internal citation omitted). This "robust causality requirement ensures that 'racial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* at 542 (quotations omitted). To plead the "robust causality requirement," a plaintiff needs to explain how the policy at issue "will *cause* a racially disparate impact, as distinct from just resulting in a disparate impact." *TBS Group, LLC v. City of Zion, Illinois*, No. 16-cv-5855, 2017 WL 5129008, at \*9 (N.D. Ill. Nov. 6, 2017) (emphasis in original).

### 1. Plaintiffs' Reliance on Pre-Existing Disparities Fails to Support Their ICRA Claim.

Plaintiffs do not allege facts sufficient to demonstrate a causal connection between ShotSpotter deployment and disparate harms. Plaintiffs merely point to pre-existing disparities that are disconnected and independent from ShotSpotter deployment. In support of their claim, Plaintiffs list general statistics regarding the City's demographics disparities in the twelve police districts where ShotSpotter was deployed alleging that each district has a population of more than 65% Black or Latinx residents and none have more than 25% White residents (SAC ¶¶ 186-88) and a total of 80% of Black and 65% of Latinx Chicagoans live "under ShotSpotter footprint" compared to "only 30% of White Chicagoans." (*Id.* ¶ 190). To the extent the SAC suggests that officers' responses to ShotSpotter alerts disproportionately impacts Black and Latinx residents within those districts, Plaintiffs' allegations have not shown that these disparities are because of ShotSpotter, rather than due to pre-existing demographic trends on the West and South Sides of Chicago. *See Inclusive Comm. Project, Inc. v. Heartland Comm. Ass'n, Inc.*, 399 F. Supp. 3d 657, 668 (N.D. Tex. 2019) ("[t]he statistical racial disparities relied upon by [plaintiff] preexisted the enactment of the policy at issue and, therefore,

18

cannot be shown to have been caused by it.").

### 2. Robust Causality Cannot Be Established by Plaintiffs' Conclusory Allegations of Disparate Harm.

Plaintiffs contend that CPD's "disparate deployment of ShotSpotter directly produces disparate harm." SAC ¶ 512. Like their Equal Protection claim, Plaintiffs ICRA claim relies upon the same conclusory allegations to establish a disparate impact and for the reasons set forth above, *supra* Section II.A, Plaintiffs have failed to plead facts establishing a disparate effect.

Additionally, Plaintiffs must produce "statistical evidence demonstrating a causal connection" between ShotSpotter and these disparities, and Plaintiffs have not done so here. *Inclusive Communities*, 576 U.S. at 543. The statistical evidence offered by Plaintiffs fails to connect the ShotSpotter technology to the racial component of the persons being stopped or arrested. Neither the OIG report nor the SAC provide any allegations showing the relationship between ShotSpotter notifications and the racial demographics of those stopped or arrested. Indeed, there are zero allegations related to the effect of ShotSpotter alerts on the Black and Latinx population as compared to the White population related to investigatory stops and arrests. Accordingly, these statistics are insufficient to demonstrate Plaintiffs' racial discrimination claims and fail to show that ShotSpotter caused any disparities. *See Munguia v. Illinois*, No. 10 C 0055, 2010 WL 3172740, at *8 (N.D. Ill. 2010) (holding that an ICRA claim requires "proof that Plaintiffs were treated differently, due to their race than other similarly situated persons").

Moreover, missing are any statistical allegations that Black or Latinx Chicagoans are more likely than other racial groups to be subjected to *excessive, illegal, or unconstitutional* use of physical force by police "that could be linked to ShotSpotter." SAC ¶ 204. Indeed, while Plaintiffs allege that "in 70 of the 82 cases, the person accosted by police was not armed with a gun," (*id.*), these allegations do not state that the use of force was unjustified, excessive, or unconstitutional. *See Marion v. City of Corydon, Indiana*, No. 4:07-cv-0003, 2007 WL 9734296, at *4 (S.D. Ind. Dec. 3, 2007) (to state a claim

for constitutional violation, a plaintiff needs to allege a violation of a constitutional right, e.g., to be "free from excessive, unreasonable, and unjustified use of force against his person"). Without such facts, Plaintiffs' allegations that "[a]ll eighty-two of the people that CPD used force against during these ShotSpotter deployments were Black and Latinx, except for four whose race CPD lists as 'unknown[,]'" fails to state that ShotSpotter caused a violation of constitutional rights. SAC ¶ 204.

In sum, while Plaintiffs allege general pre-existing demographic disparities, historical discrimination statistics, and ShotSpotter data, they fail to connect these, let alone demonstrate that ShotSpotter caused these disparities. This failure puts this case squarely among those in which courts, following the roadmap created by the Supreme Court in *Inclusive Communities*, have dismissed disparate impact claims for a failure to satisfy the causality requirement. *See, e.g., Adams*, 742 F.3d at 733; *Cesario v. Jewel Food Stores, Inc.*, No. 17 CV 319, 2017 WL 5152348, at *4 (N.D. Ill. 2017).

## IV. PLAINTIFFS' STATE LAW CLAIMS FOR RESPONDEAT SUPERIOR IN COUNTS X AND XXII SHOULD BE DISMISSED.

*Respondeat superior* does not create an independent cause of action. *See, e.g., Wilson v. Edward Hosp.*, 981 N.E.2d 971, 980 (Ill. 2012) ("We conclude that actual agency and apparent agency are not causes of action …."); *Winn v. City of Chicago*, No. 20 C 5246, 2022 WL 80272, at * 7 (N.D. Ill. Jan. 6, 2022) ("[T]he court agrees that *respondeat superior* is not a basis for an independent claim; it is instead a theory on which the City can be held liable for torts committed by officers."). Plaintiffs plead *respondeat superior* as an independent claim, not a theory of liability. Those counts must be dismissed.

## CONCLUSION

For all the above reasons, Defendant City of Chicago request that this Court grant their motion to dismiss the Complaint and provide any further relief it deems necessary and just. [4]

---

[4] Attachment of the ShotSpotter Flex Program and other exhibits are proper and do not convert this motion into one for summary judgment. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("It is well settled that in deciding a Rule 12(b)(6) motion, a court may consider documents attached to a motion

Dated: December 8, 2023

Respectfully submitted,

**CITY OF CHICAGO**

*/s/ Michael P. Sheehan*

One of their Attorneys

Michael P. Sheehan
Allan T. Slagel
Barton O'Brien
Ioana M. Guset
Yeoeun C. Yoon
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone:      (312) 527-4000
Facsimile:      (312) 527-4011
Email:          msheehan@ taftlaw.com
                aslagel@taftlaw.com
                bobrien@taftlaw.com
                iguset@taftlaw.com
                yyoon@taftlaw.com

129759342v13

---

to dismiss . . . if they are referred to in the plaintiff's complaint and are central to the claim.") (internal quotations and citation omitted).