**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL WILLIAMS, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-3773 |
| | ) | |
| CITY OF CHICAGO, et al. | ) | Judge Lindsay C. Jenkins |
| | ) | Magistrate Judge Young B. Kim |
| Defendants, | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT
CITY OF CHICAGO'S MOTION TO DISMISS**

Elizabeth Mazur
Hughes Socol Piers Resnick & Dym
70 W. Madison Street, Suite 4000
Chicago, IL 60602
(312) 580-0100
emazur@hsplegal.com

Daniel Massoglia
Joseph DiCola
Emma Melton
First Defense Legal Aid
601 S. California Avenue
Chicago, Illinois 60612
(708) 797-3066
daniel@first-defense.org

Jonathan Manes
Alexa Van Brunt
Sarah Blatt-Herold
MacArthur Justice Center
160 E. Grand Avenue, 6th Floor
Chicago, Illinois 60615
(312) 503-0012
jonathan.manes@macarthurjustice.org

Megha Ram
MacArthur Justice Center
501 H Street NE, Suite 275
Washington, DC 20002
megha.ram@macarthurjustice.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

SUMMARY OF RELEVANT FACTUAL ALLEGATIONS .......................................................... 1

    A.    ShotSpotter Alerts are Untested, Frequently Inaccurate, and Provide Officers with Unreliable Information ............................................................................................. 1

    B.    The City's Policy and Custom of Using ShotSpotter Alerts to Effectuate Unlawful Investigatory Stops. ........................................................................................... 2

    C.    The City's Racially Discriminatory Deployment of ShotSpotter and the Numerous Harms that it Causes in the Black and Latine Community. ....................................... 5

LEGAL STANDARD .............................................................................................................. 6

ARGUMENT ........................................................................................................................ 6

I.    PLAINTIFFS LUCY PARSONS LABS, ORTIZ, AND SCRUGGS HAVE PLAUSIBLY ALLEGED A *MONELL* FOURTH AMENDMENT CLAIM. ......................................... 7

    A.    Plaintiffs Have Plausibly Alleged that the City, Through Its ShotSpotter Policies and Customs, Knowingly and Deliberately Caused Unconstitutional Investigatory Stops. 8

    B.    The City's Motion Asks the Court to Impose a Heightened Pleading Burden, Ignore Plaintiffs' Actual Allegations, and Draw Inferences in its Favor. .......................... 10

II.    PLAINTIFFS LUCY PARSONS LABS, ORTIZ, AND SCRUGGS HAVE PLAUSIBLY ALLEGED THAT THE CITY'S DISCRIMINATORY SHOTSPOTTER DEPLOYMENT VIOLATES EQUAL PROTECTION. ................................................ 14

III.    PLAINTIFFS LUCY PARSONS LABS, ORTIZ, AND SCRUGGS HAVE PLAUSIBLY ALLEGED A CLAIM UNDER THE ILLINOIS CIVIL RIGHTS ACT BECAUSE THE CITY'S USE OF SHOTSPOTTER HAS DISPARATE ADVERSE IMPACTS ON BLACK AND LATINE RESIDENTS. .............................................................................. 16

IV.    PLAINTIFF WILLIAMS HAS PLAUSIBLY ALLEGED A *MONELL* CLAIM AGAINST THE CITY. .......................................................................................................... 19

V.    PLAINTIFFS HAVE PROPERLY ALLEGED *RESPONDEAT SUPERIOR* LIABILITY AGAINST THE CITY. ......................................................................................... 20

CONCLUSION .................................................................................................................... 20

i

# TABLE OF AUTHORITIES

## Cases

*Alabama v. White,*
    496 U.S. 325 (1990) ............................................................................................................. 9, 10

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................................. 6

*Bartholet v. Reishauer AG (Zürich),*
    953. F. 2d 1073 (7th Cir. 1992) .............................................................................................. 20

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,*
    520 U.S. 397 (1997) ................................................................................................................. 7

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................................. 6

*Bennett v. Schmidt,*
    153 F.3d 516 (7th Cir. 1998) ................................................................................................. 20

*Cent. Austin Neighborhood Ass'n v. City of Chicago,*
    1 N.E.3d 976 (Ill. App. Ct. 1st Dist. 2013) ..................................................................... 16, 19

*Davis v. City of New York,*
    959 F. Supp. 2d 324 (S.D.N.Y. 2013) ................................................................................... 16

Florida v. Harris,
    568 U.S. 237 (2013) ........................................................................................................... 9, 10

*Glisson v. Indiana Dep't of Corr.,*
    849 F.3d 372 (7th Cir. 2017) ............................................................................................... 7, 8

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960) ............................................................................................................... 14

*J.K.J. v. Polk County,*
    960 F.3d 367 (7th Cir. 2020) ........................................................................................... 19, 20

*L.A. County v. Humphries,*
    562 U.S. 29 (2020) ................................................................................................................... 7

*McQueen v. City of Chicago,*
    803 F. Supp. 2d 892 (N.D. Ill. 2011) .............................................................................. 17, 18

*Miller v. Johnson,*
    515 U.S. 900 (1995) ............................................................................................................... 14

*Monell v. N.Y. City Dep't of Soc. Servs*,
    436 U.S. 658 (1978) ................................................................................................8

*Moranski v. Gen. Motors Corp.*,
    433 F.3d 537 (7th Cir. 2005) ...............................................................................17

*Mwangangi v. Nielsen*,
    48 F.4th 816 (7th Cir. 2022) ..................................................................................8

*Pers. Admin. of Mass. v. Feeney*,
    442 U.S. 256 (1979) ..............................................................................................15

*Powell v. Illinois*,
    18-cv-6675, 2019 WL 4750265 (N.D. Ill. Sept. 30, 2019) ...............................17

*Santiago v. Walls*,
    599 F.3d 749 (7th Cir. 2010) ..................................................................................6

*Shaw v. Reno*,
    509 U.S. 630 (1993) ..............................................................................................14

*Smith v. City of Chicago*,
    143 F. Supp. 3d 741 (N.D. Ill. 2015) ...................................................................16

*Spearman v. Elizondo*,
    230 F. Supp. 3d 888 (N.D. Ill. 2016) ...................................................................13

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ..............................................................................................18

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008) ................................................................................6

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Comm. Project, Inc.*,
    576 U.S. 519 (2015) ..............................................................................................18

