IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL WILLIAMS, LUCY PARSONS LABS, and DANIEL ORTIZ, on behalf of himself and a class of similarly situated people,<br><br>　　　　Plaintiffs,<br><br>　　　v.<br><br>CITY OF CHICAGO, et al.,<br><br>　　　　Defendants. | Case No. 22-cv-03773<br><br>Judge Lindsay C. Jenkins<br><br>Magistrate Judge Young B. Kim<br><br>Jury Trial Demanded |

**CITY OF CHICAGO'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Plaintiffs' *Amended Civil Rights Class Action Complaint for Declaratory and Injunctive Relief and for Damages* ("SAC") [Dkt. 214] raises a political question—whether ShotSpotter technology provides operational value and whether that value justifies its expense—but does not state a justiciable legal issue. Plaintiffs' Opposition (Dkt. 244) (the "Opposition" or "Opp.") in response to the City's Motion to Dismiss (Dkt. 235) ("Motion") affirms this point. Plaintiffs ask this Court to rely upon "negative implication" derived from Plaintiffs' conclusory and conjectural allegations to find Plaintiffs' *Monell* claims viable. In the absence of factual support, Plaintiffs can only assert that Chicago police officers systematically violate the constitutional rights of Chicagoans due to the City's use of the ShotSpotter technology. ShotSpotter, however, is merely an acoustic gunshot detection system that initiates a police response to a location of possible gunfire. Upon responding to a location, officers act in accordance with the totality of circumstances presented. Plaintiffs fail to allege, and fail to articulate in their Opposition, any factual allegations that the Chicago Police Department's ("CPD") use of ShotSpotter was the "moving force" behind any constitutional injury or harm necessary to plead viable claims for municipal liability under *Monell*. In other words, Plaintiffs do not sufficiently allege how the alert, not the officers independent and intervening acts, caused harm on a systemic basis. Thus, what

Plaintiffs try to characterize as plausible inference is nothing more than pure speculation insufficient to sustain their claims.

More specifically, Plaintiffs fail to address the City's arguments that Plaintiffs have not (1) identified an express policy that, when enforced, caused Plaintiffs constitutional harm, or (2) identified a widespread practice of officers conducting unlawful investigatory stops after arriving at a ShotSpotter-identified location. Plaintiffs equally avoid that they have no factual basis to suggest that City policymakers were aware of the practice or acted in a deliberately indifferent manner. Next, Plaintiffs cannot cure their failure to allege any factual allegations necessary to plead discriminatory effect or that the City acted with a discriminatory purpose in the implementation and use of ShotSpotter technology to sufficiently allege a violation of the Equal Protection Clause ("EPC"). Further, Plaintiffs do not respond to the lack of factually supported allegations reflecting a disparate effect or the "robust" causality required to state a claim under the Illinois Civil Rights Act ("ICRA") that is based solely on a disparate impact theory. Lastly, Plaintiffs fail to save their independent claims for *respondeat superior* against the City by not addressing the City's cited authority supporting dismissal.

## ARGUMENT

**I.  PLAINTIFFS HAVE NOT MET THEIR REQUIRED BURDEN TO SHOW A PLAUSIBLE *MONELL* CLAIM AGAINST THE CITY.**

Plaintiffs agree that to survive a motion to dismiss Plaintiffs must allege facts identifying the offending City policy, practice, or official action, and, additionally, must provide enough factual support to create a plausible inference that the identified policy, practice, or official action was the "moving force" behind the alleged constitutional deprivations. Opp., p. 7. Despite acknowledging their burden, Plaintiffs do not clarify how the allegations in the SAC meet their burden.

