# Exhibit A

Plaintiffs Lucy Parsons Labs, Daniel Ortiz, and Derick Scruggs's Requests for Production

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL WILLIAMS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHICAGO, *et al.*,<br><br>Defendants. | Case No. 22-cv-3773<br><br>Judge Lindsay C. Jenkins<br>Magistrate Judge Young B. Kim |

**PLAINTIFFS LUCY PARSONS LABS, ORTIZ, SCRUGGS REQUESTS FOR PRODUCTION TO DEFENDANT CITY OF CHICAGO**

Plaintiffs Lucy Parsons Labs, Daniel Ortiz, and Derick Scruggs propound the following Requests for Production pursuant to Federal Rule of Civil Procedure 34 on Defendant City of Chicago to be answered in accordance with the schedule set for by Magistrate Judge Kim:

**Definitions and Instructions**

Please refer to the instructions and definitions attached as Appendix A to these Requests and incorporated herein.

**Requests for Production**

**POLICIES AND PROCEDURES**

1. All written policies, procedures, practices, guidance, regulations, rules, orders, directives, memoranda or similar documents of the City of Chicago, Chicago Police Department, Office of Emergency Management and Communications, Public Buildings Commission, and Office of Public Safety Administration (or any predecessor agencies) that were in effect or that were written at any time since January 1, 2012 that concern ShotSpotter or that mention ShotSpotter. This request includes but is not limited to such documents that concern:

a. how CPD officers should respond to ShotSpotter alerts, including but not limited to how ShotSpotter alerts may be used with respect to investigative stops and activities descrived in Section VII.C of CPD Special Order S03-19;

b. activities of the Office of Emergency Management and Communications with respect to police dispatches in response to ShotSpotter alerts and recordkeeping in the City's computer-aided dispatch system or other systems, including activities described in Section VII.B of CPD Special Order S03-19;

c. activities of Strategic Decision Support Centers with respect to ShotSpotter alerts, including activities described in Sections VII.A and VII.E of CPD Special Order S03-19;

d. collection and reporting of information regarding any deficiencies with respect to ShotSpotter alerts, including missed gunshots, mislocated gunshots, and false alerts to non-gunshots.

e. cross-referencing or other use of ShotSpotter alerts in conjunction with other sources of information such as surveillance cameras, Briefcam, automated license plate readers, facial recognition technology, GPS information from electronic monitors worn by people as a condition of pretrial release, parole, probation or other forms of community supervision, or social media monitoring tools;

f. analysis of ShotSpotter alerts to identify gun violence trends, crime patterns, specific locations with a high number of ShotSpotter alerts

g. use of ShotSpotter alerts in crime analysis, Compstat, strategic response, ShotSpotter "missions," or allocation of public safety resources, including all activities described in Part VII.E of CPD Special Order S03-19.

2. All documents and communications concerning the processes by which the City of Chicago developed its ShotSpotter policies, procedures, practices, guidelines, regulations, rules, orders, directives, memoranda or similar documents. This request includes but is not limited to such documents that concern CPD Special Order S03-19 and the matters identified in paragraph 1(a)-(g) above.

3. All documents and communications concerning review of or actual/potential changes to the City of Chicago's ShotSpotter policies, procedures, practices, guidelines, regulations, rules, orders, directives, memoranda or similar documents. This request includes but

is not limited to such documents that concern CPD Special Order S03-19 and the matters identified in paragraph 1(a)-(g) above.

4. For the period January 1, 2017 to present, Any communications regarding this lawsuit, regarding ShotSpotter, or regarding ShotSpotter-related policies, practices, or customs, that were sent to or from agents of the City of Chicago (including the Office of the Mayor, Chicago Police Department, Office of Public Safety Administration, and Office of Emergency Management and Communication) who have decisionmaking authority or significant input into the policies, practices, and customs with respect to ShotSpotter that are the subject of Counts I, II, and III of this lawsuit.

**GEOGRAPHICAL COVERAGE**

5. Documents sufficient to show the geographical boundaries of the ShotSpotter coverage area at different points in time form January 1, 2012 to present.

6. Documents describing, explaining, or memorializing all decisions about which geographical areas of the City to include (or not include) within the ShotSpotter coverage area.

