**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DANIEL ORTIZ and DERICK SCRUGGS, on behalf of themselves and a class of similarly situated people, and LUCY PARSONS LABS, on behalf of itself and its members, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Case No. 22-cv-3773 Class Action |
| v. | ) ) | JURY TRIAL DEMANDED |
| CITY OF CHICAGO, CHICAGO POLICE OFFICERS HARSIMRAN POWAR (#17135), MICHAEL MATIAS (#18985), FIDEL LEGORRETA (#5902), THEODORE ANDREWS JR. (#7099), and SARAH KECKLEY (#7041). | ) ) ) ) ) ) ) | Judge Lindsay C. Jenkins Magistrate Judge Young B. Kim |
| Defendants, | ) ) |  |

## THIRD AMENDED CIVIL RIGHTS CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES

Individual Plaintiffs DANIEL ORTIZ, and DERICK SCRUGGS, and organizational

Plaintiff LUCY PARSONS LABS, file this complaint for damages, declaratory, and injunctive

relief on behalf of themselves and their members, and a class of similarly situated individuals in

the City of Chicago who have been or will be stopped by Chicago police officers responding to a

ShotSpotter alert, against the CITY OF CHICAGO, as well as CHICAGO POLICE

DEPARTMENT OFFICERS HARSIMRAN POWAR (#17135), MICHAEL MATIAS (#18985),

FIDEL LEGORRETA (#5902), THEODORE ANDREWS JR. (#7099), and SARAH KECKLEY

(#7041), in their individual capacities, and allege as follows:

## INTRODUCTION

1.     The City of Chicago spends more than $9 million dollars every year on a contract with ShotSpotter, a for-profit company, to use its unreliable and ineffective gunshot detection system. The City of Chicago has purposefully blanketed the South and West sides of the City of Chicago with ShotSpotter sensors, to the detriment of the primarily Black and Latinx people who live under ShotSpotter's shadow.

2.     The City's use of ShotSpotter is fueling unconstitutional policing practices in a city that has a long history of discriminatory police conduct.

3.     Every day in Chicago, Chicago Police Department (CPD) officers are deployed around 100 times to chase down alerts of supposed gunfire generated by ShotSpotter. More than 90% of the time they find no indication of any gun-related incident, according to the City's own data. The result is more than 31,600 unfounded CPD deployments every year because of ShotSpotter—more than 87 on an average day.

4.     CPD relies so heavily on ShotSpotter because the City has repeatedly contracted for its use. Remarkably, however, ShotSpotter has never been tested to determine how well it can distinguish gunshots from other loud noises like fireworks. The City's decision to use this unreliable technology to direct massive numbers of unwarranted and highly volatile police deployments produces grave and systematic violations of Chicagoans' constitutional and statutory rights.

5.     CPD has intentionally misused ShotSpotter alerts to make scores of illegal stops and arrests. CPD officers, chasing down unfounded ShotSpotter alerts, have stopped and detained thousands of innocent Chicagoans who happened to be near the location of an alert. CPD officers have used ShotSpotter's presence on the South and West sides of the City as

justification for aggressive police tactics—treating residents as suspects, detaining them, and frisking them just because there has supposedly been a history of ShotSpotter alerts in the area. CPD officers have even used ShotSpotter alerts as a basis to falsely accuse people of crimes.

6.      CPD officers engage in thousands of unwarranted confrontations with residents on the streets of Chicago because they are chasing down bogus ShotSpotter alerts, knowing the technology to be ineffective.

7.      When CPD officers receive a ShotSpotter alert, they race to the location of the alert—often with multiple squad cars—because the system is telling them that a person just fired a gun there. CPD officers treat anyone in the area as a likely shooter, despite knowing that the overwhelming majority of ShotSpotter alerts turn up no evidence of gunfire. The predictable result is a pattern of unconstitutional investigatory stops fueled by ShotSpotter.

8.      On April 19, 2021, Plaintiff Daniel Ortiz, a 36-year-old Chicagoan of Puerto Rican descent, was stopped, frisked, handcuffed, interrogated, and ultimately arrested on pretextual drug charges by CPD Defendant Officers Powar and Matias, who were responding to a ShotSpotter alert in the Schorsch Village neighborhood on the Northwest side. The primary caretaker for his young family, Mr. Ortiz was outside a laundromat that afternoon finishing his family's laundry. Defendant Officers Powar and Matias pulled into the parking lot in their unmarked police SUV, moved aggressively toward Mr. Ortiz, and immediately detained him for questioning about supposed gunfire. In fact, there had been no gunshot, and police found nothing to corroborate the ShotSpotter alert.

9.      Defendants Powar and Matias, however, escalated their illegal stop of Mr. Ortiz. They searched his car and discovered marijuana and a bottle of prescription drugs. Defendants Powar and Matias arrested Mr. Ortiz on these drug charges and impounded his car, all as a

3

pretext to continue to search in vain for evidence that Mr. Ortiz had fired the supposed gunshot that ShotSpotter had detected. Mr. Ortiz was jailed overnight, the charges were dismissed in court the next day, and his vehicle was eventually returned after an administrative law judge determined that the Defendants lacked probable cause to impound it in the first place.

10.     Derick Scruggs, too, was illegally detained, questioned, and searched by police officers in response to a ShotSpotter alert. On the date he was detained, Mr. Scruggs was a 30-year-old father who worked as a licensed armed security guard at an AutoZone in the Englewood neighborhood on the South Side of Chicago. A ShotSpotter alert sent Defendants Legorreta and Andrews to the parking lot of the AutoZone, where they immediately stopped, detained, and interrogated Mr. Scruggs as a shooting suspect for no reason other than the ShotSpotter alert. During the course of the lengthy detention, which involved a degrading and humiliating body search, Defendant Officer Legorreta mischaracterized evidence and manufactured demonstrably false allegations in order to justify his false suspicions against Mr. Scruggs. Police found no actual evidence to corroborate their purported suspicion that a gun had been fired. Eventually, a CPD supervisor ordered Defendant Officers to release Mr. Scruggs.

11.     Remarkably, Defendant Officers Legorreta and Andrews returned the next day to continue investigating Mr. Scruggs in connection with the supposed gunshot detected by ShotSpotter. They ultimately arrested and jailed Mr. Scruggs for a paperwork violation, alleging that his registration with the state agency that licenses armed security guards had lapsed a few months prior—a purely bureaucratic requirement that simply involves paying a $45 renewal fee. The arrest, like Mr. Ortiz's, was an obvious pretext to justify their baseless suspicions fueled by ShotSpotter. The charges were dismissed two months later by the State's Attorney's Office, but by that time, Mr. Scruggs had been stripped of his livelihood, unable to work in his profession.

4

12.     CPD's illegal stops of Mr. Ortiz and Mr. Scruggs are not unique; they are emblematic of a systematic pattern of illegal ShotSpotter stops in the City of Chicago.

13.     According to the Chicago Office of the Inspector General ("OIG"), over a period of 18 months, CPD officers detained more than 2,400 Chicago residents after chasing down ShotSpotter alerts—or even just because of a supposed *history* of past ShotSpotter alerts in an area. These ShotSpotter-prompted encounters are hostile, terrifying, and unwarranted. Over a six month period in 2019, police reported using physical force against scores of unarmed Chicagoans during ShotSpotter-prompted incidents.

14.     The City's reliance on ShotSpotter results is a misallocation of municipal resources to the detriment of the people who live under ShotSpotter's footprint. The City pays $9 million every year to ShotSpotter and spends untold more on the thousands of hours CPD officers spend chasing down unfounded ShotSpotter alerts. ShotSpotter inflates gunfire statistics, thereby providing false justification for oppressive police tactics in neighborhoods under its surveillance—all of which are already overpoliced.

15.     Meanwhile, the enormous volume of ShotSpotter-prompted deployments detracts from the capacity to address actual 9-1-1 calls, slowing response times while providing no public safety benefit. In police districts with active ShotSpotter sensors, more than one in twelve of CPD's "Priority 1" calls for service are for unfounded ShotSpotter alerts, displacing actual calls from residents seeking police assistance.

16.     The harms that flow from CPD's use of ShotSpotter are meted out along stark racial lines. The City has blanketed 12 out of 22 Chicago police districts with active ShotSpotter sensors, and in the process, has covered nearly the entire South and West sides. These 12 police districts are exactly the ones with the highest proportion of Black and Latinx residents and the

lowest proportion of White residents: 80% of Black Chicagoans live within ShotSpotter's active footprint; 65% of Latinx Chicagoans do too. Only 30% of White Chicagoans live in a ShotSpotter area.

17.     This stark pattern of racial deployment—and the harms that it generates— discriminates against Black and Brown Chicagoans in violation of the Illinois Civil Rights Act and the U.S. Constitution's guarantee of equal protection. Moreover, this blanket surveillance of Black and Brown communities cannot be explained or justified by historical rates of gun crime.

18.     Organizational Plaintiff Lucy Parsons Labs is a Chicago-based non-profit membership organization that is focused on investigating, exposing, and educating the public about police surveillance and the harms it causes, particularly for people of color and other marginalized communities. It has spent years investigating surveillance technologies and worked to end the City of Chicago's use of ShotSpotter and to protect its members and constituencies from ShotSpotter's harmful consequences. It has been forced to divert many of its resources to responding to CPD's unconstitutional and oppressive use of ShotSpotter.

19.     All Plaintiffs bring this suit to obtain declaratory and injunctive relief to end the unconstitutional and discriminatory use of ShotSpotter by the City of Chicago and to enjoin the City from relying on ShotSpotter alerts to justify investigatory stops. Mr. Ortiz and Mr. Scruggs likewise seek damages for the illegal searches and seizures to which Defendants subjected them.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Plaintiffs' federal claims for damages and injunctive relief pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The Court has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same facts and form part of the same case as the federal claims.

21.     Venue is proper in the United States District Court for the Northern District of Illinois under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the Plaintiffs' claims occurred in this district. Venue is also proper under 28 U.S.C. § 1391(a) because one or more Defendants reside in this District and, on information and belief, all Defendants are residents of the State in which the District is located.

## PARTIES

### *Plaintiffs*

22.     Individual Plaintiff DANIEL ORTIZ is a 38-year-old father who grew up in the Portage Park neighborhood in Chicago. Mr. Ortiz was illegally stopped, questioned, and frisked by Defendants Powar and Matias following a bogus ShotSpotter alert outside a laundromat. Defendants Powar and Matias then searched his vehicle, arrested him on pretextual drug charges, and impounded his vehicle. Mr. Ortiz was jailed overnight by police, who filed charges against him. Those charges were dismissed upon his first appearance at bond court. He subsequently recovered his vehicle, which had sustained multiple damages as a result of Defendant Officers' seizure.

23.     Individual Plaintiff DERICK SCRUGGS is a 31-year-old father who has worked for several years as a licensed armed security guard in Chicago. Mr. Scruggs was illegally stopped, detained, and searched by Defendants Legorreta and Andrews outside his place of work following a bogus ShotSpotter alert. Defendants handcuffed Plaintiff Scruggs, searched his body multiple times, detained him in a police cruiser, and ultimately released him, finding no basis to connect him with any supposed gunshot detected by ShotSpotter. Nevertheless, the next day, Defendants Legorreta and Andrews returned to Plaintiff Scruggs' place of work to "continue the investigation" of the ShotSpotter alert, once again detaining and searching him without legal

justification. Defendants subsequently arrested Mr. Scruggs and held him overnight on a pretextual misdemeanor charge for a clerical error: his state employee registration card had expired. That charge was subsequently dismissed by the State's Attorney's Office.

24.     Individual Plaintiffs Daniel Ortiz and Derick Scruggs seek declaratory and injunctive relief on behalf of a class of similarly-situated individuals who have been or will be stopped and seized by CPD officers without reasonable suspicion or probable cause because of faulty ShotSpotter technology. They also seek relief on behalf of the subclass of Black and Latinx individuals whose rights to be free from discrimination under the U.S. Constitution and Illinois Civil Rights Act are being violated by the City's deployment and use of ShotSpotter. They also seek compensatory and punitive damages.

25.     Organizational Plaintiff LUCY PARSONS LABS ("LPL") is a registered 501(c)(3) non-profit membership organization. It is a collaboration between data scientists, transparency activists, artists, and technologists and is based in Chicago. It works at the intersection of digital rights and on-the-streets issues of policing. An important part of its mission is to oppose and organize against discriminatory and oppressive policing and surveillance practices. It primarily organizes with communities of color which have historically suffered under racist police practices. Its work includes providing digital security trainings, pursuing police accountability, researching the use of police technologies and police tactics, and engaging in public education and advocacy on related topics. It frequently files and litigates public record requests in order to obtain transparency and accountability. It publishes research, educational materials, and advocacy materials. Its work has focused on issues including various forms of police surveillance, civil asset forfeiture, the budget and funding of police activities, and police technologies.

8

26.     Individual members of LPL live in or regularly travel through the districts of Chicago where ShotSpotter is deployed. Individual members are particularly likely to be subject to an unlawful stop based on a ShotSpotter alert.

27.     LPL has had to spend significant time and money to counteract the City of Chicago's unlawful and discriminatory reliance upon ShotSpotter. It has devoted significant time to offering trainings on ShotSpotter, submitting FOIA requests related to ShotSpotter, helping to lead a local coalition focused on stopping ShotSpotter, and holding related meetings, thus diverting resources from the organization's focus on other police accountability issues, such as civil asset forfeiture and facial recognition. LPL's work on ShotSpotter has diverted resources away from ongoing organizational development projects, setting back its strategic planning and fundraising. LPL brings this action on its own behalf and as an organizational representative for its members. LPL participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

*Municipal Defendant*

28.     Defendant CITY OF CHICAGO ("City") is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois. It is authorized under the statutes of the State of Illinois to maintain the CHICAGO POLICE DEPARTMENT, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible. Defendant City was, at all times material to this Complaint, the employer and principal of the individual Defendant Officers.

*Ortiz Defendant Officers*

29.     Defendants Officer HARSIMRAN POWAR (#17135) and Officer MICHAEL MATIAS (#18985) are City of Chicago employees with the CPD. At all times relevant to the

events at issue in this case, these defendants were acting under color of law and within the scope

of their employment with the CPD. Defendants Powar and Matias participated in the stop,

questioning, search, arrest, detention, and charge of Mr. Ortiz and the seizure of his vehicle.

Each defendant is sued in his individual capacity for violating the constitutional rights of Mr.

Ortiz.

***Scruggs Defendant Officers***

30.     Defendants Officer FIDEL LEGORRETA (#5902), Officer THEODORE

ANDREWS JR. (#7099), and Officer SARAH KECKLEY (#7041) are City of Chicago

employees with the CPD. At all times relevant to the events at issue in this case, these defendants

were acting under color of law and within the scope of their employment with the CPD.

Defendants Legorreta, Andrews, and Keckley participated in the stop, questioning, search,

seizure, and detention of Mr. Scruggs. Each one is sued in his or her individual capacity for

violating the constitutional rights of Mr. Scruggs.

## FACTUAL ALLEGATIONS

**I.     CPD RELIES ON SHOTSPOTTER'S NOISE DETECTION SYSTEM, KNOWING
IT IS AN UNRELIABLE AND INEFFECTIVE LAW ENFORCEMENT TOOL**

31.     In 2018, the City of Chicago entered into a $33 million, three-year, non-

competitive contract with ShotSpotter. In December 2020, the City, without any notice or

comment from the public or City Council, exercised an option to extend the contract with

ShotSpotter through August 19, 2023, at a cost of more than $9 million per year. The City has

since extended the contract through September 24, 2024, plus an additional two month

"transition" period.

32.     The City renewed and continued the contract with ShotSpotter despite actual knowledge that the system is unreliable and harmful.

33.     The City knows that the system has never been tested in Chicago or elsewhere to assess its reliability. It knows that the so-called "accuracy" figures provided by ShotSpotter are meaningless and deceptive. It knows that the system is ineffective as a law enforcement tool, based on the public reporting of its own watchdog agency. The OIG has studied and repeatedly reported on the technology. Analyzing the City's own police data, the OIG found that ShotSpotter generates tens of thousands of unjustified CPD deployments each year. The OIG also found that the overwhelming majority of ShotSpotter deployments led CPD to find nothing to corroborate supposed gunfire and that the technology led to thousands of unfounded CPD investigatory stops. Other studies, also relying on the City's own police data, back up the OIG findings.

34.     The City knows, based on public testimony in City Council and the experience of its own employees, that Cook County prosecutors drop cases involving ShotSpotter evidence and avoid defending the system's reliability in court when it is challenged in criminal cases. The City, the current and former mayors, CPD leaders, and other City managers have been repeatedly confronted in public, in City Council, and in other forums with the harms alleged in this Complaint that the system imposes on the predominantly Black and Latinx people who live in neighborhoods under ShotSpotter's surveillance. The current Superintendent of the Chicago Police Department, Larry Snelling, was directly confronted with all of this information when he appeared at a meeting of the City Council's Public Safety Committee on November 12, 2021, during which the City's use of ShotSpotter was discussed and criticized for nearly four hours.

