**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINIOS
EASTERN DIVISION**

| | |
|---|---|
| DANIEL ORTIZ and DERICK SCRUGGS, on behalf of themselves and a class of similarly situated people, and LUCY PARSONS LABS, on behalf of itself and its members,<br><br>              Plaintiffs,<br><br>       v.<br><br>CITY OF CHICAGO, et al.,<br><br>              Defendants. | Case No. 1:22-cv-3773<br><br>Judge Lindsay C. Jenkins<br><br>Magistrate Judge Young B. Kim |

**CITY OF CHICAGO'S ANSWER AND AFFIRMATIVE DEFENSES TO THIRD
AMENDED CIVIL RIGHTS CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND FOR DAMAGES**

Defendant City of Chicago ("City"), by and through its undersigned counsel, for its Answer

to individual Plaintiffs Daniel Ortiz and Derick Scruggs and organizational Plaintiff Lucy Parsons

Labs's Third Amended Complaint (Dkt. 281), states as follows:

**INTRODUCTION**

1.      The City of Chicago spends more than $9 million dollars every year on a contract
with ShotSpotter, a for-profit company, to use its unreliable and ineffective gunshot detection
system. The City of Chicago has purposefully blanketed the South and West sides of the City of
Chicago with ShotSpotter sensors, to the detriment of the primarily Black and Latinx people who
live under ShotSpotter's shadow.

**ANSWER:**      The City admits that it entered into Contract Number 71366 with ShotSpotter, Inc.

for an area acoustic gunshot detection subscription service commencing on August 20, 2018,

which has been extended from time to time ("ShotSpotter Contract"). The City denies the

remaining allegations contained in Paragraph 1.

2.      The City's use of ShotSpotter is fueling unconstitutional policing practices in a city that has a long history of discriminatory police conduct.

**ANSWER:**      The City denies the allegations contained in Paragraph 2.


3.      Every day in Chicago, Chicago Police Department (CPD) officers are deployed around 100 times to chase down alerts of supposed gunfire generated by ShotSpotter. More than 90% of the time they find no indication of any gun-related incident, according to the City's own data. The result is more than 31,600 unfounded CPD deployments every year because of ShotSpotter—more than 87 on an average day.

**ANSWER:**      The City denies the allegations contained in Paragraph 3.


4.      CPD relies so heavily on ShotSpotter because the City has repeatedly contracted for its use. Remarkably, however, ShotSpotter has never been tested to determine how well it can distinguish gunshots from other loud noises like fireworks. The City's decision to use this unreliable technology to direct massive numbers of unwarranted and highly volatile police deployments produces grave and systematic violations of Chicagoans' constitutional and statutory rights.

**ANSWER:**      The City denies the allegations contained in Paragraph 4.


5.      CPD has intentionally misused ShotSpotter alerts to make scores of illegal stops and arrests. CPD officers, chasing down unfounded ShotSpotter alerts, have stopped and detained thousands of innocent Chicagoans who happened to be near the location of an alert. CPD officers have used ShotSpotter's presence on the South and West sides of the City as justification for aggressive police tactics—treating residents as suspects, detaining them, and frisking them just because there has supposedly been a history of ShotSpotter alerts in the area. CPD officers have even used ShotSpotter alerts as a basis to falsely accuse people of crimes.

**ANSWER:**      The City denies the allegations contained in Paragraph 5.


6.      CPD officers engage in thousands of unwarranted confrontations with residents on the streets of Chicago because they are chasing down bogus ShotSpotter alerts, knowing the technology to be ineffective.

**ANSWER:**      The City denies the allegations contained in Paragraph 6.


7.      When CPD officers receive a ShotSpotter alert, they race to the location of the alert—often with multiple squad cars—because the system is telling them that a person just fired a gun there. CPD officers treat anyone in the area as a likely shooter, despite knowing that the

2

overwhelming majority of ShotSpotter alerts turn up no evidence of gunfire. The predictable result is a pattern of unconstitutional investigatory stops fueled by ShotSpotter.

**ANSWER:**     The City denies the allegations contained in Paragraph 7.


8.     On April 19, 2021, Plaintiff Daniel Ortiz, a 36-year-old Chicagoan of Puerto Rican descent, was stopped, frisked, handcuffed, interrogated, and ultimately arrested on pretextual drug charges by CPD Defendant Officers Powar and Matias, who were responding to a ShotSpotter alert in the Schorsch Village neighborhood on the Northwest side. The primary caretaker for his young family, Mr. Ortiz was outside a laundromat that afternoon finishing his family's laundry. Defendant Officers Powar and Matias pulled into the parking lot in their unmarked police SUV, moved aggressively toward Mr. Ortiz, and immediately detained him for questioning about supposed gunfire. In fact, there had been no gunshot, and police found nothing to corroborate the ShotSpotter alert.

**ANSWER:**     The City admits that CPD Officers Powar and Matias were dispatched in response to a ShotSpotter alert and at the time that they first encountered Plaintiff Ortiz he was outside of a laundromat. The City admits that following investigation Plaintiff Ortiz was arrested on drug-related offenses on April 19, 2021. The City denies that Plaintiff Ortiz was arrested on pretextual drug charges. The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations as to whether a gunshot occurred. The City denies the remaining allegations contained in Paragraph 8.


9.     Defendants Powar and Matias, however, escalated their illegal stop of Mr. Ortiz. They searched his car and discovered marijuana and a bottle of prescription drugs. Defendants Powar and Matias arrested Mr. Ortiz on these drug charges and impounded his car, all as a pretext to continue to search in vain for evidence that Mr. Ortiz had fired the supposed gunshot that ShotSpotter had detected. Mr. Ortiz was jailed overnight, the charges were dismissed in court the next day, and his vehicle was eventually returned after an administrative law judge determined that the Defendants lacked probable cause to impound it in the first place.

**ANSWER:**     The City admits that the charges against Plaintiff Ortiz were dismissed on April 20, 2021, and that the impounded vehicle was returned to Berenice Salas, the owner of the impounded vehicle. The City denies the remaining allegations in Paragraph 9.

10.    Derick Scruggs, too, was illegally detained, questioned, and searched by police officers in response to a ShotSpotter alert. On the date he was detained, Mr. Scruggs was a 30-year-old father who worked as a licensed armed security guard at an AutoZone in the Englewood neighborhood on the South Side of Chicago. A ShotSpotter alert sent Defendants Legorreta and Andrews to the parking lot of the AutoZone, where they immediately stopped, detained, and interrogated Mr. Scruggs as a shooting suspect for no reason other than the ShotSpotter alert. During the course of the lengthy detention, which involved a degrading and humiliating body search, Defendant Officer Legorreta mischaracterized evidence and manufactured demonstrably false allegations in order to justify his false suspicions against Mr. Scruggs. Police found no actual evidence to corroborate their purported suspicion that a gun had been fired. Eventually, a CPD supervisor ordered Defendant Officers to release Mr. Scruggs.

**ANSWER:**    The City admits that CPD Officers Legorreta and Andrews responded to a ShotSpotter alert in the vicinity of the parking lot of an AutoZone. The City admits that Officers Legorreta and Andrews encountered Plaintiff Scruggs, who, upon information and belief, worked as a security guard at an AutoZone in the Englewood neighborhood, but denies that officers illegally detained, questioned, and searched Plaintiffs Scruggs. The City denies the allegations contained in the fourth, fifth and sixth sentences of Paragraph 10. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 10, and therefore denies the same.

11.    Remarkably, Defendant Officers Legorreta and Andrews returned the next day to continue investigating Mr. Scruggs in connection with the supposed gunshot detected by ShotSpotter. They ultimately arrested and jailed Mr. Scruggs for a paperwork violation, alleging that his registration with the state agency that licenses armed security guards had lapsed a few months prior—a purely bureaucratic requirement that simply involves paying a $45 renewal fee. The arrest, like Mr. Ortiz's, was an obvious pretext to justify their baseless suspicions fueled by ShotSpotter. The charges were dismissed two months later by the State's Attorney's Office, but by that time, Mr. Scruggs had been stripped of his livelihood, unable to work in his profession.

**ANSWER:**    The City admits that Defendant Officers Legorreta and Andrews returned to the AutoZone the next day following-up on matters that arose during the course of their investigation from the prior day and that Plaintiff Scruggs was arrested and charged for violating 225 ILCS 447/45-50-A-1. Upon information and belief, the City admits that the State's Attorney's Office

dismissed the charges approximately two months later. The City denies the remaining allegations contained in Paragraph 11.

12.     CPD's illegal stops of Mr. Ortiz and Mr. Scruggs are not unique; they are emblematic of a systematic pattern of illegal ShotSpotter stops in the City of Chicago.

**ANSWER:**     The City denies the allegations contained in Paragraph 12.

13.     According to the Chicago Office of the Inspector General ("OIG"), over a period of 18 months, CPD officers detained more than 2,400 Chicago residents after chasing down ShotSpotter alerts—or even just because of a supposed *history* of past ShotSpotter alerts in an area. These ShotSpotter-prompted encounters are hostile, terrifying, and unwarranted. Over a six month period in 2019, police reported using physical force against scores of unarmed Chicagoans during ShotSpotter-prompted incidents.

**ANSWER:**     The City admits that the Office of the Inspector General ("OIG") published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City denies the remaining allegations contained in Paragraph 13.

14.     The City's reliance on ShotSpotter results is a misallocation of municipal resources to the detriment of the people who live under ShotSpotter's footprint. The City pays $9 million every year to ShotSpotter and spends untold more on the thousands of hours CPD officers spend chasing down unfounded ShotSpotter alerts. ShotSpotter inflates gunfire statistics, thereby providing false justification for oppressive police tactics in neighborhoods under its surveillance— all of which are already overpoliced.

**ANSWER:**     The City denies the allegations contained in Paragraph 14.

15.     Meanwhile, the enormous volume of ShotSpotter-prompted deployments detracts from the capacity to address actual 9-1-1 calls, slowing response times while providing no public safety benefit. In police districts with active ShotSpotter sensors, more than one in twelve of CPD's "Priority 1" calls for service are for unfounded ShotSpotter alerts, displacing actual calls from residents seeking police assistance.

**ANSWER:**     The City denies the allegations contained in Paragraph 15.

16.     The harms that flow from CPD's use of ShotSpotter are meted out along stark racial lines. The City has blanketed 12 out of 22 Chicago police districts with active ShotSpotter sensors, and in the process, has covered nearly the entire South and West sides. These 12 police districts are exactly the ones with the highest proportion of Black and Latinx residents and the lowest proportion of White residents: 80% of Black Chicagoans live within ShotSpotter's active footprint; 65% of Latinx Chicagoans do too. Only 30% of White Chicagoans live in a ShotSpotter area.

**ANSWER:**     The City denies the allegations contained in Paragraph 16.


17.     This stark pattern of racial deployment—and the harms that it generates—discriminates against Black and Brown Chicagoans in violation of the Illinois Civil Rights Act and the U.S. Constitution's guarantee of equal protection. Moreover, this blanket surveillance of Black and Brown communities cannot be explained or justified by historical rates of gun crime.

**ANSWER:**     The City denies the allegations contained in Paragraph 17.


18.     Organizational Plaintiff Lucy Parsons Labs is a Chicago-based non-profit membership organization that is focused on investigating, exposing, and educating the public about police surveillance and the harms it causes, particularly for people of color and other marginalized communities. It has spent years investigating surveillance technologies and worked to end the City of Chicago's use of ShotSpotter and to protect its members and constituencies from ShotSpotter's harmful consequences. It has been forced to divert many of its resources to responding to CPD's unconstitutional and oppressive use of ShotSpotter.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18.


19.     All Plaintiffs bring this suit to obtain declaratory and injunctive relief to end the unconstitutional and discriminatory use of ShotSpotter by the City of Chicago and to enjoin the City from relying on ShotSpotter alerts to justify investigatory stops. Mr. Ortiz and Mr. Scruggs likewise seek damages for the illegal searches and seizures to which Defendants subjected them.

**ANSWER:**     The City admits that Plaintiffs seek declaratory and injunctive relief, and that Plaintiffs Ortiz and Scruggs also seek money damages. The City denies any facts giving rise to the relief sought by Plaintiffs and further denies the remaining allegations contained in Paragraph 19.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Plaintiffs' federal claims for damages and injunctive relief pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The Court has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same facts and form part of the same case as the federal claims.

**ANSWER:**     The City admits the allegations contained in Paragraph 20.

21.     Venue is proper in the United States District Court for the Northern District of Illinois under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the Plaintiffs' claims occurred in this district. Venue is also proper under 28 U.S.C. § 1391(a) because one or more Defendants reside in this District and, on information and belief, all Defendants are residents of the State in which the District is located.

**ANSWER:**     The City admits that venue is proper, but the City denies it violated any law or statute and denies Plaintiffs are entitled to any relief.

## PARTIES

### *Plaintiffs*

22.     Individual Plaintiff DANIEL ORTIZ is a 38-year-old father who grew up in the Portage Park neighborhood in Chicago. Mr. Ortiz was illegally stopped, questioned, and frisked by Defendants Powar and Matias following a bogus ShotSpotter alert outside a laundromat. Defendants Powar and Matias then searched his vehicle, arrested him on pretextual drug charges, and impounded his vehicle. Mr. Ortiz was jailed overnight by police, who filed charges against him. Those charges were dismissed upon his first appearance at bond court. He subsequently recovered his vehicle, which had sustained multiple damages as a result of Defendant Officers' seizure.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 22. The City admits that that Officers Powar and Matias were dispatched to the scene in response to a ShotSpotter alert and at the time that they first encountered Plaintiff Ortiz he was outside of a laundromat. The City admits that the vehicle was searched and impounded. The City admits that following investigation Plaintiff Ortiz was arrested by CPD Officers Powar and Matias for drug-related offenses on April 19, 2021, and Ortiz was detained following his arrest. The City admits that the charges against Plaintiff Ortiz

were dismissed at his first bond court appearance. The City denies the remaining allegations contained in Paragraph 22.

23.     Individual Plaintiff DERICK SCRUGGS is a 31-year-old father who has worked for several years as a licensed armed security guard in Chicago. Mr. Scruggs was illegally stopped, detained, and searched by Defendants Legorreta and Andrews outside his place of work following a bogus ShotSpotter alert. Defendants handcuffed Plaintiff Scruggs, searched his body multiple times, detained him in a police cruiser, and ultimately released him, finding no basis to connect him with any supposed gunshot detected by ShotSpotter. Nevertheless, the next day, Defendants Legorreta and Andrews returned to Plaintiff Scruggs' place of work to "continue the investigation" of the ShotSpotter alert, once again detaining and searching him without legal justification. Defendants subsequently arrested Mr. Scruggs and held him overnight on a pretextual misdemeanor charge for a clerical error: his state employee registration card had expired. That charge was subsequently dismissed by the State's Attorney's Office.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 23. The City admits that Plaintiff Scruggs was temporarily detained and searched and released outside his place of work in Chicago. The City also admits that Defendant Officers Legorreta and Andrews returned to Plaintiff Scruggs's place of work the next day following-up on matters that arose during the course of their investigation from the prior day and that Plaintiff Scruggs was arrested and charged for violating 225 ILCS 447/45-50-A-1. The City also admits that the State's Attorney's Office dismissed the charges. The City denies the remaining allegations contained in Paragraph 23.

24.     Individual Plaintiffs Daniel Ortiz and Derick Scruggs seek declaratory and injunctive relief on behalf of a class of similarly-situated individuals who have been or will be stopped and seized by CPD officers without reasonable suspicion or probable cause because of faulty ShotSpotter technology. They also seek relief on behalf of the subclass of Black and Latinx individuals whose rights to be free from discrimination under the U.S. Constitution and Illinois Civil Rights Act are being violated by the City's deployment and use of ShotSpotter. They also seek compensatory and punitive damages.

**ANSWER:**     The City admits that Plaintiffs Ortiz and Scruggs seek declaratory and injunctive relief on behalf of a class of individuals, as well as compensatory and punitive damages. The City

denies that any class should be certified, denies any facts giving rise to the relief sought, and further denies the remaining allegations contained in Paragraph 24.

25.     Organizational Plaintiff LUCY PARSONS LABS ("LPL") is a registered 501(c)(3) non-profit membership organization. It is a collaboration between data scientists, transparency activists, artists, and technologists and is based in Chicago. It works at the intersection of digital rights and on-the-streets issues of policing. An important part of its mission is to oppose and organize against discriminatory and oppressive policing and surveillance practices. It primarily organizes with communities of color which have historically suffered under racist police practices. Its work includes providing digital security trainings, pursuing police accountability, researching the use of police technologies and police tactics, and engaging in public education and advocacy on related topics. It frequently files and litigates public record requests in order to obtain transparency and accountability. It publishes research, educational materials, and advocacy materials. Its work has focused on issues including various forms of police surveillance, civil asset forfeiture, the budget and funding of police activities, and police technologies.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25.

26.     Individual members of LPL live in or regularly travel through the districts of Chicago where ShotSpotter is deployed. Individual members are particularly likely to be subject to an unlawful stop based on a ShotSpotter alert.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26.

27.     LPL has had to spend significant time and money to counteract the City of Chicago's unlawful and discriminatory reliance upon ShotSpotter. It has devoted significant time to offering trainings on ShotSpotter, submitting FOIA requests related to ShotSpotter, helping to lead a local coalition focused on stopping ShotSpotter, and holding related meetings, thus diverting resources from the organization's focus on other police accountability issues, such as civil asset forfeiture and facial recognition. LPL's work on ShotSpotter has diverted resources away from ongoing organizational development projects, setting back its strategic planning and fundraising. LPL brings this action on its own behalf and as an organizational representative for its members. LPL participates as a plaintiff only for purposes of securing declaratory and injunctive relief.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.

*Municipal Defendant*

28.     Defendant CITY OF CHICAGO ("City") is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois. It is authorized under the statutes of the State of Illinois to maintain the CHICAGO POLICE DEPARTMENT, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible. Defendant City was, at all times material to this Complaint, the employer and principal of the individual Defendant Officers.

**ANSWER:**     The City admits that it is a municipality organized and operating under the statutes of the State of Illinois. The City admits that under the statutes of the State of Illinois the City is authorized to maintain the Chicago Police Department. The City admits that the individual Defendant Officers are and/or were employees of the City of Chicago. The remaining allegations contained in Paragraph 28 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City denies the remaining allegations contained in Paragraph 28.

*Ortiz Defendant Officers*

29.     Defendants Officer HARSIMRAN POWAR (#17135) and Officer MICHAEL MATIAS (#18985) are City of Chicago employees with the CPD. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the CPD. Defendants Powar and Matias participated in the stop, questioning, search, arrest, detention, and charge of Mr. Ortiz and the seizure of his vehicle. Each defendant is sued in his individual capacity for violating the constitutional rights of Mr. Ortiz.

**ANSWER:**     The City admits that Harsimran Powar (#17135) and Michael Matias (#18985) (collectively, the "Ortiz Defendant Officers") were at all material times City employees as members of CPD. The City admits that the Ortiz Defendant Officers are sued in their individual capacities. The City denies that the Ortiz Defendant Officers committed any of the unlawful acts alleged herein and deny the remaining allegations contained in Paragraph 29.

*Scruggs Defendant Officers*

30. Defendants Officer FIDEL LEGORRETA (#5902), Officer THEODORE ANDREWS JR. (#7099), and Officer SARAH KECKLEY (#7041) are City of Chicago employees with the CPD. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the CPD. Defendants Legorreta, Andrews, and Keckley participated in the stop, questioning, search, seizure, and detention of Mr. Scruggs. Each one is sued in his or her individual capacity for violating the constitutional rights of Mr. Scruggs.

**ANSWER:** The City admits that Fidel Legorreta (#5902), Theodore Andrews Jr. (#7099), and Sarah Keckley (#7041) (collectively, the "Scruggs Defendant Officers") are and/or were City employees as members of CPD. The City admits that the Scruggs Defendant Officers are sued in their individual capacities. The City denies that the Scruggs Defendant Officers committed any of the unlawful acts alleged herein and deny the remaining allegations contained in Paragraph 30.

## FACTUAL ALLEGATIONS

## I. CPD RELIES ON SHOTSPOTTER'S NOISE DETECTION SYSTEM, KNOWING IT IS AN UNRELIABLE AND INEFFECTIVE LAW ENFORCEMENT TOOL

31. In 2018, the City of Chicago entered into a $33 million, three-year, non-competitive contract with ShotSpotter. In December 2020, the City, without any notice or comment from the public or City Council, exercised an option to extend the contract with ShotSpotter through August 19, 2023, at a cost of more than $9 million per year. The City has since extended the contract through September 24, 2024, plus an additional two month "transition" period.

**ANSWER:** The City admits that it entered into a three-year contract with ShotSpotter, Inc. for the period of August 20, 2018, through August 19, 2021, for a contract value worth $33 million. The City admits that in December 2020, the City exercised an option to extend the ShotSpotter Contract, commencing August 20, 2021, through August 19, 2023. The City admits that in February 2024, the term of the ShotSpotter Contract was extended through November 22, 2024. The City denies the remaining allegations contained in Paragraph 31.

32. The City renewed and continued the contract with ShotSpotter despite actual knowledge that the system is unreliable and harmful.

**ANSWER:**     The City denies the allegations contained in Paragraph 32.

33.     The City knows that the system has never been tested in Chicago or elsewhere to assess its reliability. It knows that the so-called "accuracy" figures provided by ShotSpotter are meaningless and deceptive. It knows that the system is ineffective as a law enforcement tool, based on the public reporting of its own watchdog agency. The OIG has studied and repeatedly reported on the technology. Analyzing the City's own police data, the OIG found that ShotSpotter generates tens of thousands of unjustified CPD deployments each year. The OIG also found that the overwhelming majority of ShotSpotter deployments led CPD to find nothing to corroborate supposed gunfire and that the technology led to thousands of unfounded CPD investigatory stops. Other studies, also relying on the City's own police data, back up the OIG findings.

**ANSWER:**     The City admits that the OIG published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City denies the remaining allegations contained in Paragraph 33.

34.     The City knows, based on public testimony in City Council and the experience of its own employees, that Cook County prosecutors drop cases involving ShotSpotter evidence and avoid defending the system's reliability in court when it is challenged in criminal cases. The City, the current and former mayors, CPD leaders, and other City managers have been repeatedly confronted in public, in City Council, and in other forums with the harms alleged in this Complaint that the system imposes on the predominantly Black and Latinx people who live in neighborhoods under ShotSpotter's surveillance. The current Superintendent of the Chicago Police Department, Larry Snelling, was directly confronted with all of this information when he appeared at a meeting of the City Council's Public Safety Committee on November 12, 2021, during which the City's use of ShotSpotter was discussed and criticized for nearly four hours.

**ANSWER:**     The City admits that a meeting of the City Council's Public Safety Committee was held on November 12, 2021, during which the City's use of ShotSpotter was discussed. The City also admits that then-Deputy Chief Snelling was present at the November 12, 2021 meeting. The November 12, 2021 City Council hearing recording is publicly available, and the City further states the November 12, 2021 City Council hearing recording speaks for itself and denies any allegations inconsistent with such recording. The City denies the remaining allegations contained in Paragraph 34.

35.     Brandon Johnson, the current Mayor of the City of Chicago, has personal knowledge of the harms and legal violations that the City's use of ShotSpotter causes. During his mayoral campaign, he campaigned on an explicit promise to end the City's contract with ShotSpotter. On his official campaign website, which remains unchanged today, he states: "Chicago spends $9 million a year on ShotSpotter despite clear evidence it is unreliable and overly susceptible to human error. This expensive technology played a pivotal role in the police killing of 13-year-old Adam Toledo. That cannot happen again. Brandon Johnson will end the ShotSpotter contract and invest in new resources that go after illegal guns without physically stopping and frisking Chicagoans on the street." Mayor Johnson again referenced the police killing of Adam Toledo during his inaugural address as Mayor on May 16, 2023.

**ANSWER:**     The City denies the allegations contained in the first sentence of Paragraph 35. The City admits that Mayor Johnson campaigned on ending the ShotSpotter Contract during his run for mayor. The City further states that the statements on Mayor Johnson's campaign website spoke for themselves. The City admits that Mayor Johnson referenced Adam Toledo's parents and the loss of their son during his inaugural address as Mayor on May 16, 2023, but denies the Mayor's inaugural address includes any reference to ShotSpotter.

36.     After his election, Mayor Johnson has continued to speak about his knowledge of the problems with the City's use of ShotSpotter, including questioning ShotSpotter's efficacy, usefulness, and results. Referring to ShotSpotter, Mayor Johnson has stated that "this company that's outside of the city of Chicago, that the city of Chicago's residents are footing the bill for this operation — has not yielded the results." Mayor Johnson has explained that "[w]hen it comes to public safety, we have to implement and engage in forms that are actually worthwhile, and that ... work." He has also said publicly that he "believe[s] there are better ways in which we can use those dollars."