*United States v. Bohman*,
    683 F.3d 861 (7th Cir. 2012) ............................................................................9, 10

*United States v. Rickmon*,
    952 F.3d 876 (7th Cir. 2020) .......................................................................8, 9, 10

*Venture Assoc. Corp. v. Zenith Data Sys. Corp.*,
    987 F.2d 429 (1993) ..............................................................................................11

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...................................................................................14, 15, 16

*White v. City of Chicago*,
  829 F.3d 837 (7th Cir. 2016) ........................................................................................... 11, 12

**Statutes**

Illinois Civil Rights Act, 740 ILCS 23/5 ............................................................................. 1, 16

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................................ 6

Fed. R. Civ. P. 8(e) ................................................................................................................ 20

## INTRODUCTION

Defendants attempt for a second time to dismiss Plaintiffs' *Monell* and Illinois Civil Rights Act ("ICRA") claims. Its arguments, however, boil down to a request for the Court to impose a heightened pleading burden on the Plaintiffs and to draw factual inferences in its favor. That approach is doomed. Plaintiffs have filed a 500+ paragraph complaint that alleges, more than plausibly, that the City's policies, practices, and decisions with respect to ShotSpotter violate the Fourth Amendment, Equal Protection Clause, and ICRA.

## SUMMARY OF RELEVANT FACTUAL ALLEGATIONS

### A. ShotSpotter Alerts are Untested, Frequently Inaccurate, and Provide Officers with Unreliable Information.

ShotSpotter is a noise detection system deployed in Chicago that purports to identify the sound and location of gunfire. Second Amended Complaint ("SAC") ¶¶ 45-71, ECF No. 214. When the system triggers an alert, CPD officers are dispatched on a Priority 1 call to investigate as if there were a shooting in progress. *Id.* ¶ 151.

The ShotSpotter system, however, is not reliable and has never been tested to determine how frequently it triggers alerts to loud noises that are not gunfire. *Id.* ¶¶ 4, 40, 72, 99, 107-112, 132, 155, 166. There is no evidence that it reliably picks out gunshots from the urban cacophony of engine backfires, firecrackers, and other sounds commonly confused with gunfire. *Id.* ¶ 108. Nearly 91% of ShotSpotter alerts turn up no corroboration of gunfire. *Id.* ¶¶ 48-49.

ShotSpotter is not just unreliable, it also cannot supply enough information to justify a police stop. For example, ShotSpotter states that an alert only purports to provide the location of the noise to within a radius of 82 feet, *id.* ¶ 134, and in practice locations can err by far more, *id.* ¶ 75. Moreover, when an officer arrives to the location of a ShotSpotter alert, at least several minutes will have passed since the loud noise. *Id.* ¶ 134. ShotSpotter provides no information about who was there when the

loud noise happened, what those people looked like, where they may have gone, or anything else that could create individualized suspicion of someone in the vicinity. *Id.*

**B.    The City's Policy and Custom of Using ShotSpotter Alerts to Effectuate Unlawful Investigatory Stops.**

Despite the unreliability, lack of testing, and terrible results on the ground, City policy and widespread practice directs officers who respond to ShotSpotter alerts to regard individuals they encounter as potential "offenders" and to subject them to investigatory stops on the basis of the information ShotSpotter provides. SAC ¶¶ 146-158. Plaintiffs Derick Scruggs and Danny Ortiz—and hundreds of other Chicago residents—have been unlawfully detained on false suspicion of shooting a gun in this way. *Id.* ¶¶ 169-170, 351, 376, 381, 387. The City's policies and widespread practices direct officers to rely on ShotSpotter's faulty reports of gunfire such that people going about their days and engaging in perfectly innocent behaviors that would not otherwise justify a police stop. For example, an armed security guard standing outside an AutoZone (Mr. Scruggs), *id.* ¶¶ 356 *et seq.*, or a Latino man walking out of his car into a laundromat (Mr. Ortiz), *id.* ¶¶ 297 *et seq.*, become suspects that CPD officers stop, detain, and question on suspicion of firing gunshots that police officers believe occurred solely because of ShotSpotter's uncorroborated reports. The City's use of ShotSpotter thus systematically leads officers to regard people as suspects—and to detain them for questioning—without any sound basis. *Id.* ¶¶ 4, 16, 123-124, 127, 146, 460-463, 465-468.

The City's explicit policies, as well as affirmative decisions of its policymakers, directly produce these unconstitutional ShotSpotter-prompted stops. SAC ¶¶ 146-167. CPD's 2017 Special Order on ShotSpotter explicitly tells officers that ShotSpotter alerts correspond to gunshots. *Id.* ¶¶ 147-148, 152-154; *see* Special Order S03-19 §§ III, IV.C.1, ECF No. 235-1. It instructs officers to treat a ShotSpotter alert as a basis to regard people near the location of an alert as suspects, directing responding officers to "be[] aware that an offender or multiple offenders may be on scene." *Id.* ¶¶ 147. The policy does nothing to inform officers that the ShotSpotter report of gunfire must be

corroborated by independent evidence of gunfire in order to justify a stop on suspicion of a gun crime. *Id.* ¶ 150. To the contrary, it directs officers to reach the opposite conclusion: while the policy is careful to warn officers that "a ShotSpotter alert, by itself, does not give responding Department member(s) the legal authority *to enter private property*," the policy contains no such caution with respect to the authority of officers to detain people on the basis of "a ShotSpotter alert, by itself." *Id.* ¶ 150 (emphasis added). The negative implication is clear. Taken together, the policy instructs officers to conclude from a ShotSpotter alert that shots were fired and regard people near the location of the alerts as shooting suspects who they can detain for questioning on that basis alone. *Id.* ¶ 147-50. The policy thus leads directly to the widespread practice of police detaining people like Mr. Scruggs and Mr. Ortiz on suspicion of discharging a firearm, without corroboration of gunfire or any basis—other than the ShotSpotter alert—to suspect that they did so.