**A.  It is undisputed that the City's Investigatory Stop Policy (S04-13-09) is constitutional and was not the "moving force" behind Plaintiffs Scruggs' and Ortiz's alleged constitutional harm.**

Plaintiffs Scruggs and Ortiz bring their *Monell* claims to "stop the City's unconstitutional policy

2

and custom of using ShotSpotter alerts as the basis for investigatory stops in violation of the Fourth Amendment." *Id.* Plaintiffs' argument focuses on the ShotSpotter technology itself, which Plaintiffs agree is not "inherently racist[.]" *Id.* at p. 15. Plaintiffs spend less time addressing the core contentions of the City's Motion. First, Plaintiffs fail to show how the SAC supports a plausible inference that the City's ShotSpotter Flex Program (S03-19) ("ShotSpotter Flex Program"), as implemented, was the moving force behind "hundreds of illegal, ShotSpotter-prompted investigatory stops," and completely disregard the City's constitutional Investigatory Stop Policy (S04-13-09) ("Investigatory Stop Policy"). Instead, Plaintiffs advance a "negative implication" theory to support their *Monell* claims. To properly address this theory, the City must reiterate the undisputed and ignored foundational predicates, overlooked by Plaintiffs, which are integral to their argument.

Plaintiffs Scruggs and Ortiz concede the constitutionality of the Investigatory Stop Policy. *See* SAC ¶¶ 159, 486. Consequently, Plaintiffs' *Monell* claims do not contend that CPD's enforcement of the Investigatory Stop Policy was the moving force behind the alleged constitutional harms, namely, "hundreds of illegal, ShotSpotter-prompted investigatory stops." Instead, Plaintiffs correctly allege the Investigatory Stop Policy, CPD's official, express policy, requires officers to possess constitutionally required "reasonable articulable suspicion" prior to conducting an investigatory stop. *See* Investigatory Stop Policy, Dkt. 235-2 § II.C. By its terms, this policy instructs officers that "reasonable articulable suspicion depends on the totality of the circumstances," including the "reasonable inferences that are drawn" from an officer's "training and experience," *id.*, and an officer "must possess specific and articulable facts which, combined with rational inferences from these facts, reasonably warrant a belief that the suspect is committing, is about to commit, or has committed a criminal offense." *Id.* at § II.C.1. The Investigatory Stop Policy does not equate a ShotSpotter alert with the constitutionally required "reasonable articulable suspicion" required to conduct a stop, and Plaintiffs do not contend otherwise.

3

    **B.**    **The ShotSpotter Flex Program directs officers responding to an alert to follow the Investigatory Stop Policy prior to conducting a stop at a ShotSpotter-prompted location, thus, Plaintiffs Scruggs and Ortiz cannot show the ShotSpotter Flex Program was the "moving force" that caused constitutional harm.**

The ShotSpotter Flex Program directs responding officers to "follow the procedures" in the City's Investigatory Stop Policy. *See* ShotSpotter Flex Program, Dkt. 235-1 § VII.C.3; SAC ¶¶ 147–48, 150. Plaintiffs, however, fail to address this expressed direction to officers in their Opposition. In fact, Plaintiffs' argument not only ignores the Investigatory Stop Policy in its entirety, but, more specifically, intentionally disregards the undeniable co-dependent relationship between the Investigatory Stop Policy and ShotSpotter Flex Program.

Instead, Scruggs and Ortiz rely on their novel "negative implication" theory described as follows: "while the [ShotSpotter Flex Program] is careful to warn officers that a 'ShotSpotter alert, by itself, does not give responding members the legal authority to enter private property,' the [ShotSpotter Flex Program] contains no such caution with respect to the authority of officers to detain people on the basis of a ShotSpotter alert, by itself." Opp., p. 3. Plaintiffs' theory does not rely upon the express language of the policy; the theory is solely based on a concocted "omission" or "lack of instruction to officers" in the ShotSpotter Flex Program. Plaintiffs, however, are irrefutably incorrect. The ShotSpotter Flex Program expressly provides the "caution" Plaintiffs deem lacking. The policy commands officers to "follow the procedures" in the Investigatory Stop Policy (*see* ShotSpotter Flex Program § VII.C.3; SAC ¶¶ 147–48, 150), and officers are explicitly "cautioned" to possess "reasonable articulable suspicion" prior to detaining individuals to conduct an investigatory stop.