7. Communications to, from, or among agents of the City of Chicago (including the Chicago Police Department, Office of Emergency Management and Communication, Office of Public Safety Administration, Public Buildings Commission, or predecessors) that concern decisions about which geographical areas of the City to include (or not include) within the ShotSpotter coverage area. This request includes communications with agents, employees, representatives, or lobbyists for ShotSpotter as well as personnel of the University of Chicago Crime Lab.

8. All documents, data, statistics, reports, or other information upon which the City or ShotSpotter relied in making decisions about which areas of the City to include (or not include) within the ShotSpotter coverage area.

9. Any documents that concern the City's decisionmaking process(es) to determine the ShotSpotter coverage area.

**CONTRACTUAL REQUIREMENTS**

10. All contracts, agreements and related documents exchanged between the City of Chicago and ShotSpotter with respect to the ShotSpotter gunshot detection system, to the extent such documents relate to the nature of the services provided; geographic coverage area of services provided; performance standards or service-level standards for the system; guarantees, representations, or disclaimers regarding the system's performance, outcomes, or results; representations or requirements regarding testing, validation, or reliability; or other operational aspects of the ShotSpotter system.

11. Documents relating to the procurement or contracting process used with respect to ShotSpotter gunshot detection system to the extent such documents concern the nature of the services provided; geographic coverage area of services provided; performance standards or service-level standards for the system; guarantees, representations, or disclaimers regarding the system's performance, outcomes, or results; representations or requirements regarding testing, validation, or reliability; or other operational aspects of the ShotSpotter system.

12. All documents or communications that concern decisions or deliberations by City of Chicago officials to enter into, approve, renew, extend, change, continue, discontinue or otherwise affect any agreements between the City of Chicago and ShotSpotter, including but not limited to the agreements in December 2020 and October 2022 to extend the ShotSpotter

contracts through August 2023 and February 2024, respectively; the agreements in June 2022 and June 2023 to modify the terms of the ShotSpotter contract; and the decision in October 2023 to make payment on the ShotSpotter contract. This request includes communications with agents, employees, representatives or lobbyists for ShotSpotter.

13. All communications between any agent for the City of Chicago employees and agents, employees, representatives or lobbyists for ShotSpotter since April 5, 2023 that concern the City's contract for ShotSpotter technology or the City's decision about whether to continue or extend its contract for ShotSpotter technology beyond February 2024.

14. All documents of the Chicago Emergency Telephone Systems Board that relate to ShotSpotter, including any agendas, minutes, recordings of meetings, or documents disseminated to or considered by members of the Board.

**TRAINING**

15. All Documents from January 1, 2012 to the present relating to training of City employees with respect to ShotSpotter and/or its use in the City of Chicago. This request includes, but is not limited to, training provided to CPD patrol officers, CPD detectives, CPD civilian employees, other CPD personnel (including supervisions, members of specialized units including SDSC rooms, gang units, and CPIC, and department leadership), as well as employees of OEMC and the Department of Public Safety Administration. This request includes but is not limited to training on:

a. how ShotSpotter works, its capabilities, and its functions.

b. the precision, accuracy, or reliability of ShotSpotter, including with respect to distinguishing gunshots from other loud noises and determining the location of actual or possible gunshots.

c. training provided to CPD officers about the use of ShotSpotter technology in investigatory stops or in police dispatches/calls for service;

d. whether and how CPD officers may use ShotSpotter alerts as a basis for an investigatory stop or any other search or seizure;

e. ShotSpotter's use in crime analysis, strategic responses to crime, deployment or allocation of CPD resources, CPD performance metrics, or Compstat;

f. any other functions related to ShotSpotter described in CPD Special Order S03-19;

g. OEMC personnel responsibilities with respect to ShotSpotter alerts;

h. SDSC personnel responsibilities with respect to ShotSpotter alerts.

i. training provided to members of the Fourth Amendment Street Stop Review Unit, Force Review Unit, or Tactical Review and Evaluation Division (or equivalent internal CPD units) with respect to ShotSpotter;

j. gathering and reporting data regarding ShotSpotter errors, including missed gunshots, mislocated gunshots, and false alerts.

16. All documents or communications since January 1, 2017, that concern the development, review, or actual/potential changes to the training of City employees with respect to ShotSpotter and/or its use in the City of Chicago. This request includes but is not limited to such document concerning training on the matters identified in this preceding paragraph.