11

35. Brandon Johnson, the current Mayor of the City of Chicago, has personal knowledge of the harms and legal violations that the City's use of ShotSpotter causes. During his mayoral campaign, he campaigned on an explicit promise to end the City's contract with ShotSpotter. On his official campaign website, which remains unchanged today, he states: "Chicago spends $9 million a year on ShotSpotter despite clear evidence it is unreliable and overly susceptible to human error. This expensive technology played a pivotal role in the police killing of 13-year-old Adam Toledo. That cannot happen again. Brandon Johnson will end the ShotSpotter contract and invest in new resources that go after illegal guns without physically stopping and frisking Chicagoans on the street." Mayor Johnson again referenced the police killing of Adam Toledo during his inaugural address as Mayor on May 16, 2023.

36. After his election, Mayor Johnson has continued to speak about his knowledge of the problems with the City's use of ShotSpotter, including questioning ShotSpotter's efficacy, usefulness, and results. Referring to ShotSpotter, Mayor Johnson has stated that "this company that's outside of the city of Chicago, that the city of Chicago's residents are footing the bill for this operation — has not yielded the results." Mayor Johnson has explained that "[w]hen it comes to public safety, we have to implement and engage in forms that are actually worthwhile, and that … work." He has also said publicly that he "believe[s] there are better ways in which we can use those dollars."

37. In spite of this knowledge, the City continues to fund and use ShotSpotter to dispatch CPD officers on tens of thousands of unwarranted deployments every year. In June 2023, Mayor Johnson's administration authorized the release of more than $10 million to ShotSpotter to continue its service in the City of Chicago. In February 2024, the City entered a contract modification extending the ShotSpotter contract through September 22, 2024 plus an

additional two month "transitional wind down" period. The City continues to direct CPD officers to rely on ShotSpotter alerts in stopping and detaining civilians without cause. Indeed, aside from the contract modifications described above, the City has not announced any changes to its ShotSpotter policies or practices since this lawsuit was filed in July 2022.

***Numerous Studies in Chicago and Other Cities Show That ShotSpotter Is Unreliable and Ineffective in Practice***

38.     Experience in Chicago and elsewhere shows that ShotSpotter is unreliable and ineffective for police to use in practice.

39.     ShotSpotter both over-detects and under-detects gunfire, interpreting miscellaneous noises as gunshots and failing to pick up actual gunshots. It can also provide inaccurate locations for the noises that it detects, giving police and investigators a false sense of precision as to where a supposed gunshot occurred.

40.     City of Chicago data show how rarely officers who respond to ShotSpotter alerts find any evidence of a gun or gunshots.

41.     In August 2021, the OIG conducted a thorough study of CPD deployments prompted by ShotSpotter. The OIG examined what police officers reported finding in response to 50,176 ShotSpotter alerts between January 1, 2020 and May 31, 2021. The OIG found that police reported a gun-related incident only 9.1% of the time. This figure includes not just shootings but any situation involving a gun, including when police find shell casings, identify a person armed with a weapon, or otherwise.

42.     Put differently, nearly 91% of ShotSpotter alerts turned up no reported evidence of any gun-related incident.

43.     The OIG report concluded that ShotSpotter alerts "rarely produce evidence of a gun-related crime."

44.     A December 2017 analysis of Chicago data by journalists at South Side Weekly showed similarly poor results. It found that just slightly over 10% of ShotSpotter-linked events resulted in the CPD finding enough evidence to open an investigation.

45.     The extraordinary volume of unwarranted ShotSpotter deployments persists to this day. From April 15, 2021 through April 13, 2022, only 9.6% of ShotSpotter alerts led CPD officers to turn up any evidence of a gun-related crime, according to data from the City's Office of Emergency Management and Communications. This amounts to 31,640 unfounded ShotSpotter-prompted dispatches during the period in question.

46.     During that one-year period from April 2021 to April 2022, CPD deployed police an average of more than 87 times *every day* to chase down ShotSpotter alerts that turned up no evidence of any gun-related incident.

47.     Even as the rate of unfounded deployments has remained extremely high, the total number of ShotSpotter alerts in Chicago has risen precipitously, thereby increasing the volume of unfounded CPD deployments dramatically. Between July 1, 2021, and July 1, 2022, there were approximately 44,300 ShotSpotter alerts in the City of Chicago, up from approximately 37,500 alerts during the prior one-year period (July 2020 to July 2021), 23,700 in the year before that (July 2019 to July 2020), and 17,800 the year earlier (July 2018 to July 2019). Upon information and belief, the City has not expanded the size of the area actively monitored by ShotSpotter during these periods.

48.     The City of Chicago knows about the massive number of unfounded ShotSpotter deployments, but it does not report them to ShotSpotter as errors. An official ShotSpotter

Performance Overview, which was obtained by Plaintiff Lucy Parsons Labs through FOIA, summarizes errors reported to ShotSpotter by the Chicago Police Department. It shows that over a period of just under six months in 2021, CPD reported zero false positive alerts.

49.     Larry Snelling, who currently serves as Superintendent of the Chicago Police Department, testified at a City Council hearing in November 2021 that CPD officers do not file reports or complaints with ShotSpotter about false-positive alerts—*i.e.* alerts that CPD officers are able to determine were likely caused by a firecracker or another noise other than gunfire.

50.     Similar analyses in other cities record even more dismal "hit rates," similarly high proportions of unwarranted police deployments, and extremely low rates of arrest or gun recovery as a result of ShotSpotter alerts.

51.     In Dayton, Ohio, police were deployed in response to ShotSpotter alerts an average of four times a day. Fewer than 2% of Dayton ShotSpotter deployments between December 11, 2020, and June 30, 2021, resulted in an arrest. Just 5% of ShotSpotter deployments led officers to report incidents of any crime. Dayton, Ohio has since decided to discontinue its contract with ShotSpotter "based on [its] analysis of the ShotSpotter data" as well as its consideration of "community response, changes in state law, budget, officer response, and other factors."

52.     In Atlanta, Georgia, an official city analysis determined that police found shell casings following only 3% of ShotSpotter alerts between January 1 and July 31, 2019. As of October 23, 2019, ShotSpotter had only led to five arrests and five guns recovered out of 1,349 incidents in 2019. The city's analysis calculated the cost ratio of its ShotSpotter implementation at $56,000 per gun recovered or $56,000 per arrest.

53.     In Houston, Texas, fewer than 2% of ShotSpotter alerts between December 2020 and September 2021 led police to make an arrest, according to a Houston Police Department report. Out of 2,330 ShotSpotter alerts, only 54 resulted in or were linked to an arrest.

54.     In Minneapolis, Minnesota, only 32 ShotSpotter alerts out of roughly 8,500 led to an arrest, a rate of less than 0.5%.

55.     In addition to prompting unfounded police responses, ShotSpotter also fails to send an alert when there has been an actual shooting. The same ShotSpotter Performance Overview obtained by Plaintiff Lucy Parsons Labs shows that there were 466 gunfire incidents over a nearly six-month period that ShotSpotter failed to identify or did not accurately locate (but that Chicago police learned about through other means). This included 41 incidents where ShotSpotter provided an incorrect location.

56.     Of those 466 cases, ShotSpotter either failed to detect the noise, failed to send an alert, or sent an alert to CPD with the wrong location. These 466 incidents reflect only the instances where Chicago police learned of a shooting and chose to file a complaint with ShotSpotter. On information and belief, there are many more shooting incidents that ShotSpotter missed where CPD officers filed no complaint with the company.

57.     In other cities, ShotSpotter fails to issue an alert—or issues an alert with an incorrect location—for approximately one-third of known shootings that occur outdoors within ShotSpotter area. On information and belief, the rate of such false negatives and mis-located alerts is even higher in the City of Chicago.

58.     ShotSpotter thus triggers an enormous number of unfounded police alerts. Yet, despite the enormous volume of alerts, ShotSpotter also fails to trigger alerts (or provides incorrect locations) for a large number of actual shooting incidents.

16

***Chicago's Contract with ShotSpotter Incentivizes ShotSpotter to Trigger False Alerts***

59.     ShotSpotter's contract with the City of Chicago gives it a financial incentive to over-report noises as gunfire or possible gunfire. These financial incentives further drive the technology's unreliability.

60.     The City of Chicago's contract with ShotSpotter does not contain *any* limit on the proportion of ShotSpotter alerts that are not actually caused by gunfire. The City of Chicago has imposed no contractual requirement at all to avoid false alerts.

61.     The City's contract with ShotSpotter only requires that for every 10 alerts that ShotSpotter sends out, ShotSpotter can receive no more than one complaint from CPD about a gunshot that CPD discovered but which ShotSpotter missed or mislocated by more than 25 meters. Only these missed or mislocated gunshots count against ShotSpotter. False positive alerts (where ShotSpotter is triggered by, e.g., firecrackers or cars backfiring) never count against ShotSpotter under the contract, and neither do situations where CPD pursues a ShotSpotter alert and finds nothing to corroborate gunfire.

62.     ShotSpotter can thus guarantee that it will *always* hit its performance target of one complaint per ten alerts simply by putting a thumb on the scale in favor of triggering alerts to loud noises that are not gunfire. Excess but unfounded alerts *help* ShotSpotter meet its performance target because they effectively drown out any complaints that ShotSpotter receives from CPD about missed or mislocated gunshots. Such excess alerts never count against the company.

63.     The City of Chicago has thus given ShotSpotter a powerful contractual incentive to over-report loud noises as gunfire and, therefore, to dispatch police to chase down sounds that are not gunshots.

64.     In addition, the City's contract with ShotSpotter excludes from its performance targets gunshots fired in "enclosed spaces" or "if the weapon discharged is of .25 or smaller caliber," which includes small handguns that fire .22 caliber rounds. When ShotSpotter misses or mislocates these gunshots, it does not count against its contractual performance targets.

***ShotSpotter is a Black Box, Concealing its Technological Flaws***

65.     The dismal results of ShotSpotter on the ground likely reflect flaws in the underlying technology. The system is a black box, shrouded in secrecy, and it has never been independently validated or properly tested for reliability.

66.     ShotSpotter purports to do two things: (1) identify the sound of gunfire as distinct from the cacophony of sounds in an urban environment and (2) triangulate the location of those supposed gunshots on a map to within 82 feet (25 meters).

67.     Studies show, however, that ShotSpotter sensors can easily be triggered by sounds other than gunshots, such as fireworks, trash trucks, blown tires, helicopters, construction, vehicles traveling over expansion plates and potholes, and even church bells. A 2014 ShotSpotter white paper acknowledges that some loud bangs—like fireworks, which are common year-round in a large city—may trigger false positives.

68.     ShotSpotter likewise can report significantly mistaken locations of supposed gunfire. A ShotSpotter employee has admitted in court that incidents can be "significantly mislocated" and prior reported incidents have been off by distances of 450 meters or more.

69.     ShotSpotter's potential for issuing false and mislocated alerts is evident from the system's mechanics. The ShotSpotter system contains three main components—sensors, computer algorithms, and human operators—each of which creates significant opportunity for

error. The City of Chicago knows of or should know of these flaws and has been confronted about many of them directly in City Council testimony.

70.     *First*, ShotSpotter's sensors themselves introduce opportunities for error. Pursuant to the City's contract, ShotSpotter has installed approximately 15-20 sensors for every square mile within its surveillance shadow. Each sensor contains microphones, audio processing circuitry, a cellular network connection, and other hardware. Sensors are typically installed high up on City lampposts, public buildings, or other structures. The sensors are continuously listening and recording, storing 30 hours of audio on the device itself.

71.     The sensors are designed to identify any and all loud, impulsive noises—what ShotSpotter calls any "bang, boom, or pop." When a sensor detects a loud noise, it automatically sends audio clips and other data to ShotSpotter's computer system via a cellular network.

72.     The placement of these sensors can affect their ability to distinguish and triangulate noises. The technology is liable to fail when a noise is very close to a sensor, in which case the microphone may pick up a distorted signal that cannot be properly timed. It is also negatively impacted by physical elements, including wind and temperature, which affect the speed that sound propagates, and surrounding buildings, which create reflections and other disturbances in the sound propagation.

73.     *Second*, the secret, black-box algorithms that ShotSpotter uses to analyze the noises that are detected by its sensors create enormous opportunities for error.

74.     When enough nearby ShotSpotter sensors report a noise in a certain span of time, ShotSpotter's computer system processes the noises through two proprietary computer algorithms.

75.     One algorithm attempts to identify the location of the sound by comparing the relative amount of time it took for the noise to reach each sensor, a process known as multilateration.

76.     Another algorithm attempts to classify the noise as originating from a gunshot or another source.

77.     These algorithms generate an output that purports to identify the location of the noise and to classify it as a "gunshot," "possible gunshot," or some other noise.

78.     ShotSpotter treats both algorithms as trade secrets.

79.     On information and belief, there has neither been any independent testing or validation of these algorithms, nor has the City of Chicago ever required such independent review or conducted one itself.

80.     ShotSpotter employees have published documents that reveal fundamental scientific flaws in the design and reliability of its system.

81.     The noise-classification algorithm, which is supposed to screen out noises that are not gunshots, suffers from clear flaws in design. According to a technical paper authored by eight ShotSpotter employees, the algorithm converts audio recordings of the loud noises its sensors detect into visual images that depict the waveform and other features of the sound. These visual images are then assembled into a single "image mosaic" that is split up into distinct "tiles," each of which contains certain information in visual form. The algorithm analyzes these image mosaics to decide whether to classify the noise as a gunshot.

82.     According to the technical paper, some of the tiles in the image mosaic encode information that appears to have nothing to do with the actual sound that ShotSpotter's microphones pick up. For example, one tile visually depicts the "location of recent nearby

20

incidents." Another tile visually depicts the number of "recent incidents." That is, the mosaic includes information about *prior* noises rather than the specific noise that is being analyzed. By including such extraneous information in the image mosaic, ShotSpotter's algorithms may be more likely to classify noises as gunshots if there have been more "nearby" or "recent" ShotSpotter alerts in the area. In this way, the system may be more likely to trigger false alerts in places where it has previously triggered alerts, creating harmful and inaccurate feedback loops that falsely inflate the number of ShotSpotter alerts in particular areas.

83.     ShotSpotter's noise-classification algorithm may suffer from other defects. ShotSpotter uses a "machine learning" algorithm to classify the image mosaics as gunshots or other noises. But ShotSpotter's methods and implementation have never been independently tested or audited, nor has ShotSpotter released any information about any internal testing it has done.

84.     In general terms, the type of machine learning algorithm that ShotSpotter uses works by being "trained" to recognize the features of the image mosaics that reflect gunshots as opposed to other noises. To train the algorithm, it must be fed sample image mosaics that have been pre-labeled as examples of gunshots and other noises. Using those labeled examples, the algorithm attempts to "learn" the features of the image mosaics that correspond to gunshot noises as opposed to those that correspond to other noises.

85.     Little is known about how ShotSpotter trains its algorithm or tests it for reliability. The ShotSpotter technical paper concedes that when ShotSpotter labels the samples that it uses to train the algorithm, the "ground truth" about whether a noise is a gunshot is rarely known and that "it is to be expected that some training data are misidentified."

21

86.     There is significant opportunity for error in any such machine learning process, and the method devised by ShotSpotter has never been independently validated and verified. Absent rigorous testing and validation, such algorithms may reflect unacceptably high false positive rates or could systematically misclassify certain noises as gunfire. Despite the high-tech veneer, there is no basis to believe that ShotSpotter's algorithm produces reliable results.

87.     *Third*, after ShotSpotter's algorithms process the loud noises its sensors detect, a low-level ShotSpotter employee reviews the noise and makes the ultimate decision as to whether to trigger an alert that will dispatch police. These human operators work in call-center style facilities in Newark, California, or Washington, D.C. They are another major source of error.

88.     ShotSpotter's operators have full discretion to override the computer. They can change a noise classified by the algorithm as "fireworks" to a gunshot and trigger an alert that dispatches police. They can modify the location or number of gunshots supposedly detected.

89.     ShotSpotter operators spend mere seconds reviewing the noise before deciding whether to dispatch police. The entire process, from when the noise is registered by a sensor to when a ShotSpotter operator triggers an alert, takes less than 60 seconds.

90.     According to ShotSpotter, its human operators override the computer classification about 10% of the time.

91.     ShotSpotter's operators have no obvious qualifications to conduct forensic audio analysis of gunshots or to direct a highly charged law enforcement response.

92.     Minimum job requirements for ShotSpotter operators are a high school degree and one year of experience working in a call center or customer service position. They are not forensic experts or audio specialists. ShotSpotter has not disclosed any detailed information about how it trains or evaluates the proficiency of these operators. There is no public evidence or

22

testing that ShotSpotter's internal training adequately leads these operators to differentiate a gunshot from other impulsive noises.

93. ShotSpotter operators can trigger an alert by categorizing a noise as either a "gunshot" or "probable gunshot."

94. ShotSpotter trains its operators using a protocol it calls the "Classification Continuum," which, according to ShotSpotter, "summarizes the key considerations that a reviewer should weigh in evaluating whether a given noise even was a gunshot—as opposed to, for instance, a firework, backfiring truck, or helicopter." ShotSpotter has refused to publicly disclose this crucial document, but ShotSpotter's characterization of the operator's decision as a "continuum" suggests that it permits operators to trigger alerts even when it is not clear whether the noise is a gunshot.