**ANSWER:**     The City admits Mayor Johnson in statements continued to address the usefulness and cost-effectiveness of ShotSpotter as a crime prevention tool. The City further states that  Mayor Johnson's public statements speak for themselves and denies any allegations inconsistent with his public statements.

37.     In spite of this knowledge, the City continues to fund and use ShotSpotter to dispatch CPD officers on tens of thousands of unwarranted deployments every year. In June 2023, Mayor Johnson's administration authorized the release of more than $10 million to ShotSpotter to continue its service in the City of Chicago. In February 2024, the City entered a contract

modification extending the ShotSpotter contract through September 22, 2024 plus an additional two month "transitional wind down" period. The City continues to direct CPD officers to rely on ShotSpotter alerts in stopping and detaining civilians without cause. Indeed, aside from the contract modifications described above, the City has not announced any changes to its ShotSpotter policies or practices since this lawsuit was filed in July 2022.

**ANSWER:** The City admits that it continues to fund and use ShotSpotter. The City admits that in June 2023, the City made a payment to SoundThinking, Inc. in the amount of $10,184,900.00 pursuant to a contract revision dated June 13, 2023. The City admits that in February 2024, the term of the ShotSpotter Contract was extended from February 17, 2024, through September 22, 2024 ("Extension Term"), with two (2) subsequent months to wind down in accordance with Section 4.2.2.2 ("Demobilization") (i.e., through November 22, 2024). The City specifically denies that it dispatches CPD officers on tens of thousands of unwarranted deployments every year or directs CPD officers to rely on ShotSpotter alerts in stopping and detaining civilians without cause, and generally denies the remaining allegations in Paragraph 37.


***Numerous Studies in Chicago and Other Cities Show That ShotSpotter Is Unreliable and Ineffective in Practice***

38.     Experience in Chicago and elsewhere shows that ShotSpotter is unreliable and ineffective for police to use in practice.

**ANSWER:** The City denies the allegations contained in Paragraph 38 that ShotSpotter is unreliable and ineffective for police to use in practice based on experience in Chicago. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 38.


39.     ShotSpotter both over-detects and under-detects gunfire, interpreting miscellaneous noises as gunshots and failing to pick up actual gunshots. It can also provide inaccurate locations for the noises that it detects, giving police and investigators a false sense of precision as to where a supposed gunshot occurred.

**ANSWER:** The City denies the allegations contained in Paragraph 39.

40.     City of Chicago data show how rarely officers who respond to ShotSpotter alerts find any evidence of a gun or gunshots.

**ANSWER:**     The City denies the allegations contained in Paragraph 40.

41.     In August 2021, the OIG conducted a thorough study of CPD deployments prompted by ShotSpotter. The OIG examined what police officers reported finding in response to 50,176 ShotSpotter alerts between January 1, 2020 and May 31, 2021. The OIG found that police reported a gun-related incident only 9.1% of the time. This figure includes not just shootings but any situation involving a gun, including when police find shell casings, identify a person armed with a weapon, or otherwise.

**ANSWER:**     The City admits that the OIG published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report.

42.     Put differently, nearly 91% of ShotSpotter alerts turned up no reported evidence of any gun-related incident.

**ANSWER:**     The City admits that the OIG published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City denies the remaining allegations contained in Paragraph 42.

43.     The OIG report concluded that ShotSpotter alerts "rarely produce evidence of a gun-related crime."

**ANSWER:**     The City admits that the OIG published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report.

44.     A December 2017 analysis of Chicago data by journalists at South Side Weekly showed similarly poor results. It found that just slightly over 10% of ShotSpotter-linked events resulted in the CPD finding enough evidence to open an investigation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45. The extraordinary volume of unwarranted ShotSpotter deployments persists to this day. From April 15, 2021 through April 13, 2022, only 9.6% of ShotSpotter alerts led CPD officers to turn up any evidence of a gun-related crime, according to data from the City's Office of Emergency Management and Communications. This amounts to 31,640 unfounded ShotSpotter-prompted dispatches during the period in question.

**ANSWER:** The City denies the allegations contained in Paragraph 45.

46. During that one-year period from April 2021 to April 2022, CPD deployed police an average of more than 87 times *every day* to chase down ShotSpotter alerts that turned up no evidence of any gun-related incident.

**ANSWER:** The City admits the allegations contained in Paragraph 46.

47. Even as the rate of unfounded deployments has remained extremely high, the total number of ShotSpotter alerts in Chicago has risen precipitously, thereby increasing the volume of unfounded CPD deployments dramatically. Between July 1, 2021, and July 1, 2022, there were approximately 44,300 ShotSpotter alerts in the City of Chicago, up from approximately 37,500 alerts during the prior one-year period (July 2020 to July 2021), 23,700 in the year before that (July 2019 to July 2020), and 17,800 the year earlier (July 2018 to July 2019). Upon information and belief, the City has not expanded the size of the area actively monitored by ShotSpotter during these periods.

**ANSWER:** The City denies the allegations contained in the first and last sentences of Paragraph 47. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 47.

48. The City of Chicago knows about the massive number of unfounded ShotSpotter deployments, but it does not report them to ShotSpotter as errors. An official ShotSpotter Performance Overview, which was obtained by Plaintiff Lucy Parsons Labs through FOIA, summarizes errors reported to ShotSpotter by the Chicago Police Department. It shows that over a period of just under six months in 2021, CPD reported zero false positive alerts.

**ANSWER:**     The City denies the allegations contained in the first sentence of Paragraph 48. The

City lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in Paragraph 48.


49.     Larry Snelling, who currently serves as Superintendent of the Chicago Police
Department, testified at a City Council hearing in November 2021 that CPD officers do not file
reports or complaints with ShotSpotter about false-positive alerts—*i.e.* alerts that CPD officers are
able to determine were likely caused by a firecracker or another noise other than gunfire.

**ANSWER:**     The City admits that Larry Snelling is the current Superintendent of the Chicago

Police Department. The City further states that then-Deputy Chief Snelling testified at a City

Council hearing on November 12, 2021. The November 12, 2021 City Council hearing recording

is publicly available, and the City further states the November 12, 2021 City Council hearing

recording speaks for itself and denies any allegations inconsistent with such recording. The City

denies the remaining allegations contained in Paragraph 49.


50.     Similar analyses in other cities record even more dismal "hit rates," similarly high
proportions of unwarranted police deployments, and extremely low rates of arrest or gun recovery
as a result of ShotSpotter alerts.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 50.


51.     In Dayton, Ohio, police were deployed in response to ShotSpotter alerts an average
of four times a day. Fewer than 2% of Dayton ShotSpotter deployments between December 11,
2020, and June 30, 2021, resulted in an arrest. Just 5% of ShotSpotter deployments led officers to
report incidents of any crime. Dayton, Ohio has since decided to discontinue its contract with
ShotSpotter "based on [its] analysis of the ShotSpotter data" as well as its consideration of
"community response, changes in state law, budget, officer response, and other factors."

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 51.

52.     In Atlanta, Georgia, an official city analysis determined that police found shell casings following only 3% of ShotSpotter alerts between January 1 and July 31, 2019. As of October 23, 2019, ShotSpotter had only led to five arrests and five guns recovered out of 1,349 incidents in 2019. The city's analysis calculated the cost ratio of its ShotSpotter implementation at $56,000 per gun recovered or $56,000 per arrest.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 52.

53.     In Houston, Texas, fewer than 2% of ShotSpotter alerts between December 2020 and September 2021 led police to make an arrest, according to a Houston Police Department report. Out of 2,330 ShotSpotter alerts, only 54 resulted in or were linked to an arrest.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53.

54.     In Minneapolis, Minnesota, only 32 ShotSpotter alerts out of roughly 8,500 led to an arrest, a rate of less than 0.5%.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 54.

55.     In addition to prompting unfounded police responses, ShotSpotter also fails to send an alert when there has been an actual shooting. The same ShotSpotter Performance Overview obtained by Plaintiff Lucy Parsons Labs shows that there were 466 gunfire incidents over a nearly six-month period that ShotSpotter failed to identify or did not accurately locate (but that Chicago police learned about through other means). This included 41 incidents where ShotSpotter provided an incorrect location.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 55.

56.     Of those 466 cases, ShotSpotter either failed to detect the noise, failed to send an alert, or sent an alert to CPD with the wrong location. These 466 incidents reflect only the instances where Chicago police learned of a shooting and chose to file a complaint with ShotSpotter. On information and belief, there are many more shooting incidents that ShotSpotter missed where CPD officers filed no complaint with the company.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 56.


57.     In other cities, ShotSpotter fails to issue an alert—or issues an alert with an incorrect location—for approximately one-third of known shootings that occur outdoors within ShotSpotter area. On information and belief, the rate of such false negatives and mis-located alerts is even higher in the City of Chicago.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 57.


58.     ShotSpotter thus triggers an enormous number of unfounded police alerts. Yet, despite the enormous volume of alerts, ShotSpotter also fails to trigger alerts (or provides incorrect locations) for a large number of actual shooting incidents.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 58.


***Chicago's Contract with ShotSpotter Incentivizes ShotSpotter to Trigger False Alerts***

59.     ShotSpotter's contract with the City of Chicago gives it a financial incentive to over-report noises as gunfire or possible gunfire. These financial incentives further drive the technology's unreliability.

**ANSWER:**     The City denies the allegations contained in Paragraph 59.


60.     The City of Chicago's contract with ShotSpotter does not contain any limit on the proportion of ShotSpotter alerts that are not actually caused by gunfire. The City of Chicago has imposed no contractual requirement at all to avoid false alerts.

**ANSWER:**     The City denies the allegations contained in Paragraph 60.


61.     The City's contract with ShotSpotter only requires that for every 10 alerts that ShotSpotter sends out, ShotSpotter can receive no more than one complaint from CPD about a gunshot that CPD discovered but which ShotSpotter missed or mislocated by more than 25 meters. Only these missed or mislocated gunshots count against ShotSpotter. False positive alerts (where ShotSpotter is triggered by, e.g., firecrackers or cars backfiring) never count against ShotSpotter

under the contract, and neither do situations where CPD pursues a ShotSpotter alert and finds nothing to corroborate gunfire.

**ANSWER:** The City denies the allegations contained in Paragraph 61.

62. ShotSpotter can thus guarantee that it will always hit its performance target of one complaint per ten alerts simply by putting a thumb on the scale in favor of triggering alerts to loud noises that are not gunfire. Excess but unfounded alerts help ShotSpotter meet its performance target because they effectively drown out any complaints that ShotSpotter receives from CPD about missed or mislocated gunshots. Such excess alerts never count against the company.

**ANSWER:** The City denies the allegations contained in Paragraph 62.

63. The City of Chicago has thus given ShotSpotter a powerful contractual incentive to over-report loud noises as gunfire and, therefore, to dispatch police to chase down sounds that are not gunshots.

**ANSWER:** The City denies the allegations contained in Paragraph 63.

64. In addition, the City's contract with ShotSpotter excludes from its performance targets gunshots fired in "enclosed spaces" or "if the weapon discharged is of .25 or smaller caliber," which includes small handguns that fire .22 caliber rounds. When ShotSpotter misses or mislocates these gunshots, it does not count against its contractual performance targets.

**ANSWER:** The City denies the allegations contained in Paragraph 64.

***ShotSpotter is a Black Box, Concealing its Technological Flaws***

65. The dismal results of ShotSpotter on the ground likely reflect flaws in the underlying technology. The system is a black box, shrouded in secrecy, and it has never been independently validated or properly tested for reliability.

**ANSWER:** The City denies the allegations contained in Paragraph 65.

66. ShotSpotter purports to do two things: (1) identify the sound of gunfire as distinct from the cacophony of sounds in an urban environment and (2) triangulate the location of those supposed gunshots on a map to within 82 feet (25 meters).

**ANSWER:** Upon information and belief, the City admits that ShotSpotter technology is

designed to identify the sound of gunfire in an urban environment and that ShotSpotter utilizes its

technology to geo-locate 90% of detectible outdoor incidents within a coverage area, accurate to within a circle whose radius is 25 meters (82 feet) when three or more sensors "trigger" the software system. The City lacks knowledge and information as to the specifics of the technological process employed by ShotSpotter. The City denies the remaining allegations contained in Paragraph 66.

67. Studies show, however, that ShotSpotter sensors can easily be triggered by sounds other than gunshots, such as fireworks, trash trucks, blown tires, helicopters, construction, vehicles traveling over expansion plates and potholes, and even church bells. A 2014 ShotSpotter white paper acknowledges that some loud bangs—like fireworks, which are common year-round in a large city—may trigger false positives.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67.

68. ShotSpotter likewise can report significantly mistaken locations of supposed gunfire. A ShotSpotter employee has admitted in court that incidents can be "significantly mislocated" and prior reported incidents have been off by distances of 450 meters or more.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68.

69. ShotSpotter's potential for issuing false and mislocated alerts is evident from the system's mechanics. The ShotSpotter system contains three main components—sensors, computer algorithms, and human operators—each of which creates significant opportunity for error. The City of Chicago knows of or should know of these flaws and has been confronted about many of them directly in City Council testimony.

**ANSWER:** The City denies the allegations contained in Paragraph 69.

70. *First*, ShotSpotter's sensors themselves introduce opportunities for error. Pursuant to the City's contract, ShotSpotter has installed approximately 15-20 sensors for every square mile within its surveillance shadow. Each sensor contains microphones, audio processing circuitry, a cellular network connection, and other hardware. Sensors are typically installed high up on City lampposts, public buildings, or other structures. The sensors are continuously listening and recording, storing 30 hours of audio on the device itself.

**ANSWER:** The City admits that the ShotSpotter Contract states: "[ShotSpotter's] detection solution is enabled through proprietary special purpose-built sensors that are designed to trigger and time-stamp impulsive acoustic events that spike above ambient noise. When three or more sensors "trigger" the software system, it is able to triangulate the exact location of the event within 82 feet. SST designs and deploys a sensor array of typically 15-20 sensors per square mile in order to support a coverage area. The ownership and maintenance of the sensors is the sole responsibility of SST." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 70.

71.     The sensors are designed to identify any and all loud, impulsive noises—what ShotSpotter calls any "bang, boom, or pop." When a sensor detects a loud noise, it automatically sends audio clips and other data to ShotSpotter's computer system via a cellular network.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71.

72.     The placement of these sensors can affect their ability to distinguish and triangulate noises. The technology is liable to fail when a noise is very close to a sensor, in which case the microphone may pick up a distorted signal that cannot be properly timed. It is also negatively impacted by physical elements, including wind and temperature, which affect the speed that sound propagates, and surrounding buildings, which create reflections and other disturbances in the sound propagation.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72.

73.     *Second*, the secret, black-box algorithms that ShotSpotter uses to analyze the noises that are detected by its sensors create enormous opportunities for error.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73.

74. When enough nearby ShotSpotter sensors report a noise in a certain span of time, ShotSpotter's computer system processes the noises through two proprietary computer algorithms.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 74.

75. One algorithm attempts to identify the location of the sound by comparing the relative amount of time it took for the noise to reach each sensor, a process known as multilateration.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 75.

76. Another algorithm attempts to classify the noise as originating from a gunshot or another source.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76.

77. These algorithms generate an output that purports to identify the location of the noise and to classify it as a "gunshot," "possible gunshot," or some other noise.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77.

78. ShotSpotter treats both algorithms as trade secrets.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78.

79. On information and belief, there has neither been any independent testing or validation of these algorithms, nor has the City of Chicago ever required such independent review or conducted one itself.

**ANSWER:**    The City admits that it has never performed or required an independent review of ShotSpotter's algorithms. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 79.


80.    ShotSpotter employees have published documents that reveal fundamental scientific flaws in the design and reliability of its system.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80.


81.    The noise-classification algorithm, which is supposed to screen out noises that are not gunshots, suffers from clear flaws in design. According to a technical paper authored by eight ShotSpotter employees, the algorithm converts audio recordings of the loud noises its sensors detect into visual images that depict the waveform and other features of the sound. These visual images are then assembled into a single "image mosaic" that is split up into distinct "tiles," each of which contains certain information in visual form. The algorithm analyzes these image mosaics to decide whether to classify the noise as a gunshot.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81.


82.    According to the technical paper, some of the tiles in the image mosaic encode information that appears to have nothing to do with the actual sound that ShotSpotter's microphones pick up. For example, one tile visually depicts the "location of recent nearby incidents." Another tile visually depicts the number of "recent incidents." That is, the mosaic includes information about *prior* noises rather than the specific noise that is being analyzed. By including such extraneous information in the image mosaic, ShotSpotter's algorithms may be more likely to classify noises as gunshots if there have been more "nearby" or "recent" ShotSpotter alerts in the area. In this way, the system may be more likely to trigger false alerts in places where it has previously triggered alerts, creating harmful and inaccurate feedback loops that falsely inflate the number of ShotSpotter alerts in particular areas.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82.


83.    ShotSpotter's noise-classification algorithm may suffer from other defects. ShotSpotter uses a "machine learning" algorithm to classify the image mosaics as gunshots or

other noises. But ShotSpotter's methods and implementation have never been independently tested or audited, nor has ShotSpotter released any information about any internal testing it has done.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 83.

83.    84.    In general terms, the type of machine learning algorithm that ShotSpotter uses works by being "trained" to recognize the features of the image mosaics that reflect gunshots as opposed to other noises. To train the algorithm, it must be fed sample image mosaics that have been pre-labeled as examples of gunshots and other noises. Using those labeled examples, the algorithm attempts to "learn" the features of the image mosaics that correspond to gunshot noises as opposed to those that correspond to other noises.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84.

85.    Little is known about how ShotSpotter trains its algorithm or tests it for reliability. The ShotSpotter technical paper concedes that when ShotSpotter labels the samples that it uses to train the algorithm, the "ground truth" about whether a noise is a gunshot is rarely known and that "it is to be expected that some training data are misidentified."

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 85.

86.    There is significant opportunity for error in any such machine learning process, and the method devised by ShotSpotter has never been independently validated and verified. Absent rigorous testing and validation, such algorithms may reflect unacceptably high false positive rates or could systematically misclassify certain noises as gunfire. Despite the high-tech veneer, there is no basis to believe that ShotSpotter's algorithm produces reliable results.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 86.

87.    *Third*, after ShotSpotter's algorithms process the loud noises its sensors detect, a low-level ShotSpotter employee reviews the noise and makes the ultimate decision as to whether to trigger an alert that will dispatch police. These human operators work in call-center style facilities in Newark, California, or Washington, D.C. They are another major source of error.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87.

88.    ShotSpotter's operators have full discretion to override the computer. They can change a noise classified by the algorithm as "fireworks" to a gunshot and trigger an alert that dispatches police. They can modify the location or number of gunshots supposedly detected.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88.

89.    ShotSpotter operators spend mere seconds reviewing the noise before deciding whether to dispatch police. The entire process, from when the noise is registered by a sensor to when a ShotSpotter operator triggers an alert, takes less than 60 seconds.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89.

90.    According to ShotSpotter, its human operators override the computer classification about 10% of the time.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 90.

91.    ShotSpotter's operators have no obvious qualifications to conduct forensic audio analysis of gunshots or to direct a highly charged law enforcement response.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 91.

92.    Minimum job requirements for ShotSpotter operators are a high school degree and one year of experience working in a call center or customer service position. They are not forensic experts or audio specialists. ShotSpotter has not disclosed any detailed information about how it trains or evaluates the proficiency of these operators. There is no public evidence or testing that ShotSpotter's internal training adequately leads these operators to differentiate a gunshot from other impulsive noises.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 92.

93.     ShotSpotter operators can trigger an alert by categorizing a noise as either a "gunshot" or "probable gunshot."

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 93.

94.     ShotSpotter trains its operators using a protocol it calls the "Classification Continuum," which, according to ShotSpotter, "summarizes the key considerations that a reviewer should weigh in evaluating whether a given noise even was a gunshot—as opposed to, for instance, a firework, backfiring truck, or helicopter." ShotSpotter has refused to publicly disclose this crucial document, but ShotSpotter's characterization of the operator's decision as a "continuum" suggests that it permits operators to trigger alerts even when it is not clear whether the noise is a gunshot.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 94.

95.     On information and belief, ShotSpotter's operators are trained to err on the side of *triggering* an alert whenever they are in doubt about whether a noise is a gunshot or not.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 95.

96.     The determination of a ShotSpotter operator, made in mere seconds, is immediately pushed out to CPD's computer systems and then transmitted to officers in the field on their City-issued mobile devices or mobile computers. The alert is presented to officers as a pin on a map. Officers may also listen to audio snippets of the noise if they so choose.

**ANSWER:**     The City admits that ShotSpotter transmits alerts, which are accessible by CPD's Strategic Decision Support Center ("SDSC"), the Office of Emergency Management and Communications ("OEMC"), and on-duty CPD units equipped with City-issued mobile devices that have activated the ShotSpotter mobile phone application. The City admits that CPD officers

may also be alerted on a Mobile Alert Console, if equipped, or through a dispatch over the CAD

system. The City admits that CPD officers may have the option of viewing information related to

a ShotSpotter alert and replaying audio recordings upon a confirmed shooting incident. The City

lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in Paragraph 96.

97.     When CPD receives a ShotSpotter alert, it dispatches officers, irrespective of
whether ShotSpotter decided to classify the noise a "gunshot" or just a "probable gunshot." CPD
policies make no distinction between how officers should treat each type of alert.

**ANSWER:**     The City admits that upon receipt of a ShotSpotter alert CPD initiates a notification

process to address a received alert in accordance with Special Order S03-19. The City further

admits that CPD policy does not draw a distinction for alerts classified as "gunshot" or "probable

gunshot." The City denies the remaining allegations contained in Paragraph 97.

98.     It is these ShotSpotter alerts, issued after mere seconds of review by a low-level
ShotSpotter employee, that led the individual Defendants Officers to falsely arrest and prosecute
Plaintiff Williams and to illegally detain and question Plaintiffs Ortiz and Scruggs.

**ANSWER:**     The City denies the allegations contained in Paragraph 98.

99.     Upon request by prosecutors or investigators, ShotSpotter can also conduct a
re-analysis of the audio snippets and produce what it calls a "Detailed Forensic Report." The
methods used to produce such reports are equally shrouded in secrecy and have not been
independently tested or validated. Likewise, the individuals who conduct these re-analyses are not
forensic audio specialists or otherwise qualified. One ShotSpotter employee who produces these
reports, Walter Collier III, is a former CPD officer. ShotSpotter has stated that "no official or
formal training materials exist" for these employees specifically, and that they are simply trained
"on the job."

**ANSWER:**     The City admits that ShotSpotter can produce a "Detailed Forensic Report." The

City admits that Walter Collier III was employed by the CPD for a period of time. The City lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

contained in Paragraph 99.

### The City has Direct Knowledge that ShotSpotter Is Unreliable

100.    The City has repeatedly contracted with ShotSpotter, knowing full well it is untested and unreliable.

**ANSWER:**    The City denies the allegations contained in Paragraph 100.

101.    There are *no* studies testing whether ShotSpotter can reliably distinguish between the sound of gunshots and similar noises like firecrackers, backfiring cars, construction noises, helicopters, or other loud bangs.

**ANSWER:**    The City denies the allegations contained in Paragraph 101.

102.    Neither ShotSpotter nor any other entity has ever published results from a controlled test of the ShotSpotter system against actual fireworks, engine backfires, blown tires, or other confounding noises to determine how often the system is likely to generate a false positive alert—*i.e.*, an alert that is triggered by a noise other than gunfire. ShotSpotter has recently declined an offer by an independent industry research publication to test its technology.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 102.

103.    The City knows about the lack of studies and testing because they have been confronted about it directly in City Council, the Public Safety Committee, and other forums; because it has been widely publicized in national news reports; and because they have themselves declined to permit or conduct deployment qualification testing—or any other testing—of the system in Chicago.

**ANSWER:**    The City denies the allegations contained in Paragraph 103.

104.    The City, through current and former officials, including former Chicago Mayor Lori Lightfoot, now-Superintendent of CPD Larry Snelling, and other senior officials in the City of Chicago and CPD brass have defended ShotSpotter technology in response to questions from the City's own OIG and others, despite being presented with significant information about ShotSpotter's poor performance as a law enforcement tool, its misleading marketing claims, and the absence of any proper testing of the system's reliability.

**ANSWER:** The City admits that numerous current and former City officials have publicly stated support for the City's use of ShotSpotter technology, but denies the remaining allegations contained in Paragraph 104.

105. The City of Chicago first used ShotSpotter more than a decade ago and most recently extended its contract in February 2024. Its current contract does not require any controlled testing of the system or its human operators to determine the rate of false positive alerts, nor does it require ShotSpotter to provide results of such testing.