The City's use of ShotSpotter to justify unconstitutional stops is also a widespread practice that the City knows about and has done nothing to address. SAC ¶¶ 123-137. CPD officers conduct hundreds of illegal investigatory stops every year when they chase down ShotSpotter reports. *Id.* ¶ 124. The Office of the Inspector General for the City of Chicago ("OIG") identified over 2,400 investigatory stops linked to ShotSpotter alerts over 18 months. *Id.* ¶ 128-29. While the OIG was not focused on the lawfulness of ShotSpotter-prompted stops, but instead on their lack of efficacy as a law enforcement tool, its analysis nonetheless corroborates that hundreds of these were unlawful. For instance, it found that the vast majority of ShotSpotter-prompted investigatory stops led to no further enforcement action at all—and that only a very small fraction resulted in a gun being recovered. *Id.* ¶ 130. This abysmal "hit rate," together with other facts about how CPD uses ShotSpotter, corroborates that ShotSpotter prompts many unjustified stops.

The City continues maintaining these policies and practices even though it knows ShotSpotter is unreliable, untested, and systematically leads to unwarranted stops. SAC ¶¶ 107-122, 166-169, 478.

The City explicitly decided not to permit testing of the ShotSpotter system in Chicago. *Id.* ¶ 113. Still worse, the City entered into a contract that contains no provisions that require ShotSpotter to avoid or minimize false alerts and which, to the contrary, creates a powerful incentive for ShotSpotter to issue alerts to noises that are not gunfire. *Id.* ¶¶ 66-70. CPD's current superintendent testified to City Council that officers never bother to report false alerts to ShotSpotter. *Id.* ¶¶ 55-56, 160. The City knows ShotSpotter's claims of "accuracy" are false and deceptive, having been confronted with this fact at the same City Council hearing. *Id.* ¶¶ 40, 115-21. Remarkably, the Mayor has acknowledged there is "clear evidence [ShotSpotter] is unreliable and overly susceptible to human error." *Id.* ¶ 42. Yet the City has failed to train officers that ShotSpotter alerts should not be relied upon as evidence of gunfire—or as a reason to detain a person—without independent corroboration, *id.* ¶¶ 154-158, and the City has left in place its explicit policy and widespread practice directing officers to treat ShotSpotter alerts as gunshots and people nearby as potential "offenders" in a shooting, *id.* ¶¶ 44, 122.

The City's policies and widespread practices do not just produce unconstitutional stops in the immediate response to ShotSpotter reports, but also cause officers to detain people unlawfully by relying on a supposed *history* of frequent ShotSpotter reports in a particular area. SAC ¶¶ 138-145. The City's OIG documented this widespread practice, determining that 13.9% of a random sample of investigatory stop reports mentioning ShotSpotter relied on the aggregate number of ShotSpotter alerts in the area as part of the basis to justify the stop. *Id.* ¶ 140. The OIG concluded that "the introduction of ShotSpotter technology in Chicago has changed the way some CPD members perceive and interact with individuals present in areas where ShotSpotter alerts are frequent" and that officers "are relying on ShotSpotter results in the aggregate to provide an additional rationale to initiate a stop or to conduct a pat down once a stop has been initiated." *Id.* ¶ 141 (quoting OIG Report, at 19). This practice—known to the City through its own OIG report—is the predictable result of CPD's express policies pertaining to ShotSpotter, which direct police to use ShotSpotter alerts to develop statistics

for use by patrol officers. *Id.* ¶ 164. The City thus directs and allows officers to rely upon knowingly unreliable statistics generated from ShotSpotter alerts as part of the justification for stopping people. *Id.* 164, 464.

### C. The City's Racially Discriminatory Deployment of ShotSpotter and the Numerous Harms that it Causes in the Black and Latine Community.

The City intentionally deployed ShotSpotter along stark racial lines. SAC ¶¶ 176-200. Starting in 2017, the City vastly expanded its ShotSpotter program, rolling it out to cover 12 entire police districts comprising 117 square miles. *Id.* ¶¶ 182-184, 188. The City deliberately chose to cover only the 12 police districts with the highest proportion of Black and Latine residents, and the very lowest proportion of White residents. *Id.* ¶¶ 185, 189 fig. 2. This racial deployment pattern, which covers almost all of the South and West sides, cannot be explained by historical gun crime rates. *Id.* ¶¶ 191-200. The City's decision to target these districts produces a massive racial disparity in the effects of ShotSpotter. 80% of Black residents live under ShotSpotter's shadow as do 65% of Latine residents. *Id.* ¶ 190. Meanwhile, only 30% of White Chicagoans live in a ShotSpotter area. *Id.* This means that the harms caused by the City's use of ShotSpotter are borne overwhelmingly by Black and Latine residents.

And, indeed, the City's use of ShotSpotter directly causes numerous adverse and discriminatory effects. SAC ¶¶ 201-213. *First*, the City's deployment of ShotSpotter causes unwarranted and unlawful investigatory stops. *See supra* 2-5. *Second*, the City's deployment leads to increased hostile police contacts for residents because ShotSpotter vastly increases the number of high-intensity police dispatches searching for supposed gunfire. *Id.* ¶¶ 17, 202, 229, 512. *Third*, these ShotSpotter-prompted police dispatches and investigatory stops lead to additional police uses of force against residents. *Id.* ¶¶ 17, 203-04, 512. Indeed, in a sample of 82 documented uses of force following a ShotSpotter dispatch, all 82 were directed against people of color (except 4 whose races were listed as "unknown"), and 70 of these uses of force were against people not armed with a gun. *Id.* ¶ 204.

5

*Fourth*, statistics generated from ShotSpotter alerts skew policing strategies and cause officers to use more aggressive and unwarranted police tactics in ShotSpotter areas. *Id.* ¶¶ 164, 205, 498-99, 512. *Finally*, the enormous number of unfounded ShotSpotter alerts—tens of thousands every year— significantly increases demands on police resources, slowing the response to actual emergencies reported to 9-1-1 by residents in the overwhelmingly Black and Latine districts covered by ShotSpotter. *Id.* ¶¶ 19, 207-209, 499, 512.

All of these harms are caused by the City's decision to deploy ShotSpotter along racial lines and its policies and practices directing officers to treat its alerts as gunfire. *Id.* ¶¶ 107-213. All of these harms fall disproportionately on Black and Latine residents. *Id.* ¶¶ 200, 510-13.