Still, Scruggs and Ortiz wrongly assert and determine that through "negative implication" the ShotSpotter Flex Program directly "<u>instructs</u> officers to conclude from a ShotSpotter alert that shots were fired and regard people near the location of the alerts a shooting suspects who they can detain for questioning on that basis only." Opp., p. 3 (emphasis added). This is an inherently misleading

4

theory. Plaintiffs contend that officers are conducting unlawful investigatory stops due to a non-existent "omission" in the text of the ShotSpotter Flex Program, and further presume, as they must, that scores of officers are willfully ignoring or blatantly refusing to follow the procedures in the Investigatory Stop Policy. This contorted theory is predicated on baseless assumptions and is nothing more than rank speculation. Plaintiffs offer no supporting facts and, instead, rely on some kind of premonition regarding the intentions or motivations of officers patrolling the streets of Chicago. This is nothing more than supposition. Moreover, Plaintiffs' argument is further belied by the fact that neither contest the lawfulness of their respective arrests, or, put another way, concede that the arresting officers had probable cause to effectuate each arrest with both occurring at a ShotSpotter-prompted location. In fact, Plaintiff Scruggs was standing at the ShotSpotter-prompted location with loaded 9mm handgun. SAC ¶¶ 419–27.

Because Plaintiffs offer no facts to support a plausible inference that ShotSpotter Flex Program, when applied, was the "moving force" behind their alleged constitutional harms, they have failed to meet their burden to state a viable *Monell* claim based on an express policy of the City.

### C. Plaintiffs Scruggs and Ortiz fail to show a widespread practice that was the moving force behind their constitutional injuries.

Likewise, Scruggs and Ortiz offer no facts to support their claim that the CPD's use of the ShotSpotter technology created a widespread practice much less that a widespread practice was the "moving force" behind their alleged constitutional harms. Plaintiffs again rely upon their "negative implication" theory and their derived conclusion that the City directly "<u>instructs</u> officers to conclude from a ShotSpotter alert that shots were fired and regard people near the location of the alerts a shooting suspects who they can detain for questioning on that basis only," Opp., p. 3 (emphasis added), to conclude a widespread practice exists. As stated above, pure speculation and conjecture are not enough. Moreover, Plaintiffs Scruggs and Ortiz widespread practice argument conflicts with the allegations of the SAC. Plaintiffs allege that from January 1, 2020, to May 31, 2021, CPD officers

5

responded to 50,176 ShotSpotter alerts, *see* SAC ¶ 48, and only conducted 1,056 investigatory stops upon arriving at the ShotSpotter-identified location. *Id.* ¶ 128. And Plaintiffs never allege that these 1,056 investigatory stops lacked reasonable suspicion and they fail to provide facts demonstrating otherwise. Moreover, the mere fact that an investigatory stop was initiated following dispatch of an officer pursuant to a ShotSpotter alert is not enough. Scruggs and Ortiz' factual allegations fail to connect the dots by tying the reason for the initial dispatch to the scene—a ShotSpotter alert—to the officers alleged constitutional conduct after arrival on scene.

Accordingly, Plaintiffs can only rely on two instances of allegedly unconstitutional stops initiated in response to a ShotSpotter alert: the allegations of Ortiz and Scruggs. Two incidents of unconstitutional investigatory stops are insufficient to show the existence of a widespread practice. *See Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (three incidents insufficient to establish a widespread practice). Thus, Plaintiffs fail to show the existence of a widespread practice. Without establishing the existence of a widespread practice, Scruggs and Ortiz cannot logically show any such practice was the "moving force" behind any alleged constitutional harm. *See Carmona v. City of Chicago*, No. 15-CV-462, 2018 WL 306664, at *2 (N.D. Ill. Jan. 5, 2018) ("Courts in this District regularly dismiss *Monell* claims where the plaintiff has failed to allege instances other than that from which he suffered.").