**TECHNOLOGY, RELIABILITY, AND TESTING**

17. Any and all documents from January 1, 2017 to the present that concern ShotSpotter's technology and methods for distinguishing gunfire from other noises and determining its location, including ShotSpotter's computer algorithms/software and the review of noises by ShotSpotter employees prior to publishing an alert to CPD.

18. If you contend that ShotSpotter reliably or accurately identifies the sound of gunfire, distinguishes gunfire from other noises, and/or determines the location of gunshots or other loud noises, produce all documents that support such contention(s) and all documents that reflect the City's knowledge or evaluation of the reliability or accuracy of ShotSpotter in these regards.

19. If you contend that the City has made any effort to test, validate, investigate, review, or otherwise assess ShotSpotter for its accuracy or reliability, including with respect to distinguishing gunfire from other loud noises, detecting actual gunshots, or determining the location of actual or possible gunshots including, produce all documents relating to all such efforts.

20. All Documents that reflect any testing or validation of ShotSpotter in the City of Chicago or anywhere else, including with respect to ShotSpotter's ability to detect actual gunshots, to distinguish gunfire from other loud noises, and to determine the location of actual or possible gunshots.

21. All documents or communications concerning the decision not to conduct deployment qualification testing or other validation testing of the ShotSpotter system in Chicago, as reflected in the document disclosed by Plaintiffs at Williams 5126.

**PURPOSES AND EFFICACY**

22. If you contend that the City's use of ShotSpotter has a "manifest relationship" to a legitimate non-discriminatory policy objective and is necessary to the attainment of that objective,[1] then produce all documents that support your contention.

23. If you contend that the geographical coverage of ShotSpotter in the City of Chicago has a "manifest relationship" to a legitimate non-discriminatory policy objective and is necessary to the attainment of that objective,[2] then produce all documents that support your contention.

---

[1] *See Central Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, ¶ 10 (internal quotation omitted).
[2] *Id.*

24. If you contend that ShotSpotter has played a role in saving lives of one or more shooting victims, produce all Documents that support your contention. For any/all particular shooting incident(s) where you contend that ShotSpotter played a role in saving a life, produce:

a. all OEMC event queries relating to each such shooting incident, including 9-1-1 calls or other notifications regarding the shooting;

b. all CPD or OEMC radio transmissions relating to each such shooting incident;

c. all body-worn camera footage relating to each such shooting incident;

d. incident reports, case reports, arrest reports, and other reports prepared in connection with police, fire, or ambulance response to each such shooting incident;

e. any records regarding medical treatment or medical outcomes that were relied on by the City to determine that ShotSpotter played a role in saving a life;

f. any other documents that reflect or were relied on by the City of Chicago to determine that ShotSpotter played a role in saving a life.

25. If you contend that ShotSpotter has improved public safety or community safety, then produce all documents that support your contention.

26. If you dispute any of the following propositions, then produce all documents upon which you rely to dispute them:

a. that there there is "clear evidence ShotSpotter is unreliable and overly susceptible to human error;"[3]

b. that Shotspotter "played a pivotal role in the police killing of 13-year-old Adam Toledo;"[4]

c. that "there are better ways in which we can use those dollars" currently paying for ShotSpotter;[5]

---

[3] *Public Safety and Police Reform*, Brandon Johnson Campaign Website, https://web.archive.org/web/20230522181524/https://www.brandonforchicago.com/issues/public-safety

[4] *Id.*

[5] Quinn Myers, *Will ShotSpotter Stay?*, BLOCK CLUB CHICAGO (April 12, 2023), available at https://blockclubchicago.org/2023/04/12/will-shotspotter-stay-mayor-elect-brandon-johnson-says-better-ways-to-spend-money-but-stops-short-of-pledging-to-dump-it

d. that ShotSpotter "has not yielded the results"[6]

27. Any and all documents, data, analysis, studies, audits, technical papers, white papers, or other reports regarding ShotSpotter, including but not limited to its accuracy, reliability, and efficacy.

28. All Documents from January 1, 2012 to the present that concern assessments or evaluations of ShotSpotter's usefulness or performance in the City of Chicago, including:

a. ShotSpotter's impact on homicide, shooting, and other gun crime rates;

b. the frequency with which ShotSpotter alerts lead officers to find corroboration of a gunshot;

c. the frequency with which ShotSpotter leads to the recovery of evidence;

d. the frequency with which ShotSpotter leads to gun-related arrests;

e. the frequency with which ShotSpotter leads officers to identify victims of shootings and/or provide assistance to people who have been shot;

f. the impact of ShotSpotter on case clearance rates;

g. the impact of ShotSpotter on police stops, uses of force, or other police actions;

h. whether ShotSpotter is meeting its contractual requirements and service-level commitments;

i. any other purported benefit, drawback, or harms of the ShotSpotter system;

j. any cost/benefit analysis of ShotSpotter;

k. any comparisons of ShotSpotter to other, alternative public safety or community safety interventions or tools.