95. On information and belief, ShotSpotter's operators are trained to err on the side of *triggering* an alert whenever they are in doubt about whether a noise is a gunshot or not.

96. The determination of a ShotSpotter operator, made in mere seconds, is immediately pushed out to CPD's computer systems and then transmitted to officers in the field on their City-issued mobile devices or mobile computers. The alert is presented to officers as a pin on a map. Officers may also listen to audio snippets of the noise if they so choose.

97. When CPD receives a ShotSpotter alert, it dispatches officers, irrespective of whether ShotSpotter decided to classify the noise a "gunshot" or just a "probable gunshot." CPD policies make no distinction between how officers should treat each type of alert.

98. It is these ShotSpotter alerts, issued after mere seconds of review by a low-level ShotSpotter employee, that led the individual Defendants Officers to falsely arrest and prosecute Plaintiff Williams and to illegally detain and question Plaintiffs Ortiz and Scruggs.

23

99.     Upon request by prosecutors or investigators, ShotSpotter can also conduct a re-analysis of the audio snippets and produce what it calls a "Detailed Forensic Report." The methods used to produce such reports are equally shrouded in secrecy and have not been independently tested or validated. Likewise, the individuals who conduct these re-analyses are not forensic audio specialists or otherwise qualified. One ShotSpotter employee who produces these reports, Walter Collier III, is a former CPD officer. ShotSpotter has stated that "no official or formal training materials exist" for these employees specifically, and that they are simply trained "on the job."

***The City has Direct Knowledge that ShotSpotter Is Unreliable***

100.     The City has repeatedly contracted with ShotSpotter, knowing full well it is untested and unreliable.

101.     There are *no* studies testing whether ShotSpotter can reliably distinguish between the sound of gunshots and similar noises like firecrackers, backfiring cars, construction noises, helicopters, or other loud bangs.

102.     Neither ShotSpotter nor any other entity has ever published results from a controlled test of the ShotSpotter system against actual fireworks, engine backfires, blown tires, or other confounding noises to determine how often the system is likely to generate a false positive alert—*i.e.*, an alert that is triggered by a noise other than gunfire. ShotSpotter has recently declined an offer by an independent industry research publication to test its technology.

103.     The City knows about the lack of studies and testing because they have been confronted about it directly in City Council, the Public Safety Committee, and other forums; because it has been widely publicized in national news reports; and because they have

themselves declined to permit or conduct deployment qualification testing—or any other testing—of the system in Chicago.

104.     The City, through current and former officials, including former Chicago Mayor Lori Lightfoot, now-Superintendent of CPD Larry Snelling, and other senior officials in the City of Chicago and CPD brass have defended ShotSpotter technology in response to questions from the City's own OIG and others, despite being presented with significant information about ShotSpotter's poor performance as a law enforcement tool, its misleading marketing claims, and the absence of any proper testing of the system's reliability.

105.     The City of Chicago first used ShotSpotter more than a decade ago and most recently extended its contract in February 2024. Its current contract does not require any controlled testing of the system or its human operators to determine the rate of false positive alerts, nor does it require ShotSpotter to provide results of such testing.

106.     The City did not ask or permit ShotSpotter to test the system for false negatives after the system was installed, for example by using test-fired gunshots. On information and belief, neither ShotSpotter nor the City of Chicago has ever tested the system in any covered neighborhood to determine how frequently it fails to detect gunfire.

107.     On information and belief, the City has not reviewed any of the training materials ShotSpotter provides its human operators nor imposed any training, qualification, or testing requirements with respect to the ShotSpotter employees who trigger alerts and cause police to be dispatched.

108.     In its marketing and public relations materials, ShotSpotter makes a claim of "97 percent accuracy" and "0.5 percent false positivity." These claims are false, deceptive, and misleading.

25

109.     An audit commissioned by ShotSpotter acknowledges that these figures are not derived from any testing and do not reflect any actual knowledge about whether the sounds that triggered ShotSpotter alerts were gunshots.

110.     Instead, ShotSpotter derives these "accuracy" rates by simply *assuming* that all of its alerts are gunfire. ShotSpotter only counts an alert as an error if a police department happens to voluntarily send ShotSpotter a complaint about an erroneous alert and if ShotSpotter then determines, unilaterally, that the complaint is valid.

111.     ShotSpotter's claim of 97% accuracy is, in actuality, a tally of customer complaints, a meaningless one, as customers are under no obligation to complain about every error to ShotSpotter.

112.     CPD officers *never* file complaints with ShotSpotter when they arrive at the location of a ShotSpotter alert and find no corroboration of gunfire, according to a senior CPD official's testimony to City Council and an official ShotSpotter document. Yet the OIG reports that CPD officers find no evidence of a gun crime in response to more than 90% of ShotSpotter alerts.

113.     Because officers file no complaints about these unfounded alerts, ShotSpotter counts every one of them as actual gunfire and includes those fruitless police deployments in publishing a 97% accuracy rate.

114.     The City has been confronted directly about these scientifically meaningless marketing claims in City Council meetings and other forums, and they have been reported in national news outlets.

115.     The City continues to rely on the technology, knowing and directing that CPD officers treat ShotSpotter alerts as if they are far more precise and reliable than they actually are, with dire consequences for civilians.

## II.     CPD SYSTEMATICALLY USES SHOTSPOTTER TO INSTIGATE UNLAWFUL STOPS AND SEARCHES OF CIVILIANS ON CHICAGO'S SOUTH AND WEST SIDES

*CPD Uses Faulty ShotSpotter Technology to Systemically Initiate Investigatory Stops without Reasonable Suspicion*

116.     ShotSpotter alerts result in a large number of illegal stops and frisks, known in Chicago as "investigatory stops."

117.     CPD officers conduct hundreds of illegal investigatory stops every year because they are chasing down ShotSpotter reports of supposed gunfire and stop or frisk people on the basis of the ShotSpotter alert, without independent grounds to suspect that the person has committed a crime or is carrying a weapon.

118.     When CPD officers receive a ShotSpotter alert they race into neighborhoods equipped with little information except that one or more gunshots were supposedly just fired at the location where ShotSpotter is sending them.

119.     Both ShotSpotter and CPD's own policies command officers responding to a ShotSpotter alert to regard any person they encounter as a potential suspect and lethal threat.

120.     As a result, CPD systematically sends numerous police officers in multiple squad cars to chase down ShotSpotter alerts. On an average day multiple people on the South and West sides are stopped and frisked by police who are investigating unfounded ShotSpotter alerts.

121.     The OIG identified more than 2,400 investigatory stops linked to ShotSpotter alerts over the course of 18 months, from January 1, 2020 to May 31, 2021, of which 1,056

matched a ShotSpotter event number recorded by CPD. An additional 1,366 investigatory stop reports mentioned ShotSpotter in the narrative description provided by the officer but could not be linked to ShotSpotter using a matching event number.

122. The actual number of people stopped by police following a ShotSpotter alert is likely much higher than the OIG was able to document. As the OIG found, CPD fails to keep consistent records matching ShotSpotter incidents with investigatory stops. Police officers also may not record the involvement of ShotSpotter in their narrative of investigatory stops or arrests that are in fact prompted by ShotSpotter. Moreover, CPD officers sometimes fail to prepare an investigatory stop report at all, in which case a ShotSpotter-prompted investigatory stop will not appear in CPD data.

123. CPD investigatory stops prompted by ShotSpotter alerts rarely turn up any evidence of gun crime. Of the 1,056 investigatory stops that OIG was able to match directly to a ShotSpotter event number, only 244 resulted in an arrest and only 152 resulted in a gun being recovered. The vast majority of these stops turned up no gun crime.

124. ShotSpotter alerts cannot supply officers with reasonable suspicion for a police stop.

125. ShotSpotter has never been tested to establish its reliability and so cannot properly be considered by an officer at all when determining whether there is reasonable suspicion to stop a person.

126. The U.S. Court of Appeals for the Seventh Circuit has previously concluded that ShotSpotter "is analogous to an anonymous tipster" and cannot establish reasonable suspicion on its own. *United States v. Rickmon*, 952 F.3d 876, 882 (7th Cir. 2020).

28

127.    ShotSpotter alerts also cannot establish a lawful basis for a stop by CPD officers because a ShotSpotter alert does not supply enough information to establish individualized suspicion. At best, the technology tells an officer that a gun may have been fired several minutes earlier, and that shot may have been fired somewhere within 82 feet of the location of the alert. It tells the officer nothing about the physical description of a person, what may have transpired before or after the loud noise, or anything else that might tie a particular individual to the loud noise or gunshot.

128.    The fact that a person happens to be found by a police officer near the location of a recent ShotSpotter alert is never reasonable suspicion for a stop.

129.    ShotSpotter also improperly biases the perceptions of officers responding to an alert, priming officers to expect to find gunfire and to regard residents with unwarranted suspicion. CPD officers responding to a ShotSpotter alert are liable to interpret otherwise innocuous behavior as corroboration of supposed gunfire, thus furthering the likelihood of a false arrest or stop.

130.    CPD's characteristically aggressive response when dispatched to ShotSpotter alerts may itself prompt residents to behave in ways that officers then use as justification for a stop—for example, if a resident walks away from an officer or wears a concerned expression on their face.

131.    CPD officers also systematically stop and frisk people because of a perceived history of ShotSpotter alerts in the area in the past.

132.    CPD officers who stop residents on the street regularly cite the supposed history of ShotSpotter alerts in an area as a false justification for detaining residents or searching them once detained.

133.    OIG's detailed review of 72 randomly-selected investigatory stop reports that mention ShotSpotter by name between January 2020 and May 2021 turned up 10 reports in which reporting officers "referred to the aggregate results of the ShotSpotter system as informing their decision to initiate a stop or their course of action during the stop, even when they were not responding to a specific ShotSpotter alert."

134.    The OIG's report states that "the introduction of ShotSpotter technology in Chicago has changed the way some CPD members perceive and interact with individuals present in areas where ShotSpotter alerts are frequent" and that "[a]t least some officers, at least some of the time, are relying on ShotSpotter results in the aggregate to provide an additional rationale to initiate stop or to conduct a pat down once a stop has been initiated."

135.    Nearly every part of the City that falls under ShotSpotter's shadow experiences a significant volume of ShotSpotter alerts over time. There are now approximately 44,300 ShotSpotter alerts sent to CPD per year, spread over approximately 117 miles, which amounts to an average of 379 ShotSpotter alerts per square mile per year.

136.    Using the "past alert" rationale, CPD officers can determine that nearly any part of the City blanketed with ShotSpotter has had a significant volume of ShotSpotter alerts.

137.    In this way, CPD officers use ShotSpotter's mere presence, which regularly triggers unfounded alerts, as false justification to stop or frisk residents who live within its surveillance footprint.

138.    On information and belief, CPD officers do not make any distinction between founded and unfounded ShotSpotter alerts when citing historical ShotSpotter alerts to justify a stop or search.

*The City of Chicago's Policies and Practices Fuel the Technology's Negative Consequences*

139.     The City has adopted and maintained express policies and widespread practices concerning ShotSpotter—as well as explicit decisions of officials with final policymaking authority—that fuel its negative consequences and that lead systematically to illegal searches and seizures. They have also failed to train officers to avoid illegal searches and seizures despite their knowledge that ShotSpotter is unreliable and untested.

140.     The City's formal ShotSpotter Flex Program policy, Special Order S03-19, explicitly warns officers responding to a ShotSpotter alert to "be[] aware that an offender or multiple offenders may be on scene." It instructs officers to expect danger, cautioning them to "take a safe and strategic approach while responding to the incident."

141.     The City's ShotSpotter Flex Program policy conveys to officers, including the Defendant Officers, a false sense of ShotSpotter's precision, directing them to investigate "the precise location" provided by ShotSpotter, as well as the area surrounding the "precise location given by ShotSpotter information." The City has failed to train the Defendant Officers about the inaccuracy of the locations provided by ShotSpotter alerts, and the fact that all locations provided by ShotSpotter are at best approximations. The City has likewise failed to train the Defendant Officers about the inaccuracy of the determinations provided by ShotSpotter that a particular noise was caused by gunfire.

142.     The City, by practice and express policy, directs officers, including the Defendant Officers, to treat individuals found in the vicinity of ShotSpotter alerts as suspects and to subject them to investigatory stops on that basis.

143.     The City's ShotSpotter Flex Program policy instructs officers that they can detain residents on the basis of a ShotSpotter alert alone, directing officers that "[a] ShotSpotter alert,

by itself, does not give responding Department member(s) the legal authority to enter private property," but failing to provide any similar instruction regarding investigatory stops or other seizures of residents.

144.     The City, by practice and express policy, assigns ShotSpotter alerts the same priority as 9-1-1 calls reporting in-progress shootings. That is, the City treats ShotSpotter as "Priority 1" calls for service, which are reserved for police deployments involving an imminent threat to life, bodily injury, or major property damage/loss. The only calls that Defendants assign a higher priority ("Priority 0") are those in which police officers, EMS personnel, or firefighters face a life-threatening circumstance.

145.     The City's practice and express policy make no distinction between alerts that ShotSpotter itself codes as "multiple gunshot," "single gunshot" or merely "probable gunshot." All are given the same highest priority and police officers are not directed to make any distinction in how they respond.

146.     The City's practice, policies, and training fail to inform officers about the overwhelming likelihood that any given ShotSpotter alert will lead them to find no shooting or other gun-related incident. The City failed to train the Defendant Officers in this regard.

147.     The City's practice, policies, and training direct officers, including the Defendant Officers, always to treat ShotSpotter alerts as if they correspond to actual gunfire.

148.     The City's practice, policies, and training fail to inform officers that ShotSpotter has never been tested for its ability to distinguish gunfire from other loud noises. The City's practice, policies, and training affirmatively mislead officers about the accuracy and precision of ShotSpotter alerts. The City failed to train the Defendant Officers in this regard.

149.     The City's practice, policies, and training fail to inform officers that the locations provided by ShotSpotter are not exact but at best approximate. The City failed to train the Defendant Officers in this regard. The City's practice, policies, and training fail to provide proper guidance about whether or when ShotSpotter alerts may justify an investigatory stop or other search or seizure. The City failed to train the Defendant Officers in this regard.

150.     The City's policies and training fail to inform officers that a person's mere presence within the vicinity of a ShotSpotter alert does not supply lawful justification for an investigatory stop or other search or seizure. The City failed to train the Defendant Officers in this regard.

151.     The City's policies and training fail to inform officers that the U.S. Court of Appeals for the Seventh Circuit has stated that ShotSpotter alerts should, at best, be regarded as akin to a tip from an anonymous source of unknown reliability and do not supply reasonable suspicion for a *Terry* stop. The City also fails to provide operational guidance consistent with that assessment. The City failed to train the Defendant Officers in this regard.

152.     The City's practices, express policies, and training with respect to ShotSpotter alerts violate the City's own investigatory stop policy which provides that "Reasonable Articulable Suspicion" for an investigatory stop "should be founded on specific and objective facts or observations about how a suspect behaves, what the subject is seen or heard doing, and the circumstances or situation in regard to the suspect that is either witnessed or known by the officer."

153.     The City's practice, express policies, and training do not require CPD officers to keep track of or report unfounded ShotSpotter alerts that result in no corroboration of any gun-related incident or which are determined by an officer to be caused by a firecracker, blown tire,

33

or some other source of noise other than a gunshot. The City, by policy and practice, fails to report any such false-positive alerts to ShotSpotter.

154.    The City's express policy requires officers to rely on ShotSpotter alerts when investigating any type of shooting incident and to rely on ShotSpotter reports for investigation and prosecution purposes.

155.    The City by practice, express policy, and training instructs CPD to rely on ShotSpotter alerts to guide police behavior, inform police strategy and tactics, and assess police performance.

156.    Upon information and belief, the City and its decisionmakers make no distinction between founded and unfounded ShotSpotter alerts when using ShotSpotter to guide police behavior, inform police strategy and tactics, and assess police performance.

157.    The City's practice and express policy direct CPD's Strategic Decision Support Centers ("SDSCs"), which are police surveillance hubs located in CPD police districts, to rely on ShotSpotter alerts to assess gun violence trends, crime patterns, and specific locations that have a high amount of purported gunfire incidents. The City further instructs SDSCs to disseminate ShotSpotter information in order to inform police strategies and responses, including in investigations, patrol missions, parole/probation, and gang strategies.

158.    The City, by explicit policy, mandates that ShotSpotter alerts be included in the Compstat statistical summaries prepared by police districts that are within ShotSpotter's shadow. Compstat reports are used to benchmark crime in police districts, to assess the performance of police officers and leadership, and to guide the allocation of police resources and the decision about what police tactics to employ.