**ANSWER:** The City admits that it first used ShotSpotter more than a decade ago. The City also admits that in February 2024, the term of the ShotSpotter Contract was extended. The City further states that the ShotSpotter Contract speaks for itself and denies any allegations inconsistent with the contract.

106. The City did not ask or permit ShotSpotter to test the system for false negatives after the system was installed, for example by using test-fired gunshots. On information and belief, neither ShotSpotter nor the City of Chicago has ever tested the system in any covered neighborhood to determine how frequently it fails to detect gunfire.

**ANSWER:** The City admits that it never tested the ShotSpotter system, but the City's contract with ShotSpotter provided for warranty and service level commitments. The City denies the remaining allegations contained in Paragraph 106.

107. On information and belief, the City has not reviewed any of the training materials ShotSpotter provides its human operators nor imposed any training, qualification, or testing requirements with respect to the ShotSpotter employees who trigger alerts and cause police to be dispatched.

**ANSWER:** The City denies the allegations contained in Paragraph 107.

108. In its marketing and public relations materials, ShotSpotter makes a claim of "97 percent accuracy" and "0.5 percent false positivity." These claims are false, deceptive, and misleading.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 108.

109. An audit commissioned by ShotSpotter acknowledges that these figures are not derived from any testing and do not reflect any actual knowledge about whether the sounds that triggered ShotSpotter alerts were gunshots.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 109.

110. Instead, ShotSpotter derives these "accuracy" rates by simply assuming that all of its alerts are gunfire. ShotSpotter only counts an alert as an error if a police department happens to voluntarily send ShotSpotter a complaint about an erroneous alert and if ShotSpotter then determines, unilaterally, that the complaint is valid.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 110.

111. ShotSpotter's claim of 97% accuracy is, in actuality, a tally of customer complaints, a meaningless one, as customers are under no obligation to complain about every error to ShotSpotter.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 111.

112. CPD officers *never* file complaints with ShotSpotter when they arrive at the location of a ShotSpotter alert and find no corroboration of gunfire, according to a senior CPD official's testimony to City Council and an official ShotSpotter document. Yet the OIG reports that CPD officers find no evidence of a gun crime in response to more than 90% of ShotSpotter alerts.

**ANSWER:** The City admits that the OIG published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 112.

113.    Because officers file no complaints about these unfounded alerts, ShotSpotter counts every one of them as actual gunfire and includes those fruitless police deployments in publishing a 97% accuracy rate.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 113.

114.    The City has been confronted directly about these scientifically meaningless marketing claims in City Council meetings and other forums, and they have been reported in national news outlets.

**ANSWER:**    The City denies the allegations contained in Paragraph 114.

115.    The City continues to rely on the technology, knowing and directing that CPD officers treat ShotSpotter alerts as if they are far more precise and reliable than they actually are, with dire consequences for civilians.

**ANSWER:**    The City denies the allegations contained in Paragraph 115.

## II.    CPD SYSTEMATICALLY USES SHOTSPOTTER TO INSTIGATE UNLAWFUL STOPS AND SEARCHES OF CIVILIANS ON CHICAGO'S SOUTH AND WEST SIDES

***CPD Uses Faulty ShotSpotter Technology to Systemically Initiate Investigatory Stops without Reasonable Suspicion***

116.    ShotSpotter alerts result in a large number of illegal stops and frisks, known in Chicago as "investigatory stops."

**ANSWER:**    The City denies the allegations contained in Paragraph 116.

117.    CPD officers conduct hundreds of illegal investigatory stops every year because they are chasing down ShotSpotter reports of supposed gunfire and stop or frisk people on the basis of the ShotSpotter alert, without independent grounds to suspect that the person has committed a crime or is carrying a weapon.

**ANSWER:**    The City denies the allegations contained in Paragraph 117.

118.     When CPD officers receive a ShotSpotter alert they race into neighborhoods equipped with little information except that one or more gunshots were supposedly just fired at the location where ShotSpotter is sending them.

**ANSWER:**     The City denies the allegations contained in Paragraph 118.

119.     Both ShotSpotter and CPD's own policies command officers responding to a ShotSpotter alert to regard any person they encounter as a potential suspect and lethal threat.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 119 regarding ShotSpotter's policies. The City denies

the remaining allegations contained in Paragraph 119.

120.     As a result, CPD systematically sends numerous police officers in multiple squad cars to chase down ShotSpotter alerts. On an average day multiple people on the South and West sides are stopped and frisked by police who are investigating unfounded ShotSpotter alerts.

**ANSWER:**     The City denies the allegations contained in Paragraph 120.

121.     The OIG identified more than 2,400 investigatory stops linked to ShotSpotter alerts over the course of 18 months, from January 1, 2020 to May 31, 2021, of which 1,056 matched a ShotSpotter event number recorded by CPD. An additional 1,366 investigatory stop reports mentioned ShotSpotter in the narrative description provided by the officer but could not be linked to ShotSpotter using a matching event number.

**ANSWER:**     The City admits that the OIG published an August 2021 report. The City further

states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's

report. The City lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in Paragraph 121.

122.     The actual number of people stopped by police following a ShotSpotter alert is likely much higher than the OIG was able to document. As the OIG found, CPD fails to keep consistent records matching ShotSpotter incidents with investigatory stops. Police officers also may not record the involvement of ShotSpotter in their narrative of investigatory stops or arrests that are in fact prompted by ShotSpotter. Moreover, CPD officers sometimes fail to prepare an investigatory stop report at all, in which case a ShotSpotter-prompted investigatory stop will not appear in CPD data.

**ANSWER:** The City admits that the OIG published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 122.

123.     CPD investigatory stops prompted by ShotSpotter alerts rarely turn up any evidence of gun crime. Of the 1,056 investigatory stops that OIG was able to match directly to a ShotSpotter event number, only 244 resulted in an arrest and only 152 resulted in a gun being recovered. The vast majority of these stops turned up no gun crime.

**ANSWER:** The City admits that the OIG published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City denies the remaining allegations contained in Paragraph 123.

124.     ShotSpotter alerts cannot supply officers with reasonable suspicion for a police stop.

**ANSWER:** The City admits that a ShotSpotter alert alone likely cannot supply officers with reasonable suspicion to detain an individual, but further states that a ShotSpotter alert may be a factor in the totality of the circumstances establishing reasonable articulable suspicion establishing a basis for a temporary stop. The City denies the remaining allegations contained in Paragraph 124.

125.     ShotSpotter has never been tested to establish its reliability and so cannot properly be considered by an officer at all when determining whether there is reasonable suspicion to stop a person.

**ANSWER:** Upon information and belief, the City denies the allegations contained in Paragraph 125.

126.    The U.S. Court of Appeals for the Seventh Circuit has previously concluded that ShotSpotter "is analogous to an anonymous tipster" and cannot establish reasonable suspicion on its own. *United States v. Rickmon*, 952 F.3d 876, 882 (7th Cir. 2020).

**ANSWER:**    The City admits that the Seventh Circuit Court of Appeals in *United States v. Rickmon* stated in its decision that ShotSpotter "is analogous to an anonymous tipster." *See* 952 F.3d 876, 882 (7th Cir. 2020). The City denies the remaining allegations contained in Paragraph 126.

127.    ShotSpotter alerts also cannot establish a lawful basis for a stop by CPD officers because a ShotSpotter alert does not supply enough information to establish individualized suspicion. At best, the technology tells an officer that a gun may have been fired several minutes earlier, and that shot may have been fired somewhere within 82 feet of the location of the alert. It tells the officer nothing about the physical description of a person, what may have transpired before or after the loud noise, or anything else that might tie a particular individual to the loud noise or gunshot.

**ANSWER:**    The City admits that a ShotSpotter alert alone likely cannot establish reasonable articulable suspicion to detain an individual, but further states that a ShotSpotter alert may be a factor in the totality of the circumstances establishing reasonable articulable suspicion establishing a basis for a temporary stop. The City also admits that ShotSpotter alerts do not provide data that identifies the physical description of a person. The City denies the remaining allegations contained in Paragraph 127.

128.    The fact that a person happens to be found by a police officer near the location of a recent ShotSpotter alert is never reasonable suspicion for a stop.

**ANSWER:**    The City admits that a ShotSpotter alert alone likely does not provide reasonable suspicion to detain an individual, but further states that a ShotSpotter alert may be a factor in the totality of the circumstances establishing reasonable articulable suspicion establishing a basis for a temporary stop. The City denies the remaining allegations contained in Paragraph 128.

129. ShotSpotter also improperly biases the perceptions of officers responding to an alert, priming officers to expect to find gunfire and to regard residents with unwarranted suspicion. CPD officers responding to a ShotSpotter alert are liable to interpret otherwise innocuous behavior as corroboration of supposed gunfire, thus furthering the likelihood of a false arrest or stop.

**ANSWER:**    The City denies the allegations contained in Paragraph 129.


130. CPD's characteristically aggressive response when dispatched to ShotSpotter alerts may itself prompt residents to behave in ways that officers then use as justification for a stop—for example, if a resident walks away from an officer or wears a concerned expression on their face.

**ANSWER:**    The City denies the allegations contained in Paragraph 130.


131. CPD officers also systematically stop and frisk people because of a perceived history of ShotSpotter alerts in the area in the past.

**ANSWER:**    The City denies the allegations contained in Paragraph 131.


132. CPD officers who stop residents on the street regularly cite the supposed history of ShotSpotter alerts in an area as a false justification for detaining residents or searching them once detained.

**ANSWER:**    The City denies the allegations contained in Paragraph 132.


133. OIG's detailed review of 72 randomly-selected investigatory stop reports that mention ShotSpotter by name between January 2020 and May 2021 turned up 10 reports in which reporting officers "referred to the aggregate results of the ShotSpotter system as informing their decision to initiate a stop or their course of action during the stop, even when they were not responding to a specific ShotSpotter alert."

**ANSWER:**    The City admits that the OIG published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report.


134. The OIG's report states that "the introduction of ShotSpotter technology in Chicago has changed the way some CPD members perceive and interact with individuals present in areas where ShotSpotter alerts are frequent" and that "[a]t least some officers, at least some of the time, are relying on ShotSpotter results in the aggregate to provide an additional rationale to initiate stop or to conduct a pat down once a stop has been initiated."

**ANSWER:** The City admits that the OIG published an August 2021 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report.

135. Nearly every part of the City that falls under ShotSpotter's shadow experiences a significant volume of ShotSpotter alerts over time. There are now approximately 44,300 ShotSpotter alerts sent to CPD per year, spread over approximately 117 miles, which amounts to an average of 379 ShotSpotter alerts per square mile per year.

**ANSWER:** The City admits that the City's coverage area under the current contract amendment covers 117.5 square miles. The City denies the remaining allegations contained in paragraph 135.

136. Using the "past alert" rationale, CPD officers can determine that nearly any part of the City blanketed with ShotSpotter has had a significant volume of ShotSpotter alerts.

**ANSWER:** The City denies the allegations contained in Paragraph 136.

137. In this way, CPD officers use ShotSpotter's mere presence, which regularly triggers unfounded alerts, as false justification to stop or frisk residents who live within its surveillance footprint.

**ANSWER:** The City denies the allegations contained in Paragraph 137.

138. On information and belief, CPD officers do not make any distinction between founded and unfounded ShotSpotter alerts when citing historical ShotSpotter alerts to justify a stop or search.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 138.

### *The City of Chicago's Policies and Practices Fuel the Technology's Negative Consequences*

139. The City has adopted and maintained express policies and widespread practices concerning ShotSpotter—as well as explicit decisions of officials with final policymaking authority—that fuel its negative consequences and that lead systematically to illegal searches and seizures. They have also failed to train officers to avoid illegal searches and seizures despite their knowledge that ShotSpotter is unreliable and untested.

**ANSWER:**     The City denies the allegations contained in Paragraph 139.


140.     The City's formal ShotSpotter Flex Program policy, Special Order S03-19, explicitly warns officers responding to a ShotSpotter alert to "be[] aware that an offender or multiple offenders may be on scene." It instructs officers to expect danger, cautioning them to "take a safe and strategic approach while responding to the incident."

**ANSWER:**     The City admits that CPD's ShotSpotter Flex Program, Special Order S03-09,

Section VII.C, states, in part, that: "Responding Department members will: … (2) take a safe and

strategic approach while responding to the incident, being aware that an offender or multiple

offenders may be on scene . . . .". The City denies the remaining allegations contained in Paragraph

140.


141.     The City's ShotSpotter Flex Program policy conveys to officers, including the Defendant Officers, a false sense of ShotSpotter's precision, directing them to investigate "the precise location" provided by ShotSpotter, as well as the area surrounding the "precise location given by ShotSpotter information." The City has failed to train the Defendant Officers about the inaccuracy of the locations provided by ShotSpotter alerts, and the fact that all locations provided by ShotSpotter are at best approximations. The City has likewise failed to train the Defendant Officers about the inaccuracy of the determinations provided by ShotSpotter that a particular noise was caused by gunfire.

**ANSWER:**     The City states that Special Order S03-19 speaks for itself and denies any

allegations inconsistent with the language in Special Order S03-19. The City denies the remaining

allegations contained in Paragraph 141.


142.     The City, by practice and express policy, directs officers, including the Defendant Officers, to treat individuals found in the vicinity of ShotSpotter alerts as suspects and to subject them to investigatory stops on that basis.

**ANSWER:**     The City denies the allegations contained in Paragraph 142.


143.     The City's ShotSpotter Flex Program policy instructs officers that they can detain residents on the basis of a ShotSpotter alert alone, directing officers that "[a] ShotSpotter alert, by itself, does not give responding Department member(s) the legal authority to enter private

property," but failing to provide any similar instruction regarding investigatory stops or other seizures of residents.

**ANSWER:**    The City states that Special Order S03-19 speaks for itself and denies any

allegations inconsistent with the language in Special Order S03-19. The City denies the remaining

allegations contained in Paragraph 143.


144.    The City, by practice and express policy, assigns ShotSpotter alerts the same priority as 9-1-1 calls reporting in-progress shootings. That is, the City treats ShotSpotter as "Priority 1" calls for service, which are reserved for police deployments involving an imminent threat to life, bodily injury, or major property damage/loss. The only calls that Defendants assign a higher priority ("Priority 0") are those in which police officers, EMS personnel, or firefighters face a life-threatening circumstance.

**ANSWER:**    The City admits that Special Order S03-19, Section IV.B states, in part, that

"[ShotSpotter] incidents will be dispatched in accordance to the Department directive entitled

'Radio Communications' with an immediate dispatch with the priority of in progress crimes

involving the use of a firearm." The City also admits that Special Order S03-19, Section VII.B(1)

states that OEMC will "dispatch the event according to OEMC protocol for priority in accordance

to the Department directive entitled 'Radio Communications.'" The City also admits that the Radio

Communications policy, set forth in General Order G03-01-01 (effective 13 July 2016), states, in

part, that "Priority 0" calls "involve[] any life-threatening circumstances which have the potential

to compromise the safety and well-being of police, EMS, or fire units."


145.    The City's practice and express policy make no distinction between alerts that ShotSpotter itself codes as "multiple gunshot," "single gunshot" or merely "probable gunshot." All are given the same highest priority and police officers are not directed to make any distinction in how they respond.

**ANSWER:**    The City states that Special Order S03-19 speaks for itself and denies any

allegations inconsistent with the language in Special Order S03-19. The City admits that CPD

policy does not draw a distinction for alerts classified as "multiple gunshot", single gunshot, or

"probable gunshot." The City denies the remaining allegations contained in Paragraph 145.

146. The City's practice, policies, and training fail to inform officers about the overwhelming likelihood that any given ShotSpotter alert will lead them to find no shooting or other gun-related incident. The City failed to train the Defendant Officers in this regard.

**ANSWER:**      The City denies the allegations contained in Paragraph 146.

147. The City's practice, policies, and training direct officers, including the Defendant Officers, always to treat ShotSpotter alerts as if they correspond to actual gunfire.

**ANSWER:**      The City denies the allegations contained in Paragraph 147.

148. The City's practice, policies, and training fail to inform officers that ShotSpotter has never been tested for its ability to distinguish gunfire from other loud noises. The City's practice, policies, and training affirmatively mislead officers about the accuracy and precision of ShotSpotter alerts. The City failed to train the Defendant Officers in this regard.

**ANSWER:**      The City denies the allegations contained in Paragraph 148.

149. The City's practice, policies, and training fail to inform officers that the locations provided by ShotSpotter are not exact but at best approximate. The City failed to train the Defendant Officers in this regard. The City's practice, policies, and training fail to provide proper guidance about whether or when ShotSpotter alerts may justify an investigatory stop or other search or seizure. The City failed to train the Defendant Officers in this regard.

**ANSWER:**      The City denies the allegations contained in Paragraph 149.

150. The City's policies and training fail to inform officers that a person's mere presence within the vicinity of a ShotSpotter alert does not supply lawful justification for an investigatory stop or other search or seizure. The City failed to train the Defendant Officers in this regard.

**ANSWER:**      The City denies the allegations contained in Paragraph 150.

151. The City's policies and training fail to inform officers that the U.S. Court of Appeals for the Seventh Circuit has stated that ShotSpotter alerts should, at best, be regarded as akin to a tip from an anonymous source of unknown reliability and do not supply reasonable

suspicion for a *Terry* stop. The City also fails to provide operational guidance consistent with that assessment. The City failed to train the Defendant Officers in this regard.

**ANSWER:**     The City denies the allegations contained in Paragraph 151.

152.     The City's practices, express policies, and training with respect to ShotSpotter alerts violate the City's own investigatory stop policy which provides that "Reasonable Articulable Suspicion" for an investigatory stop "should be founded on specific and objective facts or observations about how a suspect behaves, what the subject is seen or heard doing, and the circumstances or situation in regard to the suspect that is either witnessed or known by the officer."

**ANSWER:**     The City denies the allegations contained in Paragraph 152.

153.     The City's practice, express policies, and training do not require CPD officers to keep track of or report unfounded ShotSpotter alerts that result in no corroboration of any gun-related incident or which are determined by an officer to be caused by a firecracker, blown tire, or some other source of noise other than a gunshot. The City, by policy and practice, fails to report any such false-positive alerts to ShotSpotter.

**ANSWER:**     The City denies the allegations contained in Paragraph 153.

154.     The City's express policy requires officers to rely on ShotSpotter alerts when investigating any type of shooting incident and to rely on ShotSpotter reports for investigation and prosecution purposes.

**ANSWER:**     The City denies the allegations contained in Paragraph 154.

155.     The City by practice, express policy, and training instructs CPD to rely on ShotSpotter alerts to guide police behavior, inform police strategy and tactics, and assess police performance.

**ANSWER:**     The City states that Special Order S03-19 speaks for itself and denies any allegations inconsistent with the language in Special Order S03-19. The City denies the remaining allegations contained in Paragraph 155.

156.     Upon information and belief, the City and its decisionmakers make no distinction between founded and unfounded ShotSpotter alerts when using ShotSpotter to guide police behavior, inform police strategy and tactics, and assess police performance.

**ANSWER:**    The City denies the allegations contained in Paragraph 156.


157.    The City's practice and express policy direct CPD's Strategic Decision Support Centers ("SDSCs"), which are police surveillance hubs located in CPD police districts, to rely on ShotSpotter alerts to assess gun violence trends, crime patterns, and specific locations that have a high amount of purported gunfire incidents. The City further instructs SDSCs to disseminate ShotSpotter information in order to inform police strategies and responses, including in investigations, patrol missions, parole/probation, and gang strategies.

**ANSWER:**    The City admits that Special Order S03-19, Section VII.E(1)(a) states that SDSCs

will "access the information accumulated by the ShotSpotter Flex acoustic sensors to identify: (1)

potential gun violence related trends, (2) crime patterns, and (3) any specific locations which have

a high amount of gunfire incidents." The City also admits that Special Order S03-19, Section

VII.E(1)(b) states that SDSCs will "disseminate the information to the district commander and

executive officer to implement an appropriate strategic response which may include, but is not

limited to: (1) follow-up investigations, (2) patrol missions, (3) assistance from specialized units

or agencies (e.g.; parole/probation compliance checks, covert missions), (4) the utilization of

resources available from the area gang strategy meeting as delineated in the Department directive

entitled 'Area Gang Strategy Meeting,' and (5) the implementation of Gang Violence Reduction

Strategy (GVRS) as delineated in the Department directive 'Gang Violence Reduction Strategy.'"

The City denies the remaining allegations contained in Paragraph 157.


158.    The City, by explicit policy, mandates that ShotSpotter alerts be included in the Compstat statistical summaries prepared by police districts that are within ShotSpotter's shadow. Compstat reports are used to benchmark crime in police districts, to assess the performance of police officers and leadership, and to guide the allocation of police resources and the decision about what police tactics to employ.

**ANSWER:**    The City admits that Special Order S03-19, Section VII.E(2) states that "Districts

utilizing the ShotSpotter program will include any crime analysis information and strategic

response related to gunfire incidents detected by the ShotSpotter Flex acoustic sensors within their

Compstat statistical summary." The City further states that General Order G01-08 provides general information and responsibilities of CompStat. The City states that General Order G01-08 speaks for itself and denies any allegations inconsistent with the language in General Order G01-08.

159.    The City, by express policy and practice and through its decisionmakers, has failed to test the ShotSpotter system to determine the accuracy of its noise classifications or location determinations. It has failed to test the system to determine the rate of false-positive alerts (i.e. alerts to noises that are not gunfire) or the rate of false-negative alerts (i.e. failure to alert to noises that are gunfire). The City has refused or failed to require ShotSpotter to test and properly validate its system, including with respect to false positive alerts. The City has failed to do or require any testing despite knowing that ShotSpotter's marketing, which claims supposed 97% accuracy, is false, deceptive, and misleading. The City has failed to do or require any testing despite knowing that a large proportion of ShotSpotter alerts in Chicago are false-positive alerts and that ShotSpotter also fails to detect a large proportion of known shootings, *i.e.* false-negative alerts.

**ANSWER:**    The City denies the allegations contained in Paragraph 159.

160.    In all of these ways, the City's decisions, policies, practices, and training improperly treat ShotSpotter as if it is accurate, reliable, properly-validated, and effective and instruct police officers, including the Defendant Officers, to rely on ShotSpotter improperly. The City's decisions, policies, practice, and training require and encourage CPD to improperly rely on ShotSpotter as a basis for all manner of police decisions, from high-level decisions about resource allocation to investigations of particular crimes to street-level decisions about whether to conduct an investigatory stop.

**ANSWER:**    The City denies the allegations contained in Paragraph 160.

161.    The City purposefully perpetuates these decisions, policies, and practices, knowing the technology is ineffective, unreliable, and has never been properly tested.

**ANSWER:**    The City denies the allegations contained in Paragraph 161.

162.    The City's decisions, practices, policies, and training—as well as its omission of policymaking and failure to train regarding ShotSpotter's unreliability—lead officers to engage in large numbers of illegal, unnecessary, and frightening interactions with residents who live in areas wired with ShotSpotter sensors.

**ANSWER:**    The City denies the allegations contained in Paragraph 162.

163.    Plaintiff Ortiz's stop by police, discussed in Section V below, and Plaintiff Scruggs's stop, discussed in Section VI, are prime examples.

**ANSWER:**    The City denies the allegations contained in Paragraph 163.


164.    Officers targeted Mr. Ortiz on the Northwest side of the city as a suspect in a non-existent shooting and baselessly detained him for questioning just because he was near a ShotSpotter alert. Even as it became clear that there was no gunfire to be found, the Ortiz Defendant Officers escalated the encounter, searching Mr. Ortiz's vehicle arresting him when they found drugs in his car and then seizing his car. The Ortiz Defendant Officers detained and investigated Mr. Ortiz in this manner because of the City's policies, practices, and trainings regarding ShotSpotter.

**ANSWER:**    The City denies the allegations contained in Paragraph 164.


165.    Likewise, officers targeted Mr. Scruggs on the South Side as a suspect in a non-existent shooting and detained him simply because officers found him standing near the location of the ShotSpotter alert several minutes after ShotSpotter detected a noise. Even after being ordered to release Mr. Scruggs, Defendant Officers escalated their baseless suspicions by returning to re-detain Mr. Scruggs the next day and eventually finding a pretextual paperwork infraction as a basis to arrest and jail Mr. Scruggs. The Scruggs Defendant Officers detained and investigated Mr. Scruggs in this manner because of the City's policies, practices, and training with respect to ShotSpotter.

**ANSWER:**    The City denies the allegations contained in Paragraph 165.


166.    The City and individual CPD officers who rely on ShotSpotter to stop and arrest civilians have historically been immune from oversight for their unlawful conduct.