## LEGAL STANDARD

To state a claim upon which relief can be granted, the complaint need only contain "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint need not make "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). Rather, the complaint must contain "only enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and thus need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). At this stage, the Court must "tak[e] all well-pleaded allegations of the complaint as true and view[] them in the light most favorable to the plaintiff," *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (internal citations omitted), drawing "all possible inferences" in plaintiff's favor, *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

## ARGUMENT

Plaintiffs Lucy Parsons Labs ("LPL"), Scruggs, and Ortiz have properly alleged a *Monell* claim that the City's ShotSpotter policies are responsible for past and ongoing violations of Fourth

Amendment rights. *Infra* § I; City Mot. 3-11. Plaintiffs have likewise pleaded an Equal Protection Clause violation because the City has purposefully deployed ShotSpotter along racial lines, *infra* § II, City Mot. 11-16, as well as an ICRA disparate-impact race discrimination claim because the City's ShotSpotter deployment and policies cause harms that fall disproportionately on Black and Latine residents, *infra* § III, City Mot. 16-20. Plaintiff Williams properly pleads a separate, discrete *Monell* claim for damages because the City's failure to train detectives on the technology was a principal cause of the Defendant Officers' false murder accusation against him. *Infra* § IV; City Mot. 11. Finally, Plaintiff properly alleges *respondeat superior* liability. *Infra* § V; City Mot. 20.

## I.  PLAINTIFFS LUCY PARSONS LABS, ORTIZ, AND SCRUGGS HAVE PLAUSIBLY ALLEGED A *MONELL* FOURTH AMENDMENT CLAIM.

Plaintiffs seek injunctive relief on behalf of themselves and a putative class to stop the City's unconstitutional policy and custom of using ShotSpotter alerts as the basis for investigatory stops in violation of the Fourth Amendment. Plaintiffs Scruggs and Ortiz also seek damages. In order to properly allege a *Monell* claim against the City, Plaintiffs' pleading must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury" and that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (emphasis and internal citations omitted). In other words, Plaintiffs must allege a City policy or custom that caused the constitutional injuries with the requisite degree of fault.

There are at least three ways a Plaintiff may allege that "a municipal . . . policy or custom gave rise to the harm (that is, caused it)." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017). *First*, Plaintiffs can point to an express policy, *i.e.* "that 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Id.* (quoting *L.A. County v. Humphries*, 562 U.S. 29, 35 (2020)). *Second*, Plaintiffs can point to a custom or widespread practice, *i.e.* that "that the 'constitutional deprivation[ ] [was] visited pursuant to governmental 'custom' even though such a

7

custom has not received formal approval through the body's official decisionmaking channels.'" *Id.* (quoting *Monell v. N.Y. City Dep't of Soc. Servs*, 436 U.S. 658, 690–91 (1978)). *Third*, Plaintiffs can point to decisions of people with policymaking authority, *i.e.* "that a government's policy or custom is made by those whose edicts or acts may fairly be said to represent official policy." *Id.* (cleaned up). Here, Plaintiffs point to each of these three types of municipal action and allege that they all operate to cause unconstitutional ShotSpotter-prompted stops.

### A. Plaintiffs Have Plausibly Alleged that the City, Through Its ShotSpotter Policies and Customs, Knowingly and Deliberately Caused Unconstitutional Investigatory Stops.

Plaintiffs have amply alleged every element of a *Monell* claim with respect to unconstitutional ShotSpotter-prompted investigatory stops. As an initial matter, it is important to bring into focus the constitutional violations the City is causing. The Fourth Amendment only permits an investigatory stop if there is "reasonable suspicion of criminal activity," which requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Mwangangi v. Nielsen*, 48 F.4th 816, 824 (7th Cir. 2022) (internal quotations omitted). However, the law provides more specific guidance on whether and when ShotSpotter reports can be used to establish reasonable suspicion. The City's policies and customs violate the constitutional rules applicable to the use of ShotSpotter in at least three ways.

*First*, the City's policies and customs flout the Seventh Circuit's analysis that ShotSpotter is, at best, "analogous to an anonymous tipster," and thus can never justify a seizure without independent corroboration of gunfire and individualized suspicion beyond ShotSpotter's report of supposed gunfire. *United States v. Rickmon*, 952 F.3d 876, 882 (7th Cir. 2020). The *Rickmon* court agreed that "a ShotSpotter alert, standing on its own, should not allow police officers to stop a vehicle in the immediate vicinity of a gunfire report without any individualized suspicion of that vehicle" and it "question[ed] whether a single ShotSpotter alert would amount to reasonable suspicion." *Rickmon*, 952 F.3d at 881. The City's policies and customs also flout the Seventh Circuit's related holding in *United*

8

*States v. Bohman* that "[a] mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that [location]." 683 F.3d 861, 864 (7th Cir. 2012).

Plaintiffs allege that the City's express policy and widespread practice is to stop people in the vicinity of ShotSpotter on suspicion of shooting a gun, without independent corroboration that gunfire actually occurred. SAC ¶¶ 11, 123-37, 146-56, 460-63. Plaintiffs further allege that the City has failed to direct or train officers that corroboration is necessary in order to detain a person when relying on a ShotSpotter report, *id.* ¶¶ 153-57, 484-85, and that the City has failed to train officers on the requirements of *Rickmon, Id.* ¶ 158. The City deliberately put its policies in place—and remained deliberately indifferent to the widespread practices of its officers and its failure to properly direct and train them—despite key policymakers' personal knowledge that ShotSpotter is being used improperly. *Id.* ¶¶ 40-44, 107-22, 472-82.

*Second*, the City's express ShotSpotter policies and widespread customs with respect to ShotSpotter dispatches flout the Fourth Amendment by directing officers to rely on ShotSpotter's reports as a basis for investigatory stops even though the tool has not been subjected to *any testing at all* to determine how reliably it picks out actual gunfire, as opposed to other loud noises. The law is clear: "[r]easonable suspicion . . . is dependent upon both the content of information possessed by police *and its degree of reliability*." *Alabama v. White*, 496 U.S. 325, 330 (1990) (emphasis added). The Fourth Amendment does not permit police to detain people on the basis of technologies that purport to supply evidence of a crime—for example, the smell of drugs, the velocity of a speeding vehicle, or the sound of gunfire—if the technology has never even been tested to see how often it provides false information. Indeed, the Supreme Court held in *Florida v. Harris*, regarding drug-sniffing dogs, that officers may not justify an arrest with information from a detection tool that has not been tested to determine its reliability and, specifically, its rate of false alerts in "controlled testing." *Florida v. Harris*, 568 U.S. 237, 246-47 (2013).