Instead of providing the necessary factual support, Plaintiffs claim that the Motion seeks to impose a heightened pleading burden upon them and argue that they are not required to "'identify every other or even one other individual' harmed by a constitutional violation to allege a widespread practice." Opp., p. 12 (quoting *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016)). Plaintiffs are wrong. Plaintiffs must allege sufficient facts that would support a reasonable inference that the City maintained a pattern or practice, and to do so, a plaintiff must "allege facts showing that at least more than one instance of the alleged conduct occurred to establish that a practice in fact exists." *Alcorn v.*

6

*City of Chicago*, No. 17 C 5859, 2018 WL 3614010, at *17 (N.D. Ill. July 27, 2018). This requirement "is intended to demonstrate that there is a policy at issue rather than a random event." *Carmona*, 2018 WL 306664, at *2 (internal quotations omitted). Plaintiffs seek to use *White* to circumvent this requirement. *See* Opp., p. 12. But, *White* doesn't allow plaintiffs to rely on only two instances of allegedly unconstitutional stops initiated in response to a ShotSpotter alert. *See Eichelkraut v. Jungles*, No. 21 C 02528, 2022 WL 103708, at *7 (N.D. Ill. Jan. 11, 2022) (finding that the *White* decision "did not declare that personal experience alone was sufficient at the motion to dismiss stage in all cases"). As explained in the Motion, *White* is distinguishable as there is no such additional, "other factual content" existing in this case. *See* Motion, pp. 8–9; *see also Johnson v. Cook Cnty. Sheriff's Office*, No. 16 C 07523, 2018 WL 2193235, at * (N.D. Ill. May 14, 2018). Accordingly, the allegations of Scruggs and Ortiz alone are insufficient to allege a *Monell* claim based on a widespread practice at the pleadings stage. *Eichelkraut*, 2022 WL 103708, at *7.

### D. Plaintiff Williams fails to show a widespread practice to which the City was deliberately indifferent in its training or supervision.

Plaintiff Williams, at best, presents a random, isolated case of alleged constitutional injury. Williams offers no facts to support a persistent, widespread practice of constitutional violations stemming from officers improperly misusing ShotSpotter alerts and data to improperly initiate criminal proceedings. *Carmona*, 2018 WL 306664, at *2. In the absence of a known practice and other alleged instances of improperly initiated criminal proceedings, Williams merely speculates that City policymakers were deliberately indifferent with respect to CPD's training and supervision of officers about the use of the ShotSpotter technology in criminal investigations and proceedings and thereby failed to respond to known complaints. SAC ¶¶ 564-56. A plaintiff must allege facts showing that "the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *See Sanchez v. Garcia*, No. 12 C 06347, 2015 WL 2097606, at *5

(N.D. Ill. May 4, 2015) ("The pattern of constitutional violations serves to establish that decisionmakers knew or should have known that the training was inadequate and nevertheless disregarded the consequences."). Williams's allegations do not reach this high bar by merely relying on his own allegations.

## II. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE WHERE THE COMPLAINT LACKS NON-CONCLUSORY ALLEGATIONS OF DISCRIMINATORY PURPOSE AND EFFECT.

Plaintiffs' Opposition cannot cure that the SAC fails to plead a plausible claim for a violation of the Equal Protection Clause ("EPC")—a claim traditionally rooted in discriminatory motivation. Plaintiffs failed to plead in the SAC that the City's use of ShotSpotter has a "discriminatory effect and [was] motivated by a discriminatory purpose" and their Opposition fails to show otherwise. *See Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001).

First, and foremost, the SAC presents facts insufficient to allege that the deployment and use of ShotSpotter was motived by a discriminatory purpose. Plaintiffs offer four points to "suss out purposeful discrimination"— (1) the ShotSpotter "map" is facially discriminatory; (2) Chicago's long-history of racist policing; (3) rapid expansion of ShotSpotter; and (4) an absence of public safety benefits. Opp., pp. 15–16. None of these points individually, or collectively, establish that the City had a discriminatory intent in deploying ShotSpotter.