29. All documents or communications relating to empirical studies or assessments of ShotSpotter in the City of Chicago, including communications with Prof. Eric Piza concerning

---

[6] *Id.*

his National Institute of Justice-funded study of ShotSpotter in the City of Chicago or with Michael Topper or Toshio Ferrazares concerning their empirical research.

30. All briefings, reports, talking points, or similar documents prepared since January 1, 2016, for individuals with policy making authority with respect to ShotSpotter or for leadership of the City of Chicago (including the Mayor and his/her senior advisors), Chicago Police Department (including the Superintendent, Chiefs, and Deputy Chiefs), Office of Emergency Management and Communications or Department of Public Safety Administration concerning ShotSpotter, including such documents that were:

a. prepared in response to (or otherwise concerning) media reports or questions from the press;

b. prepared in response to (or otherwise concerning) the Office of Inspector General's August 2021 report concerning the CPD's use of ShotSpotter technology;

c. prepared in response to (or otherwise concerning) criticisms by members of the public of ShotSpotter or its use in Chicago;

d. prepared in response to (or otherwise concerning) questions or criticisms from members of the City Council

e. prepared in advance of or in response to (or otherwise concerning) actual or potential City Council hearings, including the meeting of the Public Safety Committee held on November 12, 2021; and

f. prepared in connection with the City's budget process or hearings.

31. All communications between any agent for the City of Chicago and any employee, agent, representative or lobbyist for ShotSpotter concerning:

a. testing, validation, or similar examination of ShotSpotter

b. the methods and processes ShotSpotter uses to detect gun violence

c. claims that ShotSpotter makes regarding its products, including its claim of "97% accuracy," its claim to "save lives," its claim to reduce gun violence, and its claim to improve police-community relations.

d. the accuracy or reliability of ShotSpotter;

e. ShotSpotter's performance in the City of Chicago

f. the impact of ShotSpotter on homicides, shootings, gun crimes, or other public safety measures.

g. the impact of ShotSpotter on case clearance rates for fatal shootings or other gun crimes.

h. the impact of ShotSpotter in recovering evidence.

i. the frequency with which ShotSpotter leads officers to identify victims of shootings and/or provide assistance to people who have been shot.

j. any other purported benefit, drawback, or harms of the ShotSpotter system.

**STRUCTURED DATA**[7]

32. Any and all reports, data, statistics, information, and documents from January 1, 2017 to the present prepared, compiled, or produced by or for the City of Chicago and pertaining to the Chicago Police Department's use of ShotSpotter.

33. A complete set of data, including all data fields available to the City, of ShotSpotter alerts in the City of Chicago from January 1, 2011 to the present.

34. A complete set of data, including all data fields (including full-text narrative), of investigatory stop reports from January 1, 2015 to the present.

35. A complete set of data, including all data fields (including full-text narratives) of traffic stop reports from January 1, 2015 to the present.

36. A complete set of data, including all data fields (including full-text narratives) of tactical response reports from January 1, 2015 to the present.

[7] Plaintiffs seek the datasets identified in paragraphs 33-37, and 40-42 below in order to establish, statistically and qualitatively, their claims regarding investigatory stops and other harms that result from ShotSpotter alerts, including the racial disparity in such effects. Some of these datasets are also relevant to questions regarding class certification and other issues. Plaintiff anticipates engaging in discussions with the Defendant to determine whether it is possible and appropriate to narrow the data fields to be disclosed from each of these datasets in order to eliminate data that is not necessary or relevant. Because Plaintiff does not currently know what data fields are contained in the relevant databases, it is not possible at this time to specify the scope of the requested data with more precision.

37. A complete set of data from the City of Chicago's computer-aided dispatch ("CAD")/9-1-1 system, including all data fields recorded by OEMC, of all events/dispatches from January 1, 2015 to the present.