159.    The City, by express policy and practice and through its decisionmakers, has

failed to test the ShotSpotter system to determine the accuracy of its noise classifications or

location determinations. It has failed to test the system to determine the rate of false-positive

alerts (i.e. alerts to noises that are not gunfire) or the rate of false-negative alerts (i.e. failure to

alert to noises that are gunfire). The City has refused or failed to require ShotSpotter to test and

properly validate its system, including with respect to false positive alerts. The City has failed to

do or require any testing despite knowing that ShotSpotter's marketing, which claims supposed

97% accuracy, is false, deceptive, and misleading. The City has failed to do or require any

testing despite knowing that a large proportion of ShotSpotter alerts in Chicago are false-positive

alerts and that ShotSpotter also fails to detect a large proportion of known shootings, *i.e.* false-

negative alerts.

160.    In all of these ways, the City's decisions, policies, practices, and training

improperly treat ShotSpotter as if it is accurate, reliable, properly-validated, and effective and

instruct police officers, including the Defendant Officers, to rely on ShotSpotter improperly. The

City's decisions, policies, practice, and training require and encourage CPD to improperly rely

on ShotSpotter as a basis for all manner of police decisions, from high-level decisions about

resource allocation to investigations of particular crimes to street-level decisions about whether

to conduct an investigatory stop.

161.    The City purposefully perpetuates these decisions, policies, and practices,

knowing the technology is ineffective, unreliable, and has never been properly tested.

162.    The City's decisions, practices, policies, and training—as well as its omission of

policymaking and failure to train regarding ShotSpotter's unreliability—lead officers to engage

in large numbers of illegal, unnecessary, and frightening interactions with residents who live in areas wired with ShotSpotter sensors.

163.    Plaintiff Ortiz's stop by police, discussed in Section V below, and Plaintiff Scruggs's stop, discussed in Section VI, are prime examples.

164.    Officers targeted Mr. Ortiz on the Northwest side of the city as a suspect in a non-existent shooting and baselessly detained him for questioning just because he was near a ShotSpotter alert. Even as it became clear that there was no gunfire to be found, the Ortiz Defendant Officers escalated the encounter, searching Mr. Ortiz's vehicle arresting him when they found drugs in his car and then seizing his car. The Ortiz Defendant Officers detained and investigated Mr. Ortiz in this manner because of the City's policies, practices, and trainings regarding ShotSpotter.

165.    Likewise, officers targeted Mr. Scruggs on the South Side as a suspect in a non-existent shooting and detained him simply because officers found him standing near the location of the ShotSpotter alert several minutes after ShotSpotter detected a noise. Even after being ordered to release Mr. Scruggs, Defendant Officers escalated their baseless suspicions by returning to re-detain Mr. Scruggs the next day and eventually finding a pretextual paperwork infraction as a basis to arrest and jail Mr. Scruggs. The Scruggs Defendant Officers detained and investigated Mr. Scruggs in this manner because of the City's policies, practices, and training with respect to ShotSpotter.

166.    The City and individual CPD officers who rely on ShotSpotter to stop and arrest civilians have historically been immune from oversight for their unlawful conduct.

167.    Most people stopped or searched by CPD officers because of ShotSpotter would never know that ShotSpotter is what caused CPD to target them. At the time of a stop or arrest,

CPD officers are not required to inform people that they are investigating a ShotSpotter alert. Even after the fact, CPD's record-keeping makes it difficult and sometimes impossible to determine whether a police action was prompted by ShotSpotter.

168.    As a result, it is extremely difficult for residents to challenge individual illegal ShotSpotter stops or searches.

## III.    THE CITY OF CHICAGO HAS INTENTIONALLY DEPLOYED SHOTSPOTTER ALONG STARK RACIAL LINES AND USES SHOTSPOTTER TO TARGET BLACK AND LATINX PEOPLE, IN KEEPING WITH CHICAGO'S HISTORICAL PATTERN OF DISCRIMINATORY POLICING.

169.    The City of Chicago decides which parts of the City should be under surveillance by the ShotSpotter system. The City, through its decisionmakers, has intentionally chosen to blanket nearly all of the South and West sides with active sensors. Throughout its long contractual relationship with ShotSpotter, the City has consistently and deliberately chosen to deploy ShotSpotter only in overwhelmingly Black and Latinx neighborhoods for the purpose of targeting the people in those neighborhoods.

170.    Relying on that technology, CPD regularly conducts high-stakes deployments in those neighborhoods, thus discriminatorily subjecting Black and Latinx people to unlawful seizures, false arrests, and police violence stemming from such police responses.

171.    Chicago first began using ShotSpotter in 2003. The City halted the program because it was producing false leads.

172.    In 2007, Chicago initiated a pilot program with ShotSpotter that was promptly discontinued. According to a 2010 NBC Chicago report, the CPD found the program to be "not entirely effective" in an urban environment.

173.    In 2012, CPD launched another pilot program for ShotSpotter, installing sensors in a total of three-square miles in the predominantly Black and Latinx Englewood and Harrison districts. ShotSpotter sensors were installed in sections of CPD's 3rd, 7th, 8th, and 11th Police Districts.

174.    In 2017, CPD moved to rapidly expand its ShotSpotter program as part of its establishment of SDSCs. SDSCs access the City's ShotSpotter network, its Police Observation Devices (surveillance cameras), its Automated License Plate Readers, and various other surveillance systems.

175.    In January 2017, the first SDSC was launched in Englewood, the 7th District. Between January and July 2017, CPD began to use ShotSpotter in the 11th, 6th, 9th, 10th, and



*Figure 1   Left: ShotSpotter alerts per police district and beat since the start of the City's current contract with ShotSpotter.
Right: Proportion of Black and Latinx residents by census tract with boundaries of police districts and beats shown.*

15th Districts. In September 2017, CPD expanded the program to the 2nd, 3rd, 4th, 5th, 8th, and 25th Districts.

176.    The City and ShotSpotter both refuse to disclose where sensors are located. But data published by the City of Chicago showing the latitude and longitude of ShotSpotter alerts shows that sensors are currently active and reporting supposed gunshots across 12 CPD police districts—the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 15th, and 25th districts. This coverage area also comports with public statements that City and CPD officials have provided regarding ShotSpotter's expansion over the years.

177.    The City continues to use ShotSpotter across these 12 Police Districts, pursuant to the City's $9 million annual contract with ShotSpotter, which the City signed on August 22, 2018, and has since extended through August 2023.

178.    There is a stark racial disparity between districts with ShotSpotter and districts without. The 12 police districts where the City has chosen to deploy and activate ShotSpotter map precisely onto the 12 districts with the highest proportion of Black and Latinx residents and the lowest proportion of White residents.

179.    The City of Chicago targeted ShotSpotter in every police district that has a population of more than 65% Black or Latinx residents, according to census data.

180.    The City of Chicago has not activated ShotSpotter in any district with more than 25% White residents.

181.    The City of Chicago has chosen to blanket entire police districts with ShotSpotter sensors, subjecting entire neighborhoods and blocks within each district to surveillance. The result is that approximately 117 square miles of the City are indiscriminately blanketed with

gunshot sensors. This is in stark contrast with other cities using ShotSpotter, which have chosen to deploy ShotSpotter only in geographically limited "hotspots."

182.    The City of Chicago deliberately chose to implement ShotSpotter along racial lines and to put the vast majority of the city's Black and Latinx residents under ShotSpotter's surveillance.



Figure 2  Racial demographics of police districts with active ShotSpotter installations (2010 census data).

183.    As a result, a total of 80% of Black Chicagoans live under ShotSpotter's footprint, as do 65% of Latinx Chicagoans, according to census data. Only 30% of White Chicagoans live in a ShotSpotter area.

184.    This disparity and deployment pattern is not explained by reference to historical gun crimes.

185.    The City has chosen to activate ShotSpotter in Black and Brown neighborhoods that have far lower historical gun crime rates than other parts of the City that do not have ShotSpotter.

186.    For example, according to city data, the areas covered by ShotSpotter include 28 police beats that experienced fewer than 100 shootings involving a victim (both homicides and non-fatal shootings) over 12 years between January 2010 and March 2022. Yet there are 18 police beats not under ShotSpotter's footprint that have experienced *more* than 100 such shootings over the same period.

187.    The City has also chosen to activate ShotSpotter in Black and Latinx neighborhoods that have notably low historical rates of shootings.

188.    There are 13 police beats within the ShotSpotter area that have experienced fewer than 60 shootings involving a victim over 12 years between January 2010 and March 2022—less than 5 per year. The rate of shootings in those ShotSpotter-covered areas is less than half of the median number of shootings in police beats city-wide, which stands at 121.5 over that same period.

189.    For example, in police beat 834, which includes much of the Ashburn neighborhood, a middle-class, predominantly Black and Latinx area on the Southwest Side, there were only 31 shootings involving a victim between January 2018 and March 2022, well below

41

the City-wide median. Yet there were 1,016 ShotSpotter alerts in that area over the same period, far above the median number of ShotSpotter alerts in ShotSpotter-covered police beats on the South and West sides.

190.    By contrast, police beat 1821, which encompasses much of Old Town on the Near North Side, an affluent and predominantly White neighborhood, had 39 shootings over the same period—more than beat 834—yet it had no ShotSpotter alerts because the City has not activated sensors there.

191.    The only police district where Defendants have *not* chosen to deploy ShotSpotter on the South and West sides is the 22nd district—which encompasses significant White-majority neighborhoods. The western part of that district includes the predominantly White neighborhoods of Mount Greenwood and Beverly, traditionally home to many Chicago firefighters and police officers. The City decided not to extend ShotSpotter to cover this district, despite the fact that much of the district has reported gun crime rates as high or higher than many others that are within ShotSpotter's footprint.

192.    The South and West Side neighborhoods where ShotSpotter is deployed also tend to have higher concentrations of loud noises and sources of loud noises, like highways, that can trigger false ShotSpotter alerts.

193.    Civilians and residents on the South and West sides of Chicago are subjected to large numbers of ShotSpotter deployments—with all of the risks and consequences they bring—not because historical gun crime rates somehow explain ShotSpotter's presence, but because the City has chosen to indiscriminately blanket active ShotSpotter sensors over massive swathes of the city where most Black and Latinx residents live.

***The City's Deliberate Decision to Target ShotSpotter at Black and Latinx Communities Harms Those Communities***

194.    CPD's use of ShotSpotter harms the communities under its surveillance in numerous ways.

195.    Black and Latinx people are being stopped, arrested, and abused by the CPD during hostile police deployments at much higher rates than White people, solely because of the City's discriminatory ShotSpotter program.

196.    These ShotSpotter-prompted stops and arrests also expose Black and Latinx people to increased and discriminatory use of force by law enforcement. The OIG has recently found that "comparing the population of the city to the population that was subject to the use of force after a stop . . . Black people were 11.7 times more likely to face a use of force following an investigatory stop than non-Black people."

197.    Police have frequently used physical force against people of color when responding to ShotSpotter alerts. According to data disclosed by the City of Chicago, over the six-month period between July 1, 2019 and December 31, 2020, there were 82 reports of CPD using physical force against residents that could be linked to ShotSpotter-prompted police deployments by matching case numbers. All 82 of the people that CPD used force against during these ShotSpotter deployments were Black and Latinx, with the exception of 4 whose race CPD lists as "unknown." In 70 of these 82 cases, the person accosted by police was not armed with a gun, according to the City's records.

198.    ShotSpotter also generates inflated statistics about gunfire in the areas under its surveillance shadow. ShotSpotter-based statistics are included in Compstat reports and in various

analyses by SDSCs that are used to guide CPD's tactics. On information and belief, CPD justifies aggressive and unwarranted police tactics on the basis of these statistics.

199.     ShotSpotter also diverts City resources away from more useful and equitable municipal services.

200.     ShotSpotter contributes to slow response to 9-1-1 calls. More than one in twelve "Priority 1" calls for police service in ShotSpotter districts was an unfounded ShotSpotter deployment. Specifically, between April 15, 2021 and April 13, 2022, there were 31,640 unfounded ShotSpotter alerts out of total of a 365,317 Priority 1 calls for police service in the 12 ShotSpotter districts, according to data from the Office of Emergency Management and Communications that is published by the Office of Inspector General.

201.     These unfounded ShotSpotter deployments contribute to the slow or non-existent police response that residents on the South and West sides often experience when they affirmatively call 9-1-1 for assistance because ShotSpotter alerts. Priority 1 calls for service, including ShotSpotter alerts, are given precedence over nearly all other calls for police service.

202.     According to a recent Wirepoints report, in 2021, more than 400,000 high-priority (Priority 1 or 2) calls for police service city-wide came in during periods when there were no police available to respond. Unfounded ShotSpotter alerts contribute to that problem.

203.     There is no evidence that ShotSpotter has reduced gun crime in ShotSpotter districts in Chicago. The City has not published any studies even attempting to quantify ShotSpotter's effect, if it exists, on gun crime in Chicago. Studies in other cities have found no benefit. One study found that ShotSpotter did not reduce rates of violent crime, even as it more than tripled the number of police deployments chasing down supposed gunshots. Another study

of 68 counties that use ShotSpotter found that ShotSpotter was associated with no difference in county-level homicides, murder arrests, or weapons arrests.

204.    There is likewise no evidence that ShotSpotter helps to save lives by getting police to shooting victims faster, which has been a frequent claim made by senior City of Chicago officials, including Defendant Superintendent Brown, and ShotSpotter itself. Defendants have not published any studies supporting this claim. Peer-reviewed studies in two other cities—Hartford, Connecticut and Camden, New Jersey—have found no benefit for patient outcomes of shooting victims when comparing situations where ShotSpotter detected the gunshot or did not.

205.    On information and belief, residents are better than ShotSpotter at notifying emergency services about actual shootings that involve a gunshot wound victim. On information and belief, even within ShotSpotter-covered areas, residents in Chicago report a higher proportion of shooting victims to emergency services than ShotSpotter does. ShotSpotter misses (or mislocates) a sizeable number of actual shootings that are within its coverage area. Moreover, ShotSpotter does not even claim to be useful for shootings that occur indoors or with small-caliber or silenced weapons.

206.    Thus, the City knowingly employs a racialized, discriminatory, and ineffective law enforcement program that results in significant and lasting harm to those it targets.

***The City of Chicago's Decision to Deploy ShotSpotter Along Racial Lines is Consistent with the City's History of Racially Discriminatory Policing Targeting the Same Black and Latinx Populations in the City***

207.    CPD's decision to target Black and Latinx communities with ShotSpotter and CPD's deployment pattern for ShotSpotter track CPD's long history of racial discrimination in policing tactics.

208.     Most recently, the Chicago Office of Inspector General has documented and quantified CPD's continuing practice of racially disparate and disproportionate stops and use of force.

209.     In a March 2022 report, the OIG found, based on CPD data, that "Black people were overwhelmingly disproportionately stopped by CPD, regardless of demographic composition and crime level in the district of the stop."

210.     The OIG also found that "[a]mong those whom CPD members stopped, Black people were disproportionately subjected to force," again controlling for demographics and crime level of the area. It also found that "CPD was more likely to use higher-level force options against Black people than non-Black people."

211.     The OIG reports that Black people were 1.5 times more likely to be searched or frisked during an investigatory stop than other people and that CPD officers searched the cars of Black people 3.3 times more frequently during traffic stops than those of White people.

212.     Earlier, in 2017, the United States Department of Justice (DOJ) released a report on the CPD, finding evidence of systemic discrimination in policing against Black and Latinx communities in Chicago, including a pattern of unconstitutional use of force, conduct, and supervision by police officers in these minority communities.

213.     As the DOJ found, many Black and Latinx Chicago residents regard CPD as an "occupying force" in their neighborhoods. While the population of Chicago is roughly equal-thirds Black, Latinx, and White, CPD used force against Black people at rates nearly ten times that of White people. With respect to both uses of force and investigatory stops, CPD continued to exhibit patterns of racial bias. Further, of persons killed by the police from 2007 through 2017, 76 percent were Black, 13 percent were Latinx, and 8 percent were white.

214.    The DOJ's findings built on an analysis of the Chicago Police Accountability Task Force ("Task Force"), which released a report describing the history of CPD's abusive relationship with Black and Latinx communities; the policies, practices, and behaviors that contributed to such strained relations; and the training, accountability and oversight reforms necessary to protect civilians' rights. Following the DOJ's findings, the City of Chicago entered into a federal consent decree, which governs CPD use of force and police accountability, among other things, and which is being overseen by a federal judge.

215.    The CPD's history of engaging in racially discriminatory stops goes back many decades and has had many incarnations.

216.    A 2015 report by the ACLU of Illinois found that Black Chicagoans were subjected to 72% of all stops yet constituted only 32% of the population. It also found extremely high rates of stop and frisk: more than 250,000 stops that did not lead to an arrest over a period of 4 months.

217.    Following that report in 2015, the ACLU of Illinois entered into a settlement agreement with the City of Chicago requiring CPD to document all stops, to properly train and supervise its officers, and to regularly disclose certain data. The agreement appointed a retired magistrate judge to serve as a consultant to review and oversee CPD's policies, practices, and orders regarding stop-and-frisk, and to issue periodic compliance reports.