**ANSWER:**    The City denies the allegations contained in Paragraph 166.


167.    Most people stopped or searched by CPD officers because of ShotSpotter would never know that ShotSpotter is what caused CPD to target them. At the time of a stop or arrest, CPD officers are not required to inform people that they are investigating a ShotSpotter alert. Even after the fact, CPD's record-keeping makes it difficult and sometimes impossible to determine whether a police action was prompted by ShotSpotter.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in the first and last sentence of Paragraph 167. The City admits that

there is no policy that requires CPD officers to "inform people that they are investigating a ShotSpotter alert."

168.    As a result, it is extremely difficult for residents to challenge individual illegal ShotSpotter stops or searches.

**ANSWER:**    The City denies the allegations contained in Paragraph 168.

## III.    THE CITY OF CHICAGO HAS INTENTIONALLY DEPLOYED SHOTSPOTTER ALONG STARK RACIAL LINES AND USES SHOTSPOTTER TO TARGET BLACK AND LATINX PEOPLE, IN KEEPING WITH CHICAGO'S HISTORICAL PATTERN OF DISCRIMINATORY POLICING.

169.    The City of Chicago decides which parts of the City should be under surveillance by the ShotSpotter system. The City, through its decisionmakers, has intentionally chosen to blanket nearly all of the South and West sides with active sensors. Throughout its long contractual relationship with ShotSpotter, the City has consistently and deliberately chosen to deploy ShotSpotter only in overwhelmingly Black and Latinx neighborhoods for the purpose of targeting the people in those neighborhoods.

**ANSWER:**    The City admits that pursuant to the ShotSpotter Contract the City placed orders for coverage areas within the City and that ShotSpotter determined the locations to place its proprietary special-purpose built sensors. The City denies the remaining allegations contained in Paragraph 169.

170.    Relying on that technology, CPD regularly conducts high-stakes deployments in those neighborhoods, thus discriminatorily subjecting Black and Latinx people to unlawful seizures, false arrests, and police violence stemming from such police responses.

**ANSWER:**    The City denies the allegations contained in Paragraph 170.

171.    Chicago first began using ShotSpotter in 2003. The City halted the program because it was producing false leads.

**ANSWER:**    The City admits that CPD initiated a pilot program for a gunshot detection system in the early 2000s for a limited period of time. At this time, the City lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 171.

172.    In 2007, Chicago initiated a pilot program with ShotSpotter that was promptly discontinued. According to a 2010 NBC Chicago report, the CPD found the program to be "not entirely effective" in an urban environment.

**ANSWER:**    The City admits that CPD initiated a pilot program for a gunshot detection system in the early 2000s for a limited period of time. At this time, the City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 171.

173.    In 2012, CPD launched another pilot program for ShotSpotter, installing sensors in a total of three-square miles in the predominantly Black and Latinx Englewood and Harrison districts. ShotSpotter sensors were installed in sections of CPD's 3rd, 7th, 8th, and 11th Police Districts.

**ANSWER:**    The City admits that CPD implemented a ShotSpotter Flex program initiative operation in districts 7 and 11 as well as parts of districts 8 and 25 in the ShotSpotter coverage area.

174.    In 2017, CPD moved to rapidly expand its ShotSpotter program as part of its establishment of SDSCs. SDSCs access the City's ShotSpotter network, its Police Observation Devices (surveillance cameras), its Automated License Plate Readers, and various other surveillance systems.

**ANSWER:**    The City admits that beginning in 2017 CPD expanded its ShotSpotter coverage areas. The City admits that Strategic Decision Support Centers have been equipped with crime analysis and monitoring technology, including but not limited to technologies supporting ShotSpotter, Police Observation Devices, and License Plate Readers. The City denies the remaining allegations contained in Paragraph 174.

175.    In January 2017, the first SDSC was launched in Englewood, the 7th District. Between January and July 2017, CPD began to use ShotSpotter in the 11th, 6th, 9th, 10th, and



*Figure 1 Left: ShotSpotter alerts per police district and beat since the start of the City's current contract with ShotSpotter. Right: Proportion of Black and Latinx residents by census tract with boundaries of police districts and beats shown.*

15th Districts. In September 2017, CPD expanded the program to the 2nd, 3rd, 4th, 5th, 8th, and 25th Districts.

**ANSWER:**    The City admits the allegations in the first and second sentences of Paragraph 176.

The City denies the remaining allegations contained in Paragraph 176.


176.    The City and ShotSpotter both refuse to disclose where sensors are located. But data published by the City of Chicago showing the latitude and longitude of ShotSpotter alerts shows that sensors are currently active and reporting supposed gunshots across 12 CPD police districts—the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 15th, and 25th districts. This coverage area also comports with public statements that City and CPD officials have provided regarding ShotSpotter's expansion over the years.

**ANSWER:**    The City denies that it refuses to disclose where ShotSpotter sensors are located

because the City lacks knowledge and information concerning the precise locations of the sensors,

which information is within the knowledge of SoundThinking, Inc. The City further lacks knowledge or information sufficient to form a belief as to the truth of the allegations directed at SoundThinking, Inc.'s (f/k/a ShotSpotter, Inc.) conduct. The City admits publishing ShotSpotter Alert data on the Chicago Data Portal in various districts, including but not limited to the 2nd, 3rd, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 15th, and 25th police districts. The City states that the data speaks for itself and denies any allegations inconsistent therewith. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 176.

177.    The City continues to use ShotSpotter across these 12 Police Districts, pursuant to the City's $9 million annual contract with ShotSpotter, which the City signed on August 22, 2018, and has since extended through August 2023.

**ANSWER:**    The City admits that it entered into the ShotSpotter Contract commencing on August 20, 2018, which has been extended through November 22, 2024. The City admits that the ShotSpotter Contract provides for subscriptions services across the contracted for coverage area, which includes the 12 districts identified in Paragraph 176. The City denies the remaining allegations contained in Paragraph 177.

178.    There is a stark racial disparity between districts with ShotSpotter and districts without. The 12 police districts where the City has chosen to deploy and activate ShotSpotter map precisely onto the 12 districts with the highest proportion of Black and Latinx residents and the lowest proportion of White residents.

**ANSWER:**    The City denies the allegations contained in Paragraph 178.

179.    The City of Chicago targeted ShotSpotter in every police district that has a population of more than 65% Black or Latinx residents, according to census data.

**ANSWER:**    The City denies the allegations contained in Paragraph 179.

180.    The City of Chicago has not activated ShotSpotter in any district with more than 25% White residents.

**ANSWER:**    The City denies the allegations contained in Paragraph 180.


181.    The City of Chicago has chosen to blanket entire police districts with ShotSpotter sensors, subjecting entire neighborhoods and blocks within each district to surveillance. The result is that approximately 117 square miles of the City are indiscriminately blanketed with gunshot sensors. This is in stark contrast with other cities using ShotSpotter, which have chosen to deploy ShotSpotter only in geographically limited "hotspots."

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last sentence of Paragraph 181. The City denies the remaining allegations contained in Paragraph 181.


182.    The City of Chicago deliberately chose to implement ShotSpotter along racial lines and to put the vast majority of the city's Black and Latinx residents under ShotSpotter's surveillance.



*Figure 2 Racial demographics of police districts with active ShotSpotter installations (2010 census data).*

**ANSWER:**  The City denies the allegations contained in Paragraph 182.


183.    As a result, a total of 80% of Black Chicagoans live under ShotSpotter's footprint, as do 65% of Latinx Chicagoans, according to census data. Only 30% of White Chicagoans live in a ShotSpotter area.

**ANSWER:**  The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 183.


184.    This disparity and deployment pattern is not explained by reference to historical gun crimes.

**ANSWER:**  The City denies the allegations contained in Paragraph 184.

185.    The City has chosen to activate ShotSpotter in Black and Brown neighborhoods that have far lower historical gun crime rates than other parts of the City that do not have ShotSpotter.

**ANSWER:**    The City denies the allegations contained in Paragraph 185.


186.    For example, according to city data, the areas covered by ShotSpotter include 28 police beats that experienced fewer than 100 shootings involving a victim (both homicides and non-fatal shootings) over 12 years between January 2010 and March 2022. Yet there are 18 police beats not under ShotSpotter's footprint that have experienced more than 100 such shootings over the same period.

**ANSWER:**    Due to the ambiguity of the data, and its source, referenced in Paragraph 186, the

City lacks knowledge or information sufficient to form a belief as to the truth of the allegations

contained in Paragraph 186.


187.    The City has also chosen to activate ShotSpotter in Black and Latinx neighborhoods that have notably low historical rates of shootings.

**ANSWER:**    The City denies the allegations contained in Paragraph 187.


188.    There are 13 police beats within the ShotSpotter area that have experienced fewer than 60 shootings involving a victim over 12 years between January 2010 and March 2022—less than 5 per year. The rate of shootings in those ShotSpotter-covered areas is less than half of the median number of shootings in police beats city-wide, which stands at 121.5 over that same period.

**ANSWER:**    Due to the ambiguity of the data, and its source, referenced in Paragraph 188, the

City lacks knowledge or information sufficient to form a belief as to the truth of the allegations

contained in Paragraph 188.


189.    For example, in police beat 834, which includes much of the Ashburn neighborhood, a middle-class, predominantly Black and Latinx area on the Southwest Side, there were only 31 shootings involving a victim between January 2018 and March 2022, well below the City-wide median. Yet there were 1,016 ShotSpotter alerts in that area over the same period, far above the median number of ShotSpotter alerts in ShotSpotter-covered police beats on the South and West sides.

**ANSWER:** Due to the ambiguity of the data, and its source, referenced in Paragraph 189, the City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 189.

190. By contrast, police beat 1821, which encompasses much of Old Town on the Near North Side, an affluent and predominantly White neighborhood, had 39 shootings over the same period—more than beat 834—yet it had no ShotSpotter alerts because the City has not activated sensors there.

**ANSWER:** The City admits that police beat 1821, located in the near north side, does not have ShotSpotter sensors. The City denies that there were more shootings in police beat 1821 than in police beat 834 for the time period of January 2018 and March 2022. The City denies the remaining allegations in Paragraph 190.

191. The only police district where Defendants have not chosen to deploy ShotSpotter on the South and West sides is the 22nd district—which encompasses significant White-majority neighborhoods. The western part of that district includes the predominantly White neighborhoods of Mount Greenwood and Beverly, traditionally home to many Chicago firefighters and police officers. The City decided not to extend ShotSpotter to cover this district, despite the fact that much of the district has reported gun crime rates as high or higher than many others that are within ShotSpotter's footprint.

**ANSWER:** The City denies the allegations contained in Paragraph 191.

192. The South and West Side neighborhoods where ShotSpotter is deployed also tend to have higher concentrations of loud noises and sources of loud noises, like highways, that can trigger false ShotSpotter alerts.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 192.

193. Civilians and residents on the South and West sides of Chicago are subjected to large numbers of ShotSpotter deployments—with all of the risks and consequences they bring—not because historical gun crime rates somehow explain ShotSpotter's presence, but because the City has chosen to indiscriminately blanket active ShotSpotter sensors over massive swathes of the city where most Black and Latinx residents live.

**ANSWER:**     The City denies the allegations contained in Paragraph 193.

***The City's Deliberate Decision to Target ShotSpotter at Black and Latinx Communities
Harms Those Communities***

194.     CPD's use of ShotSpotter harms the communities under its surveillance in numerous ways.

**ANSWER:**     The City denies the allegations contained in Paragraph 194.

195.     Black and Latinx people are being stopped, arrested, and abused by the CPD during hostile police deployments at much higher rates than White people, solely because of the City's discriminatory ShotSpotter program.

**ANSWER:**     The City denies the allegations contained in Paragraph 195.

196.     These ShotSpotter-prompted stops and arrests also expose Black and Latinx people to increased and discriminatory use of force by law enforcement. The OIG has recently found that "comparing the population of the city to the population that was subject to the use of force after a stop . . . Black people were 11.7 times more likely to face a use of force following an investigatory stop than non-Black people."

**ANSWER:**     The City admits that the OIG published a March 2022 report. The City further states

that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report.

The City denies the remaining allegations contained in Paragraph 209.

197.     Police have frequently used physical force against people of color when responding to ShotSpotter alerts. According to data disclosed by the City of Chicago, over the six-month period between July 1, 2019 and December 31, 2020, there were 82 reports of CPD using physical force against residents that could be linked to ShotSpotter-prompted police deployments by matching case numbers. All 82 of the people that CPD used force against during these ShotSpotter deployments were Black and Latinx, with the exception of 4 whose race CPD lists as "unknown." In 70 of these 82 cases, the person accosted by police was not armed with a gun, according to the City's records.

**ANSWER:**     The City denies the allegations contained in first sentence of Paragraph 197. Due

to the ambiguity of the data, and its source, referenced in Paragraph 197, the City lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 197.

198.    ShotSpotter also generates inflated statistics about gunfire in the areas under its surveillance shadow. ShotSpotter-based statistics are included in Compstat reports and in various analyses by SDSCs that are used to guide CPD's tactics. On information and belief, CPD justifies aggressive and unwarranted police tactics on the basis of these statistics.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence in Paragraph 198. The City admits that the ShotSpotter Flex Program policy, set forth in Special Order S03-19, Section VII.E(2) states that "Districts utilizing the ShotSpotter program will include any crime analysis information and strategic response related to gunfire incidents detected by the ShotSpotter Flex acoustic sensors within their Compstat statistical summary." The City denies the remaining allegations contained in Paragraph 198.

199.    ShotSpotter also diverts City resources away from more useful and equitable municipal services.

**ANSWER:**    The City denies the allegations contained in Paragraph 199.

200.    ShotSpotter contributes to slow response to 9-1-1 calls. More than one in twelve "Priority 1" calls for police service in ShotSpotter districts was an unfounded ShotSpotter deployment. Specifically, between April 15, 2021 and April 13, 2022, there were 31,640 unfounded ShotSpotter alerts out of total of a 365,317 Priority 1 calls for police service in the 12 ShotSpotter districts, according to data from the Office of Emergency Management and Communications that is published by the Office of Inspector General.

**ANSWER:**    The City admits that the OIG published a March 2022 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City denies the remaining allegations contained in Paragraph 200.

54

201.     These unfounded ShotSpotter deployments contribute to the slow or non-existent police response that residents on the South and West sides often experience when they affirmatively call 9-1-1 for assistance because ShotSpotter alerts. Priority 1 calls for service, including ShotSpotter alerts, are given precedence over nearly all other calls for police service.

**ANSWER:**     The City denies the allegations contained in Paragraph 201.

202.     According to a recent Wirepoints report, in 2021, more than 400,000 high-priority (Priority 1 or 2) calls for police service city-wide came in during periods when there were no police available to respond. Unfounded ShotSpotter alerts contribute to that problem.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 202.

203.     There is no evidence that ShotSpotter has reduced gun crime in ShotSpotter districts in Chicago. The City has not published any studies even attempting to quantify ShotSpotter's effect, if it exists, on gun crime in Chicago. Studies in other cities have found no benefit. One study found that ShotSpotter did not reduce rates of violent crime, even as it more than tripled the number of police deployments chasing down supposed gunshots. Another study of 68 counties that use ShotSpotter found that ShotSpotter was associated with no difference in county-level homicides, murder arrests, or weapons arrests.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the third, fourth, and fifth sentences of Paragraph 203. The City admits that it has not published any studies on ShotSpotter, but denies the remaining allegations contained in Paragraph 203.

204.     There is likewise no evidence that ShotSpotter helps to save lives by getting police to shooting victims faster, which has been a frequent claim made by senior City of Chicago officials, including Defendant Superintendent Brown, and ShotSpotter itself. Defendants have not published any studies supporting this claim. Peer-reviewed studies in two other cities—Hartford, Connecticut and Camden, New Jersey—have found no benefit for patient outcomes of shooting victims when comparing situations where ShotSpotter detected the gunshot or did not.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last sentence of Paragraph 204. The City denies the remaining allegations contained in Paragraph 204.

205.    On information and belief, residents are better than ShotSpotter at notifying emergency services about actual shootings that involve a gunshot wound victim. On information and belief, even within ShotSpotter-covered areas, residents in Chicago report a higher proportion of shooting victims to emergency services than ShotSpotter does. ShotSpotter misses (or mislocates) a sizeable number of actual shootings that are within its coverage area. Moreover, ShotSpotter does not even claim to be useful for shootings that occur indoors or with small-caliber or silenced weapons.

**ANSWER:**    The City denies the allegations contained in the first, second, and third sentences of Paragraph 205. The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last sentence in Paragraph 205.

206.    Thus, the City knowingly employs a racialized, discriminatory, and ineffective law enforcement program that results in significant and lasting harm to those it targets.

**ANSWER:**    The City denies the allegations contained in Paragraph 206.

***The City of Chicago's Decision to Deploy ShotSpotter Along Racial Lines is Consistent with the City's History of Racially Discriminatory Policing Targeting the Same Black and Latinx Populations in the City***

207.    CPD's decision to target Black and Latinx communities with ShotSpotter and CPD's deployment pattern for ShotSpotter track CPD's long history of racial discrimination in policing tactics.

**ANSWER:**    The City denies the allegations contained in Paragraph 207.

208.    Most recently, the Chicago Office of Inspector General has documented and quantified CPD's continuing practice of racially disparate and disproportionate stops and use of force.

**ANSWER:**    The City admits that the OIG published a March 2022 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City denies the remaining allegations contained in Paragraph 208.

209.    In a March 2022 report, the OIG found, based on CPD data, that "Black people were overwhelmingly disproportionately stopped by CPD, regardless of demographic composition and crime level in the district of the stop."

**ANSWER:** The City admits that the OIG published a March 2022 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City denies the remaining allegations contained in Paragraph 209.

210. The OIG also found that "[a]mong those whom CPD members stopped, Black people were disproportionately subjected to force," again controlling for demographics and crime level of the area. It also found that "CPD was more likely to use higher-level force options against Black people than non-Black people."

**ANSWER:** The City admits that the OIG published a March 2022 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City denies the remaining allegations contained in Paragraph 210.

211. The OIG reports that Black people were 1.5 times more likely to be searched or frisked during an investigatory stop than other people and that CPD officers searched the cars of Black people 3.3 times more frequently during traffic stops than those of White people.

**ANSWER:** The City admits that the OIG published a March 2022 report. The City further states that the OIG's report speaks for itself and denies any allegations inconsistent with the OIG's report. The City denies the remaining allegations contained in Paragraph 211.

212. Earlier, in 2017, the United States Department of Justice (DOJ) released a report on the CPD, finding evidence of systemic discrimination in policing against Black and Latinx communities in Chicago, including a pattern of unconstitutional use of force, conduct, and supervision by police officers in these minority communities.

**ANSWER:** The City admits that the DOJ published a 2017 report regarding CPD. The City further states that the DOJ's report speaks for itself and denies any allegations inconsistent with the DOJ's report. The City denies the remaining allegations contained in Paragraph 212.

213. As the DOJ found, many Black and Latinx Chicago residents regard CPD as an "occupying force" in their neighborhoods. While the population of Chicago is roughly equal-thirds Black, Latinx, and White, CPD used force against Black people at rates nearly ten times that of White people. With respect to both uses of force and investigatory stops, CPD continued to exhibit

patterns of racial bias. Further, of persons killed by the police from 2007 through 2017, 76 percent were Black, 13 percent were Latinx, and 8 percent were white.

**ANSWER:** The City admits that the DOJ published a 2017 report regarding CPD. The City further states that the DOJ's report speaks for itself and denies any allegations inconsistent with the DOJ's report. The City denies that the DOJ's 2017 report includes the information contained in the last sentence of Paragraph 213 and further denies the remaining allegations contained in Paragraph 213.

214. The DOJ's findings built on an analysis of the Chicago Police Accountability Task Force ("Task Force"), which released a report describing the history of CPD's abusive relationship with Black and Latinx communities; the policies, practices, and behaviors that contributed to such strained relations; and the training, accountability and oversight reforms necessary to protect civilians' rights. Following the DOJ's findings, the City of Chicago entered into a federal consent decree, which governs CPD use of force and police accountability, among other things, and which is being overseen by a federal judge.

**ANSWER:** The City admits that the Chicago Police Accountability Task Force ("Task Force") published a report. The City further states that the Task Force's report speaks for itself and denies any allegations inconsistent with the Task Force's report. The City lacks knowledge or information sufficient to form a belief as to the truth of the allegation that the DOJ's "findings built on an analysis of" the Task Force. The City admits that it entered into a federal consent decree in *State of Illinois v. City of Chicago*, No. 1:17-cv-6260, and that there are provisions of the consent decree governing CPD use of force and police accountability. The City also admits that the consent decree is being overseen by a federal judge. The City denies the remaining allegations contained in Paragraph 214.

215. The CPD's history of engaging in racially discriminatory stops goes back many decades and has had many incarnations.

**ANSWER:** The City denies the allegations contained in Paragraph 215.

216.     A 2015 report by the ACLU of Illinois found that Black Chicagoans were subjected to 72% of all stops yet constituted only 32% of the population. It also found extremely high rates of stop and frisk: more than 250,000 stops that did not lead to an arrest over a period of 4 months.

**ANSWER:**     The City admits that the ACLU published a 2015 report. The City further states that

the ACLU's report speaks for itself and denies any allegations inconsistent with the ACLU's

report. The City denies the remaining allegations contained in Paragraph 216.

217.     Following that report in 2015, the ACLU of Illinois entered into a settlement agreement with the City of Chicago requiring CPD to document all stops, to properly train and supervise its officers, and to regularly disclose certain data. The agreement appointed a retired magistrate judge to serve as a consultant to review and oversee CPD's policies, practices, and orders regarding stop-and-frisk, and to issue periodic compliance reports.

**ANSWER:**     The City admits that on or about August 6, 2015, the City of Chicago and the ACLU

of Illinois entered into the Investigatory Stop and Protective Pat Down Settlement Agreement, and

that pursuant to the terms of that settlement agreement, the City agreed to document all

investigatory stops and all protective pat downs, to provide training for officers and supervisors,

and to regularly disclose certain data. The City also admits that the terms of the settlement

agreement appointed retired Magistrate Judge Arlander Keys to serve as the consultant of the

agreement, whose duties included reviewing CPD's policies, practices, and orders regarding

investigatory stops and protective pat downs, and to issue periodic compliance reports. The City

denies the remaining allegations contained in Paragraph 217.

218.     Further back, between 1992 and 1995, CPD arrested over 42,000 persons—primarily persons of color—in connection to a "gang loitering ordinance" that prohibited "loitering" in a public place after receiving dispersal orders. The U.S. Supreme Court held that the ordinance was unconstitutionally vague and violated Fourth Amendment due process rights. The ordinance "fail[ed] to distinguish between innocent conduct and conduct threatening harm" and left a "potential for arbitrary enforcement" by giving police "too much discretion" that touched a "substantial amount of innocent conduct."

**ANSWER:**     The City admits that the United States Supreme Court in *City of Chicago v. Morales*, 527 U.S. 41 (1999) affirmed the Illinois appellate and supreme court's holding that the City's Gang Congregation Ordinance violated due process. The City further admits that the Supreme Court stated in *Morales* that "during the three years of its enforcement, the police . . . arrested over 42,000 people for violating the ordinance." The City also admits that the Supreme Court stated in *Morales* that "[t]he Illinois Supreme Court emphasized the law's failure to distinguish between innocent conduct and conduct threatening harm." The City also admits that the Supreme Court "discuss[ed] [the ordinance's] potential for arbitrary enforcement" and stated that the ordinance "afford[ed] too much discretion to the police" and "reach[ed] a substantial amount of innocent conduct." The City denies the remaining allegations contained in Paragraph 218.

219.     Despite amendment of the gang loitering ordinance, in 2014, CPD officers issued 4,842 orders to disperse, including 4,100 against Black persons, 673 against Latinx persons, and just 66 against white persons.

**ANSWER:**     Due to the ambiguity of the data, and its source, referenced in Paragraph 219, the City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 219.

220.     Still earlier, in the 1980s, the CPD made approximately 150,000 arrests annually, mostly in minority neighborhoods, for so-called "disorderly conduct." This amounted to nearly half of CPD's annual arrests. Such arrests were one of the primary methods for CPD interactions with minority neighborhoods. Officers often failed to appear in court following such arrests.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 220.

221.     In 1983, the ACLU of Illinois sued the City alleging that CPD officers primarily carried out these arrests against Black and Latinx people observed "congregat[ing]" in minority

neighborhoods. When the City failed to participate in the resulting ACLU suit in the Northern District of Illinois challenging the constitutionality of such stops, District Judge Prentice Marshall declared CPD's conduct unconstitutional, directed the city to expunge over 800,000 disorderly conduct arrests from the previous five years, and ordered that CPD notify all those whose records would be expunged that they could sue the City for damages.

**ANSWER:** The City admits that the lawsuit of *Michael Nelson v. City of Chicago*, 83 C 1186

(N.D. Ill.) was filed against the City of Chicago. The City further states that the public record for

the matter of *Nelson v. City of Chicago* speaks for itself and denies any allegations inconsistent

with the public record. The City denies the remaining allegations contained in Paragraph 221.