This principle is violated here. Plaintiffs allege that ShotSpotter is unreliable, SAC ¶¶ 45-65; that it is designed, operated, and incentivized to trigger alerts to noises that are not gunfire, *id.* ¶¶ 66-71; and that it has never been tested to determine its rate of false alerts, *id.* ¶¶ 4, 72, 90, 132. The City's policies and customs nevertheless instruct officers to treat every ShotSpotter alert as gunfire and to use this information to detain supposed gun "offenders" at the scene. *Id.* ¶¶ 146-56. The City adopted these policies and customs deliberately, despite its knowledge ShotSpotter is untested and unreliable. *Id.* ¶¶ 40-44, 107-22, 487. The City thus deliberately causes officers to effectuate unconstitutional investigatory stops, detaining people like Plaintiffs Scruggs and Ortiz on suspicion of firing a gun in circumstances where ShotSpotter's report is the only reason to believe a gun was fired.

*Third*, the City has knowingly adopted an express policy and widespread practice of relying on a mere history of ShotSpotter alerts in a particular area as the basis (or part of the basis) to justify investigatory stops. SAC ¶¶ 5, 138-145, 164-65, 464, 498. This compounds the violation of Fourth Amendment rules set down in *White, Harris, Rickmon, and Bohman* by directing police to regard a person as suspicious just because they happen to be in particular areas of the City with a supposedly high number of ShotSpotter reports. *Id.* This predictably causes unconstitutional stops: officers investigate and detain people who would not otherwise arouse reasonable suspicion because of the supposed aggregate number of ShotSpotter reports in the area. *Id.* ¶¶ 139-45.

## B. The City's Motion Asks the Court to Impose a Heightened Pleading Burden, Ignore Plaintiffs' Actual Allegations, and Draw Inferences in its Favor.

The City contends that Plaintiffs have failed to plausibly plead any of these claims, but its arguments ignore Plaintiffs' detailed allegations and seek to hold Plaintiffs to a heightened pleading burden, even while it asks the Court to adopt the City's preferred facts and inferences. This approach is doomed from the start. Indeed, this Court has already warned as much. *See* ECF No. 206. After considering the City's first motion to dismiss, the Court cautioned that "[t]he heightened evidentiary burden for a *Monell* claim does not suggest federal courts may apply a heightened pleading standard

more stringent than that of Rule 8(a) of the Federal Rules of Civil Procedure." *Id.* (quoting *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016)). The Court observed that the City's arguments "seek to hold Plaintiffs to such a heightened standard, including on the ICRA claim." *Id.* The City has not changed course.

The City's motion argues that its express policy does not explicitly instruct officers to stop residents on the basis of a ShotSpotter alert alone, City Mot. 4-5, but that is in fact the main thrust of the City's ShotSpotter Flex Directive, which instructs officers to treat ShotSpotter reports as gunfire and to be on the lookout for "offenders" at the scene. SAC ¶ 147. The Directive even suggests, by clear negative implication, that officers *can* rely on ShotSpotter alerts alone to stop people for investigation, in contrast with the explicit prohibition on entering private property on the same basis. SAC ¶ 150. Disputes about what the policy means cannot be resolved at the pleading stage, and certainly not in favor of the movant.

Defendants also ask the Court to conclude that the ShotSpotter policy is "facially neutral" and cannot direct or cause unconstitutional stops because the City maintains a separate, general policy on investigatory stops that parrots constitutional standards. City Mot. 5-6. Plaintiffs, however, explicitly allege that the City's ShotSpotter policy and practices direct and cause officers to *violate* the investigatory stop policy by relying on ShotSpotter in unconstitutional ways. SAC ¶¶ 159, 486. The City, again, asks the Court to ignore Plaintiffs' actual allegations and draw inferences in its favor. The Court should decline.[1]

---

[1] The City's inclusion of its investigatory stop policy as an exhibit is improper. *See* ECF No. 235-2. It is true that a defendant may sometimes attach exhibits to a 12(b)(6) motion "if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (1993). But the investigatory stop policy is not relevant to Plaintiff's claims; the complaint only mentions it to note that it is being flouted. SAC ¶¶ 159, 486. The City may regard the investigatory stop policy as important to its *defenses*, but that is an argument for summary judgment, not a 12(b)(6) motion. Plaintiffs concede, however, that the ShotSpotter Flex Directive, Special Order S03-19 (ECF No. 235-1), is sufficiently "central" to their claims to be considered on this motion.

Defendants also contend that Plaintiffs have failed to properly allege a widespread practice of constitutional violations. City Mot. 7-8. Once again, the City ignores the Complaint's allegations and seeks to impose a heightened pleading standard. Plaintiffs explicitly allege that there are hundreds of illegal, ShotSpotter-prompted investigatory stops, SAC ¶ 124, and support that allegation with facts and examples. *Id.* ¶¶ 123-30, 297-331, 356-415. But rather than contesting this motion on the ground of Plaintiffs' well-pled facts, as the law requires, Defendants instead ask the Court to resolve factual disputes in its favor. For example, the City complains that the OIG report, one source upon which Plaintiffs rely, did not making a "finding" that any of the investigatory stops it identified were unconstitutional, City Mot. 7-8, and it asks the Court to assume the 1,056 investigatory stops the OIG identified were in fact "lawfully conducted," *id.* at 9. To start, this is not a conclusion that anyone could draw at this point, and further, the OIG did not purport to assess the *constitutionality* of stops— only their usefulness as a law enforcement tool. SAC ¶¶ 40, 48-50.[2] The report strongly supports the inference that hundreds of these stops (at least) were unconstitutional. *Id.* ¶¶ 123-30. The City argues, along similar lines, that the experiences of Mr. Scruggs and Mr. Ortiz are not enough to establish a widespread practice on their own. City Mot. 7. But a *Monell* claim need not "identify every other or even one other individual" harmed by a constitutional violation to allege a widespread practice. *White*, 829 F.3d at 844. The Complaint here is replete with additional facts supporting the inference that Plaintiffs Scruggs's and Ortiz's experiences are merely the tip of the iceberg. SAC ¶¶ 45-175. Moreover, Plaintiffs' detailed allegations regarding express policies, widespread practices, and failures