To say that the ShotSpotter "map" itself—in other words, the coverage area of the ShotSpotter map captures 12 Black and Latine-majority police districts—establishes discriminatory intent is nothing more than saying that the map has a discriminatory effect based on the statistics. However, well-established law holds that statistics alone generally do not establish discriminatory purpose or intent. *See Chavez*, 251 F.3d at 647–48 ("statistics may not be the sole proof of a constitutional violation"); *Miller v. Johnson*, 515 U.S. 900, 914 (1995) (reaffirming that "impact alone is not determinative"). Moreover, the factual context of this case clearly falls outside the exceptions found

8

in the "rare cases [where] a statistical pattern of discriminatory impact demonstrated a constitutional violation[.]" *Chavez*, 251 F.3d at 647 (citing *McCleskey v. Kemp*, 481 U.S. 279, 293 n. 12 (1987)).[1] Consequently, Plaintiffs reliance on *Shaw v. Reno* and *Gomillion v. Lightfoot* is wholly inapposite because they fall under the "rare cases" identified in *Chavez*. *See Shaw v. Reno*, 509 U.S. 630, 633 (1993) (analyzing the legislature's "reapportionment plan that included one majority-black congressional district"); *Gomillion v. Lightfoot*, 364 U.S. 339, 340 (1960) (analyzing a scheme "redefining the boundaries of the City of Tuskegee"). Similarly, Plaintiffs' third point concerning the rapid expansion of ShotSpotter is nothing more than another veiled attempt to prove intent through statistics.

Plaintiffs' attempt to point to a generalized, unrelated history of racist policing in Chicago is no more availing in saving their EPC claim. Plaintiffs, however, offer not factual support to link these alleged historical policing tactics to the decisions to deploy ShotSpotter sufficient to "reveal [] a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. The SAC fails to allege a "specific sequence of events leading up to the challenged decision" that would "shed light on the decision maker's purposes" or any "substantive departures" from normal procedures that "afford evidence that improper purses are playing a role." *Id.* As pled, there is no plausible link connecting allegations of historical discrimination with the decision-making process to deploy ShotSpotter such as to draw any inference, let alone a reasonable inference, that ShotSpotter was deployed for a discriminatory purpose. Our case is analogous to the decision in *Quinn v. Bd. of Educ. of the City of Chicago*, where the court ruled that the citations to general history of "racial discrimination and segregation" in Chicago schools, a desegregation order and consent decree filed decades prior to the case, and "demographic statistics" in Chicago were insufficient to establish discriminatory intent for

---

[1] Those "rare cases" include statistical disparities "in the selection of a jury venire in a particular district [,]" analyses to "prove statutory violations under Title VII of the Civil Rights Act of 1964[,]" and "challenges to legislative redistricting." *Chavez*, 251 F.3d at 647 (citing *McCleskey v. Kemp*, 481 U.S. 279, 293 n. 12 (1987)).

9

an EPC claim. 234 F. Supp. 3d 922, 934–35 (N.D. Ill. 2017), *aff'd sub nom. Quinn v. Illinois*, 887 F.3d 322 (7th Cir. 2018) (dismissing equal protection claim where plaintiffs failed to allege any statements that suggested the decision-makers were motivated by race discrimination).

Further, a "post hoc" assessment on the utility of ShotSpotter to reduce gun crime or save lives fails to reveal the intent of City decision-makers. More so, the alleged absence of evidence of public safety benefits following deployment of ShotSpotter offers no insight into the motivations or racial intentions behind the implementation of ShotSpotter. Plaintiffs offer a "post hoc" assessment of public safety benefits to conceal that there are no factual allegations of any statements or directives by CPD officials reflecting that Black and Latine populations were intentionally and discriminatorily singled out when the deployment decisions concerning ShotSpotter were made. *See id.* at 935.