38. A set of data from OEMC and/or CPD that includes each police dispatch in response to a ShotSpotter alert from January 1, 2017 to the present to which any of the following officers responded: any Williams Defendant Officer, Ortiz Defendant Officer, or other officer disclosed as witness to the police stops of Plaintiffs Williams and Ortiz described in the Second Amended Complaint. This set of data should include all data fields available to OEMC and/or CPD, including at minimum those corresponding to the date, time, dispatch type, location (including address and/or GPS coordinates), disposition (including any IUCR code, miscellaneous incident code, or other description of what officers reported finding at the scene), beat number, district number, responding officer beat numbers (or star number or other officer-identifying information), RD number, and event number.

39. Data sufficient to show the beat number, star number, and other identifying numbersassigned to each  Williams Defendant Officer, Ortiz Defendant Officer, or other officer disclosed as witness to the police stops of Plaintiffs Williams and Ortiz described in the Second Amended Complaint on each day from January 1, 2017 to the present, This request is intended to obtain information sufficient to permit Plaintiffs to discern which officers responded to which ShotSpotter alerts contained in the datasets requested above.

40. A complete set of data showing attendance and assignment of police officers for January 1, 2015 to the present, including shift start/end times, district/beat assignment, and identifying information or each officer, including rank and title.

41. A complete set of data reflecting all complaints or error reports submitted to ShotSpotter that concern missed gunshots, mislocated gunshots, false alerts to non-gunshots, ShotSpotter alerts for which corroboration of gunfire could not be found, or any other errors or potential errors with respect to ShotSpotter.

42. All data showing the racial or ethnic demographics of the City of Chicago by census block, police beat, police district, police area, or other geographical unit, from January 1, 2010 to the present.

43. With respect to each database, spreadsheet, or similar data source from which Defendant discloses information in response to these Requests, please disclose the "data dictionary," key, legend, guide, manual, or similar documents that describe the data fields and information contained therein.

44. Body-worn camera footage for all investigatory stops that (1) have an event number or RD number that corresponds to a call-for-service for which there was an associated ShotSpotter alert; (2) list a time and location that is within 15 minutes and 500 feet of a ShotSpotter alert; or (3) mention "ShotSpotter" "Shot Spotter" "SpotShotter" "Spot Shotter" or "SST" anywhere in the investigatory stop report, including in the narrative or other free-text fields. Alternatively, body-worn camera footage for a sample of investigatory stops associated with ShotSpotter alerts. The sample will be specified by Plaintiffs (or, if possible, through means agreeable to Plaintiffs and Defendant) after obtaining disclosure of the datasets concerning investigatory stop reports, ShotSpotter alerts, and OEMC CAD/9-1-1 dispatch records that are requested in paragraphs 33, 34, and 37 above.

45. For all police uses of force (or other incidents that required the completion of a Tactical Response Report) that occurred in the course of a police response to a ShotSpotter alert

since January 1, 2017, please disclose the completed "Tactical Response Review – Investigation" form and "Tactical Response Report – Review" form associated with each such incident. Plaintiff anticipates being able to identify such incidents with particularity after obtaining disclosure of the datasets regarding ShotSpotter alerts, OEMC CAD/9-1-1 dispatch records, and tactical response reports that are requested in paragraphs 33, 36 and 37 above.

46. All complaints filed with the City of Chicago, Chicago Police Department, or Civilian Office of Police Accountability that concern or mention the use of ShotSpotter, as well as the investigative file and disposition for each such complaint.

**GENERAL REQUESTS**

47. All documents identified in your Rule 26(a)(1) disclosures.

48. For the period January 1, 2017 to present, all Communications concerning ShotSpotter to/from all City employees listed in your Rule 26(a)(1) disclosures.

49. All documents or communications that you may rely on in support of your claims or defenses in this action, including solely for impeachment.

50. All documents or communications prepared by City of Chicago officials concerning the *Monell*, ICRA, injunctive, or putative class claims in this lawsuit and related allegations in this lawsuit.

51. All documents tendered to any member of the news media in reference to this case.

52. All demonstrative aids or summaries of evidence prepared for use in this matter by the City of Chicago or its employees, agents or attorneys.

53. For any experts you disclose pursuant to Rule 26, produce (a) all documents examined or relied upon by the expert; (b) all reports or opinions prepared by the expert;(c) a

curriculum vitae for the expert, and (d) and copies of all articles, reports, or professional papers published by the expert.