218.    Further back, between 1992 and 1995, CPD arrested over 42,000 persons— primarily persons of color—in connection to a "gang loitering ordinance" that prohibited "loitering" in a public place after receiving dispersal orders. The U.S. Supreme Court held that the ordinance was unconstitutionally vague and violated Fourth Amendment due process rights. The ordinance "fail[ed] to distinguish between innocent conduct and conduct threatening harm"

47

and left a "potential for arbitrary enforcement" by giving police "too much discretion" that touched a "substantial amount of innocent conduct."

219. Despite amendment of the gang loitering ordinance, in 2014, CPD officers issued 4,842 orders to disperse, including 4,100 against Black persons, 673 against Latinx persons, and just 66 against white persons.

220. Still earlier, in the 1980s, the CPD made approximately 150,000 arrests annually, mostly in minority neighborhoods, for so-called "disorderly conduct." This amounted to nearly half of CPD's annual arrests. Such arrests were one of the primary methods for CPD interactions with minority neighborhoods. Officers often failed to appear in court following such arrests.

221. In 1983, the ACLU of Illinois sued the City alleging that CPD officers primarily carried out these arrests against Black and Latinx people observed "congregat[ing]" in minority neighborhoods. When the City failed to participate in the resulting ACLU suit in the Northern District of Illinois challenging the constitutionality of such stops, District Judge Prentice Marshall declared CPD's conduct unconstitutional, directed the city to expunge over 800,000 disorderly conduct arrests from the previous five years, and ordered that CPD notify all those whose records would be expunged that they could sue the City for damages.

222. CPD's discriminatory deployment of ShotSpotter reinforces and fuels CPD's longstanding discriminatory policing practices. As the Task Force wrote, CPD's history of "enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct." ShotSpotter exacerbates these problems because it generates tens of thousands of high-intensity—but ultimately fruitless—

police deployments and thousands of hostile encounters between police and residents, and it does so only in predominantly Black and Latinx parts of the city.

## IV. DEFENDANT OFFICERS ILLEGALLY STOPPED PLAINTIFF DANIEL ORTIZ BECAUSE OF A BOGUS SHOTSPOTTER ALERT

223. On the afternoon of April 19, 2021, Mr. Ortiz was doing his family's laundry at a coin wash on the 6700 block of W. Belmont Ave, next door to a Family Dollar store in the Schorsch Village neighborhood of Northwest Chicago.

224. Mr. Ortiz is a Hispanic man of Puerto Rican descent. He has two young children with his girlfriend and is also raising her two other children whose father has passed away. He is a primary breadwinner and caregiver in his family.

225. On April 19th, he was doing laundry for the four kids and his girlfriend.

226. Mr. Ortiz was accompanied by his close childhood friend, Mario Serrano. Mr. Ortiz and Mr. Serrano were not armed and did not have access to any firearms.

227. As they waited for the final load of laundry, Mr. Ortiz was sitting in his car with Mr. Serrano outside the laundromat.

228. The car was legally parked in the parking lot immediately outside the entrance to the laundromat.

229. Unbeknownst to them, ShotSpotter sent an alert of supposed gunfire to the immediate area where they were parked, sitting and chatting.

### *Defendant Officers Illegally Stopped Mr. Ortiz as a Result of False ShotSpotter Evidence*

230. Around 4:10 p.m., ShotSpotter sent an alert to CPD about a supposed gunshot near the 6700 block of W. Belmont Avenue, in the Schorsch Village neighborhood on Northwest

Side of Chicago. The ShotSpotter alert reported a "single gunshot." On information and belief, the alert was transmitted to numerous CPD officers in the area.

231.    ShotSpotter's computer system had originally classified the noise that triggered this alert as a "probable gunfire" with 4.2644% confidence. A ShotSpotter employee reclassified the noise from "probable gunfire" to "single gunshot." The alert was subsequently published to CPD as a "single gunshot."

232.    Defendant Officers Harsimran Powar (#17135) and Michael Matias (#18985) responded to the alert first, arriving at the 6700 block of W. Belmont Avenue soon after the alert was sent out to police officers.

233.    The officers were dressed in black and were driving in an unmarked vehicle.

234.    Mr. Ortiz noticed Defendant Officer Powar walking quickly and aggressively down the street. His behavior struck Mr. Ortiz as threatening.

235.    Mr. Ortiz saw Defendant Officer Powar approach cars in the parking area, look inside, and pull on door handles, attempting to open the car doors without the owners' permission.

236.    Defendant Officer Powar advanced to a van parked adjacent to Mr. Ortiz's car. Mr. Ortiz stood at the hood of his car while Mr. Serrano began to walk into the laundromat.

237.    Defendant Officer Powar yelled at Mr. Ortiz that a shooting occurred on the block. He began shouting questions at Mr. Ortiz, asking him about the supposed shooting. Powar approached Mr. Ortiz aggressively and ordered Mr. Ortiz to "stop," to "come here," and to respond to questions as his partner, Defendant Officer Matias, parked and got out of his vehicle.

238.    Mr. Ortiz turned away from Defendant Officer Powar and began to walk into the laundromat.

239.     Defendant Officer Powar pursued Mr. Ortiz, continuing to order him to answer questions and attempting to detain him, without a reasonable basis. Powar sought to prevent Mr. Ortiz from going back inside the laundromat and grabbed his arm to restrain him, as did Defendant Officer Matias.

240.     Defendant Officer Powar subsequently handcuffed Mr. Ortiz, took him back to his car and held him there together.

241.     Defendant Officers Matias and Powar patted down Mr. Ortiz without his consent.

242.     Defendant Officer Matias also handcuffed and searched Mr. Serrano and then ordered him out of the laundromat.

243.     Mr. Ortiz and Mr. Serrano were both restrained and ordered to remain next to the car. Defendant Officer Matias then returned to the laundromat and thoroughly searched cabinets and trash cans inside the facility but did not find a gun.

244.     The only reason the Defendant Officers targeted and detained Mr. Ortiz was the false and unreliable ShotSpotter alert.

245.     The Defendant Officers lacked reasonable suspicion to detain him for questioning or to conduct a pat down.

246.     Over the course of the encounter Mr. Ortiz told officers at the scene that he had not heard any gunshots, that he had no involvement in any supposed shooting and that they were harassing him for no reason. He did tell officers that he had heard a loud noise that he did not believe was a gunshot.

247.     The Defendant Officers talked with several individuals who work at the laundromat and the Family Dollar and, like Mr. Ortiz, none of them had heard any gunshots.

248.     While inside the Family Dollar, Defendant Officer Powar reviewed footage from a Family Dollar security camera. The footage did not show any shooting or firearms. While reviewing the video, Powar commented aloud that no one on camera was acting like there had been a gunshot.

249.     Three additional police cars arrived at the scene over a span of approximately 25 minutes after Defendant Officers Powar and Matias handcuffed and patted down Mr. Ortiz.

250.     The new officers on the scene—Officers Soly E. Roman (#10493), Mychael Ramos (#12622), Jorge Ulloa (#13936), Ilir Llika (#17061), Matthew Deneen (#2899), Miguel Nieves (#4931), and Kevin O'Brien (#8884)—continued to detain Mr. Ortiz and his friend. They continued questioning them about supposed gunshots. All of the officers at the scene acted in concert to detain and arrest Mr. Ortiz.

251.     At some point, some of the officers showed Mr. Ortiz a screen with the ShotSpotter alert that had directed them to the location. They explained that the ShotSpotter alert showed the address of the Family Dollar as the location of supposed gunfire. The officers explained that they were there to investigate the supposed gunshots.

252.     The false ShotSpotter alert was the only reason that Defendant Officers Powar and Matias had arrived in the parking lot and targeted Mr. Ortiz to stop, question, and frisk him. Their words and actions demonstrated that they had conducted the stop because of the ShotSpotter alert and believed that a gunshot must have been fired because ShotSpotter issued an alert.

253.     For example, Defendant Officers told Mr. Ortiz and Mr. Serrano multiple times that they were there to investigate a call of "shots fired" and that is why they had approached Mr. Ortiz.

254.     Similarly, even after having completed their investigation at the location of the ShotSpotter alert—including searching Mr. Ortiz, Mr. Serrano, the car, and the laundromat, reviewing the Family Dollar video footage, and speaking with employees at both the Family Dollar and the laundromat—Defendant Officers persisted in their belief that a shot must have been fired based on nothing more than the ShotSpotter alert. After impounding Mr. Ortiz's vehicle in connection with pretextual drug charges (described below), Defendant Officer Powar decided to search the car yet again to look for a gun, explaining "I don't trust . . . this guy. It [i.e. a gun] definitely has to be in here."

255.     Similarly, Defendant Officer Matias told Powar that the ShotSpotter alert "had to be" Mr. Ortiz and Mr. Serrano. When Defendant Officer Powar told another officer that they "unfortunately" had not found a gun, the other officer described it as "crazy" and "ironic" that the search had not turned up anything.

256.     The Ortiz Defendant Officers did not consider or investigate the possibility that the ShotSpotter alert had been triggered by a loud noise that was not gunfire. For example, on information and belief, Defendant Officers did not speak with a man who had been working at a food stand on the sidewalk next to the parking lot all day and who would have been in a position to hear any loud noise, even though Mr. Ortiz told officers at the scene that they should consider talking to the man.

257.     Police officers never found any evidence to corroborate gunfire. On information and belief, there was no gunshot.

53

### *Defendant Officers Searched Mr. Ortiz's Vehicle and Arrested Him on Pretextual Drug Charges*

258.     After handcuffing him, Defendant Officer Powar took the car keys out of Mr. Ortiz's pocket to open the vehicle. Defendant Officers Powar and Matias searched Mr. Ortiz's car.

259.     In response to Defendant Officers' questions while he was handcuffed, Mr. Ortiz told them, truthfully, that he had legally smoked marijuana and that he had it with him. He had recently purchased it at a nearby legal marijuana dispensary.

260.     Defendant Officers Powar and Matias searched Mr. Ortiz's car.

261.     Defendant Officers Powar and Matias recovered the marijuana that Mr. Ortiz had told them he had purchased from a legal dispensary.

262.     Defendant Officers Powar and Matias also recovered a prescription drug bottle containing approximately 20 pills of hydrocodone/acetaminophen, a commonly-prescribed pain medication.

263.     Defendant Officers Powar and Matias arrested Mr. Ortiz on pretextual drug charges, accusing him of misdemeanor possession of 36 grams of marijuana, just above the legal limit of 30 grams, in violation of 720 ILCS 550.0/4(c), and felony possession of a controlled substance, the hydrocodone/acetaminophen pills, in violation of 720 ILCS 570.0/402(c).

264.     The Ortiz Defendant Officers also impounded Mr. Ortiz's vehicle, a 2017 Ford Edge SUV, under Municipal Code of Chicago 7-24-225(a), which provides for impoundment of a vehicle used in connection with the sale or purchase of a controlled substance.

*Mr. Ortiz's Detention and Subsequent Release*

265.     Mr. Ortiz was taken by the Ortiz Defendant Officers to lockup at the 25th Precinct station at 5555 W. Grand Avenue.

266.     Mr. Ortiz was held at the station overnight. While he was there, Defendant Officer Powar verbally harassed him.

267.     Mr. Ortiz was charged with one felony count of possession of controlled substances and one misdemeanor count of possession of more than 30 grams of cannabis.

268.     On the same day, April 19, 2021, Defendant Officers Powar and Matias prepared a misdemeanor complaint against Mr. Ortiz for the marijuana possession charge and a felony complaint for the hydrocodone possession charge. Powar signed as the complainant on both charges; Matias signed as notary on both the felony and misdemeanor complaints. The complaints were filed in the Cook County Circuit Court. The court clerk's office file-stamped the complaints on April 20, 2021.

269.     Mr. Ortiz was transferred to Cook County Jail at 4 a.m. on April 20, 2021.

270.     That day, Mr. Ortiz was set to make his initial appearance in bond court before Judge Mary Marubio.

271.     The Assistant State's Attorney dropped all charges against Mr. Ortiz, moving to dismiss the charges *nolle prosequi*. Mr. Ortiz was not even called individually to appear before the judge. He was informed summarily that the charges were dismissed.

272.     Mr. Ortiz was then released from custody.

273.     After being released, Mr. Ortiz sought to recover his impounded car. He was initially told that he would have to pay a $3,000 fine to recover the vehicle. He refused and insisted on a hearing.

55

274. On April 21, 2021, Mr. Ortiz attended a hearing at 400 W. Superior Street to challenge the seizure of his car. No police officers appeared as witnesses. The Administrative Law Judge ordered the vehicle's immediate release to Mr. Ortiz after determining that there was no probable cause to support the allegation that the vehicle was used for the purchase or sale of a controlled substance, as required to impound a vehicle under MCC 7-24-225(a).

275. Mr. Ortiz searched for the vehicle and ultimately found it at a police impound lot at 2255 E. 103rd Street. When the car was returned to him, he found that there was approximately $1,200 in new damage to the car door and body. This damage was not present when he was arrested and the car was impounded.

276. CPD denied Mr. Ortiz's claims for recovery for the damage to his vehicle. The vehicle repairs remain outstanding.

277. The erroneous ShotSpotter alert prompted the Defendant Officers to falsely suspect and target him, detain him, search his person and vehicle, and ultimately arrest and jail him on pretextual drug charges. Upon information and belief, Defendant Officers Powar and Matias arrested Mr. Ortiz and filed the drug charges to retaliate against Mr. Ortiz and to attempt to justify retroactively their unlawful conduct in stopping without proper cause.

278. The charges brought against Mr. Ortiz were so petty that the State's Attorney's Office did not bother to prosecute them and no officer bothered to appear at the impoundment hearing. The detention, arrest, and subsequent proceedings stemming from the false ShotSpotter alert caused an enormous hardship for Mr. Ortiz and did nothing to make the community safe.

279. Mr. Ortiz cares for four children in his home. He suffered from the stigma of false arrest around his family and friends.

280.     Mr. Ortiz continues to feel unsafe around CPD officers after Defendant Officers violently accosted him during a routine chore he undertook to serve his family. He has seen at least one of the same officers around the neighborhood and is disturbed by their unwarranted actions.

281.     Mr. Ortiz regularly travels and goes about daily business within parts of the City of Chicago that are within ShotSpotter's footprint. He is thus likely to be falsely targeted again by CPD officers, solely based on the fact that he is in a high-alert ShotSpotter area of the City.

## V.     DEFENDANT OFFICERS ILLEGALLY STOPPED, SEARCHED, AND SEIZED PLAINTIFF DERICK SCRUGGS BECAUSE OF A BOGUS SHOTSPOTTER ALERT

282.     Derick Scruggs is a Black man who lives in the South Shore neighborhood in Chicago. He has two young children. He is a breadwinner for his family. Mr. Scruggs' profession is as an armed security guard working for a private security company.

283.     On the evening of July 18, 2022, Mr. Scruggs was working as an armed security guard at the AutoZone at 7347 S. Ashland Avenue, across from a Family Dollar in the Englewood neighborhood on the South Side of Chicago.

284.     Unbeknownst to Mr. Scruggs or others at the AutoZone that evening, ShotSpotter sent an alert to police of supposed gunfire near the AutoZone.

### Defendant Officers Illegally Stopped, Detained, and Searched Mr. Scruggs as a Result of False ShotSpotter Evidence

285.     Around 8:18 p.m. on July 18, 2022, ShotSpotter sent an alert to CPD about a supposed gunshot at 7347 S. Ashland Avenue. The ShotSpotter alert reported a "single gunshot." The alert was transmitted to CPD officers in the area.

286.    ShotSpotter's computer system had originally classified the noise that triggered this alert as a "firecracker" with 99.79620% confidence. A ShotSpotter employee reclassified the noise from "firecracker" to "single gunshot." The alert was subsequently published to CPD as a "single gunshot."

287.    Acting in response to the alert, Defendant Officers Fidel Legorreta (#5902) and Theodore Andrews (#7099) drove to the 7300 block of S. Ashland Ave. at 8:20 p.m. and pulled into the parking lot outside the entrance of the AutoZone.

288.    Mr. Scruggs was standing outside the AutoZone together with two AutoZone employees who were sharing a cigarette.

289.    The officers stopped their car directly in front of Mr. Scruggs, exited the car, and approached Mr. Scruggs.

290.    While approaching Mr. Scruggs, Defendant Officer Andrews immediately asked Mr. Scruggs, "where did those shots come from?" Mr. Scruggs replied that he hadn't seen or heard anything. Defendant Officer Andrews asked if Mr. Scruggs had "seen a car pulling off or something." Mr. Scruggs replied that he had not.

291.    The Defendant Officers did not ask a single question of the two other men standing immediately next to Mr. Scruggs. Defendant Officers did not inquire whether either of them had heard or seen gunshots or some other loud noise. Defendant Officers did not ask whether either of them had a firearm. Defendant Officers never even asked for their names. Defendant Officers trained their attention solely on Mr. Scruggs.

292.    Without any further questioning about what happened, Defendant Officer Legorreta asked to "check" Mr. Scruggs's firearm to "make sure there is no rounds missing."

58

293.     Mr. Scruggs denied the request to hand over his firearm, but Defendant Officer Legorreta persisted. Defendant Officer Legorreta told Mr. Scruggs, falsely, "If I'm a police officer you are supposed to comply," and then added, falsely, "We have the right to check."