222. CPD's discriminatory deployment of ShotSpotter reinforces and fuels CPD's longstanding discriminatory policing practices. As the Task Force wrote, CPD's history of "enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct." ShotSpotter exacerbates these problems because it generates tens of thousands of high-intensity—but ultimately fruitless—police deployments and thousands of hostile encounters between police and residents, and it does so only in predominantly Black and Latinx parts of the city.

**ANSWER:** The City admits that the Chicago Police Accountability Task Force ("Task Force")

published a report. The City further states that the Task Force's report speaks for itself and denies

any allegations inconsistent with the Task Force's report. The City denies the remaining

allegations contained in Paragraph 222.

## IV.  DEFENDANT OFFICERS ILLEGALLY STOPPED PLAINTIFF DANIEL ORTIZ BECAUSE OF A BOGUS SHOTSPOTTER ALERT

223. On the afternoon of April 19, 2021, Mr. Ortiz was doing his family's laundry at a coin wash on the 6700 block of W. Belmont Ave, next door to a Family Dollar store in the Schorsch Village neighborhood of Northwest Chicago.

**ANSWER:** The City admits that CPD Officers Powar and Matias first encountered Plaintiff

Ortiz outside of a laundromat in the vicinity of the 6700 block of W. Belmont Ave., Chicago on

April 19, 2021. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 223.

224.     Mr. Ortiz is a Hispanic man of Puerto Rican descent. He has two young children with his girlfriend and is also raising her two other children whose father has passed away. He is a primary breadwinner and caregiver in his family.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 224.

225.     On April 19th, he was doing laundry for the four kids and his girlfriend.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 225.

226.     Mr. Ortiz was accompanied by his close childhood friend, Mario Serrano. Mr. Ortiz and Mr. Serrano were not armed and did not have access to any firearms.

**ANSWER:**     The City admits that Plaintiff Ortiz was with Mario Serrano. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 226.

227.     As they waited for the final load of laundry, Mr. Ortiz was sitting in his car with Mr. Serrano outside the laundromat.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 227.

228.     The car was legally parked in the parking lot immediately outside the entrance to the laundromat.

**ANSWER:** The City admits that the vehicle was parked outside the entrance to a laundromat. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 228.

229. Unbeknownst to them, ShotSpotter sent an alert of supposed gunfire to the immediate area where they were parked, sitting and chatting.

**ANSWER:** The City admits there was a ShotSpotter alert for gunfire in the vicinity of the parking lot in the 6700 block of W. Belmont Ave. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 229.

### Defendant Officers Illegally Stopped Mr. Ortiz as a Result of False ShotSpotter Evidence

230. Around 4:10 p.m., ShotSpotter sent an alert to CPD about a supposed gunshot near the 6700 block of W. Belmont Avenue, in the Schorsch Village neighborhood on Northwest Side of Chicago. The ShotSpotter alert reported a "single gunshot." On information and belief, the alert was transmitted to numerous CPD officers in the area.

**ANSWER:** The City admits that at around 4:10 p.m., there was a ShotSpotter alert sent to CPD regarding a single gunshot in the vicinity of 6725 W. Belmont Ave. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 230.

231. ShotSpotter's computer system had originally classified the noise that triggered this alert as a "probable gunfire" with 4.2644% confidence. A ShotSpotter employee reclassified the noise from "probable gunfire" to "single gunshot." The alert was subsequently published to CPD as a "single gunshot."

**ANSWER:** The City admits that at around 4:10 p.m., there was a ShotSpotter alert sent to CPD regarding a single gunshot in the vicinity of 6725 W. Belmont Ave. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 231.

232.     Defendant Officers Harsimran Powar (#17135) and Michael Matias (#18985) responded to the alert first, arriving at the 6700 block of W. Belmont Avenue soon after the alert was sent out to police officers.

**ANSWER:**     The City admits the allegations contained in Paragraph 232.

233.     The officers were dressed in black and were driving in an unmarked vehicle.

**ANSWER:**     The City admits that Officers Powar and Matias were driving in an unmarked vehicle. The City denies the remaining allegations contained in Paragraph 233.

234.     Mr. Ortiz noticed Defendant Officer Powar walking quickly and aggressively down the street. His behavior struck Mr. Ortiz as threatening.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 234.

235.     Mr. Ortiz saw Defendant Officer Powar approach cars in the parking area, look inside, and pull on door handles, attempting to open the car doors without the owners' permission.

**ANSWER:**     The City denies the allegations contained in Paragraph 235.

236.     Defendant Officer Powar advanced to a van parked adjacent to Mr. Ortiz's car. Mr. Ortiz stood at the hood of his car while Mr. Serrano began to walk into the laundromat.

**ANSWER:**     The City denies the allegations contained in Paragraph 236.

237.     Defendant Officer Powar yelled at Mr. Ortiz that a shooting occurred on the block. He began shouting questions at Mr. Ortiz, asking him about the supposed shooting. Powar approached Mr. Ortiz aggressively and ordered Mr. Ortiz to "stop," to "come here," and to respond to questions as his partner, Defendant Officer Matias, parked and got out of his vehicle.

**ANSWER:**     The City denies the allegations contained in Paragraph 237.

238.     Mr. Ortiz turned away from Defendant Officer Powar and began to walk into the laundromat.

**ANSWER:**     The City admits the allegations in this Paragraph 238, but deny they fully reflect the

interactions between Mr. Ortiz and Defendant Officer Powar at this time.

239.     Defendant Officer Powar pursued Mr. Ortiz, continuing to order him to answer questions and attempting to detain him, without a reasonable basis. Powar sought to prevent Mr. Ortiz from going back inside the laundromat and grabbed his arm to restrain him, as did Defendant Officer Matias.

**ANSWER:**     The City admits that Officer Powar stopped Plaintiff Ortiz from fleeing into the

laundromat, and that Officer Matias assisted. The City deny the remaining allegations contained

in Paragraph 239.

240.     Defendant Officer Powar subsequently handcuffed Mr. Ortiz, took him back to his car and held him there together.

**ANSWER:**     The City admits that Plaintiff Ortiz was handcuffed by Officer Powar and was taken

near Plaintiff Ortiz's car. The City denies the remaining allegations contained in Paragraph 240.

241.     Defendant Officers Matias and Powar patted down Mr. Ortiz without his consent.

**ANSWER:**     The City admits that Defendant Officers Matias and Powar performed protective

pat downs of Plaintiff Ortiz. The City denies the remaining allegations contained in Paragraph 241.

242.     Defendant Officer Matias also handcuffed and searched Mr. Serrano and then ordered him out of the laundromat.

**ANSWER:**     The City admits the allegations contained in Paragraph 242.

243.     Mr. Ortiz and Mr. Serrano were both restrained and ordered to remain next to the car. Defendant Officer Matias then returned to the laundromat and thoroughly searched cabinets and trash cans inside the facility but did not find a gun.

**ANSWER:**     The City admits the allegations contained in the first sentence of Paragraph 243.

The City admits that Defendant Officer Matias looked inside a trash can inside the laundromat and

ultimately did not find a gun in the laundromat. The City denies the remaining allegations in Paragraph 243.

244.    The only reason the Defendant Officers targeted and detained Mr. Ortiz was the false and unreliable ShotSpotter alert.

**ANSWER:**    The City denies the allegations contained in Paragraph 244.

245.    The Defendant Officers lacked reasonable suspicion to detain him for questioning or to conduct a pat down.

**ANSWER:**    The City denies the allegations contained in Paragraph 245.

246.    Over the course of the encounter Mr. Ortiz told officers at the scene that he had not heard any gunshots, that he had no involvement in any supposed shooting and that they were harassing him for no reason. He did tell officers that he had heard a loud noise that he did not believe was a gunshot.

**ANSWER:**    The City admits the allegations in Paragraph 246 as a summary of some of Mr.

Ortiz's statements, without admitting the veracity of those statements. The City lacks knowledge

or information sufficient to form a belief as to the truth of the allegations contained in Paragraph

246.

247.    The Defendant Officers talked with several individuals who work at the laundromat and the Family Dollar and, like Mr. Ortiz, none of them had heard any gunshots.

**ANSWER:**    The City admits that the individuals, who worked at the laundromat and the Family

Dollar, that the Ortiz Defendant Officers spoke to had not heard gunshots. The City denies the

remaining allegations contained in Paragraph 247.

248.    While inside the Family Dollar, Defendant Officer Powar reviewed footage from a Family Dollar security camera. The footage did not show any shooting or firearms. While reviewing the video, Powar commented aloud that no one on camera was acting like there had been a gunshot.

**ANSWER:** The City admits that the allegations in Paragraph 248 are a summary of Officer Powar's review of footage from a Family Dollar security camera.

249. Three additional police cars arrived at the scene over a span of approximately 25 minutes after Defendant Officers Powar and Matias handcuffed and patted down Mr. Ortiz.

**ANSWER:** The City admits that three additional squad cars arrived, and that Defendant Officers Powar and Matias patted down Plaintiff Ortiz. The City further admits that Officer Powar placed Mr. Ortiz in handcuffs. The City denies the remaining allegations contained in Paragraph 249.

250. The new officers on the scene—Officers Soly E. Roman (#10493), Mychael Ramos (#12622), Jorge Ulloa (#13936), Ilir Llika (#17061), Matthew Deneen (#2899), Miguel Nieves (#4931), and Kevin O'Brien (#8884)—continued to detain Mr. Ortiz and his friend. They continued questioning them about supposed gunshots. All of the officers at the scene acted in concert to detain and arrest Mr. Ortiz.

**ANSWER:** The City denies the remaining allegations contained in Paragraph 250.

251. At some point, some of the officers showed Mr. Ortiz a screen with the ShotSpotter alert that had directed them to the location. They explained that the ShotSpotter alert showed the address of the Family Dollar as the location of supposed gunfire. The officers explained that they were there to investigate the supposed gunshots.

**ANSWER:** The City admits that Officer Nieves and Officer Roman stated to Mr. Ortiz that a ShotSpotter alert brought CPD officers to the Family Dollar parking lot. The City denies the remaining allegations contained in Paragraph 251.

252. The false ShotSpotter alert was the only reason that Defendant Officers Powar and Matias had arrived in the parking lot and targeted Mr. Ortiz to stop, question, and frisk him. Their words and actions demonstrated that they had conducted the stop because of the ShotSpotter alert and believed that a gunshot must have been fired because ShotSpotter issued an alert.

**ANSWER:** The City denies the allegations contained in Paragraph 252.

253.    For example, Defendant Officers told Mr. Ortiz and Mr. Serrano multiple times that they were there to investigate a call of "shots fired" and that is why they had approached Mr. Ortiz.

**ANSWER:**    The City admits that the Ortiz Defendant Officers told Plaintiff Ortiz and Mr. Serrano that they were there to investigate a call of "shots fired." The City denies the remaining allegations contained in Paragraph 253.

254.    Similarly, even after having completed their investigation at the location of the ShotSpotter alert—including searching Mr. Ortiz, Mr. Serrano, the car, and the laundromat, reviewing the Family Dollar video footage, and speaking with employees at both the Family Dollar and the laundromat—Defendant Officers persisted in their belief that a shot must have been fired based on nothing more than the ShotSpotter alert. After impounding Mr. Ortiz's vehicle in connection with pretextual drug charges (described below), Defendant Officer Powar decided to search the car yet again to look for a gun, explaining "I don't trust . . . this guy. It [i.e. a gun] definitely has to be in here."

**ANSWER:**    The City admits that the quoted language contained in the last sentence of Paragraph 254 is an excerpt from Defendant Officer Powar's body-worn camera footage. The City denies the remaining allegations contained in Paragraph 254.

255.    Similarly, Defendant Officer Matias told Powar that the ShotSpotter alert "had to be" Mr. Ortiz and Mr. Serrano. When Defendant Officer Powar told another officer that they "unfortunately" had not found a gun, the other officer described it as "crazy" and "ironic" that the search had not turned up anything.

**ANSWER:**    The City admits that the allegations contained in Paragraph 255 include excerpts from statements made by officers on the scene, but the City denies the meaning attributed to the excerpts by Plaintiffs and therefore deny the remaining allegations contained in Paragraph 255.

256.    The Ortiz Defendant Officers did not consider or investigate the possibility that the ShotSpotter alert had been triggered by a loud noise that was not gunfire. For example, on information and belief, Defendant Officers did not speak with a man who had been working at a food stand on the sidewalk next to the parking lot all day and who would have been in a position to hear any loud noise, even though Mr. Ortiz told officers at the scene that they should consider talking to the man.

**ANSWER:** The City admits that the Ortiz Defendant Officers did not speak to a person across the parking lot. The City denies the remaining allegations contained in Paragraph 256.

257. Police officers never found any evidence to corroborate gunfire. On information and belief, there was no gunshot.

**ANSWER:** The City admits that the Ortiz Defendant Officers did not find physical evidence of a gunshot. The City denies the remaining allegations contained in Paragraph 257.

*Defendant Officers Searched Mr. Ortiz's Vehicle and Arrested Him on Pretextual Drug Charges*

258. After handcuffing him, Defendant Officer Powar took the car keys out of Mr. Ortiz's pocket to open the vehicle. Defendant Officers Powar and Matias searched Mr. Ortiz's car.

**ANSWER:** The City admits that Defendant Officer Powar took the keys and searched the car Plaintiff Ortiz was driving. The City admits that Defendant Officer Matias searched the car Plaintiff Ortiz was driving. The City denies the remaining allegations contained in Paragraph 258.

259. In response to Defendant Officers' questions while he was handcuffed, Mr. Ortiz told them, truthfully, that he had legally smoked marijuana and that he had it with him. He had recently purchased it at a nearby legal marijuana dispensary.

**ANSWER:** The City admits that Plaintiff Ortiz stated he had smoked marijuana and had it with him. The City denies that Plaintiff Ortiz legally smoked the marijuana. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 259.

260. Defendant Officers Powar and Matias searched Mr. Ortiz's car.

**ANSWER:** The City denies that Mr. Ortiz owned the car, but admits the remaining allegations contained in Paragraph 260.

261.     Defendant Officers Powar and Matias recovered the marijuana that Mr. Ortiz had told them he had purchased from a legal dispensary.

**ANSWER:**     The City admits that the Ortiz Defendant Officers recovered marijuana. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 261.

262.     Defendant Officers Powar and Matias also recovered a prescription drug bottle containing approximately 20 pills of hydrocodone/acetaminophen, a commonly-prescribed pain medication.

**ANSWER:**     The City admits that the Ortiz Defendant Officers recovered an unmarked bottle containing approximately 20 pills of hydrocodone/acetaminophen. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 262.

263.     Defendant Officers Powar and Matias arrested Mr. Ortiz on pretextual drug charges, accusing him of misdemeanor possession of 36 grams of marijuana, just above the legal limit of 30 grams, in violation of 720 ILCS 550.0/4(c), and felony possession of a controlled substance, the hydrocodone/acetaminophen pills, in violation of 720 ILCS 570.0/402(c).

**ANSWER:**     The City admits that Plaintiff Ortiz was arrested on drug charges, including misdemeanor possession of marijuana, in violation of 720 ILCS 550.0/4(c), and felony possession of a controlled substance, the hydrocodone/acetaminophen pills, in violation of 720 ILCS 570.0/402(c). The City denies the remaining allegations contained in Paragraph 263.

264.     The Ortiz Defendant Officers also impounded Mr. Ortiz's vehicle, a 2017 Ford Edge SUV, under Municipal Code of Chicago 7-24-225(a), which provides for impoundment of a vehicle used in connection with the sale or purchase of a controlled substance.

**ANSWER:**     The City admits that the vehicle Plaintiff Ortiz was driving was impounded. The City further states that Municipal Code of Chicago 7-24-225(a) speaks for itself. The City denies the remaining allegations contained in Paragraph 264.

*Mr. Ortiz's Detention and Subsequent Release*

265.    Mr. Ortiz was taken by the Ortiz Defendant Officers to lockup at the 25th Precinct station at 5555 W. Grand Avenue.

**ANSWER:**    The City admits that Plaintiff Ortiz was taken to lockup at the 25th District station at 5555 W. Grand Ave. The City denies the remaining allegations contained in Paragraph 265.

266.    Mr. Ortiz was held at the station overnight. While he was there, Defendant Officer Powar verbally harassed him.

**ANSWER:**    The City admits that Plaintiff Ortiz was held at the station overnight. The City denies the remaining allegations contained in Paragraph 266.

267.    Mr. Ortiz was charged with one felony count of possession of controlled substances and one misdemeanor count of possession of more than 30 grams of cannabis.

**ANSWER:**    The City admits the allegations contained in Paragraph 267.

268.    On the same day, April 19, 2021, Defendant Officers Powar and Matias prepared a misdemeanor complaint against Mr. Ortiz for the marijuana possession charge and a felony complaint for the hydrocodone possession charge. Powar signed as the complainant on both charges; Matias signed as notary on both the felony and misdemeanor complaints. The complaints were filed in the Cook County Circuit Court. The court clerk's office file-stamped the complaints on April 20, 2021.

**ANSWER:**    The City admits that the Ortiz Defendant Officers prepared a misdemeanor complaint against Plaintiff Ortiz for unlawful possession of marijuana and a felony complaint against Plaintiff Ortiz for unlawful possession of hydrocodone. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 268.

269.    Mr. Ortiz was transferred to Cook County Jail at 4 a.m. on April 20, 2021.

**ANSWER:**     The City admits that Plaintiff Ortiz was transferred to Cook County Jail on April

20, 2021. The City denies the remaining allegations contained in Paragraph 269.

270.    That day, Mr. Ortiz was set to make his initial appearance in bond court before Judge Mary Marubio.

**ANSWER:**     Upon information and belief, the City admits the allegations contained in Paragraph

270.

271.    The Assistant State's Attorney dropped all charges against Mr. Ortiz, moving to dismiss the charges *nolle prosequi*. Mr. Ortiz was not even called individually to appear before the judge. He was informed summarily that the charges were dismissed.

**ANSWER:**     Upon information and belief, the City admits that the Assistant State's Attorney

moved to dismiss the charges *nolle prosequi*. The City lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations contained in Paragraph 271.

272.    Mr. Ortiz was then released from custody.

**ANSWER:**     Upon information and belief, the City admits the allegations contained in Paragraph

272.

273.    After being released, Mr. Ortiz sought to recover his impounded car. He was initially told that he would have to pay a $3,000 fine to recover the vehicle. He refused and insisted on a hearing.

**ANSWER:**     The City denies that Plaintiff Ortiz owned the car. The City lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

Paragraph 273.

274.    On April 21, 2021, Mr. Ortiz attended a hearing at 400 W. Superior Street to challenge the seizure of his car. No police officers appeared as witnesses. The Administrative Law Judge ordered the vehicle's immediate release to Mr. Ortiz after determining that there was no

probable cause to support the allegation that the vehicle was used for the purchase or sale of a controlled substance, as required to impound a vehicle under MCC 7-24-225(a).

**ANSWER:** Upon information and belief, the City admits that there was an administrative hearing and an entry of no probable cause entered regarding the impoundment of the vehicle. The City states that Municipal Code of Chicago 7-24-225(a) speaks for itself. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 274.

275. Mr. Ortiz searched for the vehicle and ultimately found it at a police impound lot at 2255 E. 103rd Street. When the car was returned to him, he found that there was approximately $1,200 in new damage to the car door and body. This damage was not present when he was arrested and the car was impounded.

**ANSWER:** The City denies the allegations contained in Paragraph 275 to the extent they allege the City damaged the vehicle. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 275.

276. CPD denied Mr. Ortiz's claims for recovery for the damage to his vehicle. The vehicle repairs remain outstanding.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 276. The City denies the remaining allegations contained in Paragraph 276.

277. The erroneous ShotSpotter alert prompted the Defendant Officers to falsely suspect and target him, detain him, search his person and vehicle, and ultimately arrest and jail him on pretextual drug charges. Upon information and belief, Defendant Officers Powar and Matias arrested Mr. Ortiz and filed the drug charges to retaliate against Mr. Ortiz and to attempt to justify retroactively their unlawful conduct in stopping without proper cause.

**ANSWER:** The City denies the allegations contained in Paragraph 277.

278.     The charges brought against Mr. Ortiz were so petty that the State's Attorney's Office did not bother to prosecute them and no officer bothered to appear at the impoundment hearing. The detention, arrest, and subsequent proceedings stemming from the false ShotSpotter alert caused an enormous hardship for Mr. Ortiz and did nothing to make the community safe.

**ANSWER:**     The City denies the allegations contained in Paragraph 278.

279.     Mr. Ortiz cares for four children in his home. He suffered from the stigma of false arrest around his family and friends.

**ANSWER:**     The City denies that Plaintiff Ortiz suffered, or suffers, from the stigma of false arrest. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 279.

280.     Mr. Ortiz continues to feel unsafe around CPD officers after Defendant Officers violently accosted him during a routine chore he undertook to serve his family. He has seen at least one of the same officers around the neighborhood and is disturbed by their unwarranted actions.

**ANSWER:**     The City denies that the Ortiz Defendant Officers "violently accosted" Plaintiff Ortiz. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 280.

281.     Mr. Ortiz regularly travels and goes about daily business within parts of the City of Chicago that are within ShotSpotter's footprint. He is thus likely to be falsely targeted again by CPD officers, solely based on the fact that he is in a high-alert ShotSpotter area of the City.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 281 regarding the allegations that Plaintiff Ortiz "regularly travels" and about Plaintiff Ortiz's "daily business." The City denies the remaining allegations contained in Paragraph 281.

## V.    DEFENDANT OFFICERS ILLEGALLY STOPPED, SEARCHED, AND SEIZED PLAINTIFF DERICK SCRUGGS BECAUSE OF A BOGUS SHOTSPOTTER ALERT

282.    Derick Scruggs is a Black man who lives in the South Shore neighborhood in Chicago. He has two young children. He is a breadwinner for his family. Mr. Scruggs' profession is as an armed security guard working for a private security company.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 282.

283.    On the evening of July 18, 2022, Mr. Scruggs was working as an armed security guard at the AutoZone at 7347 S. Ashland Avenue, across from a Family Dollar in the Englewood neighborhood on the South Side of Chicago.

**ANSWER:**    The City admits that Mr. Scruggs was at the AutoZone at 7347 S. Ashland Avenue on July 18, 2022, where, upon information and belief, he worked as a security guard. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 283.

284.    Unbeknownst to Mr. Scruggs or others at the AutoZone that evening, ShotSpotter sent an alert to police of supposed gunfire near the AutoZone.

**ANSWER:**    The City admits there was a ShotSpotter alert of gunfire in the vicinity of the parking lot of the AutoZone at 7347 S. Ashland Avenue. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 284.

***Defendant Officers Illegally Stopped, Detained, and Searched Mr. Scruggs as a Result of False ShotSpotter Evidence***

285.    Around 8:18 p.m. on July 18, 2022, ShotSpotter sent an alert to CPD about a supposed gunshot at 7347 S. Ashland Avenue. The ShotSpotter alert reported a "single gunshot." The alert was transmitted to CPD officers in the area.

**ANSWER:**    The City admits that on July 18, 2022, at around 8:18 p.m., CPD received a ShotSpotter alert to CPD for a single gunshot in the vicinity of the AutoZone at 7347 S. Ashland

Avenue, and that the information was transmitted to CPD officers in the area. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 285.

286.    ShotSpotter's computer system had originally classified the noise that triggered this alert as a "firecracker" with 99.79620% confidence. A ShotSpotter employee reclassified the noise from "firecracker" to "single gunshot." The alert was subsequently published to CPD as a "single gunshot."

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 286.

287.    Acting in response to the alert, Defendant Officers Fidel Legorreta (#5902) and Theodore Andrews (#7099) drove to the 7300 block of S. Ashland Ave. at 8:20 p.m. and pulled into the parking lot outside the entrance of the AutoZone.

**ANSWER:**    The City admits the allegations contained in Paragraph 287.

288.    Mr. Scruggs was standing outside the AutoZone together with two AutoZone employees who were sharing a cigarette.

**ANSWER:**    The City admits that Plaintiff Scruggs was standing outside the AutoZone with two AutoZone employees. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 288.

289.    The officers stopped their car directly in front of Mr. Scruggs, exited the car, and approached Mr. Scruggs.

**ANSWER:**    The City denies the allegations contained in Paragraph 289.

290.    While approaching Mr. Scruggs, Defendant Officer Andrews immediately asked Mr. Scruggs, "where did those shots come from?" Mr. Scruggs replied that he hadn't seen or heard anything. Defendant Officer Andrews asked if Mr. Scruggs had "seen a car pulling off or something." Mr. Scruggs replied that he had not.