---

[2] Defendants also misstate the OIG Report's findings. As noted, the OIG did not determine that *any* investigatory stop were "lawfully conducted," let alone that all were. Moreover, the OIG actually matched 1,740 separate investigatory stop reports with 1,056 ShotSpotter alerts. ECF No. 235-3, at 12. (Some alerts produced multiple stops.) Separately, the OIG found 1,366 *additional* investigatory stops that mentioned ShotSpotter on a keyword search. *Id.* at 18. Here and elsewhere, the City is asking the Court to draw disputed and false factual conclusions from extrinsic evidence, *i.e.* the OIG Report. This is improper on a 12(b)(6) motion. While a defendant may sometimes attach exhibits to a 12(b)(6) motion when they are central to claims, the City here is just asking the Court to use the document to draw disputed (and false) factual inferences in its favor. That is improper on a 12(b)(6) motion. The Court should disregard this exhibit.

to train interlock and support one another: the combination of these City actions together produce the unconstitutional stops that Plaintiffs Scruggs, Ortiz, and the putative class suffer. *See Spearman v. Elizondo*, 230 F. Supp. 3d 888, 893 (N.D. Ill. 2016) (acknowledging in *Monell* context that a failure to train officers may be part of "a set of interrelated, mutually-reinforcing customs or practices, all of which contribute to the civil rights violations alleged.").

The City further contends that Plaintiffs have not alleged that policymakers had actual knowledge or were deliberately indifferent to any widespread unconstitutional practice or failure to train. City Mot. 9-11. In support of this assertion, the City makes several remarkable claims that seek to erect a higher pleading burden than the law permits. For example, the City claims the OIG report cannot put officials on notice of a widespread practice, even though it documented a tremendous volume of ShotSpotter alerts that produced thousands of questionable investigative stops. SAC ¶¶ 123-30.[3] The City likewise claims that the numerous articles, studies, City Council testimony, and public statements cited in the Complaint fail to establish the City's knowledge or deliberate indifference because they only put the City on notice that ShotSpotter was "inaccurate and unreliable," not that there was a "widespread practice of unconstitutional stops or arrests." City Mot. 10. These arguments miss the mark. Even if the City were only on notice that ShotSpotter was inaccurate and unreliable, that would suffice to state a *Monell* claim because the City is knowingly and deliberately permitting its officers to rely on "inaccurate and unreliable" technology to detain citizens. *See supra*, at 9-10. Further, the Complaint's extensive allegations regarding the public and official criticism the City has faced demonstrates that City officials knew its policies and practices were generating many illegal stops. SAC ¶¶ 40-65, 107-22. Notably, the City's Motion fails even to mention the portions of the

---

[3] In support of this argument, the City again baldly mischaracterizes the OIG report. The City claims that the OIG relied on only "three Investigatory Stop Reports" to conclude that ShotSpotter is changing police behavior and leading officers to treat people as suspects in high-alert areas. City Mot. 9. That is not true. The report examined a random sample of 72 reports. But, again, this sort of factual dispute is not proper in a Rule 12(b)(6) motion..

Complaint that describe how both the current Mayor and CPD Superintendent have personal knowledge of ShotSpotter's flaws, and quotes the current Mayor endorsing central premises of Plaintiffs' claims. *Id.* ¶¶ 41-43 ("Chicago spends $9 million a year on ShotSpotter despite clear evidence it is unreliable and overly susceptible to human error.").

Plaintiffs' detailed complaint properly alleges a *Monell* claim with respect to unconstitutional, ShotSpotter-prompted investigatory stops. Defendants' arguments fail.

## II. PLAINTIFFS LUCY PARSONS LABS, ORTIZ, AND SCRUGGS HAVE PLAUSIBLY ALLEGED THAT THE CITY'S DISCRIMINATORY SHOTSPOTTER DEPLOYMENT VIOLATES EQUAL PROTECTION.

The City's decision to target ShotSpotter in Black and Latine areas of the City violates the Equal Protection Clause's prohibition against purposeful discrimination on the basis of race. Plaintiffs' allegations properly plead an Equal Protection claim and are supported by several overlapping arguments. The City's decision to deploy ShotSpotter on a map that perfectly tracks the racial demographics of the City's police districts is so stark on its face that it strongly supports an inference that race was a motivating factor. *See* SAC ¶¶ 182-190, figs. 1-2; *Miller v. Johnson*, 515 U.S. 900, 913-14 (1995). The racial lines of the ShotSpotter deployment map speak for themselves. *See Shaw v. Reno*, 509 U.S. 630, 646-47 (1993); *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960). In addition, Plaintiffs allege additional facts showing that the ShotSpotter deployment pattern is "unexplainable on grounds other than race." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Among other things, the map tracks the racial demographics of police districts rather than historical rates of shootings in the City. SAC ¶¶ 191-200. Thus, the ShotSpotter area excludes white neighborhoods with higher rates of shootings but includes many Black and Latine neighborhoods with lower rates— including areas with shootings at less than half the City median. *Id.* ¶¶ 192-97. The City also chose not to cover the 22nd police district, which has gun crime rates similar to the others within the ShotSpotter area but which, unlike the rest of the South and West side, contains large, predominantly White

14

neighborhoods. *Id.* ¶ 198. In addition, as discussed below, *infra* 15-16, Plaintiffs allege extensive additional facts that support an inference that the City "selected or reaffirmed" the racially disparate ShotSpotter coverage area "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see Arlington Heights*, 429 U.S. at 266-68 (describing facts courts consider to identify racially discriminatory intent).

The City contends Plaintiffs have failed even to allege a discriminatory *effect*—let alone a discriminatory purpose—because ShotSpotter's technology is "race neutral." City Mot. 12. But Plaintiffs do not contend that the technology itself is inherently racist; they allege that the City's decision about where and how to use it has discriminatory effects. SAC ¶¶ 200, 496. The City also argues that Plaintiffs' allegations of discriminatory harm are not "substantiate[d]." City Mot. 12-13. In fact, Plaintiffs have alleged in detail how ShotSpotter increases unwarranted stops, arrests, uses of force, and other hostile police encounters among Black and Latine residents. *Id.* ¶¶ 123-72, 201-05. Plaintiffs have explained how the City's ShotSpotter program causes these harms by changing officer behavior, biasing their perceptions and causing aggressive deployments. *Id.* ¶¶ 136-44. The Complaint explains how the massive burden of ShotSpotter alerts slows 9-1-1 response time in Black and Latine neighborhoods. *Id.* ¶¶ 207-09. The City's demand for more substantiation is just a bald request for the Court to impose a heightened pleading standard and draw inferences against the Plaintiffs.