Plaintiffs' reliance on *Davis v. City of New York* and *Smith v. City of Chicago* also cannot save the SAC. *Davis v. City of New York* is procedurally distinguishable because it addressed the City of New York's motion for summary judgment with the benefit of discovery into the plaintiffs' *Monell* claims, not pleading standards on a motion to dismiss. 959 F. Supp. 2d 324, 359 (S.D. N.Y. 2013). Whereas the court in *Smith* denied the motion to dismiss based on a distinguishable and more insidious factual record. In *Smith,* plaintiffs alleged that the challenged investigatory stop policy pressured police officers to increase the number of stop and frisks for the "right people" (i.e., minorities), and that the Superintendent, a final policymaker, made public statements encouraging more stops of minority persons and had knowledge of officers' misconduct but still "encouraged" improper behavior "and failed to rectify the abuses." *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 756 (N.D. Ill. 2015). Here, to sidestep their factual shortcomings, Plaintiffs conclude that "[t]o be sure, there may even more evidence establishing that race was a motivating factor" but they don't need to plead such proofs. While true that Plaintiffs are not required to plead proofs, Plaintiffs are required to present facts that establish a plausible claim for discriminatory purpose. Here, they have failed to do so.

Second, Plaintiffs fail to plead discriminatory effect. According to Plaintiffs, "[t]he racial lines of the ShotSpotter map speak for themselves" and is "unexplainable on grounds other than race." Opp., p. 14. Plaintiffs argue that "the map tracks racial demographics of police districts, rather than historical rates of shootings in the City." *Id.* However, upon review, the factual allegations do not address historical rates of shootings in police districts. Plaintiffs' cherry pick statistics from some beats (a sub-unit of a district) rather than point to gun rates for the districts at issue in a blatant attempt to make unsubstantiated allegations sound relevant. *See* SAC ¶¶ 193, 195, 203. In the end, as explained above, the "map" allegations are nothing more than Plaintiffs' reliance on statistics alone; but, in this case, the statistics do not have a causal connection to equal protection violations.

Ultimately, Plaintiffs' citations to various graphics and statistics fall short of alleging a discriminatory effect and fail to support Plaintiffs' conclusory statements that Black and Latine individuals are subject to more unconstitutional police interactions because of ShotSpotter. First, Plaintiffs do not offer any substantive connection between general City-wide policing data and the City's use of ShotSpotter. *See* SAC ¶¶ 201–13. While Plaintiffs claim that they "have alleged in detail" how increases in unlawful and hostile police interactions are based *solely* on ShotSpotter, *see* SAC ¶ 202, the underlying allegation is merely conclusory and speculative because Plaintiffs do not link any unconstitutional police actions solely to ShotSpotter. Opp., p. 15. For example, where Plaintiffs cite to City-wide policing data (e.g., "Black people were 11.7 times more likely to face a use of force following an investigatory stops than non-Black people," *see* SAC ¶ 203), they also do not link such statistical allegations to ShotSpotter, nor do they point to any factual allegations that any unlawful stops or "use of force" was caused by or related to ShotSpotter. *See* SAC ¶¶ 202–03.

Next, despite Plaintiffs' reliance on the OIG Report and the ShotSpotter "map," these "sources" do not demonstrate that ShotSpotter results in more discriminatory police conduct. The OIG Report is limited to analyzing the operational benefit of ShotSpotter—a clearly political, and not

11

a constitutional, issue. Plaintiffs' allegations do not, and cannot, point to anywhere in the OIG Report that ShotSpotter leads to more unconstitutional and unlawful police conduct. *See id.* at ¶¶ 216–18. The ShotSpotter "map" also does not indicate unconstitutional police conduct. *Id.* at ¶¶ 182–200. Again, Plaintiffs offer no facts to support their conclusory allegations that ShotSpotter alerts result in an increased number of *illegal* stops and police conduct in violation of the EPC. *Id.* at ¶¶ 123–27. Similarly, Plaintiffs' allegations that ShotSpotter results in changes to police responses (e.g., officers expect to find gunfire) demonstrate a race-neutral response not indicative of racially discriminatory policing practices. *See id.* at ¶ 11 ("CPD officers treat anyone in the area as a likely shooter.").