54. All documents obtained from non-parties to this action concerning ShotSpotter or the *Monell*, ICRA, injunctive, or putative class claims in this action, including but not limited to documents obtained by subpoena or FOIA request.

55. All documents, statements, or communications reflecting contacts or communications your attorneys or other agents, including anyone working at the direction of your attorneys, have had with any witnesses in this matter.

56. Any and all communications by Defendant's attorneys or their agents with non-parties that concern the *Monell*, ICRA, injunctive, or putative class claims alleged in the Second Amended Complaint.

57. All documents referred to, identified, relied upon, or related to any of your answers to any of Plaintiff's Interrogatories.

Respectfully submitted,

/s/Jonathan Manes

*One of Plaintiffs' Attorneys*

Jonathan Manes
Alexa Van Brunt
MacArthur Justice Center
160 E. Grand Ave., 6th Fl.
Chicago, Illinois 60615
(312) 503-0012
jonathan.manes@macarthurjustice.org
a-vanbrunt@law.northwestern.edu

Megha Ram
MacArthur Justice Center
501 H Street NE, Suite 275
Washington, DC 20002
(202) 86903439
megha.ram@macarthurjustice.org

Elizabeth Mazur
Hughes Socol Piers Resnick & Dym
70 W. Madison Street, Suite 4000
Chicago, IL 60602
(312) 580-0100
emazur@hsplegal.com

Daniel Massoglia
Joseph DiCola
Emma Melton
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
(336) 575-6968
daniel@first-defense.org

*Attorneys for Plaintiffs*

## Appendix: Definitions and Instructions

### Definitions

1. "Communication(s)" means any transmission of words or thoughts between or among two or more persons and includes any/all forms of communication and includes but is not limited to spoken words, conversations, conferences, discussions, talks, and reports, whether transmitted in person, in writing, or by any electronic device such as the telephone or facsimile, including text messages, emails (and any attachments thereto), messages sent via messaging applications (including without limitation WhatsApp, Telegram, Slack, Skype, Microsoft Teams, etc., and proprietary communications systems used by CPD or any City agency) and/or messages sent and/or posted in social media applications (including without limitation Facebook, Instagram, Google Hangouts, Google+, Reddit, etc.) and "documents" as that term is defined below.

2. "Document(s)" shall have the broadest possible meaning under the Federal Rules of Civil Procedure and shall include but is not limited to any handwritten, typed, photographed, computerized, electronic, audio, video, graphical matter, recorded materials, or any other tangible thing by which information is contained, stored, or displayed, whether draft or final, original or reproduction, signed or unsigned, and regardless of whether approved, signed, sent, received, redrafted, or executed, including but not limited to: written communications, email, messages sent via messaging applications (including without limitation WhatsApp, Telegram, Slack, Skype, Microsoft Teams, etc., and proprietary communications systems used by CPD or any City agency), messages sent and/or posted in social media applications (including without limitation Facebook, Instagram, Google Hangouts, Google+, Reddit, etc.), letters, words, numbers, pictures, sounds, symbols or any combination thereof, correspondence, envelopes,

computer printouts, teletypes, texts, telecopies, memoranda of telephone conversations or personal conversations, diaries, calendars, interoffice communications, records, reports, studies, bills, receipts, checks, invoices, requisitions, tape or disk recordings, papers and forms filed with any court or governmental body, notes, transportation and expense logs or records, work papers, contracts, formal or informal memoranda of meetings, statistical and financial statements, charts, graphs, reports or material similar to any of the foregoing, however denominated, by whomever prepared, and to whomever addressed, which are in your possession, custody or control or to which you have, have had or can obtain access or known by you to exist, whether or not claimed to be privileged or otherwise excludable from discovery. The word "documents" extends to data that is stored or maintained only in electronic format. Any document which contains any comment, notation, addition, insertion, or marking of any kind constitutes a document separate from the unmarked version. The word "documents" should be construed in the broadest sense possible in responding to these Requests.

3. "Person" shall refer to any individual, corporation, partnership, organization, governmental body, or any other form of business, professional, commercial governmental enterprise or entity.

4. "Relate," "relating to," "regarding" or "concerning" shall mean directly or indirectly mentioning or describing, pertaining to, being connected with, reflecting upon, or being in any way legally, logically or factually connected with the matter discussed in the interrogatory.