294.     Defendant Officer Legorreta emphasized to Mr. Scruggs that the ShotSpotter alert had supposedly come from "right" where they were. Defendant Officer Legorreta then asserted, without any basis, that "you are the only one with a firearm here."

295.     In fact, Defendant Officers had not asked or checked whether anyone else present had a firearm. Defendant Officers had no confirmation that the ShotSpotter alert corresponded to a noise in the parking lot, as opposed to other areas adjacent to the AutoZone. Nor did Defendant Officers have any reason to believe that Mr. Scruggs had been in the parking lot several minutes earlier when the ShotSpotter alert had been triggered. Defendant Officers had not asked Mr. Scruggs where he had been before police arrived, how long he had been outside, or even why he was outside.

296.     Mr. Scruggs continued to decline the officers' requests to search him. Because Defendant Officer Legorreta persisted in demanding the weapon, Mr. Scruggs eventually lifted his arms to allow the officer access to the gun. Defendant Officer Legorreta then physically removed Mr. Scruggs's firearm and holster from inside his waistband.

297.     Defendant Andrews and Defendant Legorreta had assumed and maintained positions standing on either side of Mr. Scruggs, making it clear to Mr. Scruggs that he was not free to leave.

298.     Defendant Officer Legorreta removed the magazine of the firearm and inspected it. He claimed that the magazine was "missing a round" from its magazine, which had an18-round capacity. This statement and the observation were false.

59

299.    The firearm in fact had a full complement of 18 rounds, including 17 rounds in the magazine and one live round in the chamber.

300.    Mr. Scruggs' standard practice, consistent with his duties as an armed security guard, was to carry the gun loaded while on duty, with a live round in chamber ready to be used. At the beginning of his shift, he would typically chamber one round from the 18-round magazine, leaving 17 rounds remaining in the magazine. This was the configuration of the gun when Defendant Officer Legorreta seized it. After his shift, Mr. Scruggs would unload the chamber and return the 18th round back into the magazine.

301.    The presence of 18 rounds was clearly visible to Defendant Officer Legorreta. The magazine of Mr. Scruggs' gun had witness holes through which Defendant Officer Legorreta could observe how many rounds were in the magazine. When he removed the magazine from the gun, Defendant Legorreta could plainly see that 17 of the 18 witness holes were filled with a round. Moreover, the presence of the 18th round loaded in the chamber would have been equally apparent to Defendant Officer Legorreta because of an indicator on the outside of the firearm meant to warn the user that the chamber is loaded. The 18th round would also have been apparent to Defendant Officer Legorreta as he unloaded and checked the weapon when handling it.

302.    After examining the gun, Defendant Legorreta knowingly made the false allegation that the magazine only contained 16 rounds and, thus, that a round was "missing." He made this false allegation in order to create a false justification to detain or arrest Mr. Scruggs and to provide false corroboration of his unfounded suspicion, based solely on the ShotSpotter alert, that Mr. Scruggs had discharged his weapon.

60

303. After falsely asserting that the gun was "missing" a round, Defendant Officer Legorreta next asked Defendant Officer Andrews to touch the firearm to see if it was hot. This was a further attempt to manufacture a false justification to detain or arrest Mr. Scruggs. Defendant Officer Andrews touched the firearm with the back of his bare hand. He did not respond when Defendant Officer Legorreta asked if it felt hot. Eventually, Defendant Officer Andrews told Officer Legorreta that he should touch the gun himself.

304. Defendant Officer Legorreta then removed his glove, placed the back of his own hand on the firearm, and claimed, falsely, that "it's hot here a little bit."

305. The outdoor temperature that day was around 90 degrees Fahrenheit. Mr. Scruggs had kept his firearm tucked inside his waistband all day pressed against his body. When Defendant Officer Legorreta placed his hand on Mr. Scruggs' firearm, it had been several minutes since the ShotSpotter alert had been triggered by a supposed gunshot.

306. In general, a single gunshot fired from a 9mm handgun does not make the outside of the firearm appreciably hot after discharge. Under no circumstances would a single gunshot from a 9mm handgun heat the firearm to such an extent that the weapon would remain appreciably hot to the touch several minutes after a discharge. Based on their training and experience, the Scruggs Defendant Officers would have known these facts.

307. Defendant Officer Legorreta's false implication that the gun was "hot here a little bit" because it had been fired recently was manufactured to provide false corroboration of his unfounded suspicion, based solely on the ShotSpotter alert, that Mr. Scruggs had discharged his weapon.

308. While examining the firearm, which had a live round in the chamber, Defendant Officer Legorreta handled the gun carelessly, holding it such that the muzzle was frequently

61

pointing horizontally toward Mr. Scruggs, rather than safely toward the ground. Defendant

Officer Legorreta handled the gun in this manner while it was loaded, even before attempting to

clear the chamber of the live round.

309.    Mr. Scruggs was terrified that Defendant Officer might accidentally discharge the

firearm while pointed in his direction.

310.    Defendant Officer Legorreta subsequently asked Mr. Scruggs to come inside with

him. Mr. Scruggs cooperated and walked inside. When Officer Legorreta asked if he had other

weapons on him, Mr. Scruggs truthfully responded that he did not.

311.    Inside the AutoZone, Mr. Scruggs voluntarily retrieved his wallet and presented

Defendant Officer Legorreta with his valid concealed carry license ("CCL"), firearm owners'

identification ("FOID") card, and state driver license. Defendant Officer Legorreta would not

return Mr. Scruggs' cards for twenty-two minutes.

312.    Next, Defendant Officer Legorreta asked who he should speak to for access to the

AutoZone's surveillance camera footage. Mr. Scruggs himself called over a manager.

313.    Despite Mr. Scruggs' cooperation, Defendant Officer Legorreta proceeded to put

Mr. Scruggs in handcuffs to further detain him. When Mr. Scruggs asked why he was being

detained, Officer Legorreta responded by citing the ShotSpotter alert: "The ShotSpotter [alert]

came from right here. Address is on our computer." Defendant Officer Legorreta also repeated

his patently false assertions that the gun was missing a bullet and was hot. Mr. Scruggs again

emphatically denied shooting his gun.

314.    Defendant Officer Legorreta then asked Mr. Scruggs to turn around so that he

could handcuff him. Mr. Scruggs complied. The Defendant Officers kept Mr. Scruggs in

handcuffs for twenty minutes.

315.    The only reason the Defendant Officers targeted and detained Mr. Scruggs was the false and unreliable ShotSpotter alert.

316.    The Defendant Officers lacked probable cause to search, detain, or arrest Mr. Scruggs. They also lacked reasonable suspicion to detain him for questioning or to conduct a pat down.

317.    As Defendant Officer Legorreta and Mr. Scruggs walked back outside, Defendant Officer Legorreta asked Mr. Scruggs, for the first time, how long he had been outside and why he had been outside when police arrived. Mr. Scruggs answered, truthfully, that he had been inside the store and that he had gone outside after others said they had heard a loud noise. Despite hearing this information for the first time, Defendant Officer Legorreta made no attempt to ascertain from Mr. Scruggs or others what the loud noise sounded like, where it had come from, how people in the area had reacted, whether there were any other witnesses he could speak to, or any other information that would have enabled him to actually investigate the source of the noise.

318.    Two transporting officers then arrived on the scene: Defendant Officers Sarah Keckley (#7041) and Samantha DiCerto (#18677).

319.    Defendant Officer Legorreta asked Defendant Officer Keckley and Officer DiCerto to hold Mr. Scruggs. They placed him, handcuffed, in the back of their cruiser with the door open.

320.    Defendant Officer Legorreta approached Mr. Scruggs to search his person. Defendant Officer Legorreta said he needed to "check [Mr. Scruggs'] pockets for the casing in case he put the casing in his pockets." Defendant Officer Legorreta reached into each of Mr.

Scruggs' six pant pockets and felt around. He then felt underneath the bulletproof vest Mr.

Scruggs wore as a security guard. Defendant Officer Legorreta did not find a casing.

321.    While Mr. Scruggs was handcuffed and detained outside, Defendant Officer

Legorreta went inside the AutoZone and found Mr. Scruggs' backpack. Defendant Officer

Legorreta proceeded to search Mr. Scruggs' backpack without consent. Defendant Officer

Legorreta took the backpack outside.

322.    While Mr. Scruggs remained unlawfully detained, handcuffed in the back of a

police car accompanied by Defendant Officer Keckley and Officer DiCerto, Defendant Officers

Legorreta and Andrews made another sweep of the parking lot looking in vain for a shell casing.

323.    Defendant Officer Legorreta then approached Mr. Scruggs to search his person

once again. Officer Legorreta asked Mr. Scruggs if he had put the shell casing somewhere. Mr.

Scruggs again repeated, truthfully, that he did not shoot his weapon. Nevertheless, for the second

time that night, Defendant Officer Legorreta asked Mr. Scruggs to step out of the vehicle

because he wanted to "check to make sure that there [were] no shell casings" on Mr. Scruggs'

body.

324.    Defendant Officer Legorreta then conducted a humiliating and invasive search of

Mr. Scruggs' body in public. He untied Mr. Scruggs pants, pulled his shirt out from the

waistband, and lifted both his overshirt and undershirt up to his bellybutton, exposing Mr.

Scruggs' waist.

325.    Defendant Officer Legorreta put his hands down Mr. Scruggs' pants, shook his

hands, and felt against Mr. Scruggs' body. Defendant Officer Legorreta put his hands between

the waistband of Mr. Scruggs' boxers and his skin and pulled them out to shake the clothes.

326.    Defendant Officer Legorreta put his hands down the Mr. Scruggs' pants again, thoroughly pressing against Mr. Scruggs' legs and body. He again felt up and down the outside of Mr. Scruggs' pants, reached inside of his pockets, removed Mr. Scruggs' phone, baton, and AirPods from inside his pant pockets, and again pressed against the outside of the pockets.

327.    After searching Mr. Scruggs' person, Defendant Officer Legorreta again searched the inside of Mr. Scruggs' backpack. Defendant Officer Legorreta ordered Mr. Scruggs step back into the police car.

328.    At this point, Defendant Officer Andrews approached Defendant Officer Legorreta and said they needed to release Mr. Scruggs because they did not have enough evidence to continue holding him. Defendant Officer Legorreta asked if they should call the Sergeant to see if they had enough to book him as an "attempted." Defendant Officer Andrews responded, "I know we don't." Defendant Officer Keckley agreed, saying "it's going to be dropped."

329.    Nonetheless, Defendant Officer Legorreta called the Sergeant. Defendant Officer Legorreta provided a false account of what he had observed to the Sergeant, for example stating that there were only 16 rounds in the magazine when in fact there were plainly 17 rounds in the magazine and one in the chamber. On information and belief, the Sergeant declined to authorize an arrest. After hanging up, the Defendant Officers released Mr. Scruggs from handcuffs and returned Mr. Scruggs' property to him.

330.    As they parted ways, Mr. Scruggs told the officers he would be back at work the next day.

331.    Defendant Officers did not find any evidence whatsoever to corroborate the ShotSpotter alert of supposed gunfire.

332.     On information and belief, other CPD officers determined that same evening that the ShotSpotter alert in question had in fact been triggered by a loud noise from a vehicle traveling down an adjacent street.

333.     The Citizen App is a publicly available service that transcribes and summarizes radio transmissions from police scanners and, possibly, other sources of real-time information about police activity. The app provides that information to members of the public. Through the app, a person can receive notifications and real-time updates about police activity in the vicinity.

334.     A report published on the Citizen App on July 18, 2022, at 8:22 p.m. showed a ShotSpotter alert of possible gunfire at 7347 S. Ashland Avenue, matching the address of the AutoZone parking lot. A subsequent update published to the app regarding that alert stated that "police on the scene have confirmed from a witness that a red sedan went eastbound" after the shooting. At 8:30 p.m. another update was published on the app: "Police confirmed from the witness that the car made the noise and not shots fired."

*Defendant Officers Illegally Stopped Mr. Scruggs' Again on July 19, 2022, and Pretextually Arrested Him for a Paperwork Violation.*

335.     Despite finding no evidence to corroborate a gunshot and despite determining that there was no basis to continue detaining Mr. Scruggs, Defendant Officers Andrews and Legorreta returned to the AutoZone the next day to once again detain Mr. Scruggs.

336.     Around 8:45 p.m. on July 19, 2022, Defendant Officers arrived at the AutoZone, when they knew Mr. Scruggs would again be working. According to their own police report, Defendant Officers "were conducting a follow up ShotSpotter investigation."

337.     Immediately upon arriving, Defendant Officers trained their focus on Mr. Scruggs and detained Mr. Scruggs again, without cause.

338.    Defendant Officer Legorreta opened the AutoZone door and demanded Mr. Scruggs to step outside. Mr. Scruggs complied.

339.    Once outside, Defendants Legorreta and Andrews surrounded Mr. Scruggs on two sides with Mr. Scruggs' back toward the exterior wall. They directed him to answer questions. It was clear to Mr. Scruggs that he was not free to leave.

340.    Defendant Officer Legorreta admitted that he was there to do a "follow up investigation" of the previous day's ShotSpotter alert.

341.    Defendant Officers lacked probable cause or reasonable suspicion to search Mr. Scruggs or detain him for questioning.

342.    Defendant Officer Legorreta demanded that Mr. Scruggs produce certain pieces of identification, including a "PERC card" and a "firearm control card."

343.    "PERC card" refers to a permanent employment registration card issued by the Illinois Department of Financial and Professional Regulation to licensed security guards, including armed security guards. The firearm control card is issued to people who carry firearms in the course of their employment, including as an armed security guards.

344.    Mr. Scruggs searched his phone for a digital copy of the identifications requested. After finding what he believed to be a responsive document, he gave his cell phone to Defendant Officer Legorreta to show him copies.

345.    Defendant Officer Legorreta maintained possession of the phone and called a supervisor to inquire about the document Mr. Scruggs had retrieved. Defendant Officer Legorreta sent his supervisor a picture of Mr. Scruggs' phone with the document visible.

346.    Defendant Officer Legorreta indicated to Defendant Officer Andrews and Mr. Scruggs that his supervisor was "trying to verify it over the system." Defendant Officers continued to detain Mr. Scruggs.

347.    Defendant Officer Legorreta then asked Mr. Scruggs if he had his PERC somewhere else on his phone, apparently unsatisfied with what Mr. Scruggs had already shown him. Mr. Scruggs then continued searching through his phone.

348.    Defendant Officer Legorreta subsequently received a brief call from his supervisor.

349.    After hanging up, Defendant Officer Legorreta immediately indicated to Mr. Scruggs that he was going to seize Mr. Scruggs's firearm and that Mr. Scruggs was being detained. Mr. Scruggs complied but immediately inquired as to why he was being taken into custody. Defendant Officer Legorreta said he would explain later. On information and belief, at no time during the arrest did Defendant Officers inform Mr. Scruggs of his *Miranda* rights.

350.    As Defendant Officer Legorreta was handcuffing Mr. Scruggs, an AutoZone employee opened to the door to the store and asked the officers what was happening and why they were taking Mr. Scruggs into custody. Defendant Officer Legorreta asked Mr. Scruggs if he could tell the employee the details. Mr. Scruggs had no idea why he was being arrested and so Mr. Scruggs said, "you tell her."

351.    Defendant Officer Legorreta told the AutoZone employee that he and Defendant Officer Andrews had been there the previous day investigating a ShotSpotter alert. Defendant Officer Legorreta recounted the same false reasons he had offered the prior day for detaining Mr. Scruggs in connection with the ShotSpotter alert.

352.   Defendant Legorreta then explained that Mr. Scruggs did not have his PERC or firearm control card on his person and that was why he was being taken into custody.

353.   Now realizing that he was being arrested for a paperwork issue related to his employment Mr. Scruggs became upset. Mr. Scruggs said, "get my lawyer on the phone" and "I can't pay rent if I lose this job."

354.   Defendant Officer Legorreta pinned Mr. Scruggs against the wall of the AutoZone and aggressively restrained him.

355.   Mr. Scruggs told Defendant Officer Legorreta that he could simply go to his house and show them the documents. Defendant Officer Legorreta, however, proceeded with Mr. Scruggs' arrest. Defendant Officers did not permit Mr. Scruggs to speak with his attorney.

356.   At no point during their encounter with Mr. Scruggs on July 19, 2022, did the Defendant Officers actually investigate the supposed gunshot detected by ShotSpotter alert. Their single-minded focus was to continue detaining Mr. Scruggs until they could find a pretextual basis on which to arrest him.

357.   In the course of arresting Mr. Scruggs outside the AutoZone, Defendant Officers seized Mr. Scruggs' security uniform, bulletproof vest, and firearm.

358.   Defendant Officer Legorreta entered the AutoZone and searched Mr. Scruggs's backpack. He seized Mr. Scruggs's valid FOID and CCL cards and returned the rest of the wallet and backpack to the AutoZone employees.

359.   Defendant Officer Legorreta handed Mr. Scruggs over to Officers Yan and Egan who had been called to transport Mr. Scruggs to the police station lockup.