**ANSWER:**     The City admits that statements made by Officer Andrews and plaintiff Scruggs were captured on Body Worn Camera footage. The City states that the Body Worn Camera footage speaks for itself and denies any allegations inconsistent with the footage. The City denies the remaining allegations contained in Paragraph 290.

291.     The Defendant Officers did not ask a single question of the two other men standing immediately next to Mr. Scruggs. Defendant Officers did not inquire whether either of them had heard or seen gunshots or some other loud noise. Defendant Officers did not ask whether either of them had a firearm. Defendant Officers never even asked for their names. Defendant Officers trained their attention solely on Mr. Scruggs.

**ANSWER:**     The City denies the allegations contained in Paragraph 291.

292.     Without any further questioning about what happened, Defendant Officer Legorreta asked to "check" Mr. Scruggs's firearm to "make sure there is no rounds missing."

**ANSWER:**     The City admits that Defendant Officer Legorreta asked to inspect Plaintiff Scruggs's firearm. The City denies the remaining allegations contained in Paragraph 292.

293.     Mr. Scruggs denied the request to hand over his firearm, but Defendant Officer Legorreta persisted. Defendant Officer Legorreta told Mr. Scruggs, falsely, "If I'm a police officer you are supposed to comply," and then added, falsely, "We have the right to check."

**ANSWER:**     The City admits that statements made by Officer Legorreta and plaintiff Scruggs were captured on Body Worn Camera footage. The City states that the Body Worn Camera footage speaks for itself and denies any allegations inconsistent with the footage. The City denies the remaining allegations contained in Paragraph 293.

294.     Defendant Officer Legorreta emphasized to Mr. Scruggs that the ShotSpotter alert had supposedly come from "right" where they were. Defendant Officer Legorreta then asserted, without any basis, that "you are the only one with a firearm here."

**ANSWER:**     The City denies the allegations contained in Paragraph 294.

295. In fact, Defendant Officers had not asked or checked whether anyone else present had a firearm. Defendant Officers had no confirmation that the ShotSpotter alert corresponded to a noise in the parking lot, as opposed to other areas adjacent to the AutoZone. Nor did Defendant Officers have any reason to believe that Mr. Scruggs had been in the parking lot several minutes earlier when the ShotSpotter alert had been triggered. Defendant Officers had not asked Mr. Scruggs where he had been before police arrived, how long he had been outside, or even why he was outside.

**ANSWER:**    The City denies the allegations contained in Paragraph 295.


296. Mr. Scruggs continued to decline the officers' requests to search him. Because Defendant Officer Legorreta persisted in demanding the weapon, Mr. Scruggs eventually lifted his arms to allow the officer access to the gun. Defendant Officer Legorreta then physically removed Mr. Scruggs's firearm and holster from inside his waistband.

**ANSWER:**    The City admits that Defendant Officer Legorreta removed Plaintiff Scruggs's firearm. The City denies that there was a request to search Plaintiff Scruggs at this point in time. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 296.


297. Defendant Andrews and Defendant Legorreta had assumed and maintained positions standing on either side of Mr. Scruggs, making it clear to Mr. Scruggs that he was not free to leave.

**ANSWER:**    The City denies the allegations contained in Paragraph 297.


298. Defendant Officer Legorreta removed the magazine of the firearm and inspected it. He claimed that the magazine was "missing a round" from its magazine, which had an 18-round capacity. This statement and the observation were false.

**ANSWER:**    The City admits that Defendant Officer Legorreta removed the magazine of the firearm, inspected it, and that Defendant Officer Legorreta stated it was missing a round. The City denies the remaining allegations contained in Paragraph 298.


299. The firearm in fact had a full complement of 18 rounds, including 17 rounds in the magazine and one live round in the chamber.

**ANSWER:**    The City denies the allegations contained in Paragraph 299.


300.    Mr. Scruggs' standard practice, consistent with his duties as an armed security guard, was to carry the gun loaded while on duty, with a live round in chamber ready to be used. At the beginning of his shift, he would typically chamber one round from the 18-round magazine, leaving 17 rounds remaining in the magazine. This was the configuration of the gun when Defendant Officer Legorreta seized it. After his shift, Mr. Scruggs would unload the chamber and return the 18th round back into the magazine.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 300.


301.    The presence of 18 rounds was clearly visible to Defendant Officer Legorreta. The magazine of Mr. Scruggs' gun had witness holes through which Defendant Officer Legorreta could observe how many rounds were in the magazine. When he removed the magazine from the gun, Defendant Legorreta could plainly see that 17 of the 18 witness holes were filled with a round. Moreover, the presence of the 18th round loaded in the chamber would have been equally apparent to Defendant Officer Legorreta because of an indicator on the outside of the firearm meant to warn the user that the chamber is loaded. The 18th round would also have been apparent to Defendant Officer Legorreta as he unloaded and checked the weapon when handling it.

**ANSWER:**    The City denies the allegations contained in Paragraph 301.


302.    After examining the gun, Defendant Legorreta knowingly made the false allegation that the magazine only contained 16 rounds and, thus, that a round was "missing." He made this false allegation in order to create a false justification to detain or arrest Mr. Scruggs and to provide false corroboration of his unfounded suspicion, based solely on the ShotSpotter alert, that Mr. Scruggs had discharged his weapon.

**ANSWER:**    The City denies the allegations contained in Paragraph 302.


303.    After falsely asserting that the gun was "missing" a round, Defendant Officer Legorreta next asked Defendant Officer Andrews to touch the firearm to see if it was hot. This was a further attempt to manufacture a false justification to detain or arrest Mr. Scruggs. Defendant Officer Andrews touched the firearm with the back of his bare hand. He did not respond when Defendant Officer Legorreta asked if it felt hot. Eventually, Defendant Officer Andrews told Officer Legorreta that he should touch the gun himself.

**ANSWER:**    The City admits that Defendant Officers Legorreta and Andrews touched the

firearm to see if it was hot. The City denies the remaining allegations contained in Paragraph 303.

304.     Defendant Officer Legorreta then removed his glove, placed the back of his own hand on the firearm, and claimed, falsely, that "it's hot here a little bit."

**ANSWER:**     The City admits that Defendant Officer Legorreta touched the firearm, and that he made the quoted statement contained in Paragraph 304. The City denies the remaining allegations contained in Paragraph 304.

305.     The outdoor temperature that day was around 90 degrees Fahrenheit. Mr. Scruggs had kept his firearm tucked inside his waistband all day pressed against his body. When Defendant Officer Legorreta placed his hand on Mr. Scruggs' firearm, it had been several minutes since the ShotSpotter alert had been triggered by a supposed gunshot.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences of Paragraph 305. The City denies the remaining allegations contained in Paragraph 305.

306.     In general, a single gunshot fired from a 9mm handgun does not make the outside of the firearm appreciably hot after discharge. Under no circumstances would a single gunshot from a 9mm handgun heat the firearm to such an extent that the weapon would remain appreciably hot to the touch several minutes after a discharge. Based on their training and experience, the Scruggs Defendant Officers would have known these facts.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 306.

307.     Defendant Officer Legorreta's false implication that the gun was "hot here a little bit" because it had been fired recently was manufactured to provide false corroboration of his unfounded suspicion, based solely on the ShotSpotter alert, that Mr. Scruggs had discharged his weapon.

**ANSWER:**     The City denies the allegations contained in Paragraph 307.

308.     While examining the firearm, which had a live round in the chamber, Defendant Officer Legorreta handled the gun carelessly, holding it such that the muzzle was frequently pointing horizontally toward Mr. Scruggs, rather than safely toward the ground. Defendant Officer Legorreta handled the gun in this manner while it was loaded, even before attempting to clear the chamber of the live round.

**ANSWER:**     The City denies the allegations contained in Paragraph 308.


309.     Mr. Scruggs was terrified that Defendant Officer might accidentally discharge the firearm while pointed in his direction.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations regarding Plaintiff Scruggs being "terrified." The City denies the remaining

allegations contained in Paragraph 309.


310.     Defendant Officer Legorreta subsequently asked Mr. Scruggs to come inside with him. Mr. Scruggs cooperated and walked inside. When Officer Legorreta asked if he had other weapons on him, Mr. Scruggs truthfully responded that he did not.

**ANSWER:**     The City admits that Defendant Officer Legorreta asked Plaintiff Scruggs to go

inside with him and whether he had any other weapons on him. The City denies the remaining

allegations contained in Paragraph 310.


311.     Inside the AutoZone, Mr. Scruggs voluntarily retrieved his wallet and presented Defendant Officer Legorreta with his valid concealed carry license ("CCL"), firearm owners' identification ("FOID") card, and state driver license. Defendant Officer Legorreta would not return Mr. Scruggs' cards for twenty-two minutes.

**ANSWER:**     The City admits that Plaintiff Scruggs presented Defendant Officer Legorreta with

some of his credentials, including his concealed carry license, firearm owners' identification card,

and driver's license. The City also admits that the credentials were returned to Plaintiff Scruggs

after the Defendant Officers concluded their investigation and ran Plaintiff Scruggs's name, which

took approximately twenty-two minutes. The City denies the remaining allegations contained in

Paragraph 311.


312.     Next, Defendant Officer Legorreta asked who he should speak to for access to the AutoZone's surveillance camera footage. Mr. Scruggs himself called over a manager.

81

**ANSWER:**    The City admits that Defendant Officer Legorreta asked who could access the AutoZone surveillance camera footage. The City also admits that Plaintiff Scruggs called over an individual by the name of "Mauricio" who was unable to pull up the surveillance camera footage. The City denies the remaining allegations in Paragraph 312.

313.    Despite Mr. Scruggs' cooperation, Defendant Officer Legorreta proceeded to put Mr. Scruggs in handcuffs to further detain him. When Mr. Scruggs asked why he was being detained, Officer Legorreta responded by citing the ShotSpotter alert: "The ShotSpotter [alert] came from right here. Address is on our computer." Defendant Officer Legorreta also repeated his patently false assertions that the gun was missing a bullet and was hot. Mr. Scruggs again emphatically denied shooting his gun.

**ANSWER:**    The City admits that Defendant Officer Legorreta placed Plaintiff Scruggs in handcuffs and explained to Plaintiff Scruggs the reasons he was being temporarily detained. The City denies the remaining allegations contained in Paragraph 313.

314.    Defendant Officer Legorreta then asked Mr. Scruggs to turn around so that he could handcuff him. Mr. Scruggs complied. The Defendant Officers kept Mr. Scruggs in handcuffs for twenty minutes.

**ANSWER:**    The City admits that Plaintiff Scruggs was placed in handcuffs upon request. The City also admits that Plaintiff Scruggs remained in handcuffs for the duration of the investigation, which lasted approximately twenty minutes. The City denies the remaining allegations contained in Paragraph 314.

315.    The only reason the Defendant Officers targeted and detained Mr. Scruggs was the false and unreliable ShotSpotter alert.

**ANSWER:**    The City denies the allegations contained in Paragraph 315.

316.    The Defendant Officers lacked probable cause to search, detain, or arrest Mr. Scruggs. They also lacked reasonable suspicion to detain him for questioning or to conduct a pat down.

**ANSWER:**     The City denies the allegations contained in Paragraph 316.

317.     As Defendant Officer Legorreta and Mr. Scruggs walked back outside, Defendant Officer Legorreta asked Mr. Scruggs, for the first time, how long he had been outside and why he had been outside when police arrived. Mr. Scruggs answered, truthfully, that he had been inside the store and that he had gone outside after others said they had heard a loud noise. Despite hearing this information for the first time, Defendant Officer Legorreta made no attempt to ascertain from Mr. Scruggs or others what the loud noise sounded like, where it had come from, how people in the area had reacted, whether there were any other witnesses he could speak to, or any other information that would have enabled him to actually investigate the source of the noise.

**ANSWER:**     The City denies the allegations contained in Paragraph 317.

318.     Two transporting officers then arrived on the scene: Defendant Officers Sarah Keckley (#7041) and Samantha DiCerto (#18677).

**ANSWER:**     The City admits that Defendant Officer Keckley and Officer DiCerto arrived on the scene to assist. The City denies the remaining allegations contained in Paragraph 318.

319.     Defendant Officer Legorreta asked Defendant Officer Keckley and Officer DiCerto to hold Mr. Scruggs. They placed him, handcuffed, in the back of their cruiser with the door open.

**ANSWER:**     The City admits that Defendant Officer Legorreta asked Defendant Officer Keckley and Officer DiCerto to stay with Plaintiff Scruggs while Defendant Officer Legorreta conducted his investigation. The City also admits that Plaintiff Scruggs was permitted to sit in the back of the squad car with his legs outside of the vehicle with the door open. The City denies the remaining allegations contained in Paragraph 319.

320.     Defendant Officer Legorreta approached Mr. Scruggs to search his person. Defendant Officer Legorreta said he needed to "check [Mr. Scruggs'] pockets for the casing in case he put the casing in his pockets." Defendant Officer Legorreta reached into each of Mr. Scruggs' six pant pockets and felt around. He then felt underneath the bulletproof vest Mr. Scruggs wore as a security guard. Defendant Officer Legorreta did not find a casing.

**ANSWER:** The City admits that Defendant Officer Legorreta conducted a pat down on Plaintiff Scruggs and did not find a shell casing. The City denies the remaining allegations contained in Paragraph 320.

321. While Mr. Scruggs was handcuffed and detained outside, Defendant Officer Legorreta went inside the AutoZone and found Mr. Scruggs' backpack. Defendant Officer Legorreta proceeded to search Mr. Scruggs' backpack without consent. Defendant Officer Legorreta took the backpack outside.

**ANSWER:** The City admits that Defendant Officer Legorreta went inside the AutoZone to the area where Plaintiff Scruggs was alone just prior to being detained and secured the area and items, including Plaintiff Scruggs's backpack while he was detained. The City also admits that Defendant Officer Legorreta brought Plaintiff Scruggs his belongings outside. The City denies the remaining allegations contained in Paragraph 321.

322. While Mr. Scruggs remained unlawfully detained, handcuffed in the back of a police car accompanied by Defendant Officer Keckley and Officer DiCerto, Defendant Officers Legorreta and Andrews made another sweep of the parking lot looking in vain for a shell casing.

**ANSWER:** The City admits that Defendant Officers Legorreta and Andrews continued to conduct their investigation while Plaintiff Scruggs was temporarily detained. The City denies the remaining allegations contained in Paragraph 322.

323. Defendant Officer Legorreta then approached Mr. Scruggs to search his person once again. Officer Legorreta asked Mr. Scruggs if he had put the shell casing somewhere. Mr. Scruggs again repeated, truthfully, that he did not shoot his weapon. Nevertheless, for the second time that night, Defendant Officer Legorreta asked Mr. Scruggs to step out of the vehicle because he wanted to "check to make sure that there [were] no shell casings" on Mr. Scruggs' body.

**ANSWER:** The City admits that Defendant Officer Legorreta conducted a pat down on Plaintiff Scruggs. The City denies the remaining allegations contained in Paragraph 323.

324.     Defendant Officer Legorreta then conducted a humiliating and invasive search of Mr. Scruggs' body in public. He untied Mr. Scruggs pants, pulled his shirt out from the waistband, and lifted both his overshirt and undershirt up to his bellybutton, exposing Mr. Scruggs' waist.

**ANSWER:**     The City denies the allegations contained in Paragraph 324.

325.     Defendant Officer Legorreta put his hands down Mr. Scruggs' pants, shook his hands, and felt against Mr. Scruggs' body. Defendant Officer Legorreta put his hands between the waistband of Mr. Scruggs' boxers and his skin and pulled them out to shake the clothes.

**ANSWER:**     The City denies the allegations contained in Paragraph 325.

326.     Defendant Officer Legorreta put his hands down the Mr. Scruggs' pants again, thoroughly pressing against Mr. Scruggs' legs and body. He again felt up and down the outside of Mr. Scruggs' pants, reached inside of his pockets, removed Mr. Scruggs' phone, baton, and AirPods from inside his pant pockets, and again pressed against the outside of the pockets.

**ANSWER:**     The City admits that Officer Legorreta performed a pat down and search of Mr. Scruggs, but denies the allegations contained in Paragraph 326 reflect an accurate description of the encounter.

327.     After searching Mr. Scruggs' person, Defendant Officer Legorreta again searched the inside of Mr. Scruggs' backpack. Defendant Officer Legorreta ordered Mr. Scruggs step back into the police car.

**ANSWER:**     The City admits that Defendant Officer Legorreta searched Plaintiff Scruggs's backpack and told him he could sit back down. The City denies the remaining allegations contained in Paragraph 327.

328.     At this point, Defendant Officer Andrews approached Defendant Officer Legorreta and said they needed to release Mr. Scruggs because they did not have enough evidence to continue holding him. Defendant Officer Legorreta asked if they should call the Sergeant to see if they had enough to book him as an "attempted." Defendant Officer Andrews responded, "I know we don't." Defendant Officer Keckley agreed, saying "it's going to be dropped."

**ANSWER:**     The City admits that Defendant Officer Andrews explained to Defendant Officer Legorreta that the AutoZone was unable to provide video surveillance until the next day. The City

also admits that the allegations contained excerpts of a conversation between Defendant Officers Andrews and Legorreta but fails to provide a complete reflection of the entire conversation. The City denies the remaining allegations contained in Paragraph 328.

329.    Nonetheless, Defendant Officer Legorreta called the Sergeant. Defendant Officer Legorreta provided a false account of what he had observed to the Sergeant, for example stating that there were only 16 rounds in the magazine when in fact there were plainly 17 rounds in the magazine and one in the chamber. On information and belief, the Sergeant declined to authorize an arrest. After hanging up, the Defendant Officers released Mr. Scruggs from handcuffs and returned Mr. Scruggs' property to him.

**ANSWER:**    The City admits that Defendant Officer Legorreta called the Sergeant to review the case, and that the officers released Plaintiff Scruggs and returned his property after completing their investigation. The City denies the remaining allegations contained in Paragraph 329.

330.    As they parted ways, Mr. Scruggs told the officers he would be back at work the next day.

**ANSWER:**    The City admits that Plaintiff Scruggs apologized to the Officers and stated he would be back at work the next day. The City denies the remaining allegations contained in Paragraph 330.

331.    Defendant Officers did not find any evidence whatsoever to corroborate the ShotSpotter alert of supposed gunfire.

**ANSWER:**    The City denies the allegations contained in Paragraph 331.

332.    On information and belief, other CPD officers determined that same evening that the ShotSpotter alert in question had in fact been triggered by a loud noise from a vehicle traveling down an adjacent street.

**ANSWER:**    The City denies the allegations contained in Paragraph 332.

333.    The Citizen App is a publicly available service that transcribes and summarizes radio transmissions from police scanners and, possibly, other sources of real-time information about police activity. The app provides that information to members of the public. Through the app, a person can receive notifications and real-time updates about police activity in the vicinity.

**ANSWER:**    Upon information and belief, the City admits that the Citizen App is a publicly available service, and that any unknown citizen can post unverified information in the app. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 333.

334.    A report published on the Citizen App on July 18, 2022, at 8:22 p.m. showed a ShotSpotter alert of possible gunfire at 7347 S. Ashland Avenue, matching the address of the AutoZone parking lot. A subsequent update published to the app regarding that alert stated that "police on the scene have confirmed from a witness that a red sedan went eastbound" after the shooting. At 8:30 p.m. another update was published on the app: "Police confirmed from the witness that the car made the noise and not shots fired."

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 334.

***Defendant Officers Illegally Stopped Mr. Scruggs' Again on July 19, 2022, and Pretextually Arrested Him for a Paperwork Violation.***

335.    Despite finding no evidence to corroborate a gunshot and despite determining that there was no basis to continue detaining Mr. Scruggs, Defendant Officers Andrews and Legorreta returned to the AutoZone the next day to once again detain Mr. Scruggs.

**ANSWER:**    The City admits that Defendant Officers Andrews and Legorreta returned to the AutoZone the next day to retrieve the surveillance video and to continue their investigation. The City denies the remaining allegations contained in Paragraph 335.

336.    Around 8:45 p.m. on July 19, 2022, Defendant Officers arrived at the AutoZone, when they knew Mr. Scruggs would again be working. According to their own police report, Defendant Officers "were conducting a follow up ShotSpotter investigation."

**ANSWER:** The City admits that on July 19, 2022, at approximately 8:45 p.m., Defendant Officers Andrews and Legorreta returned to the AutoZone to continue their investigation and to retrieve the surveillance video from the time of the incident. The City denies the remaining allegations contained in Paragraph 336.

337. Immediately upon arriving, Defendant Officers trained their focus on Mr. Scruggs and detained Mr. Scruggs again, without cause.

**ANSWER:** The City denies the allegations contained in Paragraph 337.

338. Defendant Officer Legorreta opened the AutoZone door and demanded Mr. Scruggs to step outside. Mr. Scruggs complied.

**ANSWER:** The City admits that Defendant Officer Legorreta asked Plaintiff Scruggs if he would go outside to speak with him. The City denies the remaining allegations contained in Paragraph 338.

339. Once outside, Defendants Legorreta and Andrews surrounded Mr. Scruggs on two sides with Mr. Scruggs' back toward the exterior wall. They directed him to answer questions. It was clear to Mr. Scruggs that he was not free to leave.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the last sentence of Paragraph 339. The City denies the remaining allegations contained in Paragraph 339.

340. Defendant Officer Legorreta admitted that he was there to do a "follow up investigation" of the previous day's ShotSpotter alert.

**ANSWER:** The City admits that Defendant Officer Legorreta was conducting a follow-up investigation. The City denies the remaining allegations contained in Paragraph 340.

341.    Defendant Officers lacked probable cause or reasonable suspicion to search Mr. Scruggs or detain him for questioning.

**ANSWER:**    The City denies the allegations contained in Paragraph 341.

342.    Defendant Officer Legorreta demanded that Mr. Scruggs produce certain pieces of identification, including a "PERC card" and a "firearm control card."

**ANSWER:**    The City admits that Plaintiff Scruggs was asked to present his PERC card and

firearm control card. The City denies the remaining allegations contained in Paragraph 342.

343.    "PERC card" refers to a permanent employment registration card issued by the Illinois Department of Financial and Professional Regulation to licensed security guards, including armed security guards. The firearm control card is issued to people who carry firearms in the course of their employment, including as an armed security guards.

**ANSWER:**    The City admits that an armed security guard needs to properly obtain and maintain

a valid PERC card and firearm control card in order to lawfully work as an armed security guard

in Illinois. The City also admits that the Illinois Department of Financial and Professional

Regulation issues PERC cards. The City denies the remaining allegations contained in Paragraph

343.

344.    Mr. Scruggs searched his phone for a digital copy of the identifications requested. After finding what he believed to be a responsive document, he gave his cell phone to Defendant Officer Legorreta to show him copies.

**ANSWER:**    The City admits that Plaintiff Scruggs handed Defendant Officer Legorreta his

phone. The City denies the remaining allegations contained in Paragraph 344.

345.    Defendant Officer Legorreta maintained possession of the phone and called a supervisor to inquire about the document Mr. Scruggs had retrieved. Defendant Officer Legorreta sent his supervisor a picture of Mr. Scruggs' phone with the document visible.

**ANSWER:**    The City admits that Defendant Officer Legorreta called his Sergeant to verify Plaintiff Scruggs's credentials. The City denies the remaining allegations contained in Paragraph 345.

346.    Defendant Officer Legorreta indicated to Defendant Officer Andrews and Mr. Scruggs that his supervisor was "trying to verify it over the system." Defendant Officers continued to detain Mr. Scruggs.

**ANSWER:**    The City denies the allegations contained in Paragraph 346.

347.    Defendant Officer Legorreta then asked Mr. Scruggs if he had his PERC somewhere else on his phone, apparently unsatisfied with what Mr. Scruggs had already shown him. Mr. Scruggs then continued searching through his phone.

**ANSWER:**    The City admits that Defendant Officer Legorreta asked Plaintiff Scruggs to show him the proper documentation. The City denies the remaining allegations contained in Paragraph 347.

348.    Defendant Officer Legorreta subsequently received a brief call from his supervisor.

**ANSWER:**    The City admits the allegations contained in Paragraph 348.

349.    After hanging up, Defendant Officer Legorreta immediately indicated to Mr. Scruggs that he was going to seize Mr. Scruggs's firearm and that Mr. Scruggs was being detained. Mr. Scruggs complied but immediately inquired as to why he was being taken into custody. Defendant Officer Legorreta said he would explain later. On information and belief, at no time during the arrest did Defendant Officers inform Mr. Scruggs of his *Miranda* rights.

**ANSWER:**    The City admits that Defendant Officer Legorreta informed Plaintiff Scruggs that he was going to secure his firearm and detain him. The City denies the remaining allegations contained in Paragraph 349.