The City next argues that Plaintiffs make only "conclusory" assertions of discriminatory purpose. City Mot. 14-16. That is incorrect. Not only have Plaintiffs plausibly alleged that the ShotSpotter map is facially discriminatory and not explainable by reference to rates of gun crime, *supra* 14-15, Plaintiffs have also made allegations supporting nearly all of the *Arlington Heights* factors that courts use to suss out purposeful discrimination. 429 U.S. at 266-68; *see* SAC ¶¶ 214-229 (describing the history of racist policing in Chicago and targeting of Black communities up through and after the 2017 rollout of ShotSpotter); *id.* ¶¶ 178-182 (describing the rapid, massive expansion of ShotSpotter

15

from a small, targeted program to a racialized deployment covering nearly the entire South and West sides); *id.* ¶¶ 191-99 (explaining that the ShotSpotter map does not track gun violence rates, but instead blankets only the most heavily Black and Latine districts); *id.* ¶¶ 210-11 (alleging that the City adopted and maintained ShotSpotter despite the absence of public safety benefits). In other cases asserting claims of race discrimination with respect to investigatory stops, similar allegations have sufficed to successfully pursue Equal Protection Clause claims. *See, e.g.*, *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 755-56 (N.D. Ill. 2015); *Davis v. City of New York*, 959 F. Supp. 2d 324, 359-66 (S.D.N.Y. 2013). To be sure, there may be even more evidence establishing that race was a motivating factor—*e.g.*, evidence from the internal decision-making process that produced the ShotSpotter map, *see* City Mot. 15—but such additional proof need not (and, realistically, cannot) be adduced before Plaintiffs have an opportunity to take discovery. *See Arlington Heights*, 429 U.S. at 268 (indicating that in some cases government officials might even need to "be called to the stand at trial to testify concerning the purpose of the official action."). Plaintiffs have plausibly alleged an Equal Protection Claim.

## III. PLAINTIFFS LUCY PARSONS LABS, ORTIZ, AND SCRUGGS HAVE PLAUSIBLY ALLEGED A CLAIM UNDER THE ILLINOIS CIVIL RIGHTS ACT BECAUSE THE CITY'S USE OF SHOTSPOTTER HAS DISPARATE ADVERSE IMPACTS ON BLACK AND LATINE RESIDENTS.

The City's decision to target ShotSpotter exclusively in South and West Side police districts causes a variety of harms for the overwhelmingly Black and Latine population in those districts. SAC ¶¶ 201-09. This racially disparate impact of the City's ShotSpotter program violates ICRA, which provides that "no unit of . . . local government in Illinois shall… utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a). Illinois courts "look to cases concerning alleged violations of federal civil rights statutes to guide . . . interpretation of the Act." *Cent. Austin Neighborhood Ass'n v. City of Chicago*, 1 N.E.3d 976, 980 (Ill. App. Ct. 1st Dist. 2013). Accordingly, courts assess ICRA disparate-impact claims under federal notice pleading standards, not Illinois's fact pleading

regime. *Powell v. Illinois*, 18-cv-6675, 2019 WL 4750265, at *16 (N.D. Ill. Sept. 30, 2019). Moreover, at the pleading stage, Plaintiffs need not allege a prima facie case. *Powell,* 2019 WL 4750265, at *16; *see also Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539 (7th Cir. 2005). Instead, "to survive a motion to dismiss" a Plaintiff must simply "identify a specific . . . practice, allege its causation of the disparate impact, and give Defendants fair notice of the claim." *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 907 (N.D. Ill. 2011).

Plaintiffs easily meet this bar. The City argues that Plaintiffs have failed to identify any specific practice that caused a disparate impact. City. Mot. 17. But this is just wrong: Plaintiffs allege that the City has chosen to deploy ShotSpotter only in predominantly Black and Latine areas and that this deployment decision, together with the ways that CPD uses ShotSpotter, are the "criteria or methods of administration" that cause various discriminatory harms that fall disproportionately on the Black and Latine residents in the ShotSpotter districts. SAC ¶¶ 510-11. Defendants confuse the issues when they claim that Plaintiffs cannot demonstrate a disparity "between Black and Latinx residents and White residents *within the affected police districts*." City Mot. 17 (emphasis added). The relevant comparison is not "within" ShotSpotter districts, but rather the discriminatory impact that the City causes by targeting ShotSpotter only at places where the vast majority of Black and Latine Chicagoans live. Defendants compound this confusion when they argue that Plaintiffs cannot make out a disparate impact claim because the City excluded "four majority-Black and Latinx police districts" from ShotSpotter's coverage.[4] City Mot. 17. This is beside the point. The City has exclusively targeted the police districts with the *greatest* racial disparity, thereby maximizing the burden on Black and Latine residents while minimizing the burden on white residents. SAC ¶¶ 182-189, fig. 2, 510. The City need

---

[4] At least one of these districts actually has only a plurality of Black and Latine residents, not a "majority." SAC ¶ 189, fig. 2.

not target every majority-minority district to have a disparate impact. Indeed, the disparate impact is *larger* because the City did not cover these four districts (or any others) that are more racially integrated.

Defendants next contend that Plaintiffs fail to plead a "robust causal connection" and that Plaintiffs' discrimination claims rest on preexisting demographic disparities in the ShotSpotter-covered districts rather than discriminatory effects caused by the City's actions. City Mot. at 18. But unlike the cases Defendants cite, *see* City Mem. 18-20, this is not a situation where "defendants [are] being held liable for racial disparities they did not create," *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Comm. Project, Inc.*, 576 U.S. 519, 542 (2015), nor is this a case where a facially neutral policy is applied equally to everyone in a jurisdiction. To the contrary, the City has made an explicit decision to deploy ShotSpotter *only in most heavily Black and Latine districts*. That overt decision to selectively target certain districts is what causes the racial disparities that flow from the use of ShotSpotter.