Finally, Plaintiffs fail to respond to the City's argument that Plaintiffs fail to establish that they were treated differently than those similarly situated to members of the unprotected class, an essential element of an EPC claim. *See Williams v. Cook Cnty.*, No. 18 C 1456, 2018 WL 4361946, at *8 (N.D. Ill. Sept. 13, 2018) ("It is insufficient that Plaintiffs allege the new policy negatively affects members of a protected class; they must allege that similarly situated parties are treated differently."). The SAC does not allege any facts to support the claim that Black and Latine individuals, including Plaintiffs, were treated differently from other similarly situated individuals such that the deployment of ShotSpotter resulted in higher rates of unjustified stops and arrests or reduced access to police services for Black and Latine individuals. There are no facts alleging differences in (i) investigatory stops, arrests, or uses of force between Black and Latine individuals and White people (let alone unlawful police actions), (ii) officer behavior, or (iii) allocation of police resources to support the claim that ShotSpotter deployments adversely impacted Black or Latine persons. For all these reasons, the EPC claim must be dismissed.

## III. PLAINTIFFS FAIL TO ALLEGE VIOLATION OF THE ILLINOIS CIVIL RIGHTS ACT.

Plaintiffs' response confirms that they have not stated an ICRA claim. As an initial matter, Plaintiffs do not dispute that, to survive a motion to dismiss, they must identify a specific policy or

practice and sufficient facts that demonstrate that it has caused a relevant and statistically significant disparity between members of affected classes. *See* Opp., p. 17; *see also Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014). Plaintiffs' Response does nothing to cure or explain Plaintiffs' failure to (1) identify a specific practice or policy and (2) allege a robust casual connection.

Plaintiffs assert that their allegations related to the City's deployment decision "together with the ways that CPD uses ShotSpotter" are sufficient to state a policy or practice under ICRA. Opp., p. 17. Notably, the SAC does not allege "the ways that CPD uses ShotSpotter" as one of the criteria and method of administration in Plaintiffs' ICRA claim. *See* SAC ¶¶ 510–11. But, even considering this new spin on Plaintiffs' allegations in the Opposition, as shown in the City's Motion to Dismiss, (Motion, pp. 7–9), and Section I.C. above, Plaintiffs have failed to adequately allege that CPD's use of ShotSpotter constitutes a policy that presents a robust causal connection to alleged disparities. *See Supra* Section. I.C. As to the criteria or methods of administration, Plaintiffs merely allege that "the City has chosen to deploy ShotSpotter only in predominantly Black and Latine areas," *see* Opp., p. 17, which is not enough for purposes of ICRA. *See Cary v. N.E. Ill. Reg'l Commuter R.R. Corp.*, 19-cv-3014, 2020 WL 1330654, at *4 (N.D. Ill. Mar. 22, 2020). To state an ICRA claim, Plaintiffs need to identify a specific policy or practice. *Id.* Here, Plaintiffs' Opposition merely regurgitates the same conclusory recitation of the legal standard for an ICRA claim ("[t]he criteria and methods the Municipal Defendants have used in determining where to deploy ShotSpotter has resulted in disparate impact on Black and Latinx residents."). *See* SAC ¶ 511; Opp., p. 17. And, contrary to Plaintiffs' arguments, the allegations regarding the decision to deploy ShotSpotter in some, but not all, majority-Black and Latine districts across the City, belies the existence of a policy or practice. *Id.* (citing SAC ¶ 189).

In addition, Plaintiffs have not presented allegations to establish a robust causality "as distinct from just resulting in a disparate impact." *TBS Group, LLC v. City of Zion, Illinois*, No. 16-cv-5855, 2017 WL 5129008, at *9 (N.D. Ill. Nov. 6, 2017). Plaintiffs fail to rebut the City's arguments that they rely

on pre-existing disparities that are independent from ShotSpotter deployment and that cannot plausibly establish the "robust causality requirement." Opp., p. 17. Instead, Plaintiffs attempt to bypass the Supreme Court's imposed "robust causality requirement," *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Comm. Project, Inc.*, 576 U.S. 519, 544 (2015), and argue that the deployment of ShotSpotter is not a facially neutral policy and the decision to selectively target certain district causes "is what causes the racial disparities." *See id.* In other words, Plaintiffs proceed under a disparate treatment theory for their ICRA claim. Even so, Plaintiffs' ICRA still fails for all the reasons stated above, *supra* Section II, because Plaintiffs have failed to properly allege that the City acted with discriminatory purpose, a necessary requirement for any disparate treatment claim. Motion, pp. 14–16; *see also Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 716 (7th Cir. 2012) (holding that disparate treatment claims requires a "showing that an employer regularly and purposefully discriminates against a protected group.").