5. "Identify" with respect to a person shall mean to provide that person's name, address, and telephone number; with respect to a Document, "identify" shall mean to tprovide the date of the Document, the authority of the Document, the subject matter of the Document,

and, where applicable, all recipients of the Document; with respect to a Communication, "identify" shall mean to provide the date of the Communication, the person making the Communication, the subject matter of the Communication, and all Persons who received the Communication.

6. "And" and "or" mean "and/or" so that the terms are given their broadest possible meaning. In construing the request, the singular shall include the plural and the plural shall include the singular, and the use of a masculine, feminine, or neuter pronoun shall not exclude any of the others. The use of any verb tense includes all other tenses of the verb so used, except where circumstances clearly make it inappropriate.

7. "ShotSpotter" also means SoundThinking.

**Instructions**

1. If you object to any of the Definitions, Instructions, or Requests herein, you must do so by written response hereto. If said written response to a Definition, Instruction, or Request is not made prior to your response to these Requests and in accordance with the Court's October 19, 2023 Order regarding objections [Dkt. 212], it will be presumed that you do not object to any Definition, Instruction, or Request.

2. In producing documents pursuant to these requests, the defendant shall indicate, by request number, the specific request(s) to which the documents are responsive. If a document is responsive to more than one paragraph of this request, it need only be produced once. However, the defendant shall identify each request to which it is responsive.

3. In response to these requests, the defendant shall produce all documents within its possession, custody, or control including those that it has effective power to obtain.

4. Defendant's search obligations extend to documents or data maintained in hard copy format and to electronically stored information ("ESI"). In producing documents, Defendants are requested to produce documents pursuant to an ESI protocol to be agreed upon by the Parties in the case.

5. These Requests are to be construed broadly to yield disclosure of as much relevant information as possible.

6. For each document responsive to these requests that is withheld from production under a claim of privilege, immunity or work product protection, the following information must be provided:

a. The place, date and manner of recording or preparing the document;

b. The name and title of the sender and the name and title of each recipient of the document;

c. A description of the subject of the document;

d. The identity of each person or persons (other than stenographic or clerical assistance) participating in the preparation of the documents;

e. The identity of each person to whom the contents of the document have heretofore been communicated by copy, exhibition, sketch, reading, or summarization, the dates of such communication, and the employer and title of the person at the time of said communication; and

f. A statement of the basis on which privilege, immunity or work protection is claimed.

7. With respect to each and every redaction of information on documents produced by the defendant, provide a statement setting forth the following:

a. The page or pages on which the redaction occurs;

b. The general nature or description of the information redacted, the subject matter of the redacted information, and the number of lines or pages that are redacted; and

c. The specific factual and legal grounds upon which you base your claim of privilege.

8. All requests herein are continuing in nature so as to require prompt supplemental responses when and if the defendant obtains additional information. Additional documents or information shall be produced promptly upon the defendant's acquisition, but not later than 30 days after such documents or information are received by the defendant.

9. Documents that are stored electronically shall be produced in their native format with all metadata intact.

10. Any request for a Document is also a request to produce all iterations of that Document, including all earlier and all later versions of that Document.

11. If there are no Documents in your possession, custody, or control responsive to a particular request, please so state and identify the particular request for which you have no responsive Documents in your possession, custody, or control.

12. If any Documents responsive to Plaintiffs' discovery requests are known by you to exist but are not in your possession, custody, or control, please Identify those Documents and the Person who has possession, custody, or control thereof.

13. If Defendant claims that any document or documents containing information responsive to these Requests have been destroyed, missing, or lost, the production of which is sought by the Request, Plaintiffs must furnish a list identifying each destroyed, missing or lost document and identify: (1) the date of the document; (2) each and every author of the document;

(3) each and every other person who prepared or participated in the preparation of the document; (4) each and every person who received the document; (5) a description of the document (*e.g.*, email, letter, memorandum, etc.); and (6) provide sufficient information explaining the circumstances resulting in the said disposition of the document.

14. To the extent such material requested has already been produced, Plaintiffs are instructed to respond by identifying such previously produced responsive material by Bates Number.

15. To the extent that Defendant previously objected or limited its responses to any request for product previously propounded by Plaintiffs on the grounds that discovery was stayed with respect to certain claims in this case, the Defendant must timely update its responses to those requests in light of the Court's order lifting such stay.

16. Headings that are included in the Requests are provided merely for clarity and convenience of the reader and should not be construed to affect or limit the substance or scope of any Request.