360.   Officers Yan and Egan transported Mr. Scruggs to Chicago Police District 7 where Mr. Scruggs was jailed.

361.    The arrest report, written by Defendant Officers Legorreta and Andrews, states that after Defendant Officers took Mr. Scruggs into custody for not having a firearm control card or PERC card on his person, officers determined that Mr. Scruggs' PERC card had expired a few months earlier.

362.    Mr. Scruggs was booked for the expired PERC card on an alleged violation of 225 ILCS 447/45-50-A-1, which prohibits practicing as a private security contractor without a license, a Class A misdemeanor. Charges against Mr. Scruggs were approved after midnight on July 20, 2022. He was released from lockup later that morning.

363.    Expired PERC cards can be automatically renewed. For people like Mr. Scruggs who have previously been approved for a license to work as an armed security guard, renewing a recently-expired license is a purely bureaucratic requirement—simply a matter of paying a $45 fee.

364.    Defendant officers nevertheless chose to arrest Mr. Scruggs on this basis, jail him at the station, and formally file charges.

365.    The arrest, detention, and charges were plainly pretextual and motivated by irrational and unfounded suspicion fueled by the ShotSpotter alert. CPD almost never arrests people for violations of the professional licensing statute at issue here. Before Mr. Scruggs' arrest on July 19, 2022, CPD had not arrested a single person solely for an alleged violation of this licensing provision since 2015.

366.    The Defendant Officer's decision to redetain, investigate, and then arrest Mr. Scruggs was motivated by the false and utterly unfounded belief that Mr. Scruggs had discharged his gun, based on nothing more than an unreliable ShotSpotter alert.

367.    At his first appearance in criminal Court on August 2, 2022, Mr. Scruggs was assigned counsel from the Office of the Cook County Public Defender.

368.    Mr. Scruggs' public defender subsequently was prepared to file a motion to suppress the evidence obtained by Defendant Officers because their warrantless search and seizure of Mr. Scruggs was without probable cause or reasonable suspicion and, in particular, because the ShotSpotter alert did not provide probable cause or reasonable suspicion to believe Mr. Scruggs had committed (or was about to commit) a crime.

369.    Rather than litigate the motion, at the next appearance in Court, on September 16, 2022, the State's Attorney Office moved to dismiss the charge, *nolle prosequi*.

370.    The State's Attorney's Office agreed to dismiss the charges only on the condition that Mr. Scruggs agree that police be allowed to destroy Mr. Scruggs' firearm, even though Mr. Scruggs had legally possessed the firearm, there was no evidence that he had misused it, and there were no charges against him relating to mishandling of a firearm.

371.    Mr. Scruggs has suffered significant hardship as a result of the Defendant Officers unwarranted and illegal conduct.

372.    Mr. Scruggs suffered from the humiliation and stigma of being detained and handcuffed in front of his co-workers. He suffered the indignity and humiliation of an intrusive body search in public.

373.    Mr. Scruggs continues to feel wary and unsafe around CPD officers after they detained him arbitrarily and pursued an investigation of him without justification until they could find a pretext to arrest him. He continues to experience fear, anxiety, nervousness, helplessness, and stress as a result of his encounters with the Scruggs Defendant Officers

374.     Mr. Scruggs lives in the South Shore neighborhood of Chicago on the South Side in an area within ShotSpotter's coverage area. He regularly travels and goes about his daily business in the surrounding areas, which are all within ShotSpotter's footprint. Mr. Scruggs has also worked multiple shifts at the same AutoZone where police responded on July 18, 2022 to a ShotSpotter alert.

375.     The areas immediately around Mr. Scruggs' home and workplaces have a very large volume of ShotSpotter alerts of supposed gunfire. Mr. Scruggs fears being once again falsely suspected and detained because of a ShotSpotter alert, particularly because he continues to work as an armed security guard and legally carries a firearm on his person. In fact, Mr. Scruggs is likely to be falsely targeted again by CPD solely because he both lives and works in areas of the City with high numbers of ShotSpotter alerts.

## CLASS ACTION ALLEGATIONS

376.     Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs Ortiz and Scruggs each bring this action on behalf of themselves and a class consisting of all persons who have been or will be subject to an investigatory stop by Chicago Police Department officers where a recent ShotSpotter alert—or a history of ShotSpotter alerts in the area—is part of the basis for the investigatory stop; as well as a subclass consisting of all such persons who are Black or Hispanic. The Plaintiffs seeks declaratory and injunctive relief against the City on behalf of the class and subclass.

377.     Plaintiffs and the members of the class and subclass are similarly situated for the purpose of asserting the claims alleged in this Complaint on a common basis.

378.     A class action is the only practicable means by which the individual named Plaintiff and the class members can challenge the City's unconstitutional policies and practices

related to the manner in which police respond to ShotSpotter alerts. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit. Many members of the class also do not know that they are being targeted for a stop and search by CPD as a result of a ShotSpotter alert because CPD fails to tell them.

379.    The class and subclass are so numerous that joinder of all members is impractical. Over an 18-month period, from January 1, 2020 to May 31, 2021, there were over 2,400 people who were subject to an investigatory stop by CPD in response to a specific ShotSpotter alert or because of a real or perceived history of frequent ShotSpotter alerts in an area. The class also includes a significant number of future class members, given that individuals are stopped by CPD on a daily basis as a result of ShotSpotter alerts. The overwhelming majority of people stopped because of ShotSpotter are Black or Latinx.

380.    There are questions of law and fact common to all class members, including but not limited to whether the City's policies and practices regarding the use of unreliable ShotSpotter evidence to justify investigatory stops violates the Fourth and Fourteenth Amendment rights of all class members, whether they violate the Illinois Civil Rights Act, and whether they violate the Equal Protection Clause of the U.S. Constitution.

381.    Because the practices and procedures challenged in this Complaint apply with equal force to the individual named Plaintiffs and the other members of the class, the claims of the individual named Plaintiffs are typical of the class and subclass.

382.    The individual named Plaintiffs will fairly and adequately represent the interests of the class and subclass. He possesses a strong personal interest in subject matter of the lawsuit and is represented by experienced counsel with expertise in complex civil rights litigation.

Counsel have previously litigated injunctive class actions, and have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

383.    The Defendants have acted on grounds generally applicable to the class: their policies, procedures, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

**MUNICIPAL LIABILITY CLAIMS ON BEHALF OF PLAINTIFFS SCRUGGS, ORTIZ, THE PROPOSED CLASS, AND THE ORGANIZATIONAL PLAINTIFF.**

**COUNT I – 42 U.S.C. § 1983**
***Monell* Liability – Violation of the Fourth and Fourteenth Amendments**
**(On Behalf of Lucy Parsons Labs and its members, Plaintiff Ortiz, Plaintiff Scruggs, and the class of similarly-situated individuals against the City of Chicago)**

384.    Each paragraph of this Complaint is incorporated as if restated fully herein.

385.    Count I is alleged against the City of Chicago.

386.    The City of Chicago's use of ShotSpotter results in illegal investigatory stops or arrests of the Plaintiffs and members of the Plaintiff Class and Plaintiff Organization in violation of the Fourth and Fourteenth Amendments. Such violations are a continuing, persistent, and widespread practice.

387.    CPD officers falsely manufacture reasonable suspicion for these searches and seizures by relying on ShotSpotter alerts that have never been tested for reliability and are not sufficiently reliable to be used as any part of the basis for a Fourth Amendment search or seizure.

388.    CPD officers falsely manufacture reasonable suspicion for these searches and seizures by stopping individuals merely because they are in the vicinity of ShotSpotter alerts.

389.    CPD officers falsely manufacture reasonable suspicion for these searches and seizures by stopping individuals without corroboration of the ShotSpotter alert or individualized suspicion.

74

390.     CPD officers falsely manufacture reasonable suspicion for these searches and seizures by relying on a claim, real or perceived, that a particular area has had frequent ShotSpotter alerts in the past.

391.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of relying on ShotSpotter to initiate investigatory stops for unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments.

392.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops and seizures by relying on ShotSpotter alerts, even though the system has never been tested for reliability and is not sufficiently reliable to be used as any part of the basis for a Fourth Amendment search or seizure.

393.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops by stopping individuals merely because they are in the vicinity of ShotSpotter alerts.

394.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops by stopping individuals without corroboration of the ShotSpotter alert or individualized suspicion.

395.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops by relying on the claim, real or perceived, that an area has had frequent ShotSpotter alerts in the past.

396.    The City maintains a policy, custom, and practice of unconstitutional misconduct by CPD officers by using the ShotSpotter system with deliberate indifference to the constitutional rights of the Plaintiff class.

397.    The City continues to use the ShotSpotter system with deliberate indifference to the constitutional rights of the Plaintiff class.

398.    The City has or should have knowledge that its present use of ShotSpotter would result in constitutional violations. This knowledge includes:

399.    The City is aware of multiple studies showing that ShotSpotter technology is inaccurate and unreliable, including one study by the Chicago OIG.

400.    The City has received criticisms of its use of ShotSpotter and the ShotSpotter contract at multiple press conferences, town hall meetings, city council hearings, and more, including the OIG's report on ShotSpotter.

401.    The City knows that ShotSpotter alerts overwhelmingly lead police to find no corroboration of gunfire.

402.    The City knows that ShotSpotter has never been tested to determine its reliability with respect to its ability to distinguish gunfire from other loud noises.

403.    The City knows that its contract with ShotSpotter does not create any obligation for ShotSpotter to avoid false alerts and it in fact strongly incentivizes ShotSpotter to over-report loud noises as gunfire and to trigger police dispatches in response to noises that are not gunshots.

404.    The City knows that ShotSpotter's purported "accuracy" rates do not reflect any actual measure of the system's reliability and that these supposed "accuracy" rates take no account of the overwhelming proportion of ShotSpotter alerts in Chicago that do not turn up any evidence of gunfire.

405.    The City knows that ShotSpotter alerts do not and cannot supply enough information to identify a particular individual as a suspect.

406.    The City knows that the U.S. Court of Appeals for the Seventh Circuit has analogized ShotSpotter alerts to unverified anonymous tips that cannot be relied upon without corroboration and that officers nevertheless routinely rely on ShotSpotter alerts and treat them as perfectly accurate without any corroboration.

407.    The City knows that its officers routinely rely on specific ShotSpotter alerts—or a real or perceived history of ShotSpotter alerts in an area—as a basis to initiate an investigatory stop or other search or seizure.

408.    The City knows that ShotSpotter leads to thousands of fruitless investigatory stops in Chicago.

409.    The City has failed to act to prevent CPD officers, including the Scruggs and Ortiz Defendant Officers, from stopping civilians based on ShotSpotter alerts, despite its knowledge and notice of ongoing constitutional violations.

410.    The City has failed to adjust its policies or practices—or to provide training—to minimize or eliminate the number of false alerts or to minimize or eliminate illegal stops and arrests on account of ShotSpotter.

411.    The City has failed to adequately train and supervise CPD officers, including the Scruggs and Ortiz Defendant Officers, on how to use ShotSpotter in a manner that does not violate individuals' constitutional rights under the Fourth Amendment, including prohibiting stops based on ShotSpotter alerts alone, prohibiting officers from relying on ShotSpotter alerts as part of the determination of reasonable suspicion or probable cause, prohibiting officers from using historical aggregate ShotSpotter alerts in an area as part of a determination of reasonable

suspicion or probable cause, and training officers that ShotSpotter alerts are not to be regarded as reliable evidence and that the vast majority of ShotSpotter alerts should be expected to lead them to find no evidence of gun crime.

412.    The City and its decisionmakers with final policymaking authority have implemented, enforced, encouraged, and sanctioned policies, practices, and customs with respect to ShotSpotter alerts that violate its own investigatory stop policy, which specifies that the "Reasonable Articulable Suspicion" necessary for an investigatory stop "should be founded on specific and objective facts or observations about how a suspect behaves, what the subject is seen or heard doing, and the circumstances or situation in regard to the suspect that is either witnessed or known by the officer."

413.    The City and its decisionmakers with final policymaking authority have failed to test or insist on testing the accuracy and reliability of any aspect of the ShotSpotter system as deployed in Chicago.

414.    The City has failed to adequately supervise ShotSpotter, including the ShotSpotter employees who are empowered to trigger alerts to loud noises. The City has effectively delegated authority to ShotSpotter and its employees to direct CPD officers to particular locations to investigate supposed gunfire. The City relies on ShotSpotter and its employees as an integral part of the City's police dispatch and deployment decisions, but the City fails to supervise them or to assess their performance or reliability.

415.    The City has failed to take other remedial action.

416.    The City has acted with deliberate indifference to the Fourth Amendment rights of the Plaintiffs Ortiz, Scruggs, the putative class members, Lucy Parsons Labs, and its members.

As a direct and proximate result of these acts and omissions, the constitutional rights of the Plaintiffs under the Fourth and Fourteenth Amendments have been violated.

417.    Plaintiff Ortiz seeks damages against the City for the unconstitutional seizure to which he was subject, leading to emotional distress, humiliation, loss of liberty, and an ongoing fear of interactions with police officers. Plaintiff Scruggs also seeks damages against the City for the unconstitutional seizure to which he was subject, leading to mental distress, degradation, humiliation, loss of liberty, and ongoing fear, anxiety, nervousness, helplessness, and stress.

418.    Unless restrained by order of this Court, a real and immediate threat exists that the Fourth Amendment rights of the Plaintiffs, Plaintiff Organization, and putative class members will be violated by CPD officers in the future through the use of ShotSpotter. Plaintiffs seek injunctive and declaratory relief against the City to prevent the continued violation of their constitutional rights.

### COUNT II – 42 U.S.C. § 1983
### *Monell* Liability – Equal Protection Clause Violation
### (On Behalf of Lucy Parsons Labs and its members, as well as Plaintiff Ortiz, Plaintiff Scruggs, and the subclass of similarly-situated individuals against the City of Chicago)

419.    Each paragraph of this Complaint is incorporated as if restated fully herein.

420.    Count II is alleged against the City of Chicago.

421.    The City has implemented, enforced, encouraged, sanctioned, and directly ordered a policy of employing ShotSpotter in neighborhoods on the basis of race and subjecting residents to increased police surveillance, arrests, and unfounded investigatory stops in violation of the Fourteenth Amendment. The City employs ShotSpotter in a facially discriminatory way, deploying ShotSpotter only in the twelve police districts that have the highest proportion of Black and Latinx residents and the lowest proportion of White residents. As a result, CPD's

policy of deploying ShotSpotter in Chicago's majority Black and Latinx districts violates the Equal Protections Clause.

422.     Data shows that the CPD's facially discriminatory decision about where to deploy ShotSpotter imposes racially discriminatory harms on Black and Latinx communities. City-wide, a massively disproportionate share of Black and Latinx residents live under ShotSpotter surveillance.

423.     Black and Latinx residents, including Plaintiffs Ortiz and Scruggs, members of the putative subclass, and Plaintiff Lucy Parsons Labs and its members are and have been subjected to additional ShotSpotter-initiated police deployments, investigatory stops, arrests, and uses of force that residents living in majority-White districts are not subjected to. Because ShotSpotter surveillance is absent in majority-White districts, these residents are not subject to additional police deployments on the basis of ShotSpotter and are thus at a lower risk of unlawful stops.

424.     The mere presence of ShotSpotter alerts changes police behavior in the predominantly Black and Latinx districts where the City has chosen to deploy the system. Police officers cite the supposed history of ShotSpotter alerts to justify future investigatory stops and other police tactics.

425.     Unreliable gunfire statistics generated by ShotSpotter skew how police resources are allocated in those districts and harm Black and Latinx residents. Large volumes of ShotSpotter alerts divert police resources from actual 9-1-1 calls by residents and contribute to lengthy delays that people in these districts often experience when calling for police service.

426.     By its acts and omissions, the City has acted under color of state law to deprive the plaintiffs of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

427.   The City intentionally discriminates by purposefully placing ShotSpotter sensors in Chicago police districts where Black and Latinx people live. The City purposefully does not put ShotSpotter in primarily White districts.

428.   This discriminatory purpose is further evidenced by the City of Chicago's long and well-documented history of discriminatory policing, particularly as to stop and frisks.

429.   The City was and remains deliberately indifferent to the harms created by CPD officers through implementation of ShotSpotter. Despite notice of racial disparities in ShotSpotter deployment—including at a public City Council meeting at which these facts were presented while CPD Superintendent Snelling was present and representing the City—the City's policies, practices, and decisions concerning ShotSpotter remain unchanged.

430.   The City has implemented, enforced, encouraged, and sanctioned CPD's policy of using and employing ShotSpotter in a manner that constitutes racial and/or ethnic discrimination against the Plaintiffs Ortiz and Scruggs, the putative subclass of similarly-situated individuals, and the organizational plaintiff Lucy Parsons Labs and its members in violation of the Fourteenth Amendment.

431.   As a direct and proximate result of the City's acts and omissions, the Fourteenth Amendment rights of the Plaintiffs, members of the putative subclass, and members of the Plaintiff Organization have been violated.