350.    As Defendant Officer Legorreta was handcuffing Mr. Scruggs, an AutoZone employee opened to the door to the store and asked the officers what was happening and why they

were taking Mr. Scruggs into custody. Defendant Officer Legorreta asked Mr. Scruggs if he could tell the employee the details. Mr. Scruggs had no idea why he was being arrested and so Mr. Scruggs said, "you tell her."

**ANSWER:**    The City admits that an AutoZone employee asked why Plaintiff Scruggs was being taken into custody, and that Plaintiff Scruggs requested the officers to "tell her." The City denies the remaining allegations contained in Paragraph 350.

351.    Defendant Officer Legorreta told the AutoZone employee that he and Defendant Officer Andrews had been there the previous day investigating a ShotSpotter alert. Defendant Officer Legorreta recounted the same false reasons he had offered the prior day for detaining Mr. Scruggs in connection with the ShotSpotter alert.

**ANSWER:**    The City denies the allegations contained in Paragraph 351.

352.    Defendant Legorreta then explained that Mr. Scruggs did not have his PERC or firearm control card on his person and that was why he was being taken into custody.

**ANSWER:**    The City admits that Defendant Officer Legorreta explained that Plaintiff Scruggs was being arrested for not having his necessary credentials, including his PERC and firearm control card on his person while working as an armed security guard. The City denies the remaining allegations contained in Paragraph 352.

353.    Now realizing that he was being arrested for a paperwork issue related to his employment Mr. Scruggs became upset. Mr. Scruggs said, "get my lawyer on the phone" and "I can't pay rent if I lose this job."

**ANSWER:**    Upon information and belief, the City admits that Plaintiff Scruggs became aggressive, yelled profanities at the Officers, and physically resisted Officers. The City further states that Plaintiff Scruggs pulled away from the Officers' hold multiple times. The City denies the remaining allegations contained in Paragraph 353.

354.    Defendant Officer Legorreta pinned Mr. Scruggs against the wall of the AutoZone and aggressively restrained him.

**ANSWER:**    The City denies the allegations contained in Paragraph 354.


355.    Mr. Scruggs told Defendant Officer Legorreta that he could simply go to his house and show them the documents. Defendant Officer Legorreta, however, proceeded with Mr. Scruggs' arrest. Defendant Officers did not permit Mr. Scruggs to speak with his attorney.

**ANSWER:**    The City admits that Plaintiff Scruggs was placed into custody. The City denies the remaining allegations contained in Paragraph 355.


356.    At no point during their encounter with Mr. Scruggs on July 19, 2022, did the Defendant Officers actually investigate the supposed gunshot detected by ShotSpotter alert. Their single-minded focus was to continue detaining Mr. Scruggs until they could find a pretextual basis on which to arrest him.

**ANSWER:**    The City denies the allegations contained in Paragraph 356.


357.    In the course of arresting Mr. Scruggs outside the AutoZone, Defendant Officers seized Mr. Scruggs' security uniform, bulletproof vest, and firearm.

**ANSWER:**    The City admits that Plaintiff Scruggs was placed into custody and that his personal belongings were secured. The City also admits that Plaintiff Scruggs requested the officers to take off his security shirt and vest. The City denies the remaining allegations contained in Paragraph 357.


358.    Defendant Officer Legorreta entered the AutoZone and searched Mr. Scruggs's backpack. He seized Mr. Scruggs's valid FOID and CCL cards and returned the rest of the wallet and backpack to the AutoZone employees.

**ANSWER:**    The City admits that Defendant Officer Legorreta retrieved Plaintiff Scruggs's FOID card and CCL card from his backpack and, at the request of Plaintiff Scruggs, returned Plaintiff Scruggs's backpack to his colleague. The City denies the remaining allegations contained in Paragraph 358.

359.     Defendant Officer Legorreta handed Mr. Scruggs over to Officers Yan and Egan who had been called to transport Mr. Scruggs to the police station lockup.

**ANSWER:**     The City admits that Officers Yan and Egan were requested to transport Plaintiff Scruggs to the police station. The City denies the remaining allegations contained in Paragraph 359.

360.     Officers Yan and Egan transported Mr. Scruggs to Chicago Police District 7 where Mr. Scruggs was jailed.

**ANSWER:**     The City admits that Officers Yan and Egan transported Plaintiff Scruggs to the police station where he was processed. The City denies the remaining allegations contained in Paragraph 360.

361.     The arrest report, written by Defendant Officers Legorreta and Andrews, states that after Defendant Officers took Mr. Scruggs into custody for not having a firearm control card or PERC card on his person, officers determined that Mr. Scruggs' PERC card had expired a few months earlier.

**ANSWER:**     The City admits that Defendant Officer Andrews wrote the arrest report, which summarized Plaintiff Scruggs's arrest. The City also admits that the arrest report included a description about how Plaintiff Scruggs's PERC card had expired on September 30, 2021. The City denies the remaining allegations contained in Paragraph 361.

362.     Mr. Scruggs was booked for the expired PERC card on an alleged violation of 225 ILCS 447/45-50-A-1, which prohibits practicing as a private security contractor without a license, a Class A misdemeanor. Charges against Mr. Scruggs were approved after midnight on July 20, 2022. He was released from lockup later that morning.

**ANSWER:**     The City admits that the arrest report listed that Plaintiff Scruggs was arrested pursuant to 225 ILCS 447/45-50-A-1, a Class A misdemeanor. The City further states that 225 ILCS 447/45-50-A-1 speaks for itself and denies any allegations inconsistent with 225 ILCS

447/45-50-A-1. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 362.

363.     Expired PERC cards can be automatically renewed. For people like Mr. Scruggs who have previously been approved for a license to work as an armed security guard, renewing a recently-expired license is a purely bureaucratic requirement—simply a matter of paying a $45 fee.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 363.

364.     Defendant officers nevertheless chose to arrest Mr. Scruggs on this basis, jail him at the station, and formally file charges.

**ANSWER:**     The City admits that Plaintiff Scruggs was arrested based on probable cause that Scruggs violated 225 ILCS 447/45-50-A-1, a Class A misdemeanor. The City denies the remaining allegations contained in Paragraph 364.

365.     The arrest, detention, and charges were plainly pretextual and motivated by irrational and unfounded suspicion fueled by the ShotSpotter alert. CPD almost never arrests people for violations of the professional licensing statute at issue here. Before Mr. Scruggs' arrest on July 19, 2022, CPD had not arrested a single person solely for an alleged violation of this licensing provision since 2015.

**ANSWER:**     The City denies the allegations contained in Paragraph 365.

366.     The Defendant Officer's decision to redetain, investigate, and then arrest Mr. Scruggs was motivated by the false and utterly unfounded belief that Mr. Scruggs had discharged his gun, based on nothing more than an unreliable ShotSpotter alert.

**ANSWER:**     The City denies the allegations contained in Paragraph 366.

367.     At his first appearance in criminal Court on August 2, 2022, Mr. Scruggs was assigned counsel from the Office of the Cook County Public Defender.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 367.


368.    Mr. Scruggs' public defender subsequently was prepared to file a motion to suppress the evidence obtained by Defendant Officers because their warrantless search and seizure of Mr. Scruggs was without probable cause or reasonable suspicion and, in particular, because the ShotSpotter alert did not provide probable cause or reasonable suspicion to believe Mr. Scruggs had committed (or was about to commit) a crime.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 368.


369.    Rather than litigate the motion, at the next appearance in Court, on September 16, 2022, the State's Attorney Office moved to dismiss the charge, *nolle prosequi*.

**ANSWER:**    Upon information and belief, the City admits that the State's Attorney Office

moved to dismiss the charges against Plaintiff Scruggs. The City denies the remaining allegations

contained in Paragraph 369.


370.    The State's Attorney's Office agreed to dismiss the charges only on the condition that Mr. Scruggs agree that police be allowed to destroy Mr. Scruggs' firearm, even though Mr. Scruggs had legally possessed the firearm, there was no evidence that he had misused it, and there were no charges against him relating to mishandling of a firearm.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 370.


371.    Mr. Scruggs has suffered significant hardship as a result of the Defendant Officers unwarranted and illegal conduct.

**ANSWER:**    The City denies the allegations contained in Paragraph 371.


372.    Mr. Scruggs suffered from the humiliation and stigma of being detained and handcuffed in front of his co-workers. He suffered the indignity and humiliation of an intrusive body search in public.

**ANSWER:**     The City denies the allegations contained in Paragraph 372.


373.     Mr. Scruggs continues to feel wary and unsafe around CPD officers after they detained him arbitrarily and pursued an investigation of him without justification until they could find a pretext to arrest him. He continues to experience fear, anxiety, nervousness, helplessness, and stress as a result of his encounters with the Scruggs Defendant Officers.

**ANSWER:**     The City denies the allegations contained in Paragraph 373.


374.     Mr. Scruggs lives in the South Shore neighborhood of Chicago on the South Side in an area within ShotSpotter's coverage area. He regularly travels and goes about his daily business in the surrounding areas, which are all within ShotSpotter's footprint. Mr. Scruggs has also worked multiple shifts at the same AutoZone where police responded on July 18, 2022 to a ShotSpotter alert.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 374.


375.     The areas immediately around Mr. Scruggs' home and workplaces have a very large volume of ShotSpotter alerts of supposed gunfire. Mr. Scruggs fears being once again falsely suspected and detained because of a ShotSpotter alert, particularly because he continues to work as an armed security guard and legally carries a firearm on his person. In fact, Mr. Scruggs is likely to be falsely targeted again by CPD solely because he both lives and works in areas of the City with high numbers of ShotSpotter alerts.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth

of the allegations contained in the first two sentences of Paragraph 375. The City denies the

remaining allegations contained in Paragraph 375.


## CLASS ACTION ALLEGATIONS

376.     Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs Ortiz and Scruggs each bring this action on behalf of themselves and a class consisting of all persons who have been or will be subject to an investigatory stop by Chicago Police Department officers where a recent ShotSpotter alert—or a history of ShotSpotter alerts in the area—is part of the basis for the investigatory stop; as well as a subclass consisting of all such persons who are Black or Hispanic. The Plaintiffs seeks declaratory and injunctive relief against the City on behalf of the class and subclass.

**ANSWER:**     The City admits that Plaintiffs Ortiz and Scruggs seek declaratory and injunctive

relief on behalf of themselves and a class of individuals, pursuant to Fed. R. Civ. P. 23(a) and

(b)(2). The City denies that any class should be certified and further denies any wrongdoing or

liability Plaintiffs allege.

377.     Plaintiffs and the members of the class and subclass are similarly situated for the
purpose of asserting the claims alleged in this Complaint on a common basis.

**ANSWER:**     The City denies the allegations contained in Paragraph 377.

378.     A class action is the only practicable means by which the individual named Plaintiff
and the class members can challenge the City's unconstitutional policies and practices related to
the manner in which police respond to ShotSpotter alerts. Many members of the class are without
the means to retain an attorney to represent them in a civil rights lawsuit. Many members of the class
also do not know that they are being targeted for a stop and search by CPD as a result of a
ShotSpotter alert because CPD fails to tell them.

**ANSWER:**     The City denies the allegations contained in Paragraph 378.

379.     The class and subclass are so numerous that joinder of all members is impractical.
Over an 18-month period, from January 1, 2020 to May 31, 2021, there were over 2,400 people
who were subject to an investigatory stop by CPD in response to a specific ShotSpotter alert or
because of a real or perceived history of frequent ShotSpotter alerts in an area. The class also
includes a significant number of future class members, given that individuals are stopped by CPD
on a daily basis as a result of ShotSpotter alerts. The overwhelming majority of people stopped
because of ShotSpotter are Black or Latinx.

**ANSWER:**     The City denies that any class should be certified and further denies that the putative

class and subclass are so numerous that joinder of all members is impractical. The City lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

contained in Paragraph 379.

380.     There are questions of law and fact common to all class members, including but not
limited to whether the City's policies and practices regarding the use of unreliable ShotSpotter
evidence to justify investigatory stops violates the Fourth and Fourteenth Amendment rights of all

class members, whether they violate the Illinois Civil Rights Act, and whether they violate the Equal Protection Clause of the U.S. Constitution.

**ANSWER:**    The City denies the allegations contained in Paragraph 380.


381.    Because the practices and procedures challenged in this Complaint apply with equal force to the individual named Plaintiffs and the other members of the class, the claims of the individual named Plaintiffs are typical of the class and subclass.

**ANSWER:**    The City denies the allegations contained in Paragraph 381.


382.    The individual named Plaintiffs will fairly and adequately represent the interests of the class and subclass. He possesses a strong personal interest in subject matter of the lawsuit and is represented by experienced counsel with expertise in complex civil rights litigation. Counsel have previously litigated injunctive class actions, and have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

**ANSWER:**    The City denies the allegations contained in the first sentence of Paragraph 382.

The City admits that Plaintiffs are represented by counsel. The City lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

Paragraph 382.


383.    The Defendants have acted on grounds generally applicable to the class: their policies, procedures, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

**ANSWER:**    The City denies the allegations contained in Paragraph 383.


**MUNICIPAL LIABILITY CLAIMS ON BEHALF OF PLAINTIFFS SCRUGGS, ORTIZ, THE PROPOSED CLASS, AND THE ORGANIZATIONAL PLAINTIFF.**

**COUNT I – 42 U.S.C. § 1983**
**Monell Liability – Violation of the Fourth and Fourteenth Amendments**
**(On Behalf of Lucy Parsons Labs and its members, Plaintiff Ortiz, Plaintiff Scruggs, and the class of similarly-situated individuals against the City of Chicago)**

384.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**     The City realleges and incorporates by reference its answers to all paragraphs above as though fully set forth herein.

385.     Count I is alleged against the City of Chicago.

**ANSWER:**     The City admits that this Count is brought against the City, but the City denies all unlawful acts alleged herein.

386.     The City of Chicago's use of ShotSpotter results in illegal investigatory stops or arrests of the Plaintiffs and members of the Plaintiff Class and Plaintiff Organization in violation of the Fourth and Fourteenth Amendments. Such violations are a continuing, persistent, and widespread practice.

**ANSWER:**     The City denies the allegations contained in Paragraph 386.

387.     CPD officers falsely manufacture reasonable suspicion for these searches and seizures by relying on ShotSpotter alerts that have never been tested for reliability and are not sufficiently reliable to be used as any part of the basis for a Fourth Amendment search or seizure.

**ANSWER:**     The City denies the allegations contained in Paragraph 387.

388.     CPD officers falsely manufacture reasonable suspicion for these searches and seizures by stopping individuals merely because they are in the vicinity of ShotSpotter alerts.

**ANSWER:**     The City denies the allegations contained in Paragraph 388.

389.     CPD officers falsely manufacture reasonable suspicion for these searches and seizures by stopping individuals without corroboration of the ShotSpotter alert or individualized suspicion.

**ANSWER:**     The City denies the allegations contained in Paragraph 389.

390.     CPD officers falsely manufacture reasonable suspicion for these searches and seizures by relying on a claim, real or perceived, that a particular area has had frequent ShotSpotter alerts in the past.

**ANSWER:**     The City denies the allegations contained in Paragraph 390.

391.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of relying on ShotSpotter to initiate investigatory stops for unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments.

**ANSWER:**     The City denies the allegations contained in Paragraph 391.

392.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops and seizures by relying on ShotSpotter alerts, even though the system has never been tested for reliability and is not sufficiently reliable to be used as any part of the basis for a Fourth Amendment search or seizure.

**ANSWER:**     The City denies the allegations contained in Paragraph 392.

393.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops by stopping individuals merely because they are in the vicinity of ShotSpotter alerts.

**ANSWER:**     The City denies the allegations contained in Paragraph 393.

394.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops by stopping individuals without corroboration of the ShotSpotter alert or individualized suspicion.

**ANSWER:**     The City denies the allegations contained in Paragraph 394.

395.     The City has implemented, enforced, encouraged, sanctioned, and failed to stop a policy, practice, and custom of falsely manufacturing reasonable suspicion for investigatory stops by relying on the claim, real or perceived, that an area has had frequent ShotSpotter alerts in the past.

**ANSWER:**     The City denies the allegations contained in Paragraph 395.

396.     The City maintains a policy, custom, and practice of unconstitutional misconduct by CPD officers by using the ShotSpotter system with deliberate indifference to the constitutional rights of the Plaintiff class.

**ANSWER:**     The City denies the allegations contained in Paragraph 396.

397.    The City continues to use the ShotSpotter system with deliberate indifference to the constitutional rights of the Plaintiff class.

**ANSWER:**    The City denies the allegations contained in Paragraph 397.


398.    The City has or should have knowledge that its present use of ShotSpotter would result in constitutional violations. This knowledge includes:

**ANSWER:**    The City denies the allegations contained in Paragraph 398.


399.    The City is aware of multiple studies showing that ShotSpotter technology is inaccurate and unreliable, including one study by the Chicago OIG.

**ANSWER:**    The City denies the allegations contained in Paragraph 399.


400.    The City has received criticisms of its use of ShotSpotter and the ShotSpotter contract at multiple press conferences, town hall meetings, city council hearings, and more, including the OIG's report on ShotSpotter.

**ANSWER:**    The City admits that people have spoken in support of and in opposition of the City's use of ShotSpotter at town hall meetings and City Council hearings.


401.    The City knows that ShotSpotter alerts overwhelmingly lead police to find no corroboration of gunfire.

**ANSWER:**    The City denies the allegations contained in Paragraph 401.


402.    The City knows that ShotSpotter has never been tested to determine its reliability with respect to its ability to distinguish gunfire from other loud noises.

**ANSWER:**    The City denies the allegations contained in Paragraph 402.


403.    The City knows that its contract with ShotSpotter does not create any obligation for ShotSpotter to avoid false alerts and it in fact strongly incentivizes ShotSpotter to over-report loud noises as gunfire and to trigger police dispatches in response to noises that are not gunshots.

**ANSWER:**    The City denies the allegations contained in Paragraph 403.

404.     The City knows that ShotSpotter's purported "accuracy" rates do not reflect any actual measure of the system's reliability and that these supposed "accuracy" rates take no account of the overwhelming proportion of ShotSpotter alerts in Chicago that do not turn up any evidence of gunfire.

**ANSWER:**     The City denies the allegations contained in Paragraph 404.

405.     The City knows that ShotSpotter alerts do not and cannot supply enough information to identify a particular individual as a suspect.

**ANSWER:**     The City admits that ShotSpotter alerts do not provide information to identify a particular individual as the person who fired a gun.

406.     The City knows that the U.S. Court of Appeals for the Seventh Circuit has analogized ShotSpotter alerts to unverified anonymous tips that cannot be relied upon without corroboration and that officers nevertheless routinely rely on ShotSpotter alerts and treat them as perfectly accurate without any corroboration.

**ANSWER:**     The City admits that the Seventh Circuit Court of Appeals in *United States v. Rickmon* stated in its decision that ShotSpotter "is analogous to an anonymous tipster." *See* 952 F.3d 876, 882 (7th Cir. 2020).  The City denies the remaining allegations contained in Paragraph 406.

407.     The City knows that its officers routinely rely on specific ShotSpotter alerts—or a real or perceived history of ShotSpotter alerts in an area—as a basis to initiate an investigatory stop or other search or seizure.

**ANSWER:**     The City denies the allegations contained in Paragraph 407.

408.     The City knows that ShotSpotter leads to thousands of fruitless investigatory stops in Chicago.

**ANSWER:**     The City denies the allegations contained in Paragraph 408.

409.     The City has failed to act to prevent CPD officers, including the Scruggs and Ortiz Defendant Officers, from stopping civilians based on ShotSpotter alerts, despite its knowledge and notice of ongoing constitutional violations.

**ANSWER:**     The City denies the allegations contained in Paragraph 409.

410.     The City has failed to adjust its policies or practices—or to provide training—to minimize or eliminate the number of false alerts or to minimize or eliminate illegal stops and arrests on account of ShotSpotter.

**ANSWER:**     The City denies the allegations contained in Paragraph 410.

411.     The City has failed to adequately train and supervise CPD officers, including the Scruggs and Ortiz Defendant Officers, on how to use ShotSpotter in a manner that does not violate individuals' constitutional rights under the Fourth Amendment, including prohibiting stops based on ShotSpotter alerts alone, prohibiting officers from relying on ShotSpotter alerts as part of the determination of reasonable suspicion or probable cause, prohibiting officers from using historical aggregate ShotSpotter alerts in an area as part of a determination of reasonable suspicion or probable cause, and training officers that ShotSpotter alerts are not to be regarded as reliable evidence and that the vast majority of ShotSpotter alerts should be expected to lead them to find no evidence of gun crime.

**ANSWER:**     The City denies the allegations contained in Paragraph 411.

412.     The City and its decisionmakers with final policymaking authority have implemented, enforced, encouraged, and sanctioned policies, practices, and customs with respect to ShotSpotter alerts that violate its own investigatory stop policy, which specifies that the "Reasonable Articulable Suspicion" necessary for an investigatory stop "should be founded on specific and objective facts or observations about how a suspect behaves, what the subject is seen or heard doing, and the circumstances or situation in regard to the suspect that is either witnessed or known by the officer."

**ANSWER:**     The City admits that CPD's investigatory stop policy is set forth in Special Order

S04-13-09. The City further states that Special Order S04-13-09 speaks for itself and denies any

allegations inconsistent with Special Order S04-13-09. The City denies the remaining allegations

contained in Paragraph 412.

413.     The City and its decisionmakers with final policymaking authority have failed to test or insist on testing the accuracy and reliability of any aspect of the ShotSpotter system as deployed in Chicago.

**ANSWER:**     The City denies the allegations contained in Paragraph 413.

414. The City has failed to adequately supervise ShotSpotter, including the ShotSpotter employees who are empowered to trigger alerts to loud noises. The City has effectively delegated authority to ShotSpotter and its employees to direct CPD officers to particular locations to investigate supposed gunfire. The City relies on ShotSpotter and its employees as an integral part of the City's police dispatch and deployment decisions, but the City fails to supervise them or to assess their performance or reliability.

**ANSWER:**     The City denies the allegations contained in Paragraph 414.

415. The City has failed to take other remedial action.

**ANSWER:**     The City denies the allegations contained in Paragraph 415.

416. The City has acted with deliberate indifference to the Fourth Amendment rights of the Plaintiffs Ortiz, Scruggs, the putative class members, Lucy Parsons Labs, and its members. As a direct and proximate result of these acts and omissions, the constitutional rights of the Plaintiffs under the Fourth and Fourteenth Amendments have been violated.

**ANSWER:**     The City denies the allegations contained in Paragraph 416.

417. Plaintiff Ortiz seeks damages against the City for the unconstitutional seizure to which he was subject, leading to emotional distress, humiliation, loss of liberty, and an ongoing fear of interactions with police officers. Plaintiff Scruggs also seeks damages against the City for the unconstitutional seizure to which he was subject, leading to mental distress, degradation, humiliation, loss of liberty, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**ANSWER:**     The City admits that Plaintiffs Ortiz and Scruggs seek damages. The City denies any facts giving rise to damages and further denies the remaining allegations contained in Paragraph 417.

418. Unless restrained by order of this Court, a real and immediate threat exists that the Fourth Amendment rights of the Plaintiffs, Plaintiff Organization, and putative class members will be violated by CPD officers in the future through the use of ShotSpotter. Plaintiffs seek injunctive and declaratory relief against the City to prevent the continued violation of their constitutional rights.

**ANSWER:** The City admits that Plaintiffs seek injunctive and declaratory relief. The City denies that Plaintiffs are entitled to any relief and further denies the remaining allegations contained in Paragraph 418.

**COUNT II – 42 U.S.C. § 1983**
**Monell Liability – Equal Protection Clause Violation**
**(On Behalf of Lucy Parsons Labs and its members, as well as Plaintiff Ortiz, Plaintiff Scruggs, and the subclass of similarly-situated individuals against the City of Chicago)**

419.   Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** The City realleges and incorporates by reference its answers to all paragraphs above as though fully set forth herein.

420.   Count II is alleged against the City of Chicago.

**ANSWER:** The City admits that this Count is brought against the City, but the City denies all unlawful acts alleged herein.

421.   The City has implemented, enforced, encouraged, sanctioned, and directly ordered a policy of employing ShotSpotter in neighborhoods on the basis of race and subjecting residents to increased police surveillance, arrests, and unfounded investigatory stops in violation of the Fourteenth Amendment. The City employs ShotSpotter in a facially discriminatory way, deploying ShotSpotter only in the twelve police districts that have the highest proportion of Black and Latinx residents and the lowest proportion of White residents. As a result, CPD's policy of deploying ShotSpotter in Chicago's majority Black and Latinx districts violates the Equal Protections Clause.

**ANSWER:** The City denies the allegations contained in Paragraph 421.

422.   Data shows that the CPD's facially discriminatory decision about where to deploy ShotSpotter imposes racially discriminatory harms on Black and Latinx communities. City-wide, a massively disproportionate share of Black and Latinx residents live under ShotSpotter surveillance.