Defendant claims that Plaintiffs have failed to allege sufficient statistical evidence. City Mot. 19-20. But a plaintiff bringing a "disparate impact claim need not allege statistical support to survive a motion to dismiss." *McQueen*, 803 F. Supp. 2d at 906 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). In any case, Plaintiffs have provided statistics showing the vast racial disparity in those subject to ShotSpotter and its resulting harms, SAC ¶¶ 20, 189, as well as specific statistics showing racial disparity in ShotSpotter-prompted uses of force, *id.* ¶¶ 203-04. Defendants' demand for more detailed statistics—even before the opportunity to get discovery of relevant City data—is premature on a 12(b)(6) motion. *See McQueen*, 803 F. Supp. 2d at 906-07 (collecting cases).

Finally, the City contends that Plaintiffs have not sufficiently alleged discriminatory harms. City. Mot. 19-20. But Plaintiffs have itemized numerous specific harms. *See supra* 5-6; SAC ¶¶ 201-13. Tellingly, the City fails even to cite the most relevant precedent establishing that Plaintiffs' alleged harms state a claim. In *Central Austin Neighborhood Association v. Chicago*, ("*CANA*") the Illinois Appellate Court permitted an ICRA lawsuit to proceed that challenged CPD's 9-1-1 dispatch practices

18

because they caused slower police response in predominantly Black and Latine neighborhoods. *CANA*, 1 N.E.3d at 91. Plaintiffs here allege precisely the same harm (among several others) flowing from the City's deployment of ShotSpotter. *Supra* 6; SAC ¶¶ 19, 207-09, 499, 512. If the ICRA claim in *CANA* could proceed, so too can the one here.

## IV. PLAINTIFF WILLIAMS HAS PLAUSIBLY ALLEGED A *MONELL* CLAIM AGAINST THE CITY.

Defendants also seek to dismiss Plaintiff Williams' *Monell* claim. As the Court knows from Plaintiff's currently-pending motion to sever, Mr. Williams' claims are distinct from those of the other Plaintiffs because he seeks only damages for a past harm and is not seeking prospective injunctive relief. ECF No. 216. His *Monell* claim is likewise narrower and distinct from the others: he plausibly alleges that all of the officers involved in his case misstated the ShotSpotter evidence and did so because the City's explicit ShotSpotter policy, together with its knowing and deliberate failure to train detectives on ShotSpotter, misled them and caused them to improperly rely on the ShotSpotter alert to arrest him and pursue charges, in violation of his constitutional rights. SAC ¶¶ 148, 155, 564-66.

The City is incorrect when it asserts that Plaintiff has not properly alleged that the City's failure to train its detectives was deliberately indifferent. City Mot. 11. The Complaint makes numerous allegations showing that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." *J.K.J. v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020) (internal quotation omitted). The City's policy here explicitly directs detectives to use ShotSpotter when investigating shootings, SAC ¶ 161, and the City knows that ShotSpotter does not provide the precise location of a gunshot—frequently providing flatly incorrect locations for actual shootings. *Id.* ¶¶ 68, 75. But, remarkably, the City fails to provide any training at all to detectives about how to interpret or use ShotSpotter alerts. *Id.* ¶ 148, Indeed, the City's policy actually misleads officers by directing them to focus on the "precise location" of an alert. *Id.* ¶¶ 148, 155, 564-66. The City thus mandates that its detectives use ShotSpotter to build criminal cases against residents, while utterly

failing to train them on crucial, well-known limitations of the system and the "evidence" it generates. These circumstances fall comfortably within the parameters of prior cases that have approved failure-to-train *Monell* claims. *See, e.g., J.K.J.*, 960 F.3d at 380-84.

Notably, the City does not dispute causation in Mr. Williams' *Monell* claim, and thus waives the argument. In any case, Plaintiff plausibly alleges that the City's policy and failure to train on ShotSpotter was the moving force behind the Defendant Officers' false allegation that ShotSpotter pinpointed the gunshot in the "exact location" occupied by Mr. Williams' car, SAC ¶¶ 258, 261, and that it could exclude the obvious alternative suspect—*i.e.* the dark sedan in the next lane, *id.* ¶ 268. Plaintiff Williams has thus alleged a viable *Monell* claim against the City for damages.

## V. PLAINTIFFS HAVE PROPERLY ALLEGED *RESPONDEAT SUPERIOR* LIABILITY AGAINST THE CITY.

The City seeks to dismiss Plaintiffs' *respondeat superior* counts on the grounds that *respondeat superior* is a "theory of liability" rather than an "independent cause of action." City Mot. 20. The City, however, does not actually dispute that the Complaint properly alleges *respondeat superior* liability against the City for its employees' torts. The City's request to dismiss Plaintiffs' *respondeat superior* count thus appears to be nothing more than a gripe with the form of Plaintiffs' pleading, serving no practical purpose. In fact, there is nothing objectionable about Plaintiffs' decision to plead *respondeat superior* in separate counts, rather than combining it with each of the underlying torts. After all, a Complaint need not even plead separate "counts" at all; what matters is that the Complaint, as written, serves to put the defendant on notice of the claims against it. *See* Fed. R. Civ. P. 8(e); *Bartholet v. Reishauer AG (Zürich)*, 953. F. 2d 1073, 1078 (7th Cir. 1992). The City's request to dismiss should be denied. *See Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("Instead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving.").

## CONCLUSION

For all of these reasons, the Court should deny the City's Motion to Dismiss in full.

Respectfully submitted,

/s/Jonathan Manes
Jonathan Manes
Alexa Van Brunt
Sarah Blatt-Herold
MacArthur Justice Center
160 E. Grand Avenue, 6th Floor
Chicago, Illinois 60615
(312) 503-0012
jonathan.manes@macarthurjustice.org

Megha Ram
MacArthur Justice Center
501 H Street NE, Suite 275
Washington, DC 20002
megha.ram@macarthurjustice.org

Elizabeth Mazur
Hughes Socol Piers Resnick & Dym
70 W. Madison Street, Suite 4000
Chicago, IL 60602
(312) 580-0100
emazur@hsplegal.com

Daniel Massoglia
Joseph DiCola
Emma Melton
First Defense Legal Aid
601 S. California Avenue
Chicago, Illinois 60612
(708) 797-3066
daniel@first-defense.org

Dated: January 19, 2024

## CERTIFICATE OF SERVICE

I, Jonathan Manes, an attorney, hereby certify that I caused a copy of the foregoing document to be served on all counsel of record on January 19, 2024, via the Court's CM/ECF system.

/s/Jonathan Manes