Regardless of whether Plaintiffs proceed under an ICRA disparate treatment or disparate impact claim, or both, their ICRA claim still fails because Plaintiffs do not adequately allege a disparate effect—that Plaintiffs were treated differently due to their race than other similar situated persons. Motion, pp. 19–20; *Munguia v. Illinois*, 2010 WL 3172740, at *8 (N.D. Ill. 2010). Plaintiffs assert that they do not have to allege any statistical evidence at this stage, and in any event, they alleged sufficient statistics. Opp., p. 17. But to state an ICRA claim, Plaintiffs must allege "some factual content in the complaint tending to show that the City's [policy] . . . caused a relevant and statistically significant disparity" (*Adams*, 742 F.3d at 733), or "statistical evidence of a kind and degree sufficient to show that the practice in question" caused the disparity (*Puffer,* 675 F.3d at 717). Plaintiffs fail to include any factual content tending to show that the disparities alleged in the SAC were related, much less caused by ShotSpotter. *See supra* Section II. And, while the SAC contains general pre-existing demographic disparities, historical discrimination statistics and isolated ShotSpotter data, Plaintiffs fail to connect ShotSpotter to the racial component of the person being stopped or the actual constitutional injuries.

14

Motion, pp. 18–20. Indeed, the SAC contains no relevant statistical evidence or facts related to the effect of ShotSpotter alerts on the Black and Latine population as compared to the White population related to investigatory stops and arrests or unlawful use of force to show a "significant disparity." *Id.* Accordingly, Plaintiffs fail to show that ShotSpotter caused any disparities.

Lastly, contrary to Plaintiffs' argument, *Central Austin Neighborhood Association v. City of Chicago*, 2013 IL App (1st) 123041 is inapposite. While *Central Austin* involved an alleged violation of ICRA challenging how the City of Chicago responded to 911 calls, the issue addressed by the appellate court did not turn on the sufficiency of the plaintiffs' complaint. *Id.* Rather, the court held that the political question doctrine did not divest the trial court of jurisdiction and that the trial court should not have dismissed the complaint for failure to state a justiciable claim. *See id.* at ¶ 28 ("because the complaint does not present a nonjusticiable political question, we reverse the trial court's judgment and remand for further proceedings in accord with this order"). Nowhere in *Central Austin* does the court discuss whether the facts alleged sufficed to state the elements for a cause of action under ICRA. Accordingly, Plaintiffs' claim under ICRA should be dismissed.

### IV. PLAINTIFFS' STATE LAW CLAIMS FOR *RESPONDEAT SUPERIOR* FAIL BECAUSE THEY ARE IMPROPERLY PLED AS INDEPENDENT CLAIMS.

In the motion to dismiss, the City argued that Plaintiffs' state law claims for *respondeat superior* should be dismissed because Plaintiffs improperly plead each claim as an independent cause of action. Motion, p. 20. Plaintiffs fail to cite any case to the contrary. *See* Opp., p. 20. This ends the analysis.

### CONCLUSION

Defendant City of Chicago requests that this Court grant their motion to dismiss Plaintiffs' SAC, and provide any further relief it deems necessary and just.

Dated: February 9, 2024          Respectfully submitted,

**CITY OF CHICAGO**

*/s/ Michael P. Sheehan*
One of their Attorneys

Michael P. Sheehan
Allan T. Slagel
Barton O'Brien
Ioana M. Guset
Yeoeun C. Yoon
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
Email: msheehan@taftlaw.com
        aslagel@taftlaw.com
        bobrien@taftlaw.com
        iguset@taftlaw.com
        yyoon@taftlaw.com