432.   Unless restrained by order of this Court, a real and immediate threat exists that CPD officers will violate the Fourteenth Amendment rights of the Plaintiffs, members of the putative subclass, and members of the Plaintiff Organization in the future. Plaintiffs seek injunctive and declaratory relief against the City to prevent the continued violation of its

constitutional rights and to prevent the continued use of ShotSpotter in the 12 predominantly

Black and Latinx districts where it is currently active.

**COUNT III – 740 ILCS 23/5(a)(2)**
**Violation of the Illinois Civil Rights Act of 2003 (ICRA)**
**(On Behalf of Lucy Parsons Labs and its members, as well as Plaintiffs Ortiz and Scruggs**
**and the subclass of similarly-situated people against the City of Chicago)**

433.     Each paragraph of this Complaint is incorporated as if restated fully herein.

434.     Count III is alleged against the City of Chicago.

435.     The Illinois Civil Rights Act ("ICRA") prohibits any state, county, or local

government in Illinois from utilizing criteria or methods of administration that "have the effect of

subjecting individuals to discrimination because of their race, color, national origin, or gender."

740 ILCS 23/5(a)(2)

436.     The City has deliberately chosen to deploy ShotSpotter only in the 12 police

districts that have the highest proportion of Black and Latinx residents in the city.

437.     The criteria and methods the City has used in determining where to deploy

ShotSpotter has resulted in a disparate impact on Black and Latinx residents.

438.     The City's disparate deployment of ShotSpotter directly produces disparate harm.

Black and Latinx residents are subject to increased ShotSpotter-prompted police encounters,

investigatory stops, pretextual arrests, uses of force, and other harmful policing tactics. The

presence of ShotSpotter and a history of ShotSpotter alerts changes the way police respond to

residents in ways that directly harm Black and Latinx residents. The City's use of ShotSpotter

skews the allocation of municipal resources and slows response to 9-1-1 calls in districts with

primarily Black and Latinx residents.

439.    The City's discriminatory law enforcement practices with respect to ShotSpotter's deployment and use constitute criteria and methods of administration that create a disparate impact on Black and Latinx people, violating the ICRA rights of Plaintiffs Ortiz and Scruggs, members of the putative subclass, and Plaintiff Lucy Parsons Labs and its members.

## PLAINTIFF ORTIZ'S INDIVIDUAL CLAIMS

### COUNT IV – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Unconstitutional *Terry* Stop and Frisk
### (Plaintiff Ortiz against Ortiz Defendant Officers)

440.    Each paragraph of this Complaint is incorporated as if restated fully herein.

441.    Count IV is alleged against the Defendants Powar and Matias.

442.    The actions by Defendants Powar and Matias in stopping, detaining, questioning, and patting down Plaintiff Ortiz without reasonable suspicion violated Plaintiff Ortiz's clearly-established rights under the Fourth and Fourteenth Amendment to be free from unreasonable search and seizure.

443.    The misconduct described in this Count, based on the use of ShotSpotter, was objectively unreasonable.

444.    The misconduct described in this Count, based on the use of ShotSpotter, was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

445.    The actions of Defendant Officers Powar and Matias were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to emotional distress, humiliation, loss of liberty, and an ongoing fear of interactions with police officers..

**Count V – 42 U.S.C. § 1983**
**Failure to Intervene**
**(Plaintiff Ortiz against Ortiz Defendant Officers)**

446.     Each paragraph of this Complaint is incorporated as if restated fully herein.

447.     Count V is alleged against the Ortiz Defendant Officers.

448.     In the manner described above, during the unconstitutional *Terry* stop described herein, the Ortiz Defendant Officers, stood by without intervening against the violation of Plaintiff Ortiz's constitutional rights, even though they had a duty and reasonable opportunity to do so.

449.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Ortiz's constitutional rights.

450.     As a result of the misconduct described in this count, Mr. Ortiz suffered injuries, including emotional distress, humiliation, loss of liberty, and an ongoing fear of interactions with police officers.

**COUNT VI – 42 U.S.C. § 1983**
**Conspiracy to Deprive Plaintiff of His Constitutional Rights**
**(Plaintiff Ortiz against Ortiz Defendant Officers)**

451.     Each paragraph of this Complaint is incorporated as if restated fully herein.

452.     Count VI is alleged against the Ortiz Defendant Officers.

453.     Ortiz Defendant Officers and acting in concert with one another as well as other officers, known and unknown, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

454.     The Ortiz Defendant Officers took concrete steps to enter into an agreement to unlawfully subject Plaintiff Ortiz to a *Terry* stop, knowing they lacked proper cause to do so, and for the purpose of violating Plaintiff's Fourth and Fourteenth Amendment rights.

84

455.     In furtherance of this conspiracy, each of the Ortiz Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by effecting the Plaintiff's *Terry* stop without reasonable suspicion to investigate him in connection with a supposed shooting and then finding an unrelated basis to arrest Plaintiff Ortiz and seize his vehicle as a pretext to continue searching the vehicle for evidence of a supposed gun or gunshot.

456.     Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

457.     As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered emotional distress, humiliation, loss of liberty, and an ongoing fear of interactions with police officers.

## PLAINTIFF SCRUGGS' INDIVIDUAL CLAIMS

### COUNT VII – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Unconstitutional *Terry* Stop and Frisk
### (Plaintiff Scruggs against Scruggs Defendant Officers)

458.     Each paragraph of this Complaint is incorporated as if restated fully herein.

459.     Count VII is alleged against the Scruggs Defendant Officers.

460.     In the manner described more fully above, the actions of the Scruggs Defendants Officers in stopping, detaining, questioning, and searching Plaintiff Scruggs on July 18, 2022 and July 19, 2022 without reasonable suspicion violated Plaintiff Scruggs' clearly-established rights under the Fourth and Fourteenth Amendment to be free from unreasonable search and seizure.

461.     The misconduct described in this Count, based on the use of ShotSpotter, was objectively unreasonable.

462.     This misconduct described in this Count, based on the use of ShotSpotter, was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

463.     The actions of the Scruggs Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to loss of liberty, mental distress, degradation, humiliation, loss of liberty, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**COUNT VIII – 42 U.S.C. § 1983**
**Violation of the Fourth and Fourteenth Amendment**
**Unreasonable Seizure and Search**
**(Plaintiff Scruggs against Scruggs Defendant Officers)**

464.     Each paragraph of this Complaint is incorporated as if restated fully herein.

465.     Count VIII is alleged against the Scruggs Defendant officers.

466.     In the manner more fully described above, the actions by the Scruggs Defendant Officers on July 18, 2022 in detaining, searching, seizing, and arresting Plaintiff Scruggs pursuant to a ShotSpotter alert was without probable cause. The Scruggs Defendant Officers' seizure of Mr. Scruggs on July 18, 2022, including through the prolonged use of handcuffs, confinement to the back of a police car, and the imposition of other restraints, constituted an arrest and was effectuated without probable cause. This violated Plaintiff Scruggs' Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure.

467.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

468.    The actions of the Scruggs Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth and Fourteenth Amendment right to be free from unreasonable search and seizure. Their actions were the direct and proximate cause of Plaintiff's loss of liberty, as well as loss of liberty, mental distress, degradation, humiliation, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**Count IX – 42 U.S.C. § 1983**
**Failure to Intervene**
**(Plaintiff Scruggs against Scruggs Defendant Officers)**

469.    Each paragraph of this Complaint is incorporated as if restated fully herein.

470.    Count IX is alleged against the Scruggs Defendant Officers.

471.    In the manner described above, during the constitutional violations described herein, the Scruggs Defendant Officers, stood by without intervening against the violation of Plaintiff Scruggs' constitutional rights, even though they had a duty and reasonable opportunity to do so.

472.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Scruggs' constitutional rights.

473.    As a result of the misconduct described in this count, Mr. Scruggs suffered injuries, including but not limited to loss of liberty, mental distress, degradation, humiliation, loss of liberty, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**COUNT X – 42 U.S.C. § 1983**
**Conspiracy to Deprive Plaintiff of His Constitutional Rights**
**(Plaintiff Scruggs against Scruggs Defendant Officers)**

474.    Each paragraph of this Complaint is incorporated as if restated fully herein.

475.    Count X is alleged against the Scruggs Defendant Officers.

476.    Scruggs Defendant Officers and acting in concert with one another as well as other officers, known and unknown, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

477.    The Scruggs Defendant Officers took concrete steps to enter into an agreement to unlawfully search and seize Plaintiff Scruggs, knowing they lacked reasonable suspicion or probable cause to do so, and for the purpose of violating Plaintiff's Fourth and Fourteenth Amendment rights.

478.    In furtherance of this conspiracy, each of the Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by effecting the Plaintiff's search and seizure without reasonable suspicion or probable cause.

479.    Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

480.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered loss of liberty, mental distress, degradation, humiliation, loss of liberty, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**COUNT XI – State Law Claim**
**False Arrest and False Imprisonment**
**(Plaintiff Scruggs against Scruggs Defendant Officers)**

481.     Each preceding paragraph of this Complaint is incorporated as if restated fully

herein.

482.     Count XI is alleged against the Scruggs Defendant Officers.

483.     In the manner described more fully above, the Scruggs Defendants Officers

restrained or arrested Plaintiff Scruggs outside the AutoZone parking lot on July 18 and July 19,

2022, and did so without reasonable grounds to believe that Plaintiff Scruggs had committed an

offense, up until the moment during Plaintiff Scruggs' seizure on July 19, 2022, when the

Scruggs Defendant Officers developed reasonable grounds to believe that Plaintiff Scruggs may

have committed a misdemeanor violation of  225 ILCS 447/45-50-A-1, which concerns

employment licenses for security guards.

484.     The misconduct described in this Count was objectively unreasonable and

undertaken intentionally with malice, willfulness, and deliberate indifference to Plaintiff

Scruggs' rights.

485.     The Scruggs Defendant Officers' conduct was willful and wanton.

486.     The Scruggs Defendant Officers' actions were taken under color of law and

within the scope of their employment.

487.     As a direct and proximate result of the Scruggs Defendant officers' misconduct

described in this Count, Plaintiff suffered loss of liberty, as well as loss of liberty, mental

distress, degradation, humiliation, and ongoing fear, anxiety, nervousness, helplessness, and

stress.

**COUNT XII – State Law Claim**
**Civil Conspiracy**
**(Plaintiff Scruggs against Scruggs Defendant Officers)**

488.     Each paragraph of this Complaint is incorporated as if restated fully herein.

489.     Count XII is alleged against the Scruggs Defendant Officers.

490.     The individual Scruggs Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

491.     Each of the Scruggs Defendant Officers took concrete steps to enter into an agreement to unlawfully use force on, detain, search, and arrest Plaintiff Scruggs, for the purpose of violating Plaintiff Scruggs' rights and knowing they lacked probable cause or reasonable suspicion to do so, up until the moment during Mr. Scruggs' seizure on July 19, 2022, when the Scruggs Defendant Officers developed probable cause of an alleged violation of 225 ILCS 447/45-50-A-1.

492.     The Scruggs Defendant Officers committed unlawful overt acts and were otherwise willful participants in joint activity in furtherance of this conspiracy.

493.     The Scruggs Defendant Officers acted with malice, willfulness, and reckless indifference to the rights of others.

494.     Each Scruggs Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

495.     As a direct and proximate result of the Defendants' conspiracy, Plaintiffs suffered damages, including emotional distress, as a proximate result of the individual Defendants' misconduct and conspiracy to engage in misconduct.

## COUNT XIII – State Law Claim
### Respondeat Superior
### (Plaintiff Scruggs against City of Chicago)

496.    Each paragraph of this Complaint is incorporated as if restated fully herein.

497.    Count XIII is alleged against the City of Chicago.

498.    In committing the acts alleged in this Complaint, each of the Scruggs Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment.

499.    Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

## PLAINTIFF ORTIZ'S AND SCRUGGS' INDIVIDUAL CLAIMS

### COUNT XIV – Indemnification
### (Plaintiffs Ortiz and Scruggs against City of Chicago)

500.    Each paragraph of this Complaint is incorporated as if restated fully herein.

501.    Count XIV is alleged against the City of Chicago.

502.    In Illinois, pursuant to 745 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

503.    Each of the individual Ortiz, and Scruggs Defendant Officers acted within the scope of their employment in committing the misconduct described herein. Therefore, Defendant City of Chicago is liable as their employer for any resulting damages or award of attorney's fees.

### REQUEST FOR RELIEF

Wherefore, Plaintiffs Ortiz and Scruggs, on behalf of themselves and the putative class and subclass they seek to represent, request that this Court grant the following relief:

a. Issue an Order certifying this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2); and

b. Issue a class-wide judgment declaring that the policies, practices, and conduct of the City of Chicago, through City officials and CPD, and as described in this Complaint, constitute violations of the rights of Plaintiffs and the class they represent under the Fourth and Fourteenth Amendments to the U.S. Constitution.

c. Declare that ShotSpotter alerts do not establish reasonable suspicion or probable cause for investigatory stops, that ShotSpotter alerts cannot be considered by officers as part of the totality of the circumstances to justify an investigatory stop or arrest, and that there must be an independent and adequate factual basis for a stop or arrest, independent of the ShotSpotter alert;

d. Enjoin the City from conducting stops or searches prompted by ShotSpotter absent an independent factual basis sufficient to establish reasonable suspicion or probable cause;

e. Issue a subclass-wide judgment declaring that the policies, practices, and conduct of the City of Chicago, through City officials and CPD, and as described in this Complaint, constitute violations of the rights of Plaintiffs and the subclass they represent under the Illinois Civil Rights Act and the Equal Protection Clause of Fourteenth Amendment to the U.S. Constitution.

f. Declare that City of Chicago has violated the Illinois Civil Rights Act and the Equal Protection Clause by deploying ShotSpotter in a racially discriminatory manner;

g. Enjoin the City of Chicago from continuing to use, operate or rely upon the ShotSpotter noise detection system in the City of Chicago.

Wherefore, the Individual Plaintiffs and Organizational Plaintiff request that this Court grant the following relief:

a. Declare that the policies, practices, and conduct of the City of Chicago, through City officials and CPD, and as described in this Complaint, constitute violations of the rights of Plaintiffs under the U.S. Constitution and Illinois state law;

b. Declare that ShotSpotter alerts do not establish reasonable suspicion or probable cause for investigatory stops, that ShotSpotter alerts cannot be considered by officers as part of the totality of the circumstances to justify an investigatory stop or arrest, and that there must be an independent and adequate factual basis for a stop or arrest, independent of the ShotSpotter alert;

c. Declare that City of Chicago has violated the Illinois Civil Rights Act and the Equal Protection Clause by deploying ShotSpotter in a racially discriminatory manner;

d. Enjoin City of Chicago from continuing to operate or rely on the ShotSpotter noise detection system in the City of Chicago.

e.  Enjoin the City of Chicago from conducting stops or searches prompted by ShotSpotter absent an independent factual basis sufficient to establish reasonable suspicion or probable cause;

f.  Declare that the Ortiz Defendant Officers and the City violated Plaintiff Ortiz's rights under federal law.

g.  Award Plaintiff Ortiz compensatory damages against the Ortiz Defendant Officers and the City arising from the violations alleged in this Complaint.

h.  Award Plaintiff Ortiz punitive damages for the violations alleged in this complaint.

i.  Declare that the Scruggs Defendant Officers and the City violated Plaintiff Scruggs' rights under federal and state law.

j.  Award Plaintiff Scruggs compensatory damages against the Scruggs Defendant Officers and the City arising from the violations alleged in this Complaint.

k.  Award Plaintiff Scruggs punitive damages for the violations alleged in this complaint.

l.  Issue an order and judgment granting reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988

m.  Grant such other relief as the Court deems just and proper.


**Jury Demand**

Plaintiffs demand a jury trial.


Dated: March 15, 2024                    Respectfully submitted,

                                         /s/Jonathan Manes
                                         Jonathan Manes
                                         Alexa Van Brunt
                                         Sarah Blatt-Herold
                                         Roderick & Solange MacArthur Justice Center
                                         160 E. Grand Ave., 6th Floor
                                         Chicago, IL 60611
                                         (312) 503-0012 (tel)
                                         (312) 503-0891 (fax)
                                         jonathan.manes@macarthurjustice.org
                                         alexa.vanbrunt@macarthurjustice.org

Megha Ram
Roderick & Solange MacArthur Justice Center
501 H Street NE, Suite 275
Washington, DC 20002
(202) 869-3439 (tel)
(202) 869-3435 (fax)
megha.ram@macarthurjustice.org

Daniel Massoglia
Joseph DiCola
Emma Melton
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
(708) 797-3066
daniel@first-defense.org
joseph@first-defense.org
emma@first-defense.org

Elizabeth Mazur
Hughes Socol Piers Resnick & Dym, Ltd
70 W. Madison, Suite 4000
Chicago, Illinois 60603
(312) 580-0100
emazur@hsplegal.com

**<u>Certificate of Service</u>**

I, Jonathan Manes, an attorney hereby certify that I served a copy of this amended pleading on all counsel of record on March 15, 2024, by operation of the Court's CM/ECF system.

/s/Jonathan Manes
Jonathan Manes