**ANSWER:** The City denies the allegations contained in Paragraph 422.

423.    Black and Latinx residents, including Plaintiffs Ortiz and Scruggs, members of the putative subclass, and Plaintiff Lucy Parsons Labs and its members are and have been subjected to additional ShotSpotter-initiated police deployments, investigatory stops, arrests, and uses of force that residents living in majority-White districts are not subjected to. Because ShotSpotter surveillance is absent in majority-White districts, these residents are not subject to additional police deployments on the basis of ShotSpotter and are thus at a lower risk of unlawful stops.

**ANSWER:**    The City denies the allegations contained in Paragraph 423.

424.    The mere presence of ShotSpotter alerts changes police behavior in the predominantly Black and Latinx districts where the City has chosen to deploy the system. Police officers cite the supposed history of ShotSpotter alerts to justify future investigatory stops and other police tactics.

**ANSWER:**    The City denies the allegations contained in Paragraph 424.

425.    Unreliable gunfire statistics generated by ShotSpotter skew how police resources are allocated in those districts and harm Black and Latinx residents. Large volumes of ShotSpotter alerts divert police resources from actual 9-1-1 calls by residents and contribute to lengthy delays that people in these districts often experience when calling for police service.

**ANSWER:**    The City denies the allegations contained in Paragraph 425.

426.    By its acts and omissions, the City has acted under color of state law to deprive the plaintiffs of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

**ANSWER:**    The City denies the allegations contained in Paragraph 426.

427.    The City intentionally discriminates by purposefully placing ShotSpotter sensors in Chicago police districts where Black and Latinx people live. The City purposefully does not put ShotSpotter in primarily White districts.

**ANSWER:**    The City denies the allegations contained in Paragraph 427.

428.    This discriminatory purpose is further evidenced by the City of Chicago's long and well-documented history of discriminatory policing, particularly as to stop and frisks.

**ANSWER:**    The City denies the allegations contained in Paragraph 428.

429. The City was and remains deliberately indifferent to the harms created by CPD officers through implementation of ShotSpotter. Despite notice of racial disparities in ShotSpotter deployment—including at a public City Council meeting at which these facts were presented while CPD Superintendent Snelling was present and representing the City—the City's policies, practices, and decisions concerning ShotSpotter remain unchanged.

**ANSWER:** The City denies the allegations contained in Paragraph 429.

430. The City has implemented, enforced, encouraged, and sanctioned CPD's policy of using and employing ShotSpotter in a manner that constitutes racial and/or ethnic discrimination against the Plaintiffs Ortiz and Scruggs, the putative subclass of similarly-situated individuals, and the organizational plaintiff Lucy Parsons Labs and its members in violation of the Fourteenth Amendment.

**ANSWER:** The City denies the allegations contained in Paragraph 430.

431. As a direct and proximate result of the City's acts and omissions, the Fourteenth Amendment rights of the Plaintiffs, members of the putative subclass, and members of the Plaintiff Organization have been violated.

**ANSWER:** The City denies the allegations contained in Paragraph 431.

432. Unless restrained by order of this Court, a real and immediate threat exists that CPD officers will violate the Fourteenth Amendment rights of the Plaintiffs, members of the putative subclass, and members of the Plaintiff Organization in the future. Plaintiffs seek injunctive and declaratory relief against the City to prevent the continued violation of its constitutional rights and to prevent the continued use of ShotSpotter in the 12 predominantly Black and Latinx districts where it is currently active.

**ANSWER:** The City admits that Plaintiffs seek injunctive and declaratory relief. The City denies that Plaintiffs are entitled to any relief and further denies the remaining allegations contained in Paragraph 432.

## COUNT III – 740 ILCS 23/5(a)(2)
## Violation of the Illinois Civil Rights Act of 2003 (ICRA)
### (On Behalf of Lucy Parsons Labs and its members, as well as Plaintiffs Ortiz and Scruggs and the subclass of similarly-situated people against the City of Chicago)

433. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    The City realleges and incorporates by reference its answers to all paragraphs above as though fully set forth herein.

434.    Count III is alleged against the City of Chicago.

**ANSWER:**    The City admits that this Count is brought against the City, but the City denies all unlawful acts alleged herein.

435.    The Illinois Civil Rights Act ("ICRA") prohibits any state, county, or local government in Illinois from utilizing criteria or methods of administration that "have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2)

**ANSWER:**    The allegations contained in Paragraph 435 constitute legal conclusions to which no answer is required.

436.    The City has deliberately chosen to deploy ShotSpotter only in the 12 police districts that have the highest proportion of Black and Latinx residents in the city.

**ANSWER:**    The City denies the allegations contained in Paragraph 436.

437.    The criteria and methods the City has used in determining where to deploy ShotSpotter has resulted in a disparate impact on Black and Latinx residents.

**ANSWER:**    The City denies the allegations contained in Paragraph 437.

438.    The City's disparate deployment of ShotSpotter directly produces disparate harm. Black and Latinx residents are subject to increased ShotSpotter-prompted police encounters, investigatory stops, pretextual arrests, uses of force, and other harmful policing tactics. The presence of ShotSpotter and a history of ShotSpotter alerts changes the way police respond to residents in ways that directly harm Black and Latinx residents. The City's use of ShotSpotter skews the allocation of municipal resources and slows response to 9-1-1 calls in districts with primarily Black and Latinx residents.

**ANSWER:**    The City denies the allegations contained in Paragraph 438.

439.    The City's discriminatory law enforcement practices with respect to ShotSpotter's deployment and use constitute criteria and methods of administration that create a disparate impact on Black and Latinx people, violating the ICRA rights of Plaintiffs Ortiz and Scruggs, members of the putative subclass, and Plaintiff Lucy Parsons Labs and its members.

**ANSWER:**    The City denies the allegations contained in Paragraph 439.


**PLAINTIFF ORTIZ'S INDIVIDUAL CLAIMS**

**COUNT IV – 42 U.S.C. § 1983**
**Violation of the Fourth and Fourteenth Amendment**
**Unconstitutional *Terry* Stop and Frisk**
**(Plaintiff Ortiz against Ortiz Defendant Officers)**

440.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    The City makes no answer to the allegations contained in Count IV of the Third Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.


441.    Count IV is alleged against the Defendants Powar and Matias.

**ANSWER:**    The City makes no answer to the allegations contained in Count IV of the Third Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.


442.    The actions by Defendants Powar and Matias in stopping, detaining, questioning, and patting down Plaintiff Ortiz without reasonable suspicion violated Plaintiff Ortiz's clearly-established rights under the Fourth and Fourteenth Amendment to be free from unreasonable search and seizure.

**ANSWER:**    The City makes no answer to the allegations contained in Count IV of the Third Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.


443.    The misconduct described in this Count, based on the use of ShotSpotter, was objectively unreasonable.

**ANSWER:**    The City makes no answer to the allegations contained in Count IV of the Third Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

444.    The misconduct described in this Count, based on the use of ShotSpotter, was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

**ANSWER:**    The City makes no answer to the allegations contained in Count IV of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

445.    The actions of Defendant Officers Powar and Matias were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to emotional distress, humiliation, loss of liberty, and an ongoing fear of interactions with police officers.

**ANSWER:**    The City makes no answer to the allegations contained in Count IV of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

### Count V – 42 U.S.C. § 1983
### Failure to Intervene
### (Plaintiff Ortiz against Ortiz Defendant Officers)

446.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    The City makes no answer to the allegations contained in Count V of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

447.    Count V is alleged against the Ortiz Defendant Officers.

**ANSWER:**    The City makes no answer to the allegations contained in Count V of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

448.    In the manner described above, during the unconstitutional *Terry* stop described herein, the Ortiz Defendant Officers, stood by without intervening against the violation of Plaintiff Ortiz's constitutional rights, even though they had a duty and reasonable opportunity to do so.

**ANSWER:**    The City makes no answer to the allegations contained in Count V of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

449.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Ortiz's constitutional rights.

**ANSWER:**    The City makes no answer to the allegations contained in Count V of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.


450.    As a result of the misconduct described in this count, Mr. Ortiz suffered injuries, including emotional distress, humiliation, loss of liberty, and an ongoing fear of interactions with police officers.

**ANSWER:**    The City makes no answer to the allegations contained in Count V of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.


## COUNT VI – 42 U.S.C. § 1983
## Conspiracy to Deprive Plaintiff of His Constitutional Rights
### (Plaintiff Ortiz against Ortiz Defendant Officers)

451.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    The City makes no answer to the allegations contained in Count VI of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.


452.    Count VI is alleged against the Ortiz Defendant Officers.

**ANSWER:**    The City makes no answer to the allegations contained in Count VI of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.


453.    Ortiz Defendant Officers and acting in concert with one another as well as other officers, known and unknown, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**    The City makes no answer to the allegations contained in Count VI of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

454.     The Ortiz Defendant Officers took concrete steps to enter into an agreement to unlawfully subject Plaintiff Ortiz to a *Terry* stop, knowing they lacked proper cause to do so, and for the purpose of violating Plaintiff's Fourth and Fourteenth Amendment rights.

**ANSWER:**     The City makes no answer to the allegations contained in Count VI of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

455.     In furtherance of this conspiracy, each of the Ortiz Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by effecting the Plaintiff's *Terry* stop without reasonable suspicion to investigate him in connection with a supposed shooting and then finding an unrelated basis to arrest Plaintiff Ortiz and seize his vehicle as a pretext to continue searching the vehicle for evidence of a supposed gun or gunshot.

**ANSWER:**     The City makes no answer to the allegations contained in Count VI of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

456.     Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

**ANSWER:**     The City makes no answer to the allegations contained in Count VI of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

457.     As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered emotional distress, humiliation, loss of liberty, and an ongoing fear of interactions with police officers.

**ANSWER:**     The City makes no answer to the allegations contained in Count VI of the Third

Amended Complaint because said Count is only directed against the Ortiz Defendant Officers.

### PLAINTIFF SCRUGGS' INDIVIDUAL CLAIMS

### COUNT VII – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Unconstitutional *Terry* Stop and Frisk
### (Plaintiff Scruggs against Scruggs Defendant Officers)

458.     Each paragraph of this Complaint is incorporated as if restated fully herein.

112

**ANSWER:** The City makes no answer to the allegations contained in Count VII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

459.    Count VII is alleged against the Scruggs Defendant Officers.

**ANSWER:** The City makes no answer to the allegations contained in Count VII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

460.    In the manner described more fully above, the actions of the Scruggs Defendants Officers in stopping, detaining, questioning, and searching Plaintiff Scruggs on July 18, 2022 and July 19, 2022 without reasonable suspicion violated Plaintiff Scruggs' clearly-established rights under the Fourth and Fourteenth Amendment to be free from unreasonable search and seizure.

**ANSWER:** The City makes no answer to the allegations contained in Count VII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

461.    The misconduct described in this Count, based on the use of ShotSpotter, was objectively unreasonable.

**ANSWER:** The City makes no answer to the allegations contained in Count VII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

462.    This misconduct described in this Count, based on the use of ShotSpotter, was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

**ANSWER:** The City makes no answer to the allegations contained in Count VII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

463.    The actions of the Scruggs Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to loss of liberty, mental distress, degradation, humiliation, loss of liberty, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**ANSWER:** The City makes no answer to the allegations contained in Count VII of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

### COUNT VIII – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Unreasonable Seizure and Search
### (Plaintiff Scruggs against Scruggs Defendant Officers)

464. Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:** The City makes no answer to the allegations contained in Count VIII of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

465. Count VIII is alleged against the Scruggs Defendant officers.

**ANSWER:** The City makes no answer to the allegations contained in Count VIII of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

466. In the manner more fully described above, the actions by the Scruggs Defendant Officers on July 18, 2022 in detaining, searching, seizing, and arresting Plaintiff Scruggs pursuant to a ShotSpotter alert was without probable cause. The Scruggs Defendant Officers' seizure of Mr. Scruggs on July 18, 2022, including through the prolonged use of handcuffs, confinement to the back of a police car, and the imposition of other restraints, constituted an arrest and was effectuated without probable cause. This violated Plaintiff Scruggs' Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure.

**ANSWER:** The City makes no answer to the allegations contained in Count VIII of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

467. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

**ANSWER:** The City makes no answer to the allegations contained in Count VIII of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

468.    The actions of the Scruggs Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth and Fourteenth Amendment right to be free from unreasonable search and seizure. Their actions were the direct and proximate cause of Plaintiff's loss of liberty, as well as loss of liberty, mental distress, degradation, humiliation, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**ANSWER:**    The City makes no answer to the allegations contained in Count VIII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

### Count IX – 42 U.S.C. § 1983
### Failure to Intervene
### (Plaintiff Scruggs against Scruggs Defendant Officers)

469.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    The City makes no answer to the allegations contained in Count IX of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

470.    Count IX is alleged against the Scruggs Defendant Officers.

**ANSWER:**    The City makes no answer to the allegations contained in Count IX of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

471.    In the manner described above, during the constitutional violations described herein, the Scruggs Defendant Officers, stood by without intervening against the violation of Plaintiff Scruggs' constitutional rights, even though they had a duty and reasonable opportunity to do so.

**ANSWER:**    The City makes no answer to the allegations contained in Count IX of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

472.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Scruggs' constitutional rights.

**ANSWER:**    The City makes no answer to the allegations contained in Count IX of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

473.     As a result of the misconduct described in this count, Mr. Scruggs suffered injuries, including but not limited to loss of liberty, mental distress, degradation, humiliation, loss of liberty, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**ANSWER:**     The City makes no answer to the allegations contained in Count IX of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.


## COUNT X – 42 U.S.C. § 1983
## Conspiracy to Deprive Plaintiff of His Constitutional Rights
## (Plaintiff Scruggs against Scruggs Defendant Officers)

474.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**     The City makes no answer to the allegations contained in Count X of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.


475.     Count X is alleged against the Scruggs Defendant Officers.

**ANSWER:**     The City makes no answer to the allegations contained in Count X of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.


476.     Scruggs Defendant Officers and acting in concert with one another as well as other officers, known and unknown, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**     The City makes no answer to the allegations contained in Count X of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.


477.     The Scruggs Defendant Officers took concrete steps to enter into an agreement to unlawfully search and seize Plaintiff Scruggs, knowing they lacked reasonable suspicion or probable cause to do so, and for the purpose of violating Plaintiff's Fourth and Fourteenth Amendment rights.

**ANSWER:**     The City makes no answer to the allegations contained in Count X of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

478.     In furtherance of this conspiracy, each of the Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by effecting the Plaintiff's search and seizure without reasonable suspicion or probable cause.

**ANSWER:**     The City makes no answer to the allegations contained in Count X of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

479.     Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

**ANSWER:**     The City makes no answer to the allegations contained in Count X of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

480.     As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered loss of liberty, mental distress, degradation, humiliation, loss of liberty, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**ANSWER:**     The City makes no answer to the allegations contained in Count X of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

## COUNT XI – State Law Claim
### False Arrest and False Imprisonment
### (Plaintiff Scruggs against Scruggs Defendant Officers)

481.     Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**     The City makes no answer to the allegations contained in Count XI of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

482.     Count XI is alleged against the Scruggs Defendant Officers.

**ANSWER:**     The City makes no answer to the allegations contained in Count XI of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

483. In the manner described more fully above, the Scruggs Defendants Officers restrained or arrested Plaintiff Scruggs outside the AutoZone parking lot on July 18 and July 19, 2022, and did so without reasonable grounds to believe that Plaintiff Scruggs had committed an offense, up until the moment during Plaintiff Scruggs' seizure on July 19, 2022, when the Scruggs Defendant Officers developed reasonable grounds to believe that Plaintiff Scruggs may have committed a misdemeanor violation of 225 ILCS 447/45-50-A-1, which concerns employment licenses for security guards.

**ANSWER:** The City makes no answer to the allegations contained in Count XI of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

484. The misconduct described in this Count was objectively unreasonable and undertaken intentionally with malice, willfulness, and deliberate indifference to Plaintiff Scruggs' rights.

**ANSWER:** The City makes no answer to the allegations contained in Count XI of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

485. The Scruggs Defendant Officers' conduct was willful and wanton.

**ANSWER:** The City makes no answer to the allegations contained in Count XI of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

486. The Scruggs Defendant Officers' actions were taken under color of law and within the scope of their employment.

**ANSWER:** The City makes no answer to the allegations contained in Count XI of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

487. As a direct and proximate result of the Scruggs Defendant officers' misconduct described in this Count, Plaintiff suffered loss of liberty, as well as loss of liberty, mental distress, degradation, humiliation, and ongoing fear, anxiety, nervousness, helplessness, and stress.

**ANSWER:** The City makes no answer to the allegations contained in Count XI of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

**COUNT XII – State Law Claim**
**Civil Conspiracy**
**(Plaintiff Scruggs against Scruggs Defendant Officers)**

488.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    The City makes no answer to the allegations contained in Count XII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

489.    Count XII is alleged against the Scruggs Defendant Officers.

**ANSWER:**    The City makes no answer to the allegations contained in Count XII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

490.    The individual Scruggs Defendant Officers, acting in concert with other known and
unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by
unlawful means.

**ANSWER:**    The City makes no answer to the allegations contained in Count XII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

491.    Each of the Scruggs Defendant Officers took concrete steps to enter into an
agreement to unlawfully use force on, detain, search, and arrest Plaintiff Scruggs, for the purpose
of violating Plaintiff Scruggs' rights and knowing they lacked probable cause or reasonable
suspicion to do so, up until the moment during Mr. Scruggs' seizure on July 19, 2022, when the
Scruggs Defendant Officers developed probable cause of an alleged violation of 225 ILCS 447/45-
50-A-1.

**ANSWER:**    The City makes no answer to the allegations contained in Count XII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

492.    The Scruggs Defendant Officers committed unlawful overt acts and were otherwise
willful participants in joint activity in furtherance of this conspiracy.

**ANSWER:**    The City makes no answer to the allegations contained in Count XII of the Third

Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

493.    The Scruggs Defendant Officers acted with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**    The City makes no answer to the allegations contained in Count XII of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

494.    Each Scruggs Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

**ANSWER:**    The City makes no answer to the allegations contained in Count XII of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

495.    As a direct and proximate result of the Defendants' conspiracy, Plaintiffs suffered damages, including emotional distress, as a proximate result of the individual Defendants' misconduct and conspiracy to engage in misconduct.

**ANSWER:**    The City makes no answer to the allegations contained in Count XII of the Third Amended Complaint because said Count is only directed against the Scruggs Defendant Officers.

### COUNT XIII – State Law Claim
### Respondeat Superior
### (Plaintiff Scruggs against City of Chicago)

496.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**    The City realleges and incorporates by reference its answers to all paragraphs above as though fully set forth herein.

497.    Count XIII is alleged against the City of Chicago.

**ANSWER:**    The City admits that this Count is brought against the City, but the City denies all unlawful acts alleged herein.

498.    In committing the acts alleged in this Complaint, each of the Scruggs Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment.

**ANSWER:**     The City admits that, at all relevant times, the Scruggs Defendant Officers were members of the CPD and acting within the scope of their employment. The City denies that the Scruggs Defendant Officers committed any of the unlawful acts alleged herein.

499.     Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

**ANSWER:**     The allegations contained in Paragraph 499 constitute legal conclusions to which no answer is required. To the extent an answer may be required, the City admits that it may be liable, in some circumstances, for certain actions committed by its agents, subject to various defenses and exceptions under the applicable laws. The City denies that the Scruggs Defendant Officers committed any of the unlawful acts alleged herein and further deny that Plaintiff Scruggs is entitled to any relief.

## PLAINTIFF ORTIZ'S AND SCRUGGS' INDIVIDUAL CLAIMS

### COUNT XIV – Indemnification
### (Plaintiffs Ortiz and Scruggs against City of Chicago)

500.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER:**     The City realleges and incorporates by reference its answers to all paragraphs above as though fully set forth herein.

501.     Count XIV is alleged against the City of Chicago.

**ANSWER:**     The City admits that this Count is brought against the City, but the City denies all unlawful acts alleged herein.

502.     In Illinois, pursuant to 745 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:**    The City admits that Illinois Compiled Statute, Article IX – Payment of Claims and

Judgment, 745 ILCS 10/9-102, states:

> A local public entity is empowered and directed to pay any tort
> judgment or settlement for compensatory damages (and may pay
> any associated attorney's fees and costs) for which it or an employee
> while acting within the scope of his employment is liable in the
> manner provided in this Article. All other provisions of this Article,
> including but not limited to the payment of judgments and
> settlements in installments, the issuance of bonds, the maintenance
> of rates and charges, and the levy of taxes shall be equally applicable
> to judgments or settlements relating to both a local public entity or
> an employee and those undertakings assumed by a local public
> entity in intergovernmental joint self-insurance contracts. A local
> public entity may make payments to settle or compromise a claim
> or action which has been or might be filed or instituted against it
> when the governing body or person vested by law or ordinance with
> authority to make over-all policy decisions for such entity considers
> it advisable to enter into such a settlement or compromise.

503.    Each of the individual Ortiz, and Scruggs Defendant Officers acted within the scope
of their employment in committing the misconduct described herein. Therefore, Defendant City of
Chicago is liable as their employer for any resulting damages or award of attorney's fees.

**ANSWER:**    The City admits that, at all relevant times, the Ortiz Defendant Officers and Scruggs

Defendant Officers were members of the CPD and acting within the scope of their employment.

The City denies that the Ortiz Defendant Officers and Scruggs Defendant Officers committed any

of the unlawful acts alleged herein and further deny that Plaintiffs are entitled to any relief.

## AFFIRMATIVE DEFENSES

The City states the following affirmative defenses to Plaintiffs' Third Amended Complaint:

1.    **Lack of Standing** — Plaintiff Lucy Parsons Labs lacks standing to be a plaintiff in

this case for the reasons set forth in the City's Rule 12(b)(1) Motion to Dismiss (Dkt. 39), which

the City incorporates herein by reference.

2. **Laches** – Plaintiffs purport to base their claims in part on actions allegedly taken by the City years, or even decades, before filing the Complaint. Plaintiffs were aware, years or even decades ago, of studies and articles which it refers to in support of their claims. Accordingly, to the extent Plaintiffs seek to impose liability in whole or in part based on actions going back many years, their claims are barred by the equitable doctrine of laches.

3. **Statute of Limitations** — To the extent any Plaintiff asserts claims beyond the applicable statutes of limitations, that Plaintiff's claims are time-barred.

4. **Operational Justification / Necessity** — The criteria or methods in which the CPD deploys ShotSpotter are justified by operational necessity. In order to assert a prima facie case for a disparate impact claim, a plaintiff "that relies on a statistical disparity" must allege facts that offer "statistical evidence demonstrating a causal connection." *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542-43 (2015). Once that threshold is met, the burden shifts to the defendant to identify a public interest justifying the challenged policy or practice. *See id.* at 533. Before rejecting such a justification, "a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'" *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)). The CPD's policing policies and practices, deployment practices, and technologies, including the ShotSpotter acoustic gunshot detection system, serve the CPD's legitimate interests in public safety. Given the complex challenges to policing in the City of Chicago, the locations with highest criminal activity, the requirement to engage in proactive policing and many other contextual variables among the City's police districts, neighborhoods, and communities, the CPD's policing policies and practices, deployment practices, and uses of technology, including the

ShotSpotter acoustic gunshot detection system, are justified. There are no viable alternatives to achieve the CPD's public safety goals and objectives in a less discriminatory way.

5.    **No Punitive Damages Against the City** — Under applicable law, the City cannot be required to indemnify an employee for punitive damages, nor may it pay a judgment for punitive damages. 745 ILCS 10/2-102; *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

6.    **No Fee Shifting for State Law Claims** — Plaintiffs are not entitled to attorneys' fees for their state law claims. *See Kerns v. Engelke*, 76 Ill. 2d 154, 166 (1979).

## PRAYER FOR RELIEF

Defendant City of Chicago prays that this Court enter judgment in its favor and against Plaintiffs in all respects, award its attorneys' fees and costs, to the extent allowed by law, and provide such other and further relief that this Court deems just and appropriate.

## JURY DEMAND

The City respectfully requests a trial by jury.

Dated:  May 17, 2024

Respectfully submitted,

**CITY OF CHICAGO**

By:   /s/ *Michael P. Sheehan*
_____
One of Its Attorneys

Michael P. Sheehan (msheehan@taftlaw.com)
Allan T. Slagel (aslagel@taftlaw.com)
Barton J. O'Brien (bobrien@taftlaw.com)
Ioana M. Guset (iguset@taftlaw.com)
Yeoeun C. Yoon (yyoon@taftlaw.com)
T. Hudson Cross IV (hcross@taftlaw.com)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone:      (312) 527-4000
Facsimile:      (312) 527-4011